Stephen E. Hessler, P.C.
Mark McKane, P.C. (*pro hace vice* pending)
Patrick Venter
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Chad J. Husnick, P.C.
Benjamin M. Rhode (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FRONTIER COMMUNICATIONS | ) | Case No. 20-22476 (RDD) |
| CORPORATION, *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF CARLIN ADRIANOPOLI,**
**EXECUTIVE VICE PRESIDENT OF STRATEGIC PLANNING,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Carlin Adrianopoli, hereby declare under penalty of perjury, that:

1.      I am the Executive Vice President of Strategic Planning of Frontier

Communications Corporation ("Frontier").  Frontier is a publicly traded company organized under

the laws of Delaware and a debtor and debtor in possession in the above-captioned cases along

with 103 of its direct and indirect subsidiaries as debtors and debtors in possession (collectively,

---

[1]      The last four digits of Debtor Frontier Communications Corporation's tax identification number are 9596.  Due
to the large number of debtor entities in these chapter 11 cases, for which the Debtors have requested joint
administration, a complete list of the debtor entities and the last four digits of their federal tax identification
numbers are not provided herein.  A complete list of such information may be obtained on the website of the
Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/ftr.  The location of the Debtors'
service address for purposes of these chapter 11 cases is:  50 Main Street, Suite 1000, White Plains, New York
10606.

the "Debtors" or the "Company").  Prior to my role with Frontier, I advised the Debtors in my capacity as a Senior Managing Director of FTI Consulting, Inc. ("FTI").

2.      Since June 2019, FTI has served as restructuring advisor to the Debtors.  FTI's professionals work closely with clients on a daily basis to identify complex business challenges and develop strategies to overcome these challenges in a diverse number of industries and business areas, including restructuring. FTI's vast network of professionals, which includes, but is not limited to, certified insolvency and restructuring advisors, certified public accountants, former executive officers, and certified turnaround professionals, enables FTI to guide clients through a wide variety of complex business challenges.

3.      I lead the Midwest region for FTI's Corporate Finance and Restructuring segment. I have more than 20 years of experience serving as a financial advisor and providing interim management and performance improvement services to corporations, various creditor classes, equity owners, and directors of distressed companies.  I have provided restructuring services on large and high-profile matters in chapter 11 proceedings and out-of-court workouts.  Recently, I served as interim chief financial officer of Outcome Health.  Prior to that, I served as a financial advisor to Peabody Energy Corporation during its chapter 11 cases.  I also served as interim CFO of RadioShack Corporation and as chief restructuring officer at Tactical Holding Operations Inc. during their respective chapter 11 cases.

4.      I hold a Master of Business Administration with an emphasis in corporate finance from the University of Notre Dame and a B.S.B.A. in accountancy from John Carroll University.  I am a Certified Insolvency and Restructuring Advisor, a Certified Turnaround Professional, and a Certified Public Accountant.

5. I submit this declaration (this "<u>Declaration</u>") to assist the Court and parties-in-interest in understanding the circumstances that led to the chapter 11 cases and in support of the Debtors' chapter 11 petitions and the first day motions (the "<u>First Day Motions</u>"). The facts supporting each First Day Motion are detailed in **<u>Exhibit A</u>**.

6. I am familiar with the Debtors' day-to-day operations, businesses and financial affairs, and books and records.

7. I am above 18 years of age and am competent to testify. The statements set forth in this Declaration are based upon: my personal knowledge; my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives; information obtained from other members of the Debtors' management team and third-party advisors; and my experience as a restructuring professional. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## <u>Introduction and Overview</u>

### A. **Preliminary Statement.**

8. Frontier is a national provider of telecommunications services in 29 states and the country's fourth largest incumbent local exchange carrier ("<u>ILEC</u>"). In recent years, operational challenges related to integrating recent acquisitions, shifting consumer preferences, highly competitive industry dynamics, and certain other business challenges, have caused Frontier's capital structure to become overleveraged. After months of extensive analysis, Frontier recognized that debt-oriented liability management transactions alone would not sufficiently improve its capital structure and that executing one or more liability management transaction(s) would at best delay maturities without comprehensively addressing the challenges inherent in its capital structure. Accordingly, in October 2019, Frontier embarked on a proactive engagement with an

ad hoc creditor group holding a substantial portion of Frontier's senior unsecured notes (such creditors, the "Consenting Noteholders"). After months of hard-fought negotiations, Frontier commenced these chapter 11 cases on April 14, 2020 (the "Petition Date") with key creditor support from over seventy-five percent of Consenting Noteholders for a comprehensive transaction, as contemplated in the agreement between the Debtors and the Consenting Noteholders (the "Restructuring Support Agreement"), attached as **Exhibit B** along with the term sheet attached thereto as Exhibit B. The Debtors intend to file a plan of reorganization in order to effectuate this balance sheet restructuring within the first thirty days of these chapter 11 cases pursuant to the Restructuring Support Agreement. The Debtors have secured $460 million in debtor-in-possession financing which, combined with the Company's more than $700 million cash on hand, totals over $1.1 billion in liquidity. The Debtors' proposed restructuring, if successfully implemented, would result in a substantial deleveraging of the Debtors' balance sheet by over $10 billion and contemplates the following key terms:

- holders of general unsecured claims will be paid in full, reinstated, or otherwise unimpaired;

- holders of secured debt will be repaid during these chapter 11 cases, paid in full on the effective date of a plan of reorganization (the "Effective Date"), or reinstated;

- holders of Senior Notes (later defined) will receive their pro rata share of 100 percent of the common stock (subject to dilution) of the reorganized Debtors ("Reorganized Frontier"), $750 million of takeback debt (subject to downward adjustment) on either a third lien or a to-be-agreed-upon basis depending on treatment of the second lien notes under a plan, and unrestricted cash of Reorganized Frontier in excess of $150 million as of the Effective Date;

- a post-emergence management incentive plan representing six percent of the total equity value of Reorganized Frontier;

- holders of certain secured and unsecured notes held by the Debtors' subsidiaries will be reinstated or paid in full on the Effective Date; and

- Consenting Noteholders are entitled to designate two observers to the Company's Board of Directors (the "Board") (one from each of the Noteholder Groups, as defined below),

who will be entitled to participate in Board and Finance Committee (as defined below) discussions and deliberations, while the Restructuring Support Agreement is effective.

9.      The Debtors also enter these chapter 11 cases amid the COVID-19 pandemic.  As the COVID-19 pandemic develops, governments, corporations and other authorities may continue to implement restrictions or policies that adversely impact consumer spending, business spending, the economy, and the Debtors' businesses.  Specific government initiatives, such as the *Coronavirus Aid, Relief, and Economic Security Act* ("CARES Act"), provide potential relief for the Debtors' customers and businesses.

10.     Relatedly, Frontier understands the importance of its network services during these times, and the Company remains committed to keeping customers connected, safe and informed. On March 13, in response to the COVID-19 pandemic, over 550 providers of critical communications services, including Frontier, took the Federal Communications Commission's (the "FCC") Keep Americans Connected pledge, pursuant to which providers agreed for the following 60 days: (a) not to terminate service to any residential or small business customers because of their inability to pay their bills due to the disruptions caused by the coronavirus pandemic; (b) to waive any late fees that any residential or small business customers incur because of their economic circumstances related to the coronavirus pandemic; and (c) to open their Wi-Fi hotspots to any American in need.  Many states in which the Company operates have issued executive orders prohibiting the disconnection of services for customers for the length of the state of emergency.  Given the unprecedented and evolving nature of the pandemic and the swift-moving response from multiple levels of government, the impact of these changes and other potential changes on the Company are uncertain at this time.

B.      **Background to the Restructuring.**

11.     Through a series of three acquisitions between 2010 and 2016 (each, a "Growth Transaction" and together, the "Growth Transactions"), the Company transformed from a provider of telephone and DSL internet services in mainly rural areas to a large, national telecommunications provider in rural, urban, and suburban markets across 29 states, with a 2019 revenue of approximately $8.1 billion.  The Company anticipated that, once fully implemented, the Growth Transactions would yield efficiencies in the form of annual operating expense savings from the consolidation of various administrative functions, and lower prices on capital expenditures.[2]  The most recent Growth Transaction was the Company's 2016 acquisition of Verizon Communications, Inc.'s ("Verizon") landline voice, broadband, and video operations in California, Texas, and Florida, with a purchase price of $10.54 billion (the "CTF Transaction"). The CTF Transaction provided an opportunity for the Company, which had historically operated largely in rural areas of the United States, to expand its service territory to residential, commercial, and wholesale customers in more urban, albeit more competitive markets, with a fiber-centric network in those states.

12.     Serving the new territories proved more difficult and expensive than the Company anticipated, and integration issues made it more difficult to retain customers. Simultaneously, the Company faced industry headwinds stemming from fierce competition in the telecommunications sector, shifting consumer preferences, and accelerating bandwidth and performance demands, all redefining what infrastructure telecommunications companies need to compete in the industry.  These conditions have contributed to the unsustainability of the

---

[2]     For a complete discussion on the Growth Transaction, see Part III.A.

Company's outstanding funded debt obligations—which total approximately $17.5 billion as of the Petition Date.

13.    As a result of these macro challenges and integration issues, Frontier has not been able to fully realize the economies of scale expected from the Growth Transactions, as evidenced by a loss of approximately 1.3 million customers, from a high of 5.4 million after the CTF Transaction closed in 2016 to approximately 4.1 million as of January 2020.  Frontier's share price has dropped from $125.70[3] per share in 2015 to $0.37 per share prior to the Petition Date, reflecting a $8.4 billion decrease in market capitalization.

14.    Although substantial funded debt maturities do not come due until 2021 and 2022, in late 2018 the Debtors embarked on a proactive process to evaluate their capital structure, including the evaluation and potential implementation of one or more comprehensive transactions to deleverage outstanding debt and extend maturities.  Such transactions were contemplated with the goal of extending the duration of impending maturities and comprehensively deleveraging of the Debtors' capital structure.

15.    In December 2018, the Company added Robert A. Schriesheim to the Board. Mr. Schriesheim was appointed chair of a newly formed five-person committee tasked with evaluating various strategic restructuring alternatives, developing a granular business plan, and identifying other transaction-related workstreams (the "Finance Committee").  Beginning in December 2018, the Finance Committee worked with the Debtors' management team and Kirkland & Ellis LLP ("Kirkland") as restructuring counsel, along with the Debtors' investment

---

[3]    Actual stock price at the peak market cap on February 25, 2015 was $8.38 per share. This price has been retroactively adjusted to reflect the Company's 1-for-15 stock split in June 2017, so it is shown here as $8.38 times 15, or $125.70.

banker, Evercore Group L.L.C. ("Evercore"), to review available alternatives to address the Company's capital structure.

16.     Since its formation, the Finance Committee has engaged with the Debtors' professionals and consultants to evaluate restructuring alternatives, analyzed the Company's business plan, and considered various strategies for optimizing enterprise value.  To bolster these efforts with telecommunications industry-specific experience, the Debtors engaged CMA Strategy Consulting ("CMA,") in March 2019 and FTI in June 2019 (together with Kirkland and Evercore, collectively, the "Advisors") to aid in developing a granular business plan.  The Debtors and their Advisors reviewed, among other things, pressures on the businesses creating continued deterioration in revenue, challenges in achieving improvements in revenue and customer trends, the reduced viability of the long-term sustainability of the Debtors' capital structure, and general headwinds prevalent in the telecommunications industry.

17.     Additionally, the Finance Committee, as an extension of the Debtors' Board, has strategically navigated the Debtors through an analysis of proactive options to solve for the Debtors' upcoming 2021 and 2022 maturities and mounting pressure from various constituents, some of whom initially favored an out-of-court deleveraging transaction while others supported a comprehensive in-court reorganization.  Simultaneously with the Finance Committee's strategic review of the various restructuring alternatives, and with the objective of maximizing optionality, the Debtors executed three significant out-of-court transactions:

- **March 2019:**  The Company issued $1.65 billion of 8.00% first lien secured notes due 2027 to repay all outstanding indebtedness under its senior secured term loan A facility (previously scheduled to mature in March 2021) and its credit agreement with CoBank, ACB (previously scheduled to mature in October 2021) (the "First Lien Issuance").

- **March and April 2019**: The Company entered into amendments to the JPM Credit Agreement (as defined herein) to, among other things (a) extend the maturity date of $850 million of the revolving loans and commitments thereunder from February 27,

2022 to February 27, 2024 (subject to springing maturity to any tranche of existing debt with an aggregate outstanding principal amount in excess of $500 million), and (b) increase the interest rate applicable to such revolving loans by 0.25%.

- **May 2019:** The Company entered into a definitive agreement to sell its northwest operations and associated assets in Washington, Oregon, Idaho, and Montana for $1.352 billion in cash, subject to certain closing adjustments, a favorable market price that will significantly enhance liquidity upon closing (the "Pacific Northwest Transaction"). The sale is expected to close on April 30, 2020, subject to customary closing conditions.

18.     The Debtors used the additional liquidity from the debt transactions and optionality associated with these transactions to prolong their strategic review of their capital structure.

### Frontier's Funded Debt Maturities Schedule
### (as of Petition Date)



Note: Balances as of 3/31/20.   ■ Unsecured Debt   ■ Secured Debt   ■ Drawn Revolver Balance   ■ Letters of Credit under Revolver

19.     To further the Debtors' strategic review of its capital structure, in June 2019, Frontier added three new directors—Kevin L. Beebe, Paul M. Keglevic, and Mohsin Y. Meghji—to the Board and Finance Committee, who collectively brought substantial telecommunications experience and strategic restructuring and turnaround expertise to the Board. The Debtors continued to evaluate various liability management options to address future maturity walls and the need for capital, including additional asset sales and an "uptier" debt-for-debt exchange,

amongst other alternatives with various degrees of legal risk and execution difficulty. Though each of these transactions would provide the Debtors with near-term liquidity, each presented implementation issues and ultimately would not achieve the Debtors' goal of a comprehensive deleveraging.

20.    For example, substantial asset sales would likely be restricted under the secured debt documents, as well as face potential regulatory approvals associated with the FCC and state-level public utility commissions (each a "PUC"). The Debtors also thoroughly evaluated multiple approaches to an "uptier" debt-for-debt exchange that would extend their liquidity runway beyond 2022. However, initial results of the Debtors' business plan projections suggested that these proposed transactions would not provide sufficient deleveraging. Even if maturities were extended, without a massive infusion of capital, there was not a clear path for the Debtors to materially grow the business to achieve a natural deleveraging. Further implementation risks were identified, as an "uptier" debt-for-debt exchange involving certain Senior Notes could be challenged by other series of Senior Notes and lead to potential protracted litigation.

21.    In summer 2019, the Debtors identified several investment opportunities to expand their fiber network to increase competitiveness and market share. Fiber provides faster broadband network services to customers than copper cables. The Debtors recognized a number of opportunities to invest in fiber network within its existing copper broadband markets, rural lower speed markets, and adjacent expansion markets. However, the Debtors' capital structure constrained their ability to execute such initiatives. The Debtors' inability to access cash to fund these growth opportunities also hindered their capacity to use such opportunities to stabilize revenue and adjusted EBITDA. Furthermore, the Debtors were unable to pursue accretive mergers

and acquisitions and other strategic transactions because of the limitations imposed by the Debtors'
funded debt liability overhang.

22.     Consequently, in September 2019, after approximately nine months of robust
analysis and discussion, it became apparent that a debt-oriented liability management transaction
alone was unlikely to achieve sufficient deleveraging to allow the Debtors to re-access the capital
markets, rightsize its capital structure, and/or adequately reinvest in the business to sustain or grow
business performance.  Put another way, the Debtors could not grow into their existing capital
structure and, therefore, needed a more comprehensive restructuring of their balance sheet.  As a
result, the Debtors pivoted to discussions regarding a comprehensive restructuring transaction and
began engaging with the representatives of certain holders of the $10.95 billion outstanding
aggregate principal amount of the unsecured senior notes and debentures issued by Frontier
Communications Corporation (the "Senior Notes").

23.     In the fall of 2019, the Debtors began to engage formally with certain ad hoc groups
comprised of holders of the Senior Notes.  In initial discussions, one group of principals and
advisors holding Senior Notes was represented by Akin Gump Strauss Hauer & Feld LLP ("Akin")
(as counsel) and Ducera Partners LLC ("Ducera") (as financial advisor), (the "CTF Notes Group"),
and the second group was represented by Milbank LLP ("Milbank") (as counsel) and Houlihan
Lokey Capital Inc. ("Houlihan") (as financial advisor) (the "Legacy Notes Group").[4]  By
October 2, 2019, Akin, Ducera, Milbank and Houlihan had executed non-disclosure agreements
that allowed the Debtors to provide confidential information regarding the Debtors' business with
the intent to facilitate a consensual transaction.  Over the next several weeks, the Debtors

---

[4]     The primary divide between the subgroups is that members of the CTF Notes Group hold Senior Notes with an
approximately $315 million interest payment that was due on March 15, 2020.  The Debtors elected to forgo the
interest payment on the CTF Notes and entered into a grace period permitted under the relevant indentures.

coordinated a series of discussions with these groups' advisors, initially to open dialogue and foster engagement, and eventually maturing into more specific and comprehensive discussions, including "deep dive" business plan discussions.

24.     All the while, the Debtors continued to take responsibility for the health of the overall enterprise.  As the Debtors continued to take action to improve their operational, financial, and strategic position, recognizing that closing a comprehensive restructuring may not be possible in the near-term, the Board decided to evaluate a leadership change.  On December 3, 2019, the Board appointed Mr. Bernard L. Han, who began serving as an advisor to Frontier in October 2019, as Frontier's President and Chief Executive Officer.  Mr. Han has more than 30 years of experience, serving more than 11 years in the communications industry in various senior roles at DISH Network, including as chief financial officer and chief operating officer.

25.     During this time, the Debtors encouraged the CTF Notes Group and Legacy Notes Group to coalesce in order to streamline negotiations regarding a potential transaction.  On December 9, 2019, the CTF Notes Group and Legacy Notes Group—which collectively hold over seventy-five percent of the Senior Notes—formally retained Altman Vilandrie & Co. ("Altman") to serve as consultant to each of their respective groups.  Though the groups indicated that their expected interests were not completely aligned, given their equal priority in the Debtors' capital structure, the Debtors engaged with the CTF Notes Group, the Legacy Notes Group, their respective advisors, and Altman, as one unitary group (the "Noteholder Groups").

26.     On January 15, 2020, certain of the Noteholder Groups' principals signed non-disclosure agreements to facilitate discussions regarding potential transactions to address the Debtors' capital structure and held several meetings to discuss the Debtors' performance, including go-forward business plans.  In February and March of 2020, the Debtors and the Noteholder

Groups exchanged several term sheets and held multiple in-person and telephonic meetings in an attempt to achieve a restructuring transaction. Meanwhile, the Debtors also opened a dialogue with advisors representing other various stakeholders. Specifically, this included an ad hoc group representing certain of the Debtors' secured funded indebtedness, led by Paul, Weiss, Rifkind, Wharton & Garrison LLP (as counsel) and PJT Partners LP (as financial advisors) to gain consensus across the Debtors' capital structure and ensure consensual post-petition financing.

27.    As the negotiations progressed, the Debtors and the Noteholder Groups honed in on a narrow set of key issues to reach consensus on a term sheet that would serve as the cornerstone of a comprehensive restructuring. The Debtors elected to forgo an interest payment due March 15, 2020, on certain of the Senior Notes and entered into a 60-day grace period in order to continue the negotiation process and evaluate potential economic structures that would be key to building consensus.

28.    During the grace period, the COVID-19 pandemic created a public health and economic crisis in the United States. Because of the resulting market disruption, it became clear to the Debtors' management team that ongoing business risks could pose potential liquidity challenges that were previously unforeseen, and would likely cause the Debtors to miss their business forecasts. Though the Debtors continued to engage with the Noteholder Groups to maximize consensus, as the COVID-19 pandemic unfolded, it became apparent that preserving cash on hand was vital for the Debtors given indefinite potential liquidity challenges and market uncertainty. The parties came to an impasse on certain final points and were unable to settle upon a consensual term sheet across the Noteholder Groups. On March 27, 2020, after being unable to reach an agreement during initial negotiations with the Noteholder Groups, the parties publicly

cleansed[5] their term sheets, but continued to engage through their respective advisors.  The Debtors and the Consenting Noteholders continued to engage through their respective advisors to close out final key points.

29.     On April 14, 2020, after extensive, arm's-length negotiations that played out over several months, the Debtors executed the Restructuring Support Agreement with the Consenting Noteholders, which will put the Debtors on a path toward maximizing stakeholder recoveries, allowing operational continuity, and ensuring a viable enterprise upon emergence.

**C.     The Proposed Restructuring.**

30.     After a series of proposals and counter-proposals, the Debtors and the Noteholder Groups made meaningful progress on the terms of a comprehensive restructuring, pursuant to the contemplated restructuring terms set out in the Restructuring Support Agreement.  As a result of proactive, extensive negotiations with the Noteholder Groups, the Debtors begin these cases with a Restructuring Support Agreement in-hand that contemplates a value-maximizing restructuring transaction, which has the support of holders of more than seventy-five percent of the Senior Notes. The Debtors filed these chapter 11 cases to implement their restructuring pursuant to the terms of a plan contemplated by the Restructuring Support Agreement, thereby bolstering their long-term growth prospects and providing opportunities to expand their businesses.  The Restructuring Support Agreement, which represents the successful culmination of months of restructuring efforts and numerous compromises and concessions by the Consenting Noteholders, gives the Debtors the best opportunity to maximize value for the benefit of all of their stakeholders.  The following graphic compares the Debtors' current capital structure with the proposed post-emergence capital structure contemplated by the Restructuring Support Agreement.

---

[5]     *See* Frontier Communications Corporation, Regulation F-D Disclosure (Form 8-K) (Mar 27, 2020).

**Debtors' Pro Forma Capital Structure**

| ($ in millions) | | | New Debt Received[1] | | | | Pro Forma Equity |
|---|---|---|---|---|---|---|---|
| | Claim[1] | Cash Distributed | 1L Debt | 2L Debt | Subsidiary Debt | Senior Notes | Ownership[4] |
| Revolver | $749 | $749 | $ - | $ - | $ - | $ - | 0% |
| Term Loan B | 1,695 | - | 1,695 | - | - | - | 0% |
| 1L Notes and Other[2] | 1,664 | - | 1,664 | - | - | - | 0% |
| 2L Debt | 1,600 | - | - | 1,600 | - | - | 0% |
| Subsidiary Debt[3] | 856 | - | - | - | 856 | - | 0% |
| Senior Notes | 10,949 | TBD[5] | - | - | - | 750[6] | 100% |
| Equity | NA | - | - | - | - | - | 0% |
| **Total** | **$17,513** | **$749** | **$3,359** | **$1,600** | **$856** | **$750** | **100%** |

*Creditor Class* (vertical label at left of table)

1. For illustrative purposes, reflects principal balance excluding accrued interest and amortization during the bankruptcy
2. Includes $1.65 billion of First Lien Notes and $14 million of Industrial Development Revenue Bonds
3. Includes $750 million of subsidiary Unsecured Notes, $100mm of subsidiary Secured Notes and $6 million of RUS Loan Contracts (secured)
4. Subject to dilution from MIP provided for in term sheet.
5. Senior Notes receive excess cash above $150mm at Effective Date; refer to term sheet for detail attached as <u>Exhibit B</u> to <u>Exhibit B</u> (the Restructuring Support Agreement).
6. Refer to term sheet for detail on terms attached as <u>Exhibit B</u> to <u>Exhibit B</u> for terms of Take-Back debt.

31.     The Restructuring Support Agreement sets the Debtors on a path to file a plan of reorganization in order to effectuate this balance sheet restructuring within the first 30 days of these chapter 11 cases. The Debtors stand positioned to emerge from chapter 11 as a stronger and better-capitalized enterprise that is better able to leverage their national platform and go-forward investments for sustained success.

32.     To minimize adverse effects of commencing these chapter 11 cases on their businesses—and to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors in possession—the Debtors filed the First Day Motions contemporaneously herewith.  I have reviewed and am familiar with the contents of each First Day Motion, and believe that the relief sought in each First Day Motion:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption to its customers, employees, and other stakeholders or loss of productivity or value; (b) constitutes a critical element in achieving a successful restructuring of the Debtors; (c) best serves the Debtors' estates by allowing business operations to continue uninterrupted; and (d) is, in those instances where the relief seeks immediate payment of prepetition amounts, necessary to avoid immediate and harmful damage to business operations.

The facts stated in **Exhibit A** are true and correct to the best of my information, knowledge, and belief.

33.     To familiarize the Court with the Debtors, their businesses, and the circumstances leading to these chapter 11 cases, I have organized this Declaration as follows:

- **Part I** provides a general overview of Frontier's business operations and corporate structure;

- **Part II** describes the Debtors' prepetition capital structure;

- **Part III** describes the circumstances leading to the commencement of these chapter 11 cases and describes the Restructuring Support Agreement as well as the Proposed DIP Financing, and Committed Exit Facility (both as defined herein);

- **Part IV** summarizes the factual bases supporting the First Day motions; and

- **Part V** sets forth certain additional information about the Debtors as required by Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York.

**Part I**
**General Background**

**A.     The Company's Corporate History.**

34.     The Company's predecessor, Citizens Utilities Company, formed as a utility conglomerate in 1935, with electric, water, gas, and telephone businesses. While the telephone business was a small part of the Company's operations for most of the 20th century, the breakup of the Bell Telephone system in 1982 and successful acquisitions throughout the 1990s and early 2000s led to increased focus on telecommunications. In 2008, the Company rebranded as Frontier Communications Corporation, exclusively focusing on the telecommunications sector.

35.     The Company grew exponentially through a series of Growth Transactions[6] from 2010 through 2016. In 2010, the Company purchased the landline operations of Verizon in 14 states. This more than doubled the size of the Company. In 2014, the Company acquired AT&T's

---

[6]     For a further discussion of the Growth Transactions, see Part III.A.

("<u>AT&T</u>") landline operations in Connecticut. In 2016, the Company greatly expanded into urban and suburban markets through the purchase of Verizon's landline operations in California, Texas, and Florida. The CTF Transaction doubled the size of the Company for a second time in a six-year span.

36.     Today, the Company conducts its business operations through Frontier and Frontier's 103 direct and indirect subsidiaries. Frontier and several of these subsidiaries hold PUC ILEC certifications and competitive local exchange carrier ("<u>CLEC</u>"), long-distance certifications, FCC licenses, and other authorizations, all of which permit the Company to operate in certain regions and provide telecommunications services. Frontier and ten of its subsidiaries[7] are obligors on the Debtors' funded debt, as issuer, borrower, guarantor, and/or grantor. Further, equity interests in several subsidiaries that are not obligors on the Debtors' funded debt have been pledged to secure various debt instruments. The Debtors' corporate organizational chart is attached as **Exhibit C**.

**B.     The Company's Scope of Operations.**

37.     As of December 31, 2019, the Company has approximately 4.1 million total customers, comprised of approximately 3.5 million broadband, 2.6 million voice, and 660 thousand video subscribers and 18,300 employees, operating in 29 states.[8] The Company's management team oversees the Company's operations from the Company's headquarters in Norwalk, Connecticut. Additionally, several managerial functions are performed outside of the

---

[7]    The subsidiaries include Frontier Southwest Incorporated, Frontier Florida LLC, Frontier Communications Northwest Inc., Frontier Communications of Iowa, LLC, Frontier Communications of Wisconsin LLC, Frontier Communications of Minnesota, Inc., Citizens Telecommunications Company of Minnesota, LLC, Citizens Telecommunications Company of Tennessee L.L.C., and Citizens Telecommunications Company of Utah, and Frontier Video Services Inc. (as a grantor).

[8]    These figures reflect the Company prior to the close of the Pacific Northwest Transaction. Revenues for the territories being sold represent approximately seven percent of consolidated revenue for the year ended December 31, 2019.

Company's headquarters in Norwalk.  These include, but are not limited to, payroll processing, procurement functions, information technology, marketing, and functions in other regions within the Company' service territory.

**Company's Service Territories**



### 1.    Company's Infrastructure.

38.    As described above, the Company principally operates as an ILEC providing traditional landline, voice, and data services to consumers.   The Company's network is extensive, consisting of over 180,000 route miles of fiber and approximately 6,400 fiber-connected cell towers (serving approximately 7,200 carrier cell sites on those towers), after the Pacific Northwest Transaction.  The Company connects to households, business locations, and cell towers in its service territories using a combination of fiber optic, copper, and wireless technologies.  The Company also owns fiber optic and copper cable, which are the primary transport technologies between the Company's central offices, remote facilities, and interconnection points with other telecommunications carriers.

39.    To focus investment and better respond to ongoing technological changes, the Company requires capital to potentially upgrade to its copper network to fiber in key locations across the current service territories to increase its competitiveness for consumer, commercial, and

wholesale customers, including mobile network operators.  The Company has previously sought, and intends to continue to seek, state and/or federal subsidies for the expansion and enhancement of broadband in rural areas within certain of the Company's current service areas.  In addition, the Company anticipates reducing costs by sharing best practices across its operations, centralizing and standardizing functions and processes, and deploying more updated technologies and systems that increase efficiency and profitability.

### 2.    Company Services and Products.



#### Frontier Revenue Mix (2019 Revenue)



40.    As a diversified telecommunications company, the Company provides a broad portfolio of communications services. The Company offers its services to all types of residential and business customers. In 2019, residential segments accounted for 51 percent of total revenue, while the commercial segment, which includes business and wholesale, (44 percent), and regulatory (5 percent)[9] segments are responsible for the remaining revenue streams.  The Company's key products and services include data and internet, video, voice, access, managed IT

---

[9]    Regulatory revenue includes revenues generated from cost subsidies from state and federal authorities, including the $332 million in Connect America Fund Phase II funding in 2019.

solution, hardware resale, and a broad range of complex communications services across their customer base.    The Company also serves high-cost rural areas that have been historically underserved by telecommunications infrastructure, aided by federal funding received through the Connect America Fund ("CAF").    The Company's wholesale business serves carrier customers from the largest national operators (*i.e.*, Verizon, AT&T, etc) to mid-market managed service providers, as well as hyperscalers (*i.e.*, Google, Netflix, etc.).    Carrier customers buy both voice and data services to augment their own network infrastructure.    The following highlights the Company's primary services.

41.    ***Internet and Data Services***.    The Company offers a comprehensive range of broadband and networking services, utilizing a mix of fiber and copper networks.    The principal residential consumer service the Company provides is broadband internet service for 2.7 million residential subscribers after the Pacific Northwest Transaction.    In certain of its consumer networks, the Company has a high concentration of aged copper wireline facilities, which provide internet service to customers at non-competitive speeds.    The Company's fiber network, pro forma for the Pacific Northwest Transaction, stretches 180,000 miles and is available to over 20 percent of the Company's service areas, based on broadband-serviceable homes passed. The Company provides internet and data services to commercial customers, including a complete portfolio of Ethernet, dedicated internet, software defined wide area network, managed Wi-Fi, time division multiplexing data transport, and optical transport services.

42.    ***Video Services.***    The Company offers video services under the Verizon FiOS brand in portions of California, Texas, Florida, Indiana, Oregon, and Washington and under the Vantage brand in portions of Connecticut, North Carolina, South Carolina, Minnesota, Illinois, New York, and Ohio. The Company also offers satellite TV video service to its customers under an agency

relationship with DISH Networks in additional markets.  Residential customers account for most of the Company's video revenue.  The modern trend towards video "cord cutting," mitigation to over-the-top video content, and the ongoing rise in video content prices have led to a decline in video revenue streams.

43.     ***Voice Services.***   The Company provides voice services, including "traditional voice" (TDM) services, VoIP, long-distance, and voice messaging services, to consumer and commercial customers in all of its markets.  Long-distance service to and from points outside the Company's operating properties are provided by interconnection with the facilities of interexchange carriers.  Approximately 31 percent of Company revenue for 2019 was derived from voice services, including "traditional voice" TDM voice, which continues to be a diminishing portion of the Company's business.

### 3.     Government Funded Rural Telecommunication Initiatives.

44.     In addition to revenue from service offerings, the Company has received funds from FCC and state led programs that are intended to replace prior telephone high cost service subsidies and support voice and/or data services in high-cost, unserved and underserved areas.  On the federal side, the FCC's CAF program has historically provided funding in certain areas across the Company's footprint, and the Company is evaluating participation in the Rural Digital Opportunity Fund ("RDOF"), a $20.4 billion program aimed at subsidizing the deployment of a high-speed broadband network and voice service in certain unserved and underserved rural areas.  On the state side, certain but not all states have state universal services and/or specific grant programs to support voice and/or data service in high cost, hard-to-serve areas.

45.     The Company has expanded broadband access in states with large rural populations, such as Indiana, Nebraska, and West Virginia through the CAF program.  The Company has accepted CAF funding in certain of its 29 states, which provides $332 million,

including approximately $19 million in the four states being divested in the Pacific Northwest Transaction, in annual support through 2021 in exchange for a commitment to make 10/1 Mbps broadband available to approximately 774,000 locations in these areas (of which approximately 41,000 locations are in states divested as part of the Pacific Northwest Transition). On August 1, 2019, the FCC adopted a notice of proposed rulemaking to establish RDOF as the next phase of the CAF program. In the notice, the FCC proposed two auctions totaling up to $20.4 billion of support over ten years. In the first auction, the FCC plans to offer up to $16 billion in support over ten years ($1.6 billion annually) for an estimated six million locations that do not have access to a certain minimum internet speed service (measured by at least 25/3 Mbps and/or voice service based on the FCC's current maps). While the RDOF program has not been finalized, it could result in a material change in the level of funding the Company receives from the FCC as early as 2022.

46.     In addition, twelve states have state universal service funds, from which the Company receives funding to support voice and/or broadband service build out in rural communities. The approximate benefit is approximately $26 million (of which $6 million is in states divested as part of the Pacific Northwest Transaction).

## C.     Regulatory Environment.

47.     The Company's operations are subject to federal, state, and local regulation, each of which require unique regulatory authorizations for the Company's regulated service offerings.

### 1.     Federal Communications Commission.

48.     At the federal level, the FCC generally exercises jurisdiction over information services, interstate or international telecommunications services, and facilities to the extent they are used to provide, originate, or terminate interstate or international services.

49.     The FCC's authority to review any proposed transaction, including reorganization in bankruptcy, is triggered by the assignment or transfer of the Company's FCC licenses. When

an entity files for bankruptcy, FCC licenses are assigned as a matter of law from the licensee to

the licensee as debtor-in-possession.  The FCC considers this to be an involuntary, *pro forma*

assignment and requires that the licensee file a notification with the agency as soon as practicable

after the bankruptcy filing.  Therefore, FCC approval will be required to assign various interstate,

long distance, and wireless licenses to Reorganized Frontier.

50.     In addition, the Federal Trade Commission maintains oversight of the Company's

general  consumer  business  practices,  including  advertising  and  other  disclosures  and

representations.

**2.     State PUCs.**

51.     The  Company  operates  as  an  ILEC  in  29  states.   PUCs  generally  exercise

jurisdiction over intrastate voice and related telecommunications services.  Certain state agencies,

including attorneys general, monitor and exercise oversight related to consumer protection issues,

including marketing, sales, provision of services, and service charges.

52.     Under the Federal Telecommunications Act of 1996, state regulatory commissions

have jurisdiction to set certain rates, arbitrate, and review interconnection disputes and agreements

between ILECs and competitive local exchange carriers, in accordance with rules set by the FCC.

53.     In  certain  of  the  jurisdictions  in  which  the  Company  operates,  the  proposed

reorganization  may  be  considered  a  "transfer  of  control"  and,  therefore,  may  be  subject  to

regulatory approval based upon public interest legal standards.  In some states where the Company

operates as an ILEC, the PUCs also require prior approval for certain ILEC financing transactions

in which the assets or operations of the ILEC will be encumbered or the ILEC is assuming or

guaranteeing affiliate debt obligations.  Additionally, in some states the Company is subject to

operating restrictions and minimum service quality standards, and needs to provide "universal

service" as a "carrier of last resort" in its service territory.  Failure to satisfy these requirements may result in financial and/or operational restrictions.

### 3. Local Regulatory Bodies.

54.     Local governments often regulate the public rights-of-way necessary to install and operate networks and may require service providers to obtain licenses or franchises regulating their use of those rights-of-way.  In addition, in some states where the Company provides video services, it may be subject to transfer of control provisions for its cable TV/video services contained in local franchise agreements with local municipalities and government authorities.

### D. Pacific Northwest Transaction.

55.     In May 2019, Frontier entered into a definitive agreement to sell its operations and associated assets in Washington, Oregon, Idaho, and Montana for $1.352 billion in cash, subject to certain closing adjustments, including adjustments for working capital and certain pension and retiree medical liabilities.  The sale is expected to close on April 30, 2020, subject to customary closing conditions.  In connection with the sale, the Company has entered into a transition services agreement with the purchaser to provide various network and support services for a minimum of six months following the transaction closing.  Of the entities that are funded debt obligors, only two entities are parties to that certain definitive agreement with Northwest Fiber, LLC, dated as of May 28, 2019—Frontier and Frontier Communications Northwest Inc.  The Debtors are filing a motion to assume the definitive agreement for the Pacific Northwest Transaction during these chapter 11 cases ("PNW Sale Assumption Motion").

**Part II**
**The Debtors' Prepetition Capital Structure**

56.     As of the Petition Date, the Debtors were liable for approximately $17.5 billion of funded debt obligations.  The table below summarizes the Debtors' prepetition capital structure as of the Petition Date:

**Capital Structure (as of Petition Date)**



| Facility | Maturity | Amount Outstanding |
|---|---|---|
| **Frontier – First Lien Debt Obligations[1]** | | |
| Revolver | 02/27/2024 | $749 million |
| Term Loan B | 06/15/2024 | $1,695 million |
| First Lien Notes | 04/01/2027 | $1,650 million |
| **Frontier – Second Lien Debt Obligations** | | |
| Second Lien Notes | 04/01/2026 | $1,600 million |
| | Frontier - Total Secured Obligations | $5,708 million |
| **Frontier – Unsecured Obligations** | | |
| Senior Notes | Varying (2020 – 2046) | $10,949 million |
| | Frontier – Total Funded Debt | $16,657 million |
| **Subsidiary – Secured Obligations[2]** | | |
| FTR SW Notes[3] | 11/15/2031 | $100 million |
| **Subsidiary – Unsecured Obligations** | | |
| Notes | Varying (2027 – 2029) | $750 million |
| | Subsidiary – Total Funded Debt | $856 million |
| | **Debtors – Aggregate Total Funded Debt** | **$17,513 million** |

[1]   Frontier has $14 million in Industrial Development Revenue Bonds as well.
[2]   Frontier has $6 million of Rural Utilities Service loan contracts at the subsidiary level.
[3]   The FTR SW Notes are secured by a first priority lien on all assets of FTR SW.  As such, the collateral package is different relative to Frontier's secured indebtedness (which contains equity pledges of certain subsidiaries as opposed to liens on their assets).

**E.      Frontier Communications Issued First Priority Debt.**

**1.       JP Morgan Credit Facilities.**

57.     On February 27, 2017, the Debtors entered into a first amended and restated credit agreement with JPMorgan Chase Bank, N.A., as administrative agent and the lenders party thereto, pursuant to which the Company combined its revolving credit agreement, dated as of June 2, 2014, and its term loan credit agreement, dated as of August 12, 2015 (as amended to date, the "JPM Credit Agreement").  Under the JPM Credit Agreement, the Debtors have a $1.695 billion senior

secured Term Loan B facility (the "Term Loan B") maturing on June 15, 2024 and an $850 million secured revolving credit facility maturing on February 27, 2024 (the "Revolver," collectively with the Term Loan B, the "Senior Secured Credit Facilities"), in each case, subject to the maturity acceleration provisions described below.

58.     The maturities of the Term Loan B and the Revolver, in each case if still outstanding, will be accelerated in the following circumstances:  (a) if, 91 days before the maturity date of any series of Senior Notes (as defined herein) maturing in 2020, 2023 and 2024, more than $500 million in principal amount remains outstanding on such series; or (b) if, 91 days before the maturity date of the first series of Senior Notes maturing in 2021 or 2022, more than $500 million in principal amount remains outstanding, in the aggregate, on the two series of Senior Notes maturing in such year.

59.     The determination of interest rates for the Term Loan B and Revolver under the JPM Credit Agreement is based on margins over the Alternate Base Rate (as defined in the JPM Credit Agreement) (the "ABR Loans" referred to in the JPM Credit Agreement), or over the Adjusted LIBOR Rate (as defined in the JPM Credit Agreement) (the "Eurodollar Loans" referred to in the JPM Credit Agreement), at the election of Frontier.  Interest rate margins on the Revolver (ranging from 1.00% to 2.00% for ABR Loans and 2.00% to 3.00% for Eurodollar Loans) are subject to adjustment based on Frontier's Leverage Ratio (as defined in the JPM Credit Agreement).  The interest rate on the Revolver as of December 31, 2019 was Adjusted LIBOR Rate plus 3.00%.  The collateral securing the JPM Credit Agreement is limited to the equity interests of certain subsidiaries of Frontier and substantially all personal property of Frontier Video Services, Inc.  As of the Petition Date, Frontier had borrowings of $749 million outstanding under the Revolver (with letters of credit issued under the Revolver totaling an additional $101 million).

60.     On March 15, 2019, the Debtors used proceeds from the offering of First Lien Notes, together with cash on hand, to repay in full the outstanding borrowings under its $1.625 billion senior secured Term Loan A facility, which otherwise would have matured in March 2021, as described below.  In addition, in March 2019 and April 2019, the Debtors amended the JPM Credit Agreement to, among other things (a) extend the maturity date of the Revolver from February 27, 2022 to February 27, 2024, (b) increase the interest rate applicable to such revolving loans by 0.25% and (c) make certain modifications to the debt and restricted payment covenants.

**2.      First Lien Notes.**

61.     On March 15, 2019, Frontier issued $1.65 billion aggregate principal amount of 8.000% First Lien Secured Notes due 2027 (the "First Lien Notes") pursuant to the indenture, dated as of March 15, 2019, by and among Frontier, as issuer, the guarantors party thereto, and Wilmington Trust, National Association, as successor trustee, and JPMorgan Chase Bank, N.A., as collateral agent.

62.     Each of the Company's subsidiaries that guarantees the Debtors' Senior Secured Credit Facilities (the "Guarantors") guaranteed the First Lien Notes.  The First Lien Notes are secured on a first-priority basis by a security interest that is *pari passu* with the first lien security interest securing the Debtors' obligations under the JPM Credit Agreement.

63.     The First Lien Notes mature on April 1, 2027 and bear interest at a rate of 8.000% per annum.  Interest on the First Lien Notes is payable to holders of record semi-annually in arrears on April 1 and October 1 of each year.

**3.      Industrial Development Revenue Bonds.**

64.     As of the Petition Date, the Debtors had a total of approximately $14 million outstanding aggregate principal amount of industrial development revenue bonds due May 1, 2030.

**F.      Frontier Communications Issued Second Priority Debt.**

  **1.      Second Lien Notes.**

  65.      On March 19, 2018, Frontier issued $1.6 billion aggregate principal amount of 8.500% Second Lien Secured Notes due April 1, 2026 (the "Second Lien Notes")  pursuant to an indenture, dated as of March 19, 2018, by and among Frontier, as issuer, the Guarantors and Wilmington Savings Fund Society FSB, as successor trustee and collateral agent (the "Second Lien Indenture").  The Guarantors guaranteed the Second Lien Notes.

  66.      The Second Lien Notes bear interest at a rate of 8.500% per annum.  Interest on the Second Lien Notes is payable semi-annually in arrears on April 1 and October 1 of each year, commencing October 1, 2018.  On July 3, 2018, Frontier amended the collateral package for the Second Lien Notes as a result of changes to the collateral package securing Frontier's Senior Secured Credit Facilities to replace certain subsidiary equity pledges with pledges of the equity interest of certain first-tier subsidiaries of Frontier.

**G.      Debtors' Senior Notes.**

  67.      As of the Petition Date, Frontier has issued approximately $10.95 billion aggregate principal amount of unsecured senior notes.  This unsecured debt is not guaranteed by any of Frontier's subsidiaries. All Senior Notes (as defined herein) are *pari passu* in right of payment.

  **1.      CTF Notes.**

  68.      On September 25, 2015, as part of the financing of the CTF Transaction, Frontier completed a private offering of $6.6 billion aggregate principal amount of unsecured senior notes (the "CTF Notes").  In June 2016, Frontier completed an exchange offer of registered senior notes for the privately placed senior notes.  Frontier issued the CTF Notes pursuant to an indenture, as amended or supplemented, dated as of September 25, 2015, by and between Frontier Communications Corporation, as issuer, and The Bank of New York Mellon, as trustee.

69.    As of the Petition Date, the Debtors had $5.84 billion outstanding aggregate principal amount of CTF Notes, comprised of: (a) $55 million aggregate principal amount of notes bearing interest at a rate of 8.875% per annum, due September 15, 2020; (b) $2.19 billion aggregate principal amount of notes bearing interest at a rate of 10.500% per annum, due September 15, 2022; and (c) $3.60 billion aggregate principal amount of notes bearing interest at a rate of 11.000%, due September 15, 2025.

### 2.    Legacy Notes.

70.    As of the Petition Date, the Debtors had $5.11 billion outstanding aggregate principal amount of senior unsecured notes and debentures that were obligations of the Debtors prior to the CTF Transaction (the "Legacy Notes").  The Legacy Notes are comprised of: (a) $172 million aggregate principal amount of notes bearing interest at a rate of 8.500% per annum, due April 15, 2020 (the "Legacy Notes due 2020"); (b) $89 million aggregate principal amount of notes bearing interest at a rate of 9.250% per annum, due July 1, 2021; (c) $220 million aggregate principal amount of notes bearing interest at a rate of 6.250% per annum, due September 15, 2021 (the "Legacy Notes due 2021"); (d) $500 million aggregate principal amount of notes bearing interest at a rate of 8.750% per annum, due April 15, 2022 (the "Legacy Notes due 2022"); (e) $850 million aggregate principal amount of notes bearing interest at a rate of 7.125% per annum, due January 15, 2023; (f) $750 million aggregate principal amount of notes bearing interest at a rate of 7.625% per annum, due April 15, 2024; (g) $775 million aggregate principal amount of notes bearing interest at a rate of 6.875% per annum, due January 15, 2025 (the "Legacy Notes due 2025"); (h) $138 million aggregate principal amount of debentures bearing interest at a rate of 7.000% per annum, due November 1, 2025; (i) $2 million aggregate principal amount of debentures bearing interest at a rate of 6.800% per annum, due August 15, 2026;  (j) $346 million aggregate principal amount of notes bearing interest at a rate of 7.875% per annum, due January

15, 2027;  (k) $945 million aggregate principal amount of notes bearing interest at a rate of 9.000%

per annum, due August 15, 2031; (l) $1 million aggregate principal amount of debentures bearing

interest at a rate of 7.680% per annum, due October 1, 2034; (m) $125 million aggregate principal

amount of debentures bearing interest at a rate of 7.450% per annum, due July 1, 2035; and (n)

$193 million aggregate principal amount of debentures bearing interest at a rate of 7.050% per

annum, due October 1, 2046.

71.     New Communications Holding Inc. issued the Legacy Notes due 2020 and Legacy

Notes due 2022 (collectively, the "2010 Verizon Transaction Notes") in connection with the 2010

Verizon Transaction (as defined herein) pursuant to that certain indenture, dated as of April 12,

2010, by and between New Communications Holdings Inc., as issuer, and The Bank of New York

Mellon, as trustee.  Frontier assumed the 2010 Verizon Transaction Notes pursuant to a

supplemental indenture, dated as of July 1, 2010, by and between Frontier Communications

Corporation and The Bank of New York Mellon.

72.     Frontier issued the Legacy Notes due 2021 and Legacy Notes due 2025 on

September 17, 2014 in connection with the 2014 AT&T Transaction (as defined herein) pursuant

to that certain indenture, as amended or supplemented, dated as of April 9, 2009, by and among

Frontier Communications Corporation, as issuer, and The Bank of New York Mellon, as trustee.

**H.     Secured Debt Issued by Subsidiaries.**

73.     As of the Petition Date, Frontier Southwest Incorporated had $100 million

outstanding aggregate principal amount of secured notes due November 15, 2031 issued pursuant

to that certain indenture, as amended, restated, or supplemented, dated as of June 1, 1940, by and

between Frontier Southwest Incorporated (formerly known as Southwestern Associated Telephone

Company), as issuer, and BOKF, NA (as successor to First National Bank in Dallas), as trustee

(the "Frontier Southwest Notes").  The Frontier Southwest Notes accrue at an interest rate of 8.500%.

74.     As of the Petition Date, Citizens Utilities Rural Company had approximately $6 million outstanding aggregate principal amount in Rural Utilities Service ("RUS") loan contracts due January 3, 2028 that accrue at an interest rate of 6.154%.

**I.      Unsecured Debt Issued By Subsidiaries.**

75.     As of the Petition Date, Frontier California Inc. had $200 million outstanding aggregate principal amount of unsecured notes due May 15, 2027 issued pursuant to that certain indenture, as amended or supplemented, dated as of December 1, 1993, by and between Frontier California Inc. (formerly known as GTE California Inc.), as issuers, and U.S. Bank Trust National Association (as successor to Bank of America National Trust and Savings Association), as trustee (the "Frontier California Notes").  The Frontier California Notes accrue at an interest rate of 6.750%.

76.     As of the Petition Date, Frontier Florida LLC had $300 million outstanding aggregate principal amount of unsecured notes due on February 1, 2028 issued pursuant to that certain indenture, as amended or supplemented, dated as of November 1, 1993, by and between Frontier Florida LLC (formerly known as GTE Florida Inc.), as issuers, and U.S. Bank National Association (as successor to NationsBank of Georgia, National Association), as trustee (the "Frontier Florida Notes").  The Frontier Florida Notes accrue at an interest rate of 6.860%.

77.     As of the Petition Date, Frontier North Inc. had $200 million outstanding aggregate principal amount of unsecured notes due February 15, 2028 issued pursuant to that certain indenture, dated as of January 1, 1993, by and between the Frontier North Inc. (formerly known as GTE North Inc.), as issuers, and U.S. Bank National Association (as successor to The First

National Bank of Chicago), as trustee (the "Frontier North Notes"). The Frontier North Notes accrue at an interest rate of 6.730%.

78.     As of the Petition Date, Frontier West Virginia Inc. had $50 million outstanding aggregate principal amount of unsecured notes due October 15, 2029 issued pursuant to that certain indenture, dated October 11, 1989, by and between The Chesapeake and Potomac Telephone Company of West Virginia, as issuers, and U.S. Bank Trust National (as successor to Merrill Lynch Capital Markets), as trustee (the "Frontier West Virginia Notes"). The Frontier West Virginia Notes accrue at an interest rate of 8.400%.

**J.     Frontier Common Stock.**

79.     Shares of Frontier's Class A common stock have traded on the NASDAQ Stock Market LLC ("NASDAQ") under the symbol "FTR."  All outstanding shares of common stock are publicly owned.  On December 16, 2019, the Company was notified by NASDAQ that it was not in compliance with NASDAQ's Listing Rule 5450(a)(1), as the minimum bid price of our common stock had been below $1.00 per share for 30 consecutive business days. Under NASDAQ's rules, the notification of noncompliance had no immediate effect on the listing or trading of Frontier's common stock and the Company had 180 days, or until June 15, 2020, to achieve compliance.[10]

80.     As of December 31, 2019, Frontier had net operating loss carry forwards ("NOL") of approximately $1.6 billion available to offset its future federal taxable income. Frontier's ability to use these NOLs would be substantially limited if it experienced an "ownership change" within the meaning of section 382 of the Internal Revenue Code. On July 1, 2019, the Debtors adopted a shareholder rights plan (the "Rights Plan") designed to prevent any holder or group of holders

---

[10]     *See* Frontier Communications Corporation, Annual Report 2019 (Form 10-K) (Mar. 31, 2020), page 3.

from obtaining effective control in the Debtors and effectively blocking strategic actions that may be beneficial to all shareholders without paying a fair control premium.  Under the Rights Plan, if the rights become exercisable, all holders of rights (other than any triggering person) will be entitled to acquire shares of common stock at a 50 percent discount or Frontier may exchange each right held by such holders for two shares of common stock.

# Part III
## Events Leading to These Chapter 11 Proceedings

**A.     Growth Transactions Overleveraging the Capital Structure and Implementation Issues.**

      **1.     The Growth Transactions.**

      81.     The telecommunications industry has been defined by continued growth and consolidation through mergers and acquisitions.  By 2008, the Debtors had shed all of their other utility businesses to operate exclusively as a telecommunications provider.  By 2009, the Debtors were the primary landline telecommunications provider in many rural areas, serving as the ILEC provider to 1.39 million customers.[11]  The Debtors offered, in various forms, local telephone, long-distance calling, directory services, and DSL internet service.  The Debtors also established bundled television services through a partnership with DISH Network Corporation.[12]

      82.     Around this time, industry competitors expressed interest in exiting landline communications.  Seizing on the opportunity to expand its ILEC operations, the Debtors embarked on a series of three acquisitions, the Growth Transactions, that transformed the Debtors from a regional provider of telephone and DSL internet to a national provider of these services.

      83.     **2010 Verizon Transaction.**  In 2009, the Debtors were offered the opportunity, through an acquisition of certain of Verizon's businesses, to expand their portfolio and to become the largest "rural" communication provider.  Through the transaction, the Debtors recognized an opportunity to bring broadband to new markets and entered into an agreement to acquire the defined assets and liabilities of the local exchange business and related landline activities of Verizon in Arizona, Idaho, Illinois, Indiana, Michigan, Nevada, North Carolina, Ohio, Oregon, South Carolina, Washington, West Virginia, and Wisconsin, and in portions of California

---

[11]   *See* Frontier Communications Corporation, Annual Report 2010 (Form 10-K) (Feb. 25, 2011), p. 9.
[12]   *Id.* at p. 4.

bordering Arizona, Nevada, and Oregon (the "2010 Verizon Transaction").  The 2010 Verizon Transaction was financed with approximately $5.2 billion of common stock (Verizon shareholders received 678.5 million shares of Frontier common stock) plus the assumption of approximately $3.2 billion principal amount of unsecured notes.[13]  Following closure of the 2010 Verizon Transaction on July 1, 2010, the Debtors had 3.5 million customers, 1.7 million broadband connections and 14,800 employees.[14]

84.    **2014 AT&T Transaction.**  On October 24, 2014, the Debtors acquired the wireline properties of AT&T in Connecticut for a purchase price of $2.0 billion in cash, excluding adjustments for working capital (the "2014 AT&T Transaction").    The Debtors entered Connecticut as an opportunity to leverage their network, information technology, engineering, administrative services, and procurement capabilities to realize scale and cost synergies[15] Following the 2014 AT&T Transaction, the Debtors owned and operated the wireline broadband, voice, and video business and statewide fiber network that provides services to residential, commercial, and wholesale customers in Connecticut.  To finance the transaction, the Debtors completed a registered debt offering of the Legacy Notes due 2021 and Legacy Notes due 2025. The Debtors used the net proceeds from the offering of these notes, together with borrowings of $350 million under a since-retired term loan, and cash on hand, to finance the transaction.[16]

85.    **2016 CTF Transaction.**  On February 5, 2015, the Debtors entered into the CTF Transaction with Verizon to acquire Verizon's wireline operations that provide services to residential, commercial, and wholesale customers in California, Texas, and Florida for

---

[13]    *Id.* at p. 3.
[14]    *Id.* at p. 2.
[15]    *See* Frontier Communications Corporation, Annual Report 2014 (Form 10-K) (Feb. 24, 2015), page 5.
[16]    *Id.* at p. 2.

$10.54 billion.[17]  Economies of scale were a large driver of the CTF Transaction.[18]  The Debtors

acquired 3.7 million voice connections, 2.2 million broadband connections, and 1.2 million FiOS

video connections through the CTF Transaction.  As a result of the CTF Transaction, the Debtors

doubled in size, increasing their network to 5.4 million customers, 4.3 million broadband

connections, and 28,300 employees.[19]

86.     The Debtors financed the CTF Transaction through a mix of debt and equity

issuances: a private debt offering of $6.6 billion of CTF Notes, a $1.5 billion senior secured

delayed-draw term loan facility,[20] and a registered offering of $2.75 billion of preferred and

common stock.[21]  The CTF Transaction closed on April 1, 2016.[22]

### 2.     Operational Issues After Expansion.

87.     While the Growth Transactions transformed the Debtors' businesses, there were

integration issues associated with such expansion.  The Debtors received public complaints from

customers about the pace and progress of the integration.  As a result, the Debtors began to

face a high rate of customer loss.  In turn, to refocus resources on servicing legacy customers,

the Debtors limited their marketing efforts, resulting in low customer growth in the new

regions that were acquired in the Growth Transactions.

### B.     Industry-Specific Challenges.

### 1.     Needed Infrastructure Updates Due to Constrained Capital Structure.

88.     The telecommunications industry is undergoing significant changes in technology

and consumer uses, preferences, and expectations.  Wireless growth has been exponential and

---

[17]   *See* Frontier Communications Corporation, Annual Report 2016 (Form 10-K) (Feb. 28, 2017), page 2.
[18]   *See* Frontier Communications Corporation, Press Release, (Feb. 5, 2015).
[19]   *Id.*
[20]   *See* Frontier Communications Corporation, Press Release, (Aug. 13, 2015).
[21]   *Id.*
[22]   *See* Frontier Communications Corporation, Quarterly Report Q1 2016 (Form 10-Q) (May 5, 2016).

customers have "cut the cord" to the Debtors' services.  These customers have no tethered voice service and may use wireless service for internet access.  Even within the "wireline" sector, the introduction of fiber-optics has allowed new entrants and existing competitors with access to capital to introduce networks in the Debtors' markets that are competitive with or superior to the Debtors' existing copper-based networks.  Although expensive to deploy, fiber-based networks can provide faster broadband speeds and have a longer useful life compared to copper-based networks.  Customer expectations and requirements have shifted because of the positive effect of these differences on broadband speeds, bandwidth, capacity, and performance.

89.     The Debtors require a technology upgrade to their infrastructure, principally by enhancing their fiber-based footprint, which requires significant investment and capital expenditures.  Several investment opportunities exist, and continue to exist, for the Debtors.  With additional capital, the Debtors would have the flexibility to modernize certain of their existing copper-based networks with optical fiber, expanding the reach of the Debtors' existing fiber-based networks into areas most suitable and attractive for growth, and providing fiber backhaul for towers and small cell deployments.  However, given the Debtors' current capital constraints, the Debtors do not have access to capital to make these necessary infrastructure investments.  Increased liquidity and decreased debt servicing costs will make pursuing these strategic enhancements to technology and equipment feasible in many areas.

**2.     Competition and Shifting Industry Preferences.**

90.     Competition within the telecommunications industry is intense.  Technological advances as well as regulatory and legislative changes have enabled a wide range of historically non-traditional communications service providers to compete with traditional providers, including the Debtors.  The Debtors have experienced substantial, and in some cases complete, revenue attrition of intercarrier compensation (the charges other telecommunications pay to terminate

traffic on the Debtors' network) at the federal level and are still rate regulated by some state PUCs. In certain jurisdictions, the Debtors are subject to significant state and federal regulations, including, but not limited to, service quality performance standards that measure the Debtors on installation and repair intervals, customer service metrics, and outage frequency and duration, and carrier of last resort obligations, where the Debtors must bring landline facilities to anyone requesting voice service regardless of complexity or cost. Wireless, VOIP, and cable competitors are not subject to these same regulations and, as a result, have lower cost structures. The industry has also experienced substantial consolidation in recent years. Certain of the Debtors' competitors are larger and have more service offerings due to greater financial resources to invest in such technologies. All of these factors create downward pressure on the demand for and pricing of the Debtors' services. The Debtors primarily compete with:

- **Cable operators:** In a majority of the Debtors' markets, cable operators offer similar high speed internet, video, and voice services, and compete with the Debtors aggressively for consumer and business customers on speed and price.

- **Wireless carriers:** Wireless operators offer internet, video, and voice services and compete with the Debtors for consumer and business customers by offering packages with mobility and increasingly large data caps that utilize or will utilize the latest 5G technology to mobile customers.

- **Satellite providers:** In all of the Debtors' markets, satellite operators offer high speed internet, voice, and/or video services and compete with the Debtors aggressively for consumer and business customers on both price and performance.

- **Online video providers:** Some consumers are opting for internet-delivered video services through online service providers rather than traditional, multi-channel video. This practice is commonly called "cord cutting."[23] In response, the Debtors have taken steps to deliver such content to consumers.

- **Competitive fiber operators:** In many of the Debtors' markets, competitive operators have developed fiber network to compete with the Debtors' internet and data services, primarily for business and carrier customers.

---

[23]    FCC, 2018 Communications Marketplace Report.

91.     Additionally, the importance of reliable broadband and demand for faster broadband speeds is increasing.  The FCC changed its definition of what constitutes advanced broadband capabilities for certain purposes to 25 megabits per second (Mbps) download and 3 Mbps upload (25/3) from the standard of 4 Mbps download and 1 Mbps upload (4/1) set in 2010.[24]  Additionally, the percentage of total fixed connections in the US with a download speed of at least 25 Mbps has grown from 44 percent in 2014, to nearly 70 percent as of Dec 2017.[25]  This trend emphasizes that the Debtors need to update their infrastructure from their current predominantly copper-based networks to better compete in the industry.

92.     Coupled with these challenges, shifting consumer preferences away from traditional landline telephone and television services have impacted the Debtors' bottom line.  As customers resort to voice and video "cord cutting," the Debtors have seen a decrease in both their voice and video subscription services.  In the last 20 years, wireline ILECs' share of the voice market has declined from greater than 60 percent to less than 10 percent nationwide, driven by losses to wireless, CLEC and cable competitors.[26]  During this same period, wireless connections increased by more than 250 percent from under 100 million to more than 348 million connections.[27]  Further, near-ubiquitous 4G wireless coverage has made wireless-only phone service a much more viable option for consumers than it has been historically.  With upgrades to 5G service, wireless operators will increasingly compete for broadband customers.

---

[24]    FCC, 2015 Broadband Progress Report.

[25]    FCC, Internet Access Services as of Dec. 31, 2017.

[26]    FCC, Voice Telephone Services Reports and Local Telephone Competition Reports, https://www.fcc.gov/voice-telephone-services-report.

[27]    *Id.*

93.     Given the increasing reliance of consumers on a fast broadband connection, the Debtors have a unique opportunity to invest in modernizing their network to improve speeds, quality, and performance.  Further, the increase in video cord cutting also presents an opportunity for the Debtor to focus more on broadband products rather than content, where the Debtors are increasingly less competitive.

94.     For video services, the Debtors have lost approximately 300,000 net video subscribers across all markets in the last two years.[28]  At the same time, programming or "content" costs for video services have increased, with video streaming providers like Amazon and Netflix entering and capturing a substantial share of the market.  Therefore, costs for content have risen such that incurring acquisition costs to add new customers to the Debtors' video product are not consistently profitable.

95.     As described in Part I.C, the Debtors' businesses rely on certain government funding programs.  Currently, it appears that the CAF-related cash flows are likely to expire or decline in beginning in 2022.  However, the RDOF may also be an opportunity for the Debtors to upgrade existing areas, and the first phase of this program may include as many as one million locations in the Debtors' service territories.  Considering the Debtors' extensive reach in rural areas, success or failure in the RDOF auction will impact the Debtors and their ability to provide more robust services in its service territory.

## C.    Exploration of Strategic Alternatives.

96.     In response to these ongoing operational and financial challenges, the Debtors have consistently instituted measures to attract customers and attempted to increase their average revenue per customer.  Despite these efforts, the steps taken in turnaround attempts were not

---

[28]    *See* Frontier Communications Corporation, Annual Report 2019 (Form 10-K) (Mar. 31, 2020), page 35.

gaining traction, as the Debtors' subscriber base continued to decline at a rate of roughly 2 percent loss of customers per fiscal quarter for the past three years without a corresponding increase in revenue per customer.[29]  Therefore, it became clear to the Debtors that current business initiatives alone would not provide sufficient deleveraging and satisfy their financial obligations, especially considering projections for continued headwinds.

97.    As discussed in greater detail in Part I.B, in light of these substantial challenges, the Debtors proactively evaluated alternatives that would maximize value to all stakeholders.  The Debtors recognized that challenges to operational performance and impending maturity walls required action.  In March 2019, the Debtors executed the First Lien Issuance and the Credit Agreement amendment, which had the effect of extending debt maturities and providing the Debtors additional flexibility.  The Debtors looked to liability management options to solve for future maturity walls, but after approximately nine months of robust analysis and discussion, the Finance Committee and the Advisors began to realize it was unlikely that a debt-oriented liability management transaction alone would achieve sufficient deleveraging to allow the Debtors to re-access the capital markets and/or adequately reinvest in the businesses to sustain or grow business performance.  As a result, the Finance Committee and the Advisors pivoted to discussions regarding a comprehensive in-court transaction and engaged the holders of the $10.95 billion outstanding on the Senior Notes.

98.    Over the course of the past several months, the Debtors have held multiple in-person and telephonic conferences with the Noteholder Groups, and have been in regular contact to develop a value-maximizing transaction for all constituents.  As a result of these exchanges and negotiations, on April 14, 2020, the Debtors and the Noteholder Groups agreed to

---

[29]    Frontier Communications Corporation, Third Quarter Investor Update, Nov. 5, 2019, p. 5.

the terms of a comprehensive restructuring proposal that the Debtors viewed as value maximizing

and beneficial to all parties pursuant to the Restructuring Support Agreement.

**D.      Restructuring Support Agreement, Proposed DIP Financing, and Committed Exit Facility.**

**1.      Restructuring Support Agreement.**

99.     The Restructuring Support Agreement contemplates a comprehensive

reorganization achieved through a plan that will result in a substantial deleveraging of the Debtors'

balance sheet by over $10 billion while paying in full all non-funded debt claims against the

Debtors.  The key financial components and commitments of the restructuring are as follows:

- all holders of secured debt will be repaid during these chapter 11 cases, paid in full on the Effective Date, or reinstated;

- the Debtors will enter into a debtor-in-possession financing facility ("DIP Facility"), with an option for conversion into an exit facility on the Effective Date, all claims under the DIP Facility not converted into an exit facility will be paid in cash on the Effective Date;

- holders of Senior Notes will receive their pro rata share of 100 percent of the common stock (subject to dilution) of Reorganized Frontier, $750 million of takeback debt (subject to downward adjustment) on either a third-lien or a to-be-agreed-upon basis depending on treatment of the second lien notes under a plan, and unrestricted cash of Reorganized Frontier in excess of $150 million as of the Effective Date;

- holders of general unsecured claims will be paid in full, reinstated, or otherwise unimpaired by the restructuring;

- holders of certain secured and unsecured notes held by the Debtors' subsidiaries will be reinstated or paid in full at the effective date; and

- Consenting Noteholders are entitled to designate two observers to the Company's Board (one from each of the Noteholder Groups), who will be entitled to participate in Board and Finance Committee discussions and deliberations, while the Restructuring Support Agreement is effective.

100.     The level of consensus for this comprehensive reorganization reflects the efforts

undertaken by the Debtors and the Consenting Noteholders, and the parties' belief in the Debtors'

prospects as a reorganized enterprise.  Importantly, the plan contemplated by the Restructuring

Support Agreement proposes to pay in full all non-funded debt.  In so doing, the Restructuring Support Agreement is intended to minimize any potential adverse effects to the Debtors' businesses and thus positioning the Debtors for a prompt confirmation of a plan of reorganization and a successful regulatory approval process.

### 2.    Proposed DIP Financing.

101.    In a true testament to the strength of Frontier's reorganizational prospects, Frontier has been able secure fully-committed new money financing of up to $460 million in debtor-in-possession financing (the "DIP Facility").  Goldman Sachs Bank USA ("Goldman") will act as administrative agent and lead arranger for the DIP Facility.  Pursuant to the DIP Credit Agreement, the Debtors have agreed to pay certain fees in connection with the extension of credit under the DIP Facility, which are included in the budget pertaining to the DIP Facility.

102.    The availability of the DIP Facility, which the Debtors are not requesting for on an interim basis, but only upon entry of a final order, will provide sufficient liquidity to fund these chapter 11 cases, the Debtors' general corporate operations, and signal to the Debtors' customers, vendors, employees, and lenders that operations will continue in the ordinary course.  Further, the letter of credit capacity thereunder is necessary to competitively bid in the upcoming RDOF auction, and the Debtors' success or failure in the RDOF auction will affect the Debtors' ability to provide more robust services in its operational territories.

103.    The Debtors believe the DIP Facility will maximize the value of the Debtors' estates as they seek to implement the restructuring contemplated by the Restructuring Support Agreement pursuant to a plan.

### 3.    Committed Exit Financing.

104.    To ensure the Debtors have sufficient liquidity upon emergence from these chapter 11 cases to continue operations in the ordinary course and effectuate their go-forward

business plan, upon the Effective Date, the DIP Facility provides for certain mechanisms by which the DIP Facility will be converted to an exit revolving credit facility, replacing the Debtors' current Revolver. In short, all borrowings and undrawn commitments under the DIP Facility will, upon satisfaction of applicable conditions, be converted into a senior secured revolving exit facility (the "Exit Revolving Facility"). This exit commitment, to convert the DIP Facility into the Exit Revolving Facility (rather than seeking to be paid in cash in full at emergence), provides the Debtors with a clear and reliable path to emerge from chapter 11 in an expeditious manner with a stronger balance sheet.

### 4. Case Milestones under the Restructuring Support Agreement.

105. As provided in the Restructuring Support Agreement, the Debtors and the Consenting Noteholders agreed to certain milestones, as follows:

| Event | Date |
|---|---|
| File the DIP Motion (including the proposed Interim DIP Order) and the PNW Sale Assumption Motion; | No later than one (1) Business Day after the Petition Date |
| Debtors shall commence the Chapter 11 Cases | No later than April 14, 2020 |
| Bankruptcy Court shall have entered the Interim DIP Order | No later than three (3) calendar days after the Petition Date |
| File the Plan and Disclosure Statement and motion for approval of the Disclosure Statement and associated solicitation procedures | No later than thirty (30) calendar days after the Petition Date |
| Final DIP Order | No later than forty-five (45) calendar days after the Petition Date |
| The "Closing Date" (as such term is defined in the PNW Purchase Agreement) shall have occurred; | No later than May 28, 2020 |
| Disclosure Statement Order Entered | No later than ninety (90) calendar days after the Petition Date |

| Event | Date |
|---|---|
| Commence Solicitation | No later than three (3) Business Days after entry of the Disclosure Statement Order |
| Confirmation Order Entered | No later than one hundred twenty (120) calendar days after the Petition Date |
| Effective Date | The date that is twelve (12) months after the Petition Date |

**Part IV**
**Evidentiary Support for First Day Motions**

106.    Contemporaneously herewith, the Debtors filed certain First Day Motions and seek orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases.  The First Day Motions seek authority to, among other things, ensure sufficient liquidity to run the Debtors' businesses, ensure the continuation of the Debtors' cash management systems, and allow for other business operations without interruption.  I believe that the relief requested in the First Day Motions is essential to allow the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

107.    The First Day Motions request authority to pay certain prepetition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and its estates.  Other relief will be deferred for consideration at a later hearing.

108.    I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to its business operations and constitutes a critical element in successfully implementing a chapter 11 strategy.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit A**.

**Part V**
**Information Required by Local Bankruptcy Rule 1007-2**

109.    Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which I have provided in **Exhibit D** through **Exhibit O**.  Specifically, these exhibits contain the following information with respect to Frontier (on a consolidated basis, unless otherwise noted):[30]

- **Exhibit D**. Pursuant to Local Bankruptcy Rule 1007-2(a)(3), provides the names and addresses of the members of, and attorneys prior to, any committee organized prior to the order for relief in these chapter 11 cases, and a brief description of the circumstances surrounding the formation of the committee.

- **Exhibit E**. Pursuant to Local Bankruptcy Rule 1007-2(a)(4), provides the following information with respect to each of the holders of the debtors' 50 largest unsecured claims, excluding claims of insiders:  the creditors name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of the person(s) familiar with the debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

- **Exhibit F**. Pursuant to Local Bankruptcy Rule 1007-2(a)(5), provides the following information with respect to each of the holders of the five largest secured claims against the debtors:  the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time.

---

[30]    The information contained in **Exhibit D** through **Exhibit O** attached to this declaration does not constitute an admission of liability by, nor is it binding on, Frontier.  Frontier reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

- **Exhibit G**. Pursuant to Local Bankruptcy Rule 1007-2(a)(6), provides a summary of the debtors' assets and liabilities.

- **Exhibit H**. Pursuant to Local Bankruptcy Rule 1007-2(a)(7), provides a summary of the publicly held securities of the debtors.

- **Exhibit I**. Pursuant to Local Bankruptcy Rule 1007-2(a)(8), provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity: the name; address; and telephone number of such entity and the court in which any proceeding relating thereto is pending.

- **Exhibit J**. Pursuant to Local Bankruptcy Rule 1007-2(a)(9), provides a list of property comprising the premises owned, leased, or held under other arrangement from which the debtors operate their business.

- **Exhibit K**. Pursuant to Local Bankruptcy Rule 1007-2(a)(10), sets forth the location of the debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the debtors outside the territorial limits of the United States.

- **Exhibit L**. Pursuant to Local Bankruptcy Rule 1007-2(a)(11), provides a list of the nature and present status of each action or proceeding, pending or threatened, against the debtors or their property where a judgment or seizure of their property may be imminent.

- **Exhibit M**. Pursuant to Local Bankruptcy Rule 1007-2(a)(12), sets forth a list of the names of the individuals who comprise the debtors' existing senior management, their tenure with the debtors, and a brief summary of their relevant responsibilities and experience.

- **Exhibit N**. Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), provides the estimated amount of payroll to the debtors' employees (not including officers, directors, and equity holders) and the estimated amounts to be paid to officers, equity holders, directors, and financial and business consultants retained by the debtors, for the 30-day period following the Petition Date.

- **Exhibit O**. Pursuant to Local Bankruptcy Rule 1007-2(b)(3), provides a schedule, for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the filing of the chapter 11 cases, and any other information relevant to an understanding of the foregoing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 15, 2020

*/s/ Carlin Adrianopoli*
Carlin Adrianopoli
Executive Vice President of Strategic Planning
Frontier Communications Corporation

## Exhibit A

**Evidentiary Support for First Day Pleadings[1]**

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the applicable First Day Motion.

**A.     Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "<u>Joint Administration Motion</u>").**

1.      The Debtors have filed several purely administrative or procedural First Day Pleadings, including a motion to jointly administer the Debtors' bankruptcy cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party-in-interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  Joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Also, joint administration will allow the U.S. Trustee and all parties-in-interest to monitor these chapter 11 cases with greater ease and efficiency.  Moreover, joint administration will not adversely affect the Debtors' respective constituencies because this Motion seeks only administrative, not substantive, consolidation of the Debtors' estates.  Parties-in-interest will not be harmed by the relief requested; instead, parties-in-interest will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

2.      I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest.  Accordingly, I respectfully submit that the Joint Administration Motion should be approved.

**B.     Debtors' Motion for Entry of Interim and Final Orders Establishing Certain Notice, Case Management, and Administrative Procedures (the "<u>Case Management Motion</u>").**

3.      The Debtors seek entry of an order approving and implementing the notice, case management, and administrative procedures (the "<u>Case Management Procedures</u>").

4.      Given the size and complexity of these chapter 11 cases, the Debtors believe that implementing the Case Management Procedures will facilitate the fair and efficient administration

2

of these chapter 11 cases and promote judicial economy.    Specifically, the proposed Case Management Procedures will benefit the Debtors, the Bankruptcy Court, and all parties-in-interest by, among other things:

> a.  assuring prompt and appropriate notice of matters affecting parties' interests;
>
> b.  allowing for electronic notice pursuant to the Bankruptcy Court's electronic filing system;
>
> c.  providing ample opportunity to parties-in-interest to prepare for and respond to matters before the Bankruptcy Court;
>
> d.  reducing the substantial administrative and financial burden that would otherwise be placed on the Debtors and other parties-in-interest who file documents in these chapter 11 cases;
>
> e.  reducing the administrative burdens on the Court and the clerk of the Court; and
>
> f.  providing for Omnibus Hearings for the Court to consider motions, pleadings, applications, objections, and responses thereto.

5.    I believe that the relief requested in the Case Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Motion should be approved.

**C.    Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs; (II) Waiving Requirements to File Lists of Equity Holders; and (III) Granting Related Relief (the "<u>Schedules and Statements Extension Motion</u>").**

6.    Pursuant to the Schedules and Statements Extension Motion, the Debtors seek entry of an order (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively,

the "Schedules and Statements") by thirty days, for a total of forty-four days from the Petition

Date, without prejudice to the Debtors' ability to request additional extensions; and (b) waiving

the requirements to file lists of equity security holders, as set forth in Fed. R. Bankr. P. 1007(a)(3).

7.      Given the size and complexity of the Debtors' business and financial affairs, and

the critical matters that the Debtors' management and professionals were required to address prior

to the commencement of these chapter 11 cases, the Debtors were not in a position to complete the

Schedules and Statements as of the Petition Date.

8.      I believe that preparing and submitting a list with the last known addresses for each

such equity security holder and sending notices to all such parties will be expensive and time

consuming and will serve little or no beneficial purpose.

9.      I believe that the relief requested in the Schedules and Statements Extension Motion

is in the best interest of the Debtors' estates, their creditors, and all other parties-in-interest and

will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

Accordingly, on behalf of the Debtors, I respectfully submit that the Bankruptcy Court should

approve the Schedules and Statements Extension Motion.

**D.      Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Fifty Largest Unsecured Creditors, (III) Authorizing the Debtors to Redact Certain Personally Identifiable Information for the Debtors' Employees, (IV) Approving the Form and Manner of Notifying Creditors of Commencement, and (V) Granting Related Relief (the "Creditor Matrix Motion").**

10.      The Debtors have filed a purely administrative or procedural First Day Pleading

requesting that the Bankruptcy Court enter an order (a) authorizing the Debtors to (i) prepare a

consolidated list of creditors (the "Creditor Matrix") in lieu of submitting a separate mailing matrix

for each Debtor, (ii) file a consolidated list of the Debtors' fifty largest unsecured creditors, and

(iii) redact certain personal identifiable information for the Debtors' employees; (b) approving the form and manner of notifying creditors of the commencement of these chapter 11 cases; and (c) granting related relief.

11.     Permitting the Debtors to maintain the Creditor Matrix in electronic format only, in lieu of each Debtor filing a creditor matrix, is warranted under the circumstances of these cases. Because the Debtors have many thousands of creditors and other parties-in-interest, converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk of error with respect to information already on computer systems maintained by the Debtors or their agents.

12.     The Debtors submit that the proposed maintenance of the Creditor Matrix by the Debtors' proposed Claims and Noticing Agent, Prime Clerk LLC ("Prime Clerk"), is consistent with applicable Local Rules.  Pursuant to Local Rule 5075-1, a debtor filing a petition with more than 250 creditors and equity interest holders, in the aggregate, as is the case here, is required to retain an approved claims and noticing agent pursuant to an order of the Court.

13.     Compiling separate top twenty creditor lists for each individual Debtor would consume a substantial amount of the Debtors' time and resources.  Further, the Debtors believe a single, consolidated list of the Debtors' fifty largest unsecured, non-insider creditors will aid the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") in its efforts to communicate with these creditors.  Filing a single consolidated list of the fifty largest unsecured creditors in these chapter 11 cases is appropriate for these reasons.

14.     The Creditor Matrix and Schedules and Statements may contain (a) the home addresses of individuals—including the Debtors' employees and former employees; such information can be used to perpetrate identity theft or locate survivors of domestic violence,

harassment, or stalking.  The Debtors therefore, propose to provide an unredacted version of the Creditor Matrix, Schedules and Statements, and any other applicable filings redacted to the proposed order to (a) the Court, the U.S. Trustee, counsel to the official committee of unsecured creditors appointed in these chapter 11 cases (if any), and (b) any party-in-interest upon a request to the Debtors or to the Court that is reasonably related to these chapter 11 cases.

15.     The Debtors believe that using Prime Clerk to undertake all mailings directed by the Court or the U.S. Trustee, or as required by section 342(a) of the Bankruptcy Code and Bankruptcy Rules 2002 (a) and (f) to all applicable parties will maximize efficiency in administering these chapter 11 cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee.  Additionally, Prime Clerk will assist the Debtors in preparing creditor lists and mailing initial notices, and therefore there are efficiencies in authorizing Prime Clerk to mail the notice of commencement of these chapter 11 cases. Accordingly, the Debtors respectfully submit that Prime Clerk should undertake such mailings.

16.     Accordingly, I respectfully submit that the Bankruptcy Court should approve the Creditor Matrix Motion.

**E.     Debtors' Application for an Entry of an Order (I) Authorizing and Approving the Appointment of Prime Clerk LLC as Claims and Noticing Agent, Effective *Nunc Pro Tunc* to the Petition Date, and (II) Granting Related Relief (the "Claims Agent Application").**

17.     The Debtors seek entry of an order (a) appointing Prime Clerk as the claims and noticing agent (the "Claims and Noticing Agent") in the Debtors' chapter 11 cases effective *nunc pro tunc* to the date of the commencement of these chapter 11 cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases, and (b) granting related relief.  Although

the Debtors have not yet filed their schedules of assets and liabilities, the Debtors anticipate that there will be thousands of entities to be noticed in these chapter 11 cases.

18.     Given the number of anticipated claimants and the complexity of the Debtors' business, the Debtors submit that the appointment of Prime Clerk as Claims and Noticing Agent is both required by Local Rule 5075-1(b) and is otherwise in the best interest of the Debtors' estates and their creditors, because the distribution of notices and the processing of claims will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

**F.      Debtors' Motion to Schedule an Expedited Hearing and Shorten the Notice Period with Respect to the Debtors' Motion to Sell the Pacific Northwest Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, and the Debtors' Assumption of Certain Executory Contracts and Unexpired Leases (the "Expedited Hearing Motion").**

19.     Pursuant to the Expedited Hearing Motion, the Debtors seek entry of an order shortening the notice period with respect to the Sale Motion.[2]  The Debtors request that the Court schedule the Sale Motion for hearing on April [●], 2020 at [●]:00 a/p.m.[3], prevailing Eastern Time, and modify the deadline for the service and filing of responses or objections to the Sale Motion to April [●], 2020 at 12:00 p.m., prevailing Eastern Time.

20.     As set forth more fully in the Adrianopoli Declaration attached as Exhibit B to the Expedited Hearing Motion, I believe that the relief requested in the Expedited Hearing Motion is in the best interest of the Debtors' estates, their creditors, and all other parties-in-interest.

---

[2]     *Debtors' Motion for Entry of an Order (I) Authorizing and Approving (A) the Assumption of the Purchase Agreement, (B) The Sale of the Debtors' Pacific Northwest Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, and (C) the Debtors' Assumption of Certain Executory Contracts and Unexpired Leases, and (II) Granting Related Relief,* filed contemporaneously herewith.

[3]     At the time of filing this Declaration, no time has been requested for this hearing.

Accordingly, on behalf of the Debtors, I respectfully submit that the Expedited Hearing Motion should be approved.

## Operational Motions

G.      **Debtors' Motion for Entry of an Interim Order (A) Granting Adequate Protection, (B) Authorizing the Unsecured Subsidiary Debt Payments, (C) Modifying the Automatic Stay, and (D) Granting Related Relief, and (II) A Final Order (A) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing, (B) Granting Liens and Superpriority Administrative Expense Claims, (C) Authorizing Repayment of the Prepetition Revolving Claims, (D) Modifying the Automatic Stay, and € Granting Related Relief (the "DIP Motion").**

21.     Pursuant to the DIP Motion, the Debtors seek entry of an interim order granting the Prepetition Secured Parties and the Prepetition Frontier Southwest Notes Secured Parties adequate protection and authorizing the Debtors to make the Unsecured Subsidiary Debt Payments in the ordinary course consistent with their sound business judgement.  Additionally, the Debtors seek entry of a final order authorizing the Debtors to (a) obtain postpetition financing pursuant to a senior secured, superpriority debtor-in-possession revolving credit facility in an aggregate principal amount of up to $460 million (the "DIP Revolving Facility") and (b) execute and deliver all agreements, documents, and instruments contemplated by the DIP Orders, the DIP Term Sheet, and the DIP Credit Agreement.  The Debtors further seek the Court's final approval of the sufficiency of the adequate protection provided to the Prepetition Secured Parties and the Prepetition Frontier Southwest Notes Secured Parties and the authorization to make the Unsecured Subsidiary Debt Payments in the ordinary course.

22.     The Debtors received multiple proposals from lenders both within and outside their existing capital structure for in-court financing.  Together with their advisors, the Debtors provided the necessary due diligence and undertook the negotiations necessary to secure the proposed DIP Facility that is now before the Court.  This process was ultimately successful, culminating in the

proposed $460 million new money DIP Facility, which will, upon the satisfaction of certain conditions, convert in an exit facility providing the Debtors with access to necessary liquidity post emergence.  The DIP Facility allows the Debtors to signal to their customers, vendors, employees, and lenders that operations will continue in the ordinary course.  Irrespective of whether the Debtors draw on the DIP Facility, I believe that the relief provided by this Motion is highly valuable to the Debtors and will provide:  (a) the assurance of an available postpetition debtor-in-possession financing commitment to draw on, if necessary, in the form of a revolving credit facility in a fully committed amount of $460 million; (b) critical letter of credit capacity for the Debtors' to competitively bid in the upcoming Rural Digital Opportunity Fund ("RDOF") auction;  and (c) subject to meeting certain conditions, a commitment for exit financing.

23.     As set forth more fully in the Shah Declaration, which will be filed contemporaneously with the Final Order, the Debtors believe that the DIP Financing pending approval before the Court represents the Debtors' best and only available financing option.  I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, I respectfully submit that the DIP Motion should be approved.

**H.      Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief (the "<u>Cash Management Motion</u>").**

24.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders  (a) authorizing, but not directing, the Debtors to (i) continue to operate their cash management system (the "<u>Cash Management System</u>"); (ii) honor certain prepetition obligations

related thereto; (iii) maintain existing Business Forms (as defined below) in the ordinary course of business; and (iv) continue to perform Intercompany Transactions (as defined below) consistent with historical practice; (b) granting superpriority administrative expense status to postpetition intercompany balances; and (c) granting related relief.

25.    In the ordinary course of business, the Debtors maintain a cash management system (the "Cash Management System") comprised of sixty-one bank accounts (collectively, the "Bank Accounts").  The Debtors' financial personnel manage the Cash Management System from the Debtors' principal executive office located in Norwalk, Connecticut.  Cash sent to each Disbursement Account is used to satisfy the Debtors' financial obligations.  The Debtors have designed the Cash Management System to meet their operating needs, enable management to control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances.

26.    Given the economic and operational scale of the Debtors' business, any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' business and operations to the detriment of their estates and stakeholders.  Accordingly, to minimize the disruption caused by these chapter 11 cases and to maximize the value of the Debtors' estates, the Debtors request authority to continue utilizing their existing Cash Management System during the course of these chapter 11 cases, subject to the terms described in the Cash Management Motion.

27.    The Cash Management System is composed of sixty-one bank accounts (collectively, the "Bank Accounts") with the following banking institutions (collectively, the "Banks"):

- 2 Bank Accounts at Associated Bank, N.A.;

- 1 Bank Account at BlackRock Investments, Inc.;

- 2 Bank Accounts at Deutsche Bank AG;

- 1 Bank Account at Deutsche Bank-DWS;

- 1 Bank Account at Fidelity Investments Institutional Services Co.;

- 6 Bank Accounts at Fifth Third Bank;

- 1 Bank Account at First Montana Bank, Inc. ("First Montana");

- 1 Bank Account at Goldman Sachs & Co.;

- 9 Bank Accounts at HSBC Bank USA, N.A.;

- 24 Bank Accounts at JPMorgan Chase Bank, N.A. ("JPMorgan");

- 1 Bank Account at JPMorgan Asset Management;

- 3 Bank Accounts at M&T Bank;

- 1 Bank Account at Morgan Stanley;

- 1 Bank Account at Norwich Telops Federal Credit Union ("Norwich Telops");

- 2 Bank Accounts at PNC Bank, Delaware ("PNC");

- 1 Bank Account at TD Bank, N.A.;

- 1 Bank Account at Umpqua Bank; and

- 3 Bank Accounts at Wells Fargo Bank, N.A.

28.     As of the Petition Date, the Debtors have $767.7 million cash on hand, including $50.2 million restricted cash, with approximately $0.4 million of availability under their revolving credit facility (the "Revolving Credit Facility") for which JPMorgan serves as administrative agent (in such capacity, the "RCF Agent").

29.     The Debtors' Cash Management System facilitates the timely and efficient collection, management, and disbursement of funds used in the Debtors' business.  Because of the nature of the Debtors' business and the disruption to the business that would result if the Debtors

were forced to close their existing bank accounts, it is critical that the existing Cash Management System remain in place.

30.     The majority of the banks in the Debtors' Cash Management System are designated as authorized depositories in the Southern District of New York pursuant to the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines").  While the Restricted Cash Account is not held at an authorized depository and exceeds the Federal Deposit Insurance Corporation ("FDIC") insurance limit, the Debtors are subject to restrictions placed upon the account.  Accordingly, the Debtors are unable to directly access the funds in this account, and will not have the ability to draw on the account during the pendency of these chapter 11 cases.  First Montana, Norwich Telops, PNC, and Umpqua Bank are insured by the FDIC, but are not authorized depositories.  Nevertheless, the Debtors believe that they can maintain the Bank Accounts at these institutions without jeopardizing any parties-in-interest and that any funds deposited in the Bank Accounts are secure, particularly since the accounts held with these financial institutions are less than $250,000 in the aggregate and are fully insured by the FDIC.  Investments of excess cash in the Short Term Investment Accounts are made pursuant to the Debtors' prudent investment guidelines (the "Investment Practices"), which are designed to maximize yield and liquidity.  Given that investments of excess cash in the Short Term Investment Accounts are made pursuant to the Debtors' prudent investment guidelines, and that the Short Term Investment Accounts invest in prime money market funds which are all Triple-A rated and operate pursuant to Securities and Exchange Commission ("SEC") Rule 2e-7, the Debtors believe that the funds held in the Short Term Investment Accounts are secure.

31.     In the ordinary course of business, the Debtors engage in routine business relationships with each other, including payments and transfers from one Debtor to another

12

(the "Intercompany Transactions"), some of which result in intercompany receivables and payables (the "Intercompany Balances"). Accordingly, at any given time there may be Intercompany Balances owing by one Debtor to another Debtor. Such Intercompany Transactions are typically conducted pursuant to ordinary use of the Debtors' Cash Management System, joint use of certain shared service platforms, and intercompany ordinary course business transactions, among others.

32.    Intercompany Balances are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems. The Debtors monitor, and will continue to monitor on a postpetition basis, the incurrence and settlement of Intercompany Balances. Discontinuing Intercompany Transactions would unnecessarily disrupt the Cash Management System and the Debtors' operations. To ensure each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors respectfully request, pursuant to section 503(b)(1) of the Bankruptcy Code, that all postpetition payments from a Debtor to another Debtor on account of an Intercompany Transaction be accorded administrative expense status. This relief will ensure that each entity receiving payments from a Debtor will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions would jeopardize the recoveries available to each Debtor's respective creditors.

33.    In the ordinary course of business, the Debtors incur periodic service charges and other fees in connection with maintaining the Cash Management System (collectively, the "Bank Fees"). The Debtors incur approximately $2,430,000 per month on account of the Bank Fees in the aggregate. The Debtors estimate that they owe approximately $250,000 as of the Petition Date, all of which will become due and payable within twenty-one days of the Petition Date. To maintain

the integrity of their Cash Management System, the Debtors request authority to pay any prepetition Bank Fees for prepetition transactions that are charged postpetition and to continue to pay the Bank Fees in the ordinary course on a postpetition basis.

34.    As part of their Cash Management System, the Debtors use various preprinted business forms, such as letterheads or checks, (the "Business Forms") in the ordinary course.  To minimize expenses to their estates and avoid confusion during the pendency of these chapter 11 cases, the Debtors request that the Court authorize the Debtors' continued use of all existing preprinted correspondence and Business Forms (including, without limitation, letterhead, checks, and other Business Forms) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new Business Forms.  The Debtors submit that once they have exhausted their existing stock of Business Forms, if the Debtors remain in chapter 11, they shall ensure that any new Business Forms are clearly labeled "Debtor In Possession" and, with respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labeled "Debtor In Possession."

35.    I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties-in-interest, will allow for efficient utilization of the Debtors' cash resources, and will enable the Debtors' businesses to continue operating during these chapter 11 cases.  Accordingly, I respectfully submit that the Cash Management Motion should be approved.

I.   **Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (II) Continue Employee Benefits Programs (the "Wages Motion").**

36.   Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders to (a) pay prepetition wages, salaries, other compensation, and reimbursable employee expenses and (b) continue employee compensation and benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto.

37.   As of the Petition Date, the Debtors employed approximately 17,700 Employees, the majority of whom are full-time Employees.   Approximately 13,200 Employees are compensated on an hourly basis, and approximately 4,500 are salaried.   Approximately 12,400 Employees are Represented Employees.   Additionally, from time to time, the Debtors retain Independent Contractors and hire Temporary Staff to supplement their workforce.

38.   Without the continued, uninterrupted services of the Debtors' workforce, the ability of the Debtors to maintain and administer their estates will be materially impaired, and the Debtors' ongoing business could be severely and adversely affected.   The Debtors seek to continue their applicable prepetition Employee Compensation and Benefits in the ordinary course.   Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, and/or discontinue any of their Employee Compensation and Benefits and/or to implement new programs, policies, and benefits in the ordinary course of business on a postpetition basis during these chapter 11 cases in the Debtors' sole discretion.

39.   By this Motion, the Debtors seek authority to:   (a) pay and honor certain prepetition claims relating to, among other things, Wage Obligations, Unpaid Contractor and Temporary Staffing Obligations, Withholding Obligations, Reimbursable Expenses, Incentive and Retention Programs, the Relocation Program, Director Compensation, Health and Welfare Coverage and

15

Benefits, Workers' Compensation Programs, the 401(k) Plans and other retiree benefits, Paid Time

Off Benefits, Tuition Benefits, Severance Benefits, and certain other benefits that the Debtors have

historically provided in the ordinary course; and (b) pay all costs related to or on account of the

Employee Compensation and Benefits, including administrative costs.

40.     Additionally, the Debtors seek to continue their applicable prepetition Employee

Compensation and Benefits in the ordinary course.  Out of an abundance of caution, the Debtors

further request confirmation of their right to modify, change, and/or discontinue any of their

Employee Compensation and Benefits and/or to implement new programs, policies, and benefits

in the ordinary course of business on a postpetition basis during these chapter 11 cases in the

Debtors' sole discretion.

41.     The Debtors additionally request authority to make industry standard non-ordinary

course adjustments to the Employee Compensation and Benefits in response to the ongoing

COVID-19 pandemic.

42.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the

Employee Compensation and Benefits to priority treatment.  As priority claims, the Debtors are

required to pay these claims in full to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(B).

Additionally, the Debtors should be authorized to pay certain withholding obligations amounts

that governments, Employees, and judicial authorities have designated for deduction from

Employees' wages and that federal, state, and local government require the Debtors to remit.  *See*

11 U.S.C. §§ 541(b)(1), (d) & 26 U.S.C. §§ 6672, 7501(a).

43.     I believe the relief requested in the Wages Motion represents a sound exercise of

the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the

Debtors' estates, and is therefore justified under sections 105(a), 362(d), 363(b), 507(a), and

541(b)(1) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1(a).

The Debtors believe that without the relief requested in the Wages Motion, Employees may seek

alternative employment opportunities, perhaps with the Debtors' competitors, which would

deplete the Debtors' workforce and hinder the Debtors' ability to operate their businesses.

44.     As such, I believe the relief requested in the Wages Motion is in the best interest of

the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to

continue to operate their businesses in chapter 11 without disruption.  Accordingly, I respectfully

submit that the Wages Motion should be approved.

> **J.      Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Claims of (I) Critical Vendors, (II) Lien Claimants, and (III) Section 503(b)(9) Claimants in the Ordinary Course of Business on a Postpetition Basis (the "<u>Critical Vendor Motion</u>").**

45.     The Debtors seek entry of interim and final orders authorizing, but not directing,

the Debtors to pay, in their sole discretion: (a) prepetition claims of critical vendors (the "<u>Critical</u>

<u>Vendor Claims</u>"), in an amount not to exceed $34.4 million; (b) prepetition claims of distribution

vendors, construction vendors, and other lien claimants (the "<u>Lien Claims</u>"), in an amount not to

exceed $21.2 million; and (c) prepetition claims of 503(b)(9) claimants (the "<u>503(b)(9) Claims</u>"

and, together with the Critical Vendor Claims and Lien Claims, the "<u>Trade Claims</u>," and

the holders of Trade Claims, collectively, the "<u>Vendors</u>"), in an amount not to exceed

$17.8 million.  The Debtors also request authority to designate additional Critical Vendors (as

defined herein) as necessary to maintain employee health and safety during the COVID-19

pandemic.

46.     The Debtors request authorization to pay the prepetition claims of certain Vendors

in light of the importance of the products and services they provide.  Because of the nature of the

Debtors' businesses, the Debtors believe many vendors are in a position to make credible and

actionable threats to cease to supply the Debtors with the specialized goods and services necessary to maintain the smooth operation of the Debtors' businesses while in chapter 11, or may otherwise impair the Debtors' ability to operate their businesses if they are not paid on account of their prepetition debts. Accordingly, to maintain stability during the opening days of these chapter 11 cases and to avoid jeopardizing the Debtors' ability to service their customers going forward, I believe that the relief requested in this Motion should be granted.

47. *The Critical Vendors*. The Debtors have identified certain Vendors (collectively, the "Critical Vendors") that supply products and services (collectively, the "Critical Vendor Products and Services") that are vital to the Debtors' operations. The Debtors rely on the Critical Vendor Products and Services to operate their businesses, and depend on the Critical Vendors' timely provision of specialized services to provide top-quality content and services to their customer base.

48. As of the Petition Date, the Debtors believe they owe the Critical Vendors approximately $34.4 million. Accordingly, the Debtors request authorization, but not direction, to pay all outstanding prepetition obligations on account of the Critical Vendor Claims, up to $34.4 million in the aggregate, but only as such amounts come due in the ordinary course of business or as may be necessary to secure a Vendor's agreement to continue business with the Debtors on Customary Trade Terms. The $34.4 million of requested relief is approximately 20.7 percent of the Debtors' outstanding accounts payable as of the Petition Date.

49. *The Lien Claimants*. The Debtors routinely transact business with a number of third parties who may assert various statutory liens (the "Lien Claimants"), including mechanics' liens, against the Debtors and their property if the Debtors fail to pay for the services rendered. The Lien

Claimants primarily consist of:  (a) fleet, shipping, and warehouse Vendors and (b) Vendors providing construction services and outside plant projects.

50.     As of the Petition Date, the Debtors estimate that approximately $21.2 million is owed to Lien Claimants.  Accordingly, the Debtors seek authorization, but not direction, to pay outstanding prepetition obligations on account of the Lien Claims, up to $21.2 million in the aggregate, but only as such amounts come due in the ordinary course of business or as may be necessary to secure a Vendor's agreement to continue business with the Debtors on Customary Trade Terms, and to continue to pay the Lien Claimants in the ordinary course of business.

51.     *The 503(b)(9) Claimants*.  The Debtors have received certain goods from various Vendors within the twenty days before the Petition Date (collectively, the "503(b)(9) Claimants"). Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, the Debtors often obtain supplies on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims. The Debtors also believe certain 503(b)(9) Claimants could reduce the Debtors' existing trade credit—or demand payment in cash on delivery—further exacerbating the Debtors' limited liquidity.

52.     The Debtors seek separate relief for the 503(b)(9) Claimants because the undisputed claims arising from the value of such goods received by the Debtors within twenty days before the Petition Date that have been sold to the Debtors in the ordinary course of business may be entitled to administrative priority under Section 503(b)(9) of the Bankruptcy Code.

53.     As of the Petition Date, the Debtors believe they owe approximately $17.8 million on account of the 503(b)(9) Claims.  The Debtors seek authorization, but not direction, to pay outstanding prepetition obligations on account of the 503(b)(9) Claims, up to $17.8 million in the

aggregate, but only as such amounts come due in the ordinary course of business or as may be necessary to secure a Vendor's agreement to continue business with the Debtors on Customary Trade Terms, and to continue to pay the 503(b)(9) Claims as they come due in the ordinary course of business.

54.    The Debtors intend to pay Trade Claims only to the extent necessary to preserve their businesses.  The Debtors have designated a core group of executives, advisors, and employees who have experience in the Debtors' businesses and in the reorganization process to review, assess, and potentially recommend any payment on account of a Trade Claim.  In return for paying the Trade Claims, the Debtors will use commercially reasonable efforts to condition payment of the Trade Claims upon each Vendor's agreement to continue supplying goods and services on customary trade terms.

55.    In particular, the Debtors will condition the payment of Critical Vendor Claims upon each such party's agreement to continue supplying goods or services on Customary Trade Terms by executing a trade agreement (each, a "Trade Agreement").  Each such Trade Agreement, once agreed to and accepted by a Critical Vendor, shall be a legally binding contractual arrangement between the parties governing the commercial trade relationship.

56.    The Debtors also seek limited authority to pay Critical Vendor Claims in the event that no Trade Agreement has been executed if the Debtors determine, in their business judgment, that a formal Trade Agreement is unnecessary to ensure a vendor's continued performance on Customary Trade Terms.  If any party accepts payment pursuant to the relief requested and thereafter does not continue to provide goods or services on Customary Trade Terms, then: (a) such payment may be deemed to be an improper postpetition transfer on account of a prepetition claim and therefore immediately recoverable by the Debtors in cash upon written

request; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested to such outstanding postpetition balance, and such Vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

57.    I believe that the relief requested in the Critical Vendor Motion is in the best interest of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendor Motion should be approved.

**K.    Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Pay or Honor Prepetition Claims of Content Providers (the "<u>Content Provider Motion</u>").**

58.    The Debtors seek entry of interim and final orders (a) authorizing the Debtors to pay or honor prepetition claims and obligations due and owing to the Debtors' Content Providers in the ordinary course of their operations; and (b) granting related relief.

59.    The Debtors provide customers a range of television services.  To provide such programming, the Debtors contract with content providers, such as Fox Corporation, CBS Corporation, and Viacom Inc. (the "<u>Direct Content Providers</u>") that provide certain television services through their stations and/or networks, such as Fox, Showtime Networks Inc., and MTV. Additionally, the Debtors contract with the National Cable Television Cooperative (the "<u>NCTC</u>"), a consortium of independent cable companies that consolidates intellectual property rights agreements for multiple cable providers (collectively, NCTC and the Direct Content Providers are

the "Content Providers").[4]    The Debtors have approximately 660,000 video subscribers,[5] representing approximately $58.5 million of monthly revenue, and the ability to deliver continuous, reliable television programming is important to maintaining customer revenue streams.

60.    Serving the Debtors' customers requires the Debtors to receive reliable and continuous programming from the Content Providers, particularly while a significant percentage of the Debtors' customer base is confined to their homes.  Non-payment of a Content Provider could cause the Debtors' customers to lose access to video services, which could in turn have significant adverse effects on the Debtors.  If the Debtors are unable to provide access to television programs and other video content, their customers are likely to seek alternative providers, resulting in customer and revenue loss for the Debtors.  Accordingly, any interruption in the services provided by the Content Providers would directly affect the Debtors' revenues and overall restructuring efforts to the detriment of all parties in interest in these chapter 11 cases.

61.    Accordingly, the Debtors seek authorization, but not direction, to pay outstanding Content Provider Claims, up to $35,877,000 in the aggregate, but only as such amounts come due in the ordinary course of business or as may be necessary to secure a Content Provider's continued performance, and to continue to pay the Content Providers in the ordinary course of business.

62.    I believe that the relief requested in the Content Provider Motion is in the best interest of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Content Provider Motion should be approved.

---

[4]    The Debtors also have an agency agreement with DISH Network ("Dish"), which is discussed in the Customer Programs Motion filed contemporaneously with this Motion.

[5]    Exclusive of DISH video subscribers.

**L.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and Continue Certain Customer Programs in the Ordinary Course of Business and (II) Granting Related Relief (the "Customer Programs Motion").**

63.      Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders, (a) authorizing, but not directing, the Debtors to honor certain prepetition obligations to customers and continue certain customer programs in the ordinary course of business, and (b) granting related relief.

64.      Customer receipts are a major component of the Debtors' receivables.  The Debtors primarily conduct their operations through long-term contracts with their residential and commercial customers under which the Debtors provide telecommunication services (the "Customer Contracts").  The Debtors' business operations are thus highly dependent on the uninterrupted continuation of the Customer Contracts.  Further, the Debtors' customers are the lifeblood of the Debtors' businesses.  Maintaining the Customer Contracts, and honoring any obligations on behalf of Advanced Billings, is critical to the Debtors' long-term success and viability.

65.      Additionally, the Debtors provide certain customer-related programs, policies, incentives, discounts, and other accommodations (collectively, the "Customer Programs") to customers to develop and maintain positive relationships.  The Debtors estimate that they spend approximately $1,000 for each new customer acquired and approximately $2,500 for each new commercial customer acquired.  Were the Debtors unable to continue the Customer Programs, resulting in customer attrition, the Debtors would lose the benefit of this significant upfront investment.

66.      As of the Petition Date, the Debtors estimate that there are approximately $21.2 million of prepetition obligations outstanding related to Customer Programs.

These obligations include amounts owed under the Debtors' Sales Promotions, Marketing Campaigns, Upgrade Programs, Retention Programs, Employee Discounts, Service Level Guarantees, Wholesale Programs, Customer Deposits, and Customer Refunds (each, a Customer Program). Additionally, the Debtors owe certain third parties amounts and obligations for goods and services associated with customer acquisition, retention, and experience, including amounts and obligations under or to the Debtors' Third-Party Providers Programs, Transition Services Agreements, Channel Partners, MDU Partners, Marketing Partners, and Community Partnerships (each, a Customer Program).

67.     The Customer Programs are critical to customer acquisition and retention, which in turn drives revenue. Further, the Customer Programs promote and maintain customer satisfaction, which, in turn, increases the Debtors' goodwill and brand value. In such a competitive industry, maintaining customer goodwill is critical to the Debtors' ongoing operations in these chapter 11 cases and the preservation and maximization of stakeholder value.

68.     I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

**M.     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Their Obligations Under Prepetition Insurance Policies, (B) Continue to Pay Certain Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, (D) Maintain their Surety Bond Program, and (E) Enter into New Financing Agreements in the Ordinary Course of Business and (II) Granting Related Relief (the "Insurance Motion").**

69.     The Debtors seek entry of interim and final orders (a) authorizing the Debtors to (i) pay their obligations under prepetition insurance policies, (ii) continue to pay certain brokerage

24

fees, (iii) renew, supplement, modify, or purchase insurance coverage in the ordinary course, (iv) maintain their Surety Bond Program on an uninterrupted basis, and (v) enter into new premium financing agreements in the ordinary course of business; and (b) granting related relief.   In addition, the Debtors request a final hearing be scheduled by the Court within approximately 25 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

70.     The Debtors are the beneficiaries of various insurance policies administered by certain third-party insurance carriers.  Continuation of the Insurance Policies and entry into new insurance policies and premium financing agreements, as applicable, are essential to the preservation of the value of the Debtors' properties and assets.  Moreover, in many instances, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts governing the Debtors' commercial activities, including the requirement of the United States Trustee for the Southern District of New York that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.

71.     Accordingly, the Debtors request authority to maintain their existing Insurance Policies, pay prepetition obligations related thereto, including those related to Claims Administration Fees, enter into new insurance policies and premium financing agreements, as applicable, in the ordinary course of business, supplement, amend, renew, or extend any existing Insurance Policies, and comply with Insurance Carrier modifications to the Collateral Requirements (including paying fees associated with such Collateral Requirements), as applicable, in the ordinary course of business.

72.     The Debtors utilize the services of certain Insurance Brokers, whose services are necessary to the Debtors' ability to obtain Insurance Policies on advantageous terms and at

competitive rates.  The Insurance Brokers' services will also facilitate the proper maintenance of the Debtors' Insurance Policies postpetition and ensure adequate protection of the Debtors' property.  Accordingly, the Debtors request authority to continue paying amounts owed to the Insurance Brokers in the ordinary course of business on a postpetition basis and replace any of the Insurance Brokers as may be necessary.

73.     Moreover, in the ordinary course of business, certain statutes, rules, contracts, and regulations require that the Debtors provide surety bonds to certain third parties, often to governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations.  The Debtors obtain their Surety Bonds through their surety broker, which assists the Debtors in, among other things, obtaining the Surety Bonds and evaluating bond offerings.  The Debtors request authority to continue paying the Surety Premiums and Surety Brokerage Fees in the ordinary course of business on a postpetition basis, including any prepetition obligations related thereto, to ensure uninterrupted coverage under the Surety Bond Program.

74.     I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**N.     Debtors' Motion Seeking Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief (the "Equity Trading Motion").**

75.     Pursuant to the Equity Trading Motion, the Debtors seek entry of orders (a) approving certain notification and hearing procedures related to certain transfers, or declarations of worthlessness with respect to, the Debtors' Common Stock or any Beneficial Ownership therein, and (b) directing that any purchase, sale, or other transfer of, or declaration of

worthlessness with respect to, any Beneficial Ownership of Common Stock in violation of the Procedures shall be null and void *ab initio*. In addition, the Debtors request that a final hearing be scheduled by the Court within approximately twenty-five (25) days of the commencement of these chapter 11 cases to consider approval of the Equity Trading Motion on a final basis.

76.     As of December 31, 2019, the Debtors estimate that they have approximately $2.2 billion of federal NOLs, approximately $412 million of interest expense deductions that have been deferred under Section 163(j) of the IRC, and federal credit carryforwards of approximately $22.7 million (collectively, and together with certain other tax attributes, the "Tax Attributes"). These federal and state NOL amounts take into account certain retroactive tax changes under the recently-enacted Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"). The Tax Attributes are of significant value to the Debtors because the Debtors can potentially carry forward the Tax Attributes to offset taxable income in future years. Additionally, the Debtors may utilize such Tax Attributes to offset any taxable income generated by transactions consummated during these chapter 11 cases. The value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

77.     The Tax Attributes are substantial, and I believe that any termination or limitation of the Tax Attributes, including during the first month of these chapter 11 cases, could cause significant and irreparable damage to the Debtors' estates and stakeholders. The Debtors seek limited relief that will enable them to closely monitor certain transfers of Beneficial Ownership of Common Stock and certain worthless stock deductions with respect to Beneficial Ownership of Common Stock, so as to be in a position to act expeditiously to prevent such transfers or worthlessness deductions, if necessary, with the purpose of preserving the Tax Attributes. The Interim and Final Order will affect only (a) holders of the equivalent of Beneficial Ownership of

more than 4,730,870 shares of Common Stock (*i.e.*, 4.5 percent or more of outstanding Common Stock) and parties who are interested in purchasing Common Stock from such holders; (b) parties who are interested in purchasing sufficient Common Stock to result in such party becoming a holder of 4.5 percent or more of Beneficial Ownership of outstanding Common Stock; and (c) any "50-percent shareholder" seeking to claim a worthless stock deduction.

78.     I further believe that the Procedures and other relief requested in the Equity Trading Motion are critical for maximizing estate value and will help ensure a meaningful recovery for creditors.  If no restrictions on trading or worthlessness deductions are imposed as requested in the Equity Trading Motion, such trading or deductions could severely limit or even eliminate the Debtors' ability to utilize the Tax Attributes.  I believe that the loss of these valuable estate assets could lead to significant negative consequences for the Debtors, their estates, their stakeholders, and the overall reorganization process.  I believe that the relief requested in the Equity Trading Motion is in the best interest of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Equity Trading Motion should be approved.

O.      **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payments of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "<u>Taxes and Fees Motion</u>").**

79.     Pursuant to the Taxes and Fees Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors, in their sole discretion, to remit and pay (or use applicable credits to offset) Taxes and Fees and (b) granting related relief.  In addition, the Debtors request a final hearing be scheduled by the Court within approximately 25 days of the commencement of these chapter 11 cases to consider entry of the Final Order.

80.     In the ordinary course of business, the Debtors bill, collect, incur, remit and.or pay sales and use taxes, personal and real property taxes, and/or various other governmental taxes, fees, and assessments, as applicable, to various federal, state, local, and tribal governmental units, including taxing authorities.  The Debtors have remitted and paid Taxes and Fees through checks and electronic transfers processed through the Debtors' cash management system.  The Debtors estimate that up to $344.2 million in Taxes and Fees relating to the prepetition period are accrued and unpaid as of the Petition Date.

81.     Payment of the Taxes and Fees is critical to the Debtors' continued and uninterrupted operations.  The Debtors' failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways.  *First*, failing to pay certain of the Taxes and Fees likely would cause the Debtors to lose their ability to conduct business in certain jurisdictions.  *Second*, the Governmental Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from the reorganization process.  *Third*, failing to pay Taxes and Fees could potentially subject certain of the Debtors' directors and officers to claims of personal liability, which likely would distract those key persons from their duties related to the Debtors' restructuring.  *Fourth*, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtors' business or the reorganization process.  Moreover, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Governmental Authorities, and these funds may not constitute property of the Debtors' estate.

82.     I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the

Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, I respectfully submit that the Taxes and Fees Motion should be approved.

> **P.**     **Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (II) Determining Adequate Assurance of Payment for Future Utility Service, (III) Establishing Procedures for Determining Adequate Assurance of Payment, (IV) Authorizing Fee Payments to the Utility Agent, and (V) Granting Related Relief (the "<u>Utilities Motion</u>").**

83.     Pursuant to the Utilities Motion, the Debtors seek entry of an interim and final order: (a) prohibiting utility providers from altering, refusing, or discontinuing services; (b) determining adequate assurance of payment for future utility services; (c) establishing procedures for determining adequate assurance of payment for future utility services; (d) authorizing fee payments to the utility agent (the "<u>Utility Agent</u>"); and (e) granting related relief.

84.     In connection with the operation of their businesses, the Debtors obtain water, sewer service, telecommunications, electricity, waste disposal, natural gas, water, and other similar services (collectively, the "<u>Utility Services</u>") from a number of utility providers (collectively, the "<u>Utility Providers</u>"). The relief requested herein is requested with respect to all Utility Providers providing Utility Services to the Debtors, irrespective of whether such Utility Providers are identified on the Utility Providers List.

85.     To manage the Debtors' payments owed to their Utility Providers, the Debtors pay certain of the Utility Providers through a third party. Specifically, the Utility Agent pays certain Utility Providers directly for Utility Services on behalf of the Debtors. In practice, those certain Utility Providers submit invoices directly to the Utility Agent. In general, the Utility Agent then bills the Debtors electronically daily. The Debtors transfer funds to the Utility Agent within one to three days of the invoice. In addition, the Debtors deal directly with a small subset of Utility

Providers.  Of note, the Debtors pay the Utility Provider directly on account of their corporate cell phone plan.

86.    The Debtors pay the Utility Agent a monthly fee of approximately $140,000 in the ordinary course of business (the "Utility Agent Fees").  The Debtors pay the monthly fee upon receipt of invoice, so as of the Petition Date, the Debtors owe $140,000 in Utility Agent Fees.  The Debtors seek authority to honor any amounts owed on account of prepetition Utility Agent Fees and to pay any Utility Agent Fees that may arise on a postpetition basis in the ordinary course of business in accordance with prepetition practices to ensure that the Utility Services are uninterrupted.

87.    The Debtors believe that cash held by the Debtors, generated in the ordinary course of business, and cash otherwise available to the Debtors will provide sufficient liquidity to pay the Utility Agent Fees in accordance with prepetition practice during the pendency of these chapter 11 cases.

88.    To provide additional assurance of payment, the Debtors propose to deposit into a segregated account $8.1 million (the "Adequate Assurance Deposit").  The amount of the Adequate Assurance Deposit is approximately one half of the Average Monthly Utility Expenses (the "Adequate Assurance Amount").  The Adequate Assurance Deposit will be held in the segregated account at a bank selected by the Debtors for the benefit of the Utility Providers (the "Adequate Assurance Account"), and, for the duration of these chapter 11 cases, may be applied to any postpetition defaults in payment to the Utility Providers.  The Adequate Assurance Deposit will be held by the Debtors; no liens will encumber the Adequate Assurance Deposit or the Adequate Assurance Account.  The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors ability to pay for future utility services in accordance with their

prepetition practices (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code.

89.     Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing business operations.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted.  Such disruption would jeopardize the Debtors' ability to administer their chapter 11 cases and adversely affect customer goodwill and employee relations, which, in turn, would negatively affect the Debtors' revenues.  Accordingly, it is essential that the Utility Services continue uninterrupted during the chapter 11 cases.

90.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, I respectfully submit that the Utilities Motion should be approved.

## Exhibit B

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL STATUTES, RULES, AND LAWS.   THIS RESTRUCTURING SUPPORT AGREEMENT AND THE INFORMATION CONTAINED HEREIN ARE SUBJECT TO THE TERMS OF ANY CONFIDENTIALITY AGREEMENTS (AS DEFINED HEREIN).

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules attached hereto in accordance with Section 15.02, this "**Agreement**") is made and entered into as of April 14, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) and (ii) of this preamble, collectively, the "**Parties**"):[1]

    i.    Frontier Communications Corporation, a company incorporated under the Laws of Delaware ("**Frontier**"), and each of its direct and indirect subsidiaries listed on **Exhibit A** to this Agreement that has executed and delivered counterpart signature pages to this Agreement to the Noteholder Groups Counsels (the Entities in this clause (i), collectively, the "**Company Parties**"); and

    ii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Senior Notes Claims that have executed and delivered counterpart signature pages to this Agreement on the Execution Date or subsequently delivered a Joinder or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting Noteholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Noteholders have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms (a) set forth in this Agreement and (b) as specified in the restructuring term sheet attached as **Exhibit B** hereto

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1 of this Agreement or the Restructuring Term Sheet (as defined below), as applicable.

(as may be amended, supplemented, or modified from time to time in accordance with the terms hereof, the "**Restructuring Term Sheet**") (such transactions as described in, and in accordance with, this Agreement and the Restructuring Term Sheet, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement (including the exhibits hereto).

**NOW, THEREFORE**, in consideration of the representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**    *Definitions and Interpretation.*

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**1991 Notes Indenture**" means that certain Base Indenture, dated as of August 15, 1991, by and between Frontier, as issuer, and JPMorgan Chase Bank, N.A., as successor trustee, as amended, supplemented, or modified from time to time.

"**2001 Notes Indenture**" means that certain Indenture, dated as of August 16, 2001, by and between Frontier, as issuer, and JPMorgan Chase Bank, N.A., as successor trustee, as amended, supplemented, or modified from time to time.

"**2006 Notes Indenture**" means that certain Indenture, dated as of December 22, 2006, by and between Frontier, as issuer, and The Bank of New York, as trustee, as amended, supplemented, or modified from time to time.

"**2009 Notes Indenture**" means that certain Base Indenture, dated as of April 9, 2009, by and between Frontier, as issuer, and The Bank of New York Mellon, as trustee, as amended, supplemented, or modified from time to time.

"**2010 Notes Indenture**" means that certain Indenture, dated as of April 12, 2010, by and between New Communications Holdings Inc., as issuer, and the Bank of New York Mellon, as trustee, as amended, supplemented, or modified from time to time.

"**2015 Notes Indenture**" means that certain Base Indenture, dated as of September 25, 2015, by and between Frontier, as issuer, and The Bank of New York Mellon, as trustee, as amended, supplemented, or modified from time to time.

"**2020 April Notes**" means the 8.500% unsecured notes due April 15, 2020, issued pursuant to the 2010 Notes Indenture.

"**2020 September Notes**" means the 8.875% unsecured notes due September 15, 2020, issued pursuant to the 2015 Notes Indenture.

"**2021 July Notes**" means the 9.250% unsecured notes due July 1, 2021, issued pursuant to the 2009 Notes Indenture.

"**2021 September Notes**" means the 6.250% unsecured notes due September 15, 2021, issued pursuant to the 2009 Notes Indenture.

"**2022 April Notes**" means the 8.750% unsecured notes due April 15, 2022, issued pursuant to the 2010 Notes Indenture.

"**2022 September Notes**" means the 10.500% unsecured notes due September 15, 2022, issued pursuant to the 2015 Notes Indenture.

"**2023 Notes**" means the 7.125% unsecured notes due January 15, 2023, issued pursuant to the 2009 Notes Indenture.

"**2024 Notes**" means the 7.625% unsecured notes due April 15, 2024, issued pursuant to the 2009 Notes Indenture.

"**2025 January Notes**" means the 6.875% unsecured notes due January 15, 2025, issued pursuant to the 2009 Notes Indenture.

"**2025 November Notes**" means the 7.000% unsecured debentures due November 1, 2025, issued pursuant to the 1991 Notes Indenture.

"**2025 September Notes**" means the 11.000% unsecured notes due September 15, 2025, issued pursuant to the 2015 Notes Indenture.

"**2026 Notes**" means the 6.800% unsecured debentures due August 15, 2026, issued pursuant to the 1991 Notes Indenture.

"**2027 Notes**" means the 7.875% unsecured notes due January 15, 2027, issued pursuant to the 2006 Notes Indenture.

"**2031 Notes**" means the 9.000% unsecured notes due August 15, 2031, issued pursuant to the 2001 Notes Indenture.

"**2034 Notes**" means the 7.680% unsecured debentures due October 1, 2034, issued pursuant to the 1991 Notes Indenture.

"**2035 Notes**" means the 7.450% unsecured debentures due July 1, 2035, issued pursuant to the 1991 Notes Indenture.

"**2046 Notes**" means the 7.050% unsecured debentures due October 1, 2046, issued pursuant to the 1991 Notes Indenture.

"**Affiliate**" has the meaning set forth in the Restructuring Term Sheet.

"**Agents**" means any administrative agent, collateral agent, or other agent or similar entity under the Credit Agreement or the DIP Credit Agreement.

"**AG Notes Group**" means the ad hoc group or committee of Consenting Noteholders represented by the AG Group Representatives.

"**AG Group Representatives**" means Akin and Ducera.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 15.02.

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Akin**" means Akin Gump Strauss Hauer & Feld LLP, as counsel to the AG Notes Group.

"**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, tender offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties, in each case, other than the Restructuring Transactions.

"**Altman**" means Altman Vilandrie & Company, as advisor to the Noteholder Groups.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York with jurisdiction over the Chapter 11 Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the local rules and general orders of the Bankruptcy Court, as in effect on the Petition Date, if applicable, together with all amendments and modifications thereto subsequently made applicable to the Chapter 11 Cases.

"**Benefit Agreement**" means any employment, consulting, incentive compensation, bonus, deferred compensation, severance, change of control, retention, stock purchase, equity, or equity-based compensation or similar agreement between a Company Party or its subsidiaries, on the one hand, and any employee, officer, director, or consultant of a Company Party or any of its subsidiaries (each a "**Service Provider**"), on the other hand.

"**Benefit Plan**" means any "employee benefit plan" (as defined in section 3(3) of ERISA (whether or not subject to ERISA)) and each other benefit or compensation, bonus, savings, pension, profit-sharing, retirement, deferred compensation, incentive compensation, stock ownership, equity or equity-based compensation, paid time off, perquisite, fringe benefit, vacation, change of control, severance, retention, salary continuation, disability, death benefit, hospitalization, medical, life insurance, welfare benefit or other plan, program, policy, arrangement or agreement sponsored, maintained or contributed to or required to be maintained or contributed to by a Company Party or its subsidiaries, in each case, providing benefits to any Service Provider or any of their respective dependents or with respect to which a Company Party or any of its subsidiaries or Affiliates has any liability, contingent or otherwise.

"**Board**" means the board of directors of Frontier.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" has the meaning set forth in the Restructuring Term Sheet.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Compensation Consultant**" means that certain compensation consultant retained jointly by the Noteholder Groups.

"**Confidentiality Agreement**" means an executed confidentiality agreement between the Company and a Consenting Noteholder, including provisions thereunder with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation**" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

"**Confirmation Date**" means the date on which Confirmation occurs.

"**Confirmation Order**" has the meaning set forth in the Restructuring Term Sheet.

"**Consenting Noteholders**" has the meaning set forth in the preamble to this Agreement.

"**Credit Agreement**" means that certain credit agreement, dated as of February 27, 2017, as amended, modified, or supplemented from time to time, by and among Frontier, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders from time to time thereto.

"**Debtors**" means Frontier and its affiliates and subsidiaries that file chapter 11 petitions.

"**Definitive Documents**" means the documents set forth in Section 3.01.

"**DIP Budget**" means that certain budget provided pursuant to the terms of the DIP Credit Agreement, including any updates delivered or provided with respect thereto.

"**DIP Claims**" means any Claim against a Debtor arising under, derived from, based on, or related to the DIP Facility Documents.

"**DIP Credit Agreement**" means that certain credit agreement evidencing the DIP Facility in accordance with the terms, and subject in all respects to the conditions, as set forth in this Agreement, and pursuant to the term and conditions to be set forth in the DIP Orders.

"**DIP Facility**" means that certain debtor-in-possession financing facility to be provided to the Company Parties in accordance with the terms, and subject in all respects to the conditions, as set forth in this Agreement, and pursuant to the terms and conditions of the DIP Orders.

"**DIP Facility Documents**" means, collectively, the DIP Credit Agreement, the DIP Budget, and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

"**DIP Lenders**" means the lenders providing the DIP Facility under the DIP Facility Documents.

"**DIP Motion**" means the motion filed by the Debtors seeking entry of the DIP Orders.

"**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code.

"**Ducera**" means Ducera Partners LLC, as financial advisor to the AG Notes Group.

"**Entity**" has the meaning set forth in the Restructuring Term Sheet.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits

interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement and including any equity security (as such term is defined in Bankruptcy Code section 101(16)) in a Company Party).

"**ERISA**" means the Employee Retirement Income Act of 1974, as amended.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit Credit Agreement**" means that certain credit agreement evidencing the Exit Facility in accordance with the terms, and subject in all respects to the conditions, as set forth in this Agreement.

"**Exit Facility**" means that certain credit facility to be provided to the Company Parties in accordance with the terms, and subject in all respect to the conditions, as set forth in this Agreement.

"**Exit Facility Documents**" means, collectively, the Exit Credit Agreement, and all other agreements, documents, and instruments delivered or entered into in connection with the Exit Facility, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents

"**FCC**" has the meaning set forth in Section 3.01.

"**First Day Pleadings**" means the "first-day" pleadings that the Company Parties intend to file upon the commencement of, or determine are necessary or desirable to file in connection with, the Chapter 11 Cases.

"**Final DIP Order**" means the final order by the Bankruptcy Court authorizing the Debtors' entry into the DIP Facility Documents.

"**Finance Committee**" means the finance committee of the Board.

"**First Lien Notes**" means the 8.000% first lien secured notes due April 1, 2027, issued by Frontier pursuant to the First Lien Notes Indenture.

"**First Lien Notes Claims**" means any Claim against a Debtor arising under, derived from, based on, or related to the First Lien Notes or the First Lien Notes Indenture.

"**First Lien Notes Indenture**" means that certain Indenture, dated as of March 15, 2019, by and among Frontier, as issuer, the subsidiary guarantors party thereto, JPMorgan Chase Bank, N.A., as collateral agent, and The Bank of New York Mellon, as trustee, as amended, supplemented, or modified from time to time.

"**Florida Sale Leaseback Transaction**" means that certain proposed sale leaseback transaction to be entered into by the Company Parties with respect to the following properties: (a) 610 East Zack Street, Tampa, FL 33602; (b) 1701 Ringling Boulevard, Sarasota, FL 34236; (c) 821 1st Avenue North, St. Petersburg, FL 33701; and (d) 1280 Cleveland Street, Clearwater, FL 33755.

"**Frontier**" has the meaning set forth in the preamble to this Agreement.

"**Houlihan**" means Houlihan Lokey Capital, Inc., as financial advisor to the MB Notes Group.

"**IDRB**" means the 6.200% industrial development revenue bonds due May 1, 2030, issued pursuant to the IDRB Loan Agreement.

"**IDRB Claims**" means any Claim against a Debtor arising under, derived from, based on, or related to the IDRB or IDRB Loan Agreement.

"**IDRB Loan Agreement**" means that certain Loan Agreement, dated as of May 1, 1995, by and among Citizens Utilities Company and The Industrial Development Authority of the County of Maricopa, as issuer, as amended, modified, or supplemented from time to time.

"**Incremental Payments**" has the meaning set forth in the Restructuring Term Sheet.

"**Interim DIP Order**" means the interim order by the Bankruptcy Court authorizing the Debtors' entry into the DIP Facility Documents.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit C**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Management Incentive Plan**" means the management incentive plan to be implemented with respect to Reorganized Frontier in accordance with the terms, and subject in all respects to the conditions, as set forth in the Restructuring Term Sheet.

"**MB Notes Group**" means the ad hoc group or committee of Consenting Noteholders represented by the MB Group Representatives.

"**MB Group Representatives**" means Houlihan and Milbank.

"**Milbank**" means Milbank LLP, as counsel to the MB Notes Group.

"**Milestones**" means the milestones set forth in Section 4.

"**New Common Stock**" means the common stock of Reorganized Frontier to be issued on the Plan Effective Date.

"**NOL Rights Plan**" means that certain Section 382 Rights Agreement, dated as of July 1, 2019, between Frontier and Computershare Trust Company, N.A., as Rights Agent, as amended, restated, modified, supplemented, or replaced from time to time.

"**Noteholder Groups**" means, together, the MB Notes Group and the AG Notes Group.

"**Noteholder Groups Counsels**" means, together, Akin and Milbank.

"**Noteholder Representatives**" means Akin, Altman, Ducera, Houlihan and Milbank.

"**New Organizational Documents**" means the organizational and governance documents for the Reorganized Debtors and any subsidiaries thereof, including, as applicable, the certificates or articles of incorporation, certificates of formation or certificates of limited partnership, bylaws, limited liability company agreements, or limited partnership agreements, stockholder or shareholder agreements, the Registration Rights Agreement, the identity of proposed members of the Reorganized Frontier Board, indemnification agreements, and registration rights agreements (or equivalent governing documents of any of the foregoing).

"**October Three**" means October Three Consulting LLC, as pension advisor to the MB Notes Group.

"**Outside Date**" means the date that is twelve (12) months after the Petition Date (the "**Initial Outside Date**"); *provided*, that (a) the Initial Outside Date may be extended for two (2) additional three (3) month periods (for a total of fifteen (15) months and then eighteen (18) months from the Petition Date, respectively), in each case, solely to the extent that the Company Parties have otherwise complied with the terms of the Definitive Documents and all other events and actions necessary for the occurrence of the Plan Effective Date have occurred other than the receipt of regulatory or other approval of a governmental unit (including the FCC and PUCs) necessary for the occurrence of the Plan Effective Date and (b) the Parties shall negotiate in good faith for a further reasonable extension of the Outside Date if the Parties have otherwise complied with the terms of the Definitive Documents and all other events and actions necessary for the occurrence of the Plan Effective Date have occurred other than the receipt of regulatory or other approval of a governmental unit (including the FCC and PUCs) necessary for the occurrence of the Plan Effective Date by the Outside Date as extended pursuant to clause (a) hereof.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Senior Notes Claims who meets the requirements of Section 9.01.

"**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a governmental or regulatory authority, or any legal entity or association.

"**Petition Date**" means the date on which each of the Debtors file its respective petition for relief commencing its Chapter 11 Case.

"**Plan**" means the joint chapter 11 plan of reorganization to be filed by the Debtors in the Chapter 11 Cases to implement the Restructuring Transactions in accordance with this Agreement and the Definitive Documents.

"**Plan Effective Date**" means the date on which all conditions precedent to the effectiveness of the Plan have been satisfied or waived in accordance with the terms of the Plan, and the Plan is substantially consummated according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be filed by the Debtors with the Bankruptcy Court.

"**PNW Purchase Agreement**" means that certain Purchase Agreement, dated as of May 28, 2019, by and among Frontier, Frontier Communications ILEC Holdings LLC, and Northwest Fiber, LLC.

"**PNW Sale**" means the sale of all the issued and outstanding equity interest of certain subsidiaries of Frontier and Frontier Communications ILEC Holdings LLC that operate Frontier's businesses in Washington, Oregon, Idaho, and Montana to Northwest Fiber, LLC as reflected in the PNW Purchase Agreement.

"**PNW Sale Assumption Motion**" means the motion filed by the Debtors seeking approval of the Debtors' assumption of the PNW Purchase Agreement and the PNW Sale, including all actions taken or required to be taken in connection with the implementation and consummation of, and performance under, the PNW Purchase Agreement, including the Transition Services Agreement, attached as Exhibit B thereto.

"**PUC**" has the meaning set forth in Section 3.01.

"**RDOF**" means the Rural Digital Opportunity Fund program administered by the FCC.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Senior Notes Claims (or enter with customers into long and short positions in Senior Notes Claims), in its capacity as a dealer or market maker in Senior Notes Claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Registration Rights Agreement**" means any agreements providing registration rights to the Consenting Noteholders or any other parties, in each case, on account of the New Common Stock.

"**Reorganized Frontier**" means either (a) Frontier, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Plan Effective Date, or (b) a new corporation, limited liability company, or partnership that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Common Stock to be distributed pursuant to the Plan.

"**Reorganized Frontier Board**" means the board of directors (or other applicable governing body) of Reorganized Frontier.

"**Reorganized Debtor**" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Plan Effective Date, including Reorganized Frontier.

"**<u>Required Consenting Noteholders</u>**" means, as of the relevant date, the Consenting Noteholders then holding, controlling, or having the ability to control, greater than fifty and one-tenth percent (50.1%) of the aggregate outstanding principal amount of Senior Notes Claims that are held by all Consenting Noteholders as of such date.

"**<u>Restructuring Term Sheet</u>**" has the meaning set forth in the recitals to this Agreement.

"**<u>Restructuring Transactions</u>**" has the meaning set forth in the recitals to this Agreement.

"**<u>Revolving Credit Claims</u>**" means any Claim against a Debtor arising under, derived from, based on, or related to the Revolving Credit Facility provided for in the Credit Agreement.

"**<u>Revolving Credit Facility</u>**" means that certain prepetition senior secured revolving credit facility provided for under the Credit Agreement in the original aggregate principal amount of $850 million, subject to adjustment from time to time.

"**<u>RSA Effective Date</u>**" has the meaning set forth in the Restructuring Term Sheet.

"**<u>Rules</u>**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**<u>Second Lien Notes</u>**" means the 8.500% second lien secured notes due April 1, 2026, issued by Frontier pursuant to the Second Lien Notes Indenture.

"**<u>Second Lien Notes Claims</u>**" means any Claim against a Debtor arising from or based upon the Second Lien Notes, the Second Lien Notes Indenture, or any guarantee and ancillary documents executed in connection with the Second Lien Notes Indenture.

"**<u>Second Lien Notes Indenture</u>**" means that certain Indenture, dated as of March 19, 2018, by and among Frontier, as issuer, the subsidiary guarantors party thereto, and The Bank of New York Mellon, as trustee and collateral agent, as amended, supplemented, or modified from time to time.

"**<u>Securities Act</u>**" means the Securities Act of 1933, as amended.

"**<u>Senior Notes</u>**" means, collectively, the 2020 April Notes, the 2020 September Notes, the 2021 July Notes, the 2021 September Notes, the 2022 April Notes, the 2022 September Notes, the 2023 Notes, the 2024 Notes, the 2025 January Notes, the 2025 November Notes, the 2025 September Notes, the 2026 Notes, the 2027 Notes, the 2031 Notes, the 2034 Notes, the 2035 Notes, and the 2046 Notes.

"**<u>Senior Notes Claims</u>**" means any Claim against a Debtor arising under, derived from, based on, or related to the Senior Notes or the Senior Notes Indenture.

"**<u>Senior Notes Indentures</u>**" means, collectively, the 1991 Notes Indenture, the 2001 Notes Indenture, the 2006 Notes Indenture, the 2009 Notes Indenture, the 2010 Notes Indenture, and the 2015 Notes Indenture.

"**Solicitation Commencement Date**" means the date that the Company Parties commence solicitation of votes to approve or reject the Plan from holders of Senior Notes Claims.

"**Specified Material Actions**" has the meaning set forth in Section 7.02(i) of this Agreement.

"**Solicitation Materials**" means any materials related to the solicitation of votes for the Plan pursuant to sections 1123, 1126, and 1143 of the Bankruptcy Code.

"**Specified Period**" means, with respect to each Consenting Noteholder, the period commencing as of the date such Consenting Noteholder, as applicable, executes this Agreement until the Termination Date, as to such Consenting Noteholder.

"**Takeback Debt**" has the meaning set forth in the Restructuring Term Sheet.

"**Takeback Debt Documents**" means, collectively, such agreements, documents, and instruments delivered and entered into in connection with the Takeback Debt, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

"**Term Loan Facility**" means that certain prepetition senior secured term loan facility provided for under the Credit Agreement in the original aggregate principal amount of $1.74 billion by and between certain of the Debtors as obligors or guarantors and the lenders thereto.

"**Term Loan Claims**" means any Claim against a Debtor arising under, derived from, based on, or related to the Term Loan Credit Facility provided for in the Credit Agreement.

"**Term Sheets**" means, collectively, the terms sheets attached as exhibits to this Agreement, including the Restructuring Term Sheet.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 13.01, 13.02, 13.03, or 13.04.

"**Transfer**" means to sell, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

"**Trustees**" means, collectively, any indenture trustee, collateral trustee, or other trustee or similar entity under the Senior Notes Indentures.

"**Virtual Separation**" has the meaning set forth in the Restructuring Term Sheet.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1998 or any similar state, local or foreign Law which calls for advance notification, wage or benefits continuation in the event of layoffs, closure or all or part of a business or operation, or relocation of work.

1.02.   Interpretation.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)   unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided*, that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)   unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)   the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)   captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)   references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)   the use of "include" or "including" is without limitation, whether or not they are in fact followed by those words or words of like import; and

(j)   the use of "writing," written" and comparable terms refer to printing, typing, and other means of reproducing words (including electronic media) in a visible form.

**Section 2.**   *Effectiveness of this Agreement.*   This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the

13

Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to the Noteholder Groups Counsels;

(b)      holders of at least sixty-six and two-thirds percent (66.67%) of the aggregate outstanding principal amount of Senior Notes shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties;

(c)      all of the accrued and outstanding, reasonable and documented fees, costs, and expenses of the following advisors shall have been paid in full and in cash: (i) Akin, (ii) Altman, (iii) Ducera, (iv) Houlihan, (v) Milbank, and (vi) October Three; and

(d)      counsel to the Company Parties shall have given notice to the Noteholder Groups Counsels in the manner set forth in Section 15.10 of this Agreement (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have been satisfied or waived in accordance with this Agreement.

## Section 3.     *Definitive Documents.*

3.01.   The Definitive Documents governing the Restructuring Transactions shall include the following:  (A) the Plan (and any and all exhibits annexes and schedules thereto); (B) the Confirmation Order; (C) the Disclosure Statement and the other Solicitation Materials; (D) the Disclosure Statement Order; (E) all pleadings filed by the Company Parties in connection with the Chapter 11 Cases (or related orders), including the First Day Pleadings and all orders sought pursuant thereto; (F) the Plan Supplement; (G) the DIP Facility Documents; (H) the DIP Orders; (I) the Exit Facility Documents; (J) the Takeback Debt Documents; (K) the New Organizational Documents; (L) any key employee incentive plan or key employee retention plan; (M) all documentation with respect to any post-emergence management incentive plan, including the Management Incentive Plan; (N) any other disclosure documents related to the issuance of the New Common Stock; (O) any new material employment, consulting, or similar agreements; (P) any and all filings as may be required under the rules of the Federal Communications Commission (the "*FCC*") and/or any state public utility commission ("*PUC*") in connection with the Chapter 11 proceedings; and (Q) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably desired or necessary to consummate and document the transactions contemplated by this Agreement or the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

3.02.   The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 14.  Further, subject to and without limiting any additional consent or approval rights of the Parties specified elsewhere

in this Agreement or in the Restructuring Term Sheet, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Noteholders; *provided,* that the New Organizational Documents shall be determined by and acceptable to the Required Consenting Noteholders in their sole discretion.

**Section 4.**     *Milestones.*     The following Milestones shall apply to this Agreement unless extended or waived in writing by the Company Parties and the Required Consenting Noteholders; *provided, however*, that in the event that the Bankruptcy Court is unable to hear the Chapter 11 Cases or is otherwise inaccessible to the Company Parties for reasons related to COVID-19, the Company Parties and the Required Consenting Noteholders agree to negotiate in good faith with respect to a reasonable extension of any of the following Milestones, as appropriate:

(a)     no later than one (1) Business Day after the Petition Date, the Debtors shall file with the Bankruptcy Court the DIP Motion (including the proposed Interim DIP Order) and the PNW Sale Assumption Motion;

(b)     no later than three (3) Business Days after the RSA Effective Date, the Debtors shall have used commercially reasonable efforts to deliver to the Consenting Noteholders the Debtors' "base case" business plan;

(c)     no later than ten (10) Business Days after the RSA Effective Date, the Debtors shall have used commercially reasonable efforts to deliver to the Consenting Noteholders (i) the Debtors' "reinvestment" sensitivity case and (ii) an alternative "reinvestment" sensitivity case for the Reorganized Debtors as set forth in the Restructuring Term Sheet;

(d)     no later than five (5) Business Days after the RSA Effective Date, the Finance Committee shall have commenced a selection process for the Reorganized Debtors with respect to certain key management positions;

(e)     no later than 8:00 a.m., prevailing Eastern Time April 15, 2020, the Debtors shall commence the Chapter 11 Cases and file the First Day Pleadings;

(f)     no later than five (5) Business Days after the Petition Date, the Company Parties shall file all applications or notifications related to entry into Chapter 11 proceedings as may be required under the rules of the FCC or any PUC, unless such applications and notifications are required to be filed on an earlier date under applicable law;

(g)     no later than fifteen (15) calendar days after the Petition Date, the Company Parties shall have used commercially reasonable efforts to commence evaluation of potential sales of assets (including identifying applicable specified markets to be considered for sale);

(h)     no later than thirty (30) calendar days after the Petition Date, the Debtors shall file with the Bankruptcy Court the Plan and Disclosure Statement and motion for approval of the Disclosure Statement and associated solicitation procedures with the Bankruptcy Court;

(i)     no later than three (3) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(j)        no later than forty-five (45) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(k)        no later than ninety (90) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Disclosure Statement Order;

(l)        no later than three (3) Business Days after entry of the Disclosure Statement Order, the Solicitation Commencement Date shall have occurred;

(m)        no later than one hundred twenty (120) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order;

(n)        no later than May 28, 2020, the "Closing Date" (as such term is defined in the PNW Purchase Agreement) shall have occurred;

(o)        no later than January 31, 2021, the Debtors shall have used commercially reasonable efforts to provide the following to the Consenting Noteholders: (i) new budgetary plan, as set forth in the Restructuring Term Sheet; and (ii) capital spending into fiber expansion and FTTx upgrades within the network;

(p)        no later than five (5) Business Days after the entry of the Confirmation Order by the Bankruptcy Court, the Company Parties shall have filed any and all applications and notifications that are necessary or required in connection with obtaining the applicable approvals of the FCC and, as applicable, any PUCs with respect to the Restructuring Transactions; and

(q)        no later than the Outside Date, all conditions to the occurrence of the Plan Effective Date shall have been either satisfied or waived in accordance with this Agreement and the Plan Effective Date shall have occurred.

**Section 5.**        *Commitments of the Consenting Noteholders.*

5.01.  <u>General Commitments</u>.

(a)        During the Agreement Effective Period, each Consenting Noteholder severally, and not jointly, agrees in respect of all of its Senior Notes Claims, to:

(i)        support the Restructuring Transactions as contemplated by, and within the timeframes outlined in, this Agreement and in the Definitive Documents;

(ii)        take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(iii)        use commercially reasonable efforts to cooperate with and, subject to applicable Laws, assist the Company Parties, at the Company Parties' sole cost and expense, in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iv)        give any notice, order, instruction, or direction to the applicable

Agents/Trustees necessary to give effect to the Restructuring Transactions; and

(v)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b)    During the Agreement Effective Period, each Consenting Noteholder severally, and not jointly, agrees in respect of all of its Senior Notes Claims subject to this Agreement that it shall not, directly or indirectly:

(i)    object to, delay, impede, or take any other action that is reasonably likely to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)    propose, file, support, solicit, or vote for any Alternative Restructuring Proposal;

(iii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan; *provided*, that nothing in this Agreement shall limit the right of any party hereto to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any other Definitive Document;

(iv)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties in violation of this Agreement other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; *provided*, that nothing in this Agreement shall limit the right of any party hereto to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any other Definitive Document;

(v)    exercise, or direct any other Person to exercise, any right or remedy for the enforcement, collection, or recovery of any of the Senior Notes Claims against the Company Parties, including rights or remedies arising from or asserting or bringing any claims under or with respect to any Senior Notes Claims, but only to the extent such exercise is inconsistent with this Agreement or the Restructuring Transactions; *provided*, that nothing in this Agreement shall limit the right of any party hereto to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any other Definitive Document;

(vi)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code, but only to the extent such action is inconsistent with this Agreement or the Restructuring Transactions; *provided*, that nothing in this Agreement shall limit the right of any party hereto to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any other Definitive Document; or

(vii)    object to, delay, impede, or take any other action to interfere with the consummation of the PNW Sale and shall otherwise support and take all actions reasonably requested by the Company Parties to support and facilitate consummation of the PNW Sale.

5.02.   Commitments with Respect to Chapter 11 Cases.

(a)     In addition to the obligations set forth in Section 5.01, during the Agreement Effective Period, each Consenting Noteholder that is entitled to vote to accept or reject the Plan pursuant to its terms, severally, and not jointly, agrees that it shall, subject to receipt by such Consenting Noteholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)      vote each of its Senior Notes Claims to accept the Plan by delivering its duly executed and completed ballot accepting the Plan promptly following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)     consent to and, if applicable, elect not to opt out of the releases set forth in the Plan by not objecting to such releases and timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in Section 5.02(a)(i) and Section 5.02(a)(ii) above; *provided*, that nothing in this Agreement shall prevent any Consenting Noteholder from changing, withholding, amending or revoking (or causing the same) its vote, election, or consent with respect to the Plan if this Agreement has been terminated in accordance with its terms with respect to such Consenting Noteholder.

(b)     During the Agreement Effective Period, each Consenting Noteholder, in respect of each of its Senior Notes Claims, severally, and not jointly, will not directly or indirectly object to, delay, impede, or take any other action in violation of this Agreement to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court to the extent such action is inconsistent with this Agreement or the Restructuring Transactions; *provided*, that nothing in this Agreement shall limit the right of any party hereto to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any other Definitive Document.

(c)     During the Agreement Effective Period, each Consenting Noteholder agrees that it will not file, will oppose, and will not support any motion to appoint a trustee or examiner in one or more of the Chapter 11 Cases of any Company Party.

5.03.   Notwithstanding the foregoing, nothing in this Agreement shall require any Consenting Noteholder to (a) incur any expenses, liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities, or other obligations to any Consenting Noteholder or its Affiliates; or (b) provide any information that it reasonably determines to be sensitive or confidential. Notwithstanding the immediately preceding sentence, nothing in this Section 5.03 shall serve to limit, alter, or modify any Consenting Noteholder's express obligations under the terms of this Agreement.

**Section 6.     *Additional Provisions Regarding the Consenting Noteholders' Commitments.*** Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Noteholder to consult with any other Consenting Noteholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official

committee and the United States Trustee); (b) impair or waive the rights of any Consenting Noteholder to assert or raise any objection permitted under this Agreement in connection with the Plan or the Restructuring Transactions; (c) prevent any Consenting Noteholder from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; or (d) constitute a commitment to, or obligate any of the Consenting Noteholders to, provide any new financing or credit support.

**Section 7.**     *Commitments of the Company Parties.*

7.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a)     support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement (including the Restructuring Term Sheet and the Milestones);

(b)     support and take all steps reasonably necessary and desirable to obtain entry of the Interim DIP Order, the Final DIP Order, the Disclosure Statement Order and the Confirmation Order;

(c)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, support and take all steps reasonably necessary and desirable to address any such impediment;

(d)     use commercially reasonable efforts to obtain any and all required governmental, regulatory and/or third-party approvals (including, as applicable, Bankruptcy Court approvals and approvals of the FCC and, as applicable, PUCs) for the Restructuring Transactions, including (i) promptly commence any required regulatory approval processes, including (x) cooperate in the preparation and prosecution of any required notices and applications with the FCC and PUCs and (y) oppose any petitions to deny or other pleadings or objections filed with respect to such notices and applications, (ii) evaluate in cooperation and coordination with the Consenting Noteholders' advisors, the path to approval by jurisdiction, (iii) seek any required approvals from the FCC, public utilities commissions, and other applicable regulatory bodies with respect to the Restructuring Transactions, and, where prior approval is not required, provide any required notifications to the FCC, public utilities commissions, and other applicable regulatory bodies with respect to the Restructuring Transactions, and (iv) provide regular progress reports with respect to regulatory approval processes; *provided,* that any agreements with or commitments to the FCC or any PUCs, including any decision to accept and/or not to oppose any proposed material conditions or limitations on any such required approvals, shall require the prior approval of the Required Consenting Noteholders, not to be unreasonably withheld;

(e)     confer and consult with the Required Consenting Noteholders with regard to material decisions in respect of negotiations with the IRS, the PBGC, or any labor union;

(f)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(g)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(h)      (i) provide the Noteholder Groups Counsels draft copies of (x) all First Day Pleadings three (3) days in advance of the Petition Date and (y) any other motions, documents and other pleadings materially affecting any Consenting Noteholder that the Company Parties intend to file with the Bankruptcy Court, as applicable, three (3) days in advance of the filing thereof to the extent reasonably practicable and, if not reasonably practicable, as soon as reasonably practicable but in any event in advance of filing thereof, and (ii) without limiting any approval rights set forth in this Agreement, consult in good faith with the Noteholder Groups Counsels, as applicable, regarding any comments to draft copies provided pursuant to sub-clause (i);

(i)      pay in full and in cash all of the accrued reasonable and documented fees, costs, and expenses of the professionals and other advisors retained by the Noteholder Groups, including such fees, costs, and expenses of (i) Akin, (ii) Altman, (iii) Ducera, (iv) Houlihan, (v) Milbank, (vi) October Three and (vii) the Compensation Consultant, and continue to pay such amounts as they come due and seek to pay such ongoing fees, costs, and expenses in connection with the Final DIP Order or other such appropriate order;

(j)      (i) operate the business of the Company Parties in the ordinary course of business in a manner that is consistent with this Agreement and past practices, and use commercially reasonable efforts to preserve intact the Company Parties' business organization and relationships with third parties (including lessors, licensors, content providers, suppliers, distributors, customers and governmental and regulatory authorities (including the FCC and PUCs) and employees, (ii) keep the Consenting Noteholders and the Noteholder Representatives reasonably informed about the operations of the Company Parties, (iii) provide the Consenting Noteholders and the Noteholder Representatives any information reasonably requested regarding the Company Parties and provide, and direct the Company Parties' employees, officers, advisors and other representatives to provide, to the Noteholder Representatives (A) reasonable access during normal business hours on reasonable advance notice to the Company Parties' representatives and without disruption to the operation of the Company Parties' business, (B) reasonable access to the management and advisors of the Company Parties on reasonable advance notice to such persons and without disruption to the operation of the Company Parties' business for the purposes of evaluating the Company Parties' assets, liabilities, operations, businesses, finances, strategies, prospects and affairs and (C) such other information as reasonably requested by the Consenting Noteholders or the Noteholder Representatives, (iv) promptly notify the Consenting Noteholders of any material governmental or third party complaints, litigations, inquires, orders to show cause, cease and desist orders, notices of violation, notice of apparent liability, orders of forfeiture, investigations, or hearings (or communications indicating that any of the foregoing is contemplated or threatened) (the parties acknowledge and agree that any written filings by, before, or with the FCC or any PUC in which the Company Parties are seeking regulatory approval to emerge from bankruptcy is deemed material for purposes of this Section 7.01(j)(iv)), and (v) cooperate in good faith to structure the Restructuring Transactions in a tax efficient manner, including as a "Bruno's transaction" in accordance with Restructuring Term Sheet, and use commercially reasonable efforts to analyze additional asset-level information, and, as appropriate, evaluate potential alternative value-maximizing structures, including REIT structures; *provided*, that, notwithstanding the foregoing, the Company shall not be required to (1) permit any inspection, or

20

to disclose any information, that in the reasonable judgment of the Company, would cause the Company to violate its respective obligations with respect to confidentiality to a third party if the Company used its commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (2) to disclose any legally privileged information of the Company, or (3) to violate applicable Law;

(k)     cooperate and consult with the Consenting Noteholders with respect to the development and adoption of the Company Parties' RDOF bidding framework and strategy (including the terms of and submission of any RDOF bid);

(l)     cooperate and consult with the Consenting Noteholders with respect to the development and adoption of the Company Parties' business plan, including any business plans contemplated by the Restructuring Term Sheet and with respect to the Virtual Separation; *provided,* that (x) the Company Parties' business plan shall be acceptable to the Company Parties and reasonably acceptable to the Required Consenting Noteholders, (y) the allocations of state operations with respect to the Virtual Separation shall be reasonably acceptable to the Required Consenting Noteholders and (z) the contents of the Disclosure Statement regarding the preparatory work for each business plan and scenario shall be reasonably acceptable to the Required Consenting Noteholders; *provided, further*, that the Debtors shall bear no obligation to attest to the Debtors' management team's view of reasonableness for either sensitivity case if sufficient preparatory work has not been conducted as of the date on which the Disclosure Statement is filed;

(m)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases;

(n)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(o)     provide responsive information to, and confer with, the Consenting Noteholders regarding potential cost savings and concessions with respect to the Company Parties' pension/OPEB plans on the terms and subject to the conditions set forth in the Restructuring Term Sheet; and

(p)     the Board shall not alter or amend its prior determination that the Restructuring Transactions, the entry into this Agreement, the approval of the Plan, the entry into the Definitive Documents, and the consummation of the Restructuring Transactions and the other transactions contemplated by the Plan and the Definitive Documents are "Exempt Transactions" as defined in the NOL Rights Plan.

7.02.     <u>Negative Commitments</u>.  Except as set forth in Section 8 or with the prior written consent of the Required Consenting Noteholders, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly, and shall cause their respective subsidiaries not to:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)    take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in this Agreement or the Plan;

(c)    modify the Plan, in whole or in part, to reflect terms that are not consistent with this Agreement in all material respects;

(d)    file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement (including the consent rights of the Consenting Noteholders set forth herein as to the form and substance of such motion, pleading, or other Definitive Document) or the Plan;

(e)    sell (including any sale leaseback transaction), lease, mortgage, pledge, grant, or incur any encumbrance on, or otherwise Transfer, any properties or assets of the Company Parties, including any Equity Interests, other than (i) sales or disposals of properties or assets in the ordinary course of business, (ii) the Florida Sale Leaseback Transaction, or (ii) the PNW Sale;

(f)    purchase, lease, or otherwise acquire (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) any assets or properties, other than in the ordinary course of business;

(g)    (i) enter into any merger with or into, or consolidation or amalgamation with, any other Person, other than in the ordinary course of business, (ii) permit any other Person to enter into any merger with or into, or consolidation or amalgamation with, it, other than in the ordinary course of business, or (iii) enter into any joint venture, partnership, sharing of profits or other similar arrangement involving co-investment between a Company Party or subsidiary thereof and any other Person, other than in the ordinary course of business;

(h)    split, combine, or reclassify any of their respective Equity Interests, or declare, set aside or pay any dividend or other distribution payable in cash, stock, property, or otherwise material with respect to any of their respective Equity Interests; *provided*, that nothing in this Section 7.02(h) shall apply to those certain dividends, distributions, and other payments described in Section 5.01(iv)(A)–(B) of the PNW Sale Agreement; or

(i)    take action with respect to any of the actions set forth on Schedule 7.02(i) (the "**Specified Material Actions**") absent prior consultation with, and prior reasonable consent of, the Required Consenting Noteholders.

## Section 8.    *Additional Provisions Regarding Company Parties' Commitments.*

8.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing

to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8 shall not constitute a breach of this Agreement (other than a failure to comply with this Section 8); *provided*, that the Company Parties shall notify the Consenting Noteholders in writing promptly in the event of any such determination (and in any event no later than twenty-four (24) hours following such determination).

8.02.   Notwithstanding anything to the contrary in this Agreement, but subject to the terms of Section 8.01, each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:

(a)      consider and respond to Alternative Restructuring Proposals;

(b)      provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity;

(c)      maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; and

(d)      enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Noteholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; *provided,* that the Company Parties shall (x) provide a copy of any written Alternative Restructuring Proposal (and notice of, and a written summary of, any oral Alternative Restructuring Proposal) within twenty-four (24) hours of the Company Parties' or their advisors' receipt of such Alternative Restructuring Proposal to the Noteholder Group Advisors  and (y) provide such information to the Noteholder Groups Counsels as reasonably requested by the Consenting Noteholders or as necessary to keep the Consenting Noteholders contemporaneously informed as to the status and substance of such discussions.

8.03.   Nothing in this Agreement shall:  (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

8.04.   Incremental Payments.  The Incremental Payments shall be paid pursuant to the terms set forth in the Restructuring Term Sheet.

8.05.   Board Observers.  As of the Agreement Effective Date and until the Plan Effective Date, the Consenting Noteholders shall be entitled to designate two (2) observers to the Board pursuant to the terms set forth in the Restructuring Term Sheet.

8.06.   Management Selection Designees.   As of the Agreement Effective Date, the Consenting Noteholders shall be entitled to appoint two (2) designees, to assist the Finance Committee with the selection process provided for in Section 4(d), pursuant to the terms set forth in the Restructuring Term Sheet.

**Section 9.**      *Transfer of Interests and Securities.*

9.01.   During the Specified Period, no Consenting Noteholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Senior Notes Claims to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)      the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Noteholder;

(b)      either (i) the transferee executes and delivers to counsel to the Company Parties and to the Noteholder Groups Counsels, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Noteholder or an Affiliate thereof and the transferee provides notice of such Transfer (including the amount and type of any Senior Notes Claims Transferred) to counsel to the Company Parties and to the Noteholder Groups Counsels by the close of business on the second Business Day following such Transfer; and

(c)      with respect to the Transfer of any Equity Interests only, such Transfer shall not (i) violate the terms of any order entered by the Bankruptcy Court with respect to preservation of net operating losses or (ii) adversely affect the Company Parties' ability to obtain the regulatory consents or approval necessary to effectuate the Restructuring Transactions.

9.02.   Upon compliance with the requirements of Section 9.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Senior Notes Claims.  Any Transfer in violation of Section 9.01 shall be void *ab initio*.

9.03.   This Agreement shall in no way be construed to preclude the Consenting Noteholders from acquiring additional Senior Notes Claims or other Claims or Interests (or any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Senior Notes Claims or other Claims or Interests; *provided,* that (a) such additional Senior Notes Claims shall automatically and immediately upon acquisition by a Consenting Noteholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or to the Noteholder Groups Counsels), other than with respect to any Senior Notes Claims acquired by a Consenting Noteholder in its capacity as a Qualified Marketmaker and (b) such Consenting Noteholder must provide notice of any acquisition of Senior Notes Claims (including the amount and type of such acquisition) to counsel to the Company Parties within two (2) Business Days of such acquisition.

9.04.   This Section 9 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Noteholder to Transfer any of its Senior Notes Claims.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply

and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05.    Notwithstanding Section 9.01, a Qualified Marketmaker that acquires any Senior Notes Claims with the purpose and intent of acting as a Qualified Marketmaker for such Senior Notes Claims shall not be required to execute and deliver a Transfer Agreement in respect of such Senior Notes Claims if (i) such Qualified Marketmaker subsequently transfers such Senior Notes Claims (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an Affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 9.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 9.01.  To the extent that a Consenting Noteholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Senior Notes Claims that the Qualified Marketmaker acquires from a holder of the Senior Notes Claims who is not a Consenting Noteholder without the requirement that the transferee be a Permitted Transferee.

9.06.    Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

9.07.    The Company Parties will provide notice of any Transfer Agreement received pursuant to Section 9.01(b)(i) (which notice shall include the amount and type of Senior Notes Claims Transferred pursuant to such Transfer Agreement) to the Noteholder Groups Counsels by the later of (i) close of business on the second Business Day following the effective date of such Transfer Agreement and (ii) the close of business on the second Business Day after the Company Parties receive notice of any such Transfer Agreement.

**Section 10.**    ***Representations and Warranties of Consenting Noteholders.***  Each Consenting Noteholder severally, and not jointly, represents and warrants that, as of the date such Consenting Noteholder executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Senior Notes Claims or is the nominee, investment manager, or advisor for beneficial holders of the Senior Notes Claims reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Senior Notes Claims other than those reflected in, such Consenting Noteholder's signature page to this Agreement, a Joinder or a Transfer Agreement, as applicable (as may be updated pursuant to Section 9);

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Senior Notes Claims, as contemplated by this Agreement and subject to applicable Law;

(c)    such Senior Notes Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on

disposition, transfer, or encumbrances of any kind, that would materially and adversely affect in any way such Consenting Noteholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)     it has the full power to vote, approve changes to, and transfer all of its Senior Notes Claims referable to it as contemplated by this Agreement and subject to applicable Law; and

(e)     solely with respect to holders of Senior Notes Claims, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Noteholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 11.**     ***Representations and Warranties of Company Parties.***   Each Company Party severally, and not jointly, represents and warrants that, as of the date such Company Party executes and delivers this Agreement:

(a)     entry into this Agreement is consistent with the exercise of such Company Party's fiduciary duties;

(b)     the Board has determined that  the entry into this Agreement, the approval of the Plan, the entry into the Definitive Documents, and the consummation of the Restructuring Transactions and the other transactions contemplated by the Plan and the Definitive Documents are "Exempt Transactions" as defined in the NOL Rights Plan; and

(c)     except (i) as set forth in the March 20, 2020 litigation audit letter from Mark Nielsen to KPMG, (ii) as set forth in the reports and forms (including exhibits, schedules and information incorporated therein) filed with the United States Securities and Exchange Commission by Frontier as of the Execution Date, and (iii) matters not exceeding $2,000,000 individually or factually-related items involving lesser amounts that do not exceed $2,000,000 in the aggregate, there is no lawsuit, legal proceeding, administrative enforcement proceeding, arbitration proceeding or similar matter pending, or, to any Company Party's knowledge, threatened, against any Company Party, any current or former director or officer of any Company Party (in his or her capacity as such) or any properties or assets of any Company Party.

**Section 12.**     ***Mutual Representations, Warranties and Covenants.***

12.01.  Each of the Parties, severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, and as of the Plan Effective Date:

(a)     it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating

to enforceability;

(b)　　except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other Person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)　　the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)　　except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)　　except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements, including cooperation agreements, with any other entity or Person with respect to Senior Notes Claims that have not been disclosed to all Parties to this Agreement.

**Section 13.**　　*Termination Events*.

13.01.　<u>Consenting Noteholder Termination Events</u>.  This Agreement may be terminated, with respect to the Consenting Noteholders, by the Required Consenting Noteholders, by the delivery to the Company Parties of a written notice in accordance with Section 15.10 hereof upon the occurrence of the following events, unless waived:

(a)　　the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Noteholders transmit a written notice in accordance with Section 15.10 of this Agreement detailing any such breach;

(b)　　the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after such terminating Consenting Noteholders transmit a written notice in accordance with Section 15.10 of this Agreement detailing any such issuance; *provided*, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)　　the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for five (5) Business Days after entry of such order;

(d)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Noteholders, not to be unreasonably withheld) (i) dismissing one or more of the Chapter 11 Cases of a Company Party, (ii) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iv) rejecting this Agreement;

(e)      the failure to meet any Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Noteholder in violation of its obligations under this Agreement;

(f)      any Company Party (i) files, waives, amends or modifies, or files a pleading seeking approval of any Definitive Document or authority to waive, amend or modify any Definitive Document (including any waiver of any term or condition therein) in a manner that is materially inconsistent with, or constitutes a material breach of, this Agreement (including with respect to the consent rights afforded the Consenting Noteholders under this Agreement), without the prior written consent of the Required Consenting Noteholders, (ii) withdraws the Plan without the prior consent of the Required Consenting Noteholders, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii), in the case of each of the foregoing clauses (i) through (iii), which remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Noteholders transmit a written notice in accordance with Section 15.10 of this Agreement detailing any of the foregoing;

(g)      the Bankruptcy Court grants relief that is inconsistent with this Agreement, the Restructuring Term Sheet or the Plan (in each case, with such amendments and modifications as have been effected in accordance with the terms hereof); *provided*, that, in the event that treatment of a class of claims contemplates payment of cash interest at the non-default rate during the Chapter 11 Cases until repayment thereunder and/or no make whole, and the Company Parties are subject to litigation, threatened litigation, or otherwise as a result of such treatment, this Agreement may not be terminated with respect to the Company Parties by the Required Consenting Noteholders on account of such litigation, threatened litigation, or otherwise pursuant to this Section 13.01(g); *provided*, *further*, that this Agreement may be terminated with respect to the Company Parties by the Required Consenting Noteholders if the Company Parties (a) take any position in any such litigation, threatened litigation, or other dispute that is materially inconsistent with this Agreement or (b) enter into any settlement of any such litigation, threatened litigation, or other dispute that is not reasonably acceptable to the Required Consenting Noteholders;

(h)      any Company Party files, proposes, or otherwise supports any plan of liquidation, asset sale of all or substantially all of a Company Party's assets or plan or reorganization other than the Plan;

(i)       a Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership

or similar law now or hereafter in effect, except as provided for in this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition, (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official for a Company Party or for a substantial part of a Company Party's assets, (iv) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) makes a general assignment or arrangement for the benefit of creditors or (vi) takes any corporate action for the purpose of authorizing any of the foregoing; or

(j)    the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal (including as contemplated by Section 8.02).

13.02.    Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 15.10 of this Agreement upon the occurrence of any of the following events:

(a)    the breach in any material respect by Consenting Noteholders holding an amount of Senior Notes that would result in non-breaching Consenting Noteholders holding less than two-thirds (2/3) of the aggregate outstanding principal amount of the Senior Notes, which breach remains uncured by such breaching Consenting Noteholder (to the extent curable) for five (5) Business Days after the terminating Company Parties transmit a written notice in accordance with Section 15.10 of this Agreement detailing any such breach;

(b)    the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after such terminating Company Party transmits a written notice in accordance with Section 15.10 of this Agreement detailing any such issuance; *provided,* that, this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)    the Bankruptcy Court enters an order denying confirmation of the Plan.

13.03.    Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Noteholders; and (b) each Company Party.

13.04.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the occurrence of: (i) the Plan Effective Date or (ii) the Outside Date if the Plan Effective Date has not occurred by such Outside Date.

13.05.  Effect of Termination.  After the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents, agreements, undertakings, tenders, waivers, forbearances, votes or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided,* that any Consenting Noteholder withdrawing or changing its vote pursuant to this Section 13.05 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Noteholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Noteholder, and (b) any right of any Consenting Noteholder, or the ability of any Consenting Noteholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Noteholder.  No purported termination of this Agreement shall be effective under this Section 13.05 or otherwise if the Party seeking to terminate this Agreement is then in material breach of this Agreement, except a termination pursuant to Section 13.01(j), Section 13.02(b), or Section 13.02(d).  Nothing in this Section 13.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 13.02(b).

**Section 14.   *Amendments and Waivers*.**

(a)   This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

(b)   This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (1) each Company Party, and (2) the Required Consenting Noteholders; *provided,* that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on (a) any of the Senior Notes Claims held by a Consenting Noteholder or (b) any individual Consenting Noteholder, as compared to similarly situated Consenting Noteholders, then the consent of each

30

such affected Consenting Noteholder shall also be required to effectuate such modification, amendment, waiver, or supplement; *provided*, *further*, that (i) any modification, amendment, or supplement to the definition of "Outside Date" shall not be binding on any Consenting Noteholder that has not provided its prior written consent to such amendment, (ii) any modification, amendment, or supplement to the definition of "Required Consenting Noteholders" shall require the prior written consent of each Consenting Noteholder, and (iii) any modification, amendment, or supplement to Section 13.04 hereof shall require the prior written consent of each Consenting Noteholder.

(c)       Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

(d)       The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

## Section 15.       *Miscellaneous.*

15.01.  <u>Acknowledgment</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

15.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

15.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable; *provided*, that this Section 15.03 shall not limit the right of any party hereto to exercise any right or remedy provided for in this Agreement (including the approval rights set forth in Section 3.02).  The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring Transactions.

15.04. <u>Complete Agreement</u>. Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

15.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

15.06. <u>TRIAL BY JURY WAIVER</u>. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.07. <u>Execution of Agreement</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.08. <u>Rules of Construction</u>. This Agreement is the product of negotiations among the Company Parties and the Consenting Noteholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Consenting Noteholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

15.09. <u>Successors and Assigns; Third Parties</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and, except as set forth in Section 9, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person or entity.

15.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Frontier Communications Corporation
401 Merritt 7
Norwalk, Connecticut 06851
Attention: Mark D. Nielsen, Executive Vice President, Chief Legal Officer, and Chief Transaction Officer
E-mail address:  mark.nielsen@ftr.com

with copies for information only (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:   Stephen E. Hessler, P.C. and Patrick Venter
E-mail address:  stephen.hessler@kirkland.com
                            patrick.venter@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Chad J. Husnick, P.C. and Benjamin M. Rhode
E-mail address:  chad.husnick@kirkland.com
                            benjamin.rhode@kirkland.com

(b)      if to a Consenting Noteholder, to the notice details identified on that Consenting Noteholder's signature page to this Agreement or its Transfer Agreement, with a copy (which shall not constitute notice unless otherwise specified herein) to:

If represented by Akin:
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attention: Ira S. Dizengoff, Philip C. Dublin, Naomi Moss, and Daniel I. Fisher
E-mail address:  idizengoff@akingump.com

pdublin@akingump.com
nmoss@akingump.com
dfisher@akingump.com

and

If represented by Milbank:
Milbank LLP
55 Hudson Yards,
New York, New York 10001
Attention: Dennis F. Dunne, Samuel A. Khalil, and Michael W. Price
E-mail address:  ddunne@milbank.com
skhalil@milbank.com
mprice@milbank.com

Any notice given by delivery, mail, or courier shall be effective when received.

15.11.  <u>Fees and Expenses</u>.  The Company Parties shall pay and reimburse all reasonable and documented fees and expenses when due (including travel costs and expenses) and all outstanding and unpaid amounts incurred in connection with the Restructuring Transactions (including, for the avoidance of doubt, all reasonable and documented fees and expenses incurred prior to the date hereof) of the attorneys, accountants, other professionals, advisors, and consultants of the Noteholder Groups (whether incurred directly or on their behalf and regardless of whether such fees and expenses are incurred before or after the Petition Date), including the fees and expenses of:  (i) Akin, (ii) Altman, (iii) Ducera, (iv) Houlihan, (v) Milbank, (vi) October Three and (vii) the Compensation Consultant, including all amounts payable or reimbursable under applicable fee or engagement letters (including any success or transaction fees when earned) with the Company Parties (which agreements shall not be terminated by the Company Parties before the termination of this Agreement); *provided*, that the Company Parties shall not be obligated to pay any fees and expenses under this Section 15.11 to the extent such fees and expenses are incurred after the Termination Date.  Subject to applicable law and applicable orders of the Bankruptcy Court, the occurrence of the Restructuring Transactions will be subject to the payment of the reasonable and documented fees and disbursements of Kirkland & Ellis LLP, Evercore Group L.L.C., FTI Consulting, Inc., and Communications Media Advisors, LLC, as advisors to the Company Parties, if any, in each case that are due and owing after receipt of applicable invoices consistent with any applicable engagement letters.

15.12.  <u>Reservation of Rights</u>.   After the termination of this Agreement pursuant to Section 13, the Parties each fully reserve any and all of their respective rights, remedies, claims, and interests, subject to Section 13 in the case of any claim for breach of this Agreement.  Further, nothing in herein shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and the Plan and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring Transactions.

15.13.  Independent Due Diligence and Decision Making.  Each Consenting Noteholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial, and other conditions, and prospects of the Company Parties.

15.14.  Enforceability of Agreement.  Each of the Parties to the extent enforceable waives any right to assert that the notice or exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising notice and termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

15.15.  Waiver.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  This Agreement is a part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

15.16.  Specific Performance.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

15.17.  Several, Not Joint, Claims.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.18.  Severability and Construction.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.19.  Remedies Cumulative.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.20.  Capacities of Consenting Noteholders.  Each Consenting Noteholder has entered into this Agreement on account of all Senior Notes Claims that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Senior Notes Claims.  Notwithstanding

anything to the contrary herein, nothing in this Agreement shall require or prohibit any Consenting Noteholder from taking any action solely in its capacity as a holder of any Claims or Interests other than Senior Notes Claims.

15.21.  <u>Relationship Among Consenting Noteholders and the Company Parties</u>.  None of the Consenting Noteholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Consenting Noteholder, the Company Parties, or any of the Company Parties' creditors or other stakeholders, including any holders of Senior Notes or Senior Notes Claims, and, other than as expressly set forth herein, there are no commitments among or between the Consenting Noteholders.  It is understood and agreed that any Consenting Noteholder may trade in any debt or equity securities of the Company Parties without the consent of the Company Parties or any other Consenting Noteholder, subject to applicable securities laws and this Agreement, including Section 9 hereof.  No prior history, pattern or practice of sharing confidences among or between any of the Consenting Noteholders and/or the Company Parties shall in any way affect or negate this understanding and agreement.  Nothing contained herein or in any other agreement referred to in this Agreement, and no action taken by any Consenting Noteholder pursuant hereto or thereto, shall be deemed to constitute the Consenting Noteholders as, and the Debtors acknowledges that the Consenting Noteholders do not so constitute, a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Consenting Noteholders are in any way acting in concert or as a group, including, without limitation, with respect to any agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of any Debtor or with respect to acting as a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended. Each Consenting Noteholder confirms that it has independently participated in the negotiation of the transactions contemplated herein. Each Consenting Noteholder shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement and it shall not be necessary for any other Consenting Noteholder to be joined as an additional party in any proceeding for such purpose. The use of a single agreement to effectuate the transactions contemplated herein was solely in the control of the Debtors, not the action or decision of any Consenting Noteholder, and was done solely for the convenience of the Debtors and not because it was required or requested to do so by any Consenting Noteholder.

15.22.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.01, Section 14, or otherwise, including a written approval by the Company Parties or the Required Consenting Noteholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

15.24.  <u>Survival.</u>  Notwithstanding (a) any Transfer of any Senior Notes Claims in accordance with Section 9 or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 13.05, Section 15, and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

15.25.  <u>Publicity</u>.  The Company Parties will submit to the Noteholder Groups Counsels all press releases, public filings, or public announcements, in each case, to be made by any of the Company Parties relating to this Agreement or the transactions contemplated hereby and any amendments thereof in advance of release and will consult with such counsel with respect to such communications.  Except as required by law or regulation or by any governmental or regulatory (including self-regulatory) authority, no Party or its advisors shall (a) use the name of any Consenting Noteholder in any public manner (including in any press release) or (b) disclose to any Person (including, for the avoidance of doubt, any other Consenting Noteholder), other than legal, accounting, financial and other advisors to the Company Parties, the principal amount or percentage of Senior Notes Claims, in each case, without such Consenting Noteholder's prior written consent; *provided,* that (i) if such disclosure is required by law, subpoena, or other legal process or regulation or by any governmental or regulatory (including self-regulatory) authority, the disclosing Party shall afford the relevant Consenting Noteholder a reasonable opportunity to review and comment in advance of such disclosure if reasonably practicable and permitted by applicable law and shall take all reasonable measures to limit such disclosure to the extent permitted by applicable law and (ii) the foregoing shall not prohibit the public disclosure, including in connection with the Chapter 11 Cases, of the aggregate percentage or aggregate principal amount of Claims held by all the Consenting Noteholders collectively. Notwithstanding the foregoing, (x) any Party hereto may disclose the identities of the Parties hereto in any action to enforce this Agreement or in an action for damages as a result of any breaches hereof and (y) any Party hereto may disclose, to the extent expressly consented to in writing by a Consenting Noteholder, such Consenting Noteholder's identity and individual holdings.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

**COMPANY PARTIES**

By: _____

Name:  Mark D. Nielsen
Title:  Executive Vice President, Chief Legal Officer, and Chief Transaction Officer

[Consenting Noteholder Signature Pages Redacted]

### Schedule 7.02(i)

### Specified Material Actions

1. take any action or inaction that would result in a breach of the DIP Facility, including any failure to comply with the DIP Budget after giving effect to any variances and applicable cure provisions set forth in the DIP Budget or the DIP Facility Documents;

2. take, adopt, or implement a material change to any Company Party's or any of its subsidiaries' sales strategy and/or other material operational changes with respect to any Company Party or any of its subsidiaries;

3. develop and adopt the Company Parties' RDOF bidding framework and strategy (or submission of any RDOF bid);

4. select, retain, and/or appoint individuals to key management positions, including entry into any employment agreements or incentive arrangements;

5. take, adopt, or implement a material change in the relationship with, or settlement with respect to, any material wholesale business counterparties of any Company Party or any of its subsidiaries, including any material amendment to a contract with respect to such counterparties;

6. take, adopt, or implement any material action or position with respect to the IRS, the PBGC or any labor union of any Company Party or any of its subsidiaries other than in the ordinary course of business, including with respect to negotiations with the IRS, the PBGC or any labor union that are inconsistent with the Restructuring Term Sheet;

7. (a) grant to any Service Provider any increase in base salary, wages, bonuses or other incentive compensation, other than in the ordinary course of business in connection with a new hire or promotion based on job performance and which, in the case of increases granted in connection with a promotion based on job performance, will not exceed $100,000 per individual and $1,000,000 in the aggregate (excluding any applicable annual merit-based increases provided in the ordinary course of business consistent with past practice), (b) grant to any Service Provider any new, or increase any existing, change in control, retention, severance or termination pay, (c) issue, deliver, sell, pledge, encumber or grant any equity or equity-based awards to any Service Provider, (d) fund any rabbi trust or similar arrangement or otherwise secure funding for any Benefit Plan or Benefit Agreement, (e) effectuate any plant closing, relocation of work, or mass layoff that would incur any liability or obligation under the WARN Act, or (f) grant or forgive any loans to any Service Provider (other than the grant of loans for travel and business expenses, in each case, in the ordinary course of business consistent with past practice, and which will not exceed $10,000 for any individual);

8. make any change in any method of financial accounting or financial accounting practice, policy or procedure other than as may be appropriate to conform to changes in United States generally accepted accounting principles in effect from time to time (or any interpretation thereof) after the date hereof or as may be required by changes in applicable Law after the date hereof;

9. assign, sell, lease, license, dispose, cancel, abandon, grant rights to or fail to renew, maintain or diligently pursue applications for, or defend, any rights with respect to any of the following: (i) patents and patent applications, inventions, utility models and industrial designs, and all applications and issuances therefor, together with all reissuances, divisions, renewals, revisions, extensions, reexaminations, provisionals, continuations and continuations-in-part with respect thereto; (ii) trademarks, trade names, service marks, trade dress, taglines, social media identifiers and related accounts, brand names, logos and corporate names, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals therefor; (iii) internet domain names and other computer identifiers; (iv) copyrights, applications and registrations therefor; (v) software; (vi) trade secrets, know-how, inventions, processes, procedures, databases, confidential business information and other proprietary information and rights; and (vii) all other intellectual property rights of any kind or nature;

10. assign, transfer, lease, sub-lease, cancel, fail to renew or fail to extend any material certificates, licenses, permits, authorizations and approvals of or issued by any governmental authorities (including any certificates, licenses, permits, authorizations and approvals of or issued by the FCC or any PUCs (collectively, "**Permits**")) or discontinue any service or operations that require prior regulatory approval for discontinuance;

11. compromise, settle or agree to settle any claim, suit, action, hearing, litigation, administrative charge, investigation, arbitration or other material proceeding (whether civil, criminal, administrative, or investigative) in a manner which: (i) constitute or result in injunctive relief or other non-monetary relief that would impose any restriction on the operations of the Company Parties or any of their subsidiaries (excluding any commitments in routine regulatory and/or compliance filings that result in immaterial process changes such as additional or modified ordinary course disclosure notices being required to be sent to customers); (ii) constitute a criminal violation; or (iii) result monetary liability in excess of $2,000,000, individually or in the aggregate with any related claims;

12. enter into, renew, or modify, amend or waive in any material respect any material contract, in each case, other than in the ordinary course of business consistent with past practice;

13. except for any actions related to any consolidated tax returns, the effect of which is not material to the business of the Company Parties, (i) change any material tax election, tax practice or procedure, or tax accounting method, (ii) settle or compromise any material tax claim, audit or assessment, enter into any closing agreement under section 7121 of the Internal Revenue Code of 1986, as amended (or any similar provision of state, local or non-U.S. tax Law), (iii) consent to an extension or waiver of the limitation period applicable to any material tax claim or assessment (other than an ordinary course extension of time to file tax returns), (iv) file any material amended tax return (other than any tax returns with

respect to sales tax or property tax amended in the ordinary course of business), (v) initiate any material voluntary tax disclosure or (vi) file or relinquish any claim for material tax refunds, in each to the extent such action would reasonably increase the tax liabilities of the Company Parties from and after the Plan Effective Date;

14. enter into, or renew, any contract that restricts the ability of any Company Party or any of its subsidiaries to compete with, or conduct, any business or line of business in any geographic area, or that grants any counterparty any exclusive right or right of first refusal; or

15. agree, authorize or commit, whether in writing or otherwise, to do any of the foregoing.

## EXHIBIT A

### Frontier Communications Corporation Affiliate Entities

Citizens Capital Ventures Corp.
Citizens Directory Services Company L.L.C.
Citizens Louisiana Accounting Company
Citizens Newcom Company
Citizens Newtel, LLC
Citizens Pennsylvania Company LLC
Citizens SERP Administration Company
Citizens Telecom Services Company L.L.C.
Citizens Telecommunications Company of California Inc.
Citizens Telecommunications Company of Idaho
Citizens Telecommunications Company of Illinois
Citizens Telecommunications Company of Minnesota, LLC
Citizens Telecommunications Company of Montana
Citizens Telecommunications Company of Nebraska
Citizens Telecommunications Company of Nebraska LLC
Citizens Telecommunications Company of Nevada
Citizens Telecommunications Company of New York, Inc.
Citizens Telecommunications Company of Oregon
Citizens Telecommunications Company of Tennessee L.L.C.
Citizens Telecommunications Company of the White Mountains, Inc.
Citizens Telecommunications Company of Utah
Citizens Telecommunications Company of West Virginia
Citizens Utilities Capital L.P.
Citizens Utilities Rural Company, Inc.
Commonwealth Communication, LLC
Commonwealth Telephone Company LLC
Commonwealth Telephone Enterprises LLC
Commonwealth Telephone Management Services, Inc.
CTE Holdings, Inc.
CTE Services, Inc.
CTE Telecom, LLC
CTSI, LLC
CU Capital LLC
CU Wireless Company LLC
Electric Lightwave NY, LLC
Evans Telephone Holdings, Inc.
Fairmount Cellular LLC
Frontier ABC LLC
Frontier California Inc.
Frontier Communications - Midland, Inc.
Frontier Communications - Prairie, Inc.

Frontier Communications - Schuyler, Inc.
Frontier Communications Corporate Services Inc.
Frontier Communications ILEC Holdings LLC
Frontier Communications Northwest Inc.
Frontier Communications of America, Inc.
Frontier Communications of Ausable Valley, Inc.
Frontier Communications of Breezewood, LLC
Frontier Communications of Canton, LLC
Frontier Communications of Delaware, Inc.
Frontier Communications of Depue, Inc.
Frontier Communications of Georgia LLC
Frontier Communications of Illinois, Inc.
Frontier Communications of Indiana, LLC
Frontier Communications of Iowa, LLC
Frontier Communications of Lakeside, Inc.
Frontier Communications of Lakewood, LLC
Frontier Communications of Michigan, Inc.
Frontier Communications of Minnesota, Inc.
Frontier Communications of Mississippi LLC
Frontier Communications of Mt. Pulaski, Inc.
Frontier Communications of New York, Inc.
Frontier Communications of Orion, Inc.
Frontier Communications of Oswayo River LLC
Frontier Communications of Pennsylvania, LLC
Frontier Communications of Rochester, Inc.
Frontier Communications of Seneca-Gorham, Inc.
Frontier Communications of Sylvan Lake, Inc.
Frontier Communications of the Carolinas LLC
Frontier Communications of the South, LLC
Frontier Communications of the Southwest Inc.
Frontier Communications of Thorntown, LLC
Frontier Communications of Virginia, Inc.
Frontier Communications of Wisconsin LLC
Frontier Communications Online and Long Distance Inc.
Frontier Communications Services Inc.
Frontier Directory Services Company, LLC
Frontier Florida LLC
Frontier Infoservices Inc.
Frontier Midstates Inc.
Frontier Mobile LLC
Frontier North Inc.
Frontier Security Company
Frontier Services Corp.
Frontier Southwest Incorporated
Frontier Subsidiary Telco LLC

Frontier Techserv, Inc.
Frontier Telephone of Rochester, Inc.
Frontier Video Services Inc.
Frontier West Virginia Inc.
GVN Services
Navajo Communications Co., Inc.
N C C Systems, Inc.
Newco West Holdings LLC
Ogden Telephone Company
Phone Trends, Inc.
Rhinelander Telecommunications, LLC
Rib Lake Cellular for Wisconsin RSA #3, Inc.
Rib Lake Telecom, Inc.
SNET America, Inc.
TCI Technology & Equipment LLC
The Southern New England Telephone Company
Total Communications, Inc.

## **EXHIBIT B**

**Restructuring Term Sheet**

---

**FRONTIER COMMUNICATIONS CORPORATION ET AL.**

**RESTRUCTURING TERM SHEET**

**April 14, 2020**

---

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY EXCHANGE OR PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH SECTION 4(A)(2) OF THE SECURITIES ACT OF 1933 AND/OR SECTION 1145 OF THE BANKRUPTCY CODE AND APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE STATUTES, RULES, AND LAWS.**

**THIS TERM SHEET DOES NOT ADDRESS ALL MATERIAL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING AND ANY AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION CONSISTENT WITH THIS TERM SHEET AND OTHERWISE REASONABLY ACCEPTABLE TO THE REQUIRED CONSENTING NOTEHOLDERS AND THE COMPANY PARTIES (EACH AS DEFINED HEREIN) IN THE MANNER SET FORTH IN THE RSA. THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL STATUTES, RULES, AND LAWS. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMPANY PARTIES AND THE REQUIRED CONSENTING NOTEHOLDERS.**

This Term Sheet (including the annexes attached hereto, this "Term Sheet") sets forth the principal terms of a financial restructuring (the "Restructuring") of the existing debt of, existing equity interests in, and certain other obligations of Frontier Communications Corporation ("Frontier") and certain of its direct and indirect subsidiaries[1] (collectively with Frontier, the "Company Parties" or "Debtors"), through a pre-negotiated plan of reorganization (the "Plan") to be filed by the Company Parties after commencing cases (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[2] Following the occurrence of the Plan effective date (the "Plan Effective Date"), Frontier (or an entity formed to indirectly acquire substantially all of the assets and/or stock of the Debtors as may be contemplated by the Restructuring) shall be referred to herein as "Reorganized Frontier". This Term Sheet is for discussion purposes only, and is non-binding, and is not an express or implied offer with regard to the transactions described herein, and does not include all of the terms or conditions relating to such transactions. Without limiting the generality of the foregoing, the terms contained herein are subject to, among other things, completion of due diligence and requisite internal approvals. Any agreements with respect to the matters discussed herein shall be subject in all respects to the negotiation and execution of definitive documentation, including, without limitation, a restructuring support agreement (the "RSA") among the Debtors and certain holders of unsecured notes (the "Consenting Noteholders") issued by Frontier (the "Senior Notes") including members of the (a) ad hoc group represented by Milbank LLP and Houlihan Lokey Capital, Inc. and (b) ad hoc group represented by Akin Gump Strauss Hauer & Feld LLP and Ducera Partners LLC ((a) and (b), the "Noteholder Committees"). Nothing herein shall constitute or be construed as an admission of any fact or liability, and each statement contained herein is made without prejudice, solely for settlement purposes.

---

[1]    Applicable Debtors to be mutually agreed by Frontier and the Required Consenting Noteholders.

[2]    Capitalized terms used but not otherwise defined or referenced herein shall have the meanings ascribed to such terms as set forth in the RSA.

| OVERVIEW | |
|---|---|
| **Implementation** | No earlier than April 12, 2020 and no later than April 15, 2020, the Debtors will have commenced the Chapter 11 Cases.  Subject to the terms and conditions of the RSA (which shall include additional milestones, consent rights, and conditions not set forth in this Term Sheet), the Restructuring will be structured, implemented, and accomplished through the Plan and other definitive documentation to be consistent with this Term Sheet and otherwise reasonably acceptable to the Company Parties and the Required Consenting Noteholders[3]; *provided, however*, that the Company Parties and Required Consenting Noteholders agree that the Company Parties shall not be required to file a motion to assume for the RSA to be effectuated on or after the commencement of the Chapter 11 Cases.  No later than 120 calendar days after the Petition Date, the Company Parties shall obtain confirmation of the Plan, which shall, for the avoidance of doubt, be on terms consistent with the RSA and this Term Sheet. |
| **Required Support** | The effectiveness of the RSA shall occur upon execution of the RSA by the following parties (such date, the "<u>RSA Effective Date</u>"): <br><br>• holders of at least sixty-six and two-thirds (66.67) percent of the aggregate outstanding principal amount of Senior Notes; and <br><br>• the Company Parties. |
| TREATMENT OF CLAIMS AND INTERESTS[4] | |
| **Revolving Credit Facility[5]** | To the extent not already satisfied in full during the Chapter 11 Cases from the proceeds of the DIP Facility (as defined herein), paid in full on the Plan Effective Date. <br><br>• To receive cash interest at non-default rate during the Chapter 11 Cases until repayment of the Revolving Credit Facility (as |

---

[3]    "<u>Required Consenting Noteholders</u>" means, as of the relevant date, the Consenting Noteholders holding greater than 50.1% of the aggregate outstanding principal amount of Senior Notes that are subject to the RSA.

[4]    Wherever more than one potential treatment for a class of claims is contemplated (*e.g.*, Revolving Credit Facility, 1L Term Loan, 1L Notes, 2L Notes), the Debtors' election of specific treatment for claims (including any election to satisfy such claims prior to the Plan Effective Date) to be subject to the reasonable consent of the Required Consenting Noteholders.  Any adequate protection to be consistent with this Term Sheet and otherwise reasonable and customary and subject to the reasonable consent of the Required Consenting Noteholders.

For the avoidance of doubt, in the event that treatment of a class of claims contemplates payment of cash interest at the non-default rate during the Chapter 11 Cases until repayment thereunder and/or no make whole, and the Company Parties are subject to litigation, threatened litigation, or otherwise as a result of such treatment, the RSA may not be terminated with respect to the Company Parties by the Required Consenting Noteholders on account of such litigation, threatened litigation, or otherwise; *provided*, that the RSA may be terminated with respect to the Company Parties by the Required Consenting Noteholders if the Company Parties (a) take any position in any such litigation, threatened litigation, or other dispute that is materially inconsistent with this Term Sheet or (b) enter into any settlement of any such litigation, threatened litigation, or other dispute that is not reasonably acceptable to the Required Consenting Noteholders.

Further, for the avoidance of doubt, although the RSA will require the Consenting Noteholders to support the treatments specified herein (including voting for the Plan when properly solicited) in their capacities as holders of Senior Notes, nothing shall preclude a Consenting Noteholder from asserting any rights in its capacity as a holder of other claims against or interests in the Company Parties.

[5]    If, prior to the commencement of the Chapter 11 Cases, the Company Parties agree to a proposed treatment for the holders of Revolving Credit Facility Claims that differs from the treatment stated in this Term Sheet, any Consenting Noteholder that objects to such treatment shall have the right, within 24 hours of notice by the professionals representing the Company Parties to the professionals representing the Noteholder Committees, to withdraw its executed signature page to the RSA.

| | applicable). |
|---|---|
| **1L Term Loan**[6] | To the extent not already satisfied in full during the Chapter 11 Cases from the proceeds of the DIP Facility, paid in full on the Plan Effective Date or, solely in the event the Company Parties cannot procure financing on terms acceptable to the Company Parties and the Required Consenting Noteholders to repay the 1L Term Loan in full, reinstated pursuant to section 1124 of the Bankruptcy Code on the Plan Effective Date.<br><br>• To receive cash interest at non-default rate during the Chapter 11 Cases until repayment or reinstatement of the 1L Term Loan (as applicable); no make whole. |
| **1L Notes**[7] | To the extent not already satisfied in full during the Chapter 11 Cases from the proceeds of the DIP Facility, paid in full on the Plan Effective Date or, solely in the event the Company Parties cannot procure financing on terms acceptable to the Company Parties and the Required Consenting Noteholders to repay the 1L Notes in full, reinstated pursuant to section 1124 of the Bankruptcy Code on the Plan Effective Date.<br><br>• To receive cash interest at non-default rate during the Chapter 11 Cases until repayment or reinstatement of the 1L Notes (as applicable); no make whole. |
| **2L Notes** | To the extent not already satisfied in full during the Chapter 11 Cases from the proceeds of the DIP Facility, paid in full on the Plan Effective Date or, solely in the event the Company Parties cannot procure financing on terms acceptable to the Company Parties and the Required Consenting Noteholders to repay the 2L Notes in full, reinstated pursuant to section 1124 of the Bankruptcy Code on the Plan Effective Date.<br><br>• The Company Parties and the Required Consenting Noteholders shall mutually agree to one of the following forms of treatment:<br><br>    o to receive cash interest at non-default rate during the Chapter 11 Cases until repayment or reinstatement of the 2L Notes (as applicable); no make whole; or<br><br>    o no cash interest payments during the Chapter 11 Cases; to receive accrued non-default rate interest on the Plan Effective Date; no make whole. |

---

[6]   If, prior to the commencement of the Chapter 11 Cases, the Company Parties agree to a proposed treatment for the holders of 1L Term Loan Claims that differs from the treatment stated in this Term Sheet, any Consenting Noteholder that objects to such treatment shall have the right, within 24 hours of notice by the professionals representing the Company Parties to the professionals representing the Noteholder Committees, to withdraw its executed signature page to the RSA.

[7]   If, prior to the commencement of the Chapter 11 Cases, the Company Parties agree to a proposed treatment for the holders of 1L Notes Claims that differs from the treatment stated in this Term Sheet, any Consenting Noteholder that objects to such treatment shall have the right, within 24 hours of notice by the professionals representing the Company Parties to the professionals representing the Noteholder Committees, to withdraw its executed signature page to the RSA.

| | |
|---|---|
| **Senior Notes[8]** | On or as soon as reasonably practicable following the Plan Effective Date, each holder of Senior Notes will receive its pro rata share of: <br><br> • 100% of the common equity of Reorganized Frontier (the "New Common Stock"), subject to dilution by the Management Incentive Plan (as defined below); <br><br> • The Takeback Debt (as defined below); and <br><br> • Any Surplus Cash remaining after payments of the Incremental Payments as contemplated hereunder.[9] |
| **Subsidiary Secured Notes** | Reinstated pursuant to section 1124 of the Bankruptcy Code on or as soon as reasonably practicable following the Plan Effective Date. <br><br> • To receive cash interest at non-default rate during the Chapter 11 Cases. |
| **Subsidiary Unsecured Notes** | Reinstated pursuant to section 1124 of the Bankruptcy Code on or as soon as reasonably practicable following the Plan Effective Date. <br><br> • To receive cash interest at non-default rate during the Chapter 11 Cases. |
| **Trade Claims/Other Unsecured Claims (other than Parent Litigation Claims)** | To the extent not already satisfied during the Chapter 11 Cases, on or as soon as reasonably practicable following the Plan Effective Date, each holder of a Trade Claim or other unsecured claim (other than Parent Litigation Claims), if applicable, that is not a Senior Notes Claim or Subsidiary Unsecured Notes Claim will receive: <br><br> • payment in full in cash; <br><br> • reinstatement pursuant to section 1124 of the Bankruptcy Code; or <br><br> • such other treatment rendering such Trade Claim/Other Unsecured Claim unimpaired, in each case set forth above, as reasonably acceptable to the Company Parties and the Required Consenting Noteholders. |
| **Parent Litigation Claims** | Unimpaired, *provided* that litigation-related claims against Frontier that would be subject to the automatic stay (except those subject to the police and regulatory |

---

[8]  Confirmation order to provide that, for determining distributions of New Common Stock, Takeback Debt, and Surplus Cash, the allowed amount of Senior Notes Claims shall be reduced on a dollar-for-dollar basis by the amount of Incremental Payments that are to be made on account of each series of Senior Notes on the Plan Effective Date.

[9]  "Surplus Cash" means the amount of unrestricted balance sheet cash in excess of $150 million on the Plan Effective Date as projected 30 days prior to the anticipated Plan Effective Date (in each case, estimated and calculated in a manner reasonably acceptable to the Company Parties and the Required Consenting Noteholders, including in respect of available net after-tax cash proceeds from the PNW Sale (as defined below) and less any deferred pension contribution payments, and any interest associated therewith, of the Company Parties under the CARES Act or applicable IRS/PBGC waiver, potential costs related to regulatory settlements, and other restructuring related payments due on the Plan Effective Date, including any required repayments of debt and the Incremental Payments (as defined below)); *provided*, the Company Parties shall use commercially reasonable best efforts to raise an $850 million Exit Facility (including seeking proposals from Consenting Noteholders), to be comprised of a revolving credit facility and/or other funded instrument, with any such proceeds expressly excluded from Surplus Cash; *provided*, *further*, that to the extent the Exit Facility commitment is below $850 million, the amount of Surplus Cash shall be reduced in an amount equal to the difference between $850 million and the actual Exit Facility commitment. Further, for the avoidance of doubt, the Exit Facilities (as defined herein) shall remain undrawn as of the Plan Effective Date (excluding any required LCs).

| | |
|---|---|
| | exception) (the "Parent Litigation Claims") will be allowed in an amount that does not exceed existing insurance coverage plus $25 million. In the event the foregoing condition is not satisfied, treatment of Parent Litigation Claims to be acceptable to the Company Parties and the Required Consenting Noteholders. During the Chapter 11 Cases, the Required Consenting Noteholders shall have consultation rights with respect to the settlement, disposition, and/or resolution of any material Parent Litigation Claims. For the avoidance of doubt, the Parent Litigation Claims shall not include any litigation-related claims against any of Frontier's direct or indirect subsidiaries. |
| **Administrative, Priority Tax, Other Priority Claims, or Other Secured Claims** | On or as soon as reasonably practicable following the Plan Effective Date, each holder of an Administrative, Priority Tax, Other Priority, or Other Secured Claim will receive:<br><br>• payment in full in cash;<br><br>• reinstatement pursuant to section 1124 of the Bankruptcy Code;<br><br>• delivery of the collateral securing any such secured claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or<br><br>• such other treatment rendering such Administrative, Priority Tax, Other Priority, or Other Secured Claim unimpaired. |
| **Intercompany Claims** | On the Plan Effective Date, all Intercompany Claims shall be, at the option of Reorganized Frontier, either (a) reinstated or (b) cancelled without any distribution on account of such interests. |
| **Existing Equity Interests in Frontier** | No recovery. |
| **OTHER KEY TERMS** | |
| **Incremental Payments** | Subject to the occurrence of the RSA Effective Date and acceptance of the Plan by the Senior Notes class, Frontier will make a cash payment on the Plan Effective Date (to the extent of available Excess Cash[10]) to each holder of Senior Notes (the "Incremental Payments"). The Incremental Payments allocable to each holder of each series of Senior Notes shall be based on each such series's pro rata share of the Incremental Payment Amount (as defined below).<br><br>"Incremental Payment Amount" means, with respect to each series of Senior Notes, (a) if the amount of Excess Cash is equal to or greater than the sum of all Series Accrued Amounts, the Series Accrued Amount for such series, (b) if the amount of Excess Cash is less than the sum of all Series Accrued Amounts but greater than zero, an amount equal to Excess Cash multiplied by the Series |

---

[10] "Excess Cash" means the amount of unrestricted balance sheet cash in excess of $150 million on the Plan Effective Date as projected 30 days prior to the anticipated Plan Effective Date (in each case, estimated and calculated in a manner reasonably acceptable to the Company Parties and the Required Consenting Noteholders, including in respect of available net after-tax cash proceeds from the PNW Sale (as defined below) and less any deferred pension contribution payments, and any interest associated therewith, of the Company Parties under the CARES Act or applicable IRS/PBGC waiver, potential costs related to regulatory settlements, and other restructuring related payments due on the Plan Effective Date, including any required repayments of debt but excluding the Incremental Payments). For the avoidance of doubt, any Incremental Payments will be made from Excess Cash first prior to the determination of, and distribution of, any Surplus Cash. Further, for the avoidance of doubt, the Exit Facilities shall remain undrawn as of the Plan Effective Date (excluding any required LCs).

|  | Ratable Share for such series, or (c) if Excess Cash is zero, zero.<br><br>"Series Accrued Amount" means, with respect to any series of Senior Notes, the Series Accrued Amount specified on **Annex 2** with respect to such series of Senior Notes.<br><br>"Series Ratable Share" means, with respect to any series of Senior Notes, the Series Ratable Share specified on **Annex 2** with respect to such series of Senior Notes.<br><br>Payment of the Incremental Payments shall be made to every holder of each series of Senior Notes in respect of the portion of the Series Accrued Amounts related to such holder's holdings in such series of Senior Notes.  For the avoidance of doubt, for purposes of determining distributions of New Common Stock, Takeback Debt, and Surplus Cash, the allowed amount of Senior Notes Claims shall be reduced on a dollar-for-dollar basis by the amount of Incremental Payments that are to be made on the Plan Effective Date. |
|---|---|
| **DIP Facility** | The Debtors will use commercially reasonable best efforts to obtain commitments on the best available terms for a superpriority secured debtor-in-possession financing facility, with an option for conversion into an Exit Facility (as defined below) on the Plan Effective Date, on terms and conditions (including as to principal amount), in each case, reasonably acceptable to the Company Parties and reasonably acceptable to the Required Consenting Noteholders.  The proceeds of all or a portion of the DIP Facility may be used to repay some or all of the Debtors' existing secured debt (*i.e.*, the Revolving Credit Facility, the 1L Term Loan, the 1L Notes, and the 2L Notes).  To the extent not converted into an Exit Facility, DIP Claims will be paid in cash on the Plan Effective Date. |
| **Exit Facilities** | The Debtors will use commercially reasonable best efforts to obtain commitments on the best available terms for one or more third-party debt facilities to be entered into on the Plan Effective Date (the "Exit Facilities"). The Exit Facilities shall be in an amount reasonably sufficient to facilitate Plan distributions and ensure incremental liquidity on the Plan Effective Date, and will otherwise be on terms and conditions (including as to amount) reasonably acceptable to the Debtors and reasonably acceptable to the Required Consenting Noteholders.<br><br>The Exit Facilities shall remain undrawn as of the Plan Effective Date (excluding any required LCs). |
| **Takeback Debt** | One or more of the reorganized Debtors will issue takeback debt (the "Takeback Debt"), solely for the purpose of distribution to each holder of Senior Notes pursuant to the Plan.  Unless otherwise agreed to by the Company Parties and the Required Consenting Noteholders, the terms of such Takeback Debt shall include:<br><br>• Principal amount:  $750 million, subject to downward adjustment by Consenting Noteholders holding at least 66 2/3% of the aggregate outstanding principal amount of Senior Notes that are subject to the RSA (the "Determining Noteholders"), with such determination to be made no later than 30 days before the occurrence of the Plan Effective Date.<br><br>• Interest rate:  (i) no more than 250 basis points higher than the interest |

|  | rate of the next most junior secured debt facility to be entered into on the Plan Effective Date if the Takeback Debt is secured on a third lien basis or (ii) no more than 350 basis points higher than the interest rate of the most junior secured debt facility to be entered into on the Plan Effective Date if the Takeback Debt is unsecured. |
|---|---|
|  | • Maturity: No less than one year outside of the longest-dated debt facility to be entered into on the Plan Effective Date, subject to an outside maturity date of 8 years from the Plan Effective Date. |
|  | • Security: (i) to the extent the 2L Notes are reinstated under the Plan, the Takeback Debt will be third lien debt, or (ii) to the extent the 2L Notes are paid in full in cash during the pendency of the Chapter 11 Cases or under the Plan, the Company Parties and the Required Consenting Noteholders will agree on whether the Takeback Debt will be secured or unsecured within 3 business days of the Debtors' delivery to the Consenting Noteholders of a term sheet for financing to repay the 2L Notes that contains terms and conditions reasonably acceptable to the Company Parties and the Required Consenting Noteholders; *provided* that such agreement will be binding in the event the 2L Notes are refinanced on substantially similar terms; *provided, further*, that in the event the Takeback Debt is third lien debt, a standard intercreditor agreement shall be executed and delivered by the relevant parties in conjunction with the execution and delivery of any third-lien debt documents. For the avoidance of doubt, the Debtors will exercise commercially reasonable best efforts to obtain financing to repay the 2L Notes on terms and conditions reasonably acceptable to the Company Parties and the Required Consenting Noteholders. |
|  | • Additional Terms: |
|  | ○ All other terms including, without limitation, covenants and governance, shall be reasonably acceptable to the Company Parties and the Required Consenting Noteholders; *provided* that in no event shall such terms be more restrictive than those in the indenture for the 2L Notes. |
|  | ○ Any terms may be modified subject to consent by the Company Parties and the Required Consenting Noteholders; *provided*, that as noted above, downward adjustment of principal amount shall require consent of the Company Parties and the Determining Noteholders. |
|  | ○ The Takeback Debt may be replaced with cash proceeds of third-party market financing that becomes available prior to the Plan Effective Date; *provided* that the third-party market financing shall contain terms no worse than those contemplated for the Takeback Debt. |
| **Pension/OPEB** | The Company Parties and the Consenting Noteholders shall confer regarding potential cost savings and concessions under the Company Parties' pension/OPEB plans and determine in good faith whether to pursue further concessions; *provided*, that from and after the RSA Effective Date, the Finance Committee of the Board, in consultation with the Required Consenting Noteholders, shall be charged with overseeing and making decisions on behalf of the Company Parties with respect to any negotiations regarding the "freeze" |

| | |
|---|---|
| | of the Company Parties' pension/OPEB plans. |
| **Business Plan** | The Restructuring contemplates the development and implementation of a business plan for Reorganized Frontier that is consistent with this Term Sheet and otherwise acceptable to the Company Parties and reasonably acceptable to the Required Consenting Noteholders. |
| | The Debtors shall solicit a Disclosure Statement containing go-forward financial projections for: (a) the Debtors' "base case" business plan; (b) the Debtors' "reinvestment" sensitivity case; and (c) an alternative "reinvestment" sensitivity case that will be delivered to the Consenting Noteholders by the RSA Effective Date.  The contents of the Disclosure Statement shall provide appropriate disclosures regarding the preparatory work for each business plan and scenario and otherwise be reasonably acceptable to the Required Consenting Noteholders; *provided*, that the Debtors shall bear no obligation to attest to the Debtors' management team's view of reasonableness for either sensitivity case if sufficient preparatory work has not been conducted as of the date on which the Disclosure Statement is filed. |
| | The analyses contained in the Debtors' "reinvestment" sensitivity case shall be premised on the following: |
| | <ul><li>Material de-leveraging of the balance sheet;</li><li>Modernization of network, systems and operations, and improved quality of service for consumer, commercial and wholesale customers;</li><li>Reinvestment of capital into fiber expansion and FTTx upgrades with IRR profiles that are viewed as acceptable to Company Parties; and</li><li>Opportunistic participation in next generation of government subsidies for rural broadband ("RDOF" program).</li></ul> |
| | The Debtors will use commercially reasonable efforts to provide a detailed report within 120 days of the RSA Effective Date on the following: |
| | <ul><li>Specific initiatives for modernization and improved quality of service; and</li><li>A plan for participation in the upcoming RDOF auction including the following:<ul><li>technology plan;</li><li>building strategy to maximize success at the accretive returns; and</li><li>assessment of potential sensitivities around different return requirement thresholds.</li></ul></li></ul> |
| | The Debtors will use commercially reasonable efforts to provide by January 31, 2021 the following: |
| | <ul><li>New budgetary plan, which shall be developed in consideration of the foregoing materials, including, but not limited to, as appropriate, information derived from results of upcoming RDOF auction and concepts of investment underlying Virtual Separation (as defined</li></ul> |

below); and

- Capital spending into fiber expansion and FTTx upgrades within the network.

The Debtors will use commercially reasonable best efforts to provide a detailed report by no later than the Plan Effective Date detailing analysis and development of the following:

- a virtual separation under the same ownership structure of select state operations where the reorganized Debtors will conduct fiber deployments ("InvestCo") from those state operations where the reorganized Debtors will perform broadband upgrades and operational improvements ("ImproveCo"), with such allocation of state operations to be reasonably acceptable to the Company Parties and the Required Consenting Noteholders (the "Virtual Separation"), such that the Reorganized Frontier Board (as defined below) may, at its determination, adopt and implement the Virtual Separation at any time on or after the Plan Effective Date; and

- an internal revenue and cost sharing model based around the Virtual Separation.[11]

The Debtors will use commercially reasonable efforts to deliver by no later than the applicable date specified below, on a one-time basis, based on available analytics, each of the following:

- no later than 3 business days after the RSA Effective Date, the Debtors' "base case" business plan; and

- no later than 10 business days after the RSA Effective Date, (a) the Debtors' "reinvestment" sensitivity case and (b) an alternative "reinvestment" sensitivity case for the reorganized Debtors in a form consistent with the analysis underlying the Virtual Separation, and otherwise reasonably acceptable to the Required Consenting Noteholders; *provided, however*, the Company Parties shall not be bound by how the ImproveCo and InvestCo clusters are defined in these cases, as all parties recognize that the composition of these clusters may change from time to time as part of the Virtual Separation evaluation process.

Notwithstanding anything to the contrary herein, any materials that constitute material, non-public information shall only be delivered to the Consenting Noteholders' advisors and the Company Parties will not have an obligation to disclose any such materials to any Consenting Noteholders unless the Company Parties and such Consenting Noteholders have entered into a mutually acceptable confidentiality agreement with respect to such information.

| **Pre-Effective Date Implementation** | Upon the RSA Effective Date, the finance committee of Frontier's Board (the "Finance Committee") will oversee certain initiatives and decisions during the period from the RSA Effective Date until the Plan Effective Date, including |
|---|---|

---

[11]   Within 14 days after the RSA Effective Date, the advisors to the Company Parties will provide to the advisors to the Consenting Noteholders (on a professionals' eyes only basis) a detailed timeline with respect to the Virtual Separation and will provide updates to the advisors to the Consenting Noteholders (on a professionals' eyes only basis) not less frequently than monthly as to progress with respect to the Company Parties' efforts in connection therewith.

the following:

- Management evaluation and selection process for the reorganized Debtors with respect to certain key management positions.

- Evaluation and oversight of any material asset sale proposals and implementation of any asset sales, if any (including selection of the M&A financial advisor with respect thereto, if applicable).

- Material strategic decisions relating to the restructuring.

- The Debtors' use of commercially reasonable best efforts to analyze and develop a detailed report regarding Virtual Separation by no later than the Plan Effective Date in accordance with this Term Sheet.

Upon the RSA Effective Date, and until the earlier of (a) the Plan Effective Date and (b) the date on which the RSA is terminated in accordance with its terms, the Consenting Noteholders shall be entitled to designate two observers to Frontier's Board (and the Finance Committee) that are reasonably acceptable to Frontier's Board (who shall be "independent" within the meaning of the rules of any stock exchange on which the shares of Frontier are listed (or if not so listed, would qualify under the rules of the New York Stock Exchange)): one observer to be appointed by the Consenting Noteholders represented by Akin Gump Strauss Hauer & Feld LLP and Ducera Partners LLC and one observer to be appointed by the Consenting Noteholders represented by Milbank LLP and Houlihan Lokey Capital, Inc.

Such board observer rights shall permit the observers' active and regular participation in Board (and Finance Committee) discussions and deliberations; *provided*, *that*, any such participation shall be subject to agreements reasonably acceptable to the Company Parties and the Required Consenting Noteholders that preserve confidentiality and privilege of such discussions and deliberations. Each observer shall be paid a reasonable and customary fee and reimbursed for all reasonable out-of-pocket expenses.

The Company Parties shall consult with the Consenting Noteholders with respect to certain Specified Material Actions.[12] The Company Parties shall not take action with respect to the Specified Material Actions absent reasonable consent from the Required Consenting Noteholders.

Promptly following the RSA Effective Date, the Finance Committee, together with one designee to be appointed by the Consenting Noteholders represented by Akin Gump Strauss Hauer & Feld LLP and Ducera Partners LLC and one designee to be appointed by the Consenting Noteholders represented by Milbank LLP and Houlihan Lokey Capital, Inc. (such designees, the "Management Selection Designees") shall commence and oversee a management selection process for the reorganized Debtors with respect to certain key management positions. The identity and compensation of any person that is proposed to be retained for, appointed to or hired for a key management position (effective either before or upon the Plan Effective Date), including any person occupying a management role on or after the RSA Effective Date, but before the Plan Effective Date who is proposed to retain such position or be appointed to a different senior management position shall be reasonably acceptable to the

---

[12] "Specified Material Actions" to be mutually agreed by Frontier and the Required Consenting Noteholders prior to the RSA Effective Date.

| | |
|---|---|
| | Management Selection Designees and reasonably acceptable to the Required Consenting Noteholders. |
| **New Board of Directors** | The board of directors of Reorganized Frontier (the "Reorganized Frontier Board") shall consist of directors, the number and identities of which shall be determined by the Required Consenting Noteholders. |
| **Key Employee Incentive / Retention Plans** | During the Chapter 11 Cases, the Debtors shall implement a key employee incentive plan and key employee retention plan for certain employees, in amounts, allocations, and subject to customary terms, conditions, documentation and metrics, in each case, that are reasonably acceptable to the Required Consenting Noteholders. |
| **Management Incentive Plan** | On the Plan Effective Date, the reorganized Debtors will reserve a pool of 6% (on a fully diluted basis) of the New Common Stock (the "Management Incentive Plan Pool") for a post-emergence management incentive plan for management employees of the reorganized Debtors, which will contain terms and conditions (including, without limitation, with respect to participants, form, allocation, structure, duration and timing and extent of issuance and vesting), in each case, as determined at the discretion of the Reorganized Frontier Board after the Plan Effective Date; *provided*, that up to 50% of the Management Incentive Plan Pool may be allocated prior to the Plan Effective Date as emergence grants ("Emergence Awards") to individuals selected to serve in key senior management positions after the Plan Effective Date (as and when such individuals are selected as contemplated by and subject to the consent rights specified in this Term Sheet); *provided*, *further*, that the Emergence Awards will have terms and conditions (including, without limitation, with respect to form, allocation, structure, duration, timing and extent of issuance and vesting) that are acceptable to the Debtors and the Required Consenting Noteholders.  For the avoidance of doubt, the Debtors and the Required Consenting Noteholders shall work jointly in good faith to effectuate the intent of the foregoing. |
| **Asset Sales** | The Debtors shall use commercially reasonable efforts to evaluate potential sales of assets during the Chapter 11 Cases (in certain specified markets and other markets as may be identified) and, as appropriate, prepare for and commence a marketing process for and, if applicable and approved by the Required Consenting Noteholders, consummate such potential sales of assets.<br><br>The Finance Committee shall oversee any such asset sale process.<br><br>Any material asset sales to be subject to monitoring by and reasonable consent of the Required Consenting Noteholders, including with respect to any such sale process. |
| **PNW Sale** | The Debtors will promptly file a motion after the Petition Date to assume the Purchase Agreement, dated as of May 28, 2019, among Frontier, Frontier Communications ILEC Holdings LLC, and Northwest Fiber, LLC, as amended, amended and restated, or otherwise modified from time to time, and close the sale (the "PNW Sale") as soon as reasonably practicable.  Any extension or material amendment of the Purchase Agreement shall be on terms reasonably acceptable to the Required Consenting Noteholders. |

| | |
|---|---|
| **Noteholder Reporting** | The Debtors shall make certain additional reporting (including key performance indicators to be agreed) available to Noteholders during the course of the Chapter 11 Cases pursuant to mutually agreed upon procedures. |
| **Structure/Tax** | The Debtors and the Consenting Noteholders will cooperate in good faith to structure the Restructuring as a "Bruno's transaction" pursuant to which Frontier sells substantially all the assets and/or stock of the Debtors in a taxable transaction to an indirect subsidiary of Reorganized Frontier; *provided, however,* that if the Debtors and the Required Consenting Noteholders determine that an alternative structure would be more value maximizing than such a "Bruno's transaction," then the Debtors and the Required Consenting Noteholders will cooperate in good faith to implement such alternative structure in the Restructuring. The Debtors shall use commercially reasonable efforts to analyze additional asset-level information and, as appropriate, evaluate potential alternative value-maximizing structures, including REIT structures. |
| **Regulatory** | The Debtors will use commercially reasonable efforts to, (i) as soon as reasonably practicable, commence any required regulatory approval processes, (ii) evaluate the path to approval by jurisdiction including a cost/benefit analysis of any conditions of approval, (iii) secure approval from the FCC, PUCs, and other applicable regulatory bodies, and (iv) provide progress reports to the Required Consenting Noteholders' advisors with respect to regulatory approval processes. |
| **Reorganized Frontier New Common Stock** | As determined by the Required Consenting Noteholders and the Debtors prior to the Plan Effective Date, upon emergence from the Chapter 11 Cases, the New Common Stock may be listed on a recognized U.S. stock exchange. In the event the Required Consenting Noteholders and the Debtors determine that the New Common Stock should be listed on a recognized U.S. stock exchange, Reorganized Frontier shall use commercially reasonable efforts to have the New Common Stock listed on a recognized U.S. stock exchange as promptly as reasonably practicable on or after the Plan Effective Date, and prior to any such listing to use commercially reasonable efforts to qualify its shares for trading in the pink sheets. |
| **MISCELLANEOUS PROVISIONS** ||
| **Conditions Precedent to Consummation of the Restructuring** | The occurrence of the Plan Effective Date shall be subject to the following conditions precedent:<br><br>• The Bankruptcy Court shall have entered the order confirming the Plan (the "<u>Confirmation Order</u>"), and such Confirmation Order shall be a Final Order and in full force and effect;<br><br>• Reorganized Frontier's New Common Stock shall have been issued;<br><br>• The Plan Supplement, including any amendments, modifications, or supplements to the documents, schedules, or exhibits included therein shall have been filed with the Bankruptcy Court;<br><br>• Any and all requisite regulatory approvals, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Plan shall have been obtained;<br><br>• Payment of all professional fees and other amounts contemplated to be paid under the RSA and the Plan; |

|  | • The Debtors shall have used commercially reasonable best efforts to analyze and develop a detailed report regarding Virtual Separation; and<br><br>• Such other conditions as mutually agreed by the Company Parties and the Required Consenting Noteholders. |
|---|---|
| **Releases and Exculpation** | The releases to be included in the Plan will be consistent with those set forth in **Annex 1** to this Term Sheet.[13] |
| **Fiduciary Out** | Notwithstanding anything to the contrary herein, nothing in this Term Sheet or any of the Definitive Documents shall require the Company Parties, nor any of the Company Parties' directors, managers, or officers, to take or refrain from taking any action to the extent such person or persons determines based on advice of counsel that taking such action, or refraining from taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law; *provided*, that the Company Parties shall be required to notify the Consenting Noteholders promptly in the event of any such determination, in which case the Consenting Noteholders will have a termination right.<br><br>The Definitive Documents shall provide that such agreements or undertakings, as applicable, shall be terminable by the Company Parties and the Consenting Noteholders where any Company Parties' board of directors or similar governing body, determines in good faith and upon the advice of counsel that continued performance would be inconsistent with its fiduciary duties under applicable law. |
| **Corporate Governance Documents** | In connection with the Plan Effective Date, and consistent with section 1123(a)(6) of the Bankruptcy Code, Reorganized Frontier shall adopt customary corporate governance documents, including amended and restated certificates of incorporation, bylaws, and shareholders' agreements in form and substance reasonably acceptable to the Company Parties and the Required Consenting Noteholders.   Such governance documents shall contain indemnification provisions no less favorable than those contained in the existing governance documents of the Company Parties. |
| **Director, Officer, Manager, and Employee Insurance** | On the Plan Effective Date, the applicable Debtors shall be deemed to have assumed all unexpired directors', managers', and officers' liability insurance policies. |
| **Exemption from SEC Registration** | The issuance of all securities in connection with the Plan will be exempt to the extent permitted under section 1145 of the Bankruptcy Code and otherwise pursuant to Section 4(a)(2) of the Securities Act of 1933, as amended. |
| **Indemnification of Prepetition Directors, Officers, Managers, *et al.*** | Under the Restructuring, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company Parties, as applicable, shall be assumed and survive the effectiveness of the |

---

[13]   Defined terms used but not otherwise defined in **Annex 1** to this Term Sheet shall have the meaning ascribed to such terms in the RSA.

| | Restructuring. |
|---|---|
| **Plan Supplement** | The following documents shall be filed by the Debtors no later than 7 days before the Confirmation hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents prior to the Plan Effective Date as amendments, including the following, as applicable:<br><br>(a) the form of certificate or articles of incorporation, bylaws, or such other applicable formation documents (if any) of Reorganized Frontier or any other reorganized Debtor, as applicable; (b) to the extent known, the identity and members of the Reorganized Frontier Board; (c) the Rejected Executory Contracts and Unexpired Lease List (if applicable); (d) the Schedule of Retained Causes of Action; (e) the Exit Facility Documents; (f) the Restructuring Transactions Memorandum; (g) as applicable, and consistent with the consent rights in this Term Sheet, documentation relating to the Emergence Awards, and (h) any additional documents necessary to effectuate the Plan. |
| **Restructuring Fees and Expenses** | The Company Parties shall pay all accrued and future fees and expenses of the Noteholder Committees in connection with the Restructuring, including the reasonable and documented fees and disbursements of (a) Akin Gump Strauss Hauer & Feld LLP, (b) Milbank LLP, (c) Ducera Partners LLC, (d) Houlihan Lokey Capital, Inc., (e) Altman Vilandrie & Company, and (f) October Three, in their capacities as counsel, financial advisors, and consultants, as applicable, and any other professionals retained by the Noteholder Committees in connection with the Restructuring, as set forth in the RSA; provided, that, the Company Parties shall not be obligated to pay any fees and expenses incurred by the Consenting Noteholders incurred after the Plan Effective Date.  For the avoidance of doubt, all accrued fees and expenses for the Noteholder Committees shall be paid upon the RSA Effective Date.  The Company Parties shall use commercially reasonable best efforts to obtain court approval for such payment promptly after commencement of the Chapter 11 Cases.[14] |

---

[14] Notwithstanding anything to the contrary, all "Transaction Fees" (as defined in the applicable engagement letters) to be deemed fully earned upon execution of the RSA and to be paid in full by no later than consummation of the Plan (and if a portion of such fee is payable on an earlier date pursuant to the applicable engagement letter, on such earlier date to the extent then payable, in each case, with any support condition to be deemed satisfied upon execution of the RSA).  Upon the occurrence of the RSA Effective Date, the Company Parties will provide agreed advance payment retainers to the advisors to the Noteholder Committees.

## Annex 1

### Proposed Plan Releases and Exculpation Provisions

| | |
|---|---|
| **Definitions** | The following terms shall have the following definitions for purposes of this <u>Annex 1</u>:<br><br>• "<u>Affiliate</u>" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.<br><br>• "<u>Avoidance Actions</u>" means any and all actual or potential avoidance, recovery, subordination, or other Causes of Action or remedies that may be brought by or on behalf of the Debtors or their estates or other parties in interest under the Bankruptcy Code or applicable non bankruptcy law, including Causes of Action or remedies under sections 502, 510, 542, 544, 545, 547–553, and 724(a) of the Bankruptcy Code or under other similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.<br><br>• "<u>Causes of Action</u>" any action, Claim, damage, judgment, cause of action, controversy, demand, right, action, suit, obligation, liability, debt, account, defense, offset, power, privilege, license, Lien, indemnity, guaranty or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, in contract or in tort, at law or in equity, or pursuant to any other theory of law or otherwise.  For the avoidance of doubt, "Causes of Action" include:  (a) any right of setoff, counterclaim, or recoupment and any claim arising from any contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of local, state, federal, or foreign law, or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any right to object to or otherwise contest Claims or Equity Interests; (d) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense, including fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.<br><br>• "<u>Entity</u>" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.<br><br>• "<u>Lien</u>" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.<br><br>• "<u>Related Party</u>" means, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.<br><br>• "<u>Released Parties</u>" means, collectively, each Released Company Party and each Released Noteholder Party.<br><br>• "<u>Releasing Parties</u>" means, collectively, each Company Releasing Party and each Noteholder Releasing Party. |
| **Company Releasing Parties** | Each of the Company Parties and each of the Company Parties on behalf of their respective current and former Affiliates and Related Parties. |
| **Consenting Noteholder Releasing Parties** | Each Consenting Noteholder, on its own behalf and on behalf of each of its Affiliates and Related Parties, in each case, solely in their respective capacities as such with respect to such Noteholder and solely to the extent such Noteholder has the authority to bind such Affiliate or Related Party in such capacity. |

| Released Company Parties | Collectively, and in each case in its capacity as such:  (a) each Company Party; (b) each reorganized Debtor; (c) each current and former Affiliate of each Entity in clause (a) through the following clause (d); and (d) each Related Party of each Entity in clauses (a) through this clause (d). |
|---|---|
| Released Noteholder Parties | Collectively, and in each case in its capacity as such: (a) each Consenting Noteholder; (b) each Trustee; (c) each current and former Affiliate of each Entity in clause (a) through the following clause (d); and (d) each Related Party of each Entity in clauses (a) through this clause (d). |
| Debtor Release | Except as expressly set forth in this Agreement, effective on the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Company Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of, the foregoing Entities, from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Company Releasing Parties, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Company Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Company Releasing Party, based on or relating to, or in any manner arising from, in whole or in part, the Company Parties (including the management, ownership or operation thereof), their capital structure, the purchase, sale, or rescission of any security of the Company Parties, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Company Party and any Released Party, the Chapter 11 Cases and related adversary proceedings, the Credit Facilities, the First Lien Notes, the Second Lien Notes, the IDRB, the Senior Notes, the DIP Facility, the Exit Facility, the assertion or enforcement of rights and remedies against the Company Parties' out-of-court restructuring efforts, intercompany transactions between or among a Company Party and another Company Party, the formulation, preparation, dissemination, negotiation, or filing of this Agreement, the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with this Agreement or the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transaction, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Company Parties taking place on or before the Plan Effective Date. |
| Third-Party Release | Except as expressly set forth in this Agreement, effective on the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Consenting Noteholder Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of any of the Company Parties, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity), based on or relating to, or in any manner arising from, in whole or in part, the Company Parties (including the management, ownership or operation thereof), their capital structure, the purchase, sale, or rescission of any security of the Company Parties, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Company and any Released Party, the Credit Facilities, the First Lien Notes, the Second Lien Notes, the IDRB, the Senior Notes, the DIP Facility, the Exit Facility, the assertion or enforcement of rights and remedies against the Company Parties' out-of-court restructuring efforts, intercompany transactions between or among a Company Party and another Company Party, the formulation, preparation, dissemination, negotiation, or filing of this Agreement, the Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with this Agreement or the Definitive Documents, the pursuit of consummation of the Plan, the administration and implementation of the Restructuring Transaction, or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Company Parties taking place on or before the Plan Effective Date. |

| | |
|---|---|
| **Exculpated Party** | Collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the reorganized Debtors; (c) the holders of Senior Notes; (d) each current and former Affiliate of each Entity in clause (a) through the following clause (e); and (e) each Related Party of each Entity in clause (a) through this clause (e). |
| **Exculpation** | Effective as of the Plan Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Disclosure Statement, the Plan, any Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |

**Annex 2**

| Series of Senior Notes | Series Accrued Amount ($)[15] | Series Ratable Share (%) |
|---|---|---|
| 2020 April Notes | 5,515,998.56 | 1.47 |
| 2020 September Notes | 2,194,528.87 | 0.59 |
| 2021 July Notes | 1,536,172.61 | 0.41 |
| 2021 September Notes | 6,214,268.09 | 1.66 |
| 2022 April Notes | 16,498,148.66 | 4.40 |
| 2022 September Notes | 103,940,094.57 | 27.72 |
| 2023 Notes | 9,135,260.60 | 2.44 |
| 2024 Notes | 21,565,437.17 | 5.75 |
| 2025 January Notes | 8,036,955.27 | 2.14 |
| 2025 September Notes | 179,198,176.94 | 47.79 |
| 2025 November Notes | 3,254,226.83 | 0.87 |
| 2026 Notes | 8,918.58 | 0.002 |
| 2027 Notes | 4,108,332.02 | 1.10 |
| 2031 Notes | 6,416,686.24 | 1.71 |
| 2034 Notes | 19,885.23 | 0.005 |
| 2035 Notes | 1,732,462.73 | 0.46 |
| 2046 Notes | 5,624,447.02 | 1.50 |
| **TOTAL** | **375,000,000.00** | **100.00** |

---

[15]   Amount of interest accrued but unpaid on each series of Senior Notes as of March 15, 2020, subject to an aggregate cap of $375,000,000.00.

## EXHIBIT C

### Form of Joinder

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**")[1] by and among Frontier Communications Corporation ("**Frontier**"), the other Company Parties bound thereto and the Consenting Noteholders and agrees to be bound by the terms and conditions thereof to the extent the other Consenting Noteholders are thereby bound, and shall be deemed a "Consenting Noteholder" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein applicable to a Consenting Noteholder as of the date hereof and any further date specified in the Agreement.

Date Executed:

**[CONSENTING NOTEHOLDER]**

[INSERT ENTITY NAME]

_____
Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
| --- | --- |
| 2020 April Notes | |
| 2020 September Notes | |
| 2021 July Notes | |
| 2021 September Notes | |
| 2022 April Notes | |
| 2022 September Notes | |

_____

[1]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

| | |
|---|---|
| 2023 Notes | |
| 2024 Notes | |
| 2025 January Notes | |
| 2025 September Notes | |
| 2025 November Notes | |
| 2026 Notes | |
| 2027 Notes | |
| 2031 Notes | |
| 2034 Notes | |
| 2035 Notes | |
| 2046 Notes | |

## EXHIBIT D

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among Frontier Communications Corporation ("**Frontier**"), the other Company Parties bound thereto and the Consenting Noteholders, including the transferor to the Transferee of any Senior Notes Claims or Incremental Payments (collectively, the "**Transferred Claims**," and each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Noteholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein applicable to a Consenting Noteholder as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:


**[CONSENTING NOTEHOLDER]**


[INSERT ENTITY NAME]


_____
Name:
Title:

Address:



E-mail address(es):


| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| 2020 April Notes | |
| 2020 September Notes | |
| 2021 July Notes | |

---

[1]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

| | |
|---|---|
| 2021 September Notes | |
| 2022 April Notes | |
| 2022 September Notes | |
| 2023 Notes | |
| 2024 Notes | |
| 2025 January Notes | |
| 2025 September Notes | |
| 2025 November Notes | |
| 2026 Notes | |
| 2027 Notes | |
| 2031 Notes | |
| 2034 Notes | |
| 2035 Notes | |
| 2046 Notes | |

**<u>Exhibit C</u>**

**Corporate Organizational Structure**

KIRKLAND & ELLIS LLP





**Exhibit D**

**Committees Organized Prepetition**

| Prepetition Committee | Counsel |
|---|---|
| **Secured Lender Group** | Paul, Weiss, Rifkind, Wharton & Garrison LLP (as counsel) and PJT Partners, LP (as financial advisor) |
| **Noteholder Groups** | Akin Gump Strauss Hauer & Feld LLP and Milbank LLP (as counsel)<br><br>Ducera Partners LLC and Houlihan Lokey Capital Inc. (as financial advisor) |

## Exhibit E

### Consolidated List of the Holders of the Debtors' 50 Largest Unsecured Claims

Pursuant to Local Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the 30 largest unsecured claims (the "Consolidated Creditor List") based on the Debtors' unaudited books and records as of the Petition Date.  The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 50 largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
| 1 | BNY Mellon as Agent for 11.000% Senior Notes due 2025<br>Ray O'Neil<br>500 Ross St.<br>12th Floor<br>Pittsburgh, PA 15262 | BNY Mellon as Agent for 11.000% Senior Notes due 2025<br>Ray O'Neil<br>Phone: 412-236-1201<br>Fax: 412-234-7535<br>Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $3,600,000,000.00 |
| 2 | BNY Mellon as Agent for 10.500% Senior Notes due 2022<br>Ray O'Neil<br>500 Ross St.<br>12th Floor<br>Pittsburgh, PA 15262 | BNY Mellon as Agent for 10.500% Senior Notes due 2022<br>Ray O'Neil<br>Phone: 412-236-1201<br>Fax: 412-234-7535<br>Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $2,187,537,000.00 |
| 3 | BNY Mellon as Agent for 9.000% Senior Notes due 2031<br>Ray O'Neil<br>500 Ross St.<br>12th Floor<br>Pittsburgh, PA 15262 | BNY Mellon as Agent for 9.000% Senior Notes due 2031<br>Ray O'Neil<br>Phone: 412-236-1201<br>Fax: 412-234-7535<br>Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $945,325,000.00 |

[1] The Debtors reserve the right to assert setoff and other rights with respect to any of the claims listed herein.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
| 4 | BNY Mellon as Agent for 7.125% Senior Notes due 2023<br>Ray O'Neil<br>500 Ross St.<br>12th Floor<br>Pittsburgh, PA 15262 | BNY Mellon as Agent for 7.125% Senior Notes due 2023<br>Ray O'Neil<br>Phone: 412-236-1201<br>Fax: 412-234-7535<br>Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $850,000,000.00 |
| 5 | BNY Mellon as Agent for 6.875% Senior Notes due 2025<br>Ray O'Neil<br>500 Ross St.<br>12th Floor<br>Pittsburgh, PA 15262 | BNY Mellon as Agent for 6.875% Senior Notes due 2025<br>Ray O'Neil<br>Phone: 412-236-1201<br>Fax: 412-234-7535<br>Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $775,000,000.00 |
| 6 | BNY Mellon as Agent for 7.625% Senior Notes due 2024<br>Ray O'Neil<br>500 Ross St.<br>12th Floor<br>Pittsburgh, PA 15262 | BNY Mellon as Agent for 7.625% Senior Notes due 2024<br>Ray O'Neil<br>Phone: 412-236-1201<br>Fax: 412-234-7535<br>Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $750,000,000.00 |
| 7 | BNY Mellon as Agent for 8.750% Senior Notes due 2022<br>Ray O'Neil<br>500 Ross St.<br>12th Floor<br>Pittsburgh, PA 15262 | BNY Mellon as Agent for 8.750% Senior Notes due 2022<br>Ray O'Neil<br>Phone: 412-236-1201<br>Fax: 412-234-7535<br>Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $500,000,000.00 |
| 8 | BNY Mellon as Agent for 7.875% Senior Notes due 2027<br>Ray O'Neil<br>500 Ross St.<br>12th Floor<br>Pittsburgh, PA 15262 | BNY Mellon as Agent for 7.875% Senior Notes due 2027<br>Ray O'Neil<br>Phone: 412-236-1201<br>Fax: 412-234-7535<br>Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $345,858,000.00 |
| 9 | US Bank as Agent for 6.860% Subsidiary (FTR FL) Debentures due 2028<br>Laura Moran<br>1 Federal St., EX-MA-FED<br>Boston MA 02110<br><br>Clark Whitmore<br>Maslon LLP<br>90 S. 7th St., Suite 3300<br>Minneapolis, MN 55402 | US Bank as Agent for 6.860% Subsidiary (FTR FL) Debentures due 2028<br>Laura Moran<br>Phone:<br>Fax:<br>Email: laura.moran@usbank.com<br><br>Clark Whitmore<br>Phone: 612-672-8335<br>Fax: 612-642-8335<br>Email: clark.whitmore@maslon.com | Unsecured Noteholder | | | | $300,000,000.00 |
| 10 | BNY Mellon as Agent for 6.250% Senior Notes due 2021<br>Ray O'Neil<br>500 Ross St.<br>12th Floor<br>Pittsburgh, PA 15262 | BNY Mellon as Agent for 6.250% Senior Notes due 2021<br>Ray O'Neil<br>Phone: 412-236-1201<br>Fax: 412-234-7535<br>Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $219,721,000.00 |
| 11 | US Bank as Agent for 6.750% Subsidiary (FTR CA) Debenture due 2027<br>Ralph Jones<br>Two Liberty Place<br>50 South 16th Street, Suite 2000<br>Philadelphia, PA 19102 | US Bank as Agent for 6.750% Subsidiary (FTR CA) Debenture due 2027<br>Ralph Jones<br>Phone: 215-761-9314<br>Fax:<br>Email: Ralph.Jones@usbank.com | Unsecured Noteholder | | | | $200,000,000.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
|---|---|---|---|---|---|---|---|
| 12 | US Bank as Agent for 6.730% Subsidiary (FTR North) Debentures due 2028 Laura Moran 1 Federal St., EX-MA-FED Boston MA 02110  Clark Whitmore Maslon LLP 90 S. 7th St., Suite 3300 Minneapolis, MN 55402 | US Bank as Agent for 6.730% Subsidiary (FTR North) Debentures due 2028 Laura Moran Phone: Fax: Email: laura.moran@usbank.com  Clark Whitmore Phone: 612-672-8335 Fax: 612-642-8335 Email: clark.whitmore@maslon.com | Unsecured Noteholder | | | | $200,000,000.00 |
| 13 | BNY Mellon as Agent for 7.050% Debentures due 2046 Ray O'Neil 500 Ross St. 12th Floor Pittsburgh, PA 15262 | BNY Mellon as Agent for 7.050% Debentures due 2046 Ray O'Neil Phone: 412-236-1201 Fax: 412-234-7535 Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $193,500,000.00 |
| 14 | BNY Mellon as Agent for 8.500% Senior Notes due 2020 Ray O'Neil 500 Ross St. 12th Floor Pittsburgh, PA 15262 | BNY Mellon as Agent for 8.500% Senior Notes due 2020 Ray O'Neil Phone: 412-236-1201 Fax: 412-234-7535 Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $172,087,000.00 |
| 15 | BNY Mellon as Agent for 7.000% Debentures due 2025 Ray O'Neil 500 Ross St. 12th Floor Pittsburgh, PA 15262 | BNY Mellon as Agent for 7.000% Debentures due 2025 Ray O'Neil Phone: 412-236-1201 Fax: 412-234-7535 Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $138,000,000.00 |
| 16 | BNY Mellon as Agent for 7.450% Debentures due 2035 Ray O'Neil 500 Ross St. 12th Floor Pittsburgh, PA 15262 | BNY Mellon as Agent for 7.450% Debentures due 2035 Ray O'Neil Phone: 412-236-1201 Fax: 412-234-7535 Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $125,000,000.00 |
| 17 | BNY Mellon as Agent for 9.250% Senior Notes due 2021 Ray O'Neil 500 Ross St. 12th Floor Pittsburgh, PA 15262 | BNY Mellon as Agent for 9.250% Senior Notes due 2021 Ray O'Neil Phone: 412-236-1201 Fax: 412-234-7535 Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $89,269,000.00 |
| 18 | BNY Mellon as Agent for 8.875% Senior Notes due 2020 Ray O'Neil 500 Ross St. 12th Floor Pittsburgh, PA 15262 | BNY Mellon as Agent for 8.875% Senior Notes due 2020 Ray O'Neil Phone: 412-236-1201 Fax: 412-234-7535 Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $54,643,000.00 |
| 19 | US Bank as Agent for 8.400% Subsidiary (FTR WV) Debenture due 2029 Ralph Jones Two Liberty Place 50 South 16th Street, Suite 2000 Philadelphia, PA  19102 | US Bank as Agent for 8.400% Subsidiary (FTR WV) Debenture due 2029 Ralph Jones Phone: 215-761-9314 Fax: Email: Ralph.Jones@usbank.com | Unsecured Noteholder | | | | $50,000,000.00 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
| 20 | PeopleScout MSP LLC Ruth Baehr 32487 Collection Drive Chicago, IL 60693-0487 | PeopleScout MSP LLC Ruth Baehr Phone: 260-436-3802 Fax: Email: RBAEHR@PEOPLESCOUT.COM | Trade Vendor | | | | $5,307,235.75 |
| 21 | Plaintiffs of California Wage & Hour Class Action Peter R. Dion-Kindem 2945 Townsgate Rd., Suite 200 Westlake Village, CA 91361 Lonnie C. Blanchard 3579 East Foothill Blvd., Suite 338 Pasadena, CA 91107 Andrew Sokolowski 1230 Rosecrans Ave., Suite 200 Manhattan Beach, CA 90266 Ryan Crist 43364 10th Street West Lancaster, CA 93934 | Plaintiffs of California Wage & Hour Class Action Peter R. Dion-Kindem Phone: 818-883-4900 Fax: 838-883-4902 Email: Peter@dion-kindemlaw.com Lonnie C. Blanchard Phone: 213–599-8255 Fax: 213-402-3949 Email: lonnieblanchard@gmail.com Andrew Sokolowski Phone: 310-531-1900 Fax: 310-531-1901 Email: asokolowski@maternlawgroup.com Ryan Crist Phone: 661-949-2495 Fax: 661-949-7524 Email: Rcrist@parrisslawyers.com | Litigation/ Settlement | | | | $4,700,000.00 |
| 22 | AT&T Sally Ann Thomas 220 Wisconsin Ave Flr 2 Waukesha, WI 53186 | AT&T Sally Ann Thomas Phone: 312-369-9119 Fax: Email: SALLYANN.THOMAS@ATT.COM | Trade Vendor | | | | $2,618,959.39 |
| 23 | Broadridge Customer Comm LLC AR 5516 Collections Center Dr Chicago, IL 60693-0055 | Broadridge Customer Comm LLC AR Phone: 631-254-7422 Fax: Email: BRCC.REMITTANCE@BROADRIDGE.COM | Trade Vendor | | | | $2,190,361.12 |
| 24 | USIC Locating Services LLC Elisabeth Owen Premier Services LLC PO Box 713359 Cincinnati, OH 45271 | USIC Locating Services LLC Elisabeth Owen Phone: 317-810-8256 Fax: 317-575-7881 Email: ACCOUNTSRECEIVABLE@USICLLC.COM | Trade Vendor | | | | $2,130,756.22 |
| 25 | Anixter Inc Amelia Kelly Expense PO Box 278 Morton Grove, IL 60053-0278 | Anixter Inc Amelia Kelly Phone: 678-546-2769 Fax: Email: CASHDEPARTMENT@ANIXTER.COM | Trade Vendor | | | | $1,811,022.41 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim | | |
|---|---|---|---|---|---|---|---|
| | | | | | If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
| 26 | BNY Mellon as Agent for 6.800% Debentures Due 2026 Ray O'Neil 500 Ross St. 12th Floor Pittsburgh, PA 15262 | BNY Mellon as Agent for 6.800% Debentures Due 2026 Ray O'Neil Phone: 412-236-1201 Fax: 412-234-7535 Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $1,739,000.00 |
| 27 | Nokia of America Corporation Selina Siu PO Box 911476 Accounts Receivable Dallas, TX 75391-1476 | Nokia of America Corporation Selina Siu Phone: 613-784-3533 Fax: +358 10 44 81 002 Email: PANKAJ.9.KUMAR.EXT@NOKIA.COM | Trade Vendor | | | | $1,454,414.05 |
| 28 | OneSupport Ryan Lommel PO Box 2479 San Marcos, TX 78667-2479 | OneSupport Ryan Lommel Phone: 800-580-3355 Fax: Email: Ryan.lommel@onesupport.com | Trade Vendor | | | | $1,345,491.53 |
| 29 | Contec LLC Bibi Ramoutar 1011 State St Schenectady, NY 12307 | Contec LLC Bibi Ramoutar Phone: 518-831-1466 Fax: 518-382-8452 Email: BRAMOUTAR@GOCONTEC.COM | Trade Vendor | | | | $1,239,634.02 |
| 30 | System One Holdings LLC Michelle Banville PO Box 644722 Pittsburgh, PA 15264-4722 | System One Holdings LLC Michelle Banville Phone: 207-482-7017 Fax: 412-995-1901 Email: MBANVILLE@MOUNTAINLTD.COM | Trade Vendor | | | | $990,021.72 |
| 31 | Dixon Schwabl Advertising Inc Judy Mcdade 1595 Moseley Rd Victor, NY 14564 | Dixon Schwabl Advertising Inc Judy Mcdade Phone: 585-899-3228 Fax: 585-383-1661 Email: JUDY@DIXONSCHWABL.COM | Trade Vendor | | | | $966,191.97 |
| 32 | F Secure Inc Kelly Sheppard 25 Independence Blvd, Ste 203 Warren, NJ 07059 | F Secure Inc Kelly Sheppard Phone: 908-432-9934 Fax: 908 935 0560 Email: KELLY.SHEPPARD@F-SECURE.COM | Trade Vendor | | | | $900,827.68 |
| 33 | Scansource Catalyst Damien Means Attn:J Guardado Or A Hogan 250 Scientific Dr Ste 300 Norcross, GA 30092 | Scansource Catalyst Damien Means Phone: 864-286-4406 Fax: 864-288-5515 Email: DAMIEN.MEANS@SCANSOURCE.COM | Trade Vendor | | | | $878,818.09 |
| 34 | Coriant North America Inc Melanie Ivanic 13884 Collections Ctr Dr Chicago, IL 60693 | Coriant North America Inc Melanie Ivanic Phone: 630-798-4135 Fax: Email: CUSTOMER-REMIT@INFINERA.COM | Trade Vendor | | | | $854,579.46 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
|---|---|---|---|---|---|---|---|
| 35 | Automotive Rentals<br>Mike Blatnic<br>50 Glenlake Parkway<br>Suite 230<br>Atlanta, GA 30328 | Automotive Rentals<br>Mike Blatnic<br>Phone: 678-557-7803<br>Fax:<br>Email: MBLATNIC@ARIFLEET.COM | Trade Vendor | | | | $839,911.83 |
| 36 | Arris Solutions Inc<br>Martha Stoudt<br>3871 Lakefield Drive<br>Suwanee, GA 30024 | Arris Solutions Inc<br>Martha Stoudt<br>Phone: 215-323-1540<br>Fax:<br>Email: CASHPOSTING@COMMSCOPE.COM | Trade Vendor | | | | $818,863.96 |
| 37 | J H Sultenfuss Inc<br>Michael Sultenfuss<br>4401 W Crest Ave<br>Tampa, FL 33614-6427 | J H Sultenfuss Inc<br>Michael Sultenfuss<br>Phone: 813-871-9600<br>Fax: 813-873-1164<br>Email: JHSULTENFUSSGC1@VERIZON.NET | Trade Vendor | | | | $781,254.20 |
| 38 | Certified Roofing Applicators<br>Ani Kaprielian<br>11914 Front St Ste C<br>Norwalk, CA 90650 | Certified Roofing Applicators<br>Ani Kaprielian<br>Phone: 562-864-8662<br>Fax:<br>Email: ANIKAPRIELIAN@AOL.COM | Trade Vendor | | | | $749,950.13 |
| 39 | Actiontec Electronics Inc<br>Tong Khuc<br>3301 Olcott St<br>Santa Clara, CA 95054 | Actiontec Electronics Inc<br>Tong Khuc<br>Phone: 408-548-4762<br>Fax: 408-541-9003<br>Email: TKHUC@ACTIONTEC.COM | Trade Vendor | | | | $734,268.00 |
| 40 | Dura Line Corporation<br>Danielle Barry<br>4296 Paysphere Cr<br>Chicago, IL 60674 | Dura Line Corporation<br>Danielle Barry<br>Phone: 865-223-5056<br>Fax: 865-223-5085<br>Email: AR@DURALINE.COM | Trade Vendor | | | | $719,053.28 |
| 41 | Asurion<br>Amy Bellucci<br>Rachel Jennings<br>PO Box 111417<br>Nashville, TN 37222-1417 | Asurion<br>Amy Bellucci<br>Phone:<br>Fax: 615-445-3348<br>Email: AMY.BELLUCCI@ASURION.COM | Trade Vendor | | | | $703,242.25 |
| 42 | BNY Mellon as Agent for 7.680% Debentures Due 2034<br>Ray O'Neil<br>500 Ross St.<br>12th Floor<br>Pittsburgh, PA 15262 | BNY Mellon as Agent for 7.680% Debentures Due 2034<br>Ray O'Neil<br>Phone: 412-236-1201<br>Fax: 412-234-7535<br>Email: raymond.k.oneil@bnymellon.com | Unsecured Noteholder | | | | $628,000.00 |
| 43 | Schindler Elevator Corporation<br>Mark Ahern<br>PO Box 70433<br>Chicago, IL 60673-0433 | Schindler Elevator Corporation<br>Mark Ahern<br>Phone: 312-771-8441<br>Fax: 973-397-3619<br>Email: CASH-APP@US.SCHINDLER.COM | Trade Vendor | | | | $621,741.17 |
| 44 | F J Hubeny Inc<br>Bill Preece<br>PO Box 525<br>Milldale, CT 06467 | F J Hubeny Inc<br>Bill Preece<br>Phone: 860-628-5509<br>Fax: 860-621-1454<br>Email: BPREECE@FJHUBENY.COM | Trade Vendor | | | | $537,636.48 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim | | |
|---|---|---|---|---|---|---|---|
| | | | | | If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff [1] | Unsecured Claim |
| 45 | Custom Janitorial Maint Corp Richard Sanchez PO Box 269 Port Hueneme, CA 93044-0269 | Custom Janitorial Maint Corp Richard Sanchez Phone: 805-486-8626 Fax: 805-981-9076 Email: RICHARDCUSJAN269@AOL.COM | Trade Vendor | | | | $485,809.00 |
| 46 | Group O Inc Darla Zrostlik PO Box 860146 Minneapolis, MN 55486-0146 | Group O Inc Darla Zrostlik Phone: 309-736-8742 Fax: 309-736-8301 Email: GROUPOACCOUNTING@GROUPO.COM | Trade Vendor | | | | $479,854.04 |
| 47 | AT&T Mobility II LLC Ken Davis 10640 Sepulveda Bl Unit 1 Mission Hills, CA 91345 | AT&T Mobility II LLC Ken Davis Phone: 205-678-7386 Fax: Email: KEVIN.DAVIS4@ATT.COM | Trade Vendor | | | | $478,048.11 |
| 48 | A To Z Call Center Services LP Brent Riley 6080 Tennyson Pkwy, Ste 100 Plano, TX 75024 | A To Z Call Center Services LP Brent Riley Phone: 972-862-4225 Fax: Email: ARGROUP@THECMIGROUP.COM | Trade Vendor | | | | $477,030.90 |
| 49 | Mitel Networks Inc Jessica Mcmannis 885 Trademark Drive Reno, NV 89521-5943 | Mitel Networks Inc Jessica Mcmannis Phone: 775-954-1244 Fax: 800-814-5860 Email: WHOLESALECOLLECTIONS@MITEL.COM | Trade Vendor | | | | $469,100.52 |
| 50 | Track Utilities LLC Brenda Anderson 441 W Corporate Dr Meridian, ID 83642 | Track Utilities LLC Brenda Anderson Phone: 208-362-1780 Fax: 208-362-1788 Email: REMIT@TRACKUTILITIESLLC.COM | Trade Vendor | | | | $431,042.78 |

## **Exhibit F**

### **Consolidated List of the Holders of the Debtors' Largest Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of Creditor | Creditor Name, and Complete Mailing Address, Including Zip Code of Employee, Agents, or Department of Creditor Familiar With Claim Who May Be Contacted | Amount of Claim | Collateral Description and Value |
|---|---|---|---|---|
| 1 | JP Morgan Chase Bank, N.A.<br><br>(Administrative Agent and Collateral Agent for the Term Loan B due 2024) | J.P. Morgan Chase Bank, N.A. 500 Stanton Christiana Road, Ops Building 2, 3rd Floor, Newark, Delaware 19713 Attn.: Demetrius Dixon Telephone: (302) 634-4466 Email: Demetrius.dixon@jpmorgan.com<br><br>With copies to:<br><br>J.P. Morgan Chase Bank, N.A. 383 Madison Avenue, 27th Floor New York, New York, 10179 ATTN: Richard Gabriel Telephone: (212) 270-4069 Email: Richard.gabriel@jpmorgan.com | $1,695M | The security package under the JPM Credit Agreement, including the Term Loan B and Revolver, includes pledges of the equity interest in certain of the Company's subsidiaries and guarantees by certain of the Company's subsidiaries. The security also includes the pledge of substantially all personal property of Frontier Video Services Inc. The collateral's value is unknown as of the date hereof. |

| | | | | |
|---|---|---|---|---|
| 2 | Wilmington Trust, National Association<br><br>(Trustee for the 8.00% First Lien Notes due 2027)<br><br>JP Morgan Chase Bank, N.A.<br><br>(Collateral Agent for the 8.00% First Lien Notes due 2027) | Wilmington Trust, National Association<br>1100 North Market Street<br>Wilmington, DE 19890<br>Attn.: Rita Marie Ritrovato<br><br>With copies to:<br><br>Emmet, Marvin & Martin LLP<br>120 Broadway<br>32nd Floor<br>New York, New York 10271<br>ATTN: Thomas A. Pitta<br><br>J.P. Morgan Chase Bank, N.A.<br>500 Stanton Christiana Road, Ops Building 2, 3d Floor Newark, Delaware 19713<br>Attn.: Demetrius Dixon<br>Telephone: (302) 634-4466<br>Email: Demetrius.dixon@jpmorgan.com<br><br>With copies to:<br><br>J.P. Morgan Chase Bank, N.A.<br>383 Madison Avenue, 27th Floor<br>New York, New York, 10179<br>Attn: Richard Gabriel<br>Telephone: (212) 270-4069<br>Email: Richard.gabriel@jpmorgan.com | $1,650M | The First Lien Notes are guaranteed by each of the Company's subsidiaries that guarantees the JP Morgan Credit Agreement, including the Term Loan B and Revolver. The guarantees are unsecured obligations of the guarantors equal in right of payment to all of the guarantor's obligations under the JPM Credit Agreement and certain other permitted future senior indebtedness and senior in right of payment to all subordinated obligations of the guarantors. The First Lien Notes are secured on a pari passu basis by all the assets that secure the Company's obligations under the JPM Credit Agreement on a first-priority basis. The collateral's value is unknown as of the date hereof. | |

| | | | | |
|---|---|---|---|---|
| 3 | Wilmington Savings Fund Society, FSB<br><br>(Trustee and Collateral Agent for the 8.50% Second Lien Notes due 2026) | Wilmington Savings Fund Society, FSB<br>500 Delaware Avenue<br>Wilmington, DE 19801<br>Attn.: Patrick Healy<br><br>With copies to:<br><br>Curtis Plaza<br>Riker Danzig Scherer Hyland & Perretti LLP<br>Headquarters Plaza<br>One Speedwell Avenue<br>Morristown, NJ 07962-1981<br>Email: cplaza@riker.com | $1,600M | The Second Lien Notes are guaranteed by each of the Company's subsidiaries that guarantees the JPM Credit Agreement. The guarantees are unsecured obligations of the guarantors and subordinated in right of payment to all of the guarantor's obligations under the Company's JPM Credit Agreement and certain other permitted future senior indebtedness but equal in right of payment with all other unsubordinated obligations of the guarantors. The Second Lien Notes are secured on a second-priority basis by all the assets that secure the Company's obligations under the JPM Credit Agreement on a first-priority basis. The collateral's value is unknown as of the date hereof. |
| 4 | JP Morgan Chase Bank, N.A.<br><br>(Administrative Agent and Collateral Agent for the Revolving Credit Facility) | J.P. Morgan Chase Bank, N.A.<br>500 Stanton Christiana Road, Ops Building 2, 3d Floor Newark, Delaware 19713<br><br>Attn.: Demetrius Dixon<br>Telephone: (302) 634-4466<br>Email: Demetrius.dixon@jpmorgan.com<br><br>With copies to:<br><br>J.P. Morgan Chase Bank, N.A.<br>383 Madison Avenue, 27th Floor<br>New York, New York, 10179<br>Attn.: Richard Gabriel<br>Telephone: (212) 270-4069<br>Email: Richard.gabriel@jpmorgan.com | $749M | The security package under the JPM Credit Agreement, including the Term Loan B and Revolver, includes pledges of the equity interest in certain of the Company's subsidiaries and guarantees by certain of the Company's subsidiaries. The security also includes the pledge of substantially all personal property of Frontier Video Services Inc. The collateral's value is unknown as of the date hereof. |

| 5 | BOKF, NA<br><br>(Trustee for the GTE Southwest First Mortgage Bonds due 2031) | BOKF, NA<br>Corporate Trust Services<br>1600 Broadway, 3rd Floor<br>Denver, Colorado 80202<br>Email: CTDENVER@BOKF.COM<br>ATTN: George F. Kubin<br><br>With a copy to:<br><br>Katten Muchin Rosenman LLP<br>575 Madison Avenue<br>New York, New York 10022<br>Email: craig.barbarosh@katten.com<br>Attn: Craig A. Barbarosh | $100M | The bonds are secured by certain property and assets of Frontier Southwest. The collateral's value is unknown as of the date hereof. |

**Exhibit G**

**Summary of the Debtors' Assets and Liabilities**

Pursuant to Local Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis.  The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with their affiliated debtors and non-debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities | Amount |
|---|---|
| Total Assets (Book Value as of 2/29/2020 | $17,433,201,422.00 |
| Total Liabilities (Book Value as of 2/29/2020 | $21,855,602,151.00 |

**Exhibit H**

**Summary of the Publicly Held Securities of the Debtors**

Pursuant to Local Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held, and the approximate number of holders thereof as of the Petition Date.

| Applicable Parent Debt | Value Outstanding (in millions) |
|---|---|
| 6.160% (Variable) Term Loan B due June 15, 2024 | $1,695 |
| 8.000% First Lien Notes due April 1, 2027 | $1,650 |
| 8.500% Second Lien Notes due April 1, 2026 | $1,600 |
| 8.500% Unsecured Notes due April 15, 2020 | $172 |
| 8.875% Unsecured Notes due September 15, 2020 | $55 |
| 9.250% Unsecured Notes due July 1, 2021 | $89 |
| 6.250% Unsecured Notes due September 15, 2021 | $220 |
| 8.750% Unsecured Notes due April 15, 2022 | $500 |
| 10.500% Unsecured Notes due September 15, 2022 | $2,188 |
| 7.125% Unsecured Notes due January 15, 2023 | $850 |
| 7.625% Unsecured Notes due April 15, 2024 | $750 |
| 6.875% Unsecured Notes due January 15, 2025 | $775 |
| 11.000% Unsecured Notes due September 15, 2025 | $3,600 |
| 7.000% Unsecured Debentures due November 1, 2025 | $138 |
| 6.800% Unsecured Debentures due August 15, 2026 | $2 |
| 7.875% Unsecured Notes due January 15, 2027 | $346 |
| 9.000% Unsecured Notes due August 15, 2031 | $945 |
| 7.680% Unsecured Debentures due October 1, 2034 | $1 |
| 7.450% Unsecured Debentures due July 1, 2035 | $125 |
| 7.050% Unsecured Debentures due October 1, 2046 | $193 |
| **Applicable Subsidiary Debt** | **Value Outstanding (in millions)** |
| 8.500% Secured Debentures due November 15, 2031 | $100 million |
| 6.154% Secured RUS loan contracts due January 3, 2028 | $6 million |
| 6.750% Unsecured Debentures due May 15, 2027 | $200 million |
| 6.860% Unsecured Debentures due February 1, 2028 | $300 million |
| 6.730% Unsecured Debentures due February 15, 2028 | $200 million |
| 8.400$ Unsecured Debentures due October 15, 2029 | $50 million |
| **Equity Security** | **Number of Outstanding Shares** |
| Common Stock Outstanding | 105,303,000 |

## **Exhibit I**

### **Summary of the Debtors' Property Held by Third Parties**

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

Certain property of the Debtors' is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors, or agents.  Through these arrangements, the Debtors' ownership interest is not affected.  In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical.

## Exhibit J

**Summary of the Debtors' Property From Which the Debtors Operates Its Business**

Pursuant to Local Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operates their business as of the Petition Date.

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Citizens Telecom Services Company L.L.C. | 401 MERRITT 7 CORPORATE PARK | NORWALK | CT | 06851 |
| Frontier Communications of the South, LLC | 251 OLD BRATT RD | ATMORE | AL | 36502 |
| Frontier Communications of the South, LLC | 11690 HWY 96 W | MILLPORT | AL | 35576 |
| Citizens Utilities Rural Company, Inc. | 927 HANCOCK RD | BULLHEAD CITY | AZ | 86442 |
| Navajo Communications Company, Inc. | HWY 191, .2 MI S OF IR 7 | CHINLE | AZ | 86503 |
| Citizens Telecommunications Company of the White Mountains, Inc. | 1819 BLACK CANYON RD | HEBER | AZ | 85928 |
| Citizens Utilities Rural Company, Inc. | 3405 NORTHERN AVE | KINGMAN | AZ | 86409 |
| Citizens Utilities Rural Company, Inc. | 3129 STOCKTON HILL RD | KINGMAN | AZ | 86401 |
| Citizens Utilities Rural Company, Inc. | 3395 NORTHERN AVENUE | KINGMAN | AZ | 86409 |
| Citizens Utilities Rural Company, Inc. | 705 KIOWA | LAKE HAVASU CITY | AZ | 86403 |
| Citizens Utilities Rural Company, Inc. | 715 KIOWA | LAKE HAVASU CITY | AZ | 86403 |
| Citizens Utilities Rural Company, Inc. | 1021 LAKE HAVASU AVE | LAKE HAVASU CITY | AZ | 86404 |
| Citizens Telecommunications Company of the White Mountains, Inc. | 655 N WOODLAND RD | LAKESIDE | AZ | 85929 |
| Citizens Telecommunications Company of the White Mountains, Inc. | 385 WEST 3RD SOUTH | SNOWFLAKE | AZ | 85937 |
| Navajo Communications Company, Inc. | HWY 264 & NAVAJO COMMUNICATION RD | ST MICHAELS | AZ | 86511 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Navajo Communications Company, Inc. | HWY. 264 & NAVAJO COMMUNICATION RD | ST MICHAELS | AZ | 86511 |
| Frontier California Inc. | 17620 ADELANTO RD | ADELANTO | CA | 92301 |
| Citizens Telecommunications Company of California Inc. | 304 W 4TH ST | ALTURAS | CA | 96101 |
| Frontier California Inc. | 11631-11633 CLARK ST | ARCADIA | CA | 91006 |
| Frontier Communications of the Southwest Inc. | 14885 S BROADWAY | BLYTHE | CA | 92225 |
| Citizens Telecommunications Company of California Inc. | 20516 SHASTA ST | BURNEY | CA | 96013 |
| Frontier California Inc. | 201 FLYNN RD | CAMARILLO | CA | 93012 |
| Frontier California Inc. | 21230 LASSEN ST | CHATSWORTH | CA | 91311 |
| Frontier California Inc. | 15356 NELSON AVE | CITY OF INDUSTRY | CA | 91744 |
| Citizens Telecommunications Company of California Inc. | 1130 MAIN ST | COLUSA | CA | 95932 |
| Citizens Telecommunications Company of California Inc. | 1150 MAIN ST | COLUSA | CA | 95932 |
| Citizens Telecommunications Company of California Inc. | 1100 MAIN ST | COLUSA | CA | 95932 |
| Citizens Telecommunications Company of California Inc. | 1155 BURTSCHELL ST | CRESCENT CITY | CA | 95531 |
| Frontier California Inc. | 1814 BLOSSOM ST | DOS PALOS | CA | 93620 |
| Citizens Telecommunications Company of California Inc. | 9260 E STOCKTON BLVD | ELK GROVE | CA | 95624 |
| Citizens Telecommunications Company of California Inc. | 531 SHAW AVENUE | FERNDALE | CA | 95536 |
| Frontier California Inc. | 424 PATTERSON AVE | GOLETA | CA | 93111 |
| Frontier California Inc. | 150 S JUANITA ST | HEMET | CA | 92543 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Frontier California Inc. | 331 E MENLO AVE | HEMET | CA | 92543 |
| Citizens Telecommunications Company of California Inc. | HERLONG ACCESS RD / TELEPHONE RD | HERLONG | CA | 96113 |
| Frontier California Inc. | 16551 3RD ST | HESPERIA | CA | 92345 |
| Frontier California Inc. | 7242 SLATER AVE | HUNTINGTON BEACH | CA | 92647 |
| Frontier California Inc. | 7292 SLATER AVE | HUNTINGTON BEACH | CA | 92647 |
| Frontier California Inc. | 7352 SLATER AVE | HUNTINGTON BEACH | CA | 92647 |
| Frontier California Inc. | 83793 DR CARREON BLVD | INDIO | CA | 92201 |
| Frontier California Inc. | 5010 AZUSA CANYON RD | IRWINDALE | CA | 91706 |
| Citizens Telecommunications Company of California Inc. | 471-850 JOHNSTONVILLE DR | JOHNSTONVILLE | CA | 96130 |
| Frontier California Inc. | CLYDE AVE AND RANDOLPH AVE | KENWOOD | CA | 95452 |
| Frontier California Inc. | 3750 INDUSTRY AVE | LAKEWOOD | CA | 90712 |
| Frontier California Inc. | 3770 INDUSTRY AVE | LAKEWOOD | CA | 90712 |
| Frontier California Inc. | 45243 N BEECH AVE | LANCASTER | CA | 93534 |
| Frontier California Inc. | 4811 AIRPORT PLAZA | LONG BEACH | CA | 90815 |
| Frontier California Inc. | 5546 WESTLAWN AVE | LOS ANGELES | CA | 90066 |
| Frontier California Inc. | 39 PINECREST AVE | MAMMOTH LAKES | CA | 93546 |
| Frontier California Inc. | 17855 COMCONEX RD | MANTECA | CA | 95336 |
| Frontier California Inc. | 32477 HAUN RD | MENIFEE | CA | 92584 |
| Frontier California Inc. | 22384 ALESSANDRO BLVD | MORENO VALLEY | CA | 92553 |
| Frontier California Inc. | 16280 CHURCH ST | MORGAN HILL | CA | 95037 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Citizens Telecommunications Company of California Inc. | 911 BROADWAY | NEEDLES | CA | 92363 |
| Frontier California Inc. | 2560 TELLER RD | NEWBURY PARK | CA | 91320 |
| Frontier California Inc. | 501 DAVIDSON AVE | NOVATO | CA | 94945 |
| Frontier California Inc. | 1495 AUTO CENTER DR | ONTARIO | CA | 91761 |
| Frontier California Inc. | 950 WILLIAMS ST | PALM SPRINGS | CA | 92264 |
| Citizens Telecommunications Company of California Inc. | DESCHUTES RD / OLD 44 DRIVE | PALO CEDRO | CA | 96073 |
| Citizens Telecommunications Company of California Inc. | 9415 DESCHUTES RD | PALO CEDRO | CA | 96073 |
| Citizens Telecommunications Company of California Inc. | 515 KEYSTONE BLVD | PATTERSON | CA | 95363 |
| Frontier California Inc. | 2849 FICUS ST | POMONA | CA | 91766 |
| Frontier California Inc. | 1400 E PHILLIPS BLVD | POMONA | CA | 91766 |
| Frontier California Inc. | 2819 W 182ND ST | REDONDO BEACH | CA | 90278 |
| Frontier California Inc. | 1625 E DINUBA AVE | REEDLEY | CA | 93654 |
| Frontier California Inc. | SW CORNER OF PINE AVENUE AT BLACKFOOT TRAIL W | RIMFOREST | CA | 92378 |
| Frontier California Inc. | PINE AVE AT BLACKFOOT TRAIL W | RIMFOREST | CA | 92378 |
| Frontier California Inc. | 1201 K ST | SACRAMENTO | CA | 95814 |
| Frontier California Inc. | 1796 N I ST | SAN BERNARDINO | CA | 92405 |
| Frontier California Inc. | 510 PARK AVE | SAN FERNANDO | CA | 91340 |
| Frontier California Inc. | 21925 NEVADA ST | SAN JOAQUIN | CA | 93660 |
| Frontier California Inc. | 12905 E LOS NIETOS RD | SANTA FE SPRINGS | CA | 90670 |
| Frontier California Inc. | 1223 W FAIRWAY DR | SANTA MARIA | CA | 93455 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Frontier California Inc. | 601 GARDNER FIELD RD | TAFT | CA | 93268 |
| Citizens Telecommunications Company of California Inc. | 18619 PINE ST | TUOLUMNE CITY | CA | 95379 |
| Frontier California Inc. | 73743 AMBOY RD | TWENTYNINE PALMS | CA | 92277 |
| Frontier California Inc. | 14635 KESWICK ST | VAN NUYS | CA | 91405 |
| Frontier California Inc. | 14645 KESWICK ST | VAN NUYS | CA | 91405 |
| Frontier California Inc. | 14041 MOJAVE DR | VICTORVILLE | CA | 92394 |
| Frontier California Inc. | 15055 LA PAZ DR | VICTORVILLE | CA | 92395 |
| Frontier California Inc. | 15168 LA PAZ DR | VICTORVILLE | CA | 92395 |
| Frontier California Inc. | CORNER OF BRIMMER & HWY 299 | WEAVERVILLE | CA | 96093 |
| The Southern New England Telephone Company | 5 SUNNY RIDGE RD | BETHLEHEM | CT | 06751 |
| The Southern New England Telephone Company | 72 SAND PIT RD | DANBURY | CT | 06810 |
| Total Communications, Inc. | 333 BURNHAM ST | EAST HARTFORD | CT | 06108 |
| The Southern New England Telephone Company | 1629 KING ST | ENFIELD | CT | 06082 |
| The Southern New England Telephone Company | 325 MORSE ST | HAMDEN | CT | 06517 |
| The Southern New England Telephone Company | 1441 N COLONY RD | MERIDEN | CT | 06450 |
| The Southern New England Telephone Company | 550 HIGHLAND AVE | MIDDLETOWN | CT | 06457 |
| The Southern New England Telephone Company | 40 COURT ST - TRAILER | NEW BRITAIN | CT | 06051 |
| The Southern New England Telephone Company | 4 HAMILTON ST | NEW HAVEN | CT | 06511 |
| The Southern New England Telephone Company | 200 STATE ST | NEW LONDON | CT | 06320 |
| The Southern New England Telephone Company | 32 COMMERCE DR | NORTH BRANFORD | CT | 06471 |
| The Southern New England Telephone Company | 134 CLUB RD | NORTH WINDHAM | CT | 06256 |

13

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| The Southern New England Telephone Company | 4 MEADOW ST | NORWALK | CT | 06854 |
| The Southern New England Telephone Company | 360 BRIDGEPORT AVE | SHELTON | CT | 06484 |
| The Southern New England Telephone Company | 1175 WOODEND RD | STRATFORD | CT | 06615 |
| The Southern New England Telephone Company | 25 RESEARCH PKWY | WALLINGFORD | CT | 06492 |
| The Southern New England Telephone Company | 101N PLAINS INDUSTRIAL RD BLD5 | WALLINGFORD | CT | 06492 |
| The Southern New England Telephone Company | 555 LAKEWOOD RD | WATERBURY | CT | 06704 |
| The Southern New England Telephone Company | 578 VAUXHALL ST EXT | WATERFORD | CT | 06385 |
| The Southern New England Telephone Company | 202 TORRINGTON RD | WINSTED | CT | 06098 |
| The Southern New England Telephone Company | 301 MAIN ST S | WOODBURY | CT | 06798 |
| The Southern New England Telephone Company | 305 MAIN ST S | WOODBURY | CT | 06798 |
| The Southern New England Telephone Company | 297 MAIN ST S | WOODBURY | CT | 06798 |
| The Southern New England Telephone Company | 147 BACON POND RD | WOODBURY | CT | 06798 |
| Citizens Telecom Services Company L.L.C. | 1800 M ST NW | WASHINGTON | DC | 20036 |
| Frontier Florida LLC | 3050 SR 60 E | BARTOW | FL | 33830 |
| Frontier Florida LLC | 6102 14TH ST W | BRADENTON | FL | 34207 |
| Frontier Florida LLC | 4128 LAKEWOOD RANCH BLVD | BRADENTON | FL | 34211 |
| Frontier Florida LLC | 2444 W BRANDON BLVD | BRANDON | FL | 33511 |
| Frontier Florida LLC | 2185 RANGE RD | CLEARWATER | FL | 33765 |
| Citizens Telecom Services Company L.L.C. | 1588 N WOODLAND BLVD | DELAND | FL | 32720 |
| Frontier Florida LLC | 12809 STATE RD 52 | HUDSON | FL | 34669 |
| Frontier Florida LLC | 1005 1/2 E LEMON ST | LAKELAND | FL | 33801 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Frontier Florida LLC | 1011 E LEMON ST | LAKELAND | FL | 33801 |
| Frontier Florida LLC | 1043 E LEMON ST | LAKELAND | FL | 33801 |
| Frontier Florida LLC | 5844 US HWY 98 N | LAKELAND | FL | 33809 |
| Frontier Florida LLC | BYRD DR W OF 2130 GUNN HWY | ODESSA | FL | 33556 |
| Frontier Florida LLC | 1002 S ALEXANDER ST | PLANT CITY | FL | 33563 |
| Frontier Florida LLC | 8600 REES ST | PORT RICHEY | FL | 34668 |
| Frontier Florida LLC | 2455 12TH ST | SARASOTA | FL | 34237 |
| Frontier Florida LLC | 10992 1/2 PARK BLVD | SEMINOLE | FL | 33772 |
| Citizens Telecom Services Company L.L.C. | 1801 S NOVA RD | SOUTH DAYTONA | FL | 32119 |
| Frontier Florida LLC | 4332 54TH AVE N | ST PETERSBURG | FL | 33714 |
| Frontier Florida LLC | 12400 N DALE MABRY HWY | TAMPA | FL | 33618 |
| Frontier Florida LLC | 1410 131ST AVE | TAMPA | FL | 33612 |
| Frontier Florida LLC | 5301 W SLIGH AVE | TAMPA | FL | 33634 |
| Frontier Florida LLC | 7855 CAUSEWAY BLVD | TAMPA | FL | 33619 |
| Frontier Florida LLC | 3704 E 3RD AVE | TAMPA | FL | 33605 |
| Frontier Florida LLC | 1950 PLAZA DR | TARPON SPRINGS | FL | 34689 |
| Frontier Florida LLC | 7701 E TELECOM PKWY | TEMPLE TERRACE | FL | 33637 |
| Frontier Florida LLC | 1290 US HWY 41 BYPASS S | VENICE | FL | 34285 |
| Frontier Florida LLC | 200 AVE B NW | WINTER HAVEN | FL | 33881 |
| Frontier Florida LLC | 350 AVE K SW | WINTER HAVEN | FL | 33880 |
| Citizens Telecom Services Company L.L.C. | 311 THIRD AVE | CEDAR RAPIDS | IA | 52401 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Frontier Communications of Iowa, LLC | 2573 CHAMBERLIN DR | DENISON | IA | 51442 |
| Frontier Communications of Iowa, LLC | 622 FIRST AVE N | FORT DODGE | IA | 50501 |
| Frontier Communications of Iowa, LLC | 517/519 CENTAL AVE | FORT DODGE | IA | 50501 |
| Citizens Telecommunications Company of Illinois | HWY 17 | ALEDO | IL | 61231 |
| Citizens Telecommunications Company of Illinois | 801 W JACKSON AVE | ALTAMONT | IL | 62411 |
| Frontier North Inc. | 2319 W MARKET | BLOOMINGTON | IL | 61705 |
| Frontier North Inc. | 2319 W MARKET | BLOOMINGTON | IL | 61705 |
| Citizens Telecommunications Company of Illinois | 225 NORTH BROAD | CARLINVILLE | IL | 62626 |
| Citizens Telecommunications Company of Illinois | QUINCY RD | CARTHAGE | IL | 62321 |
| Citizens Telecommunications Company of Illinois | 1ST ST S | CHESTERFIELD | IL | 62630 |
| Frontier Communications of the Carolinas LLC | 110 E GARFIELD ST | CISSNA PARK | IL | 60924 |
| Frontier Communications of Illinois, Inc. | 108 N OAK | CULLOM | IL | 60929 |
| Frontier North Inc. | 2120 PLEASANT ST | DEKALB | IL | 60115 |
| Frontier Communications of DePue, Inc. | 315 W 4TH ST | DEPUE | IL | 61322 |
| Frontier Communications of the Carolinas LLC | 517 OLIVE ST | EMDEN | IL | 62635 |
| Frontier Communications - Prairie, Inc. | 118 MAIN ST | FLANAGAN | IL | 61740 |
| Frontier North Inc. | 947 E CLINTON ST | FREEPORT | IL | 61032 |
| Frontier Communications of the Carolinas LLC | 310 E PENN ST | HOOPESTON | IL | 60942 |
| Citizens Telecommunications Company of Illinois | 112 NORTH 2ND ST | LONDON MILLS | IL | 61544 |

16

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Frontier North Inc. | 207 W JEFFERSON ST | MARION | IL | 62613 |
| Frontier North Inc. | 8656 OLD RT 13 | MARION | IL | 62959 |
| Frontier North Inc. | 111 E STATE ST | MASCOUTAH | IL | 62258 |
| Frontier Communications of the Carolinas LLC | 12 S AXTEL AVE | MILFORD | IL | 60953 |
| Frontier Communications of Mt. Pulaski, Inc. | 119 W JEFFERSON ST | MOUNT PULASKI | IL | 62548 |
| Frontier Communications of Mt. Pulaski, Inc. | VINE | MOUNT PULASKI | IL | 62548 |
| Citizens Telecommunications Company of Illinois | E GARNER ST | NEW DOUGLAS | IL | 62074 |
| Frontier Communications of Orion, Inc. | 1017 4TH ST REAR | ORION | IL | 61273 |
| Citizens Telecommunications Company of Illinois | RAILROAD ST | PROPHETSTOWN | IL | 61277 |
| Frontier North Inc. | 102 N CENTER ST | ROCKTON | IL | 61072 |
| Frontier Communications - Midland, Inc. | FIRST & KAATING | SHIPMAN | IL | 62685 |
| Frontier North Inc. | 433 W COLISEUM BLVD | FORT WAYNE | IN | 46805 |
| Frontier North Inc. | 5907 COVINGTON RD, STE C | FORT WAYNE | IN | 46804 |
| Frontier North Inc. | 5120 INVESTMENT DRIVE | FORT WAYNE | IN | 46808 |
| Frontier North Inc. | 6430 OAKBROOK PKWY | FORT WAYNE | IN | 46825 |
| Frontier North Inc. | 4201 COLDWATER BLVD | FORT WAYNE | IN | 46805 |
| Frontier North Inc. | 208 E PETTIT, SUITE 60 | FORT WAYNE | IN | 46806 |
| Frontier North Inc. | 8001 W JEFFERSON BLVD | FORT WAYNE | IN | 46804 |
| Frontier North Inc. | 906 PARK ST | GREENSBURG | IN | 47240 |
| Frontier North Inc. | 1087 S SAINT CHARLES ST | JASPER | IN | 47546 |
| Frontier North Inc. | 1233 W TIPTON ST | SEYMOUR | IN | 47274 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Frontier North Inc. | 3401 S US HWY 41 | TERRE HAUTE | IN | 47802 |
| Frontier Midstates Inc. | 123 N TALBOT ST | ADDISON | MI | 49220 |
| Frontier North Inc. | 1285 N BRIDGE ST | ALMA | MI | 48801 |
| Frontier Midstates Inc. | 9110 RED ARROW HWY | BRIDGEMAN | MI | 49106 |
| Frontier North Inc. | 116 VAN NEST ST | DUNDEE | MI | 48131 |
| Frontier North Inc. | 412 N JAMES ST | GRAYLING | MI | 49738 |
| Frontier North Inc. | 111 N 3RD | HARRISVILLE | MI | 48740 |
| Frontier North Inc. | 311 S CEDAR ST | IMLAY CITY | MI | 48444 |
| Frontier Midstates Inc. | 3905 CONSEAR RD | LAMBERTVILLE | MI | 48144 |
| Frontier Midstates Inc. | 50541 CO RD 374 | LAWRENCE | MI | 49064 |
| Frontier North Inc. | 1430 ISABELLA RD | MOUNT PLEASANT | MI | 48858 |
| Frontier North Inc. | 2441 OLTHOFF DR | MUSKEGON | MI | 49444 |
| Frontier North Inc. | 860 TERRACE ST | MUSKEGON | MI | 49440 |
| Frontier Midstates Inc. | 105 WARNER ST | ROSE CITY | MI | 48654 |
| Frontier North Inc. | 806 W STATE ST | SAINT JOHNS | MI | 48879 |
| Frontier North Inc. | 12801 BLUE STAR HWY | SOUTH HAVEN | MI | 49090 |
| Frontier North Inc. | 606 S MAUMEE ST | TECUMSEH | MI | 49286 |
| Frontier North Inc. | 705 WEBBER ST | THREE RIVERS | MI | 49093 |
| Citizens Telecommunications Company of Minnesota, LLC | 6317 BROGADE | ASKOV | MN | 55704 |
| Citizens Telecommunications Company of Minnesota, LLC | CENTRAL ST | AURORA | MN | 55705 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Citizens Telecommunications Company of Minnesota, LLC | 19 ADLER RD | BABBITT | MN | 55706 |
| Citizens Telecommunications Company of Minnesota, LLC | 508 MARTIN AVE | BELGRADE | MN | 56312 |
| Citizens Telecommunications Company of Minnesota, LLC | 405 INDUSTRIAL DR | BLOOMING PRAIRIE | MN | 55917 |
| Frontier Communications of Minnesota, Inc. | 14450 BURNHAVEN DR | BURNSVILLE | MN | 55306 |
| Frontier Communications of Minnesota, Inc. | 1178 BURNSVILLE CENTER | BURNSVILLE | MN | 55306 |
| Citizens Telecommunications Company of Minnesota, LLC | 10TH AVE & 11TH ST | CLARKFIELD | MN | 56223 |
| Citizens Telecommunications Company of Minnesota, LLC | 156 2ND ST SE | HALLOCK | MN | 56728 |
| Citizens Telecommunications Company of Minnesota, LLC | 231 2ND ST WEST | HECTOR | MN | 55342 |
| Citizens Telecommunications Company of Minnesota, LLC | 313 VAN LYNN RD | INTERNATIONAL FALLS | MN | 56649 |
| Frontier Communications of Minnesota, Inc. | 21017 HERON WAY, STE 111 | LAKEVILLE | MN | 55044 |
| Frontier Communications of Minnesota, Inc. | 58 WEST MINNESOTA | LECENTER | MN | 56057 |
| Citizens Telecommunications Company of Minnesota, LLC | 100 S MADDY ST | MCGREGOR | MN | 55760 |
| Citizens Telecommunications Company of Minnesota, LLC | 100 ALBERT ST | MCGREGOR | MN | 55760 |
| Citizens Telecommunications | 715 8TH ST.NORTHEAST | MILACA | MN | 56353 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Company of Minnesota, LLC | | | | |
| Citizens Telecommunications Company of Minnesota, LLC | 2378 WILSHIRE BLVD | MOUND | MN | 55364 |
| Frontier Communications of Minnesota, Inc. | 16690 CEDAR AVE S | ROSEMOUNT | MN | 55068 |
| Citizens Telecommunications Company of Minnesota, LLC | COUNTY RTE 92 | ST BONIFACIUS | MN | 55375 |
| Citizens Telecommunications Company of Minnesota, LLC | 419 17TH AVENUE | TWO HARBORS | MN | 55616 |
| Citizens Telecommunications Company of Minnesota, LLC | 609 LEWIS AVENUE NORTH | WATERTOWN | MN | 55388 |
| Frontier Communications of Minnesota, Inc. | 31573 HWY 266 | WORTHINGTON | MN | 56187 |
| Citizens Telecommunications Company of Minnesota, LLC | 26289 FALLBROOK AVE N | WYOMING | MN | 55092 |
| Frontier Communications of Mississippi LLC | 105 FIFTH AVE | HOULKA | MS | 38850 |
| Frontier Communications of Mississippi LLC | 104 FIFTH AVENUE | HOULKA | MS | 38850 |
| Frontier Communications of Mississippi LLC | 106 FIFTH AVENUE | HOULKA | MS | 38850 |
| Frontier Communications of Mississippi LLC | 48 MAIN ST | RIENZI | MS | 38865 |
| Frontier Communications of the Carolinas LLC | CHERRY ST | ANDREWS | NC | 28901 |
| Frontier Communications of the Carolinas LLC | 1058 W CLUB BLVD, STORE #518 | DURHAM | NC | 27701 |
| Frontier Communications of the Carolinas LLC | 725 E MARKHAM AVE | DURHAM | NC | 27701 |
| Frontier Communications of the Carolinas LLC | 3833 S ALSTON AVE | DURHAM | NC | 27713 |
| Frontier Communications of the Carolinas LLC | 135 E MAIN ST | FRANKLIN | NC | 28734 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Frontier Communications of the Carolinas LLC | 2909 STITT ST | MONROE | NC | 28110 |
| Frontier Communications of the Carolinas LLC | OLD DILLSBORO HWY | SYLVA | NC | 28779 |
| Citizens Telecommunications Company of Nebraska | 817 "O" ST | BEAVER CITY | NE | 68926 |
| Citizens Telecommunications Company of Nebraska | 1012 E 19TH ST | COLUMBUS | NE | 68601 |
| Citizens Telecommunications Company of Nebraska | 612 15th St (Lot 6, BLK 14) | FRANKLIN | NE | 68939 |
| Citizens Telecommunications Company of Nebraska | 523, 525, & 527 W 19TH ST | KEARNEY | NE | 68845 |
| Citizens Telecommunications Company of Nebraska | 133 N 16TH ST | ORD | NE | 68862 |
| Citizens Telecommunications Company of Nevada | 111 W FRONT ST | ELKO | NV | 89801 |
| Frontier Communications of the Southwest Inc. | 1520 CHURCH ST | GARDNERVILLE | NV | 89410 |
| Citizens Telecommunications Company of New York, Inc. | SPRING ST | ADAMS | NY | 13605 |
| Frontier Communications of Seneca-Gorham, Inc. | 71 MAIN ST | BLOOMFIELD | NY | 14469 |
| Frontier Telephone of Rochester, Inc. | 3779 ROUTE 245 | GORHAM | NY | 14461 |
| Frontier Communications of Sylvan Lake, Inc. | 1006 ROUTE 82 | HOPEWELL JUNCTION | NY | 12533 |
| Frontier Communications of AuSable Valley, Inc. | 9 MARGARET ST | KEESEVILLE | NY | 12944 |
| Citizens Telecommunications Company of New York, Inc. | 5440 SHADY AVE | LOWVILLE | NY | 12944 |
| Frontier Communications of New York, Inc. | OAK ST | MONROE | NY | 10950 |
| Frontier Telephone of Rochester, Inc. | 3064 MOUNT MORRIS GENESEO RD | MOUNT MORRIS | NY | 14510 |
| Citizens Telecommunications | 126 MAIN ST (ADJ TO FIRE DEPT) | NORTH CREEK | NY | 12853 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Company of New York, Inc. | | | | |
| Citizens Telecommunications Company of New York, Inc. | 100 S 2ND ST | NORTHVILLE | NY | 12134 |
| Citizens Telecommunications Company of New York, Inc. | 8 W CHESTNUT ST | RHINEBECK | NY | 12572 |
| Frontier Telephone of Rochester, Inc. | 1225 JEFFERSON RD | ROCHESTER | NY | 14623 |
| Frontier Telephone of Rochester, Inc. | 3441 W HENRIETTA RD | ROCHESTER | NY | 14623 |
| Citizens Telecommunications Company of New York, Inc. | 14 CLASSIC ST | SHERBURNE | NY | 13460-9723 |
| Citizens Telecommunications Company of New York, Inc. | 2 OAK ST | SIDNEY | NY | 13838 |
| Citizens Telecommunications Company of New York, Inc. | 65 WEST ST | WALTON | NY | 13856 |
| Frontier Telephone of Rochester, Inc. | 1855 EMPIRE BLVD. | WEBSTER | NY | 14580 |
| Frontier Communications Corporation | 50 MAIN STREET | WHITE PLAINS | NY | 10606 |
| Frontier North Inc. | 132 W CHURCH ST | AMANDA | OH | 43102 |
| Frontier North Inc. | STATE RT 511 | ASHLAND | OH | 44805 |
| Frontier North Inc. | 754 W UNION ST | ATHENS | OH | 45701 |
| Frontier North Inc. | 541 SAND RIDGE RD | BOWLING GREEN | OH | 43402 |
| Frontier North Inc. | 300 W GYPSY LANE RD | BOWLING GREEN | OH | 43402 |
| Frontier North Inc. | 6464 WESTBROOK RD | CLAYTON | OH | 45315 |
| Frontier North Inc. | 119 S MARKET ST | GALION | OH | 44833 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Frontier North Inc. | 90 E IOWA ST | GEORGETOWN | OH | 45121 |
| Frontier North Inc. | 1300 COLUMBUS-SANDUSKY RD N | MARION | OH | 43302 |
| Frontier North Inc. | 550 LEADER ST | MARION | OH | 43302 |
| Frontier North Inc. | 14 GIBBS RD | NORWALK | OH | 44857 |
| Frontier North Inc. | 8169 ST RT 134 | PORT WILLIAM | OH | 45177 |
| Frontier North Inc. | 210 3RD ST | SUGAR CREEK | OH | 44681 |
| Frontier North Inc. | 3226 MCCORD RD | SYLVANIA | OH | 43560 |
| Frontier North Inc. | 115 JAMES RD | WAVERLY | OH | 45690 |
| Frontier North Inc. | CASS ST | WHARTON | OH | 43359 |
| CTSI, LLC | 3864 COURTNEY ST, SUITE 240 | BETHLEHEM | PA | 18017 |
| Frontier Communications of Breezewood, LLC | 150 S MAIN ST | BREEZEWOOD | PA | 15533 |
| Frontier Communications of Breezewood, LLC | 152 SOUTH MAIN | BREEZEWOOD | PA | 15533 |
| Frontier Communications of Canton, LLC | 733 SPRINGBROOK DR | CANTON | PA | 17724 |
| Commonwealth Telephone Company LLC | 120 CTE DRIVE SERVICE CENTER | DALLAS | PA | 18612 |
| Commonwealth Telephone Company LLC | 100 CTE DR | DALLAS | PA | 18612 |
| CTSI, LLC | 3950 CHAMBERS HILL RD | HARRISBURG | PA | 17111 |
| CTSI, LLC | 4110 BUTLER PIKE | PLYMOUTH MEETING | PA | 19462 |
| Frontier Communications of Oswayo River LLC | 302 W ACADEMY ST | SHINGLEHOUSE | PA | 16748 |
| Frontier Communications of Oswayo River LLC | STEVENS ST | SHINGLEHOUSE | PA | 16748 |
| Commonwealth Telephone Company LLC | 39 PUBLIC SQUARE | WILKES-BARRE | PA | 18711 |
| Frontier Communications of the Carolinas LLC | 1113 FRONT & WOODS ST | GEORGETOWN | SC | 29440 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Frontier Communications of the Carolinas LLC | HWY 41 S | HEMINGWAY | SC | 29554 |
| Frontier Communications of the Carolinas LLC | 158 S CHURCH | LAKE CITY | SC | 29560 |
| Citizens Telecommunications Company of Tennessee L.L.C. | 250 S FRANKLIN | COOKEVILLE | TN | 38501 |
| Citizens Telecommunications Company of Tennessee L.L.C. | 250 S FRANKLIN | COOKEVILLE | TN | 38501 |
| Citizens Telecom Services Company L.L.C. | 8606 GUTHRIE CT | CROSS PLAINS | TN | 37049 |
| Citizens Telecommunications Company of Tennessee L.L.C. | 17 E. MAPLE ST. | SPARTA | TN | 38583 |
| Frontier Southwest Incorporated | 805 S. CENTRAL EXPRESSWAY | ALLEN | TX | 75013 |
| Frontier Southwest Incorporated | AT CO ALLEY BETWEEN FRONT | BANGS | TX | 76823 |
| Frontier Southwest Incorporated | 8304 N MAIN ST | BAYTOWN | TX | 77521 |
| Frontier Southwest Incorporated | 3020 14TH ST | BROWNWOOD | TX | 76801 |
| Frontier Southwest Incorporated | 301 INDUSTRIAL BLVD | BRYAN | TX | 77803 |
| Frontier Southwest Incorporated | FIRE SYSTEM ONLY | BRYAN | TX | 77803 |
| Frontier Southwest Incorporated | INDUSTRIAL & SHILOH | BRYAN | TX | 77803 |
| Frontier Southwest Incorporated | 305 INDUSTRIAL BLVD | BURNET | TX | 78611 |
| Frontier Southwest Incorporated | MOORE AT MUSTANG | CALDWELL | TX | 77836 |
| Frontier Southwest Incorporated | 1000 W DALLAS ST | CANTON | TX | 75103 |
| Frontier Southwest Incorporated | 2001 WESTGATE DR | CARROLLTON | TX | 75006 |
| Frontier Southwest Incorporated | 113 E ELM | COLEMAN | TX | 76834 |
| Frontier Southwest Incorporated | 201 W SANDY LAKE RD | COPPELL | TX | 75019 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Frontier Southwest Incorporated | 103 AVE G | DEL RIO | TX | 78840 |
| Frontier Southwest Incorporated | 3827 MORSE ST | DENTON | TX | 76208 |
| Frontier Southwest Incorporated | LOOP 288 & MORSE ST | DENTON | TX | 76208 |
| Frontier Southwest Incorporated | 5311 FM 646 | DICKINSON | TX | 77539 |
| Frontier Southwest Incorporated | GILLIS AVE & COTTONWOOD ST | ELDORADO | TX | 76936 |
| Frontier Southwest Incorporated | 312 S RAILROAD ST | FALFURRIAS | TX | 78355 |
| Frontier Southwest Incorporated | 2702 B ST | FLORESVILLE | TX | 78114 |
| Frontier Southwest Incorporated | 1325 US HWY 87 | FREDERICKSBURG | TX | 78624 |
| Frontier Southwest Incorporated | 1724 N FIRST ST | GARLAND | TX | 75040 |
| Frontier Southwest Incorporated | 1700 N AUSTIN AVE | GEORGETOWN | TX | 78626 |
| Frontier Southwest Incorporated | 180 W HEMPSTEAD ST | GIDDINGS | TX | 78942 |
| Frontier Southwest Incorporated | 200 BETTY ST | HAWKINS | TX | 75765 |
| Frontier Southwest Incorporated | 3504 N BELT LINE RD | IRVING | TX | 75062 |
| Frontier Southwest Incorporated | 3508 N BELT LINE RD | IRVING | TX | 75062 |
| Frontier Southwest Incorporated | 3510 N BELT LINE RD | IRVING | TX | 75062 |
| Frontier Southwest Incorporated | 7979 N BELT LINE RD | IRVING | TX | 75063 |
| Frontier Southwest Incorporated | 309 BEALL BLVD | JACKSONVILLE | TX | 75766 |
| Frontier Southwest Incorporated | 504 BEECH ST AT SIMMONS | JOURDANTON | TX | 78026 |
| Frontier Southwest Incorporated | 506 BEECH ST | JOURDANTON | TX | 78026 |
| Frontier Southwest Incorporated | 200 CALVERLEY RD | KELLER | TX | 76248 |
| Frontier Southwest Incorporated | 245 PRICE ST | KELLER | TX | 76248 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Frontier Southwest Incorporated | 4200A STONE RD | KILGORE | TX | 75662 |
| Frontier Southwest Incorporated | 54 EUEL MOORE DR | KINGSLAND | TX | 78639 |
| Frontier Southwest Incorporated | 1701 LEAGUE CITY PKWY | LEAGUE CITY | TX | 77573 |
| Frontier Southwest Incorporated | 209 W COLLINS ST | LEONARD | TX | 75452 |
| Frontier Southwest Incorporated | 1132 FM HWY 407 W | LEWISVILLE | TX | 75067 |
| Frontier Southwest Incorporated | 503 MAIN ST | MARTINDALE | TX | 78655 |
| Frontier Southwest Incorporated | SHERWOOD AVE | MERTZON | TX | 76941 |
| Frontier Southwest Incorporated | 2201 AVE I | PLANO | TX | 75074 |
| Frontier Southwest Incorporated | 925 22ND ST, SUITE 100 | PLANO | TX | 75074 |
| Frontier Southwest Incorporated | 2001 N FLORES ST | RIO GRANDE CITY | TX | 78582 |
| Frontier Southwest Incorporated | ALLEY 75 FT W OF CHADBOURNE | ROBERT LEE | TX | 76945 |
| Frontier Southwest Incorporated | 4318 FM 1889 | ROBSTOWN | TX | 78380 |
| Frontier Southwest Incorporated | 2010 LOOP 306 | SAN ANGELO | TX | 76905 |
| Frontier Southwest Incorporated | 2020 LOOP 306 | SAN ANGELO | TX | 76905 |
| Frontier Southwest Incorporated | COUNTRY CLUB RD AT CANAL | SAN ANGELO | TX | 76904 |
| Frontier Southwest Incorporated | 1231 BYRD ST | SHEPHERD | TX | 77371 |
| Frontier Southwest Incorporated | 2303 FM 1417 S | SHERMAN | TX | 75090 |
| Frontier Southwest Incorporated | N SIDE OF ALLEY 4TH | STERLING CITY | TX | 76951 |
| Frontier Southwest Incorporated | 1121 SHANNON RD | SULPHUR SPRINGS | TX | 75482 |
| Frontier Southwest Incorporated | QUINN & FM 486 | THORNDALE | TX | 76577 |
| Frontier Southwest Incorporated | 709 E THORNTON | THREE RIVERS | TX | 78071 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Frontier Southwest Incorporated | S PINE ST | VAN | TX | 75790 |
| Frontier Southwest Incorporated | E MARSHALL ST | VAN ALSTYNE | TX | 75495 |
| Frontier Southwest Incorporated | 1715 E PIKE | WESLACO | TX | 78599 |
| Frontier Southwest Incorporated | WILLIAMS ST | WHITESBORO | TX | 76273 |
| Frontier Southwest Incorporated | CUDE CEMETARY RD AT 027 | WILLIS | TX | 77318 |
| Frontier Southwest Incorporated | 1015 E BROWN ST | WYLIE | TX | 75098 |
| Citizens Telecommunications Company of Utah | 120 NORTH 400 WEST | DELTA | UT | 84624 |
| Citizens Telecommunications Company of Utah | 111 S 100 EAST ST | MOAB | UT | 84532 |
| Citizens Telecommunications Company of Utah | 15 N 100 E ST | MOAB | UT | 84532 |
| Citizens Telecommunications Company of Utah | 40 WEST 100 NORTH | TREMONTON | UT | 84337 |
| Citizens Telecom Services Company L.L.C. | 22001 LOUDOUN COUNTY PKWY | ASHBURN | VA | 20147 |
| Frontier North Inc. | 8082 GUY ST | BAILEYS HARBOR | WI | 54202 |
| Frontier North Inc. | 250 S MAIN ST | CEDAR GROVE | WI | 53013 |
| Frontier Communications of Wisconsin LLC | 146 MAIZE ST | CLINTONVILLE | WI | 54929 |
| Frontier Communications of Wisconsin LLC | 6 N. CLINTON AVENUE | CLINTONVILLE | WI | 54929 |
| Frontier North Inc. | 118 DIVISION ST | PLYMOUTH | WI | 53073 |
| Frontier North Inc. | 107 PLEASANT VIEW | PLYMOUTH | WI | 53073 |
| Frontier North Inc. | 502 MADISON ST | REEDSVILLE | WI | 54230 |
| Frontier Communications of Wisconsin LLC | 45 & 53 N STEVENS ST | RHINELANDER | WI | 54501 |
| Frontier North Inc. | HWY 57 | SISTER BAY | WI | 54234 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Frontier North Inc. | 621 HARTFORD RD | SLINGER | WI | 53086 |
| Frontier North Inc. | 419 S WINSTED | SPRING GREEN | WI | 53588 |
| Frontier North Inc. | 451 BROADWAY DR | SUN PRAIRIE | WI | 53590 |
| Frontier North Inc. | 100 COMMUNICATIONS DR | SUN PRAIRIE | WI | 53590 |
| Frontier North Inc. | 1609 ADAMS ST | TWO RIVERS | WI | 54241 |
| Frontier Communications of Wisconsin LLC | 609 RAILROAD AVE | VIROQUA | WI | 54665 |
| Frontier North Inc. | 222 KENOSHA ST | WALWORTH | WI | 53184 |
| Frontier North Inc. | 4143 HWY 13 N | WISCONSIN DELLS | WI | 53965 |
| Frontier North Inc. | 730 SUPERIOR ST | WISCONSIN DELLS | WI | 53965 |
| Frontier West Virginia Inc. | 120 APPALACHIAN DR | BECKLEY | WV | 25801 |
| Frontier West Virginia Inc. | 5 THOMAS ST | BERKELEY SPRINGS | WV | 25411 |
| Frontier West Virginia Inc. | 483 BRUSHY FORK RD | BRIDGEPORT | WV | 26330 |
| Frontier West Virginia Inc. | 355 DEWBERRY TRAIL | BUCKHANNON | WV | 26201 |
| Frontier West Virginia Inc. | 1500 MACCORKLE AVE SE | CHARLESTON | WV | 25396 |
| Frontier West Virginia Inc. | 1300 WILSON LN | ELKINS | WV | 26241 |
| Frontier West Virginia Inc. | RT 37-3 | FAIRLEA | WV | 24901 |
| Frontier West Virginia Inc. | 289 PRICKETTS FORT RD | FAIRMONT | WV | 26554 |
| Frontier West Virginia Inc. | 58 RESOURCE LN | FOSTER | WV | 25081 |
| Frontier West Virginia Inc. | OFF OF RT 33 | FRANKLIN | WV | 26807 |
| Frontier West Virginia Inc. | 596 SHERIDAN ST | GLENVILLE | WV | 26351 |
| Frontier West Virginia Inc. | 4500 ALTIZER AVE | HUNTINGTON | WV | 25705 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Frontier West Virginia Inc. | 117 TAVERN RD | MARTINSBURG | WV | 25401 |
| Citizens Telecommunications Company of West Virginia | HIGH ST | MILL CREEK | WV | 26280 |
| Frontier West Virginia Inc. | 1325 AIRPORT BLVD | MORGANTOWN | WV | 26505 |
| Frontier West Virginia Inc. | RT 54 | MULLENS | WV | 25882 |
| Frontier West Virginia Inc. | 4200 CAMDEN AVE | PARKERSBURG | WV | 26101 |
| Frontier West Virginia Inc. | 32 CRADDOCK WY | POCA | WV | 25159 |
| Frontier West Virginia Inc. | 400 JACOBSON DR | POCA | WV | 25159 |
| Citizens Telecommunications Company of West Virginia | 1108 N MILDRED ST | RANSON | WV | 25438 |
| Frontier West Virginia Inc. | 565 KLONDYKE RD | RIPLEY | WV | 25271 |
| Citizens Telecommunications Company of West Virginia | 1814 S PLEASANTS HWY | SAINT MARYS | WV | 26170 |
| Citizens Telecommunications Company of West Virginia | 1736 S PLEASANTS HWY | SAINT MARYS | WV | 26170 |
| Frontier West Virginia Inc. | 96 POCA RIVER RD | SISSONVILLE | WV | 25320 |
| Frontier West Virginia Inc. | 668 GLEN OAKS RD | SUMMERSVILLE | WV | 26651 |
| Frontier West Virginia Inc. | 1014 OLD LOGAN RD | WEST LOGAN | WV | 25601 |
| Frontier West Virginia Inc. | 995 MT DECHANTAL RD | WHEELING | WV | 26003 |
| Frontier California Inc. | 9000 HELLMAN AVE | RANCHO CUCAMONGA | CA | 91730 |
| Frontier California Inc. | 2535 W HILLCREST DR | THOUSAND OAKS | CA | 91320 |
| The Southern New England Telephone Company | 7 BACKUS AVE | DANBURY | CT | 06810 |
| The Southern New England Telephone Company | 114 NEW PARK AVE | FRANKLIN | CT | 06254 |
| The Southern New England Telephone Company | 1201 BOSTON POST RD | MILFORD | CT | 06460 |

| Debtor | Street Address | City | State | Zip Code |
|---|---|---|---|---|
| Total Communications, Inc. | 500 BIC DR | MILFORD | CT | 06461 |
| Frontier Communications Corporation | 101 MERRITT 7 CORPORATE PARK | NORWALK | CT | 06851 |
| The Southern New England Telephone Company | 5065 MAIN ST | TRUMBULL | CT | 06611 |
| The Southern New England Telephone Company | 115 HOOD TERRACE | WEST HAVEN | CT | 06516 |
| Citizens Telecom Services Company L.L.C. | 1250 24TH ST NW, STE 300 | WASHINGTON | DC | 20037 |
| Citizens Telecommunications Company of Tennessee L.L.C. | 447 S JEFFERSON ST, SUITE B | COOKEVILLE | TN | 38501 |
| Frontier Southwest Incorporated | 222 W LAS COLINAS BLVD | IRVING | TX | 75039 |
| Frontier California Inc. | 1495 S. AUTO CENTER DR | ONTARIO | CA | 91761 |
| Frontier Communications Corporation | 906 SE EVERETT MALL WY | EVERETT | WA | 98208 |
| Frontier Communications Northwest Inc. | 830 NORTH RAILROAD ST | OROFINO | ID | 83544 |
| Frontier Communications Northwest Inc. | 93 BORGMANN LANE | ST MARIES | ID | 83861 |
| Frontier Communications Northwest Inc. | 800 NW SECOND STREET, MAXWELL BUILDING | ENTERPRISE | OR | 97828 |
| Frontier Communications Northwest Inc. | 22965 NW EVERGREEN PKWY | HILLSBORO | OR | 97124 |
| Frontier Communications Northwest Inc. | 3833 168TH STREET | ARLINGTON | WA | 98223 |
| Frontier Communications Northwest Inc. | 15 SW EVERETT MALL WY | EVERETT | WA | 98208 |
| Frontier Communications Northwest Inc. | 1800 41ST ST | EVERETT | WA | 98203-2350 |
| Frontier Communications Corporate Services, Inc. | 2610 W CASINO RD, EVERETT AIRPORT CENTER | EVERETT | WA | 98204 |
| Frontier Communications Northwest, Inc | 7244 EVERSON GOSHEN RD | EVERSON | WA | 98247 |
| Frontier Communications Northwest Inc. | 12055 SLATER AVE | KIRKLAND | WA | 98034-8601 |

## Exhibit K

### Location of Debtors' Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

As of February 29, 2020, the Debtors' had assets of approximately $17.43 billion, as provided in Exhibit F, with substantial assets in 29 states.

### Books and Records

The Debtors' books and records are located at 401 Merritt 7, Norwalk, CT 06851

### Debtors' Assets Outside the United States

The Debtors do not have significant assets located outside of the territorial limits of the United States; however, in the ordinary course of business, on any given day, the Debtors may own title to goods and merchandise that is in transit to the United States from locations outside the territorial limits. Such goods only remain outside the United States for the duration of shipping and transport. Because of the constant movement of this property, providing a comprehensive list of such goods and merchandise would be impractical.

## Exhibit L

### Summary of Legal Actions against the Debtors

Pursuant to Local Rule 1007-2(a)(11), the following lists material actions and proceedings pending or threatened against the Company or its properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date.  This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these chapter 11 cases.[1]

| Entity | Counterparty | Nature of the Claim | Status |
|--------|-------------|---------------------|--------|
| Frontier Communications Corp. | Arkansas Teacher Retirement System and Carlos Lagomarsino | Securities Litigation | Pending |
| Frontier Communications Corp. | Celeste M Baker | Derivative Litigation | Pending |
| Frontier Communications Corp. | Mary Reidt, on behalf of the Frontier Communications 401(k) Savings Plan and all others similarly situated | Fiduciary Duties Breach | Pending |
| Citizens Telecom Service Co., LLC | Ian Taylor and on behalf of all others similarly situated | Fiduciary Duties Breach | Pending |
| Frontier Communications Corp. | Communication Workers of America | Breach of Contract | Pending |
| Frontier West Virginia, Inc., et al | Citynet, LLC | False Claims Act | Pending |
| The Southern New England Telephone Co, et al. | Verizon and Sprint | Breach of Contract | Pending |
| Frontier Communications Corp. | United States | Tort | Pending |
| Frontier Communications Corp., et al. | JCM Farming | Breach of Contract | Pending |
| Frontier Communications of New York, et al. | New York, Florida | 911 Tax Litigation | Pending |

---

[1]    Certain federal and state agencies, including public utilities commissions and state attorneys general, monitor and exercise oversight related to customer service and consumer protection matters, including those affecting the communications industry. Such agencies may choose to launch actions or investigate our business practices in response to customer complaints or other publicized customer service issues.  Such investigations that have not resulted in the initiation of a material action or proceeding are not listed here.

| Entity | Counterparty | Nature of the Claim | Status |
|---|---|---|---|
| Frontier Communications of the Carolinas, LLC, et al. | North Carolina Attorney General | 911 Tax Litigation | Pending |
| Frontier Communications Corp. | United Access Technologies | Patent Infringement | Pending |
| Frontier California, Inc. | California Attorney General | Environmental Litigation | Pending |
| Citizens Telecommunications Co. of West Virginia | Robert Riffe | Tort | Pending |
| Frontier Telephone of Rochester, Inc., et al. | Estate of Brinkworth | Tort | Pending |
| Frontier Communications Corp. | Bailey | Tort | Pending |
| Frontier California, Inc. | Mainor Velasquez Garcia | Tort | Pending |
| Frontier Communications Corp. | Katherine Willard | Tort | Pending |
| Frontier Communications Corp., Frontier California | California Wage & Hour Class Actions | Employment | Pending |
| Frontier Communications Corp. | U.S. Federal Trade Commission | Regulatory | Pending |
| Frontier North, Inc. | Public Utilities Commission of Ohio | Regulatory | Pending |

## Exhibit M

### The Debtors' Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| *Bernie Han*, President and Chief Executive Officer | Bernard L. "Bernie" Han was appointed President and Chief Executive Officer and a member of the Company's Board of Directors of Frontier Communications on December 3, 2019. Bernie Han most recently served as DISH's Executive Vice President of Strategic Planning from 2016 to 2018. Prior to that, he served as Chief Operating Officer of DISH for six years, overseeing the company's Finance, Marketing, Sales, Customer Retention, Operations, Information Technology, Product, Programming and Media Sales organizations. He began his career at DISH as Chief Financial Officer in 2006. Mr. Han also has more than 20 years of experience in the airline industry. He previously worked as Chief Financial Officer at Northwest Airlines, and Chief Financial Officer and Chief Marketing Officer at America West Airlines. Earlier in his career, he worked in financial planning and analysis for American Airlines and as a systems engineer for Hughes Aircraft Company. He received his Master of Business Administration, Master of Electrical Engineering and Bachelor of Science degrees from Cornell University. Mr. Han currently serves on the Board of Directors of Frontier Airlines. | 2019-Present |
| *Mark D. Nielsen*, Executive Vice President, Chief Transaction Officer, and Chief Legal Officer | Mark D. Nielsen is Executive Vice President, Chief Legal Officer and Secretary of Frontier Communications. In this position, Nielsen has leadership responsibility for the Company's legal and regulatory affairs, real estate operations, and corporate communications. In 2019, his role was expanded to include the position of Chief Transaction Officer in connection with the Company's consideration of financial restructuring alternatives. Nielsen started his legal career in 1990 as an associate lawyer at the Hartford law firm of Murtha, Cullina, Richter & Pinney, while simultaneously serving in the Connecticut Legislature. Later, he served as Mitt Romney's legal counsel, and then chief of staff, when Romney was Governor of Massachusetts (2003–2007). As Chief Legal Counsel, Nielsen provided advice on legal aspects of policy decisions, drafted legislation and executive orders, and served as the Governor's principal advisor on judicial appointments. As Chief of Staff, he was responsible for the Administration's policy and legislative initiatives, as well as overseeing the daily operations of state government. Before joining Frontier in 2014, Nielsen served as Vice President and Associate General Counsel at Raytheon Company from 2007 to 2009, and Vice President and Associate General Counsel at Praxair, Inc. from 2009 to 2014. Nielsen is an honors graduate of Harvard College and Harvard Law School. He serves as a member of the adjunct faculty of Columbia Law School. | 2014-Present |

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| *Sheldon Bruha*, Executive Vice President and Chief Financial Officer | Sheldon Bruha was appointed Executive Vice President and Chief Financial Officer effective June 3, 2019. He served as Interim Chief Financial Officer since September 1, 2018. Mr. Bruha joined Frontier as Senior Vice President and Treasurer in February 2018. Prior to joining Frontier, Mr. Bruha's career in global finance included positions at CDI Corp. and senior financial positions heading corporate finance, treasury, tax, and investor relations for Cable & Wireless Communications in Miami and London. He started his financial career at Lehman Brothers, the global investment bank, and held senior investment banking positions in its New York and London offices, focusing on the telecommunications industry. Mr. Bruha is an honors graduate of Washington University in St. Louis with a bachelor's degree in business administration. | 2018-Present |
| *Kenneth Arndt*, Executive Vice President and Chief Operations Officer | Kenneth Arndt is Executive Vice President and Chief Operations Officer, reporting to the CEO. He is responsible for all field operations in 29 states in addition to Customer Premises Equipment and the Advanced Network Group. Previously he was EVP of Commercial Sales Operations. Mr. Arndt also had oversight of Frontier's operations in Connecticut, New York, Ohio, Pennsylvania and West Virginia. Since joining the company in 2003, Mr. Arndt has held numerous strategic leadership positions in all aspects of operations, sales, customer care, Internet customer support, products and services and employee training and management. Before joining Frontier, Mr. Arndt served as Vice President of Marketing for Lucent Technologies and Vice President of Sales and Marketing for Commonwealth Telephone Company in Pennsylvania. Mr. Arndt holds a B.S. in Marketing from Trinity University in San Antonio, Texas and an M.B.A. in Marketing from St. John College, Middlesex School of Business, in London. | 2003-Present |
| *Elisa Bannon-Jones*, Executive Vice President and Chief Human Resources Officer | Elisa Bannon-Jones is Executive Vice President, Chief Human Resources Officer for Frontier Communications. She is responsible for developing and executing the human resource strategy in support of the overall business plan and strategic direction of the organization. The human resource group includes compensation and benefits, talent acquisition, performance and development, labor relations, and general human resources. Prior to joining Frontier Communications in 2016, Ms. Bannon-Jones served in human resources, sales and operations leadership roles at The Budget Group, T-Mobile, U.S. Cellular, and Brightstar Corp. Ms. Bannon-Jones earned a Bachelor of Science degree in Business Management and Leadership and a Master of Science in Higher Education, specializing in Adult Education, from Capella University. She has certifications from the Kellogg Strategic Human Resources program, Cornell Women in Executive Leadership, and a Master of Human Capital Strategist Designation in Organizational Effectiveness from the Human Capital Institute. She is a member of the Consero Talent Management Advisory Board and the Capella University School of Business & Technology Business Advisory Board. | 2016-Present |

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| *Steve Gable*, Executive Vice President and Chief Technology Officer | Steve Gable became Executive Vice President and Chief Technology Officer (CTO) in April 2015. He joined Frontier Communications in November 2012 as Senior Vice President and Chief Information Officer. Prior to Frontier, Mr. Gable was Executive Vice President/CTO of Tribune Company. At the same time, he was President, Tribune Digital, with expanded responsibility for the strategy and supporting technology that powered the company's digital brands latimes.com and chicagotribune.com. From 2008 to 2010, Mr. Gable was Senior Vice President and CTO of Tribune Company, responsible for all aspects of information technology systems for its TV and newspaper operations. Before this, Mr. Gable served as Vice President of Technology for Clear Channel Radio, responsible for the technology strategy and direction of 1200+ radio stations. He earned a Bachelor's degree in Business Administration and a Master's degree in Systems from Northwestern University. | 2012-Present |
| *John J. Lass*, Executive Vice President and Chief Transformation Officer | John Lass is Executive Vice President & Chief Transformation Officer, designated with leading Frontier's multi-year program to improve the customer experience, build our product line and grow the company. He reports to the Chief Executive Officer. Previously, he led Frontier's Field Operations team. Before this, Mr. Lass was President of Frontier's Central Region, comprising Illinois, Indiana, Iowa, Michigan, Minnesota and Nebraska. Mr. Lass' tenure with Frontier includes a variety of operating roles as well as leadership of integration activities related to significant mergers and acquisitions. He served as Vice President of Revenue Assurance and as Regional Operations Vice President, Vice President and General Manager of Citizens Utilities Vermont Electric Division and held operations positions in New York and the Midwest with Frontier, GTE and Contel. He earned a B.S. in Civil Engineering from Iowa State University in Ames, Iowa and an Associates of Arts Degree from Iowa Central Community College. | 1994-Present |
| *John Maduri*, Executive Vice President and Chief Customer Officer | John Maduri is Executive Vice President & Chief Customer Officer, leading sales and marketing for Frontier's commercial and consumer businesses. Previously, he was Executive Vice President, Consumer Sales, Marketing & Product for Frontier. With more than 30 years of experience in the telecommunications industry, previously Mr. Maduri was President of Cable & Wireless Communications' Commercial Business Unit, responsible for the creation and growth of that key operating segment in the Caribbean and Latin America. From 2005 to 2013, Mr. Maduri was CEO of Xplornet Communications Inc., where he built the business from a start-up into Canada's leading rural broadband provider. Mr. Maduri served as president of Telus, a $9.7B telecommunications company in Calgary, Alberta, Canada, from 2000 to 2004. He was directly responsible for all sales channels, marketing, product management, delivery, and customer support. Prior to joining Telus, Mr. Maduri held positions of increasing responsibility with Rogers Communications, Canada's largest publicly-traded national wireless services provider. His positions included Executive Vice President, Finance and Planning, and Chief Financial Officer. He began his career as a Senior Auditor at the Toronto office of Price Waterhouse. Mr. Maduri holds a Bachelor of Business Administration degree from York University in Toronto. | 2017 - Present |

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| *Donald Daniels*, Senior Vice President and Chief Accounting Officer | Appointed Senior Vice President and Chief Accounting Officer in 2018. Mr. Daniels was previously the Senior Vice President and Controller for Frontier. From October 2002 to July 2014 he held various positions with JetBlue Airways Corporation, including Corporate Controller, Chief Accounting Officer, Vice President and Controller, Assistant Controller, and Director of Financial Reporting. Prior to that Mr. Daniels held various positions of increasing responsibility at Delta Air Lines and Deloitte and Touche, LLP. Mr. Daniels is a veteran of the United States Army and a certified public accountant. | 2014-Present |

**Exhibit N**

**The Debtors' Payroll for the 30 Day Period
Following the Filing of the Debtors' Chapter 11 Petitions**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained the Debtors.

| Payments | Payment Amount |
|---|---|
| Payments to employees (not including officers, directors, and stockholders) | $27,700,000 |
| Payments to officers, directors, and stockholders | $460,000 |
| Payments to financial and business consultants[1] | - |

---

[1]    Pursuant to the retention applications filed, or to be filed, by these professionals, and the applicable Bankruptcy Rules and Local Rules, the Debtors will not make any payment to financial and business consultants in the 30-day period following the filing of the chapter 11 petitions.

**<u>Exhibit O</u>**

**The Debtors' Estimated Cash Receipts and Disbursements for the
Thirty (30) Day Period Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Type | Amount |
|------|--------|
| Cash Receipts | $ 636,621,000 |
| Cash Disbursements | $ 513,061,000 |
| Net Cash Gain | $ 123,560,000 |
| Unpaid Obligations (excluding professional fees)[1] | $ 395,024,000 |
| Unpaid Receivables (excluding professional fees) [2] | $ 675,723,000 |

---

[1] Total Accounts Payable as of February 29, 2020

[2] Total Net Accounts Receivable as of February 29, 2020