Stephen E. Hessler, P.C.
Mark McKane, P.C. (*pro hac vice* pending)
Patrick Venter
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Chad J. Husnick, P.C.
Benjamin M. Rhode (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| FRONTIER COMMUNICATIONS CORPORATION, *et al.*,[1] | ) | Case No. 20-22476 (RDD) |
| Debtors. | ) | (Joint Administration Requested) |

**DEBTORS' MOTION**
**FOR ENTRY OF INTERIM AND FINAL ORDERS**
**AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION EMPLOYEE WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EMPLOYEE EXPENSES AND (II) CONTINUE EMPLOYEE BENEFITS PROGRAMS**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion"):

## Relief Requested

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"),

[1] The last four digits of Debtor Frontier Communications Corporation's tax identification number are 9596. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/ftr. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: 50 Main Street, Suite 1000, White Plains, New York 10606.

authorizing the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable employee expenses and (b) continue employee compensation and benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto. In addition, the Debtors request that a final hearing be scheduled by the Court (as defined below) within approximately twenty-five days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated February 1, 2012. The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

## Background

5. Frontier Communications Corporation is a publicly held provider of telecommunications services and the fourth largest Incumbent Local Exchange Carrier in the United States, offering a broad portfolio of communications services for 4.1 million consumer,

commercial, and wholesale customers. Through a series of acquisitions culminating with the 2016 purchase of Verizon Communications Inc.'s ("Verizon") broadband and landline services in the states of California, Texas, and Florida (the "CTF Transaction"), the Debtors transformed in scale from a provider of services in mainly rural areas into one of the largest telecommunications businesses in the United States, with 2019 revenue of approximately $8.1 billion.

6. In the years since the completion of the CTF Transaction, the Debtors have faced industry headwinds stemming from fierce competition in the telecommunications sector and changing consumer preferences. Moreover, shifting technology has redefined what infrastructure telecommunications companies need to excel in the industry, most notably an industry overhaul from broadband networks relying on copper cables to those relying on optical fiber. These conditions have rendered the Debtors' approximately $17.5 billion in outstanding funded debt unsustainable.

7. Rather than execute a liability management transaction that would at best delay maturities without addressing their capital structure in a comprehensive manner, the Debtors have negotiated with their key stakeholders. After extensive, arm's-length negotiations that played out over several months, the Debtors executed the Restructuring Support Agreement with certain holders of unsecured notes (the "Noteholder Groups"), which puts the Debtors on a path to file a plan of reorganization during the course of these chapter 11 cases that would maximize stakeholder recoveries, allow operational continuity, and ensure a viable enterprise upon emergence.

8. On April 14, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Carlin*

*Adrianopoli, Executive Vice President of Strategic Planning, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion.[2]

9. The Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrent with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

**The Debtors' Workforce**

10. As of the Petition Date, the Debtors employed approximately 17,700 employees (the "Employees"), the majority of whom are full-time Employees. Approximately 13,200 Employees are compensated on an hourly basis, and approximately 4,500 are salaried. As of the Petition Date, the Debtors are party to 57 collective bargaining agreements (the "CBAs"). Approximately 12,400 unionized Employees are represented pursuant to the CBAs (the "Represented Employees"). In light of the significant number of CBAs and varying policies across locations, the Debtors categorize their Employees into "benefit authorization groups" ("BAGs") to facilitate the administration of benefits. The Debtors' Employees are categorized in 163 different BAGs.

11. The Employees perform a wide variety of functions which will be critical to the Debtors' go-forward business operations and the administration of these chapter 11 cases. In many instances, the Employees include personnel who are intimately familiar with the Debtors' businesses, processes, and systems and who possess unique skills and experience regarding the

[2] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

Debtors' core business segments. Without the continued, uninterrupted services of the Employees, the ability of the Debtors to maintain and administer their estates will be materially impaired, and the Debtors' ongoing business could be severely and adversely affected.

12. Further, from time to time, the Debtors retain specialized individuals, directly or through third parties, as independent contractors to supplement their workforce (collectively, the "Independent Contractors").[3] There are five primary subsets of Independent Contractors: PeopleScout Contractors, Construction Contractors, Call Center Workers, Supplemental Management, and Other Independent Contractors (each as defined herein).

13. The Debtors hire certain Independent Contractors through PeopleScout to complete specific tasks related to computer/software engineering, telecom/network engineering, and back-office analysis (the "PeopleScout Contractors"). The PeopleScout Contractors generally work full time as dedicated resources for the Debtors until their respective projects are completed. In 2019, the Debtors hired approximately 500 PeopleScout Contractors, from more than 70 firms, with an average monthly spend of $4 million. PeopleScout receives a fee for this service, usually around two to three percent, averaging $85,000 per month. The Debtors also retain construction engineer Independent Contractors to design outside plant projects (the "Construction Contractors"). The Construction Contractors are paid hourly for one-off engineering projects, which do not require them to become a dedicated resource for the Debtors. In 2019, the Debtors hired 430 Construction Contractors, with an average monthly spend of $4.3 million. The Debtors also utilize third-party call center providers to source staff for call centers (the "Call Center Workers"). The Call Center Workers manage call center operations not covered by Employees,

[3] The costs associated with the Independent Contractors and Temporary Staff, as detailed below, are subject to substantial fluctuation on a month-to-month basis. For the avoidance of doubt, the Debtors request authority to utilize Independent Contractors and Temporary Staff as necessary to meet seasonal needs.

and the Debtors pay for their services by productive hour. In 2019, the Debtors' average monthly spend for Call Center Workers was $10.7 million.

14. In recent months, the Debtors have brought in eight Independent Contractors to support the operations and initiatives of the management team (the "Supplemental Management"). The Supplemental Management contractors are paid comparably to Employees who fulfill similar roles for the Debtors and their peers in the industry, with compensation ranging from $15,000 per month to $55,000 per month plus reimbursement of expenses (no supplemental compensation or benefits programs are provided). In the aggregate, the Debtors spend approximately $240,000 per month on the Supplemental Management contractors.

15. In addition to the four subsets covered above, there are some independent contractors (the "Other Independent Contractors") hired to perform specific projects that are not sourced through PeopleScout. Examples of tasks performed by the Other Independent Contractors include product and sales training and consulting. The Debtors utilized three Other Independent Contractors in 2019, with an average monthly spend of $90,000.

16. The Debtors also hire temporary workers (the "Temporary Staff") in response to event-driven shortages to their install-and-repair workforce. Examples of events that generate a need for Temporary Staff are weather-related outages and other labor shortages. During these shortages, the Debtors hire the Temporary Staff through various telecommunication contractors to maintain a sufficient install-and-repair workforce. In 2019, the Debtors brought in over 310 workers as Temporary Staff, with an average monthly spend of $1.2 million.

17. The Employees, the Independent Contractors, and the Temporary Staff rely on their compensation and benefits to pay their daily living expenses. These individuals could experience significant financial hardship if the Court does not permit the Debtors, directly or through the third

parties that manage their roles for the Debtors, to continue paying their compensation and providing them with health and other benefits. Accordingly, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

## Employee Compensation and Benefits

18. By this Motion, the Debtors seek authority to: (a) pay and honor certain prepetition claims relating to, among other things, Wage Obligations, Unpaid Contractor and Temporary Staffing Obligations, Withholding Obligations, Reimbursable Expenses, Incentive and Retention Programs, the Relocation Program, Director Compensation, Health and Welfare Coverage and Benefits, Workers' Compensation Programs, the 401(k) Plans and other retiree benefits, Paid Time Off Benefits, Tuition Benefits, Severance Benefits, and certain other benefits that the Debtors have historically provided in the ordinary course (each as defined below, and collectively, the "Employee Compensation and Benefits") and (b) pay all costs related to or on account of the Employee Compensation and Benefits, including administrative costs.[4]

19. Subject to Court approval, the Debtors intend to continue their applicable prepetition Employee Compensation and Benefits in the ordinary course. Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, and/or discontinue any of their Employee Compensation and Benefits and/or to implement new programs, policies, and benefits in the ordinary course of business on a postpetition basis during these chapter 11 cases, consistent with the terms of the Restructuring Support Agreement, and without the need for further Court approval, subject to applicable law. Additionally, the Debtors request

[4] The Debtors have provided details regarding certain administrative costs where applicable, but, for the avoidance of doubt, request authority to pay all administrative costs associated with the Employee Compensation and Benefits, regardless of whether such costs are specifically described herein.

authority to make industry-standard non-ordinary course adjustments to the Employee Compensation and Benefits in response to the ongoing COVID-19 pandemic (*e.g.*, implementation of hazard pay for field workers) without the need for Court approval.

20. To the extent that any amounts owed to any Employees on the Petition Date exceed the statutory cap of $13,650 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, the Debtors seek approval to pay any such amounts solely pursuant to the Final Order.

## I. Employee and Director Compensation, Withholding, Payroll Processing, Expense Reimbursement, Incentive and Retention Programs, and Relocation Stipends.

### A. Wage Obligations.

21. In the ordinary course, the Debtors incur obligations to their Employees for, among other things, salaries, wages, overtime, Commissions (as defined below), and other similar obligations (collectively, the "Wage Obligations"). The Wage Obligations accrue on either a salaried or hourly basis, and Employees are generally paid in arrears on either a semi-monthly, bi-weekly, or weekly basis, depending upon their BAG. The Debtors periodically evaluate non-Represented Employees for potential merit-based raises, and Represented Employees' wages are generally increased annually, typically around the anniversary of their respective CBA's ratification. Additionally, Represented Employees receive an annual supplemental payment pursuant to their CBAs (in 2019, these supplemental payments totaled $8.3 million). In 2019, the Debtors' average monthly gross Wage Obligations were approximately $160 million. The majority of the Debtors' payroll is made by electronic direct deposits of funds to the Employees' bank accounts. A small percentage of Employees are paid by check.

22. Certain of the Debtors' Employees receive commissions (the "Commissions") as a substantial percentage of their income. The Debtors maintain several Commission programs, primarily regarding commercial and residential sales and service, including call center sales and

service. The Debtors also maintain smaller commission programs based on individual Employee contracts or discrete business projects, such as a real estate services program and a video ad sales program. As of the Petition Date, the Debtors estimate that they owe approximately $2.4 million in accrued but unpaid Commissions on account of all programs.

23. The residential and commercial sales programs provide for payments to approximately 440 Employees. Eligible Employees receive monthly or quarterly Commission payments for reaching or exceeding their recurring revenue quota for new sales to commercial or residential customers. These Commission payments are generally calculated as a percentage of the monthly quota, but Commission structures can vary based on sales role, employment level, and products sold.

24. The call center program provides for monthly commission payments to approximately 1,300 Employees. The call center program Commissions are based on sales, activations, customer care metrics, and revenues originating from call centers. Additionally, certain call center employees participate in a "pay-for-performance" program, which awards eligible non-insider Employees increased hourly compensation up to $3 an hour for satisfying certain performance metrics in the preceding quarter.

25. Because Employees are generally paid in arrears, certain prepetition Wage Obligations may be due and owing as of the Petition Date. Further, additional prepetition Wage Obligations may be due and owing as a result of (a) discrepancies that may exist between the amounts actually paid by the Debtors and the amounts that the Debtors were required to pay and (b) checks issued to Employees before the Petition Date that may not have been presented for payment, or may not have cleared the Debtors' banking system and, accordingly, may not have been honored and paid as of the Petition Date.

26. As of the Petition Date, the Debtors estimate that they owe approximately $49 million on account of accrued but unpaid Wage Obligations. The Debtors do not believe that they have outstanding Wage Obligations to any Employee in excess of the statutory cap of $13,650 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. For the avoidance of doubt, the Debtors do not seek authority to pay any amounts in excess of $13,650 to any Employee pursuant to the Interim Order. Accordingly, the Debtors respectfully request that the Court authorize them to continue such programs and policies and to pay any prepetition or postpetition claims with respect thereto, in each case in the ordinary course of business on a postpetition basis.

**B. Independent Contractor and Temporary Staffing Obligations.**

27. As of the Petition Date, the Debtors retain approximately 750 Independent Contractors and approximately 400 Temporary Staff to provide specialized services, complete discrete projects, or provide services on a temporary basis. In 2019, the Debtors incurred a monthly average of approximately $20.4 million on account of payments to Independent Contractors and Temporary Staff. In addition, as of the Petition Date, the Debtors estimate that they owe the Independent Contractors and Temporary Staff an aggregate of approximately $20.4 million on account of services rendered prior to the Petition Date (the "Unpaid Contractor and Temporary Staffing Obligations"). The Employees rely on the support of the Independent Contractors and Temporary Staff to complete certain tasks in furtherance of the Debtors' business. Examples of tasks performed by the Independent Contractors and Temporary Staff include computer/software engineering tasks, telecom/network engineering tasks, back-office analysis, call center operation, construction engineering projects, and supplementing the install-and-repair workforce. The Debtors believe that the authority to continue paying their Independent Contractors and Temporary Staff is critical to maintaining and administering their estates.

28. To the extent that any amounts owed to any Independent Contractors and Temporary Staff (or to any third party managing individuals serving in those capacities) on the Petition Date exceed the statutory cap of $13,650 per individual set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, the Debtors seek approval to pay any such amounts solely pursuant to the Final Order. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue such programs and policies on a postpetition basis and to pay any prepetition or postpetition claims with respect thereto, in each case in the ordinary course of business.

**C. Withholding Obligations, Payroll Taxes, and Payroll Processing.**

29. During each applicable payroll period, and subject to applicable law, the Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and similar deductions, as well as other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, legally ordered deductions, union dues, and other miscellaneous deductions (collectively, the "Deductions"), and forward such amounts to various third-party recipients.

30. In addition to the Deductions, certain federal and state laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities.[5] The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based on a percentage of

---

[5] In accordance with a recent federal stimulus package (the "CARES Act"), the Debtors began deferring their employer FICA contributions on April 1, 2020, and plan to defer such contributions for the remainder of 2020.

gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities in accordance with remittance intervals and deadlines established by those taxing authorities.

31. In 2019, the Debtors accumulated a monthly average of approximately $59 million on account of the Deductions and the Payroll Taxes (collectively, the "Withholding Obligations"). As of the Petition Date, the Debtors estimate that they owe approximately $21 million on account of the Withholding Obligations. In addition, certain Withholding Obligations, including Payroll Taxes, are processed by Automatic Data Processing, Inc. ("ADP"). The Debtors pay ADP approximately $6,000 each month for these administrative services. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue such programs and policies on a postpetition basis and to pay any prepetition or postpetition claims with respect thereto, in each case in the ordinary course of business.

**D. Reimbursable Expenses.**

32. Prior to the Petition Date, in the ordinary course of business and subject to applicable law, the Debtors reimbursed certain Employees for approved expenses incurred in the scope of their employment on behalf of the Debtors (the "Reimbursable Expenses"). Similarly, the Debtors pay for certain Reimbursable Expenses directly through a corporate credit card provided by American Express (the "Corporate Card"). Reimbursable Expenses include, among other expenses, home office expenses, office supplies, training fees, boot reimbursements for Represented Employees, and travel-related expenses, such as air travel, hotel charges, agency booking fees, meal allowances, car mileage allowances, car rentals, and business-related entertainment expenses. Reimbursement requests (including Corporate Card charges) above $25

must have a receipt, and all reimbursements, regardless of amount, must be approved by a manager.

33. Employees who pay for their own Reimbursable Expenses up front apply for reimbursement of such expenses by submitting an expense report to the Debtors. Once the Debtors determine that the charges are for allowable Reimbursable Expenses, they typically reimburse such Employees for any such expenses. Conversely, expenses incurred by Employees that are determined not to be allowable Reimbursable Expenses are not reimbursed and remain the Employee's responsibility. Reimbursements are processed using expense management software from Concur Technologies, Inc. (the "Concur Software"). The Debtors pay approximately $40,000 each quarter for these services, exclusive of incremental transaction fees that are incurred if the contracted base transaction count is exceeded. Once reimbursements are processed, they are paid through payroll.

34. Certain of the Reimbursable Expenses are processed through the Corporate Card. Under the Corporate Card program, Reimbursable Expenses that would otherwise be paid up front by Employees and then reimbursed by the Debtors are instead charged directly to the Corporate Card. Once the Debtors determine that the charges on the Corporate Card are for allowable Reimbursable Expenses, they typically pay the Corporate Card's bill for such charges. The Corporate Card is a joint liability credit card, and to the extent expenses are not allowable Reimbursable Expenses, the Employee-cardholder is responsible for payment of such expenses. In 2019, approximately 3,000 Employees utilized a Corporate Card. The Debtors do not pay any administrative expenses in connection with the Corporate Card.

35. Employees incurred the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed or otherwise

covered by the Debtors. The Debtors' inability to reimburse the Reimbursable Expenses or pay the Corporate Card could impose a hardship on the Employees where such individuals incurred obligations for the Debtors' benefit.

36. As of the Petition Date, the Debtors estimate that they owe approximately $3.5 million on account of Reimbursable Expenses, including amounts on the Corporate Card. Accordingly, the Debtors respectfully request that the Court authorize the Debtors, in their discretion, to continue their expense reimbursement programs and policies on a postpetition basis and to pay any prepetition or postpetition claims and fees with respect thereto, in each case in the ordinary course of business, and as required by applicable law, on a postpetition basis. For the avoidance of doubt, the Debtors will not seek to pay any outstanding Reimbursable Expenses or fees related thereto in advance of the date they come due.

37. In addition to the Reimbursable Expenses, the Debtors provide fuel cards (the "Fuel Cards") to certain Employees who work as field technicians. The Employees utilize the Fuel Cards to purchase fuel for the Debtors' fleet, and the Fuel Cards are crucial for maintaining service appointments and fulfilling installations for new customers. Wright Express, the third-party administrator for the Fuel Cards, is reimbursed daily for the prior day's Fuel Card expenses. In 2019, approximately 12,000 Employees utilized Fuel Cards at a cost of approximately $37 million to the Debtors. As of the Petition Date, the Debtors estimate that they owe approximately $175,000 on account of incurred but yet unpaid Fuel Card obligations. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue the use of such Fuel Cards on a postpetition basis and to pay any prepetition or postpetition claims with respect thereto, in each case in the ordinary course of business.

**E. Incentive and Retention Programs.**

38. Historically, the Debtors have offered certain performance-based and retention-based programs to provide eligible Employees with an opportunity to receive meaningful awards for achieving certain performance goals or service milestones (collectively, the "Incentive and Retention Programs"). Additionally, from time to time as part of the ordinary operation of their business, the Debtors provide supplemental compensation to acknowledge extraordinary efforts that go beyond the scope of an Employee's typical duties and offer sign-on incentives to help recruit new hires. The Incentive and Retention Programs include the Annual Incentive Program, the Performance LTI Program, the Restructuring Success Fee, the Retention Program, and the PNW Program (each as defined herein). **At this time, the Debtors are not seeking relief related to any of the Incentive and Retention Programs described in this Section E. The following descriptions are provided for informational purposes and will be supplemented when the Debtors seek approval of these programs in pleadings to be filed later.**

39. *Annual Incentive Program*. Historically, the Debtors have provided an annual performance-based program to all eligible non-Represented Employees (the "Annual Incentive Program"). The Annual Incentive Program provides for quarterly payments to both insider and non-insider Employees, paid approximately two months in arrears, based on the applicable Employee's performance during the previous quarter as measured by Company and individual metrics.

40. *Performance LTI Program and Senior Management Retention*.[6] Similarly, the Debtors have historically provided for quarterly performance-based payments (the "Performance LTI Program"), as well as retention-based compensation for eligible insider Employees. The Performance LTI Program, like the Annual Incentive Program, is based on measured performance metrics. Performance LTI Program payments are subject to recapture contingent upon continued employment with the Debtors.

41. Previously, the Debtors also offered retention-based compensation to their senior management team. In advance of the Petition Date, the Debtors paid senior management all outstanding retention-based compensation for 2020, totaling approximately $16.9 million. For the avoidance of doubt, the Debtors do not seek to continue retention-based compensation for senior management. Any future requests related to incentive compensation for senior management will be limited to performance-based compensation.

42. *Non-Insider Retention Program*. The Debtors also maintain a retention program (the "Retention Program"), which provides eligible non-insider Employees restricted cash awards payable in quarterly installments based on continued employment with the Debtors.

43. *Pacific Northwest Transaction Completion Program*. On April 8, 2020, the Debtors provided payments in the aggregate amount of approximately $1 million to certain non-insider Employees whose diligent efforts with respect to the Pacific Northwest Transaction have gone materially beyond the traditional scope of their duties (the "PNW Program").

44. In connection with the closing of Pacific Northwest Transaction, six Employees will separate from the Debtors. As part of the relief being sought in the *Debtors' Motion for Entry*

[6] The prepetition employment contract of the Debtors' Executive Vice President, Chief Transaction Officer, and Chief Legal Officer provides for a restructuring success fee totaling $1 million to be paid in two equal parts upon plan confirmation and the effective date.

*of an Order (I) Authorizing and Approving (A) the Assumption of the Purchase Agreement, (B) the Sale of the Debtors' Pacific Northwest Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, and (C) the Debtors' Assumption of Certain Executory Contracts and Unexpired Leases, and (II) Granting Related Relief*, filed contemporaneously herewith, the Debtors will accelerate the amounts due to these Employees under the Annual Incentive Program and pay them out at the time the Pacific Northwest Transaction closes. In total, this relief will impact six Employees, who will be paid an aggregate of approximately $188,000, if the requested relief is granted.

45. The Debtors believe that the Incentive and Retention Programs are critical to maintaining Employee morale and loyalty. The Incentive and Retention Programs drive Employees' performance, align Employees' interests with those of the Debtors' generally, help maintain the Debtors' workforce, and promote the overall efficiency and safety of the Debtors' operations. The Incentive and Retention Programs form an important part of many Employees' overall compensation packages and motivate such Employees to perform better for the benefit of the Debtors' estates. Increased uncertainty around the Incentive and Retention Programs could have an adverse impact on Employee morale, cause current Employees to seek outside employment, or cause potential employees to avoid joining the Debtors, which would undermine the Debtors' ability to strengthen their financial and operational foundation and to be positioned for long-term success.

**F. Relocation Program.**

46. The Debtors offer relocation stipends (the "Relocation Program") to certain new hires to cover costs related to the relocation of an Employee. In 2019, the Debtors paid

approximately $1.3 million on account of the Relocation Program.[7] Weichert, Realtors manages the Relocation Program. The Debtors pay Weichert, Realtors a flat fee of either $845 or $1,195 per relocation, based on the relocation. As of the Petition Date, the Debtors estimate that approximately $46,000 in unpaid obligations are outstanding on account of the Relocation Program. Costs associated with the Relocation Program are billed weekly. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue the Relocation Program on a postpetition basis and to pay any prepetition or postpetition claims with respect thereto, in each case in the ordinary course of business.

**G. Non-Employee Director Compensation (Final Order Only).**

47. The Debtors maintain several boards of directors, which include a total of approximately eight non-Employees (each, a "Director"). The Directors' fees are paid quarterly in advance on the first day of the quarter. Directors are also entitled to expense reimbursement for reasonable out-of-pocket expenses in connection with travel related to their Director duties (the "Director Compensation").[8]

48. The Debtors do not believe they presently owe any prepetition amounts on account of the Director Compensation. As such, the Debtors seek, pursuant to the Final Order only, authority to pay any prepetition amounts, solely out of an abundance of caution, and to continue to pay the Director Compensation on a postpetition basis in the ordinary course of business and consistent with past practices.

---

[7] This figure reflects the costs associated with relocating approximately fifty Employees.

[8] Additional details regarding Director Compensation can be found in Frontier Communications Corporation's Form 8-K filed on June 10, 2019 (https://investor.frontier.com/Doc/Index?did=52285826).

## II. Health and Welfare Coverage and Benefits.

49. The Debtors offer their Employees the ability to participate in a number of health insurance and benefits programs, including, among other programs, medical, prescription, well-being, dental, and vision coverage plans; life and accident insurance; disability insurance; health savings account, health reimbursement account, and flexible spending account programs, and other employee benefit plans (collectively, the "Health and Welfare Coverage and Benefits"). The Health and Welfare Coverage and Benefits are, in each case, available to Employees depending on factors, including provisions under their CBA, which are reflected in their BAG.

50. The Debtors' Health and Welfare Coverage and Benefits include:

a. "Medical and Prescription Coverage": The Debtors provide a combination of fully insured and self-insured medical and prescription insurance programs in conjunction with various insurance carriers, as well as health savings account, health reimbursement account, and flexible spending account programs. In 2019, the Debtors incurred approximately $401 million on account of the Medical and Prescription Coverage. As of the Petition Date, the Debtors estimate they owe approximately $30 million on account of incurred but yet unpaid Medical and Prescription Coverage claims and associated administrative fees.

b. "Life, AD&D, and Disability Insurance Coverage": The Debtors provide Employees with basic life insurance, accidental death and dismemberment insurance, and long-term disability insurance. In 2019, the Debtors incurred approximately $20 million on account of the Life, AD&D, and Disability Insurance Coverage, including voluntary products.[9] As of the Petition Date, the Debtors estimate they owe approximately $2 million on account of unpaid Life, AD&D, and Disability Insurance Coverage.

c. "Dental and Vision Insurance Coverage": The Debtors provide a combination of fully insured and self-insured dental and vision plans in connection with various insurance carriers. In 2019, the Debtors incurred approximately $20 million on account of the Dental and Vision

[9] The Debtors are self-billed and pay for company-provided and voluntary products based on the actual enrollment of the Life, AD&D, and Disability Insurance Coverage; the amounts paid to the carriers for voluntary products are offset by withholding the appropriate amount from the applicable Employee's paycheck.

> Insurance Coverage. As of the Petition Date, the Debtors estimate they owe approximately $1.1 million on account of unpaid Dental and Vision Insurance Coverage.

51. In 2019, the Debtors incurred a monthly average of approximately $40 million on account of the Health and Welfare Coverage and Benefits, including a monthly average of $220,000 in administrative fees paid to Empyrean Benefit Solutions, which helps administer the Health and Welfare Coverage and Benefits. In 2019, the Debtors also paid Willis Towers Watson an average of $130,000 monthly for actuarial services and benefit audit services in connection with the Health and Welfare Coverage and Benefits.

52. As of the Petition Date, the Debtors estimate they owe approximately $33.1 million on account of unpaid Health and Welfare Coverage and Benefits. As described above, failure to continue the Health and Welfare Coverage and Benefits could cause Employees to experience severe hardship and make it difficult to retain the workforce. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue such programs and policies on a postpetition basis and to pay any prepetition or postpetition claims with respect thereto, in each case in the ordinary course of business.

## III. Workers' Compensation Programs.

53. In the ordinary course of business, the Debtors maintain certain workers' compensation programs, including four current workers' compensation policies in accordance with applicable state-law requirements (the "Workers' Compensation Programs").[10] The Debtors maintain workers' compensation insurance at the level required by statute for each state in which

[10] For the avoidance of doubt, the term Workers' Compensation Programs shall include all workers' compensation insurance policies (including the Legacy Workers' Compensation Policies, as defined below) issued or providing coverage at any time to the Debtors or their predecessors, whether expired, current, or prospective, and any agreements related thereto.

the Debtors conduct business to satisfy any claims made under the Workers' Compensation Programs (each, a "Workers' Compensation Claim").

54. As part of the Workers' Compensation Programs, the Debtors maintain a primary nationwide workers' compensation insurance policy administered by Zurich American Insurance Company and American Zurich Insurance Company (collectively, and with their affiliates, "Zurich," and such policy the "Zurich Multistate Policy"). On a monthly basis, the Debtors reimburse Zurich for claim payments that Zurich makes under the Zurich Multistate Policy, with such reimbursements including claims handling fees, loss-based assessment, and applicable taxes. The annual premium for the Zurich Multistate Policy was $2 million in 2019, which may be subject to adjustment after expiration of the policy period. This premium is based on the Debtors' estimated payroll for the applicable policy year. Additionally, in 2019 the Debtors paid state surcharges of approximately $939,000 in addition to the premium on the Zurich Multistate Policy.

55. In addition to the Zurich Multistate Policy, the Debtors maintain an additional policy with Zurich specifically for Wisconsin (the "Zurich Wisconsin Policy"). On a monthly basis, the Debtors reimburse Zurich for the claim payments that Zurich makes under the Zurich Wisconsin Policy, and such reimbursements include claims handling fees and applicable taxes. The annual premium for the Zurich Wisconsin Policy was $796,000 for 2019, subject to annual adjustment. In 2019, there were no state surcharges on the Zurich Wisconsin Policy.

56. To comply with applicable state law, the Debtors also maintain separate workers' compensation policies for Ohio and Washington, which require coverage through state-specific funds (collectively, the "Monopolistic State Coverage Policies"). The Debtors pay periodic (semi-annually or quarterly) premiums related to the Monopolistic State Coverage Policies directly

to the applicable states. The premiums associated with the Monopolistic State Coverage Policies were approximately $1.4 million for the 2019 policy year.

57. As part of the Workers' Compensation Programs described above, the Debtors remain liable for Workers' Compensation Claims under prior workers' compensation policies (the "Legacy Workers' Compensation Policies"). The Debtors do not pay premiums with respect to the Legacy Workers' Compensation Policies, but have posted collateral and letters of credit with the associated counterparties for certain of these policies, reimburse carriers or third parties for claim payments made under these policies, and pay administrative costs in connection with certain of these policies. In 2019, the Debtors paid approximately $12 million on account of claims and administrative costs under the Legacy Workers' Compensation Policies.

58. The Debtors must continue claim assessment, determination, adjudication (including settlement),[11] and payment pursuant to the Workers' Compensation Programs without regard to whether such liabilities were outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements. There are approximately 1,100 open Workers' Compensation Claims under the Workers' Compensation Programs, including 20 open claims in Ohio and 15 open claims in Washington, with an aggregate claimed amount totaling approximately $61.9 million. As of the Petition Date, the Debtors estimate that they owe approximately $3.1 million in prepetition liabilities on account of the Workers' Compensation Programs. Accordingly, the Debtors seek authority to (a) continue the Workers' Compensation Programs, including paying deductibles, taxes, costs, fees, and other expenses related thereto in the ordinary course on a postpetition basis, including prepetition

[11] In the previous nine months, the Debtors settled an average of five claims per month, with an average settlement payment of $180,000. For the avoidance of doubt, the Debtors request the authority to continue their settlement process and settle future claims in the ordinary course without further Court approval.

liabilities; and (b) grant limited stay relief, if, and to the extent that, the automatic stay is applicable to such claims, for claimants under the Workers' Compensation Programs to proceed with their claims, and for insurers and third-party administrators to administer, handle, settle, and pay such claims.[12]

## IV. The 401(k) Plans and Retirement Programs.

### A. The 401(k) Plans.

59. As of the Petition Date, the Debtors maintain two retirement savings plans for the benefit of their Employees that satisfy the requirements of section 401(k) of the Internal Revenue Code (each a "401(k) Plan" and together the "401(k) Plans"). Approximately 16,200 Employees participate in the 401(k) Plans.

60. The first 401(k) Plan, the Frontier Communications Corporate Services Inc. Savings and Security Plan for Mid-Atlantic Associates (the "Mid-Atlantic 401(k) Plan") is offered to 1,200 Represented Employees and allows for pre-tax and post-tax deductions of up to 25 percent of eligible compensation up to the limits set forth by the Internal Revenue Code. The Mid-Atlantic 401(k) Plan was established to provide identical benefits to former Verizon employees who transferred to the Debtors as part of a 2010 transaction and now also covers certain Represented Employees in West Virginia. The Mid-Atlantic 401(k) Plan is administered through Fidelity Investments Institutional and certain of its affiliates ("Fidelity"), which is paid approximately $70,000 annually for its services.

61. The second 401(k) Plan, the Frontier Communications 401(k) Savings Plan, is available to all remaining eligible Employees (the "Frontier 401(k) Plan"). Approximately 15,000

---

[12] Certain of the Debtors' Workers' Compensation Programs may change postpetition in the ordinary course due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue the Workers' Compensation Programs postpetition, including making any changes to current policies and practices that become necessary.

Employees participate in the Frontier 401(k) Plan, including 10,800 Represented Employees. The Frontier 401(k) Plan allows for pre-tax and post-tax salary deductions of up to 75 percent of eligible compensation up to the limits set forth by the Internal Revenue Code.[13] The Frontier 401(k) Plan is administered through Fidelity, which is paid approximately $740,000 annually for its services. Additionally, several other professionals provide advising and consulting services with respect to both the Frontier 401(k) Plan and the Mid-Atlantic 401(k) Plan. The Debtors pay approximately $1.4 million annually in the aggregate for those services.

62. The Debtors match 401(k) contributions for certain Employees (the "<u>401(k) Matching Contributions</u>"), which are generally paid simultaneously with payroll. The matching formula utilized varies by BAG—several combinations of matching percentages and match-eligible contributions exist.

63. For the Mid-Atlantic 401(k) Plan, the Debtors match either 82 percent or 100 percent of contributions, subject to a match-eligible contribution limit of 6 percent of the Employee's eligible compensation. The match percentage utilized depends upon the Employee's hire date.

64. The 401(k) Matching Contributions vary more greatly for the Frontier 401(k) Plan. All non-Represented Employees who participate in the Frontier 401(k) Plan receive a 50 percent match rate on 6 percent of eligible compensation. The Represented Employees who participate in the Frontier 401(k) Plan primarily receive either: (a) a 100 percent match rate on 6 percent of the Employee's eligible compensation; (b) an 82 percent match rate on 6 percent of the Employee's eligible compensation; (c) an 80 percent match rate on 6 percent of the Employee's eligible

---

[13] Certain Represented Employees may make post-tax contributions of up to 50 percent of their eligible compensation (reduced by the percentage of eligible compensation deferred through elective pre-tax deferrals).

compensation; (d) a 50 percent match rate on either 4 percent, 6 percent, or 8 percent of the Employee's eligible compensation; or (e) no match. The matching formula utilized depends on the governing CBA.

65. In 2019, the Debtors incurred a monthly average of approximately $4 million on account of the 401(k) Matching Contributions. As of the Petition Date, the Debtors estimate that they owe approximately $975,000 on account of the 401(k) Matching Contributions, including accrued amounts. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue offering the 401(k) Plans and to pay any fees or costs related thereto, including the 401(k) Matching Contributions, and to pay any prepetition or postpetition claims with respect thereto, in each case in the ordinary course of business, on a postpetition basis.

**B. Retirement Programs.**

66. In addition to the 401(k) Plans, as of the Petition Date, the Debtors provide two pension plans to eligible Employees (the "Pension Plans").[14] First, the Debtors provide a single-employer defined benefit pension plan (the "Frontier Pension Plan"). Approximately 12,000 Employees participate in the Frontier Pension Plan. In 2019, the Debtors incurred obligations of approximately $167 million on account of minimum required pension contributions to the Frontier Pension Plan and approximately $12.5 million on account of administrative fees and investment management fees to Milliman and various other service providers. As of the Petition Date, the Debtors estimate that they owe approximately $153 million in additional minimum required pension contributions which must be made in calendar year 2020 and approximately $1.1 million on account of administrative and management service fees.

[14] The Debtors are currently exploring deferring their 2020 pension payments in accordance with the CARES Act.

67. Second, the Debtors provide a Taft-Hartley Money Purchase multi-employer pension plan (the "CWA Pension Plan"). Approximately 314 Employees participate in the CWA Pension Plan, some of whom have frozen pension benefits in the Frontier Pension Plan. In 2019, the Debtors incurred obligations of approximately $2.4 million on account of the CWA Pension Plan. As of the Petition Date, the Debtors estimate that they owe approximately $200,000 on account of the CWA Pension Plan. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue the Pension Plans, and to pay any fees or costs and any prepetition or postpetition claims with respect thereto, in each case in the ordinary course of business, on a postpetition basis.

68. Additionally, the Debtors offer approximately 4,200 of their retired Represented Employees and 2,400 of their retired Represented Employees' dependent and surviving spouses access to medical and prescription coverage, dental and vision insurance coverage, health reimbursement accounts, life insurance, telephone concession service benefits, or other similar benefits (the "OPEB"). In 2019, the Debtors' average monthly cost of maintaining the OPEB—including associated administrative costs of approximately $40,000 per month paid to Milliman—was approximately $5.6 million. In 2019, the Debtors also paid Willis Towers Watson an average of $150,000 monthly for combined actuarial services in connection with the Frontier Pension Plan and OPEB. As of the Petition Date, the Debtors estimate that they owe approximately $3.2 million on account of OPEB. The Debtors respectfully request that the Court authorize them to continue the OPEB on a postpetition basis and to pay any prepetition or postpetition claims with respect thereto, in each case in the ordinary course of business.

69. The Debtors also make non-qualifying supplemental income payments to eleven former employees and their spouses pursuant to individual employment agreements

(the "Non-Qualifying Pension Payments"). These agreements were primarily entered into by acquired subsidiaries prior to the Debtors' acquisition of those subsidiaries. The Non-Qualifying Pension Payments differ from a standard pension because they are paid directly out of Debtor assets, not out of a formal pension fund. The Debtors utilize a trust account maintained with JPMorgan Bank, N.A., which is administered by Milliman. These payment total approximately $700,000 annually, with eight former employees receiving aggregate payments of $57,000 per month, and three former employees receiving aggregate payments of $23,000 per year. As of the Petition Date, the Debtors estimate that they owe approximately $57,000 on account of Non-Qualifying Pension Payments. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue to honor their obligations to pay the Non-Qualifying Pension Payments and to pay any prepetition or postpetition claims with respect thereto, in each case in the ordinary course of business, on a postpetition basis.

70. In addition to the Non-Qualifying Pension Payments, the Debtors also have split-dollar life insurance agreements with four former executives or their spouses (the "Split-Dollar Life Insurance Policies"), which require annual payments of approximately $6 million from the Debtors. Three of these policies require annual annuity payments every January for the remainder of the applicable insured's life. For the final policy, the Debtors pay an annual premium and gross up any taxes on the Employee's imputed income related to this policy. Upon the insured's death, this policy will make a lump-sum payment split between the Debtors and the insured's beneficiary, of which the Debtors' share will be approximately $32.9 million. Actuarial services for the Split-Dollar Life Insurance Policies are provided by American Benefits Consulting without cost to the Debtors. As of the Petition Date, the Debtors estimate that they owe approximately $6 million on account of the Split-Dollar Life Insurance Policies. The Debtors

respectfully request that the Court authorize the Debtors to continue to honor their obligations pursuant to the Split-Dollar Life Insurance Policies, and to pay any fees or costs related thereto and any prepetition or postpetition claims with respect thereto, in each case in the ordinary course of business, on a postpetition basis.

**V. Paid Time Off Benefits.**

71. The Debtors have, in the past, provided paid time off to certain eligible Employees as a benefit (the "Paid Time Off Benefits"). With the exception of Represented Employees, whose Paid Time Off Benefits are determined by their CBAs, all non-Represented Employees who work at least twenty hours per week are eligible for Paid Time Off Benefits.

72. The Debtors' Paid Time Off Benefits program combines vacation days, sick days, and personal days. Employees receive between twenty and thirty days of Paid Time Off Benefits, depending upon how long they have worked for the Debtors. Employees redeem Paid Time Off Benefits in hourly increments, and when an Employee elects to use Paid Time Off Benefits, that Employee is paid his or her regular hourly or salaried rate for the amount of time requested. Absent state law to the contrary or special arrangements made in advance due to extraordinary circumstances, Paid Time Off Benefits cannot be carried over at the end of the year. In the event an Employee is terminated, he or she is paid out for any accrued, unused Paid Time Off Benefits.

73. In 2019, the Debtors' Employees earned a monthly average of approximately $7.2 million on account of the Paid Time Off Benefits. Additionally, as of the Petition Date, the Debtors estimate that approximately $10.7 million in Paid Time Off Benefits have been earned by Employees. The Debtors seek authority to pay any amounts due with respect to earned but unused Paid Time Off Benefits for terminated Employees and to continue the Paid Time Off Benefits policies in the ordinary course on a postpetition basis. For the avoidance of doubt, the Debtors

will only seek to pay Paid Time Off Benefits in excess of the $13,650 priority cap imposed by section 507(a)(4) of the Bankruptcy Code pursuant to the Final Order, if at all.

## VI. Tuition Reimbursement.

74. The Debtors have, in the past, provided tuition reimbursement to certain eligible Employees as a benefit (the "Tuition Benefits"). Generally, all active, full-time non-Represented Employees who have completed one year of service to the Debtors are eligible for Tuition Benefits. The Tuition Benefits for certain Represented Employees are governed by union-specific agreements.

75. The Debtors generally reimburse eligible education expenses, with an annual cap of $5,500 per Employee. Eligible expenses include tuition, laboratory fees, registration fees, certain student activity fees, technology fees, library fees, and books. Tuition Benefits are only available for courses that are either (a) directly relevant to an Employee's current position or (b) would qualify the Employee for a new position upon completion.

76. The Tuition Benefits program is processed and administered through Bright Horizons Family Solutions, Inc.'s EdAssist Solutions ("EdAssist"). The Debtors pay approximately $15,000 each month in administrative fees to utilize EdAssist.

77. In 2019, the Employees redeemed a total of approximately $2.5 million in Tuition Benefits. The Debtors typically incur increased payments at certain times of the year based on typical tuition payment cycles, particularly in February and October. Additionally, as of the Petition Date, the Debtors estimate that approximately $300,000 in obligations associated with Tuition Benefits remain outstanding. Accordingly, the Debtors seek authority to continue the Tuition Benefits policies and to pay any prepetition or postpetition claims with respect thereto, as well as any administrative fees associated with EdAssist, in the ordinary course of business, on a postpetition basis.

## VII. Additional Benefits Programs.

78. In addition to the foregoing, the Debtors offer the Employees the opportunity to participate in a range of ancillary benefits, including a legal plan, employee assistance plan, pet insurance, auto and home insurance, commuter benefits, and other employee wellness programs (collectively, the "Additional Benefits Programs"). All Debtor Employees are eligible for one or more of these Additional Benefits Programs, and most Employees participate in at least one program. In 2019, the total employer cost to the Debtors for Additional Benefits Programs was $400,000. The principal Additional Benefits Programs are summarized in the following table:

| Category | Description of Benefit | Estimated Annual Spend |
|---|---|---|
| Employee Assistance Program | Employees are offered up to five visits with a licensed counselor, and work and life consultants are available to find resources and services needed for childcare, elder care, education, daily living, and similar family needs. | $433,000 |
| Commuter Benefits | The Debtors facilitate a pre-tax account for Employees to utilize to pay for public transportation and qualified parking expenses. | $202,000 |
| Legal Plan | The Debtors facilitate access to attorneys. Employees who participate are required to remain enrolled through the entire plan year and have $16.50 deducted from their pay per month. | $98,000 |
| Elective Insurance Programs | Employees can elect to purchase discounted home and auto insurance. Amounts are deducted from payroll. | $2.5 million |
| **Total Estimated Annual Spend (Including Employee Spend)** | | **$3.2 million** |

79. The Additional Benefits Programs are primarily pass-through programs for which the Debtors facilitate, but do not fund, Employee participation.[15] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue such programs and policies and to pay any prepetition or postpetition claims with respect thereto, in each case, in the ordinary course of business, on a postpetition basis.

15 The Employee Assistance Program is not a pass-through program.

## VIII. Non-Insider Severance Program Obligations.

80. The Debtors maintain several policies to provide severance benefits (the "Severance Benefits") to eligible Employees who are terminated without cause, such as terminations due to a lack of work, a reduction in workforce, or position elimination. Severance Benefits are generally paid in installments in accordance with the payroll schedule, but the Debtors reserve the discretion to pay severance in a single lump-sum payment.

### A. Non-Represented Employees.

81. Eligible full-time non-Represented Employees receive Severance Benefits typically ranging from four to twenty-six weeks of base pay, depending on their location, seniority, and job description. Additionally, eligible Employees can receive subsidized continued medical, dental, and vision benefits under COBRA for certain periods, depending upon their length of service to the Debtors, and some terminated Employees are offered career transition services. Such employees may subsequently continue their health benefits under COBRA at their own expense upon conclusion of the subsidized period.

82. In 2019, the Debtors incurred approximately $10.4 million on account of Severance Benefits to non-Represented Employees. As of the Petition Date, the Debtors estimate that there are approximately $12,000 outstanding on account of unpaid obligations related to the Severance Benefits owed to non-insider, non-Represented Employees, all of which are owed on account of COBRA subsidies for Employees who separated from the Debtors within 180 days of the Petition Date.[16] The Debtors seek authority to pay any prepetition amounts on account of the Severance Benefits to non-insider, non-Represented Employees and to continue to honor obligations in

[16] On April 8, 2020, the Debtors paid all non-COBRA then-outstanding amounts, totaling approximately $450,000, on account of sixty-one months' worth of obligations related to Severance Benefits owed to seven non-Represented Employees.

respect of the Severance Benefits solely to non-insider, non-Represented Employees in the ordinary course of business and consistent with historical practices. To the extent any non-Represented Employee is owed amounts in excess of the $13,650 cap imposed by section 507(a)(4) of the Bankruptcy Code on account of unpaid obligations related to the Severance Benefits, the Debtors seek authority, solely pursuant to the Final Order, to pay such amounts.[17]

**B. Represented Employees.**

83. Represented Employees' Severance Benefits are outlined in their respective CBAs, with benefits ranging anywhere from one to fifty-two weeks of base pay, with a few CBAs providing for uncapped Severance Benefits. Additionally, Represented Employees can receive one to six months of continued health benefits under COBRA, some of which may be subsidized. Severance Benefits for Represented Employees depend primarily upon length of service.

84. Additionally, on November 22, 2019, the Debtors reached an agreement with one of their labor constituencies to offer a severance buyout program that would allow the applicable Represented Employees the option to retire early in exchange for three years of continued medical

[17] For the avoidance of doubt, solely pursuant to the Final Order, the Debtors request authority to honor their obligation to remit a $250,000 severance payment to Daniel J. McCarthy, the Company's former CEO, on the first regularly scheduled payroll date in June 2020. The Debtors also have an obligation to provide approximately $16,000 worth of COBRA subsidies to Mr. McCarthy over the next fourteen months. The Debtors maintain that Mr. McCarthy does not constitute an insider pursuant to Second Circuit authority, which follows the "exact date" doctrine on insider status. The "exact date" doctrine provides that it is the date of the transfer of funds that is relevant to evaluating insider status, not the date of the associated negotiation. *Cf. In re Tribune Company Fraudulent Conveyance Litigation*, 2018 WL 6329139 (S.D.N.Y. Nov. 30, 2018) ("[W]ith only one exception, every court to have considered the issue since *Barnhill* has concluded that the transferee must be an insider on the exact date when the transfer was effected in order for Section 547(b)(4)(B) to apply."). Mr. McCarthy separated from the Company on December 3, 2019.

Similarly, the Debtors owe $8,000 in COBRA subsidies to a former SVP of Carrier Services & Customer Premises Equipment, who separated from the Debtors on February 14, 2020.

benefits and one year of base pay.[18] A total of 341 Employees opted into this voluntary severance buyout program, resulting in an aggregate $3.1 million lump-sum payment to 51 retirees and a continuing obligation to contribute $24.5 million to the Frontier Pension Plan over a five-year period on account of the other 290 retirees. As part of the relief requested with respect to Severance Benefits, the Debtors request authority to continue making any payments necessary to honor their obligations under the November 22, 2019 agreement.

85. In 2019, the Debtors incurred approximately $21.6 million on account of Severance Benefits to Represented Employees. As of the Petition Date, the Debtors estimate that there are approximately $1.8 million outstanding on account of unpaid obligations related to the Severance Benefits owed to Represented Employees. The Debtors seek to continue to honor obligations in respect of the Severance Benefits owed to non-insider Represented Employees in the ordinary course of business and consistent with historical practices. To the extent any Represented Employee is owed amounts in excess of the $13,650 cap imposed by section 507(a)(4) of the Bankruptcy Code on account of unpaid obligations related to the Severance Benefits, the Debtors seek authority, solely pursuant to the Final Order, to pay such amounts.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits Obligations.

#### A. Certain of the Employee Compensation and Benefits Are Entitled to Priority Treatment.

86. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Employee Compensation and Benefits to priority treatment. As priority claims, the Debtors are

[18] For the 290 participants who are retirement eligible, the buyout severance payments are contributed into the Frontier Pension Plan over a five-year period and are distributed to the Employees in the normal course of their pension annuity payments.

required to pay these claims in full to confirm a chapter 11 plan. *See* U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for (a) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan). To the extent that an Employee receives no more than $13,650 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties. Finding, attracting, and training new qualified talent would be extremely difficult and would most likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

**B. Payment of Certain Employee Compensation and Benefits Is Required by Law.**

87. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party payees. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' wages. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' wages on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Further, federal and state laws require the Debtors to withhold certain tax payments from Employees' wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that a state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between the debtor and the city for

payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request authorization to transmit the Withholding Obligations to the proper parties in the ordinary course of business.

88. Similarly, state laws require the Debtors to maintain the Workers' Compensation Programs. If the Debtors fail to maintain the Workers' Compensation Programs, state laws may prohibit the Debtors from operating in those states. Payment of all obligations related to the Workers' Compensation Programs is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

## II. Payment of the Employee Compensation and Benefits Is Warranted Under Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity.

89. Courts generally acknowledge that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); *see also In re James A. Phillips, Inc.*, 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers who were potential lien claimants). In authorizing payments of certain prepetition obligations, courts have relied on several legal theories, rooted in sections 1107(a), 1108, 363(b), 507, and 105(a) of the Bankruptcy Code.

90. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's

going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

91. Consistent with a debtor's fiduciary duties, courts have also authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g., In re Ionosphere Clubs*, 98 B.R. at 175 (discussing prior order authorizing payment of prepetition wage claims pursuant to section 363(b) and noting that relief is appropriate where payment is needed to "preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale"); *see also In re James A. Phillips, Inc.*, 29 B.R. at 397 (considering section 363 in affirming decision allowing the debtor to pay prepetition claims of suppliers who were potential lien claimants). Specifically, the business judgment standard requires that a debtor "articulate some business justification, other than mere appeasement of major creditors . . . ." *In re Ionosphere Clubs*, 98 B.R. at 175.

92. In addition, courts may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business. *See In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *see also In re Fin. News Network Inc.*, 134 B.R. 732, 735–36

(Bankr. S.D.N.Y. 1991) ("The 'doctrine of necessity' stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization."). Specifically, the Court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See Ionosphere Clubs*, 98 B.R. at 176.

93. The Debtors submit that the payment of the Employee Compensation and Benefits represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code. Paying prepetition wages, employee benefits, and similar obligations will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Indeed, the Debtors believe that without the relief requested herein, Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their business and likely diminishing stakeholder confidence in the Debtors' ability to successfully reorganize. The loss of valuable Employees and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations. Accordingly, there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefit, and related obligations, including the prepetition Employee Compensation and Benefits.

94. In addition, the majority of Employees rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees will

be exposed to significant financial difficulties if the Debtors are not permitted to honor their obligations related thereto. Failure to satisfy such obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses. Furthermore, if this Court does not authorize the Debtors to honor their various obligations under the insurance programs described herein, Employees will not receive health coverage and may therefore be obligated to pay certain healthcare claims that the Debtors have not satisfied. The loss of healthcare coverage will result in considerable anxiety for Employees (and likely Employee attrition) at a time when the Debtors need their Employees to perform their jobs at peak efficiency. Additionally, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at this critical juncture.

95. The importance of a debtor's employees to its operations has been repeatedly recognized by courts in this jurisdiction, and such courts have granted relief similar to the relief requested herein. *See, e.g., In re Deluxe Entertainment Services Group Inc.*, No 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 25, 2019) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re Barneys New York, Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y. Sept. 4, 2019) (same); *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. July 2, 2019) (same); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. Apr. 22, 2019) (same); *In re Aegean Marine Petrol. Network Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y.

Dec. 6, 2018) (same); *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. May 7, 2018) (same).[19]

96. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay any accrued and unpaid prepetition amounts on account of the Employee Compensation and Benefits and to continue the Employee Compensation and Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

## III. The Debtors Seek a Waiver of the Automatic Stay to the Extent It Applies to Workers' Compensation Claims.

97. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

Section 362 of the Bankruptcy Code, however, permits a debtor or other party-in-interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

98. If and to the extent that section 362(a) is applicable to claims under the Workers' Compensation Programs, the Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit current and former employees to proceed with their Workers' Compensation Claims in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay, if and to the extent applicable, because the Debtors have an obligation to continue to abide by applicable workers' compensation laws and requirements, and interrupting the administration of the Workers' Compensation Claims could have a detrimental effect on the

---

[19] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

financial well-being and morale of Employees and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' businesses to the detriment of all parties-in-interest.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

99. The Debtors have sufficient funds to pay the amounts described in this Motion by virtue of expected cash flows during these chapter 11 cases and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefits obligations. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion. Any such financial institution may rely on the representations of such Debtors as to which checks are issued or wire transfers are made (or, as applicable, requested to be issued or made) and such checks and transfers are authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

100. Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, authorizing the Debtors to pay the Employee Compensation and Benefits and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases and maintain the value of their estates postpetition. Failure to receive such authorization and other relief during the first

twenty-one days of these chapter 11 cases would severely disrupt the Debtors' ability to maintain their estates at this critical juncture. For the reasons discussed herein, the relief requested is necessary for the Debtors to operate their businesses in the ordinary course, preserve the going-concern value of the Debtors' operations, and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Motion Practice**

101. This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

**Reservation of Rights**

102. Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim Order and Final Order is intended or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of, all such liens. If the Court grants the relief sought herein, any

payment made pursuant to the Court's order is not intended, and should not be construed, as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

103. To successfully implement the foregoing, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

**Notice**

104. The Debtors will provide notice of this Motion to the following parties and/or their respective counsel, as applicable: (a) the United States Trustee for the Southern District of New York; (b) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis); (c) the agent under the proposed postpetition debtor in possession financing facility; (d) the administrative agents and indenture trustees under the Debtors' prepetition credit agreement and note indentures; (e) Akin Gump Strauss Hauer & Feld LLP and Milbank LLP, counsel to the Noteholder Groups; (f) the Pension Benefit Guaranty Corporation; (g) the United States Attorney's Office for the Southern District of New York; (h) the Internal Revenue Service; (i) the United States Securities and Exchange Commission; (j) the attorneys general in the states where the Debtors conduct their business operations; (k) the Federal Communications Commission; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

105. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order granting the relief requested herein and such other relief as the Court deems appropriate.

Dated: April 15, 2020
New York, New York

*/s/ Stephen E. Hessler*

Stephen E. Hessler, P.C.
Mark McKane, P.C. (*pro hac vice* pending)
Patrick Venter
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

Chad J. Husnick, P.C.
Benjamin M. Rhode (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

# **Exhibit A**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| FRONTIER COMMUNICATIONS CORPORATION, *et al.*,[1] | ) | Case No. 20-22476 (RDD) |
| Debtors. | ) | (Joint Administration Requested) |

**INTERIM ORDER AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION EMPLOYEE WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EMPLOYEE EXPENSES AND (II) CONTINUE EMPLOYEE BENEFITS PROGRAMS**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"), (a) authorizing, but not directing, the Debtors to (i) pay certain prepetition employee wages, salaries, other compensation, and reimbursable employee expenses and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto; and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having

[1] The last four digits of Debtor Frontier Communications Corporation's tax identification number are 9596. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/ftr. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: 50 Main Street, Suite 1000, White Plains, New York 10606.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on an interim basis as set forth herein.

2. The final hearing (the "Final Hearing") on the Motion shall be held on _________, 2020, at__:__ _.m., prevailing Eastern Time. Any objections or responses to the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _________, 2020, and shall be served on: (a) the Debtors, Frontier Communications Corporation, 50 Main Street, Suite 1000, White Plains, New York 10606, Attn.: Mark Nielsen; (b) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.: Stephen E. Hessler, P.C. and Patrick Venter, and Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn.: Chad J. Husnick, P.C. and Benjamin M. Rhode; (c) counsel to any statutory committee appointed in these cases; (d) counsel to the Noteholder Groups, (i) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn.: Ira S. Dizengoff, Philip C. Dublin, and Naomi Moss and (ii) Milbank LLP, 55 Hudson Yards, New York, New York 10001, Attn.: Dennis F. Dunne, Samuel A. Khalil, and Michael W. Price; and (e) the United States Trustee,

U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn.: Greg M. Zipes and Brian S. Masumoto. In the event that no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3. The Debtors are authorized, but not directed, consistent with the terms of the Restructuring Support Agreement, to continue and/or modify, change, or discontinue the Employee Compensation and Benefits and to honor and pay, in the ordinary course and in accordance with the terms of the Restructuring Support Agreement and the Debtors' prepetition policies and prepetition practices, any obligations on account of the Employee Compensation and Benefits, irrespective of whether such obligations arose prepetition or postpetition; *provided*, *however*, that pending entry of the Final Order, the Debtors shall not make any payment to, or on account of, any individual with respect to any prepetition claim on account of the Employee Compensation and Benefits in excess of $13,650 per individual; *provided, further*, that nothing herein authorizes payments pursuant to the Incentive and Retention Programs; *provided*, *further*, that, for the avoidance of doubt, the Debtors will not seek to pay any outstanding prepetition or postpetition claims with respect to the Reimbursable Expenses in advance of the date they come due.

4. The Debtors shall not make any non-ordinary course bonus, incentive, or severance payments to their Employees or any Insiders (as such term is defined in section 101(31) of the Bankruptcy Code) without further order of this Court. For the avoidance of doubt, no bonus, incentive, or severance payments shall be made to any Insider without further order of this Court. Nothing in the Motion or this Interim Order shall constitute a determination by the Court as to

whether any individual seeking payment pursuant to this Interim Order is or is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.

5. The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, is hereby lifted to permit, without further order of this Court: (a) current or former employees to proceed with their claims (whether arising prior to or subsequent to the Petition Date) under the Workers' Compensation Programs in the appropriate judicial or administrative forum; (b) insurers, including but not limited to Zurich, and third-party administrators to handle, administer, defend, settle, and/or pay workers' compensation claims and direct action claims; (c) the Debtors to continue the Workers' Compensation Programs and pay any amounts relating thereto in the ordinary course; and (d) insurers, including but not limited to Zurich, and third-party administrators providing coverage for any workers' compensation or direct action claims to draw on any and all collateral and/or prefunded loss accounts provided by or on behalf of the Debtors therefor, if and when the Debtors fail to pay and/or reimburse any insurers and third-party administrators for any amounts in relation thereto. The modification of the automatic stay in this paragraph pertains solely to claims under the Workers' Compensation Programs and direct action claims.

6. Nothing herein (a) alters or amends the terms and conditions of the Workers' Compensation Programs; (b) relieves the Debtors of any of their obligations under the Workers' Compensation Programs; (c) precludes or limits, in any way, the rights of any insurer to contest and/or litigate the existence, primacy, and/or scope of available coverage under the Workers' Compensation Programs; or (d) creates a direct right of action against any insurers or third-party administrators where such right of action does not already exist under non-bankruptcy law.

7. The Debtors are authorized, but not directed, to forward any unpaid amounts on account of Deductions or Payroll Taxes to the appropriate third-party recipients or taxing authorities in accordance with the Debtors' prepetition policies and practices.

8. The Debtors are authorized, but not directed, to pay costs and expenses incidental to payment of the Employee Compensation and Benefits obligations, including all administrative and processing costs and payments to outside professionals.

9. Nothing contained herein is intended or should be construed to create an administrative priority claim on account of the Employee Compensation and Benefits obligations.

10. Nothing in this Interim Order authorizes the Debtors to accelerate any payments not otherwise due prior to the date of the Final Hearing.

11. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized and directed to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

12. For the avoidance of doubt, other than as relating to approval or consent to entry of this Interim Order (or the proposed form hereof), any consent or approval rights of the parties to the Restructuring Support Agreement shall remain in force unaffected from and after entry of this Interim Order, solely to the extent the Restructuring Support Agreement remains in effect.

13. Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the

Debtors' or any other party-in-interest's right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Interim Order are valid, and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection of, or seek avoidance of, all such liens. No payment made pursuant to this Interim Order should be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute any particular claim on any ground.

14. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to any prepetition amounts owed to their Employees.

15. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

16. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

17. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

18. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

19. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

White Plains, New York
Dated: ____________, 2020

_________________________________
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

# Exhibit B

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| FRONTIER COMMUNICATIONS CORPORATION, *et al.*,[1] | ) | Case No. 20-22476 (RDD) |
| Debtors. | ) | (Joint Administration Requested) |

**FINAL ORDER AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION EMPLOYEE WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EMPLOYEE EXPENSES AND (II) CONTINUE EMPLOYEE BENEFITS PROGRAMS**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Final Order"), (a) authorizing, but not directing, the Debtors to (i) pay certain prepetition employee wages, salaries, other compensation, and reimbursable employee expenses and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto; and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that

[1] The last four digits of Debtor Frontier Communications Corporation's tax identification number are 9596. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/ftr. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: 50 Main Street, Suite 1000, White Plains, New York 10606.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted as set forth herein.

2. The Debtors are authorized, but not directed, consistent with the terms of the Restructuring Support Agreement, to continue and/or modify, change, or discontinue the Employee Compensation and Benefits and to honor and pay, in the ordinary course and in accordance with the terms of the Restructuring Support Agreement and the Debtors' prepetition policies and prepetition practices, any obligations on account of the Employee Compensation and Benefits, irrespective of whether such obligations arose prepetition or postpetition; *provided*, *however*, that, for the avoidance of doubt, nothing herein authorizes payments pursuant to the Incentive and Retention Programs.

3. The Debtors shall not make any non-ordinary course bonus, incentive, or severance payments to their Employees or any Insiders (as such term is defined in section 101(31) of the Bankruptcy Code) without further order of this Court. For the avoidance of doubt, no bonus, incentive, or severance payments shall be made to any Insider without further order of this Court. Nothing in the Motion, the Interim Order, or this Final Order shall constitute a determination by

the Court as to whether any individual seeking payment pursuant to this Final Order is or is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.

4. The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, is hereby lifted to permit, without further order of this Court: (a) current or former employees to proceed with their claims (whether arising prior to or subsequent to the Petition Date) under the Workers' Compensation Programs in the appropriate judicial or administrative forum; (b) insurers, including but not limited to Zurich, and third-party administrators to handle, administer, defend, settle, and/or pay workers' compensation claims and direct action claims; (c) the Debtors to continue the Workers' Compensation Programs and pay any amounts relating thereto in the ordinary course; and (d) insurers, including but not limited to Zurich, and third-party administrators providing coverage for any workers' compensation or direct action claims to draw on any and all collateral and/or prefunded loss accounts provided by or on behalf of the Debtors therefor, if and when the Debtors fail to pay and/or reimburse any insurers and third-party administrators for any amounts in relation thereto. The modification of the automatic stay in this paragraph pertains solely to claims under the Workers' Compensation Programs and direct action claims.

5. Nothing herein (a) alters or amends the terms and conditions of the Workers' Compensation Programs; (b) relieves the Debtors of any of their obligations under the Workers' Compensation Programs; (c) precludes or limits, in any way, the rights of any insurer to contest and/or litigate the existence, primacy, and/or scope of available coverage under the Workers' Compensation Programs; or (d) creates a direct right of action against any insurers or third-party administrators where such right of action does not already exist under non-bankruptcy law.

6. The Debtors are authorized, but not directed, to forward any unpaid amounts on account of Deductions or Payroll Taxes to the appropriate third-party recipients or taxing authorities in accordance with the Debtors' prepetition policies and practices.

7. The Debtors are authorized, but not directed, to pay costs and expenses incidental to payment of the Employee Compensation and Benefits obligations, including all administrative and processing costs and payments to outside professionals.

8. Nothing contained herein is intended or should be construed to create an administrative priority claim on account of the Employee Compensation and Benefits obligations.

9. The Debtors shall not make any payments on account of any Severance Benefits or Incentive and Retention Program obligations arising after the Petition Date in violation of section 503(c) of the Bankruptcy Code.

10. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized and directed to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

11. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to any prepetition amounts owed to their Employees.

12. For the avoidance of doubt, other than as relating to approval or consent to entry of this Final Order (or the proposed form hereof), any consent or approval rights of the parties to the

Restructuring Support Agreement shall remain in force unaffected from and after entry of this Final Order, solely to the extent the Restructuring Support Agreement remains in effect.

13. Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Final Order are valid, and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection of, or seek avoidance of, all such liens. No payment made pursuant to this Final Order should be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute any particular claim on any ground.

14. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

15. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

16. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

17. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

White Plains, New York
Dated: __________, 2020

_______________________________________
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE