UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x

In re:                              Chapter 11

FRONTIER COMMUNICATIONS             Case No. 20-22476 (RDD)
CORPORATION, et al.,
                                    (Jointly Administered)

        Debtors.

- - - - - - - - - - - - - - - - - x

# MODIFIED BENCH RULING ON APPLICATION TO RETAIN EVERCORE GROUP LLC AS THE DEBTORS' INVESTMENT BANKER & FINANCIAL ADVISOR

Appearances:

KIRKLAND & ELLIS LLP, attorneys for the Debtors, by Stephen
Hessler, Chad Husnick, and Patrick Venter

DEBEVOISE & PLIMPTON, attorneys for Evercore Group LLC, by
Sidney Levinson and Wendy Reilly

MILBANK LLP, attorneys for Ad Hoc Committee of Frontier
Noteholders, by Aaron Renenger and Julie Wolf

AKIN GUMP STRAUSS HAUER & FELD LLP, attorneys for Ad Hoc Group of
Consenting Noteholders, by Abid Qureshi

KRAMER LEVIN NAFTALIS & FRANKEL LLP, attorneys for Official
Committee of Unsecured Creditors, by P. Bradly O'Neill

UNITED STATES DEPARTMENT OF JUSTICE, attorney for United States
Trustee, by Greg Zipes


HON. ROBERT D. DRAIN, United States Bankruptcy Judge

        I have before me the Debtors' application for authority to

retain Evercore Group LLC ("Evercore") as their investment banker

and financial advisor, effective as of the bankruptcy petition date, April 14, 2020, pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code.

The application was originally scheduled for a July 1, 2020 evidentiary hearing because, unlike with many financial advisor/investment banker retention applications, the Debtors and their proposed financial advisor/investment banker were not able to resolve objections.

I adjourned the hearing after taking testimony on direct and cross-examination of the Debtors' three witnesses: Mr. Nielson, Mr. Mendelow, and Mr. Shah.  I did not hear at that time the objectors' evidence, including the testimony of Mr. Kramer.

In the light of, among other things, my comments at the July 1, 2020 hearing, the hearing was adjourned and the proposed engagement letter was meaningfully modified as set forth in a third supplemental declaration by Evercore's Mr. Shah.  The proposed engagement letter was subsequently amended again in a couple of respects set forth in the joint reply of the Debtors and Evercore to the objections of the ad hoc noteholder groups and the Official Committee of Unsecured Creditors not only to the original proposal but also to the penultimate proposal by Evercore and the Debtors.  The parties still have not resolved the objections, however, and so now, several months into these cases and in fact after the Debtors' chapter 11 plan has been

2

confirmed, I have heard an additional day of testimony, reviewed the documentary evidence, and concluded the evidentiary hearing on the application.

The context for this determination therefore is unusual, because unlike with the normal professional retention application that seeks approval of compensation terms under Section 328(a) of the Bankruptcy Code, there is an extensive record of the services that Evercore has actually provided, although the firm still may provide important services going forward.  Nevertheless, I have tried to apply Congress' intention with respect to Section 328(a) retentions that the Court consider the proposed compensation terms as of the time the professional was proposed to be retained, that is, largely prospectively, although I also am free to consider the facts as they now exist. See In re XO Commuc'ns, Inc., 398 B.R. 106, 115-16 (Bankr. S.D.N.Y. 2008).

This context highlights the distinctions as well as the similarities between the two ways that an estate-compensated professional can be paid, as set forth in Sections 330 and 328(a) of the Bankruptcy Code, respectively.

Section 330 of the Bankruptcy Code lists factors for evaluating a professional's request for compensation ultimately based on a reasonableness standard, or, as that section states, "reasonable compensation for actual, necessary services rendered."  11 U.S.C. § 330(a)(1)(A).  Applications for

3

compensation under Section 330 are heard at the end of the case,
although of course professionals also can seek interim
compensation under Section 331 of the Bankruptcy Code for
services performed.  Courts considering such requests are not to
apply perfect hindsight, however; to warrant compensation, a
professional's services do not necessarily have to achieve the
intended result, only to have been reasonable when performed.
See, e.g., In re Quigley Co., 500 B.R. 347, 357 (Bankr. S.D.N.Y.
2013); In re Cenargo Int'l PLC, 294 B.R. 571, 595-96 (Bankr.
S.D.N.Y. 2003).  Nevertheless, the court has a record of what the
professional achieved and the context in which the professional
worked to help it decide what a reasonable fee would be under
Section 330.

Section 328(a) of the Bankruptcy Code also hinges on a
reasonableness standard, but it has a different perspective.
Under Section 328(a), a debtor in possession with the court's
approval may employ a professional person "on any reasonable
terms and conditions of employment, including on a retainer, on
an hourly basis, on a fixed or percentage fee basis, or on a
contingent fee basis.  Notwithstanding such terms and conditions,
the court may allow compensation different from the compensation
provided under such terms and conditions after the conclusion of
such employment, if such terms and conditions prove to have been
improvident in light of developments not capable of being

4

anticipated at the time of the fixing of such terms and conditions."  11 U.S.C. § 328(a).

That is, if the terms of their compensation are approved as part of their retention under Section 328(a), professionals largely lock in how they will be paid, with no later second-guessing as to reasonableness unless such terms prove to have been improvident in the light of developments not capable of being anticipated when they were fixed by the retention order. In re XO Commuc'ns, 398 B.R. at 111-12; see also In re Fansteel Foundry Corp., 2018 Bankr. LEXIS 4168, at *19 (Bankr. S.D. Iowa Nov. 27, 2018).

Section 328(a) obviously provides comfort to professionals that they will be paid as they bargained, subject to unforeseeable events, including, presumably, having to perform far less work or their providing services of far lower quality than expected, but it also raises the concern noted by several courts that one cannot necessarily foresee all of the services that a professional will be providing, or be able to predict the actual difficulty of such services.  That is, Section 328(a) may work well for a simple contingency fee arrangement for a particular litigation, but it may leave the parties and the court guessing about the reasonableness of a compensation package for, as here, an investment banker that, in the lingo, has a whole suite of capabilities, such as valuation, negotiation, M&A, and

5

the raising of debt or equity capital either during the case or as part of an exit facility, and the difficulty of whose future work might range from fairly simple to really hard.

This is especially a problem if the compensation for such services is not easily tested against a market, because courts in the Second Circuit have adopted a "market driven" approach in which the cost of comparable services is a significant factor in determining the reasonableness of compensation, whether for purposes of Section 330 or 328(a), see In re Residential Capital, LLC, 504 B.R. 358, 368 (Bankr. S.D.N.Y. 2014), and the cases cited therein, including In re Ames Department Stores, Inc., 76 F.3d 66, 71 (2d Cir. 1996), which with the exception perhaps of the Fifth Circuit is the view in other circuits, as well.  See In re United Artist Theater Company v. Walton, 315 F.3d 217, 229 (3d Cir. 2003); In re Cenargo Int'l, 294 B.R. at 596.

As the Third Circuit stated in United Artist, the approach is market driven, not market determined, especially given the special supervisory role played by bankruptcy courts.  315 F.3d at 230.  That being said, determining the reasonableness of compensation, especially for purposes of Section 328(a), largely focuses on the market for the services at issue, in keeping with Congress' desire that the most able professionals work in bankruptcy matters, contrary to the pre-Bankruptcy Code principle of economy applied to compensation that starved bankruptcy cases

of the full panoply of professionals who would serve only at market rates. Donaldson Lufkin & Jenrette Sec. Corp. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.), 123 F.3d 861, 862-63 (5th Cir. 1997).

In part because investment bankers and financial advisors failed to establish a clear market rate for their services, bankruptcy courts struggled into at least the second decade after the Bankruptcy Code's enactment when asked to fix their proper compensation, requiring them to be evaluated on a loadstar method based on imputed hourly rates and placing other limitations on their compensation that differed from compensation practices outside of bankruptcy cases. See In re Hillsborough Corp., 125 B.R. 837 (Bankr. M.D. Fla. 1991); In re Drexel Burnham Lambert Grp., 133 B.R. 13 (Bankr. S.D.N.Y. 1991).

More recent decisions recognize that task-based, as opposed to hourly-based, compensation for investment bankers is a normal fee structure outside of bankruptcy cases, indeed that transaction fees have long been the market practice of investment bankers in non-bankruptcy settings as well as proposed in bankruptcy cases, a number of which are identified in In re Relativity Fashion, LLC, 2016 Bankr. LEXIS 4339, at *8-9 (Bankr. S.D.N.Y Dec. 16, 2016). See also In re XO Commuc'ns, 398 B.R. at 118. Judges also have become more comfortable with what to a layperson may appear to be very high transaction fees, provided

7

that there is some reality check by the requirement that semi-hourly or hourly time records be included in the fee application even though that level of reporting may not be customary for such services outside of bankruptcy cases.

The problem remains, however, to discern in a Section 328(a) application a suitable basis to find the proposed compensation terms are reasonable for a prospective set of transaction-related services.  That problem is compounded by the fact that there is no clear non-bankruptcy market analogue to a "restructuring fee" on top of a financing fee or an M&A fee, which raises the possibility that "market data" for restructuring services may turn into an echo chamber in which a small group of investment bankers establish the parameters of their market in bankruptcy cases with little input from others.  Ultimately, however, the burden of proof to establish that the proposed compensation terms are reasonable rests with the applicant, In re Energy Partners Ltd., 409 B.R. 211 (Bankr. S.D. Tex. 2009), and, relatedly, if the banker later seeks compensation that was not adequately described in the Section 328(a) retention application, it too will be denied. In re Northwest Airlines Corp., 400 B.R. 393 (Bankr. S.D.N.Y. 2009).

In their original application, the Debtors not only attached the proposed Evercore engagement letter setting forth the proposed compensation terms but also, with Evercore's assistance

8

in the supporting declarations and testimony at the July 1, 2020
hearing, tried to show why the proposed compensation, which
included a basic restructuring fee with additional transaction
fees, was at market and reasonable in the context of these cases.
They have continued to try to do so in the later supplements to
the application in respect of the modifications proposed by
Evercore and the Debtors.

In evaluating whether the Debtors and Evercore have carried
their burden to show reasonableness under Section 328(a), one is
guided by the following factors: Do the proposed terms reflect
the marketplace for these types of services?  Did the parties
engage in arms-length negotiations to derive the terms?  Is the
retention as proposed in the best interests of the estate?  Do
creditors oppose the retention or the proposed fees?  And,
lastly, is the projected amount of fees reasonable given the size
and circumstances of the case?  See In re Energy Partners, 409
B.R. at 226; In re High Voltage, Inc., 311 B.R. 320, 333 (Bankr.
D. Mass. 2004); In re Insilco Techs., Inc., 291 B.R. 628, 633
(Bankr. D. Del. 2003).

Notwithstanding the foregoing, my determination largely
comes down to the first factor, whether the terms of the proposed
engagement reflect the market.  See In re XO Commuc'ns, 398 B.R.
at 112.  Indeed, the other factors can be seen as indirect ways
to establish whether the modified engagement letter is at market,

9

or not.  Before turning to the specific market evidence, however,
I should address the nature of the objections to the application
and whether the Debtors and Evercore engaged in arms-length
negotiations.  In the context of a discussion of the market, I
also will consider whether the proposed fees could simply become
too high in the light of these cases' size and circumstances.
See, e.g., In re UDC Homes, Inc., 203 B.R. 218 (Bankr. D. Del.
1996), in which the court mostly applied market data to determine
the reasonableness of financial advisor fees, but also reduced a
fee on the basis that it simply seemed too high in relation to
the size of the client's recovery and therefore not in the best
interests of the estate and parties in interest. Id. at 222-23.

The three objectors represent (in the case of the Official
Committee of Unsecured Creditors) or largely comprise (in the
case of the two unsecured noteholder groups) the major creditors
in these cases; further, the objecting noteholders will be the
Debtors' future controlling shareholders when the chapter 11 plan
goes effective.  On its face this level of opposition seems
significant, especially as it is often observed, although not so
often in the case law, that a debtor in possession, if a
fiduciary and here well represented both at the senior management
level and by outside counsel, is in a sense paying its
professionals with other people's money, i.e., the creditors'
money.

10

Management primarily has an interest in having the case go well, and as testified to by the Debtors' representative who negotiated Evercore's original engagement letter, Mr. Nielson, the Debtors had a strong interest in getting the very best services and therefore in incentivizing its investment banker to bring its "A team."

Creditors balance against that interest a more immediate sense of how the proposed terms affect their pocketbook, and therefore their views are important. <u>See</u> <u>generally</u> Nancy B. Rappaport, *The Case for Value Billing in Chapter 11*, 7 J. Bus. & Tech. Law 117 at 139-40 (2012).

On the other hand, creditors -- particularly sophisticated players in the distressed market like the members of the noteholder groups in this case -- sometimes object to proposed compensation terms not because those terms are unreasonable but, rather, simply to enhance their recovery. There naturally is a higher risk of this happening when the court is presented with a proposed retention or compensation application after the professional's work has, as here, largely been performed and there is little need for the professional's ongoing services.

Having read the parties' pleadings and heard the evidence, I believe that both the Debtors/Evercore and the three objectors are acting in good faith and simply have a legitimate disagreement over what is reasonable compensation for Evercore's

11

services.   Thus, the fact that there are significant objections
to the proposed retention ultimately is not very meaningful to my
decision, except, of course, that the Debtors and Evercore must
successfully counter them.

The nature of an engagement letter's negotiation also can be
relevant to a Section 328(a) application; that it was not at
arms-length or was based on misinformation reflects poorly on the
assertion that the letter's terms are market.  (It is important
to reiterate that the bankruptcy court does not apply a state
corporate law business judgment standard to a debtor's entry into
an engagement letter, but, rather, reviews it under the
reasonableness standard discussed above.)

As testified to by Mr. Neilson, the original engagement
letter did not include typical market terms for these types of
engagements, such as crediting of a portion or, in some cases,
all of separate transaction fees against the restructuring fee
or, as if often the case, a cap on overall compensation or on
significant portions of the total compensation.  Nor were those
points sought to be negotiated by the Debtors, and it is not even
established that Mr. Neilson was told that such provisions are
customary for engagement letters for investment bankers in this
context.

I also note that Mr. Nielson, while having extensive
experience in engaging investment bankers for M&A assignments,

12

candidly testified -- and I found his testimony credible
throughout -- that he had no prior experience negotiating an
engagement letter for an investment banker providing
restructuring services.

Indeed, when one talks about a "market" for such types of
services, one is referring to a set of comparators that is
neither widely, nor perhaps well, understood.  There are not many
firms that engage in this type of work, at least in very large
chapter 11 cases such as these.  It is a highly specialized
field, and there are barriers to entry because of that
specialization and the resources that need to be employed.

This helps explain bankruptcy judges' continued discomfort
with contested investment banker retentions.  Courts' struggle to
understand what is reasonable for restructuring fees, monthly
fees, crediting for related transaction fees, and partial or full
fee caps indeed appears to have led some to approve hybrid
retention arrangements (sometimes the product of negotiated
resolutions of objections, whether formal or informal), with
certain fees covered by Section 328(a) and others to be
determined under the Section 330 standard, although that approach
may just postpone the task of determining what is reasonable in
the light of the "market."

When proposing the original engagement letter, Mr Shah did
show Mr. Nielson a list of what he said were comparable

restructuring engagements and their fees.  Mr. Nielson testified
that his approach to those comparables was "trust but verify,"
but there is no evidence that he questioned Evercore or others
about them or otherwise tried to confirm that they actually were
good market analogues to Evercore's proposed retention terms.

And, indeed, based on the evidence, it appears that the list
of comparators originally provided to Mr. Nielson was thin and
that a more representative comparable set of retention terms
would not justify entry into the original engagement letter.

Because these facts became clear midway through the July 1,
2020 hearing, the parties acted on my suggestion to re-examine
and consider revising the compensation terms, which they did as
set forth in the amended proposal.

The original negotiations therefore also turn out not to be
particularly relevant to the revised proposed engagement letter,
which was agreed between the Debtors and Evercore with full
knowledge of the objectors' arguments and highlighting of fee
arrangements in a more representative sample of comparable
engagements.

That leaves primarily for consideration the specific market
evidence offered by both sides.  I therefore have carefully
considered the comparators offered by Mr. Shah for Evercore and
by Mr. Kramer on behalf of the objectors, as well as the nature
of Evercore's services and how those services might differ from

14

services in the comparable cases.

I should note before providing that analysis, however, that bankruptcy courts have wide discretion to determine reasonable professional fee awards, perhaps unsurprisingly, given that they routinely see such applications and how the professionals' services and compensation have played out in their cases, see Zolfo, Cooper & Co. v. Sunbeam Oster Co., 50 F.3d 253, 258 (3d Cir. 1995); In re Tribeca Mkt., LLC, 516 B.R. 254, 276 (S.D.N.Y. 2014); In re Cenargo, 294 B.R. at 596 and the cases cited therein, and the fact -- driven home by the evidence here -- that there is no bright-line "market" answer with respect to investment banker compensation for these types of bundled services.

In exercising that discretion, I am guided by the following:

First, the evidence from the July 1, 2020 and October 8, 2020 hearings shows that with one exception the work proposed to be undertaken and performed by Evercore, both prepetition and postpetition, while sophisticated and difficult, does not warrant a bonus above market driven compensation in other comparable engagements.

Large chapter 11 cases generally have recurring types of difficult problems for investment bankers to work on, although the specifics differ from case to case. Often they must address valuation issues, sometimes by providing litigation support

15

relating to years in the past, sometimes pertaining to predicting
the debtor's value on the confirmation date and thereafter.
Usually such cases involve developing the optimum post-emergence
capital structure and converting others to that view.  Often the
work also involves raising new money, either in the form of DIP
financing or exit financing or both and, at times, managing an
auction process for either financing or a sale of all or a major
portion of the debtor's business.  Financial analyses and a
negotiation role also might be required to deal with specific
constituents such as unions, the PGBC, personal injury claimants,
other tort creditors and the like.

In large chapter 11 cases (and I will note that for the
purposes of the Administrative Office of the U.S. Courts, "mega"
chapter 11 case are those with over $100 million of debt), many
or often all of these types of services would be subsumed within
the rubric of "restructuring advice" and covered by a
"restructuring fee" in addition to, as discussed earlier,
separate transaction fees for sale and financing-related
services.  That the Debtors' cases involved the restructuring of
a very high amount of debt, approximately $17.5 billion, does not
necessarily take them into a different category with respect to
services to be rendered by the Debtors' investment banker, as
evidenced by the array of comparable cases chosen by both
Evercore and Mr. Kramer involving at least $5 billion of debt and

16

a subset thereof involving at least $10 billion of debt to be restructured and the Court's own experience.

Certainly as originally filed the application highlighted nothing with the exception of the Pacific Northwest M&A engagement (the "PNW Sale") as something out of the ordinary from the generally complex set of tasks typically undertaken by an investment banker in such large chapter 11 cases

The Debtors and Mr. Shah now have described the work that Evercore has actually performed and that in the unique posture of this application, I can consider, and it does not appear that Evercore's work to date materially exceeds the level of work in comparable cases to warrant a premium over market compensation. It is difficult and sophisticated work, but such work already is well compensated at market rates that generally apply.

At the same time, I do not find, as the objectors have argued, that Evercore's work was anticipated to be, or has been, meaningfully less complex and sophisticated than engagements in cases with in excess of $5 billion of restructured debt or the subset of cases with more than $10 billion of restructured debt.

This returns us to whether Evercore's proposed compensation is reasonable in comparison to the market for such services. Both Mr. Shah and Mr. Kramer were generally credible witnesses on market terms. They disagree in part because there are aspects of what both sides describe as "market" that the testimony has

17

brought out are, in fact, *sui generis* to individual engagements, although in grand concept there are certain commonly recognized market elements.

This lack of bright line market guidance primarily applies to the use of an overall fee cap or a fee cap for significant portions of an engagement.  I agree with Mr. Kramer's testimony that when one examines fee caps in comparable engagements, there is no level-set or level measure against which to compare one fee cap, including the caps proposed in Evercore's modified proposal, against another.  In Mr. Kramer's terminology, fee caps in these types of engagements are often "bespoke" in the light of an overall negotiation that takes into account the facts and circumstances of the case.

This was born out by both Mr. Shah and Mr. Kramer's testimony about the rationale behind a fee cap, which is that such caps are negotiated to prevent an unwarranted or unanticipated windfall in the context of potential transaction outcomes, the estate's resources, and the outer range of work that might be reasonably expected of the banker.  Of course, Section 328(a) itself carves out from its protection unanticipated windfalls.  However, fee caps are negotiated and approved in advance to take the bankruptcy court out of some of that determination, *i.e.*, from deciding what could have been anticipated, and there is obviously merit to that.

18

But other than the general proposition that some sort of a
fee cap appears in most investment banker restructuring
engagement letters, it is almost impossible to conclude that a
particular fee cap is at market.  As brought out in Mr. Kramer's
cross-examination, several comparable engagements had fee caps
but not total fee caps.  Some carved out M&A fees from the fee
cap.  Some carved out monthly fees from the fee cap.  Some carved
out subsets of those fees, and at least one case capped only the
restructuring fee.  On the other hand, when one looks at the
orders in cases discussed during Mr. Kramer's cross-examination
where a cap has not been imposed, which are all relatively recent
-- Intelsat, Avaya, Linn Energy, Windstream -- the uncapped fees
at times were also carved out of the Section 328(a) retention and
therefore subjected to the Section 330 standard, which gave all
parties the flexibility to review a particular transaction after
it took place to determine what was reasonable.

Here, one can evaluate reasonable compensation for purposes
of Section 328(a) knowing a lot more of what transpired than was
predicted when the terms were first agreed, and the objectors
have confirmed that they do not seek to cap Evercore's fees for
future M&A work or change the formula for those fees.  Instead,
the main dispute over the revised proposal's fee cap is whether
it should apply not only to all of the other fees that would be
payable under the modified engagement letter but also to the PNW

19

Sale fee of $22 million, which Evercore would exclude from its proposed $49 million fee cap but which would be included in the objectors' proposed $52 million fee cap.

I have considered the evidence regarding the PNW Sale fee, including the testimony of Mr. Nielson, Mr. Mendalow, and Mr. Kramer, and conclude that it would not be reasonable to include the $22 million PNW Sale fee in an overall $52 million fee cap.

The PNW Sale should be viewed as standing on its own, separate from Evercore's other services, which were much more tied to the Debtors' restructuring.  The PNW Sale was negotiated and agreed over a year before the filing of these bankruptcy cases.  It did not close until after the commencement of the bankruptcy cases, but that was not because of the Debtors' financial distress but, rather, because of a regulatory condition.

The evidence shows that where fee caps have been agreed and approved under Section 328(a), they have not applied to M&A transactions like the PNW Sale but, instead, to M&A transactions that evenly straddled the pre- and postpetition period or occurred during the bankruptcy case and were contemplated in essence as part of the financial advisor's restructuring work, albeit perhaps with add-ons from its M&A department.

I have also considered the reasonableness of the PNW Sale fee.  It is above market, in the 75th percentile, and Mr. Nielson

testified that this was intentional, to incentivize Evercore with respect to an unusually difficult assignment.  Does that make it an unreasonable fee in the context of this case?  I conclude to the contrary that the fee is reasonable for four reasons.

First, Mr. Nielson *was* experienced and well informed in negotiating standalone M&A fees such as the PNW Sale fee. Second, it also is clear that in addition to its size the PNW Sale was an unusually complex and difficult transaction, including in the light of the limited number of likely buyers, difficult business integration issues, and sensitive regulatory concerns, warranting a market premium. And, of course, it was successfully concluded to the great benefit of the Debtors' estates and creditors. Lastly, in Evercore's revised proposal, 25 percent of the PNW Sale fee will be credited against its restructuring fee.

Both Mr. Shah and Mr. Kramer stated that the primary rationale for crediting a portion of separate transaction fees against a restructuring fee is that a significant amount of the work for such services usually overlaps.  While it appears that some work related to the PNW Sale was done by Evercore's restructuring team, mostly in relation to possible restrictions asserted by the first lien lenders on the permitted use of the sale proceeds, that overlap would not normally warrant crediting 25 percent of the PNW Sale fee to the restructuring fee.  Thus,

while the proposed credit should not be viewed as taking the PNW Sale fee completely down to the average fee for an average M&A transaction of this size, it does substantially reduce what would otherwise be a 25 percent premium for the PNW Sale work.

With respect to the remainder of the parties' disputes, Evercore's revised proposal is still not reasonable in three respects.  First, although the proposal currently purports to provide for crediting of 50 percent of finance fees and monthly fees against the restructuring fee, it really does not do so because it then imposes a cap on the 50 percent crediting.  I have not seen any similar mechanism in comparable engagements, and no persuasive justification for that cap on crediting has been offered.

Again, the primary rationale behind a crediting mechanism in the marketplace for such services is the substantial overlap between restructuring work and transactional work done in the context of a client's financial distress.  (Mr. Kramer also testified that sometimes a crediting mechanism is used if the parties and/or the court believe that something called a restructuring fee is just too high to begin with, although that would appear simply to be a *sui generis* negotiation.)

Unlike with fee caps, there are fairly clear market measures for restructuring fees and financing fees; and the overlap of the work involved for these types of services, as well

22

as with respect to the monthly fees, warrants a full 50 percent credit against the restructuring fee.

Second, Evercore's proposed revised fee for financing transactions is unreasonable, whether one looks at the market generally or the nature of the work to be performed, inquiries which here are closely aligned.

I will note first that the original engagement letter contemplated a fee for debtor-in-possession financing of 50 basis points of the loan, a fee for a true exit financing of 75 basis points of the loan, and an exit financing fee for, in essence, a rollover of existing debt at 35 basis points of the loan amount.

Certain financings already have been arranged in these cases, but there may be additional exit financing as permitted by the chapter 11 plan. What is in place today is a so-called DIP-to-exit facility, for which under Evercore's revised proposal Evercore would be paid at one percent of the outstanding amount. That one percent would also apply under its proposal to any future additional exit financing, which with the $49 million fee cap proposed by Evercore would add another roughly $2 million of fees if in fact the financing occurs.

Based on the comparators offered by Evercore and Mr. Kramer, as well as the lower fees in Evercore's original proposal, these fees are too high. Evercore attempts to justify them by arguing that under the original proposal its fee for the DIP-to-exit

23

financing would have been treated as being earned for two
separate financings, the DIP loan and the exit financing,
aggregating 1.25% of the borrowed amount.  However, one cannot
view these financings as in essence two financings. They are
properly seen as one financing that has a relatively small true
DIP component and an exit component that is essentially a
rollover of debt to take advantage of current market conditions.

Therefore the original structure proposed by Evercore should
apply to these amounts; namely, the fee for the true DIP amount
should be paid at 50 basis points of the financing and the fee
for the rest of the financing should be at 35 basis points of
such amount.  This also is supported by the comparator data.

That result also is justified by focusing on crediting.
Clearly *at least* a full 50 percent crediting (not the capped
crediting proposed by Evercore) is warranted here based on the
overlap between Evercore's restructuring services and the work
that Evercore has done and is expected to do related to most of
the financing, which, as Mr. Shah and Mr. Schriesheim testified,
is largely to analyze the Debtors' prior capital structure,
right-size it, and validate that view to others, which is very
close to the work that one would expect a restructuring advisor
to do in connection with a standalone restructuring. In addition,
there has been and will be some further negotiation with
potential lenders, but that work also is very largely informed by

24

Evercore's overlapping restructuring work.  Evercore is not the
lead arranger for any of the exit financing (although it did do
the work on the original, proposed but not approved, $425 million
DIP loan, which is why the 50 basis points fee should apply to
that portion of the financing).

Thus, if I were not to reduce Evercore's currently proposed
financing fees as stated, I would instead require a much greater
crediting with respect to non-$425 million portion growing out of
Evercore's work on the originally proposed DIP facility.  Indeed,
as in the Linn Energy case, one might require full crediting,
although a credit of 75 percent might be more warranted.  Instead
of taking that approach, however, it is reasonable to keep a 50
percent across-the-board credit but reduce the financing fee,
with the exception of the fee for the $425 million portion that
Evercore did primary work on, to 35 basis points of the amount of
the facility.

That leaves one remaining issue in dispute, the proper size
of the restructuring fee.  Both Mr. Shah and Mr. Kramer have
testified that as with financing fees and unlike fee caps, there
is a recognized starting point, and often ending point, for a
market driven restructuring fee based on a percentage of the debt
to be restructured.

That debt base in any particular engagement should include
not only funded debt but significant other debt that needs to be

25

restructured, such as a large contract damages award or
significant tort claims or governmental sanctions, and, at some
level, capital leases or other debt of non-debtor affiliates that
must also be restructured, such as one can infer informed the
engagement letters in cases like Westinghouse, PG&E, and Hertz.

Here, if one looks at the comparable cases where the
restructured debt was in excess of $5 billion, Evercore's
proposed restructuring fee before crediting is below market: .16
percent of the funded debt to be restructured as opposed to
market fees somewhat in excess of .20 percent.

On the other hand where one looks at the seven cases that
are closer to this case in terms of the amount of debt to be
restructured, *i.e.*, cases where such debt is above $10 billion,
the percentage on average of the restructuring fee to debt is in
the range of .10 to .11 percent.  I recognize that this includes
two cases where the percentage is substantially lower, namely
Caesars and Hertz.  Caesars' low percentage is explicable in part
because the investment banker came in only postpetition and
arguably therefore could be said to have less to do, although
Caesars also appears to have been a contentious case. Hertz may
be an artificially low percentage depending on the amount of debt
upon which the fee ratio is based, although the record is not
clear on this point.

Nevertheless, there is only one restructuring fee in the

most comparable group of cases that is in line with Evercore's
proposed fee, IHeart Media.  In reviewing the engagement approval
order in that case, however, it appears that the court left
certain fees open for future determination and reduced certain
transaction fees or required full crediting with respect to them.

So it would appear that while the .16 percent restructuring
fee proposed by Evercore is not outrageous, the better approach
would be to look at fees in comparable cases with debt above $10
billion, as opposed to the $5 billion set of cases, and in that
light, the fee is too high. Essentially I agree with Mr. Kramer's
testimony that once one gets above a certain level of debt to be
restructured, the tasks to be performed -- while sophisticated
and difficult -- are not so much more sophisticated and difficult
to justify the increase in a restructuring fee that would result
from applying the same percentage to restructured debt that would
be applied in cases with the next lowest band of debt.
Therefore, a reasonable restructuring fee in this case, where the
debt to be restructured in approximately $17.5 billion would be
.14 percent of such debt, before crediting.

Certainly it would appear to me that the restructuring tasks
to be undertaken by Evercore here are not materially more
difficult than those performed by Rothschild in the American
Airlines case or PGT in the Intelsat case, where such a
percentage fee applied. It appears that the Intelsat case

27

involved substantial work in a short timeframe in which the debtor did not have consensus over a chapter 11 plan on the petition date,[1] and the American Airlines engagement involved difficult valuation disputes throughout the capital structure as well as dealing with the debtor's unions and a potential M&A process.

This represents no criticism of Evercore's work in these cases or of Evercore's sophistication and capabilities.  As I have noted, there is a small group of firms that can perform an assignment like this.  Evercore is part of that group.

There is some dispute whether a court can impose compensation terms under Section 328(a) of the Bankruptcy Code. Compare In re Energy Partners, 409 B.R. at 232 ("[U]nder § 328, bankruptcy courts have the discretion to tailor the fees in the application if the court is dissatisfied with the terms of the application"), citing In re Fed. Mogul-Global Inc., 348 F.3d 390, 403 (3d Cir. 2003), with In re Fansteel Foundry Corp., 2018 Bankr. LEXIS 4168, at *19 ("Under 11 U.S.C. § 328(a) a court approves or rejects the employment of a professional based upon the stated compensation terms.  The court's role does not extend to changing or dictating the terms"), citing In re Farmland Indus., 296 B.R. 188, 191 (B.A.P. 8th Cir. 2003), aff'd, 397 F.3d

---

[1] See Intelsat 8-K May, 13, 2020.

647 (8th Cir. 2005).  Perhaps this issue is largely academic, however, at least here.  Evercore and the Debtors now know the Court's determination of reasonable compensation for Evercore's services in these cases.  If Evercore chooses not to be retained on those terms under Section 328(a), its compensation will be governed by the Court's views of reasonableness under Section 330 of the Bankruptcy Code.  I assume that Evercore would prefer to be retained on such terms under Section 328(a) and will enter an order granting the application on such revised terms.

Dated:  White Plains, New York
        October 30, 2020

                              /s/ Robert D. Drain          _
                              United States Bankruptcy Judge