Hearing Date: May 18, 2021 at 10:00 a.m. (Eastern Time)

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Arthur J. Steinberg, Esq.
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

*Counsel for National Public Finance Guarantee Corporation*

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
Joel Moss, Esq.
Jordan A. Wishnew, Esq.
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

*Counsel to the Ad Hoc Group of Subsidiary Debtholders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| **FRONTIER COMMUNICATIONS CORPORATION**, *et al.*, | Chapter 11 |
| | Case No. 20-22476 (RDD) |
| Debtors. | (Jointly Administered) |

**JOINT RESPONSE TO NOTEHOLDER GROUPS' OBJECTION TO SUBSTANTIAL CONTRIBUTION APPLICATIONS FILED BY NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION AND THE AD HOC GROUP OF SUBSIDIARY DEBTHOLDERS**

National Public Finance Guarantee Corporation ("**National**") and the Ad Hoc Group of Subsidiary Debtholders (the "**Ad Hoc Group**," and with National, the "**Applicants**"),[1] by their

---

[1] Capitalized terms not otherwise defined in this Response shall have the meanings ascribed to them in the Applications or the applicable referenced document.

respective counsel, hereby file this response (the "**Response**") to the objection filed by the Noteholder Groups, dated April 30, 2021 [Docket No. 1794] the ("**Objection**") regarding the *Application of National Public Finance Guarantee Corporation Pursuant to 11 U.S.C. § 503(b) for Allowance of Administrative Expenses for Counsel Fees and Expenses in Making a Substantial Contribution in these Cases* [Docket No. 1755] ("**National Application**") and the *Application of the Ad Hoc Group of Subsidiary Debtholders for an Order Pursuant to 11 U.S.C. § 503(b) for Allowance of Administrative Expenses for Counsel Fees and Expenses in Making a Substantial Contribution in these Cases* [Docket No. 1756] (the "**Ad Hoc Group Application**" and, together with the National Application, the "**Applications**"). The Applicants hereby represent as follows:

1.  National is a substantial creditor of Frontier California Inc., Frontier Florida LLC, and Frontier North Inc. (collectively, the "**CFN Subsidiaries**") which issued $700 million in Subsidiary Unsecured Notes that were reinstated under the *Joint Plan of Reorganization of Frontier Communications Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1309] (the "**Plan**"). The Ad Hoc Group consists of certain holders of notes issued by the debtor CFN Subsidiaries along with Frontier Southwest Incorporated ("**Southwest**") and Frontier West Virginia, Inc. ("**West Virginia**," and collectively with Southwest and the CFN Subsidiaries, the "**Subsidiary Debtors**").

2.  The Subsidiary Debtors are each important and separate operating subsidiaries of the parent company debtor Frontier Communications Corporation ("**Frontier**" and along with its co-debtors, the "**Debtors**"). The Subsidiary Debtors each have their own creditors with hundreds of millions of dollars of indebtedness. This is evidenced through the unsecured notes that trade independently of the indebtedness and notes issued by Frontier. The Subsidiary Debtors filed for bankruptcy even though they were solvent and generating hundreds of millions of dollars of

2

positive cashflow from their operations—a significant portion of which was transferred to fund indebtedness owed by Frontier and other affiliated Debtors. As a result, the Subsidiary Debtors had substantial assets consisting of intercompany claims which continued to grow during the bankruptcy cases.

3.    Under the Debtors' Plan, only the Frontier unsecured notes were supposed to be impaired while the structurally senior Subsidiary Unsecured Notes and the Verizon Secured Notes issued by Southwest (collectively, the "**Subsidiary Notes**") were supposed to be unimpaired. The underlying tension that existed in the bankruptcy cases between the Noteholder Groups (the only party objecting to the Applications) and the Applicants[2] related to what constituted "unimpaired" treatment. To be more granular, the Applicants' position was that the Subsidiary Notes would be impaired: (a) if the hundreds of millions of dollars of intercompany claims owed to the Subsidiary Debtors, that would otherwise be a source of repayment of the Subsidiary Notes, were extinguished under the Debtors' plan; (b) if the Debtors merged the Subsidiary Debtors into Frontier so that the structural priority that the Subsidiary Notes had to the assets of the Subsidiary Debtors was eviscerated; (c) if the Debtors pledged the assets of the Subsidiary Debtors to secure post-petition loans or exit loans, the proceeds of which were used by Frontier and the other Debtors, but not necessarily the Subsidiary Debtors who did not need that level of funding; (d) if the Subsidiary Debtors who had not guaranteed prepetition indebtedness of Frontier became guarantors of post-petition loans or exit loans obtained and used by Frontier but not necessarily the Subsidiary

---

[2] The Applicants participated in a Working Group which included National, represented by King & Spalding LLP (Arthur Steinberg and Sarah Primrose); the Ad Hoc Group, represented by Shearman & Sterling LLP (Joel Moss and Jordan Wishnew); and U.S. Bank National Association, the indenture trustee under the unsecured notes indentures issued by the CFN Subsidiaries (the "**Indenture Trustee**"), represented by Maslon LLP (Clark Whitmore and Jason Reed).

3

Debtors; and (e) if any of the Subsidiary Debtors became obligated through the Plan for prepetition indebtedness owed by Frontier that it was not otherwise liable for.

4. Because the reinstated Subsidiary Notes would remain outstanding long after the Effective Date of the Debtors' Plan, the Applicants continually sought assurances that the actions to be taken by the Debtors would not prejudice the relative economic and legal position of the Subsidiary Notes within the Debtors' overall capital structure.

5. Section 1124 (a)(1) of the Bankruptcy Code provides in relevant part that a class of claims or interests is impaired unless the plan "leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder of such claim or interest." The Second Circuit in *In re Taddeo*, 685 F.2d 24, 28 (2d Cir. 1982) noted that Congress defined impairment in the broadest possible terms. The Second Circuit elaborated on that concept in *In re DBSD*, 634 F.3d 79, 89, n.4 (2d Cir. 2011), when it ruled that the Bankruptcy Code treats a claim as impaired unless "the plan leaves in place all rights to which the claim entitles its holder, except for certain rights to accelerate payments after default." To the Noteholder Groups, as long as the contractual rights under the Subsidiary Notes were not infringed upon, the Subsidiary Notes should be deemed unimpaired. The Applicants thought differently. Section 1124 of the Bankruptcy Code includes protection of the "legal" and "equitable" rights of the claimant, and that statutory language had meaning beyond infringement of contractual rights.

6. All of this is not meant to ask this Court to rule on issues relating to impairment that were consensually resolved as part of the Plan. But the foregoing is meant to highlight that: (a) there were issues relating to impairment of the Subsidiary Debtors; (b) it was the Applicants that raised those issues; (c) that the Debtors compromised those issues based on the Applicants'

4

efforts; and (d) that those changes redounded to the benefit of all creditors of the Subsidiary Debtors—not just the Applicants.

7. The Applicants did not involve themselves in all aspects of the bankruptcy cases. They were clearly focused on inter-estate issues and their goal was to protect the legal, equitable and contractual rights of the Subsidiary Debtors. The Debtors and the Creditors Committee did not have that singular focus of what was in the best interests of the Subsidiary Debtors, and there needed to be a counter-party in the bankruptcy cases on these inter-estate issues to the Noteholder Groups—which had a dominant parent company focus.[3]

8. Three other things are worth noting before the specific arguments laid out in the Objection are addressed. ***First***, the Subsidiary Debtors clearly have the funds to pay the amount sought by the Applicants, and no creditor of the Subsidiary Debtors[4] is objecting to the relief sought in the Applications.

9. ***Second,*** the benefit in a case where the Subsidiary Notes were promised unimpaired treatment is not measured by their enhanced recovery. Rather, it is the successful efforts undertaken to ensure that the promised unimpaired treatment was *actually delivered* by the Plan. In addition, since the Subsidiary Noteholders would not be paid the principal on their reinstated notes for another six to seven years after the Effective Date, the preservation of the Debtors' capital structure and the structural seniority of the Subsidiary Notes was of paramount importance and benefit to the Subsidiary Noteholders. This concern was particularly relevant in these cases since the Debtors filed for bankruptcy even though they had enough liquidity to satisfy their short-term debt obligations but did not believe they could do so for their long-term debt obligations.

---

[3] The amount of Subsidiary Unsecured Notes that members of the Noteholder Groups either "hold or held" is approximately 4% of their Frontier indebtedness holdings, which was their primary focus during the bankruptcy cases.

[4] The Noteholder Groups define themselves as being creditors of Frontier only.

5

10.  ***Third***, the Noteholder Groups' efforts have been funded by the Debtors.[5] Specifically, they have been paid approximately $14 million by the Debtors' estates since the Petition Date. The purpose of the Applications is for the Applicants, as the counter-party to the Noteholder Groups, to get reimbursed for the monies already paid to their counsel in an effort to protect the rights of the Subsidiary Debtors on inter-estate issues. The aggregate amount sought by the Applicants is approximately 12% of what the Noteholder Groups have been paid since the Petition Date—which reflects the narrow focus of the work for which they seek reimbursement.

11.  The Objection argument is broken down into three categories, which are addressed in the following paragraphs.

## RESPONSE

**A.    The Claimed Benefits Were Substantial and a Direct Result of the Applicants' Efforts.**

12.  Footnote 12 of the Objection highlights the headwinds that the Applicants faced throughout this matter. The Subsidiary Notes may only constitute 5% of the aggregate principal amount of the Debtors' prepetition funded debt, but the Subsidiary Notes *represented 100% of the prepetition funded debt* of the Subsidiary Debtors. And it was exactly because the Noteholder Groups approached *every* issue through the prism of what would be most advantageous to the parent company creditors (where they had their financial interests) that the Applicants needed to interject themselves on various inter-estate issues on behalf of the creditors of the Subsidiary Debtors.

13.  Far from being "conclusory" in the Applications, the Applicants pointed to numerous, specific, examples where their efforts led to changes in the relief sought by the Debtors and endorsed by the Noteholder Groups. For example:

---

[5] In reality, a substantial portion of the payments to the Noteholder Groups has been made from funds generated by the Subsidiary Debtors, who were not in privity with the Noteholder Groups.

6

- The Debtors' original presentation of the intercompany claims was wrong. Originally, it had the Subsidiary Debtors owing money to Frontier. That clear and substantial mistake was corrected based on comments made by the Applicants. In the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 14], the Applicants insisted that inter-estate transfers made by the Subsidiary Debtors to Frontier and the other Debtors be properly accounted for and granted a super-priority administrative expense claim. Those protections for the Subsidiary Debtors in the correlating order were ultimately made based on the comments made by the Applicants.

- The original plan filed by the Debtors, which was endorsed by the Noteholder Groups, reserved the right to extinguish intercompany claims. The original plan also reserved the right for the Debtors to make this determination after the confirmation order was entered, but before the effective date of the plan. The Applicants told the Debtors that this treatment of intercompany claims was objectionable on both procedural and substantive grounds. The Applicants argued that to eliminate hundreds of millions of dollars of intercompany claims in favor of the Subsidiary Debtors, which were a valuable and substantial asset available to repay the Subsidiary Notes, constituted an impairment to the Subsidiary Noteholders. Further, to not tell the Subsidiary Noteholders what they were planning to do until after confirmation was contrary to the disclosures required to be made in the Disclosure Statement. The Applicants, through the Indenture Trustee, served interrogatories and a document request on the Debtors when they would not initially yield on this issue. The purpose of those discovery requests was to elicit more precise information on the magnitude of the prepetition and postpetition intercompany claims to demonstrate the importance of the issue for the Subsidiary Debtors. Eventually, the Debtors agreed to disclose their intentions regarding the treatment of the intercompany claims during the Plan voting period, and not months after a confirmation order was entered. Ultimately, the Debtors indicated that they would not eliminate the intercompany claims of the Subsidiary Debtors. But tellingly, the concession that the Debtors made relating to intercompany claims was not applicable to all Debtors. It was narrowly focused in favor of the Debtors that the Applicants were advocating for (*i.e.* the preservation of the intercompany claims owed to the Subsidiary Debtors). To put into perspective what that meant to a subsidiary debtor like Frontier California (which was by far National's largest exposure to a subsidiary debtor), the amount of the intercompany claim owed to Frontier California was a multiple of the prepetition indebtedness issued by Frontier California.

- The original financing motions filed by the Debtors were vague as to which Debtors would (i) grant liens or guaranty the loans made to Frontier, and (ii) provide adequate protection claims or super-priority administrative expense claims for the new lenders. The Applicants actively negotiated modifications to the proposed financing orders to make clear that none of the Subsidiary Debtors would be pledging their assets to secure such loans, and that Frontier California, Frontier North, and West Virginia would not be guarantors of such loans. With respect to Frontier Florida and Southwest, the Applicants were successful in having Frontier Florida and Southwest carved out of the adequate protection provision in

7

the DIP Order, and they negotiated a marshalling concept in the DIP Order so that the assets of Frontier Florida and Southwest would only be looked to after the lenders had exercised remedies against the collateral posted by the other Debtors. These protections, especially those negotiated for Frontier Florida and Southwest relating to adequate protection carve-outs and marshalling concepts, would not have been included in the financing orders if not for the efforts of the Applicants.

- The original plan proposed by the Debtors, which was endorsed by the Noteholder Groups, allowed the Debtors at their option to eliminate equity interests of subsidiaries which would have undermined the structural seniority of the Subsidiary Noteholders to the Subsidiary Debtors' assets. Moreover, as was the situation for intercompany claims, the Debtors were not intending to timely reveal their intentions with respect to the elimination of equity interests of subsidiaries. The Applicants opposed the procedure set forth by the Debtors and indicated that they would oppose the substantive relief if the Debtors sought to eliminate the equity interests relating to the Subsidiary Debtors. Ultimately, the Debtors agreed to make a timely determination of whether the equity interests of the Subsidiary Debtors would be eliminated, and they decided that they would not do so. The Confirmation Order reflects the protections bargained for by the Applicants. Specifically, the separate legal existence of the Subsidiary Debtors was preserved, the nature of the business operations of the Subsidiary Debtors was preserved, and the structural seniority of the Subsidiary Noteholders with respect to subsidiary assets would be protected in any Restructuring Transaction undertaken by the Debtors. Those protections, especially the preservation of the structural seniority of the Subsidiary Noteholders with respect to Restructuring Transactions, would not have been adopted if not for the efforts of the Applicants.

- The original plan filed by the Debtors, which was endorsed by the Noteholder Groups, sought to reserve the right to recharacterize the postpetition interest payment made to Subsidiary Noteholders as a principal payment. Such a result would clearly have undermined the unimpaired treatment provided for by the plan. The Applicants objected to that reservation of rights in the plan and ultimately the Debtors backed down on this point. This would not have occurred without the efforts of the Applicants.

- Likewise, the DIP-to-exit motion originally proposed by the Debtors would have asked the Court to authorize the repayment of the Subsidiary Notes without the consent of the Subsidiary Noteholders. This would have breached the no-call provisions of the Subsidiary Notes and thus constituted a clear impairment of the Subsidiary Noteholders' rights thereunder. Ultimately, the Debtors recognized that the Subsidiary Noteholders' consent was necessary and they dealt specifically with the Applicants (and others) to seek that consent. The appropriate procedure would not have been followed if not for the Applicants' diligent efforts.

14.   The general theme of the Objection is that everything was worked out prepetition as part of the Restructuring Support Agreement ("**RSA**") and there was no need for anyone to

participate in the bankruptcy cases other than the Noteholder Groups who were the only impaired class. If that were true: (a) there would have been no need for a Creditors Committee since general unsecured creditors were to be paid in full under the RSA; (b) there would have been no need for two sets of counsel for the Noteholder Groups (since all intramural issues among the Noteholder Groups were resolved prepetition); and (c) the Prepetition Secured Lenders did not need to take any action in the bankruptcy cases to protect their interests since the Noteholder Groups had determined, albeit incorrectly, that they were unimpaired.

15. Importantly, there is nothing sacrosanct about a restructuring support agreement. It can be modified during a bankruptcy case—consider the treatment of the prepetition secured lenders described herein. Further, the terms negotiated in a restructuring support agreement are not all-encompassing—consider the indefinite treatment originally provided for intercompany claims and the potential elimination of the equity interests of the Subsidiary Debtors. Regardless, the transactions embedded in such an agreement were not vetted by the non-parties to the RSA, the regulators over the Debtors' business, the United States Trustee and, most importantly, the Bankruptcy Court—all of whom have significant roles to play before the contemplated transactions in a restructuring support agreement are effectuated.

**B.      The Services Provided by the Applicants Were Extraordinary.**

16. As outlined above, the narrowly tailored services performed by the Applicants were "extraordinary" as that term is used in deciding substantial contribution applications. The indentures governing the Subsidiary Noteholders did not have stringent covenants, the concept of impairment has not been clearly defined by the case law, and the Applicants' adversaries on these inter-estate issues were well financed and formidable. To achieve the protections for the Subsidiary Debtors discussed above with minimal litigation and disruption to the administration of the

bankruptcy cases was noteworthy. The chapter 11 process is designed to be flexible and to encourage creditor participation. On inter-estate issues when there is only one Debtors' counsel and one firm representing the Creditors Committee, but when there is a strong and aggressive advocate for one side of the table (here, the parent creditors), there needed to be an equally skilled advocate for the other side in order to achieve a balanced and fair result. Under these circumstances, the Applicants made an extraordinary contribution to the Subsidiary Debtors' estates that benefited all parties in interest in those cases.

17. The situation here is not even close to what the Court dealt with in *Sears*. *See* Objection at n. 11. Unlike here: (a) the alleged benefit in *Sears* was to only a subset of administrative creditors; (b) the alleged benefit was the result of comments made by the Court and not the efforts of the applicant; and (c) the alleged benefit of accelerating the repayment of the claim by eight months was not substantial.

18. The Noteholder Groups mischaracterize the Applicants' role as akin to merely monitoring the bankruptcy cases. They point to time entries for National's counsel totaling 3.9 hours, but the clear majority of that time related to interrogatories served on the Debtors to flesh out the magnitude of the intercompany claims—at the time the Debtors were reserving the right to extinguish such claims as part of their proposed plan. *See* May 13, 2020 version of the plan [Docket No. 281]. That is hardly a service related to merely "monitoring" the bankruptcy cases.

19. The Noteholder Groups concede that the Debtors made changes to the cash management order, multiple financing orders, the Plan, the Disclosure Statement, and the Confirmation Order based on positions taken by the Applicants. *See* Objection at n. 23. But somehow, the Noteholder Groups think it is relevant to examine the subjective intent of the Debtors for making those changes. ***First***, it is clear that the changes benefited the Subsidiary Debtors and

10

the Debtors would not have made them if not for the intervention of the Applicants. That ends the relevant inquiry. **Second**, it is not credible to argue that modifications insisted on by the Applicants would have inevitably been made. The Debtors tried to get third party releases for the Noteholder Groups from unimpaired creditors such as the Subsidiary Noteholders. Their efforts were successfully rebuffed by the Applicants and the Creditors Committee. The marshalling concept built into the DIP Order to protect Frontier Florida and Southwest was resisted for days by the Debtors before the DIP Lenders ultimately agreed to a compromise of the issue. The result reached on the preservation of intercompany claims protected the Subsidiary Debtors, but not other Debtors. Those results were not accidental or inevitable. The Applications clearly highlight the original problems in the Debtors' documents on inter-estate issues, and how they were resolved through the efforts of the Applicants—all without the need for excessive judicial intervention. That type of leadership, deployed in a constructive manner, which resulted in the successful results achieved from the Subsidiary Debtors' perspective, is "extraordinary" as that term is used in analyzing substantial contribution applications.

20. Finally, when the Debtors sought to refinance out the Subsidiary Notes in order to achieve major cost savings for the Debtors and to simplify their capital structure, the Applicants were front and center in those negotiations. This is an explicit recognition of the leading role played by the Applicants on behalf of the Subsidiary Debtors throughout these bankruptcy cases.

**C.     The Applicants' Roles were not Duplicative of Other Estate-Compensated Professionals.**

21. Under the RSA, the future owners of the Debtors were the Noteholder Groups. The Debtors agreed under the RSA not to undertake Restructuring Transactions unless they were acceptable to the Noteholder Groups. The Debtors functioned appropriately in these cases. But they clearly listened closely to the views of their RSA counter-party.

11

22. The Creditors Committee equally functioned appropriately in these cases. But their members included those of the Noteholder Groups. Moreover, parent company creditors comprised the majority of their overall constituency.

23. There was a void that needed to be filled for inter-estate issues to advocate for the Subsidiary Debtors and the Applicants filled that role.

24. As explained in the Applications, in order to achieve critical mass and get the recognition from the Debtors and other parties in interest, the Applicants needed to team up and their counsel acted as a virtual firm on their common issues. Both law firms staffed the matter leanly to avoid duplication which is reflected by the aggregate amount billed over a one-year period. Moreover, the scope of the services for which reimbursement is sought is limited to inter-estate issues and not the broader issues that impacted the cases. That is why the amount sought is relatively small compared to what others have billed the estates.

25. Counsel for the Indenture Trustee was also part of a Working Group formed with the Applicants. The Indenture Trustee's fees have been paid by the Debtors' estates, and it has played an important role in protecting the rights of certain of the Subsidiary Noteholders. But its role does not diminish the valuable efforts also played by counsel for the Applicants, especially at the beginning of the cases, when the Indenture Trustee was not yet fully engaged in the matter, and by the Ad Hoc Group with respect to the estates of West Virginia and Southwest, in which the Indenture Trustee had no interest. Further, as the Noteholder Groups well know, their parent company notes also had indenture trustees and that did not diminish the important role played by counsel for the noteholders themselves (who are the economic stakeholders).

12

26. Furthermore, to state the obvious, the diligent advocacy of the Applicants minimized the need for the Indenture Trustee and the trustee for the Verizon Secured Notes issued by Southwest to incur additional fees and expenses.

***

27. In various cases of multiple Debtors, inter-estate issues are dealt with in different ways. In the extreme case, an examiner is appointed to address the issues for the multiple constituencies (*e.g., Enron*). In other situations, an additional creditors committee is appointed to advocate for one particular estate. And, in other circumstances, like here, the inter-estate issues are addressed in a less formal way. The creditors negotiate, a consensual resolution is had, and a balanced result achieved—with a minimal amount of litigation. That is success in the chapter 11 world. Here, the parties who facilitated that result—and provided a tangible and direct benefit to a broad constituency—should be reimbursed for their substantial contribution to the cases.

## NOTICE

28. Notice of the Response will be provided to all required parties in accordance with the *Final Order (I) Establishing Certain Notice, Case Management and Administrative Procedures and (II) Granting Related Relief* entered on May 26, 2020 [ECF No. 390].

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, the Applicants respectfully request entry of an order, (i) approving of the fees requested in the Applications plus any additional fees and expenses expended pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code, (ii) overruling the Noteholder Groups' objection, and (iii) providing such other and further relief as the Court deems just and proper.

Dated: May 14, 2021
New York, New York

KING & SPALDING LLP

By: /s/ *Arthur J. Steinberg*
Arthur J. Steinberg
1185 Avenue of the Americas
New York, New York 10036-4003
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Email: asteinberg@kslaw.com

*Counsel for National Public Finance Guarantee Corporation*

SHEARMAN & STERLING LLP

By: /s/ *Joel Moss*

Joel Moss
Jordan A. Wishnew
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
Email: joel.moss@shearman.com
Email: jordan.wishenew@shearman.com

*Counsel to the Ad Hoc Group of Subsidiary Debtholders*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of the foregoing to be served by electronic mail through the Clerk's Office ECF noticing facilities upon the parties eligible to receive notice on this 14th day of May, 2021.

*/s/ Arthur J. Steinberg*
Arthur J. Steinberg
