UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No.: **20-22476 (RDD)** |
| Frontier Communications Corporation, et al.[1] | RESPONSE TO NOTICE OF REORGANIZED DEBTORS' OMNIBUS OBJECTION [DOC. #1818] TO CERTAIN DISPUTED COPYRIGHTED CLAIMS |
| | Hearing Date: June 15, 2021, at 10:00 am |

## RESPONSE TO NOTICE OF REORGANIZED DEBTORS' OMNIBUS OBJECTION TO CERTAIN DISPUTED COPYRIGHTED CLAIMS

Claimants Voltage Holdings, LLC; Backmask, LLC; Union Patriot Capital Management, LLC; Venice PI, LLC; Bedeviled, LLC; MON, LLC; Colossal Movie Productions, LLC; TBV Productions, LLC; Definition Delaware LLC; I Am Wrath Productions, Inc.; Hannibal Classics Inc.; Justice Everywhere Productions LLC; Badhouse Studios, LLC; After Productions, LLC; Rise Up, LLC; Status Update LLC; Morgan Creek Productions, Inc.; Shock and Awe, LLC; Fun Mom Dinner, LLC; Dead Trigger Movie, LLC; YAR Productions, Inc.; Gunfighter Productions, LLC; Ace in the Hole Productions, LP; SF Film, LLC; The Rest of Us, Inc.; Killing Link Distribution, LLC; Cell Film Holdings, LLC; Dallas Buyers Club, LLC; Screen Media Ventures, LLC; Rambo

---

[1] The last four digits of Debtor Frontier Communications Corporation's tax identification number are 9596. Due to the large number of debtor entities in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/ftr. The location of the Debtors' service address for purposes of these chapter 11 cases is: 50 Main Street, Suite 1000, White Plains, New York 10606.

V Productions, Inc.; Millennium Funding, Inc.; Millennium IP, Inc.; LHF Productions, Inc.; UN4

Productions, Inc.; Millennium Media, Inc.; Bodyguard Productions, Inc.; Hunter Killer

Productions, Inc.; Fallen Productions, Inc.; HB Productions, Inc.; Laundry Productions, Inc.;

Black Butterfly Film, LLC; AMBI Distribution Corp.; Dubious Productions, Inc.; Rupture CAL,

Inc.; Future World One, LLC; Groove Tails Productions, LLC; Family of the Year Productions,

LLC; Eve Nevada, LLC; After II Movie, LLC;  Wonder One, LLC; and American Cinema

International, Inc. ("movie claimants"), file their response to Debtors' NOTICE OF

REORGANIZED DEBTORS' OMNIBUS OBJECTION TO CERTAIN DISPUTED

COPYRIGHTED CLAIMS [Doc. #1818] ("Objection").  Debtors will be referred to collectively

as Frontier Communications, Inc. ("Frontier").

## I.      INTRODUCTION

The movie claimants filed pre-petition and post-petition administrative claims based upon

*inter alia* secondary liability for Frontier's subscribers' direct infringements of the copyrights in

their motion pictures and violations of the integrity of the copyright management information

("CMI") conveyed with their motion pictures per 17 U.S.C. §§1202(a)(2), (b)(2), (3).  A summary

of the claim numbers and claims is shown in Exhibit "1".

The movie claimants are producers of popular motion pictures currently available for sale

online and in brick and mortar retail stores. Many of these critically acclaimed motion pictures

were released in theaters throughout the world and feature A-list actors such as Matthew

McConaughey, Samuel Jackson, Ryan Reynolds, Sylvester Stallone, Nicholas Cage, Morgan

Freeman and Angela Basset, among others.

The movie claimants invested significant financial resources, time and effort in making

and marketing these motion pictures based upon the expectation that they would have an

2

opportunity to get a return on their investment from rentals and sales. Massive piracy of these motion pictures by subscribers of Frontier and the willful failure of Frontier to deal with this issue despite clear notice of it have hindered this opportunity.

The movie copyright claimants and/or their affiliates and other rightsholders engaged Maverickeye UG (haftungsbeschränkt) ("MEU") to monitor peer-to-peer/BitTorrent networks for acts of distribution of their motion pictures ("Works") and generate Notices of infringements ("Notices") styled per the Digital Millennium Copyright Action ("DMCA") to be sent to Internet Service Providers ("ISPs") of Internet Protocol ("IP") addresses where MEU confirmed infringement of copyright protected content. Each Notice detailed confirmed infringements of specific movie titles, at specific Internet Protocol addresses and port numbers and at specific times under the penalty of perjury. *See, e.g.,* Exhibit "2" (redacted Notice).

Plaintiffs' Agents sent over 191,300 Notices to Frontier concerning over 89,900 IP addresses associated with confirmed infringing activity as of March of 2020. Since Frontier's bankruptcy, Plaintiffs' agent has sent an additional 25,000 Notices, some of which concern the same IP addresses for which Notices were sent prior to the bankruptcy [i.e., 32.212.161.8 (73 Notices); 32.213.168.49 (73 Notices); 32.208.6.160 (91 Notices); 32.214.243.168 (39 Notices)]. *See* Second Decl. of Daniel Arheidt at ¶¶4-6.

The movie claimants' counsel sent a letter to Frontier on March 10, 2020 detailing concerns about Frontier's subscribers' widespread piracy of copyright protected content and providing specific examples of rather egregious subscribers assigned IP addresses for each of which 362 to 573 Notices were sent. *See* Decl. of Kerry S. Culpepper at ¶¶2-3. The activity of the subscriber at IP address 32.211.168.134 is illustrative of the damages that the movie copyright claimants have suffered from Frontier's policy of completely ignoring Notices. Between July 21, 2017 and Aug.

3

28, 2019, movie claimants' Agents sent 491 Notices to Frontier concerning confirmed infringements of the motion pictures *Once Upon a Time in Venice*, *The Hitman's Bodyguard*, *The Titan* and *Hellboy*.  *See* Second Decl. of Arheidt at ¶7.  During that same period, there were over 50,000 confirmed instances of this subscriber distributing copyright protected Works from the IP address.  If Frontier had just terminated this subscriber after the fifth, sixth, seventh, eighth, ninth or *even tenth* Notice in November of 2017 (after the subscriber had already accumulated over 1600 instances of distributing copyright protected Works including *Once Upon a Time in Venice*), there would not have been another:

(a) more than 9,500 instances of distributing *The Hitman's Bodyguard* (mere months after its theater run);

(b) more than 7,900 instances of distributing *Hurricane Heist*;

(c) more than 10,100 instances of distributing *Hellboy*; and

(d) more than 7,700 instances of distributing *After*.  *See* Id. at ¶8.

## II.    LEGAL STANDARD

A proof of claim is *prima facie* evidence of the validity and amount of a claim, and the objector bears the initial burden of persuasion. Fed.R.Bankr.P. 3001(f); see *Abboud v. Abboud* (In re Abboud), 232 B.R. 793, 796 (Bankr.N.D.Okla. 1999), aff'd, 237 B.R. 777 (10th Cir. BAP 1999); *In re Adelphia Communications Corp.*, 2007 WL 601452, at *5 (Bankr. S.D.N.Y.Feb.2007).

The burden then shifts to the claimant if the objector produces "evidence equal in force to the prima facie case ... which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Allegheny Intern.*, *Inc.*, 954 F.2d 167, 173-174 (3d Cir.1992), quoting *In re Holm*, 931 F.2d 620, 623 (9th Cir.1991).

4

When the burden is shifted back to the claimant, it must then prove by a preponderance of the evidence that under applicable law the claim should be allowed. *See Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000); *In re Holm*, 931 F.2d at 623; *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y.2000).

To establish direct copyright infringement, "a plaintiff must establish (1) ownership of a valid copyright and (2) unauthorized copying or a violation of one of the other exclusive rights afforded copyright owners pursuant to the Copyright Act." *Byrne v. British Broad. Corp.*, 132 F.Supp.2d 229, 232 (S.D.N.Y.2001) (citing *Twin Peaks Prods. v. Publ'ns Int'l. Ltd.*, 996 F.2d 1366, 1372 (2d Cir.1993)). "The Copyright Act does not expressly render anyone liable for infringement committed by another." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 434, 104 S.Ct. 774, 774, 78 L.Ed.2d 574 (1984). However, common law doctrines permit a court to impose secondary liability where "just" and appropriate. *Id*. at 435, 104 S.Ct. 774.

A defendant is liable for contributory copyright infringement where "one...with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971)).

To establish a claim for inducement, a plaintiff must show that the defendant "(1) engaged in purposeful conduct that encouraged copyright infringement, with (2) the intent to encourage such infringement." *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 425 (S.D.N.Y. 2011) (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 US 913, 937 (2005)). A defendant's intent to induce infringement can be established by evidence of the defendant's "clear expression" of such an intent, or of "affirmative steps taken to foster infringement." *Id.* (citing *Grokster*, 545 U.S. at 936-37, 125 S.Ct. 2764). In *Grokster,* an "advertisement or solicitation that

broadcasts a message designed to stimulate others to commit violations" was found to be direct evidence of inducement *Grokster* 545 U.S. at 937, 125 S.Ct. 2764.

A defendant may also be held liable for contributory copyright infringement if the defendant materially contributes to the infringing conduct of another, "with knowledge of the infringing activity". *Gershwin* 443 F.2d at 1162. Unlike an inducement claim, a claim for contributory infringement does not require a showing that the defendant intended to foster infringement. *Id.* at 942. To establish material contribution, a plaintiff must show that the defendant (1) had actual or constructive knowledge of the infringing activity, and (2) encouraged or assisted others' infringement, or provided machinery or goods that facilitated infringement. *See Faulkner v. Nat'l Geographic Soc'y*, 211 F.Supp.2d 450, 473-74 (S.D.N.Y.2002), aff'd at 409 F.3d 26 (2d Cir.2005).

Vicarious liability for copyright infringement exists where the defendant "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *Gershwin Pub. Corp.*, 443 F.2d at 1162. Unlike contributory infringement, knowledge is not an element of vicarious liability. *Id.*

When alleging liability under §1202 of the DMCA, "Courts have applied this statute in a straightforward manner". *See BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 109 (S.D.N.Y. 2010) (finding a plaintiff must only allege the existence of CMI, removal and/or alteration of the CMI, and that the removal and/or alteration was done intentionally); *see also, Associated Press v. All Headline News Corp.*, 608 F.Supp.2d 454, 461 (S.D.N.Y.2009).

III.    ARGUMENT

As explained more fully below, Frontier is secondarily liable for their subscribers' widespread piracy of the movie claimants' Works and DMCA violations.  Frontier is liable as a

contributory infringer because it had actual knowledge of this widespread piracy and DMCA violations but purposely chose to do nothing so that it could continue to profit from it and continued to provide the Internet service to its subscribers that facilitated infringement. *See Faulkner*, 211 F.Supp.2d at 473-74 (S.D.N.Y.2002). Frontier is also vicariously liable for its subscribers' piracy and DMCA violations because it has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities. *Gershwin Pub. Corp.*, 443 F.2d at 1162. Frontier has no safe harbor from liability for infringement because it failed to implement the requisite policy.

A.  Frontier's subscribers directly infringe and violate the movie claimants' rights.

1.  Frontier's subscribers directly infringe the movie claimants' exclusive rights of distribution.

In Frontier's Objection, it asserts "The Claimants cannot establish any direct and actual copyright infringement by Frontier subscribers…". Objection at. pg. 6. However, Plaintiffs' agent MEU monitored "peer-to-peer/BitTorrent networks for acts of distribution of copyright owners' motion pictures through the use of proprietary…software" and "logged evidence of infringing activity set forth in each of the notices, including IP addresses, times, and hash values, that accurately reflects instances of actual observed distribution of copyright owners' motion pictures by the infringing IP addresses." Claim #2742, Decl. of Daniel Arheidt at ¶¶ 3, 10. Each Notice sent by the movie claimants' Agent asserted that the Work was being distributed by Frontier's subscriber. *See*, *e.g.* Exhibit "2" (example notice). Accordingly, the Notices sent by movie claimants' agents and MEU's logged evidence establish that Frontier's subscribers distributed copies of their Works. Moreover, the MEU logs include evidence of acts of distributions of movie claimants Works that is *exponentially* higher than the number of Notices. For example, during July 21, 2017 and Aug. 28, 2019, when Plaintiffs' Agents sent 491 Notices to Frontier concerning

7

confirmed infringements of the motion pictures *Once Upon a Time in Venice*, *The Hitman's Bodyguard*, *The Titan* and *Hellboy* at IP address 32.211.168.134, MEU logged more than 9,500 instances of the subscriber distributing *The Hitman's Bodyguard* and more than 10,100 instances of distributing *Hellboy*.  *See* Second Decl. of Arheidt at ¶¶7-8.

In Frontier's Objection, it asserts, "The only evidence that the Claimants have set forth of direct infringement is that the Claimants sent notices to Frontier alleging that someone using an IP address assigned to Frontier *made available* a copyrighted work on what is called a peer-to-peer network…"  Objection at pg. 7.  Frontier goes on to cite a notice sent by a different Claimant as support for its assertion that the notices are "highly equivocal".  Id. Frontier does not even discuss the Notices that the movie claimants' agent sent to Frontier which are not "highly equivocal".  For example, Anna Reiter states under penalty of perjury that "The unauthorized download and distribution of this file by your IP address constitutes copyright infringement….And, you're also creating a security risk on your computers, devices and networks when you download unauthorized movies or allow others to do so from your Internet connection. We respectfully ask that you stop infringing and redistributing Bodyguard Productions, Inc. copyright protected content…."  Exhibit "2".

Moreover, although the movie claimants' assertion is that Frontier's subscribers actually distributed and reproduced copies of their Works as discussed more fully below, leading copyright experts, the U.S. Copyright Office, and international treaties (to which the United States is a signatory) conclusively establish that making available a copyrighted Work is still a violation of their exclusive right of distribution.  *See* NIMMER ON COPYRIGHT § 8.11[B][4][d](2013)(concluding that the "act of making available sound recordings for downloading by the public through file-sharing networks suffices to show actionable copyright

infringement."); *see also* U.S. COPYRIGHT OFFICE, THE MAKING AVAILABLE RIGHT IN THE UNITED STATES at p. 74 (Feb. 2016) ("Copyright Office Report") ("In general, where a party offers members of the public access to a work in the form of a download, the offer implicates the right of distribution . . . . the statutory language, context, and legislative history all indicate that Congress intended to reserve to copyright owners the right to determine whether and how their works are made available to the public in copies, including digital files…."); *See also*, World Intellectual Property Organization Internet Treaties ("WCT") ("[A]uthors of literary and artistic works shall enjoy the exclusive right of authorizing any communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them.") WCT, art. 8 at p. 13.2. This interpretation has been adopted by Courts throughout the United States. *See Atl. Recording Corp. v. Anderson*, No. H-06-3578, 2008 WL 2316551, at *7 (S.D. Tex. Mar. 12, 2008) (Gilmore, J.)("[M]aking copyrighted works available for download via a peer-to-peer network contemplates 'further distribution,' and thus constitutes a violation of the copyright owner's exclusive 'distribution' right under 17 U.S.C. § 106(3).")

2.  Frontier's subscribers directly infringe the movie claimants' exclusive rights of reproduction.

The movie claimants have set forth further evidence of direct infringements in addition to the Notices and MEU capture logs.  Some of Frontier's subscribers have registered for accounts with notorious piracy websites such as YTS and RARBG that the United States Trade Representative ("USTR") has listed as examples of Notorious Markets engaged in and facilitating substantial piracy.  *See* USTR, 2014 Out-of-Cycle Review of Notorious Markets, Mar. 5, 2015, pg.                         17,                         Available                         at https://ustr.gov/sites/default/files/2014%20Notorious%20Markets%20List%20-%20Published_0.

pdf [last accessed on May 7, 2021]; USTR, *2018 Out-of-Cycle Review of Notorious Markets*, April

2019, pgs. 24, 27-28 Available at

https://ustr.gov/sites/default/files/2018_Notorious_Markets_List.pdf [accessed on May 7, 2021].

    The Frontier subscribers shown in Exhibit "3" registered for accounts with the YTS website,

downloaded torrent files for reproducing and sharing the Works, and distributed copies of the

Works from their respective IP addresses provided by Frontier.  For example, the Frontier

subscriber at IP address 47.144.236.81 used a yahoo email address to download a torrent file for

the Work *Angel Has Fallen* from the YTS website on 11/26/2019.  MEU obtained evidence logs

including capture records of this same subscriber sharing copies of *Angel Has Fallen* shortly

thereafter, as well as other movie claimants' titles.  *See* Second Decl. of Arheidt at ¶9.

    These Frontier subscribers <u>must</u> have downloaded and reproduced a complete copy of the

Works such as *Angel Has Fallen* from the torrent file they obtained from YTS or else they would

not have been able to distribute copies of it.

3.   Frontier's subscribers violate the integrity of movie claimants' copyright management

information.

    Frontier's subscribers share illegitimate file copies of the movie claimants' Works with file

titles altered to "brand" the pirated copy with the notorious piracy website and further drive traffic

to the website.  The file titles of legitimate digital copies of the Works are copyright management

information ("CMI") as defined in 17 U.S.C. §1202(c).  *See Energy Intelligence Grp., Inc. v.

Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261, 267 (5th Cir. 2020) (holding that filenames

constitute CMI).  These violations of the integrity of the CMI are referred to as "DMCA violations".

    For example, as stated above, the Frontier subscriber at IP address 47.144.236.81 who

downloaded the Work *Angel Has Fallen* from the YTS website on 11/26/2019, was then confirmed

sharing copies of the Work by the altered file name: "Angel Has Fallen (2019) [BluRay] [720p] [YTS.LT]". *See* Second Decl. of Arheidt at ¶9. Fallen Productions, Inc. (now owned by Millennium Funding, Inc.) did not include the piracy website YTS.LT in the file title of a digital copy of its Work *Angel Has Fallen*. This same subscriber was confirmed also sharing copies of other movie claimants' Works with altered CMI such as: (a) *Fun Mom Dinner* under the file name "Fun Mom Dinner (2017) [1080p] [YTS.AG]"; (b) *After* under the file name "After (2019) [WEBRip] [1080p] [YTS.LT]"; as well as other Works with file names with altered CMI indicative of piracy websites/organization such as "BONSAI", "iExTV" and "RARBG". *See* id. These movie claimants also do not release file titles of their Works that include names of piracy groups.

Frontier's subscribers such as the subscriber at IP address 47.144.236.81 knew they were distributing illegitimate file copies of the Works with false CMI – as many of them have registered accounts with these piracy websites. Frontier's subscribers knew that the CMI would encourage others to go to the same piracy website to obtain torrent files to copy the movie claimants' Work in violations of the movie claimants' rights. Accordingly, Frontier's subscribers actions directly violate the movie claimants' integrity of the CMI per 17 U.S.C. §§ 1202(a)(2), (b)(2) and (b)(3).

B.    Frontier's subscribers' infringements were extremely damaging to movie claimants.

Frontier asserts that "Claimants do not allege that any Frontier customer shared a copyrighted work with any other Frontier customer or any third party, but only with the Claimants themselves or with one of Claimants' agent." Objection at pg. 8. However, Courts in copyright infringement cases have accepted evidence of downloads by plaintiff's investigator to establish both unauthorized copying and distribution of a plaintiff's work." *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc*. ["Cox II"], 199 F. Supp. 3d 958, 972 (E.D. Va. 2016); *Arista Records LLC v. Usenet.com , Inc.*, 633 F.Supp.2d 124, 149-150 n.16 (S.D.N.Y. 2009) ("Defendants' argument

11

that [downloads by Plaintiffs' investigators] are not proof of unauthorized copying because Plaintiffs had 'authorized' the downloads by their investigators is without merit. Courts routinely base findings of infringement on the actions of plaintiffs' investigators." (collecting cases)); *Warner Bros. Records Inc. v. Walker*, 704 F. Supp. 2d 460, 467 (W.D. Pa. 2010) (holding that downloads by MediaSentry [a third-party service used to detect infringement] "establish[ed] unauthorized distribution as to those nine recordings"); *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1216 (D. Minn. 2008) ("[D]istribution to MediaSentry can form the basis of an infringement claim."); *Universal City Studios Prods. LLLP v. Bigwood*, 441 F. Supp. 2d 185, 190 (D. Me. 2006) ("[B]y using [a peer-to-peer network] to make copies of the Motion Pictures available to thousands of people over the internet, [d]efendant violated Plaintiffs' exclusive right to distribute the Motion Pictures."); *see also UMG Recordings, Inc. v. Grande* ["Grande II"], 384 F. Supp. 3d 743, 765 (W.D. Tex. 2019) (rejecting defendant's argument regarding tertiary liability and holding that "the [c]ourt concludes a theory of direct liability properly applies to [the ISP's] customers, either through making infringing materials available, or through actual dissemination of infringing materials".)

Movie claimants repeatedly allege that, for example, "the FC subscribes at over 20,000 IP addresses have distributed copies of the Work *The Hitman's Bodyguard* multiple times despite over 36,000 Notices being sent to FC." Claim #2754 at ¶13. On January 18, 2021, the Movie claimants provided Frontier's counsel with:

(a) an excel sheet "Frontier Notices" listing the Notices sent and for each Notice: the IP address; Filehash; Filename; Notice Sent Date; Title; Client Port; Region information; and transfer end date. Each notice was generated based upon captured instances of infringement at a Frontier IP address;

12

(b) an excel sheet "YTS FC users" listing information for Frontier subscribers that registered for accounts with the piracy website YTS and downloaded torrent files for movie claimants' Works from Frontier IP addresses for downloading and sharing copies of the Works [attached to this response as Exhibit "3"];

(c) all 573 notices the movie claimants' agent sent to Frontier concerning just IP address 47.146.148.100; and

(d) a document "Frontier_Hits" showing infringement capture records for some of the more egregious Frontier subscribers (including 47.146.148.100). *See* Decl. of Culpepper at ¶4

Frontier provided no response to movie claimants until May 14, 2021 when Frontier's counsel requested permission to seek bankruptcy adjudication. *See* id. at ¶5. Accordingly, contrary to Frontier's assertion, the movie claimants' have provided extensive evidence to Frontier of their subscribers' piracy.

Frontier's assertion that any infringements were *de minimis* is contrary to the facts and common sense. As discussed above, the subscriber at IP address 32.211.168.134 was confirming sharing copies of: *The Hitman's Bodyguard* merely months after its theater run for more than 9,500 instances; *Hurricane Heist* for more than 7,900 instances; *Hellboy* for more than 10,100 instances; and *After* for more than 7,700 instances between July 21, 2017 and Aug. 28, 2019. *See* id. at ¶8. It would defy common sense to assume that this subscriber did not share copies with anyone else during 13 months of continuously making the Works available for distribution.

The activity of Frontier's subscriber at 32.212.161.8 illustrates the fallacy of Frontier's contention. The movie claimants' agent has sent over 70 Notices (one as recently as May 30, 2021) to Frontier concerning this subscriber's more than 700 confirmed instances of distributing the Work *Angel Has Fallen* by participating in a "swarm" where other peers are distributing the

same Work by a unique certain hash number under the file name "Angel.Has.Fallen.2019.1080p.WEBRip.x264-RARBG". *See* id. at ¶10. During the same time period that the Frontier subscriber at 32.212.161.8 was participating in the swarm, MEU has confirmed that 328 other Frontier subscribers participated in the swarm. *See* id at ¶11.

Moreover, looking at the damages cause by the Frontier subscribers collectively gives a fuller picture. For example, MEU confirmed over 400,000 instances of Frontier subscribers sharing the Work *The Hitman's Bodyguard*. *See* id at ¶12.

C.    Frontier was obligated to take simple measures to stop further infringements in response to the Notices.

Frontier boldly asserts that it had no obligation to act based upon the Notices. *See* Objection at pg. 9. No court has adopted this position. Frontier is attempting to recast the widely rejected argument that the DMCA requires multiple *adjudications* of infringement before an ISP must take action to maintain its safe harbor. The Fourth Circuit explicitly rejected such an assertion by the ISP Cox and stated, "…Congress knew how to expressly refer to adjudicated infringement but did not do so in the repeat infringer provision…That suggests the term "infringer" in §512(i) is not limited to adjudicated infringers." *BMG Rights Mgmt. (US) LLC v. Cox Communs*., Inc., 881 F.3d 293, 302 (4th Cir. 2018). Courts across the United States have concluded that notices similar to those sent by movie claimants' agent to Frontier sufficed for establishing the requisite knowledge for contributory infringement. *See Cox II*, 199 F. Supp. 3d at 979 (finding that the "jury could reasonably conclude that Rightscorp captured infringing activity on Cox's network, and that had Cox received the notices they would have satisfied the knowledge requirement); *UMG Recordings, Inc. v. RCN Telecom Servs*., LLC, Civil Action No. 19-17272 (MAS) (ZNQ), 2020 U.S. Dist. LEXIS 158269 (D.N.J. Aug. 31, 2020) (notices from Rightscorp

14

provide factual support for Plaintiffs' allegation that RCN had knowledge of the infringement); *Warner Bros. Records, Inc. v. Charter Communs., Inc.,* 454 F. Supp. 3d 1069 (D. Colo. 2019) (Finding that Plaintiffs' allegations that Defendant's failure to stop or take other action in response to notices of infringement is a draw to current and prospective subscribers to purchase and use Defendant's internet service to pirate Plaintiffs' copyrighted works supports claim for vicarious infringement); *UMG Recordings, Inc. v. Grande Communs. Networks*, LLC, No. A-17-CA-365-LY, 2018 U.S. Dist. LEXIS 32275 (W.D. Tex. Feb. 28, 2018) (the Court was persuaded that UMG pled a plausible claim of secondary infringement based on Grande's alleged failure to act when presented with evidence of ongoing, pervasive infringement by its subscriber from the Rightscorp notices); *see also Jalbert v. Grautski*, 554 F. Supp. 2d 57, 68 (D. Mass. 2008) ("Although the defendant must have knowledge of the infringing activity, the defendant need only have known of the direct infringer's activities, and need not have reached the legal conclusion that those activities infringed a copyrighted work.") (internal quotation omitted).

D.    Frontier has no safe harbor for liability

1.    Frontier has no safe harbor for secondarily liable for its subscribers' direct infringements.

The DMCA shields a service provider such as Frontier from liability for the infringing acts of its users if the provider satisfies certain conditions. *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 88 (2d Cir. 2016). One of those conditions requires that a service provider "adopt[] and reasonably implement[] . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." *Id.* (citing 17 U.S.C. § 512(i)(1)(A)), *BMG Rights Mgmt. (US) LLC v. Cox Communs.*, Inc., 881 F.3d at 305 (4th Cir. 2018) ("(Cox failed to qualify for the DMCA safe harbor

15

because it failed to implement its policy in any consistent or meaningful way — leaving it essentially with no policy).

Similarly to *Cox*, Frontier has failed to terminate any repeat infringers and/or take any meaningful actions against these subscribers in response to these Notices consistent with a reasonably implemented policy ("policy") for termination of subscribers and account holders of the service provider's system or network who are repeat infringers necessary to support a safe harbor from liability per the DMCA.

Frontier argues that it has a policy that involves placing subscribers in a "walled garden" and terminating subscribers in appropriate circumstances. Objection at pg. 16. However, the sheer number of Notices sent by movie claimants over an extended period demonstrates that any policy of Frontier is simply a sham. As stated above, the movie claimants' agent has sent over 70 Notices to Frontier between February 13 and May 30, 2021 concerning the subscriber at IP address 32.212.161.8 distributing copies of the Work *Angel Has Fallen* for over 700 instances yet just within the last month this subscriber is *still* pirating the movie claimants' Works. *See* id at ¶11. Frontier's so called "Walled Garden" is more akin to a sprawling wild forest but of freely pirating customers instead of wildflowers. Accordingly, Frontier has no safe harbor from secondary liability for copyright infringement.

2.      Frontier has no shield from secondary liability for its subscribers' DMCA violations.

Frontier's objection completely ignores the movie claimants' claims based upon secondary liability for Frontier's subscribers' DMCA violations of 17 U.S.C. §§1202(a)(2), (b)(2), (3). Frontier had knowledge that its subscribers were sharing copies of the movie claimants' Works with altered CMI from the Notices sent to Frontier from movie claimant's Agent. For example, the movie claimants' agent sent over 70 Notices to Frontier that its subscriber at IP address

32.212.161.8 is sharing copies of *Angel Has Fallen* under the file name "Angel.Has.Fallen.2019.1080p.WEBRip.x264-RARBG". *See* id at ¶11. Nonetheless, Frontier continued to and *still continues to this day to* provide service to its subscribers that engage in widespread piracy. Accordingly, Frontier is secondarily liable for its subscribers DMCA violations.

17 U.S.C. §512(a) provides that "A service provider shall not be liable for monetary relief…for *infringement of copyright*….". Thus, the safe harbor does not foreclose Frontier from being liable for these DMCA violations. Assuming *arguendo* that the safe harbor applies, Frontier is still liable for these DMCA violations because Frontier failed to reasonably implement the requisite policy as discussed above.

E.    Frontier did not act in good faith or even act at all.

Frontier contends *ipse dixit* that it "at all times acted responsibly and in good faith." However, the vast number of Notices sent by the movie claimants and the UMG-Capital/McGraw Hill claimants undermines Frontier's contention.

F.    The movie claimants should be awarded maximum statutory damages.

Frontier's conduct of ignoring Notices is wanton and willful. Even now (as recently as May 30, 2021) Frontier continues to intentionally allow the subscriber at IP address 32.212.161.8 to pirate *Angel Has Fallen* and other Works despite the movie claimants' agent having sent Frontier over 70 Notices. *See* id at ¶10. The reason is clear – Frontier profits from subscribers that use the service to pirate movie claimants' Works.

Moreover, the movie claimants' demand for maximum statutory damages is reasonable because the movie claimants' actual damages from Frontier's complete failure to terminate the accounts of its pirating customers are higher than $150,000. As stated above, between July 21,

17

2017 and Aug. 28, 2019, Plaintiffs' Agents sent 491 Notices to Frontier concerning confirmed infringements of the motion pictures *Once Upon a Time in Venice*, *The Hitman's Bodyguard*, *The Titan* and *Hellboy* by the subscriber at IP address 32.211.168.134. The subscriber was confirmed sharing copies of *The Hitman's Bodyguard* more than 9500 times and of *Hellboy* more than 10,100 times. However, this just concerns one subscriber. MEU confirmed over 400,000 instances of sharing *The Hitman's Bodyguard* by over 25,000 unique IP addresses of Frontier and over 244240 instances of sharing *Hellboy* by over 12,000 unique IP addresses of Frontier. *See* id at ¶¶7-8 and 12. Each instance of sharing was the transfer of an unrestricted copy of the Work. Accordingly, the retail price to purchase a copy of the Work is the basis for damages. The movie claimants' demand for maximum statutory damages is consistent with 17 U.S.C. § 504(C)(1). The movie claimants reserve the right to request that the Court conduct a jury trial to decide the amount of damages pursuant to 28 U.S.C. §157(e) and LR 9015-1.

G.  Frontier has failed to set forth evidence rebutting movie claimants' *prima facie* case.

The movie claimants' claims include allegations verified by a declaration of MEU. Frontier has failed to set forth *any* evidence refuting the allegations of the claimants. Accordingly, Frontier has failed to meet its burden to produce "evidence equal in force to the prima facie case ... which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Allegheny Intern., Inc.*, 954 F.2d at 173-174 (3d Cir.1992). Frontier does not even address the movie claimants' DMCA claims. Accordingly, the Court should deem the movie claimants' claims allowed at the amount claimed pursuant to 11 U.S.C. § 502(b).

H.    Frontier's proposed adjudication schedule is legally and practically unworkable.

1.    It is impossible legally.

18

Frontier proposes a deadline of June 30, 2021 to serve third-party subpoenas and a close of discovery in November 5, 2021. Objection at pgs. 6-7.  However, Frontier asserts that "Claimants cannot prove direct and actual copyright infringement by Frontier Subscribers." Id. at pg. 7.  Accordingly, the movie claimants intend to serve a subpoena on Frontier for the identities of a percentage of the more than 89,000 subscribers that pirated their Works in order to prove up the direct infringements and also to prove that Frontier's so-called safe harbor was a sham.   The normal practice for this type of subpoena is to give subscribers a time period to object to disclosure. For example, the Cable Act (47 USC 551(c)(2)(C))) requires a cable provider to provide "…the subscriber the opportunity to prohibit or limit such disclosure."  This District regularly requires ISPs to give their subscribers 60 days to make any objections before disclosing their identities. *See Strike 3 Holdings, LLC v. Doe*, No. 21-cv-1850 (AJN), 2021 U.S. Dist. LEXIS 90806 (S.D.N.Y. May 12, 2021) (Ordering ISP to give Defendant 60 days from the date of service of the Rule 45 subpoena and this Order upon them to file any motions with the Court contesting the subpoena including a motion to quash or modify the subpoena).  On top of the 60 day period, there will be time required for Frontier to notify the subscribers and most importantly time for the movie claimants to study the identification data and contact Frontier's subscribers and depose those subscribers the movie claimants' deem necessary. Accordingly, the discovery period should be extended by an additional 180 days at least.

2.      It is impossible factually.

There will likely be terabytes of data to be studied and analyzed by both sides such as the communications of Frontier concerning the so-called policy, data files capturing the infringements, and the notices.  It is unrealistic to believe either side will be able to ingest this data within 45 days

and be prepared to have meaningful depositions.   The time for the evidentiary hearing should be one year from the date the Court rules on Frontier's objection at earliest.

3.      Frontier and the movie claimants should be first required to attempt to negotiate the disputed claims and a proposed adjudication schedule.

The movie claimants propose that Frontier and the movie claimants ("Parties") first make a good faith attempt to negotiate the disputed claims and, should negotiations to resolve the disputed claims fail, negotiate a proposed adjudication schedule.   Such an approach is consistent with the language of Article VII.A of the confirmed Plan that the parties attempt to "consensually" resolve disputes.   Confirmation Order of Plain, Art. VII.A. [Doc. # 1005].   To this end, the movie claimants propose the following schedule:

| Date | Event Deadline |
|------|----------------|
| June 15, 2021 | Frontier provides confidential offer to resolve all of movie claimants' claims. Status hearing – Court sets order for Parties to negotiate. |
| June 22, 2021 | Movie claimants provide confidential counteroffer if Frontier's offer is rejected |
| June 30, 2021 | The Parties' representative(s) meet and confer to decide whether mediation would be beneficial.   If Parties agree that mediation would be beneficial, Parties select a mediator to be paid equally by Parties.  If Parties decline |

| | mediation, Parties meet and confer on proposed adjudication schedule. |
|---|---|
| July 30, 2021 | Deadline for confidential settlement statements to mediator. Deadline for Parties to submit alternative proposed adjudication schedule if unable to consensually determine a schedule. |
| August 16-20, 2021 | Up to 8 hours of Mediation (if agreed by Parties). |
| September 17, 2021 | Deadline for Parties to report results of mediation (if agreed by Parties). |

III.    CONCLUSION

The movie claimants respectfully request that their pre-petition and post-petition claims be deemed allowed and/or that Frontier be ordered to make a good faith attempt to negotiate the disputed claims and a proposed adjudication schedule with movie claimants' counsel.


DATED: Kailua-Kona, HI, June 7, 2021.


/s/ Kerry S. Culpepper
Kerry S. Culpepper
CULPEPPER IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawaii 96740
Telephone:    (808) 464-4047
Facsimile:    (202) 204-5181
E-Mail:    kculpepper@culpepperip.com