**Responsive Papers Due: October 17, 2022**

Andrew A. Wittenstein
Jonathan D. Daugherty
FRIEDMAN & WITTENSTEIN
A Professional Corporation

1345 Avenue of the Americas
Second Floor
New York, NY 10105
Tel: (212)750-8700
Email:     awittenstein@friedmanwittenstein.com

*Co-Counsel to the Reorganized Debtors*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FRONTIER COMMUNICATIONS CORPORATION *et al.,* | ) | Case No. 20-22476 (MG) |
| | ) | |
| | ) | Hon. Martin Glenn, Chief Judge |
| | ) | |
| Reorganized Debtors. | ) | (Jointly Administered) |
| | ) | |

## REORGANIZED DEBTORS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

Preliminary Statement........................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 2

    Background ........................................................................................................................ 2

    The 2019 Nokia License Agreement ................................................................................. 2

    Frontier Attempts to Obtain the Nokia Licenses from IV .................................................. 3

    Frontier Finally Obtains the 2019 Nokia License ............................................................. 5

    The Lantiq License ........................................................................................................... 7

    The AT&T Documents Reveal IV/Dechert's Knowledge of the Lantiq Issue ................... 9

ARGUMENT ........................................................................................................................ 14

    POINT I

    THIS COURT SHOULD DISMISS IV'S CLAIMS IN THEIR ENTIRETY
    BASED ON THE COURT'S INHERENT POWERS...................................................... 14

    POINT II

    THE COURT SHOULD DECLARE THIS MATTER
    TO BE AN "EXCEPTIONAL CASE" PURSUANT TO 35 U.S.C. § 285 ...................... 20

    POINT III

    THE COURT SHOULD AWARD ATTORNEYS' FEES TO
    FRONTIER PURSUANT TO 28 U.S.C. § 1927 DUE TO
    UNREASONABLE AND VEXATIOUS CONDUCT BY IV'S COUNSEL.................. 22

CONCLUSION...................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**                                                                                                **Page(s)**

*Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n,*
   886 F.3d 863 (10th Cir. 2018) ............................................................... 23

*Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.,*
   393 F.3d 1378 (Fed. Cir. 2005)............................................................... 20

*Brown v. City of New York,* 1
   5-CV-4488, 2018 WL 3193208 (E.D.N.Y. June 28, 2018) .................................... 18

*CDR Creances S.A.S. v Cohen,*
   23 N.Y.3d 307, 15 N.E.3d 274 (N.Y. 2014) .................................................... 15-16

*Chambers v. NASCO, Inc.,*
   501 U.S. 32, 111 S. Ct. 2123 (1991)........................................................... 14, 15

*Connecticut General Life Ins. Co. v. New Images of Beverly Hills,*
   482 F.3d 1091 (9th Cir. 2007) ............................................................... 19

*Demodulation, Inc. v. United States,*
   122 Fed. Cl. 652 (2015) ............................................................... 23

*Doe 1 v. East Side Club, LLC.,*
   18 Civ. 11324, 2021 WL 2709346 (S.D.N.Y. July 1, 2021) .................................... 23

*Goodyear Tire & Rubber Co. v. Haeger,*
   581 U.S. 101, 137 S. Ct. 1178 (2017)........................................................... 15, 19

*Impression Prods., Inc. v. Lexmark Int'l, Inc.,*
   137 S. Ct. 1523, 198 L. Ed. 2d 1 (2017) .................................................... 2

*In re Plumeri,*
   434 B.R. 315, 327 (S.D.N.Y. 2010) ............................................................... 15

*Izzo v. ING Life Ins. and Annuity Co.,*
   235 F.R.D. 177 (E.D.N.Y. 2005)........................................................... 22-23

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,*
   572 U.S. 545, 134 S. Ct. 1749 (2014)........................................................... 20-21

*Quanta Computer, Inc. v. LG Elecs., Inc.,*
   553 U.S. 617 (2008)........................................................... 2

*Raniere v. Microsoft Corp.,*
   887 F.3d 1298 (Fed. Cir. 2018)........................................................... 21

*Reyes-Santiago v. JetBlue Airways Corp.*,
   932 F. Supp. 2d 291 (D. P.R. 2013)......................................................................................... 19

*SecurityPoint Holdings, Inc. v. United States*,
   147 Fed. Cl. 499 (2020) ...................................................................................................... 23

## **Statutes**

28 U.S.C. § 1927 ................................................................................................................. 22-23

35 U.S.C. § 285 .................................................................................................................. 20-21

**Preliminary Statement**

The Reorganized Debtors' (Frontier's) Motion to Dismiss concerns a critical and central issue: whether Intellectual Ventures ("IV") and its counsel ("Dechert") engaged in improper conduct purposely designed to hide the fact that approximately three-fourths of the allegedly infringing networks devices are immune from inclusion in the damages calculation because they are already licensed. The record shows that they did. This motion also raises the serious question of whether IV's and Dechert's conduct warrants the rare remedy of dismissal of IV's claims altogether, as well as other relief. We will show that it does.

As explained below, Dechert and IV knew that most of the accused Frontier products are licensed, but falsely claimed at various times that key licensing documents were "irrelevant" or that they had been "destroyed," and they continually frustrated Frontier's efforts to discover their existence and impact. The record thus demonstrates that IV and Dechert willfully filed multimillion dollar claims in this Court that they knew could not form the basis of a damages award as a matter of settled law. Their all-out effort to prevent dispositive documents from ever coming to light was almost successful, and was thwarted only by Frontier's persistence in its belief that something disturbing was taking place. The Court's recent observation that Dechert and IV have been "making life as impossibly difficult as possible for Frontier" (Aug. 23, 2022 Hrg. Transcript, p. 22) is, as explained in painful detail below, an accurate assessment of how Dechert and IV have litigated this case.

Frontier recognizes the gravity of the accusations contained herein, and would not make them unless a careful review of the facts and law demonstrated the merits of this motion. IV and Dechert will undoubtedly argue that the relief that Frontier is seeking is "drastic." Be that as it may, we have never before encountered a situation involving widespread attorney misconduct – going to the heart of the case – of the type involved here.

## STATEMENT OF FACTS

### Background

As the Court is aware from the parties' prior submissions, this is a patent infringement

claim in which IV, on August 18, 2020, accused Frontier of infringing five of its patents

connected with Digital Subscriber Line Access Multiplexer (DSLAM) equipment, which is a

network distribution device that aggregates individual subscriber lines into a high-capacity

uplink.  The legal principle underlying Frontier's motion – and the impetus for IV's and

Dechert's incessant stonewalling – is the patent exhaustion doctrine.  "The longstanding doctrine

of patent exhaustion provides that the initial authorized sale of a patented item terminates all

patent rights to that item."  *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008).

That is, where a licensee sells a product substantially embodying licensed patent rights, the

patent rights are deemed "exhausted" and downstream users are exempt from suit.  *See*

*Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1535, 198 L. Ed. 2d 1 (2017)

("That licensee's sale is treated, for purposes of patent exhaustion, as if the patentee made the

sale itself.  The result:  The sale exhausts the patentee's rights in that item.").

### The 2019 Nokia License Agreement

Long before filing its dispute against Frontier, IV had already licensed the asserted

patents to Nokia, and covenanted in that license not to sue Nokia customers.  (Declaration of

Andrew A. Wittenstein In Support of Reorganized Debtors' Motion To Dismiss ("AAW Decl.")

¶ 3 and Ex. 1 § 2.1.1, referred to herein as the "2019 Nokia License").  Frontier is one of Nokia's

customers.  By August 2020, therefore, when IV first accused Frontier's Nokia DSLAMs of

infringing the five asserted patents in this case, IV knew that the 2019 Nokia License to which it

-2-

was a party precluded the claim as to many of the DSLAMs used by Frontier.  (AAW Decl. Ex. 2 at 2 ¶ 8 (accusing the Alcatel 7300 *by name*)).[1]

      Not only did IV (as a party to the agreement) know of the Nokia license, but the attorneys *in the present case* also indisputably knew about it.  Indeed, in another matter in 2017, Martin Black – lead counsel for IV in this case – was the lead counsel in another of IV's litigations.  In that case, IV and Dechert became aware – if they were not already – of the patent-exhausting effects of a prior Nokia license because Nokia itself intervened in the matter.  (AAW Decl. ¶ 5 and Ex. 3.  (Intervention by Nokia; Joint Motion listing Martin Black as lead counsel of record for IV)).  Nokia's intervention in that matter led directly to the creation of the 2019 Nokia License (*e.g.*, AAW Decl. Ex. 1 § 4.4(a)), and Mr. Black himself likely played a role in the negotiation of that license.  At the very least, as lead counsel, he was undoubtedly aware of it.

      Despite being aware of the existence of the license, IV and its counsel failed to disclose it to Frontier in response to plainly applicable discovery requests bearing directly on the issues at the upcoming hearing.  Indeed, IV and Dechert purposefully concealed the existence of the dispositive 2019 Nokia License.

**<u>Frontier Attempts to Obtain the Nokia Licenses from IV</u>**

      On December 27, 2021, Frontier sought from IV "all licenses" concerning the five patents at issue.  (AAW Decl. Ex. 4 (RFPs 5 and 6)).  Despite knowing that the 2019 Nokia License directly "concerned" the patents, on January 10, 2022, IV only produced three licenses (none of which were the 2019 Nokia License) and withheld all others.  (AAW Decl. Ex. 5 (Responses 5 and 6)).  In withholding other licenses, IV falsely – and astoundingly – represented that these other licenses (including the 2019 Nokia License) were all "irrelevant."  (*Id.* at 7).  By

---

[1] Nokia acquired Alcatel Lucent in 2016.  *See Re Organized Debtors [Corrected] Pre-Trial Brief*, Doc. 2109, at 21 n.6.

definition, those other licenses could not be "irrelevant" because they render accused product immune from suit.

After further inquiry by Frontier, IV agreed to produce a list of the names of the allegedly "irrelevant" licensees. In making that agreement, IV again represented that the licenses were irrelevant because they "do not involve DSL service providers" like Frontier. (AAW Decl. Ex. 6). This statement was materially misleading given the scope of the 2019 Nokia License and the covenant not to sue, which covered any "service providers" that obtained licensed products from Nokia. That is, Dechert knew before filing its claim against Frontier that the 2019 Nokia License absolved the accused Frontier product licensed from Nokia.

Seeing Nokia on the list of licensees, and knowing it had purchased DSLAMs from Nokia and its predecessor Alcatel, Frontier again demanded that IV produce all Nokia licenses, among other things. (AAW Decl. Ex. 7). Although it should have gone without saying, Frontier explained that "any license to Nokia is relevant to at least the question of damages as well as the extent to which the asserted patents are exhausted as to certain portions of Frontier's network." (*Id.*).

On February 11, 2022, IV produced various licenses and agreements, representing to Frontier in an email that: "here are ***the*** Nokia licensing documents." (AAW Decl. Ex. 8 (emphasis added)). It would be difficult to overstate the grossly misleading nature of Dechert's email. Any reasonable person would interpret the email as a representation that all relevant Nokia licensing documents – "the Nokia licensing documents" – were being produced without qualification or limitation. It turned out, however, that the email was false because the 2019 Nokia License – the most important one, and still unknown to Frontier at the time – was not included among "the Nokia licensing documents" that IV and Dechert produced.

**Frontier Finally Obtains the 2019 Nokia License**

Suspicious of IV's recalcitrant behavior, Frontier contacted Nokia directly, and was stunned to learn of the 2019 Nokia License.  Had Frontier not itself contacted Nokia, Frontier would never have learned that when IV's counsel wrote "Here are *the* Nokia licenses," it really meant *here are some of the Nokia licenses*, or *here are the Nokia licenses with the exception of the most important one*.  The Court would have then heard IV's presentation of alleged damages at the scheduled hearing to include licensed products that as a matter of fact and law could not form the basis of IV's damages calculation, as IV's expert reports explicitly do.  (Frontier has asked Dechert whether IV's experts knew of the existence of the 2019 Nokia License before rendering their opinions, but Dechert declined to answer.  (AAW Decl. Ex. 9 p. 5).

There is no innocent characterization of Dechert's representation that it had produced "the Nokia licenses" while concealing the existence of the operative 2019 Nokia License, which of course is one of "the Nokia licenses."  Dechert's statement was plainly false.

The next day, February 12, 2022, Frontier requested from IV the 2019 Nokia License by name.  (AAW Decl. Ex. 10).  On Feb. 14, 2022, IV finally turned over the 2019 Nokia License with no explanation for the delay in its production, much less any excuse for Dechert's representation that it had previously produced "the Nokia licensing documents."  (AAW Decl. Ex. 11).  Frontier recognized the significance of the 2019 Nokia License immediately and asked IV to confirm that it would not seek damages for any Nokia customers like Frontier covered by the license.  (AAW Decl. Ex. 12).

Dechert said nothing in response to Frontier's straightforward question for the rest of February and all of March, even with the then-scheduled hearing fast approaching.  Finally, nearly two months later, on April 6, 2022, Dechert admitted the relevance of the 2019 Nokia License that it had been concealing and denying all along.  Specifically, Dechert stated that

"[w]e confirm the applicability of the IV/Nokia 2019 agreement to sales made by Nokia and to the use of such products by Frontier."  Dechert further admitted, in a classic understatement, that "the extent of such use appears to be significant."  (AAW Decl. Ex. 13).

Of course, nothing had changed between August 2020, when IV sued Frontier, and April 2022, when IV confessed that over a third of its case was gone.  The only new development was that Dechert and IV had been caught trying to hide significant evidence, and that Frontier had been forced to engage in multiple rounds of requests, ultimately learning about the critical and dispositive agreement not from Dechert or IV, but from a third party whom Frontier had approached because of Dechert's obfuscation and highly suspicious behavior.

The culmination of the Nokia fiasco occurred on April 18, 2022, when Dechert begrudgingly agreed to withdraw any claim against the Alcatel 7300 (the Nokia DSLAM). (AAW Decl. Ex. 14).  Dechert euphemistically stated that it was withdrawing these claims "for the convenience of the parties."  As we all know, however, claimants do not withdraw seven-figure claims for the convenience of the parties.  Rather, they withdraw them when – as here – they are caught in a lie that shows that they had no basis for bringing the claim in the first place.

The 2019 Nokia License wipes out about 39% of IV's alleged damages.  While the precise amount of the reduction in alleged damages would matter for purposes of the hearing currently scheduled for November 9, 2022 (if it goes forward), the mere fact that IV and Dechert hatched a scheme improperly to inflate the potential damages by a meaningful amount is what is important for purposes of this motion.  That said, Frontier is prepared to prove up a precise percentage now should the Court desire a hard number.

We respectfully submit that IV's and Dechert's conduct as set forth above is sufficient in and of itself to justify the relief that Frontier is seeking. But IV and Dechert were just getting started.

**The Lantiq License**

In March 2022, an important issue arose concerning whether still another set of accused DSLAMs were, in fact, licensed – and therefore also immune from inclusion in the damages calculation – due to a series of licensing agreements among Aware, Inc. ("Aware"), Infineon AG ("Infineon") and Lantiq Deutschland GmbH ("Lantiq"). (*See* Reorganized Debtors' [Corrected] Pretrial Brief, Doc. 2109, filed 06/09/22, at pp. 21-25 and Exhibit 1 thereto). This group of DSLAMs is *in addition to* the DSLAMs covered by the 2019 Nokia License.

Since at least 2007, Lantiq chipsets have been licensed. All five of the patents-in-suit were originally invented or owned by Aware. On October 1, 2007, Aware entered into a License Agreement with Infineon, and in 2009 Infineon assigned the 2007 License Agreement to Lantiq. In 2008, IV acquired Aware's patent portfolio subject to all pre-existing licenses, including the 2007 License Agreement that was assigned to Lantiq. (*See Id.*). Thus, the scope of the five patents at issue in this case are limited by the 2007 License Agreement. IV knew this, of course, because they acquired the asserted patents subject to that License.

Frontier's largest DSLAM supplier is Adtran, Inc. Adtran DSLAMs contain DSL transceiver "chipsets." Adtran has historically built its DSLAMs around chipsets manufactured by Lantiq. Since 2012, the vast majority of Adtran DSLAMs sold to Frontier – 992,000 of 1,200,000 (*i.e.,* 82%) – contain Lantiq chipsets. (*See Id.* at p. 22). Just like the licensed Nokia products, they are also licensed and cannot be counted for purposes of IV's damages claim against Frontier.

-7-

On December 27, 2021, Frontier served a Documents Request on IV that asked for "all licenses concerning any of the Asserted Patents" (RFP No. 5) and "All licenses concerning any of the patents" in certain prior litigations. (RFP No. 6). (AAW Decl. Ex. 4). Among those prior litigations was a 2013 case between IV and AT&T in the Western District of Texas that concerned, in part, the same Infineon license that was assigned to Lantiq. Counsel for IV in the present litigation were also counsel for IV in the 2013 Texas litigation – not just the same firm, but the same lawyers. That case settled in 2017.

In response to Frontier's Document Request, on January 10, 2022, IV produced documents that included documents identifying "Infineon" as an Aware licensee, but which made no mention of Lantiq or Adtran. (AAW Decl. Ex. 5). On March 8, 2022, IV produced a *redacted* copy of an Infineon license. (*See* AAW Decl. Ex.15 (production cover email) and Doc. 2078 (License previously filed under seal)). Based on IV's production and Dechert's unreliable representation that it had in its possession, custody, or control neither an unredacted copy of that Infineon license nor any related licenses, Frontier, on March 9, 2022, issued third-party subpoenas to Aware. (*See* AAW Decl. Ex. 16). Already, at this juncture, Frontier had begun to suspect that IV and Dechert were again hiding even more evidence detrimental to IV's case.

After Frontier initiated litigation in the District of Massachusetts to enforce subpoenas on Aware for the licensing documents, Aware produced unredacted copies of Infineon/Lantiq licenses to Frontier on Friday, April 22, 2022. Frontier then promptly (and ironically, since they are licenses concerning IV's own patents) provided them to IV the following business day, on Monday, April 25, 2022. (AAW Decl. Ex. 17). Thus, Frontier had to get the license covering IV's own patents by serving a subpoena on a third party, and then give it back to IV because IV said it did not have it. The backwards nature of the process bears repeating: Frontier had to go

through the time-consuming process of serving subpoenas on Aware in a different district to get

unredacted copies of a license covering IV's patents that it is asserting against Frontier. The

licenses the third party ultimately produced included (i) a clean/unredacted copy of the 2007

License Agreement with Infineon; and (ii) documentation reflecting Infineon's assignment of the

license to Lantiq. (*See* AAW Decl. Ex. 18).

From a review of the licensing documents that Aware produced, it became clear that the

Infineon/Lantiq licenses were critical to this case, again just like the 2019 Nokia License. As

noted above, Frontier's largest DSLAM supplier, Adtran (*see* Doc. 2109 at p. 22), used Lantiq

chipsets in its DSLAMs. Such Adtran equipment was therefore licensed and indisputably could

not be the basis for damages in this case under the patent exhaustion doctrine.

About 42% of Frontier's DSLAM "working ports" are in Adtran DSLAMs, and 82% of

those Adtran DSLAMs are Lantiq-driven. Therefore, 34% of Frontier's total DSLAMs (82% of

42%) are covered by the Infineon/Lantiq licenses, wiping out an additional 34% of IV's claimed

damages. (*See* Doc. 2109 at p. 25).

**The AT&T Documents Reveal**

In view of the importance of the Infineon/Lantiq issue to the case, and having recently

experienced the excruciating process of trying to extract the 2019 Nokia License from IV,

Frontier decided to obtain relevant information from third party AT&T instead of from IV itself.

As this Court is aware from the papers submitted by the parties in July and August 2022 and the

Hearing held on August 23, 2022, IV filed a patent infringement suit against AT&T in the

Western District of Texas on February 8, 2013. IV sued AT&T for infringement of, *inter alia*,

four of the five patents at issue in the present case: the '532 Patent; the '735 Patent; the

'171 Patent; and the '068 Patent. (*See* AAW Decl. Exhibit 19).

Not only did IV's suit against AT&T involve four of the five patents at issue here, but IV accused the very same Adtran DSLAMS in both the present case and its suit against AT&T. (*See* AAW Decl. Exhibit 20). Because IV sued AT&T on four of the five patents at issue in the present case, and because IV accused the same Adtran components as infringing products in both the present case and the Texas case, Frontier believed it was likely that the Infineon/Lantiq licensing issue had been addressed in the Texas case.

The record in this case establishes that both Frontier and IV continued to pursue information on the Infineon/Lantiq issue well after the fact discovery cutoff date of February 14, 2022, and the parties seemed to have an understanding that such discovery was appropriate. Therefore, on July 8, 2022 – since IV itself steadfastly refused to produce the pertinent licenses – Frontier served subpoenas on AT&T and its affiliates. But IV – even though the subpoenas required it to do absolutely nothing – vehemently objected to the subpoenas and, oblivious to the irony, had its lawyers at Dechert fire off an accusatory letter to Frontier's counsel threatening to report them to the Court for a "serious" violation of the proper procedures. (*See* AAW Decl. Ex. 21). IV and Dechert apparently sensed danger as to what AT&T might produce and tried to scare Frontier off with threats.

Given Frontier's prior experience with IV over the Nokia matter, IV's reaction to the third-party subpoenas confirmed that there were likely some documents from IV's case against AT&T in Texas that IV did not want to ever to see the light of day in these proceedings. Frontier persisted, however, and tried a conciliatory approach. First, Frontier voluntarily and immediately withdrew the AT&T subpoenas. Frontier then provided a much-narrowed subpoena to Dechert, and asked whether "IV will either consent to our serving the subpoenas or will

-10-

produce the documents itself." (*See* AAW Decl. Ex. 22). Dechert answered by stating that "Intellectual Ventures does not consent to the proposed third-party subpoena." (*See Id.*).

Dechert's adherence to its position that it would object to a third-party subpoena that required neither it nor IV to do anything at all prompted needless motion practice before this Court. Frontier had to file a moving brief and affidavit; IV submitted an opposition brief and affidavit; and Frontier submitted a reply brief. A hearing was then held before the Court on August 23, 2022, at which the Court asked IV's counsel for a "very clear answer" on whether IV had facts showing that Frontier's Adtran DSLAMs were licensed. (Aug. 23 Hearing Transcript, p. 20). The answer given by IV's counsel was certainly not very clear, but can be fairly read as a concession that Frontier's Adtran DSLAMs contain Lantiq chipsets. (Aug. 23 Hearing Transcript, p. 20-22).

Without knowing about Frontier's struggle to obtain the 2019 Nokia License, the Court also remarked to IV's counsel at the hearing that "you have been following this course of making life as impossibly difficult as possible for Frontier." (Aug. 23 Hearing Transcript, p. 22). The Court granted Frontier's request to serve the third-party subpoenas and also ordered Dechert to produce the documents covered by the subpoenas. (*Id.*, pp. 26-28).

AT&T made its document production on August 30, 2022, and it was immediately apparent why Dechert had fought so hard to keep that production from ever being made. AT&T's documents showed without question that

.

(*See* AAW Decl. Ex. 23, pp. 112-13, 115 (emphasis added)).

Inexplicably, the version of this document that Dechert and IV produced in response to the Court's Order *omits this critical quoted section entirely*. (*See* AAW Decl. Ex. 24 at IV 22321-22 (skipping from page 17 to page 123 in the interrogatory response)). IV and Dechert must have hoped that AT&T would not still have its case file, and would therefore not produce the key language that IV and Dechert continued to conceal. We do not understand how this important language could be omitted unless Dechert is continuing to thwart the discovery process.

Finally, the statement in Dechert's opposition brief (Doc. 2127) that "Frontier's Subpoena Is Unlikely To Lead To Relevant Evidence" was a knowingly false representation to the Court.

Indeed, it is now clear that Dechert's opposition to Frontier's request to serve a subpoena on AT&T was designed to keep that information from ever coming to light. There is simply no other explanation for Dechert's recalcitrant opposition to a subpoena that required it to do absolutely nothing.

IV and Dechert, as officers of the Court, also argued that "it is highly unlikely – almost nonsensical, in fact to think that AT&T" would have relevant information. (*See* Doc. 2127 at

p. 3).  In addition, in response to Frontier's argument that IV already had the information it was requesting from AT&T, counsel for IV in a sworn document stated that "AT&T's confidential information was destroyed long ago pursuant to the protective order in that case."  (*See* Docs 2127, p. 15 and 2128 ¶ 5).  That was also false, as Dechert, in response to the Court's Order, has produced confidential information of AT&T from IV's case against AT&T.

Notably, IV's experts' reports do not mention the Lantiq licensing documents in arriving at IV's damages calculation.  As with the 2019 Nokia License, Frontier asked if Dechert and IV shared the Lantiq licensing documents with IV's experts, but received no answer.  (AAW Decl. Ex. 9 p. 5).  It is Frontier's understanding that IV intends to proceed with its damages presentation at the upcoming hearing to include the licensed Lantiq products.

To this day, then, IV and Dechert continue to resist the conclusion that the Lantiq license has the same impact as the Nokia license, which IV and Dechert reluctantly admitted is "significant" and cannot form the basis of IV's damages claim.  But there is no logical basis for distinguishing between the effect of the Nokia and Lantiq licenses, for they both lead to the same conclusion under settled law:  that the licensed accused product cannot form the basis of IV's claims.  If the Nokia license immunizes the accused DSLAMs, as IV concedes, *a fortiori* so does the Lantiq license.

* * *

From the very beginning, and at every turn, IV and Dechert have concealed and misrepresented the truth, both to Frontier and to this Court.  It is against this backdrop that the following legal principles should be applied.

# ARGUMENT

## POINT I

### THIS COURT SHOULD DISMISS IV'S CLAIMS IN
### THEIR ENTIRETY BASED ON THE COURT'S INHERENT POWERS

It is well established that a federal court has the inherent power to control the matters

before it.  As the United States Supreme Court stated in *Chambers v. NASCO, Inc.*, 501 U.S. 32,

111 S. Ct. 2123 (1991):

> It has long been understood that "[c]ertain implied powers must necessarily result
> to our Courts of justice from the nature of their institution," powers "which cannot
> be dispensed with in a Court, because they are necessary to the exercise of all
> others."  *United States v. Hudson*, 7 Cranch 32, 34, 3 L. Ed. 259 (1812); see also
> *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S. Ct. 2455, 2463, 65 L.
> Ed. 2d 488 (1980) (citing *Hudson*).  For this reason, "Courts of justice are
> universally acknowledged to be vested, by their very creation, with power to
> impose silence, respect, and decorum, in their presence, and submission to their
> lawful mandates."  *Anderson v. Dunn*, 6 Wheat. 204, 227, 5 L. Ed. 242 (1821);
> see also *Ex parte Robinson*, 19 Wall. 505, 510, 22 L. Ed. 205 (1874).  These
> powers are "governed not by rule or statute but by the control necessarily vested
> in courts to manage their own affairs so as to achieve the orderly and expeditious
> disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631, 82 S. Ct.
> 1386, 1388–1389, 8 L. Ed. 2d 734 (1962).

501 U.S. at 43, 111 S. Ct. at 2132.

The Supreme Court in *Chambers* also recognized that a federal court's inherent powers

include the power to dismiss a case outright, even though that is a severe sanction:

> Because of their very potency, inherent powers must be exercised with restraint
> and discretion.  See *Roadway Express, supra*, 447 U.S., at 764, 100 S. Ct., at
> 2463.  A primary aspect of that discretion is the ability to fashion an appropriate
> sanction for conduct which abuses the judicial process.  As we recognized in
> *Roadway Express*, outright dismissal of a lawsuit, which we had upheld in *Link*, is
> a particularly severe sanction, yet is within the court's discretion. 447 U.S., at
> 765, 100 S. Ct., at 2463.  Consequently, the "less severe sanction" of an
> assessment of attorney's fees is undoubtedly within a court's inherent power as
> well. *Ibid.* See also *Hutto v. Finney*, 437 U.S. 678, 689, n.14, 98 S. Ct. 2565,
> 2573, n.14, 57 L.Ed.2d 522 (1978).

501 U.S. at 44-45, 111 S. Ct. at 2132-33.  The *Chambers* court specifically recognized

that "a court may assess attorney's fees when a party has acted in bad faith, vexatiously,

wantonly, or for oppressive reasons."  501 U.S. at 45-46, 111 S. Ct. at 2133 (internal

quotations omitted).

The Supreme Court reaffirmed these powers in *Goodyear Tire & Rubber Co. v. Haeger*,

581 U.S. 101, 137 S. Ct. 1178 (2017):

> Federal courts possess certain "inherent powers," not conferred by rule or statute,
> "to manage their own affairs so as to achieve the orderly and expeditious
> disposition of cases."  *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631, 82 S. Ct.
> 1386, 8 L. Ed.2d 734 (1962).  That authority includes "the ability to fashion an
> appropriate sanction for conduct which abuses the judicial process."  *Chambers v.
> NASCO, Inc.*, 501 U.S. 32, 44–45, 111 S. Ct. 2123, 115 L.Ed.2d 27 (1991).  And
> one permissible sanction is an "assessment of attorney's fees" – an order, like the
> one issued here, instructing a party that has acted in bad faith to reimburse legal
> fees and costs incurred by the other side.  *Id.*, at 45, 111 S. Ct. 2123.

137 S. Ct. at 1186; *see also In re Plumeri*, 434 B.R. 315, 327 (S.D.N.Y. 2010) ("Federal courts,

including bankruptcy courts, possess inherent authority to impose sanctions against attorneys and

their clients.") (citation omitted).

In *CDR Creances S.A.S. v Cohen*, 23 N.Y.3d 307, 15 N.E.3d 274 (N.Y. 2014), the New

York Court of Appeals held that "a court has inherent power to address actions which are meant

to undermine the truth-seeking function of the judicial system and place in question the integrity

of the courts and our system of justice."  *Id.* at 318, 15 N.E.3d at 282.  The court further stated

that "[f]raud on the court involves willful conduct that is deceitful and obstructionistic, which

injects misrepresentations and false information into the judicial process 'so serious that it

undermines . . . the integrity of the proceeding.'"  *Id.* (citation omitted).  The court then analyzed

how federal courts have addressed this issue:

> The federal courts have applied the clear and convincing standard in determining
> whether the offending party's actions constitute fraud on the court (*see e.g.,*

> *Aoude v Mobil Oil Corp.*, 892 F.2d 1115, 1118 [1st Cir 1989]).  Characteristic of
> federal cases finding such fraud is a systematic and pervasive scheme, designed to
> undermine the judicial process and thwart the non-offending party's efforts to
> assert a claim or defense by the offending party's repeated perjury or falsification
> of evidence (*id.* at 1118).  Fraud on the court warrants heavy sanctions, <u>including
> the striking of an offending party's pleadings and dismissal of the action</u>.

*Id.* at 318-19, 15 N.E.3d at 282 (emphasis added).

We are well aware, of course, that dismissal of an action is a severe sanction, but Dechert's and IV's conduct warrants that result.  The drawn-out, excruciating process of extracting the most critical documents in this case was the result of IV's and Dechert's non-stop efforts to hide relevant evidence and to assert claims for damages that were entirely off limits as a matter of law.  We will not repeat the facts in detail here, but even a short recap suffices to show the extent of Dechert's and IV's misconduct:

### <u>The Nokia Issue</u>

- Dechert and IV failed to produce the 2019 Nokia License in response to discovery requests that called for it, claiming the licenses it failed to produce were "irrelevant."

- Dechert and IV eventually produced licenses with an email stating "Here are the Nokia Licenses," but the email was grossly misleading because the 2019 Nokia License was not included in the production.

- Dechert's and IV's suspicious conduct prompted Frontier to contact Nokia directly, and Frontier learned about the 2019 license – a critical and dispositive document – directly from Nokia.

- Confronted with the document it had improperly withheld, Dechert and IV two months later finally admitted the relevance of the 2019 Nokia License.

- Dechert and IV then dropped its claims against Frontier regarding the Nokia DSLAMs.

- Dechert's statement that it was dropping those claims "for the convenience of the parties" was knowingly false and misleading.

- The actual reason why Dechert and IV dropped its claims against the Nokia DSLAMs was because it had been caught in a lie and had no alternative but to drop its meritless claim.

### The Infineon/Lantiq Issue

- Frontier requested that IV produce "all licenses concerning any of the Asserted Patents."

- Dechert did not produce anything regarding Lantiq, and there was no mention of Lantiq in any documents produced by Dechert and IV.

- Frontier eventually subpoenaed documents from Aware (the original owner of the patents), and the documents showed Infineon's assignment of its license to Lantiq.

- Because IV had sued AT&T in Texas on four of the five patents at issue here and because IV accused the same Adtran components as infringing products in both cases, Frontier believed it was likely that the Infineon/Lantiq licensing issue had been addressed in the Texas case. Frontier therefore served a subpoena on AT&T seeking relevant documents.

- 

- Dechert vehemently objected to the subpoena on AT&T even though the subpoena did not require Dechert or IV to do anything at all.

- Frontier then sent Dechert a much-narrowed subpoena on AT&T and asked whether Dechert would consent to having it served, but Dechert again refused even though it did not require Dechert or IV to lift a finger.

- Dechert's position caused needless motion practice and a Hearing before the Court regarding Frontier's attempt to obtain relevant information from AT&T.

- At the Hearing, the Court granted Frontier's request to serve the subpoena on AT&T and ordered Dechert to produce the same documents from its own files.

- In opposing the motion, Dechert falsely represented to the Court that Frontier's subpoena "Is Unlikely To Lead To Relevant Evidence."

- In opposing the motion, Dechert falsely represented to the Court that "it is highly unlikely – almost nonsensical, in fact" to think that A&T would have relevant information.

- In opposing the motion, Dechert falsely represented to the Court that "AT&T's confidential information was destroyed long ago."

- The Court stated to IV's counsel at the Hearing on August 23, 2022 that "you have been following this course of making life as impossibly difficult as possible for Frontier."

-

- IV's subsequent document production in response to this Court's order has demonstrated that AT&T's confidential information was not all destroyed.

- Dechert's obstructionist conduct was designed to keep Frontier and the Court from ever knowing that Adtran DSLAMs with Lantiq chipsets are licensed.

Although this record clearly establishes IV's and Dechert's bad faith, a finding of bad faith, as opposed to mere negligence, is not required for the imposition of sanctions under the Court's inherent powers. As the court stated in *Brown v. City of New York*, 15-CV-4488, 2018 WL 3193208, at *3 (E.D.N.Y. June 28, 2018):

> [D]efendants disregard the court's finding that sanctions are appropriate under both Fed. R. Civ. P. 37 and under the court's inherent powers. As Judge Reyes correctly noted, the Second Circuit has held that bad faith or willful misconduct is not required for sanctions, and that negligence may suffice. (ECF No. 58, Order Granting Sanctions at 4-5. . . . Based on this record, the defendants' actions are, at a minimum, negligent if not grossly negligent.
>
> * * *
>
> Further, even if the decision were made solely pursuant to the court's inherent powers, the court is not required to make a bad faith finding.

(Emphasis added; internal citation omitted).

Here, of course, Dechert's bad faith is self-evident. Indeed, it would be bad enough if Dechert's conduct consisted of *either* its efforts to hide the 2019 Nokia License *or* its baseless attempt to prevent Frontier from obtaining important evidence from AT&T regarding the Infineon/Lantiq issue. Taken together, however, Dechert's conduct constituted a double-barreled assault on the principles of fairness and candor that are the hallmarks of our judicial system.

-18-

Dismissal is therefore appropriate, along with an award of attorneys' fees to Frontier. *See Goodyear Tire, supra,* 137 S. Ct. at 1184 ("By withholding the G159's test results at every turn, the company and its lawyers had made repeated and deliberate attempts to frustrate the resolution of this case on the merits.") (internal quotations and citation omitted).

Just by adding the percentages under the Nokia and Lantiq licenses, nearly three-fourths of IV's alleged damages are wiped out completely. Although about 27% of IV's alleged damages are not covered by the Nokia and Lantiq licenses, that is no impediment to dismissing IV's entire claim. Where, as here, a party's and its counsels' pattern of discovery abuse so taints the judicial proceedings that the Court can no longer be assured that the truth will come out, dismissal of the case – as opposed to lesser sanctions – is entirely appropriate. As the court stated in *Connecticut General Life Ins. Co. v. New Images of Beverly Hills,* 482 F.3d 1091 (9th Cir. 2007):

> The most critical factor to be considered in case-dispositive sanctions is whether "a party's discovery violations make it impossible for a court to be confident that the parties will ever have access to the true facts." Dickson's "pattern of deception and discovery abuse made it impossible for the district court to conduct another trial with any reasonable assurance that the truth would be available. It is appropriate to reject lesser sanctions where the court anticipates continued deceptive misconduct."

*Id.* at 1097 (footnotes omitted). *See also Reyes-Santiago v. JetBlue Airways Corp*., 932 F. Supp. 2d 291, 303 (D. P.R. 2013) (ordering default judgment for failure to provide a report pursuant to F.R.C.P. 37(b) where "JetBlue has damaged the 'integrity of the discovery process'" by withholding the report for 8 months on "relevance" grounds and a witness provided "dishonest" testimony about its non-existence.).

Because this case has been irreparably tainted by IV's and Dechert's severe misconduct, dismissal of IV's entire claim against Frontier is warranted.

## POINT II

## THE COURT SHOULD DECLARE THIS MATTER TO BE AN "EXCEPTIONAL CASE" PURSUANT TO 35 U.S.C. § 285

Section 285 of the Patent Act authorizes a district court to award attorneys' fees in patent cases. It provides that "[t]he court in exceptional cases may award reasonable attorneys' fees to the prevailing party." 35 U.S.C. § 285.

If this Court dismisses IV's claims pursuant to its inherent authority, then Frontier will be the "prevailing party" and the issue of attorneys' fees will depend on whether this is an "exceptional" case.

The leading case on this subject is the Supreme Court's decision in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 134 S. Ct. 1749 (2014). Prior to *Octane*, the Federal Circuit, in *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005), had held that a case could be deemed "exceptional" under Section 285 only in two circumstances: "when there has been some material inappropriate conduct," or when the litigation is both "brought in subjective bad faith" and "objectively baseless." *Id.* at 1381. In *Octane*, the Supreme Court held that the Federal Circuit's formulation was "unduly rigid" (572 U.S. at 553, 134 S. Ct. at 1755), and established a new standard:

> We hold, then, that an "exceptional" case is simply one that stands out from others with respect to <u>the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated</u>. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances. As in the comparable context of the Copyright Act, " '[t]here is no precise rule or formula for making these determinations,' but instead equitable discretion should be exercised 'in light of the considerations we have identified.' " *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534, 114 S. Ct. 1023, 127 L.Ed.2d 455 (1994).

572 U.S. at 554, 134 S. Ct. at 1756 (footnote omitted; emphasis added).

We will not repeat here the sordid facts relating to Dechert's and IV's efforts to hide the 2019 Nokia License and its attempt to block Frontier from ever getting crucial information about the Lantiq license from AT&T. It is clear, however, that Dechert's and IV's behavior over the course of two years fits like a glove into the Supreme Court's language in *Octane* that "the unreasonable manner in which the case was litigated" is a basis for finding a case to be "exceptional" under Section 285. The Court's observation to IV's counsel at the Hearing that "you have been following this course of making life as impossibly difficult as possible for Frontier" supports a finding that this case has been litigated in an "unreasonable manner." And the Court made that statement without knowing how IV and Dechert had concealed the existence of the 2019 Nokia License, or the fact that Dechert had misrepresented to the Court that it did not still possess any confidential AT&T information, only to produce confidential AT&T documents after the Court ordered it. The Court would be well within its discretion to find the record that IV and Dechert created to be "exceptional."

Moreover, as set forth above, the 2019 Nokia License eliminates about 39% of IV's alleged damages, and the Infineon/Lantiq licenses wipe out an additional 34% of those alleged damages. This means that about 73% of IV's damage claim is eradicated solely on the basis of the patent exhaustion doctrine. Given *Octane's* language that "the substantive strength of a party's litigating position" is a factor in the "exceptional" case inquiry, the extreme weakness of IV's claim shows that the present matter is an "exceptional" case wholly apart from the "unreasonable manner" in which the case has been litigated. *See also Raniere v. Microsoft Corp.*, 887 F.3d 1298, 1308 (Fed. Cir. 2018) (affirming district court's award of attorneys' fees under Section 285 where "Raniere's behavior throughout the litigation employed 'a pattern of

obfuscation and bad faith,' and that this behavior caused Appellees to incur significant fees and costs to oppose Raniere's positions.").

Pursuant to these authorities, we respectfully request that the Court deem the present action an "exceptional" case and award attorneys' fees to Frontier.

## POINT III

### THE COURT SHOULD AWARD ATTORNEYS' FEES TO FRONTIER PURSUANT TO 28 U.S.C. § 1927 DUE TO UNREASONABLE AND VEXATIOUS CONDUCT BY IV'S COUNSEL

28 U.S.C. § 1927 provides as follows:

Counsel's liability for excessive costs

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

We respectfully submit that the facts of the present case are exactly what the drafters of Section 1927 had in mind when they referred to an attorney who "multiplies the proceedings in any case unreasonably and vexatiously."

We will again refrain from repeating the facts set forth above, but do wish to note that *either* the facts relating to the 2019 Nokia License *or* the facts relating to the Infineon/Lantiq issue would be enough to award attorneys' fees to Frontier under the statute. Taken together, there is strong and direct evidence of Dechert's misconduct. Although bad faith is required for the imposition of sanctions under Section 1927, that standard is clearly met here. *See Izzo v. ING Life Ins. and Annuity Co.*, 235 F.R.D. 177, 189 (E.D.N.Y. 2005) ("the Second Circuit Court of Appeals has established that a finding of bad faith on the part of the attorney is a prerequisite to

imposing sanctions under this statute."). Indeed, the court's language in *Izzo* is strikingly similar

to the attorney misconduct involved in the present case:

> Here, plaintiff's efforts to obtain the requested discovery, set forth in detail *supra,*
> consisted of repeated letters and phone calls, over the course of 2003 and 2004, to
> get the documents. During this time, defendant's counsel (1) misled plaintiff into
> believing the documents were forthcoming; (2) turned over non-responsive
> documents instead of the requested documents; and (3) refused to provide a
> written response to the request for the 1980 Plan and related documents at issue
> here. Courts in this jurisdiction have held that such repeated failure to produce
> documents, particularly after the entry of a Court order directing production of the
> documents, constitutes bad faith on the part of defendant's counsel.

*Id.*

In *Doe 1 v. East Side Club, LLC*., 18 Civ. 11324, 2021 WL 2709346 (S.D.N.Y. July 1,

2021), in which the court awarded attorneys' fees under 28 U.S.C. § 1927, the court stated:

> Had Plaintiff disclosed relevant information in response to discovery demands at
> the outset, including the truth about the Bronx Action, it is certain that this
> litigation would have concluded years ago and at significantly less expense.

*Id.* at *30. The same is true here; had Dechert not drawn out these proceedings with its constant

stonewalling, this case would have proceeded much more smoothly and efficiently for both the

parties and the Court. *See also SecurityPoint Holdings, Inc. v. United States*, 147 Fed. Cl. 499,

504 (2020) (awarding sanction of attorneys' fees under section 1927 in a patent case where

motion in limine duplicated argument in lost summary judgment motion); *Demodulation, Inc. v.*

*United States*, 122 Fed. Cl. 652, 659-660 (2015) (awarding sanction of attorneys' fees where

attorney argued that trade secrets were misappropriated without any proof of existence of trade

secrets, holding argument made in bad faith); *Auto-Owners Ins. Co. v. Summit Park Townhome*

*Ass'n*, 886 F.3d 863, 871 (10th Cir. 2018) (failure to disclose potential bias by appraisers in

insurance case was sanctionable under 28 U.S.C. § 1927; awarding attorneys' fees).

## **CONCLUSION**

For the foregoing reasons, Frontier's motion should be granted.  In light of Frontier's

motion and the remedy sought, we also respectfully request that the Court cancel the upcoming

hearing, as well as order any and all further relief and sanctions that the Court deems just and

appropriate.

Dated:      New York, New York
            October 3, 2022                          Respectfully submitted,

                                                     FRIEDMAN & WITTENSTEIN
                                                     A Professional Corporation

                                                     By: /s/  Andrew A. Wittenstein
                                                             Andrew A. Wittenstein
                                                             Jonathan D. Daugherty

                                                     1345 Avenue of the Americas
                                                     Second Floor
                                                     New York, NY  10105
                                                     Tel: (212) 750-8700
                                                     awittenstein@friedmanwittenstein.com
                                                     jdaugherty@friedmanwittenstein.com

                                                     DUANE MORRIS LLP
                                                     Timothy R. Shannon, Esq. (BBO# 655325)
                                                     Seth S. Coburn (BBO# 681932)
                                                     100 High Street, Suite 2400
                                                     Boston, MA  02110-1724
                                                     Tel: (857) 488-4200
                                                     Fax: (857) 488-4201
                                                     trshannon@duanemorris.com
                                                     sscoburn@duanemorris.com