**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| FRONTIER COMMUNICATIONS CORPORATION, *et al.*, | ) ) | Case No. 20-22476 (MG) |
| | ) | |
| Reorganized Debtors. | ) | (Jointly Administered) |
| | ) | |

**Record Company Claimants' Memorandum of Law in Opposition to Frontier's Motion for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c)**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND .................................................................................................. 3

LEGAL STANDARD........................................................................................... 5

ARGUMENT ....................................................................................................... 6

I.    Frontier's Continued Provision of Internet Service to Known Repeat Infringers Subjects
      Frontier to Contributory Liability. ........................................................... 6

   A.   Frontier's receipt of the Notices identifying specific subscribers who were repeatedly
        infringing the Record Company Claimants' copyrighted works satisfies contributory
        liability's knowledge requirement. ..................................................... 6

   B.   Frontier's continued provision of internet service to specific subscribers it knew were
        repeatedly infringing satisfies contributory liability's material contribution
        requirement.......................................................................................... 9

   C.   Frontier's continued provision of internet service to known repeat infringers satisfies
        the *Sony* and *Grokster* standards for contributory infringement. ................ 10

   D.   *Twitter v. Taamneh* did not alter *Sony*'s and *Grokster*'s holdings on contributory
        liability............................................................................................... 13

II.   Frontier's Ability to Terminate Repeat Infringers' Service Gives Frontier the Right and
      Ability to Supervise Infringement for Purposes of Vicarious Liability............................ 17

III.  The Record Company Claimants Have Not Asserted Claims for Liability Under the
      DMCA, as Frontier Implies. .................................................................... 19

IV.   Frontier's DMCA Safe Harbor Defense Does Not Affect the Relevance of the
      Infringement Notices to the Reasonableness of Frontier's Implementation of a Repeat
      Infringer Policy and Frontier's Knowledge of Direct Infringement............................... 19

   A.   Frontier's responses to infringement notices are relevant to whether Frontier
        reasonably implemented a repeat infringer policy because infringement notices
        identify repeat infringers. ................................................................... 19

   B.   Infringement notices establish that Frontier has the requisite knowledge for
        contributory liability............................................................................. 20

   C.   Frontier's assertion of the Section 512(a) safe harbor does not render the infringement
        notices it received irrelevant................................................................. 20

   D.   Frontier cannot establish a DMCA safe harbor as a defense to liability on a motion for
        judgment on the pleadings..................................................................... 22

CONCLUSION.................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ........................................................................... 6, 18

*ALS Scan, Inc. v. Steadfast Networks, LLC*,
  819 F. App'x 522 (9th Cir. 2020) ............................................................................. 8

*Arista Records, LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010) .................................................................................... 6

*Arista Recs. LLC v. Usenet.com, Inc.*,
  633 F. Supp. 2d 124 (S.D.N.Y. 2009) ............................................................... 13, 18

*BMG Rts. Mgmt. (US) LLC v. Altice USA, Inc.*,
  No. 2:22-CV-00471-JRG, 2023 WL 3436089 (E.D. Tex. May 12, 2023) ............... 7, 11, 12, 18

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
  199 F. Supp. 3d 958 (E.D. Va. 2016),
  *aff'd in part, rev'd in part, vacated in part, and rem'd on other grounds*,
  881 F.3d 293 (4th Cir. 2018) .................................................................................... 9

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
  881 F.3d 293 (4th Cir. 2018) ........................................................................... passim

*Capitol Records, Inc. v. MP3tunes, LLC*,
  48 F. Supp. 3d 703 (S.D.N.Y. 2014),
  *aff'd in part, rev'd in part, and rem'd on other grounds*,
  844 F.3d 79 (2d Cir. 2016) ....................................................................................... 7

*Capitol Records, LLC v. Escape Media Grp., Inc.*,
  No. 12-CV-6646 (AJN) (SN), 2014 WL 12698683 (S.D.N.Y. May 28, 2014)
   *report and recommendation adopted*,
  2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015) ...................................................... 7, 18

*Casual Holdings, LLC v. YouTube, LLC*,
  No. 22-3007-cv, 2023 WL 6842449 (2d Cir. Oct. 17, 2023) ................................... 17

*CoStar Grp., Inc. v. LoopNet, Inc.*,
  373 F.3d 544 (4th Cir. 2004) .................................................................................. 22

*Dish Network LLC v. Datacamp Ltd.*,
  No. 22-cv-00993, 2023 WL 4549528 (N.D. Ill. July 14, 2023) ........................... 9, 18

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004) ............................................................ 21

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
    844 F.3d 79 (2d Cir. 2016) ......................................................... passim

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996) .............................................................. 10

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*,
    443 F.2d 1159 (2d Cir. 1971) ............................................................... 6

*Gomez v. Toledo*,
    446 U.S. 635 (1980) ........................................................................... 23

*Greer v. Moon*,
    83 F.4th 1283 (10th Cir. 2023) ............................................................ 6

*Lively v. WAFRA Inv. Advisory Grp., Inc.*,
    6 F.4th 293 (2d Cir. 2021) .............................................................. 5, 6

*Louis Vuitton Malletier, S.A. v. Alkanoc Sols., Inc.*,
    No. C 07-03952 JW, 2010 WL 5598337 (N.D. Cal. Mar. 19, 2010),
    *aff'd in part, vacated in part on other grounds,*
    658 F.3d 936 (9th Cir. 2011) ............................................................... 8

*McKenna v. Wright*,
    386 F.3d 432 (2d Cir. 2004) .............................................................. 23

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ................................................................. passim

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*,
    380 F.3d 1154 (9th Cir. 2004) ........................................................... 11

*Millennium Funding, Inc. v. 1701 Mgmt. LLC*,
    576 F. Supp. 3d 1192 (S.D. Fla. 2021),
    *amended on reconsideration in part,*
    No. 21-cv-20862, 2022 WL 845468 (S.D. Fla. Mar. 22, 2022) ................ 9

*Pani v. Empire Blue Cross Blue Shield*,
    152 F.3d 67 (2d Cir. 1998) ............................................................... 23

*Perfect 10 v. Amazon.com*,
    508 F.3d 1146 (9th Cir. 2007) ........................................................... 10

*Sept. 11 Prop. Damage & Bus. Loss Litig.*,
    481 F. Supp. 2d 253 (S.D.N.Y. 2007) ................................................ 23

iii

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ................................................................................................ 1, 10

*Sony Music Entm't v. Cox Commc'ns, Inc.*,
    426 F. Supp. 3d 217 (E.D. Va. 2019) ......................................................................... 8

*Sony Music Entm't v. Cox Commc'ns, Inc.*,
    464 F. Supp. 3d 795 (E.D. Va. 2020) .................................................................... 9, 18

*Spanski Enters. v. Telewizja Polska, S.A.*,
    883 F.3d 904 (D.C. Cir. 2018) ................................................................................. 16

*Trichilo v. Secretary of Health and Human Servs.*,
    823 F.2d 702 (2d Cir. 1987) ..................................................................................... 17

*Twitter v. Taamneh*,
    598 U.S. 471 (2023) .................................................................................. 1, 13, 15, 16

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
    384 F. Supp. 3d 743 (W.D. Tex. 2019),
    *report and recommendation adopted*,
    No. 1:17-CV-365-LY, 2018 WL 1905124 (W.D. Tex. Mar. 28, 2018) ........................ passim

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
    No. A-17-CA-365-LY, 2018 WL 1096871 (W.D. Tex. Feb. 28, 2018) ................... 12, 18

*UMG Recordings, Inc. v. RCN Telecom Servs., LLC*,
    No. 19-17272 (MAS) (ZNQ), 2020 WL 5204067 (D.N.J. Aug. 31, 2020) ........ 7, 12, 18

*Warner Recs. Inc. v. Charter Commc'ns, Inc.*,
    454 F. Supp. 3d 1069 (D. Colo. 2020) ...................................................................... 18

<u>Statutes</u>

17 U.S.C. § 1202 ......................................................................................................... 19

17 U.S.C. § 512(a) ........................................................................................ 19, 21, 23, 24

17 U.S.C. § 512(c) ......................................................................................................... 22

17 U.S.C. § 512(i)(1)(A) ........................................................................................ 19, 21, 24

18 U.S.C. § 2333(d)(2) .................................................................................................. 13

<u>Rules</u>

Federal Rule of Civil Procedure 12(b)(6) ..................................................................... 22

## **INTRODUCTION**

In its Motion, Frontier asks the Court to discard decades of well-established copyright law to concoct a new rule that internet service providers ("ISPs") cannot be held liable for secondary copyright infringement for what happens on their networks, even if they knew it was happening, could easily stop it, but did nothing about the infringement because they were profiting from it. If successful, Frontier's Motion would not only trample longstanding decisions from every level of the judiciary, including the Supreme Court, but it would also completely undermine the balance that Congress struck between the interests of content owners and ISPs in the Digital Millennium Copyright Act ("DMCA").

Frontier's expansive reading of *Twitter v. Taamneh*, 598 U.S. 471 (2023), seeks to apply a decision related to a terrorism statute to copyright law. *Twitter* is not a copyright case. It makes no mention of copyright law at all. And the Supreme Court in *Twitter* did not silently upend decades of jurisprudence, including its own, establishing the parameters of secondary liability for copyright infringement. On the contrary, the Supreme Court's holdings in *Sony* and *Grokster* fully support imposing secondary liability on an ISP, like Frontier, that continues to provide high-speed internet service to subscribers that it knows repeatedly use the service to infringe.[1]

Beyond the Supreme Court cases, multiple appellate and district court rulings, discussed below, have held that an ISP can be held liable when it knows of ongoing infringement on its network by specific subscribers and continues to provide internet access to those known repeat infringers. Indeed, *none* of the analogous secondary liability cases brought against ISPs has been dismissed on the pleadings (or on summary judgment). Rather, every one of them has ended in either a verdict for Plaintiffs or a settlement, or is still being litigated following the denial of the

---

[1] *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ("*Sony*"); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ("*Grokster*").

defendant ISP's motion to dismiss.  ISPs have repeatedly raised the same arguments Frontier raises here, and courts have repeatedly and consistently rejected all of them.

Frontier's argument that the Supreme Court's *Twitter* decision upended these established principles and prior decisions is meritless.  In *Twitter*, the Supreme Court held that social media platforms could not be liable under the aiding and abetting provision of the Justice Against Sponsors of Terrorism Act for a terrorist attack committed by ISIS.  And while not a copyright case, *Twitter* is best read as an extension of the same common law principles that undergird *Sony* and *Grokster*, and support Frontier's liability here.  *Twitter* highlights the importance of a direct nexus between the defendant accused of secondary liability and the underlying tort.  That direct nexus is present here because, unlike in *Twitter*, Frontier's repeatedly infringing subscribers committed the offense at issue (copyright infringement) using Frontier's network.

Moreover, Frontier's application of *Twitter* is wrong because Congress has already articulated in the DMCA exactly when an ISP may be immune from certain claims for infringement.  Congress established safe harbors for ISPs that provide immunity from potential money damages in specific circumstances.  Those safe harbors have both conditions of eligibility and, in some instances, exceptions to their application.  Frontier seeks to have this Court completely ignore the statutory structure that Congress created and instead provide broad immunity well beyond what Congress ever contemplated in enacting the DMCA.  In so doing, Frontier would render the DMCA safe harbor provisions completely superfluous.

Finally, Frontier's long detour into the differences between the DMCA safe harbors is nothing more than a dodge to excuse its inaction in response to the tens of thousands of copyright infringement notices that Frontier received from the Record Company Claimants alone.  Frontier's receipt of infringement notices and its actions or inactions in response to those notices are relevant

to both Frontier's knowledge of specific subscribers who are actively engaging in infringement on its network, and whether Frontier has reasonably implemented a repeat infringer policy under § 512(i) of the DMCA, which is a condition of eligibility for *any* of the safe harbor defenses. Those issues are entirely independent of and unaffected by which DMCA safe harbor Frontier chooses to assert among sections 512(a), (b), (c), or (d). In any event, Frontier cannot establish its entitlement to any safe harbor defense at the pleadings stage.

Frontier's motion for judgment on the pleadings should be denied in its entirety.

## **BACKGROUND**

The Record Company Claimants are several of the world's largest record companies; they produce, manufacture, distribute, sell, and license commercial sound recordings. Record Company Claimants Am. Proofs of Claim at 10 ¶ 1, ECF Nos. 2131, 2132, 2133 ("Proofs of Claim"). The Record Company Claimants own or control the copyrights or exclusive rights in innumerable sound recordings, including the sound recordings identified in Exhibit A to the Proofs of Claim. *Id.* at 10 ¶ 1 and Ex. A. The sound recordings in this case span a broad range of distinguished artists, including The Beatles, Beyoncé, Ed Sheeran, and The Rolling Stones.

Frontier is one of the largest ISPs in the United States, with approximately 3.5 million internet subscribers. *Id.* at 11 ¶ 2. Frontier has received hundreds of thousands of copyright infringement notices from copyright owners. *Id.* at 11 ¶ 3. In particular, the Record Company Claimants sent Frontier over 20,000 notices during the time period relevant to this case (the "Notices"). *Id.* at 15 ¶ 40. Each Notice detailed a specific instance of a Frontier subscriber using Frontier's network to unlawfully distribute and copy the Record Company Claimants' copyrighted works on BitTorrent, a peer-to-peer ("P2P") network. *Id.* The Notices provided Frontier with all of the information it required to understand precisely which of its subscribers were infringing and

the specific acts of infringement in which they were engaged.  The Notices identified among other things: the unique IP address assigned to the infringing subscriber on Frontier's network; the date and time the infringing activity was detected; the name of the infringing file; a cryptographic hash value identifying the infringing file; and the title of the album and sound recordings contained in the infringed file.  *Id.* at 15 ¶ 41.

The Notices identified Frontier subscribers engaged in blatant and repeated infringement. *Id.* at 15 ¶ 44.  More than 4,000 Frontier subscribers were the subject of three or more Notices, and some subscribers were the subject of 100 or more Notices.  *Id.*  And those figures do not include other copyright holders' infringement notices to Frontier, which will apply to some of the very same infringers.  Put another way, the Record Company Claimants repeatedly caught Frontier subscribers in the act of illegally distributing their copyrighted works on Frontier's network over and over again, and contemporaneously informed Frontier of that infringement.

Frontier had both the legal right and the practical ability to limit the infringement occurring on its network.  Frontier's "Acceptable Use Policy" empowered Frontier to suspend or terminate a subscriber's use of Frontier's network or services for "transmitting or receiving copyright infringing . . . material."  *Id.* at 15–16 ¶ 46 (quoting Ex. C).  That policy expressly provided that "[r]epeated copyright infringements are grounds for termination of service."  *Id.*  Rather than terminate these repeat infringing subscribers, however, Frontier consciously chose to continue to provide them with the internet service essential to their continued infringement so that Frontier could continue collecting subscriber fees.  *Id.* at 15 ¶ 45.

Frontier's motion mischaracterizes the Record Company Claimants' allegations.  The Record Company Claimants do not allege just that Frontier "'materially contributes' to its customers' alleged infringements . . . by providing them with internet service knowing that *some*

*of them* are using that service to commit copyright infringement."  Reorganized Debtors' Br. in Supp. of their Mot. for Judgment as a Matter of Law on All Claims of Copyright Infringement (Dec. 5, 2023) at 4 (ECF No. 2235) ("Frontier Br.") (emphasis added).  Instead, the Record Company Claimants allege that Frontier continued to provide internet service to *specific known repeat infringers* that were contemporaneously and continuously identified to Frontier in the infringement notices Frontier received from the Record Company Claimants and others.  *See* Proofs of Claim at 17 ¶ 52 ("Frontier also knew which specific subscribers engaged in such repeated and flagrant infringement.").  The Record Company Claimants have not simply alleged that Frontier knew *some* subscribers were infringing, but that Frontier knew *who* its repeatedly infringing subscribers were from the information in the Notices.

By sending Frontier the Notices, the Record Company Claimants were not asking Frontier to shut their network down, but rather to take appropriate steps to stop known repeat infringers from using Frontier's network to repeatedly infringe the Record Company Claimants' copyrighted works, as the DMCA requires in order for Frontier to receive safe harbor protection.

## **LEGAL STANDARD**

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim."  *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (internal quotation marks omitted).  In evaluating a Rule 12(c) motion, the court determines whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id.*  This evaluation "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal conduct."  *Id.*  At this stage, the court must "draw all reasonable inferences in [the plaintiff's] favor."  *Id.*  "[J]udgment on the pleadings is not appropriate if there are issues of

fact which if proved would [entitle the non-movant to] recovery, even if the trial court is convinced

that the party opposing the motion is unlikely to prevail at trial." *Id.*  Accordingly, the court "may

not use a motion for judgment on the pleadings to weigh disputed factual allegations." *Id.* at 302.

## ARGUMENT

I.    **Frontier's Continued Provision of Internet Service to Known Repeat Infringers
      Subjects Frontier to Contributory Liability.**

   A.    **Frontier's receipt of the Notices identifying specific subscribers who were
         repeatedly infringing the Record Company Claimants' copyrighted works
         satisfies contributory liability's knowledge requirement.**

The standard for contributory liability is well-established in the Second Circuit and

elsewhere: "[O]ne who, with knowledge of the infringing activity, induces, causes or materially

contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer."

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971); *see

also Greer v. Moon*, 83 F.4th 1283, 1287 (10th Cir. 2023).[2]  The Second Circuit has held that

"contributory infringement liability is imposed on persons who 'know or have reason to know' of

the direct infringement." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) (quoting

*A&M Records, Inc. v. Napster, Inc.* ("*Napster*"), 239 F.3d 1004, 1020 (9th Cir. 2001)).

The Record Company Claimants' allegation that Frontier received the Notices identifying

specific subscribers who were repeatedly and actively infringing their works satisfies contributory

liability's knowledge requirement.   "[M]ultiple courts have determined that allegations of

knowledge of infringement based on infringement notices sent to ISPs were sufficient to support

a contributory infringement claim." *BMG Rts. Mgmt. (US) LLC v. Altice USA, Inc.*, No. 2:22-CV-

---

[2] The Second Circuit's *Gershwin* opinion is one of the foundational appellate decisions on contributory
copyright infringement and has been cited by appellate courts around the country, including by the Supreme
Court in *Grokster*, 545 U.S. at 930-31.

00471-JRG, 2023 WL 3436089, at *11 (E.D. Tex. May 12, 2023) ("*Altice*") (citing cases and denying defendant ISP's motion to dismiss). *See also UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, No. 19-17272 (MAS) (ZNQ), 2020 WL 5204067, at *8 (D.N.J. Aug. 31, 2020) ("*RCN*") (holding that allegations that defendant ISP received millions of infringement notices adequately alleged knowledge element of contributory liability); *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646 (AJN) (SN), 2014 WL 12698683, at *23 (S.D.N.Y. May 28, 2014), *report and recommendation adopted*, 2015 WL 1402049 (S.D.N.Y. Mar. 25, 2015) (holding that the evidence, which included DMCA takedown notices, demonstrates defendant ISP's knowledge of infringement for contributory liability); *cf. Capitol Records, Inc. v. MP3tunes, LLC*, 48 F. Supp. 3d 703, 713 (S.D.N.Y. 2014) (holding that plaintiffs proved knowledge for contributory liability through evidence that included online music service provider's CEO's "awareness of DMCA takedown notices"), *aff'd in part, rev'd in part, and rem'd on other grounds*, 844 F.3d 79 (2d Cir. 2016). Tellingly, courts from around the country consistently hold that allegations against an ISP like those pleaded against Frontier here are sufficient to support a contributory infringement claim.

In a materially identical case against another ISP (applying a heightened actual knowledge standard, rather than the Second Circuit's "reason to know" standard), the Fourth Circuit held that contributory liability "requires a defendant to have specific enough knowledge of infringement that the defendant could *do* something about it" and concluded that an ISP's knowledge that a subscriber repeatedly infringed gives rise to a presumption of knowledge that they will infringe again. *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 307–08, 311–12 (4th Cir. 2018) ("*BMG*") (emphasis in original).

Applying *BMG* to nearly identical facts and similar infringement notices to those the Record Company Claimants sent to Frontier, one court granted summary judgment against a defendant ISP on the knowledge element of contributory infringement, concluding that, "[Plaintiffs'] notices accomplished far more than telling [the ISP] that *some number* of subscribers were infringing. They told [the ISP] *which ones* [were infringing]. The standard is focused on the subscriber, not the particular works infringed, and the specific instance of infringement guides service providers to the source." *Sony Music Entm't v. Cox Commc'ns, Inc.*, 426 F. Supp. 3d 217, 233 (E.D. Va. 2019) (emphasis in original); *see also UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 768 (W.D. Tex. 2019) (*"Grande II"*) (denying defendant ISP's motion for summary judgment on contributory infringement where defendant ISP received "over a million copyright infringement notices" and "specifically tracked users by the number of notices it received about them"); *cf. Louis Vuitton Malletier, S.A. v. Alkanoc Sols., Inc.*, No. C 07-03952 JW, 2010 WL 5598337, at *5 (N.D. Cal. Mar. 19, 2010) (knowledge for contributory infringement established by continued provision of webhosting services to specific sellers identified in infringement notices), *aff'd in part, vacated in part on other grounds*, 658 F.3d 936 (9th Cir. 2011).

Frontier's reliance on *ALS Scan, Inc. v. Steadfast Networks, LLC* and *Millennium Funding, Inc. v. 1701 Mgmt. LLC* is misplaced. In those cases, unlike here, the plaintiffs did not allege or establish that their notices gave the (non-ISP) defendants knowledge of specific repeatedly infringing *subscribers*; therefore there was no specific action the defendants could take to prevent infringement. *See ALS Scan, Inc. v. Steadfast Networks*, *LLC*, 819 F. App'x 522, 524 (9th Cir. 2020) (affirming summary judgment for defendant where defendant "could not supervise, access, locate, or delete [infringing subscribers'] accounts"); *Millennium Funding, Inc. v. 1701 Mgmt.*

*LLC*, 576 F. Supp. 3d 1192, 1212–13 (S.D. Fla. 2021) (dismissing contributory infringement claim against a provider of servers to VPN companies which encrypt their end-user clients' online activity thereby preventing the provider of servers from knowing of any specific infringing activity), *amended on reconsideration in part*, No. 21-cv-20862, 2022 WL 845468 (S.D. Fla. Mar. 22, 2022).  By contrast, where the defendant received "hundreds of infringement notices containing ample information that would have allowed Defendant to prevent infringement," contributory infringement has been adequately pled.  *Dish Network LLC v. Datacamp Ltd.*, No. 22-cv-00993, 2023 WL 4549528, at *3 (N.D. Ill. July 14, 2023) (distinguishing *ALS Scan, Inc.*).

**B.    Frontier's continued provision of internet service to specific subscribers it knew were repeatedly infringing satisfies contributory liability's material contribution requirement.**

"There can be no question that the provision of high-speed internet service materially contributes to infringement via BitTorrent and that [an ISP] had the means to withhold that assistance upon learning of specific infringing activity."  *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 979 (E.D. Va. 2016), *aff'd in part, rev'd in part, vacated in part, and rem'd on other grounds*, 881 F.3d 293 (4th Cir. 2018); *see also Grande II*, 384 F. Supp. 3d at 768 ("[I]t is beyond debate that [an ISP's] continuing provision of internet services to customers who engage in repeated copyright infringement substantially facilitates access to and the distribution of infringing materials"); *Sony Music Entm't v. Cox Commc'ns, Inc.*, 464 F. Supp. 3d 795, 816 (E.D. Va. 2020) ("*Cox*") (holding that, "a reasonable jury could find that Cox substantially assisted widespread infringement with actual knowledge of the conduct on specific subscribers' accounts" because "[d]efendants' high-speed internet services were necessary to the infringing actions in this case . . . [and] Cox was indispensable to each instance of P2P infringement on its network").  These holdings apply the widely accepted principle that "providing the site and facilities for known infringing activity is sufficient to establish contributory liability." *Fonovisa,*

*Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996); *Perfect 10 v. Amazon.com*, 508 F.3d 1146, 1172 (9th Cir. 2007) (a service provider's knowing failure to prevent infringing actions can be enough to impose contributory liability).

Frontier's argument that "[m]erely providing high-speed internet service . . . simply cannot be a basis for secondary liability," Frontier Br. at 13, ignores this caselaw while mischaracterizing Frontier's conduct. Frontier has done more than merely provide high-speed internet service to the general public: it has continued to provide internet service to specific subscribers it knows use that service to repeatedly infringe, thereby encouraging and assisting their infringement. Like the knowledge element, while multiple courts have held the allegations here sufficient, no court has held that allegations against an ISP like those against Frontier in this case do not sufficiently plead material contribution.

### C. Frontier's continued provision of internet service to known repeat infringers satisfies the *Sony* and *Grokster* standards for contributory infringement.

Frontier can find no refuge in the Supreme Court's holding in *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). "In *Sony*, the Supreme Court held that when a product is capable of 'substantial noninfringing uses,' its manufacturer cannot be liable simply for knowing that the product could be used in a way that would constitute infringement." *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 100 (2d Cir. 2016) (quoting *Sony*, 464 U.S. at 456). Frontier tries to leverage *Sony*'s language that "the sale of copying equipment . . . does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes" to argue that *Sony* immunizes *all* sales of services with substantial noninfringing uses. Frontier Br. at 10 (quoting *Sony*, 464 U.S. at 442). But in *Grokster* the Supreme Court rejected that reading of *Sony*. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 933–34 (2005). In *Grokster*, the Ninth Circuit had held, as Frontier argues

here, that "whenever a product is capable of substantial lawful use, the producer can never be held contributorily liable for third parties' infringing use of it." *Id.* at 934 (citing *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*, 380 F.3d 1154, 1162 (9th Cir. 2004)); *see* Frontier Br. at 10 ("Since Sony's copying device was 'capable of substantial noninfringing uses,' its sale to the general public did not constitute copyright infringement.") (quoting *Sony*, 464 U.S. at 456).

However, the Supreme Court flatly rejected this precise line of reasoning, holding that "[t]his view of *Sony*, however, was error" and explaining that "*Sony* barred secondary liability based on *presuming or imputing intent* to cause infringement *solely* from the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement." *Grokster*, 545 U.S. at 933–34 (emphasis added). Irrefutably then, *Sony* does not create blanket immunity from secondary liability for any product with substantial noninfringing uses, as the Second Circuit has recognized. *See EMI Christian Music Grp.*, 844 F.3d at 100 (relying on *Grokster* to reject substantial noninfringing use defense for secondary infringer who "acted in a manner intended to promote infringement"). *Sony* was not a case where the defendant was put on notice repeatedly of ongoing, actual infringement, as Frontier was here.

Reading *Sony* properly and in light of *Grokster*, every court to consider this issue has rejected Frontier's argument that *Sony* immunizes an ISP's continued provision of service to known repeat infringers. For example, the Fourth Circuit rejected another ISP's attempt to raise this argument as "meritless" and held that "the fact that [the ISP's] technology can be substantially employed for a noninfringing use does not immunize it from liability for contributory copyright infringement." *BMG*, 881 F.3d at 306–07; *see also Altice*, 2023 WL 3436089, at *13 (denying ISP's motion to dismiss secondary infringement claims and rejecting ISP's reliance on the substantial noninfringing uses doctrine); *UMG Recordings, Inc. v. Grande Commc'ns Networks,*

11

*LLC*, No. A-17-CA-365-LY, 2018 WL 1096871, at *9 (W.D. Tex. Feb. 28, 2018) ("*Grande I*") (same), *report and recommendation adopted,* No. 1:17-CV-365-LY, 2018 WL 1905124 (W.D. Tex. Mar. 28, 2018).

Far from absolving Frontier, *Grokster* supports the conclusion that Frontier is contributorily liable. *Grokster* held that, "where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement, *Sony*'s staple-article rule will not preclude liability." *Grokster*, 545 U.S. at 935. Every court to consider the issue has held that an ISP "intentionally encourag[es] infringement through specific acts . . . by continuing to sell internet services and continuing to provide internet access to infringing customers." *Grande II*, 384 F. Supp. 3d at 767–68 (denying ISP's motion for summary judgment) (internal quotation marks and citation omitted); *RCN*, 2020 WL 5204067, at *9–10 (denying motion to dismiss and observing that "other courts have found an ISP's failure to take remedial action against repeat copyright infringers is tantamount to encouraging infringement"); *Altice*, 2023 WL 3436089, at *13 (denying ISP's motion to dismiss and adopting *Grande II*'s rationale).

These courts have recognized that ISPs like Frontier crucially differ from the defendant in *Sony*: ISPs have an ongoing relationship with their customers who use their services to infringe, while the seller of video recorders in *Sony* did not. *See BMG*, 881 F.3d at 308 (differentiating under *Grokster* and *Sony* cases that "involve subscription services or rentals rather than one-time sales"). Due to this ongoing relationship, Frontier knows that particular customers use its services to infringe and will continue to do so. "[W]hen a person sells a product that has lawful uses, but with the *knowledge* that the buyer *will in fact* use the product to infringe copyrights . . . the seller knows that infringement is substantially certain to result from the sale; consequently, the seller

intends to cause infringement just as much as a seller who provides a product that has exclusively

unlawful uses." *BMG*, 881 F.3d at 307 (emphasis in original).  This result follows naturally from

"the common law rule that if a person 'knows that the consequences are certain, or substantially

certain, to result from his act, and still goes ahead, he is treated by the law as if he has in fact

desired to produce the result.'" *Grande II*, 384 F. Supp. 3d at 767–68 (quoting Restatement

(Second) of Torts § 8A cmt. b (1965)).  Thus, the continued provision of internet service to known

repeat infringers establishes "actions directed to promoting infringement" under *Grokster* and

obviates application of *Sony*'s substantial noninfringing uses rule.  *See Arista Recs. LLC v.

Usenet.com, Inc.*, 633 F. Supp. 2d 124, 156 (S.D.N.Y. 2009) (holding *Sony*'s substantial

noninfringing uses doctrine inapplicable and granting summary judgment for plaintiffs where

"there is no dispute that Defendants maintain an ongoing relationship with their users").

### D. *Twitter v. Taamneh* did not alter *Sony*'s and *Grokster*'s holdings on contributory liability.

The Supreme Court's holding in *Twitter v. Taamneh*, 598 U.S. 471 (2023), did not alter the

application of secondary liability principles to Frontier.  In *Twitter*, the Supreme Court held that

the family of an ISIS terrorism victim had failed to state a claim against Facebook, Google, and

Twitter under the aiding and abetting provision of the Justice Against Sponsors of Terrorism Act,

18 U.S.C. § 2333(d)(2).  *Id.* at 507.  In evaluating aiding-and-abetting liability, the Supreme Court

emphasized the importance of the nexus between the defendant's conduct and the tort at issue:

"[w]hen there is a direct nexus between the defendant's acts and the tort, courts may more easily

infer such culpable assistance.  But, the more attenuated the nexus, the more courts should demand

that plaintiffs show culpable participation through intentional aid that substantially furthered the

tort."  *Id.* at 506.  In holding that no claim had been stated against the social media company

defendants, the Court found that "the nexus between defendants and the Reina attack is far

removed" because "plaintiffs have failed to allege that defendants intentionally provided any substantial aid to the Reina attack or otherwise consciously participated in the Reina attack." *Id.*

The direct nexus between the defendants' conduct and the underlying tort at issue that was lacking in *Twitter* is present here.  While the *Twitter* plaintiffs alleged that ISIS used the defendants' social-media platforms to recruit terrorists, raise funds, and spread propaganda, *id.* at 481, they did not and could not allege that ISIS used the defendants' social-media platforms to actually carry out or even plan the terrorist attack at issue, *id.* at 498 (stating that "plaintiffs never allege that ISIS used defendants' platforms to plan or coordinate the Reina attack").  Thus, in *Twitter*, the Court explained that the "claim here rests . . . on an alleged failure to stop ISIS from using these platforms," *id.* at 500, and not on an alleged failure to stop ISIS from using those platforms to carry out terrorist acts.

This case differs from *Twitter* because Frontier's subscribers use Frontier's internet service to carry out their infringement; indeed, the infringement would be impossible without Frontier's services.  Frontier's continued provision of internet service to known repeat infringers gives rise to an inference of "culpable assistance" to those subscribers' infringing conduct, while the social media platforms' failure to remove ISIS-affiliated accounts did not support the same inference with regard to ISIS's terrorist attacks.

*Twitter*'s missing nexus also distinguishes the *Twitter* social media platforms' "passive nonfeasance" in that case from Frontier's material contribution to its subscribers' infringement in this case.  An ISP like Frontier contributes to its subscribers' infringement and "is not a case of mere refusal to act."  *Grande II*, 384 F. Supp. 3d at 767.  Every time Frontier received an infringement notice for a subscriber and chose to let that subscriber continue infringing on its network, often dozens of times or more, Frontier "acted affirmatively by continuing to sell internet

14

services and continuing to provide internet access to infringing customers." *Id.* By virtue of the large number of repeat infringements by the same subscribers, Frontier received numerous infringement notices for these subscribers and repeatedly chose to let these subscribers continue infringing. By contrast, in *Twitter*, "the only affirmative 'conduct' defendants allegedly undertook was creating their platforms and setting up their algorithms to display content relevant to user inputs and user history." *Twitter*, 598 U.S. at 498. Nor did the plaintiffs in *Twitter* "allege that, after defendants established their platforms, they gave ISIS any special treatment." *Id.* Whereas here, unlike in *Twitter*, Frontier gave its infringing subscribers special treatment by choosing to ignore those subscribers' infringement notices contrary to Frontier's repeat infringer policy under which subscribers were to be terminated for using Frontier's internet service to repeatedly commit copyright infringement. *See supra* at 4.

*Twitter*'s actual holding and discussion belies Frontier's argument that *Twitter* stands for the proposition that "communications providers cannot be held secondarily liable for wrongdoing even if they know specific customers are using their services to do it." Frontier Br. at 8. *Twitter* says nothing of the sort. In fact, *Twitter* specifically instructs that the principles it discusses "should not be taken as inflexible codes; rather, they should be understood in light of the common law and applied as a framework designed to hold defendants liable when they consciously and culpably participated in a tortious act in such a way as to help make it succeed." *Twitter*, 598 U.S. at 497 (internal quotation marks omitted).

*Twitter* thus rejects the categorical rule for which Frontier asserts it stands and by its own terms roots itself in the same common-law principles that underlay *Grokster* and *Sony*. *See Twitter*, 598 U.S. at 488 ("turn[ing] to the common law of aiding and abetting"); *Grokster*, 545 U.S. at 930 (noting that "doctrines of secondary liability emerged from common law principles").

As *Grokster* supports liability over Frontier, *see supra*, it would be anomalous to read *Twitter* as a radical departure from *Grokster* and compelling the opposite outcome. And as *Twitter* makes no mention at all of copyright law, it would be highly irregular to presume, as Frontier urges, that the Supreme Court silently intended to rewrite well-established copyright law doctrine in an unrelated non-copyright case.

While Frontier makes much of *Twitter*'s remarks on the risks of overextending liability to service providers, these statements must be read in light of the ultimately determinative lack of nexus between the defendants' conduct and the terrorist attack. Thus, crucial to *Twitter*'s statement that "a contrary holding would effectively hold any sort of communication provider liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop them," *Twitter,* 598 U.S. at 503, is that the wrongdoers are not using the communication provider's services to commit the wrongs at issue. Where that nexus is missing, the concerns *Twitter* highlights of overextending liability may apply. But where that direct nexus exists—as it does here—those concerns evaporate.

Lastly but importantly, with respect to liability of online service providers for copyright infringement occurring over their networks, Congress has already addressed the concerns articulated in the *Twitter* decision. Congress enacted the DMCA including the § 512 safe harbor defenses, to provide ISPs with a potential shield from liability for copyright infringement occurring on their networks in certain circumstances. To obtain the benefit of those potential defenses, an ISP simply needs to comply with the pertinent statutory conditions. As one appellate court has observed, "Congress has already provided statutory protection against some of these potential ramifications" with respect to copyright infringement liability by enacting the DMCA safe harbors. *Spanski Enters. v. Telewizja Polska, S.A.*, 883 F.3d 904, 912 (D.C. Cir. 2018). Indeed, Frontier

16

seeks to invoke one of the section 512 safe harbors in this case.  Under Frontier's reading of *Twitter*, however, the safe harbors and 25 years of operation of the DMCA would be rendered superfluous as no ISP would need to invoke or comply with them to avoid liability for infringement.  That absurd result is clearly not what the Supreme Court contemplated when issuing its *Twitter* decision.  *See, e.g.*, *Trichilo v. Secretary of Health and Human Servs.*, 823 F.2d 702, 706 (2d Cir. 1987) (explaining that sound tenets of statutory construction prevent courts from interpreting a statute "so that some of its terms are rendered a nullity").

## II.    Frontier's Ability to Terminate Repeat Infringers' Service Gives Frontier the Right and Ability to Supervise Infringement for Purposes of Vicarious Liability.

The Record Company Claimants have adequately alleged that Frontier is vicariously liable for its subscribers' infringement—the second and separate basis under which the Proofs of Claim allege Frontier is secondarily liable for copyright infringement.  A defendant is vicariously liable for the acts of another "when the defendant had the right and ability to supervise that coalesced with an obvious and direct financial interest in the exploitation of copyrighted materials." *MP3tunes*, 844 F.3d at 99 (internal quotation omitted).  "[A] party 'infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it.'"  *Bus. Casual Holdings, LLC v. YouTube, LLC*, No. 22-3007-cv, 2023 WL 6842449, at *3 (2d Cir. Oct. 17, 2023) (quoting *Grokster*, 545 U.S. at 930).

The Record Company Claimants have adequately alleged that Frontier has the right and ability to supervise its subscribers' infringement.[3]  The right and ability "to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to

---

[3] Since Frontier's motion does not challenge the direct financial benefit element of vicarious liability at all, the Record Company Claimants do not address that element here.  And while Frontier makes reference to the supervision prong in the introductory sections of its brief, Frontier does not address the sufficiency of the Record Company Claimants' vicarious liability claim at all in the Argument section of its brief.

supervise." *Napster*, 239 F.3d at 1023; *see also Dish Network LLC*, 2023 WL 4549528, at *4

("When the defendant can terminate its users' access to the system to prevent infringement, the

defendant has the ability to stop infringement.").  In the internet context, this element is satisfied

where an ISP has the contractual *right* to "terminate [users'] accounts" and "revoke [access]

privileges," *Capitol Records, LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646 (AJN) (SN), 2014

WL 12698683, at *22 (S.D.N.Y. May 28, 2014), *report and recommendation adopted*, 2015 WL

1402049 (S.D.N.Y. Mar. 25, 2015), and the *practical ability* to "terminate, suspend or restrict

users' subscriptions, thereby limiting their access to uploading or downloading," *Arista Recs. LLC

v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009).

As a result, courts have repeatedly held that an ISP has the right and ability to supervise its

subscribers' infringement because the ISP can terminate its subscribers.  *Cox*, 464 F. Supp. 3d at

813–14 (the jury's finding that "[t]he right and ability to supervise the infringing activity is

supported, as Cox had both a contractual and actual ability to stop or limit ongoing infringement

by modifying or terminating an account"); *Grande I*, 2018 WL 1096871, at *10 (holding that

"Grande can stop or limit the infringing conduct by terminating its subscribers' internet access");

*Warner Recs. Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069, 1086 (D. Colo. 2020) (same);

*RCN*, 2020 WL 5204067, at *11 (same); *Altice*, 2023 WL 3436089, at *8 (same).  In doing so, all

of those courts have addressed and rejected Frontier's argument that "the Claimants cannot

plausibly allege that Frontier has a right or ability to supervise and control its customers' activities

on the internet."  Frontier Br. at 5-6.  Nor are Frontier's arguments about *Sony*, *Grokster*, or *Twitter*

relevant here: those cases do not address vicarious liability.

### III.    The Record Company Claimants Have Not Asserted Claims for Liability Under the DMCA, as Frontier Implies.

Frontier's argument that the DMCA is not an independent basis for liability, Frontier Br. at 13–15, is misplaced: the Record Company Claimants have not asserted any claims based on liability under the DMCA.  They have asserted claims for contributory and vicarious copyright infringement, which are not based on the DMCA.  Proofs of Claim at 16–19 ¶¶ 50–67.  Frontier, *as an affirmative defense*, has asserted the DMCA safe harbor under 17 U.S.C. § 512(a).[4]

### IV.    Frontier's DMCA Safe Harbor Defense Does Not Affect the Relevance of the Infringement Notices to the Reasonableness of Frontier's Implementation of a Repeat Infringer Policy and Frontier's Knowledge of Direct Infringement.

#### A.    Frontier's responses to infringement notices are relevant to whether Frontier reasonably implemented a repeat infringer policy because infringement notices identify repeat infringers.

To be eligible for *any* of the DMCA safe harbors, Frontier must "ha[ve] adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers."  17 U.S.C. § 512(i)(1)(A).  Because infringement notices can (and in this case, the Notices do) identify repeat infringers who should be subject to Frontier's repeat infringer policy, Frontier's actions or inactions in response to infringement notices are plainly relevant to whether Frontier reasonably implemented such a policy.

---

[4] The Movie Company Claimants have asserted claims under the DMCA, and Frontier improperly conflates the two distinct sets of claims that the Movie Company Claimants and Record Company Claimants have asserted.  In all events, the Movie Company Claimants' DMCA claims are under a different statutory provision of the DMCA, namely section 1202, which concerns the "[i]ntegrity of copyright management information" and does not implicate the safe harbor provisions of section 512.  *See* 17 U.S.C. § 1202; Response to Notice of Reorganized Debtors' Omnibus Objection to Certain Disputed Copyright Claims at 2, ECF No. 1894 ("The movie claimants filed pre-petition and post-petition administrative claims [including] based upon ... violations of the integrity of the copyright management information ("CMI") conveyed with their motion pictures per 17 U.S.C. §§ 1202(a)(2), (b)(2), (3).").

Accordingly, courts consider a defendant's response to infringement notices in evaluating whether the defendant reasonably implemented a repeat infringer policy, *even where* the defendant is an ISP like Frontier that might try to claim eligibility for § 512(a)'s safe harbor. *BMG*, 881 F.3d at 304–05 (affirming summary judgment against defendant ISP on DMCA safe harbor and stating that ISP's "decision to categorically disregard all notices from Rightscorp provides further evidence that [ISP] did not reasonably implement a repeat infringer policy"); *Grande II*, 384 F. Supp. 3d at 755 (considering defendant ISP's actions in response to "over a million infringement notices" in granting summary judgment against defendant ISP on DMCA safe harbor for failure to reasonably implement repeat infringer policy). Frontier cites no case holding otherwise.[5]

### B. Infringement notices establish that Frontier has the requisite knowledge for contributory liability.

Infringement notices are relevant to whether Frontier has the knowledge required to establish contributory liability. As explained above, courts have consistently held that infringement notices sent to an ISP can establish that the ISP had the knowledge of infringement that contributory liability requires. *See supra* § I.A. Frontier's only response to this line of cases is that they predate *Twitter*. Frontier Br. at 16 n.5. That argument fails; for the reasons described above, *Twitter* has not altered the existing principles of contributory infringement. *See supra* § I.D.

### C. Frontier's assertion of the Section 512(a) safe harbor does not render the infringement notices it received irrelevant.

The infringement notices Frontier received are relevant to Frontier's liability regardless of which of the § 512 safe harbors it has asserted. Frontier argues at length that infringement notices

---

[5] Frontier refers to termination as taking "the extreme measure of terminating accounts, which in this day and age of remote meetings, virtual classes, and online social interactions is nothing short of draconian." Frontier Br. at 5. However, the potential act of an ISP terminating a subscriber's account is a requirement of the DMCA's safe harbor provisions as just discussed. Furthermore, the Record Company Claimants expect discovery to show that Frontier terminated thousands of subscribers for not paying their invoices.

it received "require no action" because Frontier claims to be a conduit under 17 U.S.C. § 512(a).

Frontier Br. at 16–22.  Section 512(a), sometimes referred to as a "conduit" safe harbor, limits

under certain conditions a service provider's liability for copyright infringement "by reason of the

provider's transmitting, routing, or providing connections for, material through a system or

network controlled or operated by or for the service provider."  17 U.S.C. § 512(a).  Unlike the

other DMCA safe harbors, § 512(a) does not require a service provider to respond to infringement

notices by removing infringing content residing on a system or network.  *Id.*  But critically, the §

512(a) safe harbor is only available if the ISP has complied with § 512(i), which requires the ISP

to "ha[ve] adopted and reasonably implemented . . . a policy that provides for the termination in

appropriate circumstances of subscribers and account holders of the service provider's system or

network who are repeat infringers."  17 U.S.C. § 512(i)(1)(A).

Frontier is thus wrong that, because it asserts a § 512(a) safe harbor defense, the Notices

"did not establish Frontier's knowledge of specific instances of customers' copyright infringement

or create a duty on the part of Frontier to act in response to them."  Frontier Br. at 16.

Recognizing that infringement notices are relevant for some purposes but not others does

not "rewrite § 512", as Frontier argues (Frontier Br. at 22).  Quite the opposite: in enacting

§ 512(a), Congress intended to leave the independent doctrines of secondary liability untouched.

"[T]he DMCA did not simply rewrite copyright law for the on-line world . . . Congress would have

done so if it so desired.  Claims against service providers for direct, contributory, or vicarious

copyright infringement, therefore, are generally evaluated just as they would be in the non-online

world."  *Ellison v. Robertson*, 357 F.3d 1072, 1077 (9th Cir. 2004) (internal quotation marks

omitted).  Similarly, the Fourth Circuit has held that: "the DMCA was intended not to change the

21

'evolving' doctrines on ISP liability for copyright infringement . . . but to offer a certain safe harbor for ISPs." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 553 (4th Cir. 2004).

Similarly, if Congress had intended that eligibility for the § 512(a) safe harbor would materially affect the application of the § 512(i) repeat infringer policy requirement, it would have said so. Instead, cases assessing whether an ISP like Frontier has reasonably implemented a repeat infringer policy have not altered their analysis of § 512(i)'s requirements on the basis that an ISP may be eligible for the § 512(a) safe harbor. *BMG*, 881 F.3d at 304; *Grande II*, 384 F. Supp. 3d at 755. The one Second Circuit case analyzing the significance of notices to a service provider's repeat infringer policy placed no significance on *which* DMCA safe harbor the service provider was asserting. *MP3tunes*, 844 F.3d at 91. Frontier cites no case holding otherwise. It is Frontier that seeks to improperly rewrite copyright law.

It simply does not matter for purposes of establishing the knowledge element of contributory infringement or Frontier's failure to comply with the DMCA's repeat infringer policy requirement under § 512(i) whether the infringement notices Frontier received were in a format that complied with the conditions set forth by § 512(c)(3). For both issues, the significance of the infringement notices is that, by receiving them, Frontier gained knowledge of the existence of repeated infringement on its network by specific subscribers. How Frontier learned those facts— whether from a DMCA-compliant notice, a certified letter, an email, communication with its subscribers, or anything else—is irrelevant.

### D. Frontier cannot establish a DMCA safe harbor as a defense to liability on a motion for judgment on the pleadings.

To the extent Frontier seeks to establish its entitlement to the § 512(a) safe harbor now, the affirmative defense cannot be established on a motion for judgment on the pleadings. "An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without

resort to summary judgment procedure, if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998). "Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (internal citations and quotation marks omitted). "[T]he plaintiff is not required to allege facts to negate the affirmative defense." *In re Sept. 11 Prop. Damage & Bus. Loss Litig.*, 481 F. Supp. 2d 253, 258 (S.D.N.Y. 2007) (citing *Gomez v. Toledo*, 446 U.S. 635, 640–41 (1980)).

Frontier's attempt to assert the § 512(a) safe harbor cannot meet this standard. To claim the § 512(a) safe harbor, Frontier must establish a series of detailed factual elements:

> A service provider shall not be liable for monetary relief. . . for infringement of copyright by reason of the provider's transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider, or by reason of the intermediate and transient storage of that material in the course of such transmitting, routing, or providing connections, if—
>
> (1) the transmission of the material was initiated by or at the direction of a person other than the service provider;
>
> (2) the transmission, routing, provision of connections, or storage is carried out through an automatic technical process without selection of the material by the service provider;
>
> (3) the service provider does not select the recipients of the material except as an automatic response to the request of another person;
>
> (4) no copy of the material made by the service provider in the course of such intermediate or transient storage is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission, routing, or provision of connections; and
>
> (5) the material is transmitted through the system or network without modification of its content.

17 U.S.C. § 512(a).  Frontier cannot show that the facts required to establish all of these elements "appear on the face of the complaint."   For example, nothing in the Proofs of Claim shows conclusively that "the transmission, routing, provision of connections, or storage is carried out through an automatic technical process without selection of the material by the service provider" or that Frontier does not maintain any copy of infringing material "in a manner ordinarily accessible to anyone other than anticipated recipients."   Indeed, Frontier does not even try: Frontier's argument that it is a § 512(a) conduit does not cite anything in the Proofs of Claim.

Nor is there anything in the Proofs of Claim that set forth that Frontier complied with the requirements of § 512(i), including that Frontier "adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers."  17 U.S.C. § 512(i)(1)(A). Indeed, the Proofs of Claim allege only facts to the contrary.

Accordingly, Frontier's argument that infringement notices are irrelevant because Frontier has asserted a § 512(a) safe harbor defense is without merit.

## **CONCLUSION**

For the reasons stated above, the Record Company Claimants respectfully request that Frontier's Motion for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c) be denied in its entirety.

Dated: January 5, 2024

Respectfully submitted:

*/s/ Matthew J. Oppenheim*

Matthew J. Oppenheim
**OPPENHEIM + ZEBRAK, LLP**
4350 Wisconsin Avenue, NW, Fifth Floor
Washington, DC 20016
Telephone: (202) 480-2999
matt@oandzlaw.com

Michael Luskin
Stephan E. Hornung
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY  10178-0060
Telephone: (212) 309-6000
Michael.luskin@morganlewis.com
Stephan.hornung@morganlewis.com

Alexander Kaplan
Carly K. Rothman
**OPPENHEIM + ZEBRAK, LLP**
461 Fifth Avenue, 19th Floor
New York, New York 10017
Telephone: (212) 951-1156
alex@oandzlaw.com
carly@oandzlaw.com

*Counsel to the Record Company Claimants*