**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| FRONTIER COMMUNICATIONS CORPORATION, *et al.* [1] , | Case No. 20-22476 (MG) |
| Reorganized Debtors. | (Jointly Administered) |
|  | **RELATED DOC NOS. 2235, 2248, 2249** |

---

**REORGANIZED DEBTORS' CONSOLIDATED REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS ON ALL MATTERS OF COPYRIGHT INFRINGEMENT**

---

JOHN P. CAMPO, ESQ.
AKERMAN LLP
1251 Avenue of the Americas
37th Floor
New York, NY 10020
(212) 880 3800

RUBÉN CASTILLO, ESQ.
(Admitted Pro Hac Vice)
ILDEFONSO P. MAS, ESQ.
(Admitted Pro Hac Vice)
AKERMAN LLP
71 South Wacker Drive
47th Floor
Chicago, IL 60606
(312) 634 5700

*Co-Counsel for Reorganized Debtors*

---

[1]Due to the substantial number of debtor entities in these chapter 11 cases, for which the Court has ordered joint administration, a complete list of the reorganized debtor entities and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Reorganized Debtors' claims and noticing agent at https://cases.primeclerk.com/ftr.  The location of the Reorganized Debtors' service address for purposes of these chapter 11 cases is:  180 Maiden Lane, New York, NY 10038.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   ARGUMENT ...................................................................................................... 3

    A.    Claimants' Common-Law Secondary Liability Claims Must Be Dismissed
        With Prejudice. .................................................................................................. 3

        1.    Frontier is not contributorily liable merely because it allegedly
             knew some of its subscribers infringed and failed to terminate them........ 3

            a.    *Twitter*, *Sony*, and *Grokster* foreclose Claimants' theory .............. 3

            b.    Claimants' attempts to evade *Twitter*, *Sony*, and *Grokster*
                fail ............................................................................................... 5

            c.    This Court should not follow nonbinding, out-of-circuit
                district court cases that predate and contradict *Twitter* ............... 10

        2.    Frontier is not vicariously liable for the alleged infringement of its
             subscribers ..................................................................................................... 14

    B.    Claimants Concede That The DMCA Does Not Create Any Cause Of
        Action, Prescribe Any Standard Of Liability, Or Impose An Independent
        Duty Upon Providers Of Internet Service........................................................... 17

    C.    The Movie Company Claimants' § 1202 Claim Should Be Dismissed
        Because They Plead No Basis For Imposing Secondary Liability ...................... 18

III.  CONCLUSION................................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) ........................................................................15, 16

*Arista Records, LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010).....................................................................................11

*BMG Rights Mgmt. (US) LLC v. Cox Communications, Inc.*,
    881 F.3d 293 (4th Cir. 2018) ...................................................................................12

*BMG Rts. Mgmt. (US) LLC v. Altice USA, Inc.*,
    No. 2:22-CV-00471-JRG, 2023 WL 3436089 (E.D. Tex. May 12, 2023) ........................12, 16

*Bodyguard Prods., Inc. v. RCN Telecom Servs., LLC*,
    No. 3:21-CV-15310 (GC) (TJB), 2022 WL 6750322 (D.N.J. Oct. 11, 2022)........................16

*Bus. Casual Holdings, LLC v. YouTube, LLC*,
    No. 22-3007-cv, 2023 WL 6842449 (2d Cir. Oct. 17, 2023) ............................................11, 17

*Cobbler Nevada, LLC v. Gonzales*,
    901 F.3d 1142 (9th Cir. 2018) .................................................................................13

*Dish Network LLC v. Datacamp Ltd.*,
    No. 22-cv-00993, 2023 WL 4549528 (N.D. Ill. July 14, 2023) .............................................12

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
    844 F.3d 79 (2d Cir. 2016)....................................................................................3, 12

*Flava Works, Inc. v. Gunter*,
    689 F.3d 754 (7th Cir. 2012) ....................................................................................3

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996) ...................................................................................13, 16

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*,
    443 F.2d 1159 (2d Cir. 1971)..................................................................................6, 12

*Matthew Bender & Co. v. W. Pub. Co.*,
    158 F.3d 693 (2d Cir. 1998)....................................................................................12

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005).................................................................................... *passim*

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ...................................................................................9

*In re Roman Cath. Diocese of Rockville Ctr.*,
    650 B.R. 765 (Bankr. S.D.N.Y. 2023) ...................................................................17

*Shapiro, Bernstein & Co. v. H. L. Green Co.*,
    316 F.2d 304 (2d Cir. 1963) ..........................................................................14, 16

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ...........................................................1, 2, 3, 4, 5, 7, 11, 12

*Sony Music Entm't v. Cox Commc'ns, Inc.*,
    464 F. Supp. 3d 795 (E.D. Va. 2020) ................................................................16

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) ................................................................................. *passim*

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
    384 F. Supp. 3d 743 (W.D. Tex. 2019) ............................................................8, 12

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*,
    No. A-17-CA-365-LY, 2018 WL 1096871 (W.D. Tex. Feb. 28, 2018) ..................................16

*UMG Recordings, Inc. v. RCN Telecom Services, LLC*,
    No. 19-17272 (MAS) (ZNQ), 2020 WL 5204067 (D.N.J. Aug. 31, 2020) ......................12, 16

*Venegas-Hernandez v. ACEMLA*,
    424 F.3d 50 (1st Cir. 2005) ..................................................................................3

*VHT, Inc. v. Zillow Grp.*,
    918 F.3d 723 (9th Cir. 2019) ..............................................................................16

*Warner Recs. Inc. v. Charter Commc'ns, Inc.*,
    454 F. Supp. 3d 1069 (D. Colo. 2020) ...............................................................16

**Statutes**

17 U.S.C. § 512 ....................................................................................................18

17 U.S.C. § 1202 .............................................................................................18, 19

18 U.S.C. § 2333(d)(2) ...........................................................................................5

## I.    INTRODUCTION

Claimants do not dispute that Frontier's motion presents pure issues of law that may be resolved on the pleadings. Nor do they dispute that their claims are premised on common-law principles of secondary liability, not any affirmative duty imposed by the Digital Millennium Copyright Act. And they implicitly acknowledge their extreme theory of liability: Frontier may be held secondarily liable merely because it failed to take the drastic step of terminating homes' and businesses' internet access after receiving automated notices asserting that unknown persons were using those subscribers' accounts to infringe Claimants' works.

That theory is foreclosed as a matter of law by *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), and *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). Those cases are emphatic that the "conceptual core" that has "animated" common-law secondary liability "for centuries" is "truly culpable conduct." *Twitter*, 598 U.S. at 489, 493; *Grokster*, 545 U.S. at 934. This requires more than "mere passive nonfeasance"; a defendant must "take some 'affirmative act' 'with the intent of facilitating the offense's commission,'" i.e., it must give "culpable assistance" to the primary tortfeasor. *Twitter*, 598 U.S. at 490-91, 500. This principle requires dismissal of the claims.

Claimants identify no such "culpable assistance" that would justify holding Frontier secondarily liable for its subscribers' alleged infringement. *Id.* at 500. Rather, just as in *Twitter*, they seek to hold Frontier contributorily liable merely for allegedly "knowing that the wrongdoers were using its services and failing to stop them." *Id.* at 503. The law "absolves" such "equivocal" inaction. *Grokster*, 545 U.S. at 932. An online service provider's mere failure to "terminate customers after discovering that the customers were using [its otherwise legitimate] service for illicit ends" does not, without more, establish a knowing, material contribution to its customers' wrongs. *Twitter*, 598 U.S. at 501; *see Grokster*, 545 U.S. at 939 n.12 (courts are "unable to find

1

contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement, if the device otherwise [i]s capable of substantial noninfringing uses"). The only exception is where the defendant owes an independent legal duty to act—an exception Claimants concede they cannot meet by disavowing any argument that the DMCA imposes an obligation on a conduit ISP like Frontier to terminate subscribers in response to notices alleging infringement.

Thus, *Twitter*, *Sony*, and *Grokster* require dismissal of Claimants' contributory liability claims. And while *Twitter* does not specifically call out vicarious liability, which is a form of secondary liability, it roundly condemns any approach to secondary liability under which an online service provider may be held liable "merely for providing [its] services to the public writ large." 598 U.S. at 499. Claimants' theory of vicarious liability would hold virtually every online service provider liable for all of its users' wrongful acts, untethering vicarious copyright liability from its *respondeat superior* moorings and contravening the Supreme Court's admonition in *Twitter*.

At bottom, Claimants' entire arguments rise and fall on a smattering of out-of-circuit district court opinions that predate—and cannot be squared with—*Twitter*. None of those cases has been affirmed by *any* court of appeals, much less the Second Circuit. This Court should not be the first in this Circuit to hold, contrary to binding Supreme Court precedent, that ISPs have an affirmative duty to throw their subscribers off the internet—imperiling the livelihoods of untold numbers of individuals and businesses—merely because a bot has sent automated notices asserting that someone is using those subscribers' internet to infringe.

Claimants' common-law secondary liability claims must therefore be dismissed in full and with prejudice. And because the Movie Company Claimants do not dispute that their § 1202 claim turns on the same principles of secondary liability, that claim must also be dismissed for the same reasons.

## II.    ARGUMENT

**A.    Claimants' Common-Law Secondary Liability Claims Must Be Dismissed With Prejudice.**

### 1.    Frontier is not contributorily liable merely because it allegedly knew some of its subscribers infringed and failed to terminate them.

As Frontier explained in its opening brief (Mot. 7-13[2]), *Twitter*, *Grokster*, and *Sony* squarely foreclose Claimants' claims that Frontier is secondarily liable merely because it allegedly knew that a small subset of its subscribers had repeatedly infringed using its services and failed to terminate their internet access.

#### a.    *Twitter*, *Sony*, and *Grokster* foreclose Claimants' theory.

Claimants do not dispute the following core premises of that argument.

Premise 1: *Twitter*, *Grokster*, and *Sony* all address the same "general principle" of common law secondary liability for another's acts, and the same principle underlying Claimants' claims. Mot. 10. Contributory liability is just copyright's label for common-law "aiding and abetting" liability. *See EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 100 (2d Cir. 2016) (defendant liable for contributory infringement because he "aided and abetted" users' direct infringement); *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012) (a contributory infringer is "in effect … an aider and abettor"); *Venegas-Hernandez v. ACEMLA*, 424 F.3d 50, 57-58 (1st Cir. 2005) ("contributory infringement" is "abettor liability"). *Twitter* too addressed the "conceptual core that has animated aiding-and-abetting liability for centuries." 594 U.S. at 493.

---

[2] References herein to "Mot." are to Reorganized Debtors' Brief In Support Of Their Motion For Judgment As A Matter Of Law On All Claims Of Copyright Infringement, Dkt. 2235. References to "Rec. Cos. Opp." are to the Record Company Claimants' Memorandum of Law in Opposition to Frontier's Motion for Judgment on the Pleadings, Dkt. 2249. And references to Mov. Cos. Opp. are to the Movie Company Claimants' Memorandum In Opposition To Debtors' Motion For Judgment As A Matter Of Law, Dkt. 2248. All other defined terms bear the same meaning set forth in Frontier's opening brief.

Premise 2: *Twitter*, *Grokster*, and *Sony* all agree that this "conceptual core" is "truly culpable conduct," *id.* at 489, 493, not passive conduct like providing a lawful service that is abused. *Grokster*, reaffirming *Sony*, emphatically demands "culpable expression and conduct," 545 U.S. at 937, and explains that "*Sony* barred secondary liability based on presuming or imputing intent to cause infringement solely from the … distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement," *id.* at 933. *Twitter* echoes *Grokster*, limiting secondary liability to defendants who "consciously, voluntarily, and culpably participate in or support the relevant wrongdoing." 598 U.S. at 505.

Premise 3: *Twitter* held that the above principle forecloses secondary liability for an online intermediary based merely on allegations that it "kn[ew] that … wrongdoers were using its services and fail[ed] to stop them." *Id.* at 503. *Twitter* makes clear, that, to be secondarily liable for assisting another's infringement, a defendant must ordinarily "take some 'affirmative act' 'with the intent of facilitating the offense's commission,'" such that the defendant can be said to have given "knowing and substantial assistance" to the primary tortfeasor. *Id.* at 490-91 (citation omitted). Continuing to provide online "infrastructure" that is "generally available to the internet-using public with little to no front-end screening" is not such an "affirmative act"—it is the sort of mere inaction that does not establish culpability absent breach of a "duty to act." *Id.* at 489-90, 498-99; *accord Grokster*, 545 U.S. at 933-34 (the law "absolves the equivocal conduct of selling an item with substantial lawful as well as unlawful uses, and limits liability to instances of more acute fault than the mere understanding that some of one's products will be misused").

The conclusion is unavoidable: *Twitter*, *Sony*, and *Grokster* foreclose Claimants' theory. As Frontier explained (at 8-9), Claimants' allegations are materially indistinguishable from those in *Twitter*. Frontier provides nothing but a basic, passive internet connection to millions of

4

subscribers, the vast majority of whom use those services lawfully. Claimants do not allege otherwise, nor could they. And here, as in *Twitter*, Claimants are seeking to hold an online platform contributorily liable for failing "to terminate customers after discovering that the customers were using the service for illicit ends." 598 U.S. at 501; *see* Rec. Cos. Am. Proof of Claim, ECF 2130, ¶ 20 ("Rather than disconnect the Internet access of blatant repeat infringers, Frontier knowingly continued to provide these subscribers with the Internet access that enabled them to continue to illegally download or distribute Claimants' copyrighted works unabated."); *see* Mov. Cos. Proof of Claim, Claim No. 2283, ECF 2235-1, Ex. 1, ¶ 6 (Frontier "has failed to terminate any repeat infringers … in response to" notices purporting to identify subscribers' previous infringement). Simply put, Supreme Court authority forecloses Claimants' theory of liability.

> **b.    Claimants' attempts to evade *Twitter*, *Sony*, and *Grokster* fail.**

Claimants resist this conclusion based on a grab bag of arguments, but each of their (often contradictory) points is meritless.

**Twitter *applies fully to copyright claims.*** The Movie Company Claimants assert that *Twitter* does not apply here, because *Twitter* "pertains to the specific aiding and abetting language of 18 U.S.C. § 2333(d)(2)," not secondary liability for copyright infringement. Movie Cos. Opp. 7-8. But they do not dispute that the underlying principles are the same, and the Record Company Claimants openly concede the point: *Twitter* "roots itself in the same common-law principles that underlay *Grokster* and *Sony*." Rec. Cos. Opp. 15. That much is irrefutable. In interpreting that statutory phrase, "aid[ing] and abet[ting]," *Twitter* explains that the "proper legal framework" is the "common-law tradition" of aiding-and-abetting liability. 598 U.S. at 484-85 (quotation marks omitted). Contributory liability for copyright infringement draws from the same "common law principles," *Grokster*, 545 U.S. at 930, namely, as explained in the cases cited above (at 3), aiding-and-abetting liability.

5

The Movie Company Claimants are equally wrong to suggest that *Twitter*'s analysis is inapplicable to secondary copyright liability claims "based upon material contribution." Mov. Cos. Opp. 7-8; *see also id.* at 8-9 (claiming support from cases that merely recite the elements of a material contribution claim). "Material contribution" is just a species of affirmative conduct that can give rise to aiding-and-abetting liability—hence the canonical statement that "one who, with knowledge of the infringing activity, induces, causes or *materially contributes* to the infringing conduct" may be a contributory infringer. *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) (emphasis added). *Grokster* emphasizes that, whatever the label, contributory infringement requires "culpable expression and conduct." 545 U.S. at 937. For its part, *Twitter* likewise lists "inducing, encouraging, soliciting, or advising" as examples of the type of "knowing and substantial assistance to the primary tortfeasor" required for liability. 598 U.S. at 490-91. No matter the *type* of assistance alleged, the "conceptual core" of liability is "truly culpable conduct." *Twitter*, 598 U.S. at 489, 493. *Twitter* teaches what this requirement entails— both an affirmative act and one that is blameworthy—and makes clear it requires more than merely continuing to provide generalized internet services.

**Twitter, Sony*, and* Grokster *apply equally to passive internet service.*** Both sets of Claimants argue that there is a "direct nexus" between Frontier's provision of internet services and its subscribers' wrongful acts that was lacking in *Twitter*. Rec. Cos. Opp. 13-14. Their rationale is that "Frontier's subscribers use Frontier's internet service to carry out their infringement," whereas ISIS did not use the *Twitter* "defendants' social-media platforms to actually carry out or even plan the terrorist attack at issue" in that case. Rec. Cos. Opp. 13-14; *see* Mov. Cos. Opp. 8. According to Claimants, this so-called "direct nexus" gives rise to an inference that Frontier gave "culpable assistance" to its subscribers' infringement. Rec. Cos. Opp. 14.

6

Nothing about the alleged fact that Frontier's subscribers use its internet services to infringe suggests a "direct nexus" between the provision of Frontier's services and the alleged wrongful conduct. Otherwise, merely providing a passive conduit to the internet would give ISPs a "direct nexus" with every unlawful thing a subscriber might do on the internet. Indeed, this is *Sony* and *Grokster*'s central teaching: Culpable assistance may not be "presum[ed] or imput[ed]" merely because a company's legitimate product is being "misused" for infringing ends. *Grokster*, 545 U.S. at 933. *Twitter* likewise emphasizes that a service provider that offers legitimate, lawful services to the public is not secondarily liable for a user's wrong merely because that service is being used to commit the wrong. *See* 598 U.S. at 499 (observing that cell providers "would [not] normally be described as aiding and abetting, for example, illegal drug deals brokered over cell phones—even if the provider's conference-call or video-call features made the sale easier"); *see id.* at 489 (noting that "those who merely deliver mail" should not be held responsible "for the tortious message contained therein"). Frontier is no different.

If anything, the nexus between Frontier's provision of the internet and its subscribers' alleged infringement is even less "direct" than in *Twitter*. Unlike Claimants' allegations against Frontier, the online platforms in *Twitter* were accused of *hosting* and *promoting* (via algorithms) harmful material on servers entirely within their control. The Supreme Court nevertheless held as a matter of law that there was no direct nexus between those platforms' provision of internet services and their users' bad acts. *Twitter* requires the same result here.

***Continuing to provide internet infrastructure is not an affirmative act.*** Claimants attempt to argue around *Twitter* by asserting that Frontier "acted affirmatively by continuing to sell internet services and continuing to provide internet access to infringing customers" after receiving notice of its subscribers' purported infringement. Rec. Cos. Opp. 14-15 (quotation marks omitted); Mov.

Cos. Opp. 12-13. *Twitter* rejected a nearly identical argument, explaining that the defendants'
continued "provision of … infrastructure" did not go "beyond passive aid" or rise to the level of
"active, substantial assistance." 598 U.S. at 499-500. That is because, "[a]t bottom," such a claim
is "less [about] affirmative misconduct and more" about a service provider's "alleged failure to
stop" users from accessing its services. *Id.* If anything, the conduct alleged in *Twitter* was more
affirmative, as the defendants' platforms included "'recommendation' algorithms" that connected
wrongdoers (terrorist groups) with potential new recruits and content. *Id.* at 499. *Twitter* thus
forecloses Claimants' reliance on a few pre-*Twitter* district courts' mistaken and unsupportable
conclusions that an ISP's mere failure to stop providing internet services to allegedly known
infringers constitutes an affirmative act. *E.g.*, *UMG Recordings, Inc. v. Grande Commc'ns
Networks, LLC*, 384 F. Supp. 3d 743, 767 (W.D. Tex. 2019) ("*Grande II*"). It simply doesn't.

*Twitter* likewise disposes of Claimants' related arguments that this case is supposedly
different because of Frontier's "ongoing relationship" with its users. Rec. Cos. Opp. 11-13, 15.
Claimants posit that Frontier "intentionally encourag[ed] infringement" or "gave its infringing
subscribers special treatment" when it failed to terminate them after allegedly receiving notice of
their previous acts of alleged infringement. *Id.* at 12, 15 (quotation marks omitted). There was, of
course, the same ongoing relationship in *Twitter*. *See* 598 U.S. 481 ("Plaintiffs … allege that
defendants have known that ISIS has used their platforms for years" and "have profited from the
advertisements placed on ISIS' tweets, posts, and videos."). *Twitter* holds, however, that a
communication provider like Frontier cannot be held liable for subscribers' wrongdoing "merely
for knowing that the wrongdoers were using its services and failing to stop them." *Id.* at 503.
Failing to terminate an account did not qualify as "special treatment" or "encouragement" in
*Twitter*, *id.* at 498, and it is not enough here, either.

> **The Ninth Circuit's pre-Twitter, outlier "simple measures" approach is inapplicable.**

Claimants seek to affix liability based on the Ninth Circuit's outlier and inapplicable decision in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007). *See* Mov. Cos. Opp. 13. In *Perfect 10*, the Ninth Circuit held that an online content *host* like Google "can be held contributorily liable" for continuing to provide access to infringing works if it "has actual knowledge that specific infringing material is available using its system" and can take "simple" (i.e., "reasonable and feasible") "measures to prevent further" infringement, such as removing links to infringing content. 508 F.3d at 1172-73 (citations omitted). The Ninth Circuit's 2007 articulation of an online content host's potential liability runs head on into the traditional requirement of "clear expression," *Grokster*, 545 U.S. at 919, "affirmative steps," *id.*, or "affirmative misconduct," *Twitter*, 598 U.S. at 500, imposing an affirmative duty to take "reasonable and feasible" steps to prevent another's wrongdoing.

No circuit other than the Ninth has adopted this "simple measures" test. And even the Ninth Circuit has never applied the test to internet service providers like Frontier—conduits who host nothing but are merely pass-throughs to the internet. Claimants thus do not allege that Frontier knows of, can take down, or otherwise "disable" specific infringing content somewhere on the web. Nor could they, because there is no specific infringing material for Frontier to locate or disable. Such material only passes through Frontier's networks. Accordingly, while a content host like the defendant in *Perfect 10* could remove infringing content or links stored on its servers, an ISP like Frontier has no such ability. Thus, Claimants again ask this Court to be the first in this Circuit to apply an inapplicable theory of liability against an ISP.

*Perfect 10*'s duty to take "simple measures" to stop infringement has no purchase here, however, because it would not be "reasonable" or "feasible" for Frontier to terminate internet

connections—including their countless lawful uses—for the tens of thousands of homes and businesses based on accusations that some unidentified person (perhaps a neighbor or coffee shop patron) used that connection to infringe. And Claimants fail to identify any other measures Frontier should or could have taken short of termination. *E.g.*, Rec. Cos. Am. Proof of Claim, ECF 2130, ¶ 20; Mov. Cos. Proof of Claim, Claim No. 2283 ECF 2235-1, Ex. 1, ¶ 6.

In any event, the simple measures test cannot be squared with *Twitter*'s recognition that liability requires either an affirmative act or inaction in the face of an independent legal duty. Where "legislatures have wanted to impose a duty," they have generally "done so by statute." *Twitter*, 598 U.S. at 501 n.14. Claimants do not argue that Congress has legislated any such duty on ISPs to take the drastic step of canceling their subscribers' internet for mere alleged infringement. Quite the opposite. As explained below (at 17-18), they expressly concede that their "claims for contributory and vicarious copyright infringement … are not based on the DMCA," Rec. Cos. Opp. 19, and they identify no other purported duty to act. Accordingly, just like in *Twitter*, Claimants cannot identify any "duty that would require defendants or other communication-providing services to terminate customers after discovering that the customers were using the service for illicit ends." 598 U.S. at 501.[3]

> **c.    This Court should not follow nonbinding, out-of-circuit district court cases that predate and contradict *Twitter*.**

Unable to distinguish *Twitter* or establish that it is inapplicable, Claimants attempt to appeal to what they call "decades of well-established copyright law." Rec. Cos. Opp. 1-2; Mov. Cos. Opp. 13. The Record Company Claimants have changed their tune—previously they sought

---

[3] Insofar as the Record Company Claimants argue that Frontier's Acceptable Use Policy imposed on Frontier a duty to terminate repeat infringers (Rec. Cos. Opp. 15), they are wrong. Frontier's policy only "empower[s]" Frontier to terminate repeat infringers; it does not require that consequence. *See* Rec. Cos. Am. Proof of Claim, ECF No. 2130, ¶ 19 & Ex. C.

to withdraw the reference to this Court on the rationale that the "complex legal issues (some of which are novel in the Second Circuit)" could only be resolved by the district court. *See* Pls.' Mem. Of Law In Support of Mot. to Lift Stay at 4, ECF No. 48, *UMG Recordings, Inc. v. Frontier Commc'ns Corp.*, No. 21-cv-5050-AT (S.D.N.Y.). The Movie Company Claimants, meanwhile, chide Frontier for relying on *Twitter* in light of Frontier's prior statement that "secondary liability law … is well-settled, based on decades-old Supreme Court precedent." Movie Cos. Opp. 2 (quotation marks omitted). But Frontier has always maintained that this case is controlled by settled principles of secondary liability, which the Supreme Court most recently invoked in *Twitter*. To be sure, scattered district courts, though never the Second Circuit, misapplied *Sony* and *Grokster*. *Twitter* simply shows why those courts have erred. In short, it clarifies, based on "centuries" of directly analogous common-law secondary-liability precedents, 598 U.S. at 493, precisely how *Sony* and *Grokster*'s longstanding insistence on affirmative, culpable conduct applies to claims based on a defendant's continued provision of passive internet infrastructure despite knowledge that some people misuse it: It bars the claims.

The nonbinding cases Claimants cite provide no basis for this Court to disregard the teachings of *Twitter*, *Sony*, and *Grokster*. Critically, the Second Circuit has never endorsed Claimants' theory that an ISP may be held secondarily liable for failing to terminate a user after receiving notice of alleged infringement. None of the Second Circuit cases Claimants cite even involve secondary liability of an ISP, much less suggest that one could be liable for failing to terminate subscribers based on allegations of infringement.[4] On the contrary, the Second Circuit

---

[4] *See Gershwin Pub. Corp.*, 443 F.2d 1159 (concert artists' manager); *Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) (individual internet user's First Amendment claim); *MP3tunes*, 844 F.3d 79 (DMCA safe harbor involving website owner and CEO whose websites allowed users to search for and store free music); *Bus. Casual Holdings, LLC v. YouTube, LLC*, No. 22-3007-cv, 2023 WL 6842449 (2d Cir. Oct. 17, 2023) (summary opinion) (online content host, YouTube).

has long held, consistent with *Twitter*, *Grokster*, and *Sony*, that, where a seller does not intentionally "influence or encourage unlawful copying," "the provision of equipment does not amount to contributory infringement if the equipment is 'capable of substantial noninfringing uses.'" *Matthew Bender & Co. v. W. Pub. Co.*, 158 F.3d 693, 706 (2d Cir. 1998) (quoting *Sony*, 464 U.S. at 442).

Claimants therefore err in relying on statements in a handful of out-of-circuit district court cases that, for instance, an ISP supposedly "intentionally encourag[es] infringement" merely "by continuing to sell internet services and continuing to provide internet access to infringing customers." *Grande II*, 384 F. Supp. 3d at 767-68 (quotation marks omitted); *accord UMG Recordings, Inc. v. RCN Telecom Services, LLC*, No. 19-17272 (MAS) (ZNQ), 2020 WL 5204067, at *9 (D.N.J. Aug. 31, 2020); *BMG Rts. Mgmt. (US) LLC v. Altice USA, Inc.*, No. 2:22-CV-00471-JRG, 2023 WL 3436089, at *12-13 (E.D. Tex. May 12, 2023); *see also Dish Network LLC v. Datacamp Ltd.*, No. 22-cv-00993, 2023 WL 4549528, at *3 (N.D. Ill. July 14, 2023) (non-ISP case denying motion to dismiss). Those cases—which have not been affirmed by any court of appeals, much less the Second Circuit—cannot be squared with *Twitter*. Simply put, they were wrongly decided.

Claimants likewise misplace reliance on the Fourth Circuit's decision in *BMG Rights Management (US) LLC v. Cox Communications, Inc.*, 881 F.3d 293 (4th Cir. 2018), a case that *reversed* a verdict of contributory liability. While the Fourth Circuit observed generally that "an intent to cause infringement may be presumed" when a seller "sells a product … know[ing] that infringement is substantially certain to result from the sale," *id.* at 307-08, it most certainly did not (and could not consistent with Supreme Court jurisprudence) dispense with the requirement of "active, substantial assistance" that goes beyond merely continuing to provide generalized online

12

services to someone who has misused them, *Twitter*, 598 U.S. at 499. If it had, it would have committed the same error for which the Ninth Circuit was reversed in *Twitter* itself—relying on knowledge alone, while "elid[ing] the fundamental" requirement that the defendant "consciously, voluntarily, and culpably participate in or support the relevant wrongdoing." *Id.* at 505.

No other court of appeals has endorsed Claimants' theory of liability either. And again, certainly not the Second Circuit. The only other circuit-level authority Claimants cite in support of their contributory liability arguments, *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) (cited at Rec. Cos. Opp. 9-10), is even further afield. That case involved allegations that the owner of a physical "swap meet" (a brick-and-mortar flea market where "customers come to purchase various merchandise from individual vendors") unlawfully "protect[ed] infringers' identities" after "more than 38,000 counterfeit recordings" were seized at the swap meet. *Id.* at 261, 264. In its factual context, *Fonovisa*'s broad statement that "providing the site and facilities for known infringing activity is sufficient to establish contributory liability," *id.* at 264, does not support liability any time someone uses internet service to infringe. Indeed, later Ninth Circuit decisions recognize otherwise. *See, e.g.*, *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d 1142, 1148-49 (9th Cir. 2018) (internet subscriber's failure to secure internet connection held insufficient to make out a claim of secondary liability for infringement over that connection). Anyway, Frontier does not provide the "site and facilities" used to infringe any more so than the phone company or mail service. It provides a passive connection to sites and facilities maintained by others, over which it exercises no control. If anything, the peer-to-peer services that subscribers allegedly used to infringe—and that purposely promote copyright infringement—are the ones that provide the means to infringe. Yet Claimants lodge no complaint against them.

At bottom, Claimants invite this Court to reject binding, on-point Supreme Court authority in favor of scattered, nonbinding district court decisions endorsing the dubious theory that ISPs should be liable for not policing the internet. This Court should reject Claimants' invitation and dismiss Claimants' claims.

## 2.    Frontier is not vicariously liable for the alleged infringement of its subscribers.

As explained in Frontier's opening brief, Claimants' vicarious liability claims must also be dismissed. To establish a claim for vicarious liability, claimants must allege that Frontier "[1] profits directly from the infringement and [2] has a right and ability to supervise the direct infringer." *Grokster*, 545 U.S. at 930 n.9. Claimants' basic theory is that Frontier is vicariously liable because it has the ability to terminate subscribers' internet accounts and it receives subscription fees from infringing subscribers (even though it receives the same fees from non-infringing subscribers).

Claimants' theory founders at the outset on *Twitter*'s admonition that "generally … internet or cell service providers" do not "incur culpability merely for providing their services to the public writ large." 598 U.S. at 499. *Twitter* holds that an online service provider is not secondarily liable for its users' bad acts merely because it "profit[s]" from those users' use of its platform and has the power to terminate their access to its platform. *Id.* at 481-82.

Claimants' expansive version of vicarious liability would contravene that holding, rendering ISPs liable for any conduct that paying subscribers engage in on the internet, merely because the ISP always has the option of just throwing those homes or businesses off the internet entirely. Accepting this capacious theory of vicarious liability would not only sever the doctrine from its roots in the "agency rule of respondeat superior." *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963). It would swallow every traditional limitation on secondary liability in the process. This Court should decline Claimants' invitation.

Claimants' vicarious liability claims also fail because Claimants do not "plausibly allege that Frontier has a right or ability to supervise and control its customers' activities." Mot. 5-6. Claimants "do not allege, for example, that Frontier has the technological ability to monitor what people do on the internet." *Id.* Instead, Claimants point to Frontier's power to terminate its subscribers' accounts. Rec Cos. Opp. 17-18; Mov. Cos. Opp. 11. Terminating subscribers *after* they have allegedly infringed cannot conceivably amount to supervision and control of the infringing activity itself. *See* Mot. 8 (explaining that "[t]he common law test for vicarious copyright liability requires that the accused company has … the right and ability to supervise and control—*not just affect*—the third party's infringing activity" (emphasis added)).

The only circuit-level case Claimants cite for their right-to-terminate argument—*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)—in fact refutes their position. *Napster* did recognize that the "ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Id.* at 1023. But the defendant in *Napster* operated its own centralized "network servers" with "search indices" that listed all the music files stored on individual users' hard drives, enabling users to search for and download copyrighted works stored on other users' computers. *Id.* at 1012, 1024. It could thus supervise and control its users' infringing activity because it "ha[d] the ability to locate infringing material listed on its search indices." *Id.* at 1024. The court emphasized, however, that Napster's "right and ability" was "cabined by the system's current architecture" and that Napster could not be liable for failing to "police" infringement outside "the boundaries of the premises that Napster 'controls and patrols.'" *Id.* at 1023-24; *see id.* at 1024 (highlighting that the "file name indices … are within the 'premises' that Napster has the ability to police").

15

Thus, *Napster*, like other court of appeals cases, recognizes that a service provider may only be vicariously liable for direct infringement occurring *on its premises*, and only insofar as it has the ability to "police" those premises. *See VHT, Inc. v. Zillow Grp.*, 918 F.3d 723, 746 (9th Cir. 2019) (no supervision and control where defendant lacked "technical ability to screen out or identify" specific infringing content); *compare Shapiro, Bernstein*, 316 F.2d at 308 (defendant vicariously liable for licensee's infringing sales in defendant's stores where it had "the power to police carefully the conduct of its" licensee); *Fonovisa*, 76 F.3d at 262 (supervision and control plausibly alleged where flea market operator "controlled and patrolled" its physical premises). Claimants ask this Court to stretch Napster beyond its natural limits.

Here, Claimants do not allege that the entire internet is Frontier's "premises." Nor do they allege that Frontier can "police" the internet. *Napster*, 239 F.3d at 1024. They cannot, therefore, plausibly allege that Frontier's mere ability to terminate internet connections altogether as punishment for *past* alleged infringement establishes Frontier's right and ability to control those infringing activities in the first instance.[5]

Separately, the Movie Company Claimants argue that this Court "should reject Frontier's attempt to improperly argue based upon material outside the pleadings that it does not have the technological ability to monitor what its customers do on the Internet." Mov. Cos. Opp. 11.

---

[5] For these reasons, this Court should not follow nonbinding, out-of-circuit district court cases that have found that an ISP's right to terminate subscribers amounts to a right and ability to supervise and control those subscribers' infringement. *See* Rec. Cos. Opp. 18; Mov. Cos. Opp. 11 (citing *Sony Music Entm't v. Cox Commc'ns, Inc.*, 464 F. Supp. 3d 795, 813-14 (E.D. Va. 2020); *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, No. A-17-CA-365-LY, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018) ("*Grande I*"); *Warner Recs. Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069, 1086 (D. Colo. 2020); *RCN*, 2020 WL 5204067, at *11; *Altice*, 2023 WL 3436089, at *8; *Bodyguard Prods., Inc. v. RCN Telecom Servs., LLC*, No. 3:21-CV-15310 (GC) (TJB), 2022 WL 6750322, at *9 (D.N.J. Oct. 11, 2022)). Simply put, these pre-*Twitter* cases rest on the same flawed reading of *Napster* and its progeny that Claimants press here. Here again, this Court ought not be the first in this Circuit to commit this same error.

Frontier does nothing of the sort. Rather, Frontier merely pointed out that "Claimants cannot and do not allege, for example, that Frontier has the technological ability to monitor what people do on the internet" (or that it can otherwise supervise and control its subscribers' alleged infringing activities). Mot. 5-6. The fact of the matter is, Claimants make no such allegation, and it would be implausible even if they had.[6]

**B.    Claimants Concede That The DMCA Does Not Create Any Cause Of Action, Prescribe Any Standard Of Liability, Or Impose An Independent Duty Upon Providers Of Internet Service.**

Reacting to lengthy treatments of the Digital Millennium Copyright Act in both Claimants' Proofs of Claim, *e.g.*, Mov. Cos. Proof of Claim, Claim No. 2283, ECF 2235-1, Ex. 1, ¶¶ 4, 6, 19; Rec. Cos. Am. Proof of Claim, ECF No. 2130, ¶¶ 8, 12-18, 20, 35, Frontier explained in its Motion that the DMCA "is entirely beside the point of whether Frontier is secondarily liable." Mot. 13. As the Second Circuit recently explained, "there is no affirmative cause of action for any alleged failure" to comply "with the DMCA's safe harbor provisions." *Bus. Casual Holdings*, 2023 WL 6842449, at *3.  This is important, because it means Claimants cannot contend, for purposes of their secondary liability claims, that the DMCA carries an independent duty to terminate subscribers in response to notices.

Claimants have now effectively abandoned their invocation of the DMCA, conceding that it was little more than window dressing for their claims. The Record Company Claimants candidly acknowledge that their claims are not "based on the DMCA." Rec. Cos. Opp. 19. Neither set of Claimants disputes that "failure to satisfy" a DMCA safe harbor "does not equate to liability."

---

[6] In fact, it is the Movie Company Claimants who ask that this Court consider "evidence" purporting to demonstrate Frontier's "right or ability to supervise and control its customers' activities on the Internet." Mov. Cos. Opp. 11-12. This Court should disregard that purported evidence. *See In re Roman Cath. Diocese of Rockville Ctr.*, 650 B.R. 765, 779 (Bankr. S.D.N.Y. 2023) ("[I]n considering a claim objection" on a Rule 12 motion, no extra-pleadings evidence "may be considered" apart from judicially noticeable facts.).

Mot. 14. And they do not, and cannot, take on the DMCA's plain statement that not qualifying for a safe harbor does not even "bear adversely" when it comes to secondary liability. 17 U.S.C. § 512(*l*).

This Court should take Claimants at their word when they disavow any reliance on the DMCA and reject their effort to use of the DMCA as a back-door standard of liability for their claims. For instance, while the Movie Company Claimants insinuate that the DMCA imposes an "obligation to act on notices," Mov. Cos. Opp. 16, they admit in the very next sentence that what they are calling an "obligation" is merely a "*condition*[]" for *safe-harbor* eligibility. *Id.* The safe harbor is simply not at issue in Frontier's motion.[7]

For the Record Company Claimants' part, having acknowledged that the DMCA imposes no duties or obligations on conduit ISPs, and implicitly conceding that notices are irrelevant under § 512(a), Rec. Cos. Opp. 21, they nevertheless incongruously argue that their notices "are relevant to Frontier's liability" because, "by receiving them, Frontier gained knowledge of the existence of repeated infringement." Rec. Cos. Opp. 20, 22. But, again, that is no different from the supposed knowledge of wrongdoing alleged in *Twitter*. Claimants can run but cannot hide from *Twitter*.

## C.    The Movie Company Claimants' § 1202 Claim Should Be Dismissed Because They Plead No Basis For Imposing Secondary Liability.

The Movie Company Claimants do not dispute that "the basis for Frontier's alleged liability for [their claim under 17 U.S.C. § 1202] is the same as all the others, namely, that Frontier's delivery of internet service 'provided the means' for those supposed violations to occur." Mot. 5. Even assuming for present purposes that § 1202 recognizes a claim for secondary infringement,

---

[7] Thus, though plainly incorrect, the Movie Company Claimants' suggestion (at Mov. Cos. Opp. 16-17) that Frontier is not merely a conduit service provider under § 512(a) is entirely beside the point for purposes here.

18

such a claim would fail for the same reasons Claimants' secondary copyright infringement claims fail. The § 1202 claims should therefore also be dismissed.

## III.    CONCLUSION

In the end, the Court has a purely legal choice. It can either follow the *Twitter-Sony-Grokster* trilogy, or be the first in this Circuit to commit the same error that a handful of nonbinding district courts have made. We submit that the choice is clear. The Claimants' Proofs of Claim should be dismissed with prejudice.

Dated: January 22, 2024
        New York, New York

**AKERMAN LLP**

By:*/s/ John P. Campo*
JOHN P. CAMPO, ESQ.
AKERMAN LLP
1251 Avenue of the Americas
37th Floor
New York, NY 10020
(212) 880 3800
(212) 880 8965
john.campo@akerman.com

RUBÉN CASTILLO, ESQ.
(Admitted *Pro Hac Vice*)
ILDEFONSO P. MAS, ESQ.
(Admitted *Pro Hac Vice*)
AKERMAN LLP
71 South Wacker Drive
47th Floor
Chicago, IL 60606
(312) 634 5700
(312) 424 1900
ruben.castillo@akerman.com
ildefonso.mas@akerman.com

*Co-Counsel for Reorganized for Debtors*

19

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2024, I caused a true and accurate copy of the

foregoing document to be served upon counsel the Record Companies and Movie Companies by

filing the foregoing via the Court's ECF system.


*/s/ John P. Campo*
John P. Campo