**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

FRONTIER COMMUNICATIONS
CORPORATION, *et al.*,

Reorganized Debtors.

**FOR PUBLICATION**

Chapter 11

Case No. 20-22476 (MG)

---

**MEMORANDUM OPINION AND ORDER DENYING FRONTIER'S**
**MOTION FOR JUDGMENT ON THE PLEADINGS**

*A P P E A R A N C E S :*

MORGAN, LEWIS & BOCKIUS LLP
*Counsel for the Record Company Claimants*
101 Park Avenue
New York, NY 10178
By:     Michael Luskin, Esq.
          Stephen E. Hornung, Esq.

              and

OPPENHEIM + ZEBRAK, LLP
*Counsel for the Record Company Claimants*
4350 Wisconsin Avenue, NW, Fifth Floor
Washington, DC 20016
By:     Matthew J. Oppenheim, Esq.

461 Fifth Avenue, 19th Floor
New York, New York 10017
By:     Alexander Kaplan, Esq.
          Carly K. Rothman, Esq.

CULPEPPER IP
*Counsel for the Movie Company Claimants*
75-170 Hualalai Road, Suite B204
Kailua-Kona, HI 96740
By:     Kerry S. Culpepper, Esq.

AKERMAN LLP
*Counsel for Frontier*
71 South Wacker Drive
47th Floor
Chicago, IL 60606
By:    Rubén Castillo, Esq.
        Ildefonso P. Mas, Esq.

1251 Avenue of the Americas
37th Floor
New York, NY 10020
By:    John P. Campo, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the motion (the "Motion," ECF Doc. #2235) of Frontier

Communications Corporation, *et al.* (collectively "Frontier" or the "Debtors") for judgment on

the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  The Movie Company

Claimants and the Record Company Claimants (both as defined below) filed objections to the

motion ("Movie Opposition," ECF Doc. # 2248; "Record Opposition," ECF Doc. # 2249, and

together, the "Objections").  Frontier filed a reply to the Objections ("Reply," ECF Doc. # 2258).

Frontier disputes its liability for alleged secondary copyright infringement liability on the

grounds that the Supreme Court's decision in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023)

("*Twitter*") requires dismissal when read in conjunction with copyright jurisprudence, and

because the Digital Millennium Copyright Act ("DCMA," PUB. L. NO. 105-304 (1998)) does not

create any cause of action, prescribe any standard of liability, or impose an independent duty

upon providers of internet service.  Movie Company Claimants and Record Company Claimants

respond that *Twitter* did not alter the standard for secondary copyright infringement liability,

under which they have stated viable claims.

The Court held a hearing on the Motion on March 27, 2024 (the "Hearing"). For the reasons explained below, Frontier's Motion is **DENIED**.

## I.  BACKGROUND

### A. Frontier's Chapter 11 Case

On April 14, 2020, Frontier filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court. (*See* ECF Doc. #1.) On August 27, 2020, the Court confirmed Frontier's Chapter 11 plan of reorganization (ECF Doc. # 1005-1). On April 30, 2021, the plan became effective and Frontier emerged from Chapter 11. (ECF Doc. # 1793.)

### B. The Bankruptcy Court Copyright Claims and the District Court Actions

The Record Company Claimants[1] and Movie Company Claimants[2] (together, the "Claimants") filed proofs of claim (the "Bankruptcy Claims") for pre-petition and post-petition (pre-effective date administrative expenses) copyright infringement against Frontier,[3] a

---

[1]      The "Record Company Claimants" are: UMG Recordings, Inc. and Capitol Records, LLC; ABKCO Music & Records, Inc.; Sony Music Entertainment, Arista Music, Arista Records LLC, LaFace Records LLC, Sony Music Entertainment US Latin, Volcano Entertainment III, L.L.C., and Zomba Recording LLC; Atlantic Recording Corporation, Atlantic Records Group LLC, Bad Boy Records LLC, Big Beat Records Inc., Elektra Entertainment Group Inc., Fueled by Ramen LLC, Maverick Recording Company, Nonesuch Records Inc., Rhino Entertainment Company, Rhino Entertainment LLC, Roadrunner Records, Inc., Warner Music Inc., Warner Music International Services Limited, Warner Music Nashville LLC, and Warner Records Inc.

[2]      The "Movie Company Claimants" are: Voltage Holdings, LLC; Backmask, LLC; Union Patriot Capital Management, LLC; Venice PI, LLC; Bedeviled, LLC; MON, LLC; Colossal Movie Productions, LLC; TBV Productions, LLC; Definition Delaware LLC; I Am Wrath Productions, Inc.; Hannibal Classics Inc.; Justice Everywhere Productions LLC; Badhouse Studios, LLC; After Productions, LLC; Rise Up, LLC; Status Update LLC; Morgan Creek Productions, Inc.; Shock and Awe, LLC; Fun Mom Dinner, LLC; Dead Trigger Movie, LLC; YAR Productions, Inc.; Gunfighter Productions, LLC; Ace in the Hole Productions, LP; SF Film, LLC; The Rest of Us, Inc.; Killing Link Distribution, LLC; Cell Film Holdings, LLC; Dallas Buyers Club, LLC; Screen Media Ventures, LLC; Rambo V Productions, Inc.; Millennium Funding, Inc.; Millennium IP, Inc.; LHF Productions, Inc.; UN4 Productions, Inc.; Millennium Media, Inc.; Bodyguard Productions, Inc.; Hunter Killer Productions, Inc.; Fallen Productions, Inc.; HB Productions, Inc.; Laundry Productions, Inc.; Black Butterfly Film, LLC; AMBI Distribution Corp.; Dubious Productions, Inc.; Rupture CAL, Inc.; Future World One, LLC; Groove Tails Productions, LLC; Family of the Year Productions, LLC; Eve Nevada, LLC; After II Movie, LLC; and Wonder One, LLC.

[3]      The Record Company Claimants filed the following claims: Claim. Nos. 3560, 3821, 3822, and 3832, amended at Claim Nos. 3944, 3946–48. The Movie Company Claimants filed the following claims: Claim Nos. 2169, 2137, 2177, 2128, 2132, 2131, 2150, 2167, 2119, 2192, 2269, 1378, 1372, 1394, 1434, 2168, 2121, 2129, 2163, 2125, 2264, 2228, 2236, 2237, 2233, 2193, 2235, 2159, 2283, 2511, 2659, 2742, 2741, 2747, 2748, 2750, 2755, 2752, 2754, 2757, 2756, 2759, 2777, 2853, 2858, 2865, 2901, 2856, 2862 3131, 3806, 3807, 3803, 3808, 3804, and 3812.

telecommunications and internet services provider ("ISP"). The basis of the Bankruptcy Claims are alleged infringements of copyrighted works by Frontier subscribers, for which Frontier has received hundreds of thousands of copyright infringement notices, including a substantial number from the Claimants. Claimants, who hold the copyrights to the allegedly infringed works, argue that Frontier is liable based on theories of contributory and vicarious liability. Frontier objected to the Bankruptcy Claims (*see* ECF Doc. ## 1818, 1951), to which Claimants have responded (*see* ECF Doc. ## 1902, 1984).

In addition to the Bankruptcy Claims, the Claimants as plaintiffs filed actions (the "District Court Actions") in the U.S. District Court for the Southern District of New York[4] alleging post-effective date copyright infringement. The cases are pending before Judge Analisa Torres. The Bankruptcy Claims and the District Court Actions raise many common factual and legal issues.

The Claimants filed motions to withdraw the reference of the Bankruptcy Claims from the Bankruptcy Court, which Judge Torres denied in two written orders. (*See* 21-cv-5253 ECF Doc. # 15; 21-cv-5708 ECF Doc. # 20, together the "Withdrawal Denial Orders.") In prior proceedings in the District Court, Judge Torres determined that discovery for the Bankruptcy Claims and District Court Actions should proceed together in the Bankruptcy Court.

### C. The Pleadings

#### 1. The Motion

Frontier advances several arguments in support of its Motion.

---

[4]    *See UMG Recs., Inc. v. Frontier Commc'ns Corp.*, Case No. 1:21-cv-05050-AT; *UMG Recs., Inc. v. Frontier Commc'ns Corp.*, Case No. 1:21-cv-05253-AT; *Voltage Holdings LLC et al. v. Frontier Commc'ns Corp.*, Case No. 1:21-cv-05708-AT.

*First,* Frontier argues that the Supreme Court's holding in *Twitter* means that as a matter of law, "communications providers cannot be held secondarily liable for wrongdoing even if they know specific customers are using their services to do it." (Motion at 8.) This, Frontier argues, when read in combination with copyright-specific cases, bars Frontier's liability because the internet service they provide has "substantial non-infringing uses" and they were only "passive providers" who have taken no "affirmative steps" to "foster infringement." (Motion at 10, 12 (citing *Sony Corp. of Am. v. Universal Studios, Inc.*, 464 U.S. 417, 440 (1984) ("*Sony*") and *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936–37 (2005) ("*Grokster*")).)

*Second*, Frontier asserts that failure to qualify for a DMCA safe harbor under 17 U.S.C. § 512 (a)–(d) does not create liability, and Claimants must still properly allege that Frontier is secondarily liable under basic common law principles, which Frontier argues they have not done. (Motion at 13, 15.) Thus, Frontier argues that the DMCA notices sent by Claimants "have no legal or practical effect" and "require no response or action." (*Id.* at 17.)

    2. The Objections

       *a. Movie Company Claimants' Opposition*

Movie Company Claimants dispute each of Frontier's contentions.

*First*, the Movie Company Claimants argue that the "substantial assistance" standard in *Twitter* related specifically to the statute in question (the Justice Against Sponsors of Terrorism Act ("JASTA")),[5] and does not apply to the common law on secondary liability for copyright

---

[5]     JASTA imposes secondary liability on anyone who "aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2).

infringement.  (Movie Opposition ¶ 20.)  It notes that post-*Twitter*, courts routinely recite the

same elements for contributory copyright infringement as they did pre-*Twitter*.  (*Id.* ¶ 21)

      *Second*, the Movie Company Claimants note that Frontier does not argue that *Twitter*

altered "vicarious" secondary liability, an allegation made in each of Movie Company

Claimants' proofs of claim.  (*Id.* ¶ 23.)  They further contest Frontier's description of the

standard for vicarious liability.  (*Id.* ¶ 25.)  Rather than the ability to control or monitor

subscriber content, which Frontier sets forth as the standard and maintains that it cannot do,

Movie Company Claimants assert that what is required is "the ability to terminate subscribers'

service or the right to block access to infringing material," which, they argue, Frontier can

clearly do.  (*Id.* ¶¶ 25–26 (citing *Sony Music Entm't v. Cox Commc'ns, Inc.*, 464 F. Supp. 3d 795,

813 (E.D. Va. 2020) ("*Cox IV*"), *aff'd in part, rev'd and vacated on other grounds*, *Sony Music

Ent. v. Cox Commc'ns, Inc.*, 93 F.4th 222 (4th Cir. 2024) ("*Cox V*"); *Bodyguard Prods., Inc. v.

RCN Telecom Servs., LLC*, No. 3:21-CV-15310 (GC) (TJB), 2022 WL 6750322, at *26–27

(D.N.J. Oct. 11, 2022)).)

      *Third*, Movie Company Claimants argue that Frontier cannot escape secondary liability

simply because the *primary purpose* of its service is legitimate—*i.e.*, it has substantial non-

infringing uses.  (*Id.* ¶ 28.)  This reasoning, they argue, has been rejected by the Supreme Court,

which clarified in *Grokster* that *Sony* barred secondary liability based on *presuming* or *imputing*

intent when a product had substantial non-infringing uses, but did not mean a producer could

never be held contributorily liable.  (*Id.*)  Movie Company Claimants clarify that they are not

alleging intentional inducement, which requires a higher standard of purposeful conduct under

*Grokster*.  (*Id.*)  However, they maintain that to the extent that "affirmative acts" are required,

they have sufficiently alleged that Frontier was not passive, but "acted affirmatively by

continuing to sell internet services and continuing to provide internet access to infringing customers." (*Id.* (citing *UMG Recs., Inc. v. Grande Commc'ns. Networks, LLC*, 384 F. Supp. 3d 743, 767 (W.D. Tex. 2019)).)

*Fourth,* Movie Company Claimants argue that the DMCA safe harbors do not permit Frontier to ignore notices of its subscribers' infringement. (*Id.* ¶ 30.) They dispute that Frontier is a mere conduit service provider under section 512(a) (17 U.S.C. § 512(a)), arguing that Frontier's services also qualify it as an information location tool under 512(d) (17 U.S.C. § 512(d)). (*Id.* ¶¶ 33, 36–37.) They submit that the disagreement on this point makes judgment on the pleadings inappropriate. (*Id.* ¶ 33.) However, even assuming that Frontier is merely a section 512(a) conduit, they argue that Frontier's position—that the notices are irrelevant, as it is not asserting a safe harbor under any subsection that addresses them specifically—is a "red herring," because regardless of their form, the notices "informed Frontier of its customers' flagrant activity." (*Id.* ¶ 30.)

*Lastly,* Movie Company Claimants suggest that because Frontier did not object to its claims based on secondary liability for DMCA § 1202 violations, it cannot move for judgment on the pleadings for claims it did not even dispute.[6] (*Id.* ¶ 40.)

### b. *Record Company Claimants' Opposition*

Record Company Claimants also dispute each of Frontier's claims, concurring with the Movie Company Claimants that *Twitter* did not "silently upend decades of jurisprudence, including its own, establishing the parameters of secondary liability for copyright infringement." (Record Opposition at 1.)

---

[6]      *See* 17 U.S.C. § 1202(a) "False Copyright Management Information.—No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement—(1) provide copyright management information that is false, or (2) distribute or import for distribution copyright management information that is false."

*First*, Record Company Claimants argue that Frontier's "continued provision of internet service to known repeat infringers subjects Frontier to contributory liability." (*Id.* at 6.) Record Company Claimants assert that (1) Frontier's receipt of the notices identifying specific subscribers who were repeatedly infringing the Record Company Claimants' copyrighted works satisfies the knowledge requirement for contributory liability (*id.*), (2) Frontier's continued provision of internet service to specific subscribers it knew were repeatedly infringing satisfies the material contribution requirement for contributory liability, which accords with the *Sony* and *Grokster* standards for contributory infringement (*id.* at 9–10), and (3) *Twitter* did not alter *Sony* and *Grokster*'s holdings on contributory liability (*id.* at 13).

*Second*, Record Company Claimants argue that Frontier's ability to terminate repeat infringers' service gives Frontier the right and ability to supervise infringement sufficient to satisfy the first element of a vicarious liability claim. (*Id.* at 17–8.) This, Record Company Claimants argue, combined with their financial interest in the activity, is sufficient to allege vicarious liability. (*Id.* at 17.)

*Third,* Record Company Claimants note that they have not asserted claims for liability under the DMCA, but rather for contributory and vicarious infringement, and thus Frontier's argument that the DMCA is not an independent basis for liability is misplaced. (*Id.* at 19.)

*Lastly*, Record Company Claimants argue that Frontier's DMCA safe harbor defense does not affect the relevance of the infringement notices to the reasonableness of Frontier's implementation of a repeat infringer policy and Frontier's knowledge of direct infringement. (*Id.*) In support of this contention, Record Company Claimants assert that (1) Frontier's responses to infringement notices are relevant to whether Frontier reasonably implemented a repeat infringer policy because infringement notices identify repeat infringers (*id.*), (2)

8

infringement notices establish that Frontier has the requisite knowledge for contributory liability (*id.* at 20), (3) Frontier's assertion of the section 512(a) safe harbor defense does not render the infringement notices it received irrelevant (*id.*), and (4) Frontier cannot establish a DMCA safe harbor defense to liability on a motion for judgment on the pleadings (*id.* at 22).

> 3. The Reply

Frontier argues that *Sony*, *Grokster*, and *Twitter* foreclose any possible secondary liability, because they require culpable conduct that rises above and beyond passive nonfeasance. (Reply at 1.)  It characterizes the cases that have found liability in similar circumstances to theirs as "a smattering of out-of-circuit district court decisions that predate—and cannot be squared with—*Twitter*."  (*Id.* at 2.)  Frontier argues that *Twitter* forecloses both contributory and vicarious liability claims.  (*Id.* at 7, 14.)  Lastly, Frontier asserts that Movie Company Claimants DMCA § 1202 claim should be dismissed as it turns on the same principles of secondary liability that *Twitter* forecloses.  (*Id.* at 18.)

Frontier posits that *Sony*, *Grokster* and *Twitter* stand for the following premises, which when taken together, absolve it of liability.  *First*, Frontier submits that all three cases address the general principal of common-law secondary liability, and that "contributory liability is just copyright's label for common-law 'aiding and abetting' liability."  (*Id.* at 3.)  *Second*, Frontier argues that the cases agree that the "conceptual core" is "truly culpable conduct," not passively providing a lawful service which is abused.  (*Id.* at 4.)  *Third*, Frontier asserts that *Twitter* "forecloses secondary liability for an online intermediary" based on knowledge that wrongdoers were using its services and failed to stop them.  *Id.*  According to Frontier, taken together, these premises foreclose liability because continuing to provide internet service is not an "affirmative act" that could give rise to liability.  (*Id.*; *id.* at 7.)

9

Frontier then disputes that its services have a "direct nexus" with the alleged wrongful conduct, because that would imply a "'direct nexus' with every unlawful thing a subscriber might do on the internet." (*Id.* at 7.)  It compares itself to cell phone providers or mail carriers who are not liable for illegal deals brokered over the phone, or tortious messages sent by mail. (*Id.*)  Frontier characterizes the cases which nevertheless impose liability on ISPs for continued provision of internet to infringing customers as "a handful of out-of-circuit district court cases" that "cannot be squared with *Twitter*" and "[s]imply put . . . were wrongly decided." (*Id.* at 12.)

Regarding the vicarious liability claims, Frontier argues that it neither has the requisite supervision and control, nor the direct financial benefit, that would give rise to vicarious liability. (*Id.* at 14–15.)  Frontier alleges that Claimants' vicarious liability claim "founders at the outset" based on *Twitter*, which provides that internet providers generally do not incur liability "merely for providing their services to the public." (*Id.* at 14, citing *Twitter*, 548 U.S. at 499.)

Lastly, Frontier reiterates that the DMCA is "entirely beside the point," as it does not create a duty to terminate subscribers. (*Id.* at 17.)  And further, because the "basis for Frontier's alleged liability" under section 1202 of the DMCA is "the same as all the other[] [claims]," Frontier argues that they should be dismissed for the same reasons. (*Id.* at 18–19.)

## II.   <u>LEGAL STANDARD</u>

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (internal quotation marks omitted).  Rule 12(b)(6) of the Federal Rules of Civil Procedure is made applicable to these proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").  *See* FED. R. BANKR. P. 7012; FED. R. CIV. P. 12(b)(6).  In deciding a 12(b)(6) motion, the "court must accept a complaint's allegations as

true," and "[w]hen there are well-pleaded factual allegations, a court should assume their
veracity and then determine whether they plausibly give rise to an entitlement to relief."
*Ashcroft v. Iqbal*, 556 U.S. 662, 663–664 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S.
544 (2007)). A court's role in evaluating a Rule 12(b)(6) motion is to determine the legal
feasibility of the complaint, not to weigh the evidence that may be offered to support it. *Cooper
v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998).

In deciding a Rule 12(b)(6) motion, the Court accepts a complaint's factual allegations as
true and must draw all reasonable inferences in favor of the plaintiff. *See Tellabs, Inc. v. Makor
Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007); *see also Littlejohn v. City of N.Y.*, 795 F.3d
297, 306 (2d Cir. 2015). Although the allegations must be taken as true, the complaint must
contain more than just a formulaic recitation of the elements of a cause of action, and the court
should "identify[] allegations that, because they are mere conclusions, are not entitled to the
assumption of truth." *Iqbal*, 556 U.S. at 664; *Spool v. World Child Int'l Adoption Agency*, 520
F.3d 178, 183 (2d Cir. 2008) (stating that "bald assertions and conclusions of law will not
suffice"). To survive a Rule 12(b)(6) motion, a plaintiff's obligation to "provide the 'grounds' of
his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation
of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "To show facial
plausibility, the Claimant must plead 'factual content that allows the court to draw the reasonable
inference that the [defendant] is liable for the misconduct alleged.'" *In re DJK Residential LLC*,
416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) (citing *Iqbal*, 556 U.S. at 663).

The Court's responsibility is to "assess the legal feasibility of the complaint, not to assay
the weight of the evidence which might be offered in support thereof." *Liu v. Credit Suisse First
Bos. Corp. (In re Initial Pub. Offering Sec. Litig.)*, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005)

(internal quotation makers and citation omitted).  *See also Koppel v. 4987 Corp.*, 167 F.3d 125,

133 (2d Cir. 1999) (explaining that plaintiff need only allege, not prove, sufficient facts to

survive a motion to dismiss).  Dismissal is only warranted where it appears beyond doubt that the

plaintiff can prove no set of facts in support of her claim which would entitle her to relief.  S*ee*

*Maxwell Commc'n. Corp. Pub. Ltd. Co. v. Societe Generale (In re Maxwell Commc'n. Corp.*

*Pub. Ltd. Co.)*, 93 F.3d 1036, 1044 (2d Cir. 1996).  The Court considers "facts stated on the face

of the complaint and in documents appended to the complaint or incorporated in the complaint

by reference, as well as to matters of which judicial notice may be taken."  *Hertz Corp. v. City of*

*N.Y.*, 1 F.3d 121, 125 (2d Cir. 1993).

## III.    DISCUSSION

Frontier asks the Court to square two contradictory propositions.  It begins from the

premise that *Twitter* is based on, and did not alter, decades of common-law doctrine on

secondary liability.  (*See* Reply at 11 ("Frontier has always maintained that this case is controlled

by settled principles of secondary liability, which the Supreme Court most recently invoked in

*Twitter*.").)  Yet Frontier's conclusion—that it cannot be liable as a matter of law—depends on

*Twitter* having silently rewritten decades of common-law doctrine on secondary liability.  The

Court declines to graft an analysis of secondary criminal liability for aiding and abetting

*terrorism* onto the well-established branch of law governing secondary liability for *copyright*

*infringement*.  Under the relevant standard, Claimants have alleged facts sufficient to state a

claim.

### A.  Secondary Liability for Copyright Infringement Is a Well-Established Doctrine

Although "'[t]he Copyright Act does not expressly render anyone liable for infringement committed by another' . . . doctrines of secondary liability emerged from common law principles and are well established in the law." *Grokster*, 545 U.S. at 930 (quoting *Sony*, 464 U.S. at 104).

Courts have developed and refined common-law principles of secondary liability in the context of copyright infringement for decades.  The result is two broad theories: contributory infringement and vicarious infringement.  Under the "contributory" umbrella, there exists liability both for (1) *inducement* as well as (2) *material contribution*, both carrying a knowledge requirement.  Vicarious liability, by contrast, developed from the doctrine of *respondeat superior*, and imposes liability (regardless of knowledge) when one has both (1) *supervision or control* over, and (2) a *direct financial interest* in, the infringing activity.  There is a wealth of caselaw applying these theories, including several in the specific context of alleged liability for ISPs based on infringement carried out on their networks by their subscribers.

### 1.  ISP Secondary Liability for Contributory Copyright Infringement

If a person "knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he has in fact desired to produce the result."  RESTATEMENT (SECOND) OF TORTS § 8A cmt. b (1965).  Thus, secondary liability may be imposed based on "the common-law doctrine that one who knowingly participates or furthers a tortious act is jointly and severally liable with the prime tortfeasor."  *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) ("*Gershwin*").  *See also Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) ("[T]he common law doctrine that one who knowingly participates in or furthers a tortious act is jointly and

severally liable with the prime tortfeasor, is applicable under copyright law.") (citing NIEL

BOORSTYN, BOORSTYN ON COPYRIGHT § 10.06[2], at 10–21 (1994)).

Specifically, "one who, with *knowledge* of the infringing activity, *induces*, causes or

*materially contributes* to the infringing conduct of another, may be held liable as a 'contributory'

infringer.'" *Gershwin*, 443 F.2d at 1162 (emphasis added).  Once knowledge of direct

infringement is established, either prong—inducement or material contribution—is sufficient to

establish secondary liability.[7]  *See Faulkner v. Nat'l Geographic Soc'y*, 211 F. Supp. 2d 450, 473

(S.D.N.Y. 2002), *aff'd*, 409 F.3d 26 (2d Cir. 2005) ("*Faulkner*") (stating that besides the

"knowledge" prong, the "two types of activities that lead to contributory liability are: (i) personal

conduct that encourages or assists the infringement," *i.e.*, inducement, and "(ii) provision of

machinery or goods that facilitate the infringement," *i.e.*, material contribution) (internal

quotation marks omitted).

The knowledge standard is an objective one, imposing liability on persons who "know or

have reason to know" of the direct infringement.  *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 118

(2d Cir. 2010) (quoting *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir. 2001),

*aff'd*, 284 F.3d 1091 (9th Cir. 2002) ("*Napster*")).  The standard is thus met if one has

constructive knowledge but remains willfully blind.  *BMG Rts. Mgmt. (US) LLC v. Cox

Commc'ns, Inc.*, 881 F.3d 293, 308 (4th Cir. 2018) ("*Cox II*") (concluding that it is "well-

established" that willful blindness supplies the "requisite intent for contributory copyright

infringement"); *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003) (holding that

---

[7]     These twin theories of liability are mirrored in trademark jurisprudence: "if a manufacturer or distributor
intentionally induces another to infringe a trademark, *or* if it continues to supply its product to one whom it knows
or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily
responsible." *Inwood Labs., Inc. v. Ives Labs., Inc*., 456 U.S. 844, 854 (1982) (emphasis added).  Trademark and
copyright law deal with similar concepts, such as infringement, and courts regularly find them analogous and cross-
pollinate their theories.

14

"[w]illful blindness is knowledge, in copyright law . . . as it is in the law generally"); *Arista Recs., Inc. v. Flea World, Inc.*, No. 03-2670 (JBS), 2006 WL 842883, at *14 (D.N.J. Mar. 31, 2006) (concluding that constructive knowledge or turning a "blind eye" to infringing activity is sufficient to support allegations of contributory infringement).

In the context of ISP liability for copyright infringement, ISPs have sufficient knowledge when they have enough information to "*do* something about [the infringement]." *Cox II*, 881 F.3d at 312 (emphasis in original). Courts have found detailed infringement notices to satisfy this standard. *See, e.g.*, *BMG Rts. Mgmt. (US) LLC v. Altice USA, Inc.*, No. 2:22-CV-00471-JRG, 2023 WL 3436089, at *11 (E.D. Tex. May 12, 2023) (stating that "multiple courts have determined that allegations of knowledge of infringement based on infringement notices sent to ISPs were sufficient to support a contributory infringement claim"); *UMG Recs., Inc. v. RCN Telecom Servs., LLC*, Civil Action No. 19-17272 (MAS) (ZNQ), 2020 WL 5204067, at *2 (D.N.J. Aug. 31, 2020) (concluding that notices that identified "the date and time of the download, the IP address and port number of the host computer, the host computer's ISP, the suspected location of the host computer, and information about the infringing file" established the ISP's constructive knowledge); *Sony Music Ent. v. Cox Commc'ns, Inc.*, 426 F. Supp. 3d 217, 231–232 (E.D. Va. 2019) ("*Cox III*") (finding that detailed notices that included information prescribed by the DMCA "documented a specific instance of infringement and notified [the ISP] of that instance," thus establishing the ISP's knowledge for contributory infringement liability).

### a. Inducement

With knowledge established, a plaintiff can state a claim for inducement, which "premises liability on purposeful, culpable expression and conduct" and requires "active steps taken to encourage direct infringement." *Grokster*, 545 U.S. at 915. In *Grokster*, the Supreme

Court "confirmed that inducement of copyright infringement constitutes a distinct cause of action." *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 425 (S.D.N.Y. 2011). The "classic instance of inducement" is "advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations," such that "[t]he unlawful objective is unmistakable." *Grokster*, 545 U.S. at 916, 940.

In *Grokster*, a canonical inducement case, the defendants were companies that had sprung up as alternatives to "the notorious file-sharing service, Napster" which was at the time "under attack in the courts for facilitating massive infringement." *Id.* at 924, 938. Defendants argued that *Sony*, in which the Supreme Court had found no liability for the producers of Betamax (a VCR-like product) machines despite knowledge that some consumers used them to infringe copyrights, precluded their liability as well. Specifically, they argued that their services, like the Betamax, were "capable of substantial non-infringing use" and they had no "knowledge of specific unlawful uses." *Id.* at 934. The Supreme Court squarely rejected this line of reasoning as a misreading of *Sony*.[8] It clarified that the *Sony* staple-of-commerce rule barred only "*presuming* or *imputing* intent . . . solely from the design or distribution of a product capable of substantial lawful use." *Id.* at 933 (emphasis added). However, "nothing in *Sony* requires courts to ignore *evidence* of intent if there is such evidence, and the case was never meant to foreclose rules of fault-based liability derived from the common law." *Id.* at 934–35 (emphasis added).

---

[8] Frontier relies on *Matthew Bender & Co. v. W. Pub. Co.*, 158 F.3d 693 (2d Cir. 1998) to support its argument that selling a product capable of substantial non-infringing use does not create liability. (Motion at 10.) *Matthew Bender*, decided pre-*Grokster*, applies *Sony* in exactly the manner that the Supreme Court rejected in *Grokster*, rejecting a claim of material contribution because "the provision of equipment does not amount to contributory infringement if the equipment is 'capable of substantial noninfringing uses.'" *Matthew Bender*, 158 F.3d at 706 (quoting *Sony*, 464 U.S. at 442). *Matthew Bender* further qualified the analysis in a footnote, stating that even if the "substantial noninfringing use" test did not apply, a claim of material contribution would fail on the knowledge prong. *Id.* at 707 n.23. Here, Claimants have alleged knowledge.

16

The Court called out three features of the evidence as "particularly notable" in demonstrating the requisite unlawful intent. *First*, defendants were "aiming to satisfy a known source of demand for copyright infringement" (*i.e.*, the former Napster users), as demonstrated through their marketing campaigns, the mechanism of the software, and internal communications.[9] *Id.* at 939. *Second*, defendants did not attempt to "develop filtering tools or other mechanisms to diminish the infringing activity." *Id.* Although there was no independent duty to monitor activity, this fact "underscore[d] [the defendants'] intentional facilitation" of infringement. *Id.* *Third*, defendants' business model—based on advertising revenue, and thus turning on the number of users—supported the finding of liability, because these users were known infringers. *Id.* at 940.

Applying *Grokster*, courts generally find liability for inducement when the defendant is clearly flaunting copyright law, taking unequivocal and affirmative steps to promote a product primarily used for infringement, and facilitating the infringement by its users. *See, e.g.*, *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d at 425 (finding defendant Lime Wire LLC ("LW"), another Napster-like service, liable for inducement based on "(1) LW's awareness of substantial infringement by users; (2) LW's efforts to attract infringing users; (3) LW's efforts to enable and assist users to commit infringement; (4) LW's dependence on infringing use for the success of its business; and (5) LW's failure to mitigate infringing activities"); *Arista Recs. LLC v. Usenet.com, In*c., 633 F. Supp. 2d 124, 151 (S.D.N.Y. 2009) (concluding that evidence of intent to induce was shown by "the staggering scale of infringement"; the "courting of the Napster community, which was notorious for copyright infringement"; the provision of

---

[9]    In their bid to "become the next Napster," defendants employed targeted marketing campaigns promoting themselves as the "# 1 alternative to Napster," and asking consumers "[w]hen the lights went off at Napster . . . where did the users go?" while internal communications from the CTO read "[t]he goal is to get in trouble with the law and get sued. It's the best way to get in the new[s]." *Grokster*, 545 U.S. at 920 (citations omitted).

"technical assistance for playback of copyrighted content"; the defendant having "evaluated its system's functionality by its infringing capabilities"; and the business model "depend[ing] on the existence of massive infringement").

Though courts considering secondary liability for ISPs usually begin from the *Grokster* recitation of the standard, which includes "inducement," inducement is generally not the main hook for ISP liability given the high standard of affirmative conduct to be shown. Rather, like the Claimants in this case, plaintiffs alleging contributory infringement tend to rely on the other prong: material contribution.

### b. Material Contribution

A defendant may be held liable for contributory copyright infringement if it "materially contributes to the infringing conduct of another." *Arista Recs., LLC v. Doe 3*, 604 F.3d at 117 (quoting *Gershwin*, 443 F.2d at 1162). This contribution must be more than "a mere quantitative contribution to the primary infringement: in other words, the participation or contribution must be substantial." *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d at 155 (quoting *Faulkner*, 211 F. Supp. 2d at 473 (internal quotation marks and citation omitted)). Such contribution can be established by providing machinery or goods that facilitate the infringement, or the site and facilities for known infringing activity. *Faulkner*, 211 F. Supp. 2d at 473; *see also Fonovisa*, 76 F.3d at 264. "It is true that mere[ ] . . . failure to take affirmative steps to prevent infringement does not establish contributory liability in the absence of other evidence of intent. But supplying a product with knowledge that the recipient will use it to infringe copyrights is exactly the sort of culpable conduct sufficient for contributory infringement." *Cox V*, 93 F.4th at 236 (quoting *Grokster*, 545 U.S. at 939 n.12) (internal quotation marks omitted).

18

In the online space, "substantial contribution is found where an internet service

provider's servers 'are the sole instrumentality of their subscribers' infringement.'" *Capitol*

*Recs., Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 648 (S.D.N.Y. 2011) (quoting *Arista Recs.*

*LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d at 155).

An ISP that continues to provide that crucial conduit despite knowledge of infringing

activity satisfies this standard. *Cox V*, 93 F.4th at 236 ("The evidence at trial, viewed in the light

most favorable to Sony, showed more than mere failure to prevent infringement. The jury saw

evidence that Cox knew of specific instances of repeat copyright infringement occurring on its

network, that Cox traced those instances to specific users, and that Cox chose to continue

providing monthly internet access to those users despite believing the online infringement would

continue because it wanted to avoid losing revenue."); *UMG Recs., Inc. v. Grande Commc'ns*

*Networks, LLC*, 384 F. Supp. 3d 743, 767 (W.D. Tex. 2019) (finding that an ISP satisfied the

material contribution standard by "continuing to sell internet services and continuing to provide

internet access to infringing customers"); *Bodyguard Prods., Inc. v. RCN Telecom Servs., LLC*,

2022 WL 6750322, at *9 (concluding that plaintiffs had successfully alleged contributory

infringement based on ISP's continued provision of service to subscribers despite knowledge of

widespread infringement); *BMG Rts. Mgmt. (US) LLC v. Altice USA, Inc.*, 2023 WL 3436089

(finding that by failing to terminate known repeat infringers, ISP contributed materially to

infringement).

2. Vicarious Copyright Infringement Liability for ISPs

The other theory of secondary liability, besides contributory infringement, is vicarious

infringement. "The concept of vicarious copyright liability was developed in the Second Circuit

as an outgrowth of the agency principles of *respondeat superior*." *Faulkner*, 211 F. Supp. 2d at

472.  The doctrine has expanded beyond the employer-employee relationship, such that "one

may be vicariously liable if he has the right and ability to supervise the infringing activity and

also has a direct financial interest in such activities."  *Gershwin*, 443 F.2d at 1162 (citing

*Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963)); *see also*

*Grokster,* 545 U.S. at 930 (concluding that one is liable for vicarious copyright infringement by

"profiting from direct infringement while declining to exercise a right to stop or limit it").

Thus, to establish liability, a plaintiff must show that the defendant had both (1) "the right

and ability to supervise the infringing activity" and (2) a "direct financial interest" in such

activity.  *Gershwin*, 443 F.2d at 1162; *see also EMI Christian Music Grp., Inc. v. MP3tunes*

*LLC*, 844 F.3d 79 (2d Cir. 2016).  Both elements are necessary; the "failure to satisfy either

element is fatal to a claim for vicarious infringement."  *Totally Her Media, LLC v. BWP Media*

*USA, Inc.*, No. CV 13-08379-AB (PLAx), 2015 WL 12659912, at *7 (C.D. Cal. Mar. 24, 2015).

Thus, if a court finds one lacking, it may decline to consider the other.  *Cox V*, 93 F.4th at 230

(concluding that because plaintiffs "failed, as a matter of law, to prove that [defendant] profit[ed]

directly from its subscribers' copyright infringement," the court did not "reach the additional

question of [defendant's] right and ability to supervise its subscribers"); *Perfect 10, Inc. v. Visa*

*Int'l Serv. Ass'n*, 494 F.3d 788, 806 (9th Cir. 2007) (concluding that because plaintiffs failed to

show defendants had "the right and ability to control the alleged infringing conduct," the court

did not need to "reach the issue of direct financial interest").

The plaintiff need not establish knowledge or intent.  *Arista Recs. LLC v. Usenet.com,*

*Inc.*, 633 F. Supp. 2d at 156 (stating that "vicarious liability. . . does not include an element of

knowledge or intent on the part of the vicarious infringer"); *cf. Shapiro, Bernstein & Co.*, 316

F.2d at 307 (finding vicarious liability "even in the absence of actual knowledge").

20

a. *Right and Ability to Supervise or Control.*

"The first element of the test for vicarious liability is satisfied if the plaintiff proves that the defendant had the ability to supervise or control the third parties' infringing activity and failed to do so." *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d at 435. While the standard is clearly met in situations where the direct infringers "look to [the defendant] for direction" and the defendant is "in a position to police the infringing conduct," *Gershwin*, 443 F.2d at 1163, such a tight leash is not *required* to establish liability. Rather, "[t]he ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d at 157 (citing *Napster*, 239 F.3d at 1023); *see also Dish Network LLC v. Datacamp Ltd.*, No. 22-cv-00993, 2023 WL 4549528, at *4 (N.D. Ill. July 14, 2023) ("When the defendant can terminate its users' access to the system to prevent infringement, the defendant has the ability to stop infringement.") If a defendant has the *right* to block access, such right must be "exercised to its fullest extent" to "escape imposition of vicarious liability." *Napster*, 239 F.3d at 1023.

In the ISP context, courts have found that the ability to terminate or block its subscribers' accounts satisfies this prong. *See, e.g.*, *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 675 (E.D. Va. 2015) ("*Cox I*"), *aff'd in part, rev'd in part on other grounds*, *Cox II*, 881 F.3d 293 (concluding that control prong sufficiently alleged when ISP had "contractual relationship with its users" which gave it "the legal right to withhold service"); *UMG Recs., Inc. v. RCN Telecom Servs., LLC*, 2020 WL 5204067, at *11 (rejecting ISP's argument that terminating subscribers had only an "indirect" effect on infringement, and the ISP's "ability to control, supervise, or terminate the accounts of its subscribers" satisfied the "right or ability to supervise prong of vicarious infringement"); *BMG Rts. Mgmt. (US) LLC v.*

*Altice USA, Inc.*, 2023 WL 3436089 (concluding that plaintiffs had plausibly alleged control element where defendant ISP's policies expressly prohibited copyright infringement and reserved the right to terminate users' accounts); *UMG Recs., Inc. v. Grande Commc'ns Networks, LLC*, No. A-17-CA-365-LY, 2018 WL 1096871, at *10 (W.D. Tex. Feb. 28, 2018) (concluding that the fact that defendant ISP could "stop or limit the infringing conduct by terminating its subscribers' internet access," was "clearly sufficient to state a claim on the first element of vicarious liability").

### b.    Direct Financial Interest

The second prong of the vicarious liability inquiry requires "an obvious and direct financial interest in the exploitation of copyrighted materials." *Shapiro, Bernstein & Co.*, 316 F.2d at 307.  In *Shapiro*, a canonical vicarious liability case, the Second Circuit found a "most definite financial interest" when a department store received a commission of 10-12% of each record sold by a concessionaire, including the "bootleg" versions that infringed valid copyrights. *Id.* at 308.  In another early vicarious infringement case, *Fonovisa*, the court found this prong was satisfied with respect to the owner of a "swap meet," who "reap[ed] substantial financial benefits from admission fees, concession stand sales and parking fees, all of which flow[ed] directly from customers who want[ed] to buy the counterfeit recordings." *Fonovisa*, 76 F.3d at 263.  Accordingly, vicarious liability was properly imposed because the ability to access infringing materials "enhance[ed] the attractiveness of the venue for potential customers," thus serving as a "draw." *Id.* at 263.  In an early internet case, *Napster*, the Ninth Circuit found that because Napster's user base grew with the "quantity and quality of available music" (the vast majority of which was infringed), access to the material also served as a "draw." *Napster*, 239 F.3d at 1023.

Courts do not always agree on the exact nature or extent of the necessary "draw." *See Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) ("There is no requirement that the draw be 'substantial.'"); *EMI Christian Music Grp.*, 844 F.3d at 99 ("[I]nfringing material acts as a 'draw' to attract subscribers to a defendant's business, even if it is not the primary, or even a significant draw."). *But see Adobe Sys. Inc. v. Canus Prods., Inc.*, 173 F. Supp. 2d 1044, 1051 (C.D. Cal. 2001) (concluding that the infringing must be "the *main* customer 'draw'").[10] Regardless of the nature of the "draw," "the crux of the financial benefit inquiry is whether a causal relationship exists between the infringing activity and a financial benefit to the defendant. If copyright infringement draws customers to the defendant's service or incentivizes them to pay more for their service, that financial benefit may be profit from infringement. But in every case, the financial benefit to the defendant must flow directly from the third party's acts of infringement to establish vicarious liability." *Cox V*, 93 F.4th at 231–32 (internal citations omitted).

The Fourth Circuit's recent *Cox V* decision is the most recent appellate decision to consider whether ISPs have a direct financial interest in their subscribers' infringement, finding that the "continued payment of monthly fees for internet service, even by repeat infringers, was not a financial benefit flowing directly from *the copyright infringement itself*." *Id.* at 232 (emphasis in original). The court explained:

> The continued payment of monthly fees for internet service, even by repeat infringers, was not a financial benefit flowing directly from *the copyright infringement itself*. As Cox points out, subscribers paid a flat monthly fee for their internet access no matter what they did online. Indeed, Cox would receive the same monthly fees even if all of its subscribers stopped infringing. Cox's financial interest in retaining subscriptions to its internet service did not give it a financial interest in its subscribers' myriad online activities, whether acts of copyright infringement or any other unlawful

---

[10]    The Court notes that *Adobe* cited *Fonovisa* for its "main draw" standard without explanation of the further qualifier, which did not appear in *Fonovisa*.

acts. An internet service provider would necessarily lose money if it canceled subscriptions, but that demonstrates only that the service provider profits directly from the sale of internet access. Vicarious liability, on the other hand, demands proof that the defendant profits directly from the *acts of infringement* for which it is being held accountable.

*Id.* at 232 (emphasis in original).

However, not every court considering that question has reached the same conclusion. *See BMG Rts. Mgmt. (US) LLC v. Altice USA, Inc.*, WL 3436089, at *5 (finding that plaintiffs had sufficiently alleged direct financial benefit because ISP "[was] directly profiting from the retention of accounts which are used for music piracy" and subscribers were "drawn" to the ISP's services "both because of lax policing of such piracy as well as faster internet speed for those willing to pay more"); *Warner Recs. Inc. v. Charter Commc'ns, Inc.*, 454 F. Supp. 3d 1069, 1084 (D. Colo. 2020) (finding that plaintiffs had sufficiently alleged a direct financial interest based on, *inter alia*, claims that subscribers were "motivated" by advertisements promoting the high speed of song downloads, and ISP revenues increased as infringing customers purchased increase bandwidth to carry out their infringement).

### B. Purpose and Effect of DMCA § 512

The DMCA was enacted to "provide certainty for copyright owners and Internet service providers with respect to copyright infringement liability online," and specifically, "clarif[y] the liability faced by service providers who transmit potentially infringing material over their networks." S. REP. NO. 1–190, at 2 (1998). The Committee noted that there had been "several cases relevant to service provider liability for copyright infringement," most of which had "approached the issue from the standpoint of contributory and vicarious liability." *Id.* at 19. Leaving the "current law in its evolving state," the DMCA was intended to "create a series of 'safe harbors.'" *Id.*

The DMCA safe harbors "provide protection from liability for: (1) transitory digital network communications; (2) system caching; (3) information residing on systems or networks at the direction of users; and (4) information location tools." *Ellison v. Robertson*, 357 F.3d at 1077 (citations omitted). These correspond with sections 512(a), 512(b), 512(c), and 512(d) of the DMCA. Each subsection contains its own qualifications that any defendant wishing to take advantage of a particular "harbor" must meet. In addition, to take advantage of *any* of the harbors, a defendant must meet the conditions set forth in section 512(i):

> (i) Conditions for Eligibility.
>
> > (1) Accommodation of technology. The limitations on liability established by this section shall apply to a service provider only if the service provider—
> >
> > (A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and
> > (B) accommodates and does not interfere with standard technical measures.

17 U.S.C. § 512(i).

Section 512(l) provides that the failure to qualify for any safe harbor "shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing." 17 U.S.C. § 512(l). The DMCA does not impose any standalone duty: put simply, the DMCA is "irrelevant to determining what *constitutes* a prima facie case of copyright infringement." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 555 (4th Cir. 2004) (emphasis added). "Claims against service providers for direct, contributory, or vicarious copyright infringement, therefore, are generally evaluated just as they would be in the non-online world." *Ellison v. Robertson*, 357 F.3d at 1077; *see also CoStar Grp., Inc. v. LoopNet, Inc.*, 373

F.3d at 553 (stating that the safe harbors "apply if the provider is found to be liable under

existing principles of law") (citation omitted).  Only once liability is found under those existing

principles does a defendant turn to the safe harbors of the DMCA (or other defenses).  And only

then, when the defendant wishes to invoke a safe harbor, must they show that they have

complied with section 512(i) and conditions relevant to their harbor of choice.

### 1.   DMCA Protection for ISPs

ISPs faced with claims of secondary infringement liability generally invoke the safe

harbor under section 512(a),[11] which provides protection for "transitory digital network

communications."  17 U.S.C. § 512(a).  Section 512(a) protects service providers from

infringement liability for "transmitting, routing, or providing connections for, material through a

system or network controlled or operated by or for the service provider" subject to the following

conditions:

> (1) the transmission of the material was initiated by or at the direction of a person other than the service provider;
> (2) the transmission, routing, provision of connections, or storage is carried out through an automatic technical process without selection of the material by the service provider;
> (3) the service provider does not select the recipients of the material except as an automatic response to the request of another person;
> (4) no copy of the material made by the service provider in the course of such intermediate or transient storage is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission, routing, or provision of connections; and
> (5) the material is transmitted through the system or network without modification of its content.

17 U.S.C. § 512(a)(1)–(5).

---

[11]    Movie Company Claimants have also alleged that Frontier qualifies as an "Information Location Tool" under section 512(d).  (Movie Opposition ¶ 26–37.)  The Court need not reach the merits of that issue in denying the present Motion.

Unlike the other safe harbors, section 512(a) does not reference the notification described in section 512(c)(3)(A). This is because, like section 512(c), the "activities described in §§ 512(b) and (d) are storage functions. As such, they are . . . susceptible to the notice and take down regime," which relies on the notification described in section 512(c)(3)(A). *Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1237 (D.C. Cir. 2003). Because a pure internet service provider is a conduit, there is nothing for an ISP to "take down." However, the fact that ISPs have no duty to "take down" infringing content to benefit from their safe harbor has no bearing on the questions of (1) whether a plaintiff has alleged the knowledge element of contributory liability, and (2) whether an ISP has implemented and enforced a termination policy under section 512(i).

The crux of the knowledge prong for contributory liability is whether the defendant has "actual knowledge or awareness of facts or circumstances that indicate specific and identifiable instances of infringement." *EMI Christian Music Grp.*, 844 F.3d at 92 (quoting *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 32 (2d Cir. 2012)). Such details provide enough information to "*do* something about it." *Cox II*, 881 F.3d at 312. The exact *form* by which an ISP gains that knowledge—whether via a notice that also happens to meet the requirements of section 512(c)(3)(A), or a scroll delivered by carrier pigeon—is less relevant than the *substance*, *i.e.*, enough information to act on. If the knowledge prong of the contributory infringement analysis is satisfied by the information on a DMCA notice, the fact that the notice does not trigger an inapplicable section of the DMCA is irrelevant.

The DMCA does not contain an "affirmative duty to monitor its servers for infringement." *EMI Christian Music Grp.*, 844 F.3d at 93. However, to take advantage of the section 512(a) safe harbor, section 512(i) *does* require some action: namely, that an ISP have

27

"reasonably adopted and implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers . . . who are repeat infringers."  17 U.S.C. § 512(i)(1)(A).  Knowledge of specific instances of infringement is obviously relevant to this gating question: to implement a policy of terminating subscribers, naturally ISPs must know who to terminate, and on what grounds.  And again, the format from which they glean this knowledge is irrelevant, so long as it conveys the requisite information.

### C. *Twitter* Applied Common Law Aiding and Abetting Principles to Acts of Terrorism by Social Media Platforms

In *Twitter*, the Supreme Court held that the family of a terrorism victim failed to state a claim against Twitter, Facebook, and Google for liability under JASTA, which imposes secondary liability on anyone "who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." *Twitter*, 598 U.S. at 478 (quoting 18 U.S.C. § 2333(d)(3)).  Plaintiffs alleged secondary liability based on defendants' knowledge of, and failure to prevent, the terrorist group ISIS using the defendants' platforms for recruiting and fundraising.  *Id.*  In reaching its decision, the Supreme Court considered two questions: "First, what exactly does it mean to 'aid and abet?' Second, what precisely must the defendant have 'aided and abetted'?"  *Id.* at 484.

#### 1.   Culpability Based on Common-law Aiding and Abetting

In addressing the first question, the Supreme Court analyzed the "ancient criminal law doctrine" of aiding and abetting, which has "substantially influenced its analog in tort."[12]  *Id.* at 488.  It began by analyzing the legal framework set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).  *Halberstam* set forth a three-part test, requiring (1) the party whom the

---

[12]      "[N]uances may establish daylight between the rules for aiding and abetting in criminal and tort law; we have described the doctrines as 'rough[ly] simila[r],' not identical."  *Twitter*, 598 U.S. at 493.

defendant assisted to "perform a wrongful act that causes an injury"; (2) that the defendant be

"generally aware of his role as part of an overall illegal or tortious activity" at the time of the

assistance; and (3) that the defendant "knowingly and substantially assist in the principal

violation." *Twitter*, 598 U.S. at 486 (citation omitted).  In analyzing the third factor, *Halberstam*

set forth six factors to consider: (1) the nature of the act assisted, (2) the amount of assistance, (3)

the defendant's presence at the wrongdoing, (4) the defendant's relation to the wrongdoer, (5) the

defendant's state of mind, and (6) the duration of the assistance. *Id.* (citation omitted).

In its review of the common law, the Supreme Court also noted that liability "has never

been boundless," and rather is "cabin[ed]" to defendants with some level of "blameworthiness,"

to avoid the case were "ordinary merchants could become liable for any misuse of their goods

and services . . . and those who merely deliver mail or transmit emails could be liable for the

tortious messages contained therein." *Id.* at 489.  Further, the Supreme Court cautioned that the

*Halberstam* "elements and factors should not be taken as inflexible codes; rather, they should be

understood in light of the common law and applied as a framework designed to hold defendants

liable when they consciously and culpably participate[d] in a tortious act in such a way as to help

make it succeed." *Id.* at 497 (internal quotations marks omitted).

Applying these common law principals, the Supreme Court found that the allegations in

*Twitter* "f[ell] short of [a] showing under *Halberstam*'s framework." *Id.* at 497.  The

allegations—that ISIS was active on the defendants' platforms and was able to use them "just

like everyone else," that the platforms' algorithms treated ISIS's content "just like any other

content," and that defendants knew ISIS was uploading content but "took insufficient steps" to

ensure it was removed—did not suggest that defendants had culpably associated themselves with

ISIS, or sought to make ISIS's activities succeed. *Id.* at 498.  It found that, at bottom, the claim

"rest[ed] less on affirmative misconduct and more on an alleged failure to stop ISIS from using these platforms. But, as noted above, both tort and criminal law have long been leery of imposing aiding-and-abetting liability for mere passive nonfeasance." *Id.* at 500.

### 2.    The Nexus Between the Defendant and the Object of the Assistance

The Supreme Court then turned to the question of what, precisely, a defendant must aid and abet, holding that a defendant must have aided and abetted "another person *in the commission* of the actionable wrong." *Id.* at 495 (emphasis added). In its analysis, the Supreme Court relied on the importance of the "nexus" between the wrongdoing and the defendant's assistance: "[w]hen there is a direct nexus between the defendant's acts and the tort, courts may more easily infer such culpable assistance." *Id.* at 506. Conversely, "the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." *Id.* Lastly, if "a plaintiff 's theory would hold a defendant liable for all the torts of an enterprise, then a showing of pervasive and systemic aid is required to ensure that defendants actually aided and abetted each tort of that enterprise." *Id.*

In *Twitter*, given that the relationship between the defendants and ISIS was "arm's length, passive, and largely indifferent," and the relationship between the defendants and the terrorist attack was "even further removed, given the lack of allegations connecting [it] with ISIS' use of [the defendants'] platforms," the nexus was extremely attenuated. *Id.* at 500. The Supreme Court also found "notabl[e]" that plaintiffs had not "allege[d] that ISIS used defendants' platforms to plan or coordinate the Reina attack." *Id.* at 498. Thus, for liability to attach, plaintiffs would have needed strong evidence of conscious, culpable participation, which they did not have. *Id.* at 500.

**D. *Twitter* Did Not Silently Rewrite Well-Established Jurisprudence on Secondary Liability for Copyright Infringement**

In *Twitter*, the Supreme Court cautioned that principles of common-law aiding-and-abetting liability were not rigid rules, but rather flexible standards to be interpreted and applied based on particular facts.  As with any common law doctrine, the core principle must adapt to its circumstances: different branches of the same tree, grown of the same wood.  One such branch represents general copyright jurisprudence, incorporating seminal cases such as *Sony* and *Grokster*.  That branch has long since established the necessary elements to state a claim for contributory copyright infringement: both (1) *knowledge*, plus (2) either *inducement* or *material contribution*.  Through cases such as *Napster* and *Grokster*, the branch has stretched into the internet age, and in the intervening years winnowed further to speak directly to the narrow issue of ISPs facing secondary liability for their customers' alleged infringement.  *Twitter* did not chop off this branch.  On the other hand, vicarious liability for infringement, which requires both (1) *control or supervision* and (2) a *direct financial interest*, grows from an altogether different tree, with its roots in *respondeat superior* theory.  This "tree" was not addressed in, and was certainly not uprooted by, *Twitter*.

1. Contributory Copyright Liability is in Harmony with *Twitter*

In *Twitter*, the Supreme Court returned to the roots of the aiding-and-abetting liability, re-affirming that culpability must be the basis of any such claim.  This culpability is the same core trunk from which contributory copyright infringement jurisprudence grows, and the language of "aiding and abetting" flows through the copyright caselaw; it is that caselaw which ultimately determines what conduct reflects the requisite culpability for secondary infringement.

*a. Inducement and Material Contribution Both Reflect Culpability*

The specific language of "aiding and abetting," relating to affirmative acts and intentional encouragement, surfaces most often in descriptions of the "inducement" flavor of material contribution. *See, e.g.*, *Grokster*, 598 U.S. at 936 (stating that liability for inducement of copyright infringement occurs when one "actively and knowingly aids and abets another's direct infringement" evidenced by "active steps" to "encourage direct infringement") (internal citations omitted); *EMI Christian Music Grp.*, 844 F.3d at 100 (finding defendant contributorily liable when he knowingly "personally encouraged" infringement, because it "aided and abetted" the infringement); *Cox II*, 881 F.3d at 309 (concluding that the Restatement of Torts, which "accepts a doctrine with rough similarity to criminal aiding and abetting," provides an analog to contributory infringement).

However, inducement is only half of the picture: material contribution, too, grows from the same branch of law and is an equally valid theory of liability. *See, e.g.*, *Faulkner*, 211 F. Supp. 2d at 473. Frontier's conclusion relies on the premise that "inducement" liability, with its requirement of affirmative ill intent and action, is the *only* avenue of secondary liability for copyright infringement. This ignores its sibling, "material contribution" (as well as the entire "tree" from which vicarious liability grows, discussed *supra*). Willful blindness to flagrant infringement, combined with the continued provision of the essential tools to carry out the infringement, also represents "exactly the sort of culpable conduct sufficient for contributory infringement" based on material contribution. *Cox V*, 93 F.4th at 236. This finding "accords with principles of aiding and abetting liability in the criminal law"; just as "[l]ending a friend a hammer is innocent conduct[,] doing so with knowledge that the friend will use it to break into a

credit union ATM supports a conviction for aiding and abetting bank larceny." *Id.* (citing *U.S. v. Thompson*, 539 F. App'x 778, 779 (9th Cir. 2013)).

Frontier takes great pains to emphasize language about "active encouragement" and "affirmative steps" which demonstrate an "unlawful objective." (*See* Motion at 11–12 (quoting *Grokster*).) To be sure, it is indisputable that copyright jurisprudence supports the imposition of liability for that conduct, which dovetails with *Twitter*'s "substantial assistance" language—those claims proceed under a theory of "inducement." But Plaintiffs have not alleged contributory infringement based on *inducement*, but rather on *material contribution*. (*See* Movie Opposition ¶¶ 22, 28 (stating that the "substantial assistance" requirement is not applicable, because "Movie Company Claimants are not alleging that Frontier is liable under the intentional inducement" standard, but rather "the material contribution standard").) To that, Frontier responds that "the fact that some Frontier customers allegedly committed copyright infringement using Frontier's internet services cannot amount to a material contribution by Frontier to the asserted wrongdoing. Merely providing high-speed internet service, whose primary purpose is legitimate and which most people use lawfully, simply cannot be a basis for secondary liability." (*Id.* at 12–13.)

Frontier's statement obfuscates the relevant standard: Claimants are not alleging that Frontier "merely" did anything (as discussed in greater detail *supra*). Rather, they are alleging that Frontier *knowingly* turned a blind eye to *specific* instances of infringement carried out over its network, but nevertheless *continued* to provide the means to carry out that infringement. This states a claim for contributory infringement, because "supplying a product with knowledge that the recipient will use it to infringe copyrights is exactly the sort of culpable conduct sufficient for contributory infringement." *Cox V*, 93 F.4th at 236; *accord Arista Recs. LLC v. Lime Grp. LLC*,

784 F. Supp. 2d at 422 ("Secondary liability for copyright infringement may be imposed on a party that . . . has played a significant role in direct infringement committed by others, for example by providing direct infringers with a product that enables infringement.") (citing *Grokster*, 545 U.S. at 929–30 and *Sony*, 464 U.S. 417, 434–35.)

Frontier's only argument to the contrary is that "[i]t simply doesn't," and every case finding to the contrary was wrongly decided and "cannot be squared with *Twitter*." (Reply at 2, 8.) However, as the Court has explained, those cases' interpretation of "material contribution" liability is in harmony with the precedent upon which both *Twitter* and the thick lines of copyright precedent rest.

### b. The Alleged "Nexus" Is Not Attenuated

In *Twitter*, the Supreme Court found that the "nexus" between the defendants and the crime they were accused of aiding and abetting was so "attenuated" that they could not infer culpable assistance. *Twitter*, 598 U.S. at 506. There, plaintiffs were attempting to link social media platforms operating in cyberspace to the Reina terrorist attack, at a nightclub in Istanbul. The alleged link was that the terrorists who carried out the attack had also maintained active accounts on the platforms, which facilitated their general operations—not even that they had "plan[ned] or coordinate[d] the Reina attack" on the platforms. *Id.* at 498.

Claimants argue that the nexus lacking in *Twitter* is present here. This, they argue, is because unlike in *Twitter*, where defendants "did not and could not allege that ISIS used the defendants social-media platforms to carry out" the attack (Record Opposition at 14), here, "the underlying tort of copyright infringement occurred not only on Frontier's platform by its subscribers, but also on Frontier's servers when it transmitted and routed copies" of the works. (Movie Opposition ¶ 20.) Frontier responds that *Twitter* still forecloses liability because

34

"[n]othing about the alleged fact that Frontier's subscribers use its internet services to infringe suggests a 'direct nexus' between the provision of Frontier's services and the alleged wrongful conduct. Otherwise, merely providing a passive conduit to the internet would give ISPs a 'direct nexus' with every unlawful thing a subscriber might do on the internet." (Reply at 7.)

The Court agrees with Claimants that the nexus in *Twitter* is a far cry from the allegations here, and does not foreclose theories of contributory liability based on attenuation. The Reina attack was not carried out on or through a social media platform, but rather in Istanbul by terrorists who had maintained accounts on the platforms; in contrast, the copyright infringement alleged here took place via Frontier's network itself. *Twitter* is thus distinguishable and does not compel dismissal. And as explained below, this conclusion does not imply the irrational result that "merely providing a passive conduit to the internet would give ISPs a 'direct nexus' with every unlawful thing a subscriber might do on the internet" (Reply at 7), a slippery-slope argument which finds no purchase in caselaw and which Congress has explicitly addressed through the DMCA.

### c. *"Merely" Providing Internet Does Not Incur Liability*

Lastly, Frontier relies on snippets of *Twitter* that, it argues, speak directly to its situation and bar liability. Frontier relies on the following quotes relating to nonliability for passive provision of internet service, which it claims forecloses its own liability:

- "[T]he Supreme Court . . . conclude[ed] that 'we generally do not think that internet or cell service providers incur culpability merely for providing their services to the public writ large.'" (Motion at 2 (quoting *Twitter*, 598 U.S. at 499).)
- "The fact that some bad actors took advantage of these platforms is insufficient to state a claim that defendants knowingly gave substantial assistance . . . a contrary holding would effectively hold any sort of communication provider liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop

35

them.  That conclusion would run roughshod over the typical limits on tort liability." (*Id.* at 2, 9 (quoting *Twitter*, 598 U.S. at 503).)

- "[T]he Supreme Court observed [] the law has 'long been leery of imposing aiding-and-abetting liability for mere passive nonfeasance' . . . .  Otherwise, 'those who merely deliver mail or transmit emails could be liable for the tortious messages contained therein.'" (*Id.* at 9 (quoting *Twitter*, 598 U.S. at 489, 500).)
- The Supreme Court "observ[ed] that cell providers 'would [not] normally be described as aiding and abetting, for example, illegal drug deals brokered over cell phones—even if the provider's conference-call or video-call features made the sale easier'" and "not[ed] that 'those who merely deliver mail' should not be held responsible 'for the tortious message contained therein.'" (Reply at 7 (quoting *Twitter*, 598 U.S. at 489, 499).)

These are uncontroversial bedrock principles which form the foundation of secondary liability, including the copyright infringement jurisprudence, and furthermore are statutorily enshrined in the DMCA.  However, Frontier's invocation of these principles does not place it within their protection.[13]

Of course, the *mere*[14] provision a service or product with primarily lawful uses, with only some *general* knowledge that it can and will be used for nefarious ends, does not result in *automatic* imposition of liability.  That is the core holding of *Sony* that *Grokster* reaffirmed. *Grokster*, 545 U.S. at 933 ("*Sony* barred secondary liability based on *presuming* or *imputing* intent to cause infringement *solely* from the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement.") (emphasis added).  Under the theory of material contribution, culpability arises when the essential ingredients of *specific knowledge* of infringement and *continued provision* of the means to

---

[13]     For the avoidance of doubt, the Court is not deciding whether Frontier has or could successfully avail itself of a DMCA safe harbor.  Rather, the Court's analysis at this stage concerns only whether Claimants have stated a claim for secondary infringement.  The Court rejects Frontier's argument that Claimants have not stated a claim because, it claims, it is merely passively providing service.  The Court concludes that Frontier cannot gain the protection of this principle simply by invoking it.  By contrast, invocation of the DMCA is an affirmative defense that requires additional factual inquiry, which may be adjudicated in the district court if Frontier asserts the defense and the district court ultimately decides to withdraw the reference.  (*See* Withdrawal Denial Orders.)

[14]     A word which appears in each relevant selected *Twitter* quote.

infringe are layered on top of the "simple" or "mere" provision of internet services.  With proper

proof of both elements, there is no need to presume or impute anything.  While the internet may

facilitate all manner of illegal activity, no court has ever taken the drastic step of imposing

liability on ISPs "simply" for providing internet—even those that Frontier says are wrongly

decided based on an overly broad standard.  *See, e.g.*, *BMG Rts. Mgmt. (US) LLC v. Altice USA,*

*Inc.*, 2023 WL 3436089, at *5 ("Taking the allegations in the complaint as true, [ISP] is not

*simply* providing internet services.") (emphasis added).

In fact, the safe harbors of the DMCA were enacted precisely to "clarif[y] the liability

faced by [ISPs] who transmit potentially infringing material over their networks."  S. REP. NO.

105-190, at 2 (1998).  Leaving untouched the "evolving" standards on secondary copyright

liability over the web, the DMCA established certain protections for ISPs.  *Id.*  These safe

harbors insulate them from "incur[ring] culpability merely for providing their services to the

public writ large."  *Twitter*, 598 U.S. at 499.  *See also Cox V*, 93 F.4th at 228–29 ("Congress

recognized that internet service providers may get caught in the crossfire when infringers use the

internet to reproduce or distribute copyrighted works, so it created a safe harbor defense in the

[DMCA].")  However, as a precondition to invoking a safe harbor, an ISP must meet the

requirements of section 512(i).  *See Viacom Int'l Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110, 122

(S.D.N.Y. 2013) (stating that the "purpose of subsection 512(i) is to deny protection to

[defendants] that tolerate users who flagrantly disrespect copyrights") (citation omitted).

Based on Frontier's logic, an ISP could only possibly face secondary liability if it had a

clearly unlawful intent, manifested by substantial assistance—*i.e.*, only under the inducement

standard.  This would render the DMCA, and especially the section 512(i) requirement of

implementing a reasonable termination policy, meaningless.

Thus, rather than silently rewriting this copyright doctrine, as Frontier's conclusion implies, *Twitter* is wholly consistent with the established principles of contributory liability for copyright infringement described above. Read together, *Twitter*, *Sony*, and *Grokster* do not foreclose Claimants' theory: though all three cases attach to the same conceptual core, *Twitter* proceeded to refine the branch concerning secondary liability for terrorist acts under JASTA. *Twitter* did not touch the copyright branch, which is based on *Sony*, *Grokster*, and other cases which have established what precisely what constitutes culpable conduct in the copyright context.

## 2. *Twitter* Did Not Address or Alter Vicarious Liability

Vicarious liability is an entirely different species of secondary liability, drawn not from aiding-and-abetting principles, but rather with its roots in *respondeat superior* theory. Frontier acknowledges that "*Twitter* does not specifically call out vicarious liability." (Reply at 2.) Nevertheless, it argues, *Twitter* "roundly condemns any approach to secondary liability under which an [ISP] may be held liable 'merely for providing [its] services to the public writ large." (*Id.* (citing *Twitter*, 598 U.S at 499).)

The Court need not reiterate the analysis performed above: namely, that (1) clearly the "mere" or "simple" provision of internet is innocent conduct for which common law does not impose liability, and which the DMCA safe harbors explicitly protect (with some conditions); and (2) Claimants have alleged conduct that rises above "mere" or "simple" provision of internet, and which copyright caselaw has recognized as a cause of action. This non-controversial statement of the law does not foreclose liability based on the aiding-and-abetting principles on which *Twitter* is based, which similarly flow through the contributory copyright liability doctrine and crystallize as "inducement" and "material contribution." And it certainly

38

cannot not strike down an entirely alternate theory of liability, based on the completely different

principles of agency, requiring elements that *Twitter* does not mention, let alone analyze.  The

thin, superficial thread of connection—*i.e.*, that *Twitter* defendants' platforms were online, and

Frontier is an internet provider—does not alter this conclusion.

The balance of Frontier's vicarious liability arguments do not concern how *Twitter* could

have altered vicarious liability writ large, but rather are arguments on the merits for why it is not

vicariously liable.  (*See* Reply at 15 (stating that Claimants do not "plausibly allege that Frontier

has a right or ability to supervise and control its customers' activities").)  The Court does not

consider those arguments at this stage.

### E.  Movie Company Claimants' DMCA § 1202 Claims Survive

In addition to contributory and vicarious liability claims, Movie Company Claimants have

asserted claims for secondary liability under section 1202 of the DMCA, 17 U.S.C. § 1202,

which protects the integrity of Copyright Management Information ("CMI," and such claims, the

"CMI Claims").  CMI is defined broadly and includes the "title and other information identifying

the work" conveyed "in connection with" the work.  17 U.S.C. § 1202(c).  This includes a digital

file name.  *Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P.*, 948 F.3d 261, 277

(5th Cir. 2020).

Section 1202 prohibits (a) the knowing distribution of "false [CMI]," and (b) the "removal

or alteration of [CMI]" in both cases done with the "intent to induce, enable, facilitate, or conceal

infringement."  17 U.S.C. § 1202(a)–(b).  Courts have concluded that adding letters to the digital

filenames of works is sufficient to make out an "alteration" claim.  *See After II Movie, LLC v.

Grande Commc'ns Networks, LLC*, No. 1:21-CV-709-RP, 2023 WL 1422808, at *9 (W.D. Tex.

Jan. 31, 2023) (concluding that claims that "users added the names of torrent sites, such as YTS

and RARBG" sufficiently alleged alteration of CMI); *Millennium Funding, Inc. v. Doe*, Civil

Action No. 1:21-cv-282 (RDA/TCB), 2021 WL 5217018, at *7 (E.D. Va. Oct. 15, 2021)

(concluding that plaintiffs stated claim for altered CMI when alleging that initials "YTS" were

added to filenames of copyrighted works).

Movie Company Claimants allege that Frontier subscribers violated section 1202.  (*See,
e.g.*, Claim No. 2853 ¶ 19 ("The word YTS was added to the CMI by the initial individual(s) that

created the illegitimate copies of the Works to drive traffic to their notorious movie piracy

website YTS.").)  Movie Company Claimants rely on theories of secondary liability to hold

Frontier responsible for the CMI Claims.  (*See* Movie Opposition ¶ 40.)  Frontier asserts that

these claims, because they are based on the same theories of liability as "all the others," should

"fail for the same reasons."  (Reply at 18–19.)

The Court has explained why *Twitter* has not altered or foreclosed established theories of

secondary infringement.  Other courts have contemplated that secondary liability may attach to

DMCA §1202 claims.  *See Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*, 345 F.3d 922,

925 (6th Cir. 2003) (concluding that summary judgment for DMCA § 1202 claims would be

"inappropriate" when defendants "may be vicariously liable"); *Bodyguard Prods., Inc. v. RCN
Telecom Servs., LLC*, 2022 WL 6750322, at *12 (stating that court "agree[d] that secondary

liability may be found under the DMCA [§ 1202]"); *Millennium Funding, Inc. v. Doe*, 2021 WL

5217018, at *7–8 (analyzing contributory and vicarious liability under DMCA § 1202);

*Millennium Funding, Inc. v. Priv. Internet Access, Inc.*, No. 21-CV-01261-NYW-SKC, 2022 WL

7560395, at *17 (D. Colo. Oct. 13, 2022) (declining to "hold, at the pleading stage, that

principles of vicarious liability are inapplicable to claims arising under [DMCA] § 1202").

Accordingly, the CMI Claims, based on the same theories of secondary liability, *survive* for the same reasons as all the others: namely, Movie Company Claimants have alleged facts sufficient to state a claim under existing law, which *Twitter* did not alter.

## IV.    <u>CONCLUSION</u>

*Twitter* is based on, and did not alter, the same common-law principles of contributory liability that other courts, including the Supreme Court, have interpreted in the copyright context. Frontier, recognizing the echoes of *Twitter*'s "substantial assistance" language in the "inducement" theory of contributory infringement, seizes on this similarity and argues that this is the *only* theory of liability.  This argument is without merit.  Under copyright jurisprudence, Claimants have stated claims for secondary infringement liability.

For the reasons explained above, Frontier's Motion is **DENIED**.

**IT IS SO ORDERED.**

Dated:    March 27, 2024
          New York, New York

_____
              *Martin Glenn*
              MARTIN GLENN
      Chief United States Bankruptcy Judge

41