

Matthew Oppenheim
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.450.3958
matt@oandzlaw.com

VIA CM/ECF AND EMAIL  April 15, 2024
The Honorable Martin Glenn
U.S. Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

**Re:**  *In re Frontier Communications Corp.*, **Case No. 20-22476 (S.D.N.Y. Bankr.)**

Dear Chief Judge Glenn:

On behalf of the Record Company Claimants (the "RCCs"), we write to respond to Frontier Communications Corporation's ("Frontier's") April 11, 2024 letter seeking a discovery conference. Frontier's requests for orders requiring the RCCs to search for and produce documents concerning any agreements and communications regarding any third-party internet service provider's ("ISP's") repeat infringer program should be denied.

Communications between a RCC and an ISP other than Frontier are completely irrelevant to all of the legal issues in this case. Evaluating whether Frontier satisfies the DMCA's requirement under 17 U.S.C. § 512(i)'s that Frontier adopt and reasonably implement a policy for terminating repeat infringers does not involve "benchmarking" Frontier's conduct against an "industry standard." Frontier cites no authority for this position, for good reason: the Second Circuit's explication of § 512(i) did not adopt such a framework. *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 90–91 (2d Cir. 2016). Nor have any of the cases addressing whether an ISP satisfies § 512(i) done so. *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 303–05 (4th Cir. 2018); *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 754–58 (W.D. Tex. 2019); *see also Capitol Recs., LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646 AJN, 2015 WL 1402049, at *12–*13 (S.D.N.Y. Mar. 25, 2015) (holding that non-ISP defendant did not reasonably implement policy without benchmarking against other industry participants).

Even if a third-party ISP's repeat infringer policy could be relevant (and it is not) that relevance would only lie in the facts of what that ISP actually did. But the RCCs' communications with an ISP are not likely to reveal those facts. As Frontier knows well from its own conduct, ISPs do not typically disclose how they implement their repeat infringer programs to anyone, let alone to potentially adverse litigants like the RCCs. Any communications between an ISP and an RCC would not include that information.

If Frontier truly wanted to obtain the policies and procedures of third-party ISPs, the proper way to do so would be to subpoena that information from the ISPs directly. The only source of reliable information about how an ISP implements its repeat infringer policy is the ISP itself. If establishing the facts of how ISPs implement repeat infringer policies were important, Frontier would have served third-party subpoenas on those ISPs to obtain information showing, not only what those ISPs' policies were, but how they were implemented. But Frontier has not done so,

despite having already served eleven third-party subpoenas on other entities. And, if Frontier did this, it would prompt multiple mini litigations about the reasonableness of every other ISP's repeat infringer policy, all within this case.

Frontier ignores the applicable legal framework in arguing that, because the RCCs sought Frontier's communications with other copyright owners, the RCCs cannot now object to producing their own communications with third parties. The parties and the requests are not similarly situated under the law. By asserting the DMCA safe harbor, Frontier put at issue its "policy toward all of its repeatedly infringing subscribers, not just those who infringed [the plaintiff's] copyrights." *BMG*, 881 F.3d at 304. Frontier thus made relevant its communications with other copyright owners. By contrast, none of the claims in the case put at issue how the RCCs interacted with third parties.

The RCCs' internal communications about third parties' repeat infringer policies are even further afield from relevance. The most any such communications could show about a third-party ISP's practices is second-hand hearsay, which is of scant value in establishing what those practices were. Nor are RCC employees' subjective understanding or views about reasonableness relevant. Unlike Frontier, the RCCs' state of mind is not a relevant legal issue in the case; the RCCs' subjective understanding of any third party's repeat infringer policy has no bearing on the objective reasonableness of Frontier's implementation of its own repeat infringer policy. Frontier's argument that responsive communications might show "circumstances that RCC acknowledges qualify for the safe harbor," Ltr. at 2, is entirely speculative. "[L]itigants may not use discovery under Rule 26 to engage in 'fishing expeditions' in order to find support for baseless or speculative allegations." *In re Grabis*, No. 13-10669-JLG, 2018 WL 6132045, at *13 n.32 (Bankr. S.D.N.Y. Nov. 20, 2018) ("Debtor should not be allowed to take discovery to 'fish' for documents in support of [] a speculative theory."). And while Frontier argues that, "if RCC has never seen a repeat infringer policy that it believes to have been reasonably implemented that too would be telling," Ltr. at 2, it fails to specify of *what issue* it would be telling—because there is none.

Further, to the extent any RCC's internal communications about third parties' repeat infringer policies exist, all of them are likely privileged. Whether an ISP qualifies for the DMCA safe harbor is a quintessentially legal question; to the extent any RCC has internally analyzed or commented on another ISP's repeat infringer policy, that would be a legal analysis conducted by counsel, and likely done in anticipation of litigation. The low likelihood of finding non-privileged documents and the significant burden involved in logging the privileged documents weighs decisively against permitting such discovery in Fed. R. Civ. P. 26(b)(1)'s proportionality analysis.

As regards RFP 36, no responsive documents exist. RFP 36 seeks "[a]ll documents concerning agreements between any of the Record Company Claimants and any online service provider concerning its repeat infringer policy." There are no agreements between any of the Record Company Claimants and any ISP concerning an ISP's repeat infringer policy. Accordingly, there are no documents concerning such agreements and there is nothing to produce.

Respectfully submitted,

/s/ *Matthew J. Oppenheim*
Matthew J. Oppenheim

2