Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 20-22476-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    FRONTIER COMMUNICATIONS CORPORATION,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    One Bowling Green

14                    New York, NY   10004

15

16                    April 30, 2024

17                    2:06 p.m.

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  F. FERGUSON

1    HEARING re Hybrid Discovery Conference re:   Record Company

2    Claimant's request (Doc ##2330, 2331, 2338, 2339, 2345)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

1   A P P E A R A N C E S :

2

3   OPPENHEIM ZEBRAK, LLP

4        Attorneys for Record Company Claimants

5        461 5th Avenue, 19th Floor

6        New York, NY 10017

7

8   BY:  CARLY KESSLER ROTHMAN

9        LAUREN BERGELSON

10

11  OPPENHEIM ZEBRAK, LLP

12        Attorneys for Record Company Claimants

13        4530 Wisconsin Avenue, NW, 5th Floor

14        Washington, DC 20016

15

16  BY:  MATTHEW J. OPPENHEIM

17        ALEXANDER KAPLAN

18

19  MORGAN, LEWIS BOCKIUS LLP

20        Attorneys for Record Companies

21        101 Park Avenue

22        New York, NY 10178

23

24  BY:  MICHAEL LUSKIN

25

Page 4

1    DAY PITNEY LLP

2         Attorneys for the Debtors

3         225 Asylum Street

4         Hartford, CT 06117

5

6    BY:  MATTHEW J. LETTEN

7         JOSHUA COHEN

8         ELIZABETH ALQUIST

9

10   DAY PITNEY LLP

11        Attorneys for the Debtors

12        195 Church Street, 15th Floor

13        New Haven, CT 06510

14

15   BY:  JONATHAN TROPP

16

17   DAY PITNEY LLP

18        Attorneys for the Debtors

19        One Stamford Plaza

20        Stamford, CT 06897

21

22   BY:  STANLEY A. TWARDY, JR.

23

24

25

Page 5

1    CULPEPPER IP, LLC

2         Attorneys for Badhouse Studios, LLC

3         75-170 Hualalai Road, Suite B204

4         Kailua Kona, HI 96740

5

6    BY:  KERRY STEVEN CULPEPPER

7

8    AKERMAN LLP

9         Attorneys for Frontier Communications Corp.

10        750 9th Street NW, Suite 750

11        Washington, DC 20001

12

13   BY:  ILDEFONSO MAS

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  Good afternoon.  Starting the recording

3      for the hearing on April 30th, 2024 at 2 p.m.  Calling

4      Frontier Communications Corporation, Case No. 20-22476.  Do

5      we have any parties in the courtroom that are giving their

6      appearance?

7              MR. COHEN:  Yes.

8              MS. ALQUIST:  Yes.

9              CLERK:  If you could come to the middle podium to

10     do so.

11             MS. ALQUIST:  Hi.  Beth Alquist with Day Pitney

12     for Frontier Communications.

13             CLERK:  Okay, thank you, Beth.

14             MS. ALQUIST:  And there's more.

15             MR. COHEN:  Joshua Cohen from Day Pitney also for

16     Frontier.

17             CLERK:  Yeah.

18             MR. TROPP:  Jonathan Tropp, also of Day Pitney and

19     also for Frontier.

20             CLERK:  Okay, thank you.

21             MR. TROPP:  You want to just tell (indiscernible)?

22             MR. KLIMMEK:  Chris Klimmek from Day Pitney for

23     Frontier Communications.  I'm actually -- I haven't appeared

24     in the case yet because I'm still in the process of getting

25     admitted in the SDNY.

Page 7

1              CLERK:  Okay.

2              MR. KLIMMEK:  So I am an observer.  I will not

3       speak unless the judge authorizes me to.

4              CLERK:  Understood.  All right, thank you.

5              MR. MAS:  Good afternoon.  This is Ildefonso Mas

6       from Akerman on behalf of Frontier.

7              CLERK:  Okay, thank you.  All right, if there's --

8       Pedro, are you still there?  So, if there's anyone in the

9       courtroom that needs to state their appearance, if you could

10      come to the middle podium to do so.

11             MR. OPPENHEIM:  Yes, good afternoon.  It's Matt

12      Oppenheim from Oppenheim and Zebrak.  I have here with me

13      Corey Miller, Alex Kaplan, and Carly Rothman, among others,

14      from our firm on behalf of the RCCs.

15             CLERK:  Thank you.

16             MR. LUSKIN:  Good afternoon.  Michael Luskin,

17      Morgan Lewis, for the RCCs.  Thank you.

18             CLERK:  Thank you.  All right, do we have any

19      additional parties in the courtroom?  Okay.  Do we have any

20      parties on Zoom?  Mr. Culpepper, we're -- start with you.

21             MR. CULPEPPER:  Good afternoon, everyone.  Kerry

22      Culpepper appearing on behalf of the movie company

23      claimants.

24             CLERK:  Thank you.

25             MR. LETTEN:  Good afternoon.  Matthew Letten from

1      Day Pitney on behalf of Frontier.

2             CLERK:  All right, thank you.  All right, I'll

3      pause the recording again for now.

4             (Pause)

5             CLERK:  Mr. Twardy, if you could give your

6      appearance for the record.

7             MR. TWARDY:  Sure.  Stanley Twardy from the law

8      firm Day Pitney for the Debtor Frontier.

9             CLERK:  Okay, thank you.  Are the parties ready to

10     proceed?

11            MR. OPPENHEIM:  I think we're making great

12     progress trying to resolve some of these issues.  Could we

13     have five more minutes?

14            CLERK:  Okay, we'll ask the judge.  Thank you.

15            (Pause)

16            THE COURT:  Please be seated.  Good afternoon.

17            GROUP:  Good afternoon, Your Honor.

18            THE COURT:  All right.  Mr. Oppenheim, do you want

19     to begin?

20            MR. OPPENHEIM:  Good afternoon, Your Honor and

21     appreciate you giving us a few extra moments.  It gave the

22     parties an opportunity to have a discussion about many of

23     the issues that have arisen over the last several weeks.  As

24     our letter set forth, we -- the record companies have had

25     significant concerns about the manner in which discovery has

Page 9

1    come from Frontier and that concern has been in part a

2    failure to produce, and now, a kind of complete dump of

3    everything at the very last minute in a way that will make

4    it extremely difficult for us to proceed with depositions in

5    the way that we would like to.

6            We are intent on moving forward on the Court's

7    schedule.  We are intent on prosecuting this case the way it

8    needs to be prosecuted, but are disappointed that that this

9    has happened the way it has happened, Your Honor.  And to

10   put that into context, Your Honor, so today, Frontier -- let

11   me just by way of example, on the email front, Frontier

12   finally has produced emails, 22,800 or so emails to date.

13   Of those, 21,467 were produced in the last roughly week.

14           Within their -- another example.  Within their

15   production, one of the things they produced was a

16   declaration from a subscriber, a subscriber who was a repeat

17   infringer.  This declaration is on a In re:  Frontier

18   caption and was signed in November.  And does not seem to be

19   any rational explanation for it's not having been produced

20   then, but being produced literally in the last several days

21   of discovery.  Now --

22           THE COURT:  What is it relevant to?  What do you

23   believe it was -- what request was it responsive to?

24           MR. OPPENHEIM:  So, I can't know how Frontier

25   intends to use this declaration.  They obviously got it for

Page 10

1    some reason.

2            THE COURT:  What document request that you made do

3    you believe its production was responsive to?

4            MR. OPPENHEIM:  It's certainly a document

5    responsive to the request for documents related to repeat

6    infringers and the termination of repeat infringers.  On the

7    face of it, it's a declaration about a subscriber who is

8    sent a termination letter and Frontier ultimately decided

9    not to terminate.  Leave aside that, you know, there's been

10   an agreement that we've -- we're okay with for them to

11   redact PII on all the subscribers.

12           But when it serves their purpose, they, you know,

13   they use the name and they go and they talk to the

14   subscriber and they bring it forward, which is a little one

15   sided.  We could never do that because we don't have the

16   subscriber's name and address.  That's a, that's an issue

17   for another day, but --

18           THE COURT:  You should have the subscriber's name.

19           MR. OPPENHEIM:  Well, we have --

20           THE COURT:  -- under seal, but --

21           MR. OPPENHEIM:  We have this subscriber's name.

22           THE COURT:  Yeah.

23           MR. OPPENHEIM:  Because this subscriber they

24   decided to go and talk to and get a declaration from because

25   they think they can tell a good story from this subscriber's

Page 11

1   perspective.  There are tens of thousands of repeat

2   infringers that Frontier had and was dealing with, receiving

3   infringement notices from, and by agreement, those -- we

4   don't know the names of those subscribers.  We're not going

5   to go and talk to all those subscribers and we agreed to

6   that.

7           I just find it a little ironic and somewhat

8   disconcerting that they can -- it's a sword/shield issue,

9   Your Honor, that they decide oh, it's so confidential that

10  we can't tell you all the names.

11          THE COURT:  Well, let me back up.  Did I enter

12  some order that said they didn't have to disclose the names

13  of repeat infringers?  I don't think so.

14          MR. OPPENHEIM:  No.  We did discuss it at one of

15  the early hearings and we --

16          THE COURT:  There's a difference between public

17  disclosure of the names and -- I mean, there's a protective

18  order in place.  There's a means to be able to provide

19  discovery of the names subject to, you know, appropriate

20  protection.  But I'll ask the question again.  Did I order

21  that names not be disclosed and discovered?

22          MR. OPPENHEIM:  You did not, Your Honor.

23          THE COURT:  Okay.  So, what are you complaining

24  about?  That's your -- if -- I'm -- you know, I'm serious to

25  this (indiscernible).  If you believe you need the names of

Page 12

1    the subscribers who were repeat infringers, ask for them and

2    you'll get them.  And there will be an appropriate, you

3    know, confidentiality.  I think the existing confidentiality

4    order will be sufficient to provide the protection for it.

5              MR. OPPENHEIM:  Very well.

6              THE COURT:  That isn't to say that you can't reach

7    out and contact people or subpoena them.  Look, you have the

8    burden at trial and you have to show, as I understand it,

9    you need to show the primary act of infringement in order to

10   be able to recover for contributory infringement.

11             MR. OPPENHEIM:  Yes.

12             THE COURT:  Okay.  I may not have said that as

13   fancy as you would, but that's what I basically understand.

14   Okay.  So, you know, unless you negotiate an agreement with

15   Frontier, you know, a stipulation for purposes of use at

16   trial, you know, I don't know how many repeated infringers

17   there are, and if they're really going to make you put into

18   the evidence of every act of repeated infringement.

19             Okay, load the boxes up and they'll come in.  But

20   otherwise, you know, if that -- if they're going to fight

21   the battle about who were the repeat infringers, have you

22   satisfactorily put in proof of the direct infringement, then

23   do what you have to do to prove your case.  Okay?

24             MR. OPPENHEIM:  Very well, Your Honor.

25             THE COURT:  But I certainly never intended to

Page 13

1    shield from discovery the names of the repeat infringers.

2    You have to prove it.

3              MR. OPPENHEIM:  Very well, Your Honor.

4              THE COURT:  So you're entitled to get discovery

5    on.

6              MR. OPPENHEIM:  We'll meet and confer with the

7    other side to address this issue.  I don't believe for

8    purposes of demonstrating the underlying direct infringement

9    that we'll need the identities of the underlying subscribers

10   --

11             THE COURT:  Okay.

12             MR. OPPENHEIM:  -- but for other purposes --

13             THE COURT:  I'm not telling you how to prove your

14   case.

15             MR. OPPENHEIM:  Yeah.  Very well.  I appreciate

16   that, Your Honor.  We came into this hearing with many

17   issues that we laid out in our letter.  Prior to this

18   hearing, we've been talking to opposing counsel.  I believe

19   by agreement, we've resolved most of those issues in the --

20   and Frontier has agreed to either produce the outstanding

21   documents or to search for them, or in some instance, they

22   say they don't exist.  And we're -- we appreciate Frontier's

23   effort in that regard and we'll work with them on that

24   basis.

25             So, the only thing at this point that we would ask

Page 14

1      for as relief from the Court is with respect to the way --

2      the timing in which this discovery came out with the vast

3      majority of it not being produced on a rolling basis as this

4      Court instructed early on, but -- and clearly withholding

5      materials until the very end.

6            This November Declaration should have been

7      produced a very long time ago -- is that we'll proceed with

8      the depositions on the current schedule, but as we're

9      reviewing documents to the extent we review additional

10     documents related to a deposition that we've already taken

11     that the -- that we be permitted to reopen depositions with

12     respect to newly reviewed -- not newly produced but newly

13     reviewed materials as needed.

14           THE COURT:  I'm not -- based on what you've said

15     so far, I'm not inclined to grant that relief.  I haven't

16     heard from the other side yet, you know, what the total

17     volume of paper and electronic materials that have been

18     produced in discovery.  Yes, I expected rolling production.

19     I didn't say how many documents a week or -- I don't know

20     what difficulties Frontier had in gathering information.

21           They, from their letter, indicate that the

22     enormous resources that they've had to devote to providing

23     the discovery, and I'll assume for purposes of discussion

24     that it's so.  Whether those resources were all added on in

25     the last couple of weeks to get the information produced,

Page 15

1    the question would -- then would be, why didn't they do it

2    earlier?  Okay.  But I'm not -- I don't want to get into the

3    back and forth about that.

4           So put the resources you need to produce the

5    documents be before the depositions.  It's one thing when

6    it's -- you know, when I think back, the years I was

7    litigating, it was almost inevitable that additional

8    documents always, you know, come out.  You ask -- you see

9    something and you ask a question about it and they search in

10   good faith.  More documents are found.

11          And you know, it's one thing to ask to reopen a

12   deposition because of some significant piece of evidence

13   that was produced after the deposition was taken.  And you

14   know, most of the time I remember never having to go to a

15   Court to ask about it.  Counsel just worked it out.  Yeah,

16   okay, this is -- we understand that this is -- document, at

17   least this handful of documents produced after, you want to

18   be able to depose Mr. Smith about it.  We'll make him

19   available for a short additional deposition to do that.

20          That's just give and take of litigation.  Okay.

21   So, I'm not willing to ascribe bad faith to what you

22   describe as the late production of documents.  It sounds

23   like more or less they met the deadline for substantial

24   production.

25          MR. OPPENHEIM:  Well --

1            THE COURT:  You said it should have been earlier.

2    But -- okay.

3            MR. OPPENHEIM:  So, if I may clarify.

4            THE COURT:  Yeah, go ahead.

5            MR. OPPENHEIM:  So, with respect to email

6    production, assuming they've now produced everything, yeah,

7    they produced 94 percent of it in the last roughly week.

8    That's not a rolling production to me, but we'll put the

9    resources in.  We'll do our best as we can to review it and

10   make it applicable.

11           The data is a different issue and it presents a

12   significant problem, and let me try to --

13           THE COURT:  Let me just stop for a second, okay?

14   I would be really unhappy -- and I do bad things when I'm

15   unhappy -- if I found out that they've had the stuff set

16   aside for the last month-and-a-half and they just produced

17   it last week.  I'm not accusing anybody of anything.  I just

18   -- but if that -- if those were the facts that it turned out

19   to be, bad things would happen.  Okay.  You know, it just --

20   let me stop there.  Go ahead, mister --

21           MR. OPPENHEIM:  And to be clear, I think since the

22   Day Pitney firm has come on, they have probably thrown a lot

23   of resources at this.  But this is not a case against Day

24   Pitney.  It's a case against Frontier.  And the question is,

25   did Frontier start actually actively pursuing the production

Page 17

1    of documents after they received our document requests in

2    November of last year or did they wait until Day Pitney was

3    retained --

4              THE COURT:  -- deposition and find out, go ahead.

5              MR. OPPENHEIM:  Yeah.  So, the issue where it

6    really becomes difficult is the issue on the data and the

7    Day Pitney lawyers have told us today they're going to do

8    their best to try to address the data holes.  But to give

9    you a sense of what this is and why it's problematic.  Rough

10   -- so we -- the record companies, not the movie studios, the

11   record companies alone during the claim period sent 54.5

12   thousand infringement notices to Frontier.  These --

13             THE COURT:  -- paper copies or just emailed them?

14             MR. OPPENHEIM:  They're sent by email in a

15   particular way so they can be read from a computer.  The

16   computer can read them.  They're generally sent with, I

17   think what's called an XML script.  But they're sent in a

18   way so the computers can read them.  The Frontier MariaDB

19   database which we've spoken about repeatedly here, has a

20   reports table which tracks these notices.  That reports

21   table is missing 7,500 of those 54,000 notices.

22             Well, what does that mean?  That means that we

23   don't know who the Frontier subscriber was, who was

24   responsible for the infringement at issue for 13.7 percent

25   of the infringement notices in this case.  That's a problem.

Page 18

1    We don't -- we can't track those notices.  We can't track

2    the level of infringement for those repeat infringers.

3            THE COURT:  Do they cover a particular time

4    period?

5            MR. OPPENHEIM:  They -- so some of them come from

6    an early time period where Frontier says they didn't

7    maintain the data, which will become an issue at trial and

8    we'll deal with it.  But there is a --- there are notices

9    missing throughout the entire claim period beyond that.

10           THE COURT:  You know that because why?

11           MR. OPPENHEIM:  Because we've analyzed it.  We've

12   looked at the dates of the notices month by month compared

13   to their data and we're seeing what's missing.  So -- and we

14   -- they do keep a database of the actual notices apart from

15   their database that compiles the notices, and they often

16   have the actual copies of the notices that they don't have

17   in their database that they use for tracking the notices.

18           So, we know they got them, but they didn't track

19   them.  So, this is a problem.  We're going to try to figure

20   out how to solve it.  They're going to look for those

21   notices and if they can't find them, they're going to try to

22   do lookups in IP lease logs to identify the subscribers.

23   So, the parties are working towards a solution.

24           THE COURT:  Did you -- you have no doubt inquired

25   why aren't they there.  Have you -- what answers have you

```
 1    gotten?

 2              MR. OPPENHEIM:  I don't think we have an answer

 3    yet, but I think that's an issue that Frontier is

 4    investigating based on our discussions recently.  So -- and

 5    of course, since the substantial completion deadline was

 6    only on Thursday, this is all quite recent and fresh.  So,

 7    the issue then is magnified because the next step of the

 8    process in analyzing the repeat infringement by Frontier

 9    subscribers is we have to look at that reports database that

10    MariaDB reports database and look at the account numbers,

11    but it doesn't use account numbers.  It uses something

12    called owners, which is -- it's a hash number related to a

13    modem MAC ID.

14              We get it.  They get it.  They have to give us a

15    translation table and they did.  But that translation table

16    is missing numerous entries, so we can't translate from one

17    database to the next.  Again --

18              THE COURT:  How do you know it's missing entries?

19              MR. OPPENHEIM:  Because you can see that there's -

20    - A, we've got owner numbers for which there are no account

21    numbers, and sometimes you have owner numbers and it's

22    literally just a blank.  So, we're working on this with

23    Frontier.

24              THE COURT:  But I just -- let's assume there's no

25    answer to it, that -- okay.  I suspect you've either
```

Page 20

1    encountered this issue before or you figured out what you're

2    going to try and prove a trial, what inferences you're going

3    to try and draw.  You know, it may be that this is going to

4    work against Frontier, because they can't -- if you have

5    copies of the infringement notices and shown that it was

6    sent to them and there's an absence of data on their part

7    and their practice was to keep the data, you may be able --

8    you'll ask the Court to draw adverse inferences from the

9    absence of the files.

10           They -- you're absolutely correct trying to get to

11   understand, you know, get to the bottom of it.  But the

12   answer at the end of the day may be an unsatisfactory one.

13   There are 7,000 missing entries.  Okay?  So there's 7,000 --

14   and you'll make whatever arguments you're going to make from

15   the absence of the entries.  They can't create documents

16   that don't exist in their records.  They can't create data

17   that isn't in their records.

18           MR. OPPENHEIM:  Absolutely, Your Honor.  And we'll

19   do that, if that's where we are and have done that in the

20   past and understand that.  But while we're working through

21   these issues, to the extent that this data is produced over

22   the course of the next several weeks and it requires us to

23   ask to either reopen or push certain deadlines, we may

24   either ask opposing counsel or come to the Court and request

25   that relief because, unfortunately, we're not quite where we

Page 21

1    would have hoped to have been at this point, but we're

2    working on it.  So, I'll leave it at that, Your Honor.  I do

3    think there are serious questions about why it took so long

4    for Frontier to gear up its production, but we appreciate

5    that they're there now.

6              THE COURT:  Okay.  Who wants to speak for --

7              MR. TWARDY:  Yes, Your Honor, this is Stan Twardy.

8    Attorney Alquist who is there will be handling this for us

9    today.

10             THE COURT:  Okay.

11             MR. TWARDY:  Thank you, Your Honor.

12             THE COURT:  Nice to see you on the screen, Mr.

13   Twardy.

14             MR. TWARDY:  Thank you, Your Honor.  Thank you for

15   letting me do it from afar.

16             THE COURT:  Sure.  Okay.  Go head.

17             MS. ALQUIST:  Good afternoon, Your Honor.  I am

18   Beth Alquist for Frontier, and I'll just respond very

19   briefly to contextualize it.

20             THE COURT:  You know, I'm feeling guilty that --

21   but only a little guilty, that the dates for the trial may

22   not coincide with the rest of your schedule, but I am

23   mindful of it, but I got my own problems.

24             MS. ALQUIST:  I appreciate that, Your Honor.  I

25   do, too, and I just can't move it in appeal in New Zealand,

Page 22

1    and there I'll be.

2            THE COURT:  Okay.

3            MS. ALQUIST:  But I will be here until --

4            THE COURT:  There are worse places to be than

5    there.

6            MS. ALQUIST:  Worse things have happened to me.  I

7    spent a month there trying a case and now I'm going to spend

8    a two-day appeal.  Didn't see that coming.  In any event, to

9    contextualize this for Your Honor, we haven't been sitting

10   on a pile of documents just to send them over at the end and

11   I suspect the other side hasn't, either.  The fact of the

12   matter is the parties and specifically MCC and RCC didn't

13   agree to the search terms we were going to use to search our

14   emails until March 29th.  RCC agreed to it about a week

15   earlier.  MCC agreed to it March 29th.

16           And from March 29th until April 25th, we had 35 to

17   45 lawyers and paralegals working literally around the clock

18   to get all the documents out and we produced about 25,000.

19   RCC from March 29th to date, produced 13,748 documents.

20   Prior to that, they had produced 3,207.  As Your Honor

21   pointed out --

22           THE COURT:  That's why I like sitting here rather

23   than out where you are.

24           MS. ALQUIST:  A hundred percent.  A hundred

25   percent, Your Honor.  But as you pointed out, this happens

Page 23

1    in complex IP litigations.  The parties produce things.

2    They do their best.  Things get missed.  Deficiencies happen

3    and the parties talk about it.

4          What was disappointing to Frontier was that a

5    letter went to Your Honor last night without contacting us

6    and asking us those questions and your clerk had to sit

7    through and listen to us work them all out within about 15

8    minutes.  That's what should happen.  We proposed, and I'm

9    happy to say that the other side has accepted, a weekly

10   standing meeting so that both sides can talk about discovery

11   deficiencies because we have them, too, Your Honor.

12         THE COURT:  Sounds like a perfect solution.  Maybe

13   not perfect, gut it sounds like it's well on the way to --

14         MS. ALQUIST:  I agree, and Attorney Cohen gets all

15   the credit for that, but I took the credit for it during the

16   meeting, and I'm wont to do.  So, that is the fact of the

17   matter.  We hear issues about data and it missing.  We asked

18   on April 18th for some information about what was then

19   30,000 alleged missing data entries.  Turns out we didn't

20   get a response to that and then it became only 7,500.  They

21   must have figured something out.  And now, they've agreed

22   today about an hour ago to provide us with the data we need

23   to be able to go find out what they're talking about and if

24   there's an answer or not.  Frontier has been working

25   diligently to do that.  The rules apply both ways and we all

Page 24

1    intend to meet Your Honor's deadlines.

2            THE COURT:  Let me just say, as much as I love

3    having you here, it's very rare that I actually have

4    discovery conferences in the courtroom and that was true

5    even before the pandemic and with, you know -- I wanted to

6    get you all here today because it sounds like you -- the

7    first thing that you told me about that makes perfect sense

8    is to have the weekly meetings or calls.  May be necessary

9    to have more than weekly, not with the whole group, but to

10   work your way through this.  Okay.

11           And if that's the case -- so I thought, okay, I

12   got these competing letters and, you know, you say bad

13   things about the other.  If they would have told us first,

14   et cetera.  We can hopefully avoid you having to travel here

15   to the courtroom.  When it's appropriate, we will.  Okay.

16   But these are -- every big case has its problems in

17   discovery.

18           Just, every case that I was ever involved in,

19   where lawyers have acted in entire good faith and have had

20   appropriate resources devoted to it, stuff just happens and

21   getting your clients to -- you know, you communicate with

22   your clients and they may not actually understand that you

23   really mean it.  They really have to find it.  Okay.  That

24   just happens.  That's what it's like.  Okay.

25           If you're talking to each other and giving each

Page 25

1   other the information that you need to go back to the

2   Frontier and vice versa with the record companies and the

3   movie companies, you're going to move ahead a lot faster.

4   Yes, it's an aggressive schedule which I intend to hold.

5   Okay.  You know, nothing in these letters struck me as --

6   you know, I've seen this a dozen times and it just -- okay,

7   you -- but you can -- I guess the one clear message, I've

8   said a bunch of times, you can move forward on the schedule.

9   This is the schedule.

10          MS. ALQUIST:  We agree, Your Honor.  Frontier

11  plans to meet that and I think the weekly calls will help a

12  great deal and hopefully all of these people can go back to

13  reviewing documents and not being in this courtroom.  Thank

14  you, Your Honor.

15          THE COURT:  Okay.  All right, thank you, Ms.

16  Alquist.  Anybody else want to be heard?  Is there anything

17  that needs more guidance?  It sounds like you all -- you

18  know, it's not like one side is saying no, never, we're

19  never going to produce this.  That's not what I'm hearing

20  today.  It's not this -- okay.

21          The last thing I would say is, if there are

22  problems, don't hesitate to write the Court and we'll have

23  another conference.  I just, you know, I'm holding you to

24  the schedule.  That ought to be clear to you all.  There's a

25  lot of work that has to be done.

Page 26

1          I really do think that many of the sort of

2      foundational issues you ought to be able to try and resolve

3      through stipulations and avoid having to go through

4      thousands of pages of documents for an effort that probably

5      isn't going to be worth fighting about at the end of the

6      day.  You have plenty of issues that you are going to fight

7      about.  I understand that.

8          All right, anybody on the -- on Zoom who wants to

9      be heard?  Mr. Culpepper?  I know you were -- I saw you

10     briefly.  Do you want to be heard on anything?

11          MR. CULPEPPER:  Thank you, Your Honor.  Kerry

12     Culpepper appearing on behalf of movie company claimants.  I

13     don't have anything to add, Your Honor.

14          THE COURT:  Okay.  All right.  All right.  The

15     longer I don't hear from you, the happier I'm going to be.

16     It means that you're moving things along without having to

17     go to the Court about it.  Okay.  All right.  So, thanks

18     very much.

19          (Whereupon these proceedings were concluded at

20     2:34 PM)

21

22

23

24

25

Page 27

1                     C E R T I F I C A T I O N

2

3         I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  May 1, 2024