Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 20-22476-mg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   FRONTIER COMMUNICATIONS CORPORATION,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                    United States Bankruptcy Court

12                    One Bowling Green

13                    New York, NY  10004

14

15                    May 29, 2024

16                    3:00 p.m.

17

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  JONATHAN

1    **HEARING re Discovery Conference Using Zoom for Government**

2    **(Doc # 2353, 2354, 2360)**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    **Transcribed by:  Sonya Ledanski Hyde**

Page 3

```
 1   A P P E A R A N C E S :

 2

 3   CULPEPPER LP LLC

 4        Attorneys for Badhouse Studios LLC

 5        75-170 Hualalai Road, Suite B204

 6        Kailua Kona, HI 96740

 7

 8   BY:  KERRY STEVEN CULPEPPER

 9

10   DAY PITNEY LLP

11        Attorneys for the Debtor

12        195 Church Street, 15th Floor

13        New Haven, CT 06510

14

15   BY:  JOSHUA W. COHEN

16        JONATHAN TROPP

17

18   DAY PITNEY LLP

19        Attorneys for the Debtor

20        225 Asylum Street

21        Hartford, CT 06103

22

23   BY:  MATTHEW LETTEN

24

25
```

Page 4

1    LAW OFFICE OF GREGORY A. FERREN

2         Attorneys for MCC

3         92-1063 Koio Drive, Apt. C

4         Kapolei, HI 96707

5

6    BY:  GREGORY A. FERREN

7

8    MORGAN LEWIS BOCKIUS LLP

9         Attorneys for Record Company Claimants

10        101 Park Avenue

11        New York, NY 10178

12

13   BY:  MICHAEL LUSKIN

14

15   OPPENHEIM ZEBRAK LLP

16        Attorneys for Record Company Claimants

17        4530 Wisconsin Avenue NW, 5th Floor

18        Washington, D.C. 20016

19

20   BY:  MATTHEW J. OPPENHEIM

21

22

23

24

25

```
1    AKERMAN LLP

2         Attorneys for the Debtor

3         750 9th Street NW, Suite 750

4         Washington, D.C. 20001

5

6    BY:  ILDEFONSO MAS

7

8    ALSO PRESENT:

9    LAUREN BERGELSON

10   STEPHAN E. HORNUNG

11   ALEXANDER KAPLAN

12   COREY MILLER

13   CARLY KESSLER ROTHMAN

14   STANLEY A. TWARDY, JR.

15   UDAY GORREPATI

16   TAYLOR HARRISON

17

18

19

20

21

22

23

24

25
```

Page 6

1                    P R O C E E D I N G S

2               CLERK:  Calling the matters on May 29, 2024 at 3

3    p.m.  Calling Frontier Communications Corporation, Case No.

4    20-22476.  If we could please have appearances.

5               MR. CULPEPPER:  Kerry Culpeper appearing on behalf

6    of the movie company claimants along with co-counsel Gregory

7    Ferren.

8               CLERK:  Thank you.  Go ahead.

9               MAN:  Someone.

10              MR. OPPENHEIM:  Hi, this is Matt Oppenheim.  It

11   sounds like you were calling for appearances.

12              CLERK:  Yes, I am.

13              MR. OPPENHEIM:  I appeared after you called for

14   appearances.  So, sorry about that.  Matt Oppenheim on

15   behalf of the RCCs and I believe several of my colleagues

16   will be dialing in.  And co-counsel, I see, is online.  He

17   may have already entered an appearance, Mr. Lusken, I don't

18   know.

19              MR. LUSKIN:  Michael Luskin, Morgan Lewis, for the

20   record company claimants.  Thank you, Matt.

21              CLERK:  All right, do we have any additional

22   appearances?

23              MR. COHEN:  Joshua Cohen for Frontier.

24              CLERK:  Okay.

25              MR. LETTEN:  Matthew Letten for Frontier.

1          CLERK:  Thank you.  Are those all the appearances

2     at this time?

3          MR. CULPEPPER:  Those are all the appearances on

4     behalf of the movie company claimants.

5          CLERK:  Okay.  Are there any additional parties

6     that are speaking on the record this afternoon?

7          MR. COHEN:  I think Attorney Tropp and Attorney

8     Twardy are -- joined.  I think they're just trying to unmute

9     themselves, but they'll be appearing on behalf of Frontier.

10          CLERK:  Thank you.  All right.  I'm going to pause

11     for now and I'll be back in a few.

12          (Pause)

13          CLERK:  If any parties are speaking on the record

14     this afternoon and have not given their appearance yet,

15     please unmute and state your appearance for the record.

16          Again, are there any parties that have not given

17     their appearances yet?

18          MR. COHEN:  I believe that my -- our colleagues,

19     Mr. Tropp and Mr. Twardy in -- are still having trouble

20     getting their audio to work.

21          THE COURT:  I see.  Okay.  Anyone else on the line

22     at this time that would like to make an appearance?

23          MR. MAS:  Good afternoon.  Ildefonso Mas from the

24     law firm of Akerman LLP on behalf of Frontier

25     Communications, and I do not plan on speaking today.

Page 8

1              CLERK:  Okay, thank you.

2              MR. COHEN:  I'm advised that Mr. Tropp and Mr.

3    Twardy are working to get the audio resolved.

4              CLERK:  All right, thank you.  All right, you can

5    pause for now.

6              (Pause)

7              CLERK:  Start the recording.  All right, this is

8    the final call for appearances.

9              MR. TROPP:  This is Jonathan Tropp of Day Pitney

10   for Frontier.

11             MR. TWARDY:  And Stanley Twardy from Day Pitney

12   for Frontier also.

13             CLERK:  Thank you.

14             MR. TWARDY:  We apologize for the audio problem.

15             CLERK:  No problem.  Are there any additional

16   appearances?

17             MR. OPPENHEIM:  On behalf of the record company

18   claimants, my colleagues, Alex Kaplan, Lauren Bergelson,

19   Carly Rothman, and Corey Miller are also on the line.

20             CLERK:  All right, thank you.

21             MR. OPPENHEIM:  Sorry, as is Audrey Adu-Appiah.

22             CLERK:  Thank you.

23             MR. FERREN:  And my name is Greg Ferren.  I work

24   with Kerry Culpepper representing the movie company

25   claimants.

Page 9

```
 1            CLERK:  Okay.  Thank you.  All right, I believe

 2     that's everyone.  We're not waiting on anyone; is that

 3     correct?

 4            MR. COHEN:  It's correct.  From Frontier.

 5            CLERK:  Frontier.  Okay.

 6            THE COURT:  All right.  This is Judge Glenn.  Can

 7     everyone hear me?  Because I'm having some problems with my

 8     audio equipment this afternoon.

 9            MR. OPPENHEIM:  Yes, Your Honor

10            MR. TROPP:  Yes, Your Honor.

11            THE COURT:  All right.  So, we're obviously here

12     in connection with a discovery conference in Frontier, 20-

13     22476.  Let me hear from Mr. Oppenheim first.  Go ahead.

14            MR. OPPENHEIM:  Good afternoon, Your Honor.  I

15     believe we have two issues before us today.  The first is an

16     issue with respect to privilege and the other is an issue

17     with respect to Frontier's responses to the RCC's request

18     for admission, and with your permission, I'll address the

19     privilege issue first and then allow any response on that

20     issue before turning to the RFA issue.

21            Your Honor, on the --

22            MR. TROPP:  Your Honor?  I'm sorry to interrupt.

23            THE COURT:  Don't interrupt, please.

24            MR. TROPP:  It's  -- I was seeking a point of

25     clarification if I may?
```

1              THE COURT:  What's your point of clarification?

2              MR. TROPP:  Thank you, Your Honor.  Jonathan Tropp

3      for Frontier.  My understanding is that the only issue on

4      the agenda for today is --

5              THE COURT:  Mr. Tropp --

6              MR. TROPP:  -- the privilege issue --

7              THE COURT:  I don't want to hear any more from you

8      right now.  Mr. Oppenheim, please go ahead.  Don't interrupt

9      someone when they're speaking.

10             MR. TROPP:  I apologize.

11             THE COURT:  Go ahead, Mr. Oppenheim.

12             MR. OPPENHEIM:  Thank you, Your Honor.  As our --

13     sorry, I'm getting a little echo.  Just a moment.  As our

14     submission, I believe sets forth, Your Honor, Frontier in

15     response to the RCC discovery request promulgated a very,

16     very, very extensive privilege list that included, I

17     believe, well, over 1,800 documents, and many of which the

18     record company plaintiffs have significant concerns with.

19     And we believe that notwithstanding the response by Frontier

20     to our letter in which they agreed with us on the legal

21     principles that they are -- their approach to addressing

22     privilege here is fundamentally flawed for two reasons.

23             First, that we don't believe that there is an

24     attorney-client or work product privilege in the first

25     instance, for many of these documents.  We believe that

Page 11

1    these documents were related to the business operations of

2    Frontier do -- and do not rise to the level of meriting

3    privilege protection.

4           Secondly, even if they were to rise to the level

5    of being privileged, either under attorney -- as an

6    attorney-client communication or as work product, we believe

7    that Frontier has waived that privilege under the clear

8    Second Circuit law here.  So, if I may address each of those

9    in turn, Your Honor.

10          So, in the first instance, Frontier tells us that

11   they don't dispute the principle that implementing a repeat

12   infringer policy is a business operation and not legal

13   advice.  And that is, it's useful that they agree with us on

14   the principle.  There -- then the application of this

15   principle to their documents, we believe, has been drawn

16   much, much too narrowly because Frontier's application of

17   their policy does not -- is not limited to just whether or

18   not they terminated a specific infringer.

19          The question -- the questions at issue in this

20   case go far deeper.  It's how did they respond to

21   infringement notices generally, what was their process, both

22   generally and specifically with respect to particular

23   infringers.  And on that front, what we see over and over

24   and over again is that Frontier will put forward the fact

25   that they claim that they terminated somebody but refuse to

Page 12

1    disclose any of the discussion that went into the decision

2    to terminate them, or they will show us that they didn't

3    terminate somebody and refuse to show us whether -- why they

4    decided not to terminate.

5            And finally, there are many, many documents

6    withheld on the (audio glitch) which speak to their process

7    internally for dealing with infringement notices and what

8    their thinking was when they set up the system and when they

9    received the notices.  The caselaw coming out of the Second

10   Circuit gives us guidance here.

11           The In re:  County of Erie case tell us that the

12   question of when a lawyer is functioning as a lawyer as

13   opposed to something else can be determined by looking at

14   whether there was legal advice provided.  And legal advice

15   involves the interpretation and application of legal

16   principles to guide future conduct or to assess past

17   conduct.  It requires a lawyer to rely on legal education

18   and experience to inform judgment.

19           Now, in the case of Frontier, Mr. Paul Garcia is

20   the gentleman who is in the center of all of this.  Mr.

21   Garcia, from all we can tell, built and operated Frontier's

22   entire repeat infringer system and Frontier acknowledges

23   this in their response.  And they say, well, Mr. Garcia wore

24   multiple hats.  On the one hand, he was on the DMCA

25   committee.  On the other hand, he's also responsible for

Page 13

1    overseeing litigation.

2              Well, let's break that down, Your Honor.  With

3    respect to Mr. Garcia's role on the DMCA committee, that's a

4    role that's not typically handled by a lawyer at other ISPs.

5    And we've seen this in other cases.  The individual who's

6    responsible for running the program to respond to

7    infringement notices has typically been somebody who doesn't

8    need legal training, because it's not -- it's a business

9    function.  It's not a legal function.

10             It -- there is nothing within the Digital

11   Millennium Copyright Act or any of the law that tells you

12   how you should build and operate your repeat infringer

13   program.  So, when Mr. Garcia is investigating what a repeat

14   infringer's history is and discussing whether to terminate

15   that subscriber, he's neither applying legal principles to

16   guide conduct nor using anything that would -- he would have

17   learned in law school, that's for certain.

18             THE COURT:  May I ask you this --

19             MR. OPPENHEIM:  Yes.

20             THE COURT:  -- Mr. Oppenheim?  Are there -- are

21   minutes kept of meetings of the DMCA committee?

22             MR. OPPENHEIM:  So, the answer is, we are not

23   aware of minutes kept.  We are aware that Mr. Garcia

24   apparently took extensive notes on yellow legal pads.  None

25   of those have been produced.  We have been told that they

Page 14

1    are nonresponsive and so we have not seen any of them.

2            THE COURT:  How are the decisions of the DMCA

3    committee documented?

4            MR. OPPENHEIM:  We do not know, Your Honor.  We

5    know that there is documentation going into the meeting

6    where non-lawyers are asked to prepare spreadsheets that

7    identify either 10 or 15 subscribers who will be eligible

8    for potentially being terminated.  And for most of the

9    period as we understand it right now, for the claims in this

10   case, Frontier capped the number of subscribers it would

11   potentially terminate at 10 or 15 each quarter.  And so,

12   they would get this spreadsheet of the 10 or 15 worst

13   offenders, and that that would be the basis for the

14   discussion at the quarterly meeting.

15           Now, we've been told that there's this DMCA

16   committee in correspondence with opposing counsel, but when

17   we asked individuals in deposition who were apparently on

18   this DMCA committee if they were on it, they all say, what

19   is the DMCA committee?  What is the DMCA team?  So, I don't

20   even know that it uses that name, Your Honor, but it was a

21   group of individuals who met each quarter.  It was run by

22   Mr. Garcia and he apparently made almost all of the

23   decisions.

24           THE COURT:  Do you know who the members of what

25   may be called a committee and may not be called a committee?

Page 15

```
 1              MR. OPPENHEIM:  We know who we believe attended

 2    the meetings, Your Honor.  How's that for an answer?  And

 3    we've taken the deposition of two of them, I believe.  I'm

 4    just making sure I get the numbers right.

 5              THE COURT:  How many (indiscernible) meeting?

 6              MR. OPPENHEIM:  I believe at most we've -- and I

 7    believe the, the individuals may have changed slightly over

 8    time, but I believe we've identified a total of five people

 9    who may have been involved.  But some came and went.

10              THE COURT:  Have you received any documents that

11    show who the members of the committee were at various points

12    in time?

13              MR. OPPENHEIM:  No, Your Honor.  Nothing that

14    clear.

15              THE COURT:  Have you asked for it?

16              MR. OPPENHEIM:  We have certainly asked for all of

17    the documents related to this, the quarterly meetings and

18    the DMCA team.  Yes, we have, Your Honor.

19              THE COURT:  Let me -- here, let me try and cut

20    through this.  I'll let you continue with your argument in a

21    minute.  I mean, I've always found, even when I was in

22    practice, that the most difficult -- among the most

23    difficult privilege issues was when a lawyer wore two hats,

24    business hat and a lawyer.  When I read the letters from

25    each side, they purport to rely on the same legal principles
```

1     and it seems to me that these issues may really be factual.

2     I don't know how many members of the committee.  I don't

3     know -- do they document -- when a decision is made to

4     terminate a subscriber, how is that decision documented?  Do

5     you know that, Mr. Oppenheim?

6          MR. OPPENHEIM:  We know that there is somebody

7     from a different group than the technical group and a

8     different group from the legal group that's tasked with

9     implementing the termination.  We know that that -- the

10    people from that group who participate in the meeting say

11    they exercise no judgment at the meeting.  They don't even

12    often read the documents before the meeting, and the -- the

13    task of actually terminating the subscribers takes less than

14    five minutes.

15         THE COURT:  So, is there some document prepared

16    that explains the reasons for terminating or not terminating

17    people who are considered at meetings?

18         MR. OPPENHEIM:  You just hit the heart of the

19    issue, Your Honor.  In other cases, what we have seen is

20    that ISPs will have a number of notices at -- that you hit a

21    number of notices and then a subscriber is terminated.  Now,

22    that that number may have changed over time.  They may have

23    counted notices differently.  Put all that issue aside, they

24    had some threshold that if you were the subject of, say, in

25    Cox's case, you know, it started at seven, but then they

Page 17

1    went up to 13, over time.  Notices, at 13 notices you were

2    terminated.

3            Frontier has no threshold at which you are

4    terminated.  We know -- and this will come out when we

5    discuss the RFAs, Your Honor.  They had policies at which

6    there were a certain number of notices that would trigger an

7    email notification to the subscriber though that email

8    notification rarely went to the subscriber, we understand.

9    And then they had what was called a walled garden at 100

10   notices, which was later reduced, I believe, to 50 notices.

11           And then -- but termination would only happen

12   because of the quarterly meetings.  And presumably it was

13   the 10 or 15 worst offenders who would all be well over 100

14   notices.  The circumstances which would determine whether or

15   not somebody was terminated is entirely in Mr. Garcia's

16   head, from what we can tell, and the only way we can

17   determine whether he exercised those -- that authority in

18   any rational way is to see the documents.

19           So, if you look, for example, Your Honor, at some

20   of the attachments to our letter and we've shown some of the

21   redactions -- so these are not documents where they withheld

22   the entire document, but some of the redactions -- what you

23   see is that they're withholding the actual discussion about

24   what to do with the subscriber.  They'll show that there's

25   an issue with respect to a subscriber and they'll show the

Page 18

1   ultimate outcome, but the entire internal discussion, they

2   have redacted.

3           So, Exhibit C for example, Your Honor, which is --

4   I'll put -- give a Bates number just so it's clear on the

5   record.  I believe it starts with Frontier 00036728.  Is an

6   email exchange that starts with something from Mr. Elmore

7   who was on the -- we believe on the DMCA committee, a

8   critical person from the IT side, emailing -- strike that,

9   I'm sorry.

10          It starts with Mr. Garcia.  Looks like it was sent

11  to Mr. Elmore and there's back and forth, the entirety of

12  which is redacted.  All of the initial emails are redacted

13  and then what you see later is a discussion about certain

14  customers that they are considering for termination.

15          THE COURT:  Let me stop you there.  How many

16  members of the committee have you deposed?

17          MR. OPPENHEIM:  One of the -- so, I believe one,

18  Your Honor, and one for just document custodian purposes,

19  his substantive deposition will be happening, I believe next

20  week.

21          THE COURT:  I -- the custodian's deposition is

22  taken next week or the member's deposition is next week?

23          MR. OPPENHEIM:  We took one member substantively

24  and this is the person -- this is the individual whose team

25  was responsible for effectuating the terminations.  She knew

Page 19

1   nothing.

2          THE COURT:  When you say she knew nothing, did you

3   ask her what the reasons were for terminating subscribers?

4          MR. OPPENHEIM:  She -- Your Honor, she didn't even

5   know what the policy was.  She didn't get involved in it.

6          THE COURT:  -- question.  You deposed her.  She

7   was at meetings.  You -- and I take it she was at meetings

8   when a decision was made to terminate subscribers; is that

9   correct?

10          MR. OPPENHEIM:  Yes, I believe she was, Your

11   Honor.  Or one of her (indiscernible).

12          THE COURT:  Did you ask her why decisions were

13   made to terminate subscribers?

14          MR. OPPENHEIM:  I didn't ask it like that, Your

15   Honor.  I asked her to describe the meetings and she

16   couldn't recall anything about them.  And so -- and she had

17   no -- and I don't -- while other witnesses we've had issues

18   with where their spotty recollection seems convenient, with

19   her I believe it was completely forthcoming and honest.  And

20   she literally said she --

21          THE COURT:  (indiscernible).  Where's his office?

22   Where's Mr. Garcia's office?

23          MR. OPPENHEIM:  In Connecticut, Your Honor, I

24   believe.

25          THE COURT:  Mr. Oppenheim, here's my problem in

1    resolving this issue.  Look, I've read the cases you've

2    cited in your letter.  I dealt with this issue years ago in

3    practice.  And I always thought that one of the most

4    difficult issues -- and, you know, fundamentally, I think

5    Frontier doesn't really dispute the legal principles.  When

6    you have a lawyer sitting on a business committee that

7    making -- that's making decisions, the lawyer's wearing two

8    hats.

9         It may be that some of what the lawyer says to the

10   committee, to other committee members is legal advice and

11   some of it reflects a business decision.  If he's a member

12   of the committee and has a vote on the committee, he's

13   acting in the capacity as a businessman, it's not privilege.

14   And I don't feel that I have enough facts to resolve this

15   dispute, which really raises the question, what do I do now?

16        So, one point I've been considering, I'm not ready

17   to order yet, is, yes, you know, you're -- so I have in

18   front of me your May 13th letter.  And you know, you talk

19   about some of what happened.  You cite some legal authority.

20   I'm familiar with some of these cases.  I've read other

21   cases, you know, leading up to today and I don't -- I'm --

22   you know, what I'm inclined to do is give both sides a

23   relatively short time to file one additional round of letter

24   briefs addressing the issue of privilege where a lawyer is

25   also serving in a business capacity.

Page 21

```
 1            And, you know, I would say, take Mr. Garcia's
 2    deposition.  I mean, I -- (indiscernible) bring him to
 3    Court.  Let him sit in the witness chair.  Ask his questions
 4    and -- but take his deposition.  I'll read the transcript.
 5    If they assert privilege as a basis for not answering, I'll
 6    resolve it.
 7            So, look, I'm reading from your May 13th letter on
 8    page 2.  You say, in the third full paragraph, "Frontier's
 9    assertion of privilege is unfounded for four reasons.
10    First, Frontier's internal communications regarding its
11    business decisions, implementing its repeat infringer policy
12    are not privileged because they are not legal advice."
13            Well, that may be right.  It may not.  The
14    attorney -- and reading on.  The attorney-client privilege
15    is, "triggered only by a client's request for legal as
16    contrasted with business advice."
17            Yes, I've read the Second Circuit's grand jury,
18    you know, subpoena decision that you cite.  And then you go
19    on and say communications with counsel "that principally
20    involved the performance of nonlegal functions by an
21    attorney are not protected."  You cite ABN Amro, the
22    District Court decision.  I've read that.  And that may be
23    the situation here, it may not.  I don't know.  I'm not
24    satisfied by it.
25            Yes, and you go on in the next paragraph to talk
```

Page 22

1    about the Cox Communicate -- Fourth Circuit Cox

2    Communications decision.  And I've read that multiple times,

3    including I looked back at it today.  So, I'm in a bit of a

4    loss.  It seems -- look, I rarely try, as you've all

5    experienced so far, I try to resolve discovery disputes in

6    Zoom hearings like this.

7            And I think I probably have said to you all

8    because I've said this to others in other cases, sometimes

9    when the issues are privilege issues, I'll ask the parties

10   to file letter briefs addressing the issues and we'll have

11   another hearing.  And I -- while Frontier has alluded to the

12   legal principles that apply, I don't think they've applied

13   and attempted to apply them to the facts here.

14           And what I don't -- I try to avoid, and it may be

15   unavoidable in this, is, you know, I told you a couple of

16   times on other issues, go take the deposition and sometimes

17   you have.  Okay?  I'm -- and I've expressed this before.

18   I'm very concerned by the amount of time this case is taking

19   to move forward.  But you know, whether it's Mr. Garcia or

20   one other member of -- serve a 30(b)(6).

21           If you serve a 30(b)(6) notice and they tender a

22   witness on the DMCA committee and you list the topics you

23   want to talk about and they serve somebody who doesn't know

24   anything about it, well, that's going to wind up with

25   sanctions. Okay?  They better -- you serve a 30(b)(6) notice

Page 23

1   and you identify the specific topics, they better provide

2   you with a witness with knowledge.

3          And if you want, take Mr. Garcia's deposition.  I

4   mean, I think it's always a difficult problem for me as a

5   judge and it was as a lawyer when I had lawyers wearing two

6   hats.  That's a fact intensive issue that I don't feel

7   comfortable weighing in on, on really just a bunch of

8   letters.  I don't have a factual record on which to do it.

9   I'm troubled on this and some other things we'll talk about

10  in a little while, about seemingly most issues being dragged

11  out here with letter writing wars, et cetera.

12          And there may be on some other issues, I'm going

13  to put a stop to it.  But this is a serious issue.  I mean,

14  look, the one thing that's clear -- Frontier better

15  understand this -- as the record now stands, I may not

16  permit Mr. Garcia to testify, period, at trial.  Okay?

17  They're not going to sit back and refuse production of

18  information and letters and then turn around and they've

19  suggested, well, they plan to call him at trial.  And I just

20  may not permit it.  And who they're going to put up, I don't

21  know.  But we're not at that point yet.

22          I think reluctantly, I don't feel I can resolve

23  this issue today based on the correspondence.  You both pay

24  lip service to the same legal principles.  And the dispute

25  is, what hat was Mr. Garcia wearing when he did what?  So,

Page 24

1    if there's no documentation, I mean, look, I would think

2    that if they're going to terminate subscribers, somebody has

3    got somebody who's not a lawyer has gotten notes about why

4    specific subscribers were terminated.

5           And all I can say is the RCC is entitled to know

6    exactly why.  Okay, and it can't be because a lawyer said --

7    gave legal advice and consequently, we just decided to

8    terminate, but we won't tell you what the legal advice is.

9    What that may result in is I preclude everybody from

10   testifying from Frontier about it.  Okay?  There's got to be

11   a record on this.  I'm not going to hesitate to issue

12   preclusion orders if they try to hold back.

13          I'm sure they're smart enough to know that they're

14   not going to suddenly say, all right, we're going to present

15   -- yes, during discovery, we asserted attorney client

16   privilege but we now want to call somebody as a witness to

17   testify about -- legally, that isn't going to happen.  I

18   think they know that.  But -- so, I'm just -- look, if you

19   want to take Mr. Garcia's deposition first, let them

20   instruct him not to answer, ask your questions.

21          Get a clear -- as clear a record as you can.  I

22   will have you each file letter briefs addressing the

23   specific issues and we'll get it resolved quickly, but I

24   just don't feel like, based on the letters -- I read all

25   these letters.  I got a pile of letters in front of me.

Page 25

```
 1    I've read all the cases you've cited.  Some of them I'd read

 2    before.  I don't know what else to tell you, Mr. Oppenheim.

 3    I just -- I -- look, I'm not ready today to say turn over

 4    all of these alleged privileged documents to me for an in

 5    camera review.

 6            I've done that in other cases.  I'm not prepared

 7    to do that today.  I will, if it comes to that, I will

 8    consider appointing an expert on privilege.  You know,

 9    there's -- I'm not supposed -- bankruptcy judges in our

10    rules, we don't have rules on appointing special masters.  I

11    think some of my colleagues have -- what they've done in the

12    past is, I can appoint an expert.

13            I can appoint an expert on attorney-client

14    privilege and ask that all documents be provided to the

15    expert for in camera review.  I -- what I'm -- what I want

16    to do, Mr. Oppenheim, I don't want to put myself in the

17    position where I've read all this stuff in camera and then

18    somebody says, well, judge, you can't, you got to recuse

19    yourself.  You can't try this case because you've been

20    exposed to this attorney-client privileged information.

21            So, I will seriously consider appointing an expert

22    to review and report and have the costs split initially and

23    then chargeable to whoever loses, you know.

24            MR. OPPENHEIM:  Your Honor -- I'm sorry.

25            THE COURT:  Go ahead, Mr. Oppenheim.
```

Page 26

1              MR. OPPENHEIM:  I have two really important points

2    to make, if I may.  One on the deposition that you suggested

3    of Mr. Garcia and the other on waiver issue.  And let me

4    start with the waiver issue.  We actually disagree on the

5    law here, Your Honor.  We don't agree.  So, the critical

6    issue is that the way Frontier sees it is they cite to the

7    In re:  Residential Capital case.  It's one of your

8    decisions --

9              THE COURT:  Oh, I -- yeah.

10             MR. OPPENHEIM:  And it's a very limited New York

11   State law application of waiver.  And what they're saying

12   is, at issue waiver only occurs when they're asserting a

13   defense where they're relying on the privileged materials.

14   And otherwise, it doesn't come into play, but that's not the

15   law for this case.  This is a copyright case and federal law

16   applies and the Bilzerian case controls and that case

17   actually gives us a roadmap of how to handle this situation.

18   That case, Your Honor, the Second Circuit --

19             THE COURT:  What case are you talking --

20             MR. OPPENHEIM:  The Bilzerian case.  It's --

21             THE COURT:  What's the cite?

22             MR. OPPENHEIM:  United States v. Bilzerian, sorry,

23   I'm -- 926 F.2d 1285.

24             THE COURT:  Okay.

25             MR. OPPENHEIM:  And this is a case where a

Page 27

1    defendant wanted to come forward and describe his good faith

2    in how he structured certain securities transactions.  Much

3    more your world, Your Honor, than mine.  But I understood it

4    enough to say that when the Court said, that's fine, but if

5    you do that, the United States gets to inquire about what

6    you knew about what was right and wrong under the law in

7    your communications with your lawyers about how to structure

8    these things.

9            So, if you're going to testify as to good faith,

10   that opens the door and waives the privilege.  And they

11   said, well, we're not going to rely on the privileged

12   communications and the Court said, it doesn't matter.  You

13   have to give the opposing counsel the opportunity to see the

14   documentation and get the information to cross examine you

15   on your assertion of good faith.

16           And the Court speaks about the critical need to

17   not allow somebody to use, you know, attorney-client

18   privilege as both a shield and a sword, which is exactly

19   what is likely to happen here, if all we do is go forward

20   with a deposition.  I have no doubt Mr. Garcia, as a well-

21   spoken, well-educated, well-heeled counsel is likely to in a

22   deposition, articulate reasonable grounds now for what he

23   did.  But we have a right to see whether he actually did

24   that, because we don't think he did.

25           We think that if we see the documents, we will

```
 1    have the opportunity to cross examine him on those decisions

 2    and show that the yarn he spins is not accurate and just

 3    taking his deposition -- and now I'm transitioning into my

 4    second point, Your Honor -- doesn't accomplish the issue

 5    here.  Because he will get to say whatever he wants about

 6    acting reasonably in appropriate circumstances.  Here are

 7    the factors we considered, Your Honor.

 8              But if we look at the emails, we may see they

 9    didn't look at those factors.  They looked at other factors

10    or they didn't care.  And we -- if they are going to assert

11    the safe harbor, they're putting their conduct at play.

12    They don't get to shield that conduct and those

13    communications about that conduct in privilege.  And that's

14    what Bilzerian says.

15              THE COURT:  What -- I just opened Bilzerian on my

16    screen.  What page are you referring to?

17              MR. OPPENHEIM:  Well, the discussion starts with

18    what happened at the trial on page -- let's see, what's the

19    pagination here.  One moment.  Sorry, Your Honor.  There's a

20    heading called the trial which talks about that it was an in

21    limine motion, and it's -- for some -- oh, 1291, Your Honor.

22              THE COURT:  All right, hold on.

23              MR. OPPENHEIM:  -- by discussing the motion in

24    limine.

25              THE COURT:  Give me -- all right, I'm on 1291.
```

```
 1    Yeah.  What are you pointing to?

 2              MR. OPPENHEIM:  So, where you -- this is just the

 3    factual basis to understand what happened.  In the section

 4    titled, The Trial, it talks about at trial --

 5              THE COURT:  What page?

 6              MR. OPPENHEIM:  -- seeking a ruling permitting him

 7    to testify.

 8              THE COURT:  What page?

 9              MR. OPPENHEIM:  This is the 12 -- I believe it's

10    1291, Your Honor, still.

11              THE COURT:  Hold on.  Give me a moment to switch

12    back.

13              MR. OPPENHEIM:  There's a paragraph that starts,

14    "At trial, the defendant argued."

15              THE COURT:  All right, challenges of the conduct

16    of the trial.  Yeah.

17              MR. OPPENHEIM:  Right.  So, that's describing how

18    the issue arose.  And then when you -- when you go forward,

19    Your Honor, to Page 1292 --

20              THE COURT:  Yes.

21              MR. OPPENHEIM:  -- there's a paragraph, it starts

22    with the word "however."  "However, the attorney-client

23    privilege."  It talks about sword and shield.

24              THE COURT:  Yes.  I'm there.

25              MR. OPPENHEIM:  And it says that the defendant may
```

Page 30

1   not use the privilege to prejudice his opponent's case or

2   disclose some selected communications for self-serving

3   purposes.  Thus, the privilege may implicitly be waived when

4   the defendant asserts a claim that in fairness requires

5   examinations of the protected communication.

6           THE COURT:  Well, that's the point.  I'm not yet

7   persuaded that the privilege is being asserted in a way that

8   would prevent the Court from judging the fairness of the

9   policy and how it was implemented.

10          MR. OPPENHEIM:  Well -- I'm sorry.

11          THE COURT:  I don't know that right now.  Okay?  I

12  hear what you're arguing.  I didn't read Bilzerian before

13  you just pointed it out to me.  I'll make sure I read the

14  whole thing.

15          MR. OPPENHEIM:  And if you go to the bottom of

16  1293, there's a paragraph that starts, "Bilzerian asserts."

17          THE COURT:  Yes.  "Bilzerian asserts the Court

18  ruled that even his own testimony regarding the steps he

19  took to change the structure of his financing arrangements

20  would waive the privilege."

21          THE COURT:  Well, it might lead me to preclude

22  Garcia from testifying.

23          MR. OPPENHEIM:  So -- well, so the analogy here --

24  and actually there is a perfect analogy, which is the

25  structure of their DMCA program.  They want to put forward

Page 31

1    that they had a structure to deal with DMCA infringement

2    notices, right?  That at some point in time, they emailed

3    the subscribers.  At some point in time, they built -- had

4    a, a walled garden.  At some point in time, they would

5    consider termination.

6              They want to put this whole thing forward as their

7    defense both to the -- on the safe harbor and to liability.

8    And yet, they will not allow us to examine the documents

9    that show how they implemented that program.  And it's

10   document after document after document.  And if you look --,

11   and God knows, you don't really want to look at his

12   privilege list because it's enormous.

13             But document after document after document on that

14   privilege list is about the specific quarterly meetings.

15   It's about specific subscriber issues.  It's not about, boy,

16   did you see that interesting decision on the DMCA which

17   would be potentially privileged -- potentially?  It's about

18   how they implemented their program.  So, you know, I can

19   take -- and we're scheduled to take Mr. Garcia's deposition.

20   He's been designated on the vast majority of subjects and

21   we're going to take his deposition on the last two days of

22   discovery.

23             It's been a puzzle trying to get all the

24   depositions in place, but we've done it, I think, and I'll

25   take his deposition.  But without all of the documents to

Page 32

```
 1    examine whether or not his testimony is consistent with the
 2    documents, we're essentially being forced to take a
 3    deposition blindfolded.  I can show you several documents,
 4    Your Honor, if you like, that I think make the point.
 5              THE COURT:  Well --
 6              MR. OPPENHEIM:  -- you probably --
 7              THE COURT:  I'll give you a chance to argue
 8    further, but let me hear from the other side first, okay?
 9              MR. OPPENHEIM:  Thank you, Your Honor.
10              THE COURT:  Who's going to argue for Frontier?
11              MR. TROPP:  Jonathan Tropp, Your Honor.
12              THE COURT:  Go ahead.
13              MR. TROPP:  I'm not sure what I might at this
14    point add to the conversation.  I think that Your Honor is
15    exactly correct that the parties are espousing the same
16    principles and that Frontier has endeavored mightily to
17    apply those principles in an appropriate way.  We are not
18    using the privilege as a sword and a shield.
19              THE COURT:  Let me ask you --
20              MR. TROPP:  This is a very, very --
21              THE COURT:  How do you intend to defend Frontier's
22    DMCA policy?
23              MR. TROPP:  Your Honor, we've produced thousands
24    of documents that show --
25              THE COURT:  I didn't ask that question.  I didn't
```

Page 33

1  ask that question.  Let's assume we go to trial next week.

2  How do you intend to try to persuade the Court as to the --

3  as to Frontier's DMCA policy, the reasonableness of it?

4            MR. TROPP:  Through the testimony of Mr. Garcia

5  and others on the committee and the documents that --

6            THE COURT:  Who else is on the committee?  I want

7  -- give me the list of the names of the people on the

8  committee.

9            MR. TROPP:  The three members of the committee who

10  in recent years have performed the function are Mr. Garcia,

11  Mr. Philippe Levan, and Mr. Josh Elmore.

12            THE COURT:  Levan -- how do you spell Levan?

13            MR. TROPP:  L-E-V-A-N.

14            THE COURT:  Are Mr. Levan or Mr. Elmore lawyers?

15            MR. TROPP:  No, sir.

16            THE COURT:  And what do you anticipate Mr.

17  Garcia's testimony to be?

18            MR. TROPP:  Mr. Garcia will discuss the structure

19  of the program and the way that it was implemented including

20  the fact that Frontier tracked notices of infringement,

21  evaluated the behaviors or accusations made against its

22  subscribers over the course of time.  When subscribers came

23  to the attention of the committee for evaluation, there were

24  documents that were presented to the committee that

25  described the facts related to the subscriber's account and

Page 34

1    the accusations made against the subscriber.  The committee

2    met, discussed, and made decisions.  There were no minutes

3    taken, Your Honor, and terminations when appropriate were

4    then performed.

5              THE COURT:  Were the terminations documented?  I

6    mean, was there anything in the record that showed the

7    reasons for decision to terminate?

8              MR. TROPP:  No, Your Honor.  They're not withheld.

9    They just don't exist.

10             THE COURT:  And was it done by vote of the three

11   members of the committee, the decision to terminate?

12             MR. TROPP:  It was done -- I apologize.  It was

13   done in discussion.  I'm not aware of formal votes.  As I

14   said, there were no minutes taken.  There's nothing recorded

15   that says this is a 2 to 1 vote.

16             THE COURT:  And this is a business decision made

17   by the committee to terminate people because they violated

18   the Frontier's DMCA policy?

19             MR. TROPP:  That's correct.  And Mr. Garcia, Mr.

20   Levan, and Mr. Elmore will testify about it as asked.

21             THE COURT:  Okay.  And so mister -- no privilege

22   will be asserted as to Mr. Garcia's consideration of whether

23   or not to terminate any subscribers; is that correct?

24             MR. TROPP:  That's correct.

25             THE COURT:  Can you tell me how many subscribers

```
 1    in total were terminated for violation of the DMCA policy?

 2               MR. TROPP:  I don't know the precise number, Your

 3    Honor.  It's --

 4               THE COURT:  Give me an approximate.

 5               MR. TROPP:  -- something around the order of 450

 6    to 500.

 7               THE COURT:  And with respect to all of those 450

 8    to 500 subscribers, Mr. Garcia, Mr. Levan, and Mr. Elmore

 9    were the members of the committee that made the decision to

10    terminate; is that correct?

11               MR. TROPP:  No, not entirely, Your Honor.  In

12    recent years, that has been the committee.  Mr. Garcia

13    joined the company in 2018.  He assumed responsibility for

14    participation in the committee over time, and before that

15    John Greifzu, attorney John Greifzu  was in that role --

16               THE COURT:  Spell that.

17               MR. TROPP:  -- and there were others.

18               THE COURT:  How do you spell his last name?

19               MR. TROPP:  G-R-E-I-F-Z-U.

20               THE COURT:  Say it again.  I'm sorry.

21               MR. TROPP:  G-R-E-I-F-Z-U.  Mr. Greifzu is

22    scheduled to be deposed on June 11th.  Mr. Levan is

23    scheduled to be deposed on June 5th.  Mr. Elmore -- I'm

24    sorry, Mr. Elmore is scheduled to be deposed on June 5th.

25    Mr. Levan is scheduled to be deposed on June 6th, I believe.
```

1          THE COURT:  And so, there are no minutes that

2     reflect any of the discussions or reasons for the

3     termination of any of the subscribers; is that what you're

4     telling me?

5          MR. TROPP:  There are no minutes that are being

6     withheld, Your Honor.  There are no minutes.

7          THE COURT:  I didn't ask if there were any being

8     withheld.  Are there any minutes of any of the decisions of

9     the DMCA committee to terminate subscribers?

10          MR. TROPP:  There are no minutes, Your Honor.

11          THE COURT:  Are there any documents or minutes

12     that reflect any -- the reasons for not terminating

13     subscribers who were discussed at DMCA meetings?

14          MR. TROPP:  I don't honestly know, but to the

15     extent that they exist, they would have been produced.

16          THE COURT:  And I take it then that you agree that

17     the decisions of the DMCA committee, whoever the members

18     were at the time, to either terminate or not terminate are

19     business decisions that are not protected by attorney-client

20     privilege?

21          MR. TROPP:  That is the position that we -- that

22     is the rule that we applied in evaluating privilege.  Your

23     Honor, if I may, there are privilege issues that exist in

24     this case.  Obviously, there's a lengthy privilege log.

25     It's important for the Court to understand that for the last

Page 37

1    three years or so, this committee has also -- has been

2    operating within the context of a litigation.  Mr. Garcia,

3    as has been discussed, wears more than one hat.

4          If he was performing his role on a DMCA committee,

5    we produced the documents.  But Mr. Garcia sometimes came

6    out of the committee and had an idea about how he would like

7    to defend this case, and so he might have veered off from a

8    conversation about how to handle a particular subscriber and

9    asked for research to be done to support a legal theory.

10          THE COURT:  Well --

11          MR. TROPP:  -- with respect to the defense --

12          THE COURT:  Were these discussions with other --

13    with the other committee members or were these discussions

14    between Mr. Garcia and other inside or outside counsel?

15          MR. TROPP:  It could have been both, Your Honor.

16          THE COURT:  Well, I certainly didn't understand

17    from your earlier remarks that any of the discussions

18    between Mr. Garcia and the other committee members were

19    attorney-client privileged communication.  I specifically

20    asked whether his discussions with the committee members,

21    the other committee members, were business discussions as to

22    whether or not to terminate members.  And you answered that

23    yes.  You didn't say --

24          MR. TROPP:  Yes --

25          THE COURT:  -- those discussions were privileged

Page 38

1    communications.  You told me (audio glitch) they were

2    business decisions.

3              MR. TROPP:  Your Honor, I understood your question

4    to be as you just stated it.  If the discussion was with

5    respect to the termination of a subscriber, we treated that

6    and understood that to be a business decision and we did not

7    withhold it.  If Mr. Garcia had a subsequent idea or a

8    related idea, not about the termination of a subscriber, but

9    about how to defend this litigation, that was treated as

10   work product and/or privilege.  That's a different kind of

11   an analysis.

12             THE COURT:  -- with the other committee members,

13   maybe?

14             MR. TROPP:  Yes, Your Honor.

15             THE COURT:  What position was Mr. Levan?

16             MR. TROPP:  Mr. Levan is an engineer, as I

17   understand it.

18             THE COURT:  What does he have to do with defending

19   this lawsuit?

20             MR. TROPP:  Your Honor, Mr. Garcia depended upon

21   Mr. Elmore and Mr. Leon to provide to him facts about the

22   case.  So, for example, if Mr. Garcia wanted to know not how

23   to treat Mrs. Jones and whether to terminate Mrs. Jones, but

24   how many people were like Mrs. Jones and what Frontier ought

25   to understand the implications of the fact that there were 1

1    or 500 or 5,000 like Mrs. Jones in order to understand the

2    claims being made against it in this case, Mr. Garcia would

3    turn to Mr. Elmore or to Mr. Levan and ask for them to help

4    him develop facts to assist in the defense of this

5    litigation.

6             THE COURT:  What was Mr. Elmore's position or what

7    is Mr. Elmore's position?

8             MR. TROPP:  I believe he's a network engineer.

9             THE COURT:  Wasn't it a relevant consideration to

10   make a business decision whether to terminate a subscriber

11   to know how many other subscribers were similarly situated

12   with similar numbers of infringement notices?  Isn't that a

13   business decision?

14            MR. TROPP:  I don't believe that that was one of

15   the factors that was considered, but I can't tell you all

16   the things that the committee considered.  I can tell you

17   that we would distinguish between when the committee does

18   that for the purpose of evaluating what to do with a

19   specific subscriber, in which case we would have produced it

20   or generated that information for the purpose of defending

21   this litigation, which -- in which case, we would have

22   withheld it.

23            THE COURT:  How can you separate out?  If this is

24   the committee that decides who to terminate and who not to

25   terminate, how can you separate out their discussions of oh,

Page 40

1    my gosh, if we terminate him, we got 3,000 others, we got to

2    terminate, and that'll cost us a lot of money in revenue.

3    Why isn't that also a business decision?

4              MR. TROPP:  That would have been, but we didn't

5    withhold anything like that, Your Honor.

6              THE COURT:  Anything else you want to add, Mr.

7    Tropp?

8              MR. TROPP:  One other, perhaps relevant piece of

9    information.  So, in addition to the complex work product

10   issues in the case, in addition to the complexity of trying

11   to figure out which hat Mr. Garcia or Mr. Greifzu may have

12   been wearing at a particular moment in time, it is also true

13   that on occasion, especially early on, Frontier sought

14   advice from outside counsel with respect to how to handle

15   various issues.

16             We treated those issues as privileged because

17   outside counsel were not performing a business function and

18   if Frontier --

19             THE COURT:  To whom did they deliver their advice?

20             MR. TROPP:  I'm sorry, I missed your question,

21   Your Honor.

22             THE COURT:  To whom did outside counsel deliver

23   their advice?

24             MR. TROPP:  Outside counsel at Wiley Rein, David

25   Weslow communicated with Mr. Greifzu or Mr. Garcia.

Page 41

1              THE COURT:  Okay.

2              MR. TROPP:  There may have been others who were

3    copied on some of those emails internal to Frontier.

4              THE COURT:  Mr. Oppenheim, are you challenging

5    privilege for communications from outside counsel to inside

6    counsel?

7              MR. OPPENHEIM:  That's a broad question, but I

8    will -- let me respond to the specific, narrow situation Mr.

9    Tropp, I believe, is speaking to.  There are a series of

10   emails about a specific -- at least one specific subscriber

11   and what to do with respect to that subscriber who has been

12   the subject of, I believe, as I recall, hundreds of notices.

13   And out -- there's some back and forth on it with outside

14   counsel.  The vast majority of the email (audio glitch).

15   And again, this is not, as far as I can tell, any

16   application of the law.  It's the decision about how -- what

17   Frontier's policy is and how they're implementing.

18             THE COURT:  Yeah, but -- or, you know, you confer

19   with outside counsel.  They're going to want to know what's

20   -- what policy do you have?  So, let me ask you this.  Who

21   is the to and from for communications with outside counsel?

22   Is it with inside counsel?

23             MR. TROPP:  Are you asking me, Your Honor, or Mr.

24   Oppenheim?

25             THE COURT:  No, I'm asking -- Mr. Oppenheim is the

Page 42

1    one who's raised this.

2              MR. OPPENHEIM:  Well, it's with Mr. Garcia.  I'm

3    not sure whether to call him in-house counsel or the head of

4    the DMCA committee.

5              THE COURT:  Mr. Tropp, did you want to add

6    something?  Go ahead.

7              MR. TROPP:  I was trying to be responsive to Your

8    Honor's question, although I would in response to what Mr.

9    Oppenheim just said, say it doesn't matter what hat Mr.

10   Garcia was wearing at the time.  He wasn't the lawyer in the

11   equation.  It was David Weslow.  Mr. Garcia was entitled to

12   seek legal advice from his outside counsel, no matter which

13   hat he was wearing.

14             MR. OPPENHEIM:  I believe this exchange, Your

15   Honor, is Exhibit E to our filing, if that's helpful.  You

16   can see -- I'm just pulling it up here.  So, it -- the

17   exchange begins with an email from Mr. Elmore, who's an IT

18   engineer, and it's re:  the DMCA Q4 2019 review.  So, this

19   is before any litigation exists.  No claims have been

20   asserted.  And there's a back and forth.  The first back and

21   forth actually with mister -- is between Mr. Elmore and Mr.

22   Levan and that's redacted, which I don't understand.  The

23   two engineers are speaking to each other.

24             And then, it goes on.  Now, it does copy Mr.

25   Garcia, but it also copies the other members, I guess, of

1    the DMCA committee talking about the problem of determining

2    who was responsible for certain infringement notices.  And

3    you see that they're struggling with this issue and they

4    then kind of figure out lots of notices and then every --

5    they dial in Wiley Rein, outside counsel, and it's all

6    redacted.  But this is before any litigation existed.

7              THE COURT:  Well, they're entitled to confer with

8    their -- with outside counsel to get legal advice.

9              MR. OPPENHEIM:  Of course.

10             THE COURT:  I'm not breaking -- you'll excuse me,

11   based on what I consider to be a fairly flimsy showing, I'm

12   not overruling Frontier's objection of attorney-client

13   privilege with communications with outside counsel.  And

14   outside counsel is entitled to, you know, develop facts from

15   not only inside counsel but other people with knowledge of

16   it.  That I view is a different -- raising different issues

17   than an inside counsel who wears two hats as a business

18   person and as a lawyer.

19             MR. OPPENHEIM:  I don't --

20             THE COURT:  Let -- no, stop.  I'm unpersuaded by

21   anything I've heard or seen that would lead me to overrule

22   an assertion of privilege by -- with respect to

23   communications with Frontier's outside counsel.  I view that

24   issue -- I view that as very different from the issues of

25   assertion of privilege with respect to Mr. Garcia, what he

1   communicated to other members of the committee.  You know,

2   and this is a circumstance where there are no notes, no

3   minutes.  I don't know why.  I'm assuming that members of

4   the committee would say, oh, we need to be consistent with

5   whatever policy we're going to apply.

6           If we're going to terminate this subscriber who's

7   had 15 notices, we can't then permit somebody with 40

8   notices to remain because we think we're getting more

9   revenues on -- you know, those internal discussions.  No, I

10  -- so I -- with respect to communications with outside

11  counsel, the objection is overruled.

12          I'm not there yet with respect to Mr. Garcia's

13  communications and before him with Mr. -- I'll butcher the

14  name -- Greifzu was the way I wrote it down -- who was a

15  lawyer.

16          MR. OPPENHEIM:  Your Honor --

17          THE COURT:  But that still leaves me uncertain

18  about what to do with respect to, you say they were 1,800

19  privilege assertions, I think was the number I wrote down,

20  1,800 docs that they've asserted privileged.

21          MR. OPPENHEIM:  And to be clear, Your Honor, we're

22  not claiming each and every one of those, right, is -- the

23  privilege should be waived in any way.  But I think that

24  that the Court should be drawing some lines as to when they

25  -- on what they waived the privilege.

1              THE COURT:  I need more facts.

2              MR. OPPENHEIM:  So --

3              THE COURT:  I need more facts.  Based on letters

4     which are not evidentiary, and I read a lot of the cases

5     that are cited, not all of them.  I didn't read Bilzerian

6     before.  I will now.  I'm not ready to rule.  And one

7     question I have is, are you all about to spring for the cost

8     of an expert on attorney-client privilege who will do an in

9     camera review and make a recommendation to the Court with

10    respect to these communications?

11             I don't want to find myself in the position of

12    having reviewed a large number of allegedly privileged

13    documents and then having an argument somehow I become

14    tainted if I sustain, or if I overrule the privilege, it can

15    -- you know, it can be challenged on appeal.  But assuming I

16    sustain it, I don't know what I'm going to get to read and I

17    am going to be the trier of fact on a lot of this.  So, you

18    can do one of two things.

19             If you want to make a formal motion to compel and

20    support it with evidentiary material as well as legal

21    analysis, and they'll respond --  I'm not going to allow you

22    all -- a lot of time to do this -- I will rule.  If you want

23    if you want to select, agree on an expert to review

24    allegedly privileged communications and make a report and

25    recommendation to the Court with respect to privilege, you

Page 46

1    can -- we can go that direction.

2              MR. OPPENHEIM:  May I --

3              THE COURT:  Go ahead.

4              MR. OPPENHEIM:  Sorry, I don't want to step on

5    your words, Your Honor.

6              THE COURT:  No, go ahead.

7              MR. OPPENHEIM:  First of all, I do want to correct

8    something I said before.  I think I said there were four

9    depositions.  I've been reminded, it's been six.  And one of

10   the depositions is somebody else who has been in these DMCA

11   committee meet quarterly meetings, Mr. Murphy, and he

12   testified that Garcia made all the decisions, which is

13   consistent with everything we've seen, that it wasn't --

14   there wasn't decisions.

15             THE COURT:  Do you have a transcript?

16             MR. OPPENHEIM:  Pardon me?

17             THE COURT:  Do you have a transcript of Mr.

18   Murphy?

19             MR. OPPENHEIM:  We do.  I don't have it handy, but

20   I can -- we can find it, Your Honor, and I'm sure one of my

21   colleagues will scurry for it right now as we're --

22             THE COURT:  I -- look, we're at the point -- I try

23   very hard never to have to have discovery motions, and I

24   think I said early on the exception -- I didn't say motions,

25   I said briefing on privilege issues.  This is one of those

1   privilege issues.  I feel like I need a factual record,

2   evidentiary factual record on which to make a decision.  If

3   you want to proceed with a formal motion, agree on a

4   relatively short briefing schedule and we'll proceed on that

5   basis and I'll do my best to resolve it, but I want a

6   factual record on which to do it.

7           The issue of a lawyer wearing two hats is a

8   complicated one.  The one thing that Frontier is at

9   substantial risk if they withhold communications, not by

10  outside counsel with Garcia, but Garcia -- if they're

11  asserting privileged communications between Garcia and other

12  members of the committee, for example, on grounds of

13  privilege, they're at, I think, a fairly substantial risk

14  that I will preclude the testimony of Garcia on any issue at

15  trial.

16          I don't know.  I have to see how things develop.

17  If they think he's a crucial witness for them at trial, you

18  know, they're on warning that they're going to operate on

19  their own risk.  They're not going to decide on the eve of

20  the trial that now we'll produce all those communications

21  because we need Garcia to testify.  That's not going to

22  happen.  It's now or never.  When I say now or never, but if

23  we don't run afoul of the privilege -- you made your record,

24  Mr. Oppenheim, and when we get close to trial, you may

25  prevail on this point.

1         The result will be a preclusion order that Mr.

2    Garcia can't testify.  It -- they're not going to have

3    anything that sounds like reliance on defense of counsel

4    defense through Garcia when this stuff should have been

5    produced and full deposition now.  I don't know that's going

6    to happen.  It may not happen.  But Frontier better

7    understand the risk if we go that way.

8         If you want to agree on having an expert to review

9    allegedly privileged material, we can do that.  You will

10   split the cost, and the cost of that will be chargeable

11   depending on the outcome of the report and recommendation

12   and the ultimate decision of the Court.  That's about as far

13   as I can go today with respect to this attorney-client

14   privilege issue with respect to Mr. Garcia.

15        If you want -- you know, if you take his

16   deposition and decide to make -- you know, that you think

17   that the transcript helps you make this point, fine.  I'm

18   not saying that you have to file the motion next week, but

19   it's not going to be on the eve of trial either.  I just

20   can't resolve this issue on this record.

21             MR. OPPENHEIM:  I understand, Your Honor.

22             MR. TROPP:  Your Honor, just as a point of

23   clarification -- this is Jonathan Tropp.  I understood Your

24   Honor to say that Frontier does not have to produce the

25   communications with its outside counsel, which means that

Page 49

1   that portion of the motion or the request is denied.  Your

2   Honor said the objection is denied.  I understand the Court

3   to sustain the objection --

4          THE COURT:  They objected to the -- when I spoke

5   of objection, they asserted an objection to your assertion

6   of privilege.  And I'm saying that with respect to the

7   communications with outside counsel on the record before me

8   now, that objection is overruled.

9          MR. TROPP:  Thank you, Your Honor.  I appreciate

10  the clarification.

11         THE COURT:  All right.  You want to address the

12  issue of the RFAs, Mr. Oppenheim?

13         MR. OPPENHEIM:  Certainly, Your Honor.  As an

14  initial matter, Your Honor, I do believe this issue is

15  right.  The parties met and conferred about the type and

16  nature of Frontier's objections.  The parties went through

17  in detail one of the RFAs, by way of example.  There was no

18  need and -- nor would there be any time to go through all of

19  them and all of what's in there.

20         In that meet and confer, Frontier indicated --

21  Frontier's counsel indicated it had no intent to amend its

22  responses, any of them.  But I do think that the letter

23  process here has been very helpful because Frontier's letter

24  exemplifies the approach that Frontier has taken throughout

25  the RFAs.  So, let me give --

1          THE COURT:  -- came back and they attached your

2     responses to RFAs and there's a plague on your house, too.

3          MR. OPPENHEIM:  Well, let -- so I want to talk

4     about their RFAs, but let me just spell with this first.

5     So, they raised two questions with respect to the

6     plaintiffs' RFAs.  One of them is a question about pricing

7     that was already -- there was already a motion to this Court

8     and this Court ruled in our favor because the plaintiffs

9     aren't the ones selling the recordings, right?  It's

10    distributors.

11         So, they don't set the pricing and this was

12    explained and the Court ruled and denied the motion on that

13    basis.  They chose not to move on any of the other RFAs at

14    the time, and the other, they complain -- other complaint

15    that they make about our RFAs is similarly unfounded because

16    they really do have a problem that they're asking us to

17    speak about what consumers are doing when the record

18    companies --

19         THE COURT:  Let me stop you right there, because I

20    -- and this is something that -- I'm stopping you because I

21    agree with you.

22         MR. OPPENHEIM:  Okay.

23         THE COURT:  An RFA is not a proper device for

24    asking a party to agree or disagree with whatever third

25    parties may have thought or may not have thought.

Page 51

1              MR. OPPENHEIM:  Exactly.

2              THE COURT:  Okay.  That's --

3              MR. OPPENHEIM:  No --

4              THE COURT:  I'm firm on that.  Okay.

5              MR. OPPENHEIM:  We issued our RFAs in direct

6    response to a hearing we had with you, Your Honor, where you

7    told us we needed to narrow -- we as the -- as counsel

8    should work to narrow the issues as much as possible.

9              THE COURT:  Stop.  So, I'm looking at the Day

10   Pitney letter of May 29th.  Mr. Twardy's letter.  The last

11   paragraph where he says, "In fact, Frontier's denials were

12   proper.  For example, as we told RCC's counsel on our call,

13   Frontier did not deny RFA one, 'on the basis that it has two

14   versions of its acceptable use policy.'  Rather, Frontier

15   communicates its policy that its subscribers shall not

16   infringe third party copyrights in other ways as well,

17   including through Frontier's terms of service; thus,

18   Frontier properly denied RFA 1."

19              That's one of the few paragraphs of the letter I

20   agree with.  I'm making a point to both sides.  RFAs are not

21   a game where facially improper responses were provided with

22   the expectation of dragging out the process and ultimate

23   disclosure.  I have always believed that RFAs deserve an

24   admit or deny response -- and bear with me.  Reading Mr.

25   Oppenheim's May 28th letter on Page 2, carry over to top of

Page 52

1    Page 3, Mr. Oppenheim quotes Frontier's response, which with

2    all due respect is gibberish.  It's clearly improper.

3           You know, I remember as a practicing lawyer,

4    people would do everything they could to avoid admit or deny

5    an RFA, because they know that -- you know, in a jury trial,

6    opposing counsel wants to read it to a jury and they're

7    going to have a page of gibberish.  Nobody's going to

8    understand what it means.  Well, I'm not a jury.  I'm a

9    judge.  I understand.  This is not acceptable to me.

10          It seems to me that again, based on Mr.

11   Oppenheim's May 28th letter RFAs 5, 7, 10, 11 are quite

12   clear and they call for admit or deny, and if you can't

13   admit or deny, you have to explain why.  And now, I'm

14   switching to Day Pitney's May 29th letter which responds, I

15   think, to Mr. Oppenheim.  You know, when you say in that

16   second paragraph that as with so many other requests for

17   Court intervention RCC's latest request is premature.

18   Indeed, the request is premature for two reasons, and you

19   give me a bunch of reasons.

20          This goes to both sides.  If gibberish is given in

21   response to RFAs, take a deposition.  If the deposition

22   reveals that the RFA sought responsive information -- and I

23   get gibberish as a response, there's going to be sanctions.

24   Okay?  I'm tired.  This case has got a lot to be done in

25   this case.  It's going to proceed to trial.

Page 53

1          RFAs -- you know, I agree completely with Judge

2     Kimba Wood's decision in Wiwa.  It's pretty -- you know, she

3     sets forth pretty simple explanation about RFAs and I've

4     always followed that view and I just -- look, you're not

5     going to use this process, you know, give a bunch of junk in

6     response to an RFA instead of a clear admission or denial

7     and then say, okay, well, there's an obligation to meet and

8     confer and, you know, that takes weeks.  And then there's

9     back and forth.

10          We're not on that schedule.  Okay, we're on a

11     schedule where this case needs to be ready for trial in

12     October.  So, you can all continue whatever behavior you

13     want, but it may well result in the imposition of sanctions.

14     Okay.  I don't believe in sanctions.  I believe the parties

15     ought to play the game by the rules.  The rules aren't, oh,

16     give a lengthy objection to an RFA and expect to meet and

17     confer, and the other side can't raise it until we completed

18     the meet and confer.  Forget it.  It's a message to all of

19     you, okay.

20          To go back specifically to Mr. Oppenheim's May

21     28th letter, we would refer on Page 2, okay, RFAs 5, 7, 10,

22     and 11, and then where he quotes, you know, substantially

23     the same response to all of them.  It's unacceptable.  It's

24     really as simple as that.  Fix it, okay?  If you have to

25     have a quick meet and confer to say, okay, we'll play by the

Page 54

1    judge's rules, fine.  But it's going to start costing

2    everybody money if it -- this game continues.  It's just not

3    -- that's not the game.

4           So, you know, Mr. Oppenheim's May 28th letters at

5    the bottom, in ii on that page, "Frontier obfuscates its

6    answers with unnecessary qualifications regarding its

7    residential and commercial acceptable use policies."  You

8    quote RFA 1 and you quote Frontier's response.

9           I guess I read the response differently than you

10   did, Mr. Oppenheim.  I read their response as saying, we

11   have two policies, residential acceptable use policy and

12   commercial acceptable use policy.  And the response, "Admit

13   that on May 1, 2019 through December 31, 2023 the only

14   policy related to copyright infringement that Frontier

15   communicated to subscribers was Frontier's acceptable use

16   policy."

17          I read their response saying there actually were

18   two acceptable use policies and our answer is no, that's not

19   the only thing we communicated.  That, to me, is responsive.

20          MR. OPPENHEIM:  May I, Your Honor?

21          THE COURT:   Go ahead.

22          MR. OPPENHEIM:  I completely disagree with you.

23          THE COURT:  Well, we --

24          MR. OPPENHEIM:  Here's why.  Because the issue

25   here is under the safe harbor, the question is whether they

Page 55

1     communicated a repeat infringer policy to their subscribers.

2     I don't care whether they communicated a residential

3     acceptable use policy to residential subscribers and a

4     commercial acceptable use policy to commercial subscribers.

5     That still would be an admit within the RFA we issued.  They

6     could have -- they could have said we admit, but only the --

7     we have a residential one that goes to residential customers

8     and we have a commercial one that goes to commercial

9     subscribers, but they're both acceptable use policies and --

10            THE COURT:  Let me ask you this.  So, they say

11    they're terms of use.  I don't have the terms of use in

12    front of me.  I thought I read somewhere in one of these

13    letters, and they say their terms of use communicate an

14    acceptable use policy.  So, they say they deny that the only

15    thing they ever sent to subscribers was their acceptable use

16    policy.  They say, we have two of them and we deny that

17    those are the only things we sent to subscribers.  Okay,

18    it's either true or not true.  Okay?  Prove them false.

19            MR. OPPENHEIM:  The terms of use are the

20    contractual agreement with the subscriber.  That's not your

21    policy.  The terms of use incorporate and adopt policies.

22            THE COURT:  I don't know.  Do the terms of use

23    include something that's the equivalent of an acceptable use

24    -- you know, the terms of use say, it's not permissible to

25    infringe copyrighted material.

1           MR. OPPENHEIM:  Your Honor, I believe -- and I'll

2      be corrected, I'm sure by Mr. Tropp if I'm wrong here --

3      that the terms of use just simply adopt and incorporate the

4      acceptable use --

5           THE COURT:  I don't know what's in the terms of

6      use.

7           MR. OPPENHEIM:  But what I'm trying -- what we

8      were trying to narrow here is a very clean fact of what they

9      communicated to their subscribers to fulfill the obligation

10     under the safe harbor.  And we believe that the thing that

11     they're going to point to is the acceptable use policy.  We

12     don't believe that fulfills the requirements of the statute,

13     but that's what we're trying to figure out.

14          THE COURT:  So, you know, there are consequences

15     to denying an RFA that you established through a deposition

16     is true.  Take the deposition.  Take a 30(b)(6) deposition

17     on this issue.  Establish that their answer was inaccurate

18     and seek sanctions.  What can I tell you?

19          MR. OPPENHEIM:  Your Honor, the -- I think the

20     third part of our letter on this or our motion on this is

21     that they just -- they decided to include in all of their

22     responses their advocacy as opposed to just --

23          THE COURT:  -- the point that I tried to make

24     clearly and maybe I didn't, okay.  The response to an RFA is

25     admit or deny, and if they deny and you prove that it's not

1     accurate, there are consequences.  Okay?  I can't -- look.

2     What I -- the -- your May 28th letter on Page 4, you quote

3     Frontier's response.  It's what I put as the gibberish.

4     It's unacceptable to me.  Okay?  So, fix it or not, and

5     don't fix it and run the risk of bad things happening.

6     Okay?

7            This is not how the game, the RFA game is going to

8     be played.  May be what you do in other cases.  It may be

9     what you do with other judges.  You're not going to do it

10    with me.  I don't know how to say it.  That -- I said it

11    before.  I'll say it again.  You know, you cite Wiwa again.

12    I agree Kimba Wood's decision on Wiwa.  I've seen this over

13    and over.  It's been frustrating to me for years that I get

14    these crazy inappropriate responses to RFAs because, you

15    know, everybody is looking for wiggle room.  Okay.

16           They want to -- they want do that, I'll strike the

17    -- I'll strike the response.  I'll, you know, the rules

18    allow me to, you know, deem admitted what you said.  I can

19    impose sanctions.  I don't want to do any of that.  I want

20    you to play by the rules.  What I don't want to see is a

21    paragraph that you quote for Frontier's response on Page 4.

22    It's junk.  It's not an appropriate response.  My note to

23    myself is, does not fairly respond to RFA.  It doesn't.

24           So, what you all need to tell me is coming back to

25    the privilege issue, how you want to proceed.  Do you want

Page 58

```
 1   to make a formal motion?  Do you want to take the deposition

 2   first of one of these people?  Do you want to make a formal

 3   motion to compel and I'll decide, and they can put in a

 4   response -- agree on a briefing -- tight briefing schedule

 5   and I'll resolve it.

 6              If you all want to agree on an attorney-client

 7   privilege expert to review the allegedly privileged material

 8   and report, you'll split the cost and the Court will be --

 9   and the cost will be (indiscernible).  You need to let me

10   know by the middle of next week how you want to proceed.

11              MR. OPPENHEIM:  May I ask --

12              THE COURT:  -- take the deposition, you can do

13   that.

14              MR. OPPENHEIM:  May I ask a question, Your Honor?

15              THE COURT:  Sure.

16              MR. OPPENHEIM:  So, I believe fact discovery

17   concludes in roughly two weeks.  And I think I could fairly

18   say for every lawyer on this call. We are all 100 percent

19   engaged on a huge number of depositions between now and

20   then.  And -- including Mr. Garcia's, Mr. Elmore, and Mr.

21   Levan's.  would it be acceptable to the Court if we chose to

22   take this route, to file the motion shortly after Mr.

23   Garcia's deposition, which would be shortly after the close

24   of fact discovery?

25              THE COURT:  (indiscernible).
```

Page 59

1           MR. OPPENHEIM:  I'm sorry.

2           THE COURT:  I want you to get your depositions

3    done.

4           MR. OPPENHEIM:  Okay.

5           THE COURT:  Yes, it would be acceptable to me for

6    you to file the motion then.

7           MR. OPPENHEIM:  Okay.  Thank you, Your Honor.  And

8    we will consult with our clients and confer internally and

9    confer with opposing counsel as well.  Do you want us to let

10   you know how we choose to proceed by letter or just --

11          THE COURT:  Send a letter to the Court.

12          MR. OPPENHEIM:  Okay.  Very well.

13          THE COURT:  So, next -- we're losing track of the

14   days.  Hang on.  Next Tuesday, Wednesday, and Thursday is

15   the Second Circuit Judicial Conference.  I will have a

16   computer with me and I'll be able to read whatever response

17   you want to have.  Okay?  I should say -- and on Friday, I'm

18   on a very, very long flight out of the country.  Don't take

19   that as an invitation to -- whatever.

20          MR. OPPENHEIM:  Are you saying you're going to

21   have lots of time to read really lengthy motions, Your

22   Honor?

23          THE COURT:  I won't have time to get it.  It's a

24   17-hour flight.

25          MR. OPPENHEIM:  Oy.  We'll get something in.

Page 60

```
 1              THE COURT:  Is there anything else we need to talk
 2      about today?
 3              MR. OPPENHEIM:  Not from the record company
 4      claimants.
 5              THE COURT:  From Frontier?
 6              MR. COHEN:  No, Your Honor.  Thank you for your --
 7              MR. TROPP:  Yes, Your Honor.  Sorry.  Your Honor,
 8      as Mr. Oppenheim --
 9              THE COURT:  -- name so we have a clear record.
10              MR. TROPP:  Jonathan Tropp for Frontier.  Your
11      Honor, as Mr. Oppenheim mentioned, the parties are engaged
12      in taking a very large number of depositions in order to
13      complete them all by the fact discovery deadline of June
14      13th.  There is one deposition that we have had trouble
15      scheduling, to be completed by the Thursday, June 13th that
16      the parties have agreed to do on Friday, June 14th, but I
17      wanted to make sure that Your Honor had no objection --
18              THE COURT:  That's acceptable to me.  Well, look,
19      let me just say, I certainly experienced this all the time
20      as a litigator.  It's just -- there's cleanup discovery that
21      has to be done.  There are witnesses, there are schedules,
22      and all that.  If you agree -- and, you know, good
23      litigators agree.  They work these things out.  It's
24      acceptable to me.  Okay.
25              MR. TROPP:  Thank you, Your Honor.
```

Page 61

1           THE COURT:  Okay.  Have fun with all of your

2    depositions.  We're adjourned.

3           MR. COHEN:  Thank you, Your Honor.  Safe travels.

4           MR. OPPENHEIM:  Thank you, Your Honor.

5           MR. TROPP:  Thank you, Your Honor.

6           CLERK:  Jonathan, you can stop the recording.

7           (Whereupon these proceedings were concluded at

8    4:26 PM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 62

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  May 31, 2024