# DAY PITNEY LLP

BOSTON   CONNECTICUT   FLORIDA   NEW JERSEY   NEW YORK   PROVIDENCE   WASHINGTON, DC

**STANLEY A. TWARDY, JR.**
Attorney at Law

One Stamford Plaza, 7th Floor
263 Tresser Boulevard
Stamford, CT 06901
T: (203) 977-7368 F: (866) 458-1037
satwardy@daypitney.com

July 26, 2024

**VIA E-FILING**

Chief Judge Martin Glenn
U.S. Bankruptcy Court, S.D.N.Y.
One Bowling Green
New York, NY 10004-1408

    Re:    <u>In re: Frontier Communications Corp., No. 20-22476-mg</u>

Dear Judge Glenn:

    Pursuant to this Court's order [ECF Nos. 2397 & 2398], we write on behalf of Frontier Communications Corporation ("Frontier") to respond to the Record Company Claimants' ("RCCs") undocketed letter motion dated July 19, 2024, seeking to preclude Frontier from presenting certain evidence at trial (the "Errata Letter"), now joined by Movie Company Claimants ("MCCs") [ECF No. 2399].

    RCCs and MCCs have never had to try a secondary copyright liability case against an internet service provider like Frontier, which adopted and reasonably implemented a policy that provides for the termination in appropriate circumstances of repeat copyright infringers. 17 U.S.C. § 512(i)(1). Frontier terminated hundreds of accounts under that policy affecting thousands of people. As trial draws near, RCCs and MCCs are seeking desperately to avoid having to try this case on its merits. Just as RCCs baselessly moved to prevent the testimony of Paul Garcia, a key player in Frontier's DMCA program [*see* ECF No. 2394], RCCs now seek to obstruct Frontier's proof of hundreds of terminations that are not reasonably in dispute. Indeed, RCCs' effort is for naught because Frontier's proof of subscriber terminations will be made independent of the evidence RCCs now seek to exclude. *See* Ex. 1 ¶¶ 5-6.

    The Court should deny the relief RCCs and MCCs request because the Errata Letter is devoid of any evidence or applicable authority suggesting Frontier did anything wrong. To the contrary, the record demonstrates that Frontier fully and properly complied with its discovery obligations.



Chief Judge Martin Glenn
July 26, 2024
Page 2

## FACTUAL BACKGROUND

At least as early as 2015, Frontier adopted and informed subscribers of its repeat copyright infringer policy. The policy is elegantly simple: "Repeated copyright infringements are grounds for termination of service." Frontier reasonably implemented this policy by adopting a graduated response program for addressing DMCA notices alleging copyright infringement. Under that policy, in appropriate circumstances, Frontier took the severe step of terminating the internet accounts of its subscribers—hundreds of them. *Id.* ¶ 4.

The front end of Frontier's program was automated so that Frontier's computer systems logged each DMCA notice upon receipt, identified the relevant account holder, and sent an email warning to the account holder associated with the IP address identified in the notice after a minimum threshold was met. However, the ultimate decision whether "appropriate circumstances" existed to terminate a subscriber's account was not automatic or formulaic. Instead, Frontier employees convened and conferred regularly to make these difficult and qualitative determinations.

When Frontier made the momentous decision to terminate a subscriber's internet service, Frontier sent the subscriber a letter giving notice of the impending termination. Frontier (and, indeed, Mr. Garcia personally) sent hundreds of such letters, each of which was timely produced in this case. In addition, Mr. Garcia, by email, directed Frontier's Senior Project Manager Sean Murphy to effectuate each termination on the designated date. *Id.* ¶ 5.a. Frontier timely produced these emails as well. Mr. Murphy acknowledged these instructions by return email and input service orders to have the accounts terminated on the specified date; these orders were entered into Frontier's service order platform called DPI. *Id.* ¶ 5.b-c. After the terminations were completed, Mr. Murphy emailed Mr. Garcia to confirm. *Id.* ¶ 5.d. Frontier has produced emails between Messrs. Murphy and Garcia from shortly before and shortly after these terminations. In the small number of cases in which Frontier rescinded a termination decision based on the particular circumstance of the subscriber, Frontier produced relevant records too, such as emails between Messrs. Murphy and Garcia disclosing the changed plans. *See id.* ¶ 6.

Based on documents produced by April 25th, RCCs and MCCs were able to determine which subscriber accounts were terminated, and when. For example, RCCs' expert Kristofer Buchan issued a report on July 15, 2024—four days before RCCs sent the Errata Letter—in which he wrote:

> 73. I reviewed 1,377 letters produced by Frontier informing customers that they would be terminated based on copyright infringement Notices ("Termination Letters"). There was significant duplication across the population of Termination Letters. To leverage this data for subsequent analyses, I electronically extracted from the PDFs, where available, Account Number, the date in the letter header (or "Termination Letter Date"), and the date that the Subscriber was notified that they

**DAY PITNEY** LLP

Chief Judge Martin Glenn
July 26, 2024
Page 3

> would be terminated ("Termination Date"). Manual review was used for confirmation. I then deduplicated the results by these same values.
>
> 74.   The results of this work yielded 472 unique Termination Letters sent to 445 unique Subscribers (based on Account Numbers). The details of the 472 unique Termination Letters are provided in Exhibit H2.

Ex. 2 ¶¶ 73-74 (footnotes omitted).

Despite the voluminous record from which Mr. Buchan was able to determine the information RCCs now disingenuously decry is lacking, Frontier did not as part of its regular business compile these terminations in any single list. Ex. 1 ¶ 9. But Frontier undisputedly did timely produce reams of documentation from which RCCs could and did determine which subscriber accounts were terminated.

Nonetheless, at RCCs' request and to avoid a discovery dispute, Frontier agreed to undertake a time-consuming project to extract data from the sprawling DPI system to confirm the precise date and time each account was terminated under Frontier's DMCA policy. This information did not exist in a form it could be produced to RCCs. Frontier voluntarily agreed to *create* the exhibit in question in an effort to mollify RCCs. That voluntary project, which resulted in the creation of the document RCCs refer to as the "Spreadsheet," turned out to be significantly more difficult than Frontier's counsel understood when they agreed that Frontier would undertake it. As set forth in the accompanying declaration of Mr. Murphy (Ex. 1 hereto), two members of his team, Jon Klein and Doug Hogue, had to spend almost 100 hours over multiple weeks drafting code to extract data for the hundreds of DMCA terminations from the thousands of tables of data for tens of millions of subscribers in the DPI system, join it together in a single spreadsheet, and conduct quality control on the results. Ex. 1 ¶¶ 10-12. Frontier produced this information as soon as it was able, on June 11, 2024, within the fact discovery deadline. *Id.* ¶ 18.

The next day, RCCs deposed Mr. Garcia, who had spent dozens of hours over many weeks preparing to serve as a 30(b)(6) deponent on certain topics. They asked Mr. Garcia about the Spreadsheet, which was marked at the deposition as RCC Exhibit 124. Mr. Garcia answered these questions as best he could on the first day of his deposition on June 12, 2024, but he was uncomfortable answering questions about a Spreadsheet he had never seen before. On the second day of his deposition, on June 13, 2024, Mr. Garcia was able to provide further information about the Spreadsheet, but apparently not to RCCs' satisfaction.

After his deposition, Mr. Garcia investigated the Spreadsheet and, in his subsequent and timely errata, confirmed what he had said at his deposition: The Spreadsheet is a compilation of the subscriber accounts terminated under Frontier's DMCA policy. Ex. 3 at 426:24 – 427:21,

**DAY PITNEY** LLP

Chief Judge Martin Glenn
July 26, 2024
Page 4

428:22 – 429:12. RCCs' demand that Frontier withdraw his errata and agree not to rely on the Spreadsheet for any purpose soon followed.

## ARGUMENT

I. **Frontier Fully Complied With Its Discovery Obligations**

Impelled by their strong motivation to avoid trying this case on the merits, RCCs never pause to ask the threshold question: what discovery rule or obligation did Frontier supposedly violate? The Errata Letter identifies none. And there is none.

A. *Mr. Garcia's Errata Sheets Were Proper*

The Errata Letter opens with RCCs' charge that Mr. Garcia's errata pages substantively modified his testimony. RCCs do not fairly characterize the deposition or the errata. More fundamentally, it is black letter law in this Circuit that a deponent may modify his testimony in either form or substance through errata, as the Rule plainly allows:

> On request by the deponent or a party before the deposition is completed, the deponent ***must*** be allowed 30 days after being notified by the officer that the transcript or recording is available in which: (A) to review the transcript or recording; and (B) if there are changes in form ***or substance***, to sign a statement listing the changes and the reasons for making them.

Fed. R. Civ. P. 30(e) (emphasis added). The Second Circuit has held "the language of the Rule places no limitations on the type of changes that may be made." *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2d Cir. 1997) (quotation marks and alteration marks omitted). This should be the end of RCCs' complaint.

B. *The Spreadsheet Was Timely Produced*

RCCs next complain about the timing of Frontier's production of the Spreadsheet. There are at least three fatal flaws with their argument.

First, the Spreadsheet did not exist until Frontier created it. *See A&R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, No. 07-CV-00929, 2014 WL 5859024, at *3 (D. Conn. Nov. 10, 2014) (holding "the case law is clear that Rule 34 cannot be used to compel a party to produce a document that does not exist"); *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, No. 3:18-CV-00705, 2020 WL 401776, at *8-*9 (D. Conn. Jan. 24, 2020) (denying motion to compel where new coding would be required to generate a new document with requested information from a database). Frontier employees had to spend almost 100 hours to create the code necessary to identify and extract the data. Ex. 1 ¶ 10. As Mr. Murphy explains,

**DAY PITNEY** LLP

Chief Judge Martin Glenn
July 26, 2024
Page 5

it was not even clear that Frontier would be able to do it. *Id.* ¶ 18. The exhibit was not available until the morning of June 11, 2024, and Frontier immediately produced it. *Id.*

Second, neither the Spreadsheet nor the information contained in the DPI system is responsive to any of RCCs' discovery requests.[1] The first and only time RCCs mention any document request at all is at the top of the last page of their letter. There, RCCs rely on RFP No. 9, which they rewrite. RFP No. 9 does not, as RCCs contend, seek "all notes relating to communications"; rather, on its face, it is limited to the "communications" themselves.[2] DPI is a sprawling database system comprised of 13 separate environments containing billing and ordering information relating to almost 25 million accounts, past and present, in over 4000 tables. Ex. 1 ¶ 8. It is not a "communication," which RCCs defined in their document requests to require "the transmittal of information." It is an internal interconnected billing and ordering platform spanning numerous environments and containing millions of records that cannot be reproduced. Ex. 1 ¶ 9.

Third, as RCCs acknowledge, Frontier produced the Spreadsheet before the close of fact discovery. The April 25th deadline for the "substantial completion" of document production was just that—a deadline for substantial completion, not a deadline by which Frontier was required to have produced all documents. Indeed, RCCs themselves produced many documents, including multiple critical spreadsheets they said were difficult to compile, in the waning days of the fact discovery period, including a Summary of Revenue Report spreadsheet that they produced on June 13, 2024, two days after Frontier had produced the Spreadsheet. RCCs also produced a final spreadsheet on June 20, 2024, a week late by any measure. As set forth in the Murphy Declaration, Frontier produced the Spreadsheet as soon as it was ready, after weeks of work. Ex. 1 ¶¶ 10-12, 18. RCCs rely on a single inapposite case in which a party was sanctioned "for their sluggish efforts in obtaining responsive documents and information, ***despite previous Court orders*** to provide all such information and to confirm via affidavit, even after sanctions had been imposed for previous violations." *Peralta v. Regent Catering, Inc.*, No. 17-CV-06993, 2022 WL

---

[1] Though MCCs have joined RCCs' Errata Letter, MCCs also have not identified any discovery requests served by them to which the Spreadsheet or the data in the DPI system is responsive.

[2] The text of RFP No. 9 is as follows:

**REQUEST NO 9:** All communications concerning alleged or repeat copyright infringement by Subscribers, or violation of any Frontier policy relating to copyright infringement, or any action or potential action taken against any Subscriber for copyright infringement or a violation of any Frontier policy relating to copyright infringement, including internal communications concerning the actual or potential termination of internet services to any Subscriber.

**DAY PITNEY** LLP

Chief Judge Martin Glenn
July 26, 2024
Page 6

6799407, at *5 (E.D.N.Y. Mar. 18, 2022) (emphasis added).[3] Here, again, Frontier did not withhold a document, but worked diligently to create and promptly produce the Spreadsheet when complete, in a good-faith effort to avoid burdening the Court with a discovery dispute—to no avail.

    C.    *Mr. Garcia Was Not Designated to Testify With Respect to the Spreadsheet*

Rule 30(b)(6) required RCCs to "describe with reasonable particularity the matters for examination." They point to no deposition topic that required Mr. Garcia (or any Frontier designee) to be prepared to testify with respect to the Spreadsheet. Though RCCs state that "Frontier designated Mr. Garcia as its 30(b)(6) witness on most of the RCCs' topics, including Frontier's implementation of its policies and procedures, and decision-making with respect to whether to suspend or terminate internet services to a subscriber relating to actual or alleged copyright infringement or violation of any copyright infringement-related policy" (Errata Letter at 2 n.1), the Spreadsheet is not within that scope.[4] The Spreadsheet is merely a list of terminated accounts corroborating the voluminous information previously produced. Ex. 1 ¶ 13. Mr. Garcia was prepared to testify and did testify on the designated topics; he even testified concerning subscriber terminations in the context of the Spreadsheet.[5]

---

[3] RCCs' only other authority is irrelevant. *Godfried v. Ford Motor Co.*, No. 1:19-CV-00372, 2022 WL 2869700, at *7-*8 (D. Me. July 21, 2022) (applying the "sham affidavit" rule to errata in the context of summary judgment).

[4] By written stipulation of the parties, all scope objections were reserved, so Frontier was not required to object at the deposition to RCCs' questions as outside the scope.

[5] Even if RCCs could identify a topic concerning the Spreadsheet on which Mr. Garcia was designated, but unprepared, "[a] party seeking sanctions for an unprepared Rule 30(b)(6) witness must show that the deponent's inability to testify was 'egregious and not merely lacking in desired specificity in desired areas.'" *Da Silva v. N.Y.C. Transit Auth.*, No. 17-CV-04550, 2023 WL 8096925, at *4 (E.D.N.Y. Nov. 20, 2023) (quoting *Fashion Exch. LLC v. Hybrid Promotions, LLC*, 333 F.R.D. 302, 308 (S.D.N.Y. Sept. 16, 2019)); *accord Elavon, Inc. v. Ne. Advance Techs., Inc.*, No. 15-CV-07985, 2022 WL 1166157, at *2 (S.D.N.Y. Apr. 20, 2022) (same). Given Mr. Garcia's detailed testimony with respect to dozens of topics over **14** hours, RCCs cannot meet this standard. RCCs' claim that Mr. Garcia could not testify about whom Frontier terminated and when is simply false. (Errata Letter at 3.) *See, e.g.*, Errata Letter Ex. C at 47-48 (Mr. Garcia testifying, with respect to the question whether he knew what RCC Ex. 124 is, "So, I think I do because I recognize some of the names and I think I do also because it's close to the number of termination letters we sent. And so, I believe, especially when I look at column F, 'Disconnect Date,' and column G, 'Disconnect Date,' I believe this is the list of most of the

**DAY PITNEY** LLP

Chief Judge Martin Glenn
July 26, 2024
Page 7

      D.      *Sean Murphy's Deposition Is A Red Herring*

RCCs and MCCs deposed Mr. Murphy on May 28, 2024. At the time of his deposition, the Spreadsheet did not yet exist, and Mr. Murphy did not know whether the information necessary to create it could be extracted from DPI. Ex. 1 ¶ 10. He therefore truthfully answered that he did not know if records existed to permit Frontier to determine when terminations took place. He also testified truthfully that he did not maintain a running list and did not know of one. There was no reason for him to correct this testimony through errata.

      E.      *Frontier Had No Obligation to Disclose Jon Klein or Doug Hogue*

Neither Mr. Klein nor Mr. Hogue has substantive information about this case. Ex. 1 ¶ 11. Their only involvement in the case was to create the Spreadsheet by writing the code necessary to extract relevant data from DPI. *Id.* Frontier does not intend to rely on their testimony for any purpose in this case, and the Errata Letter identifies no discovery request or rule that would have required Frontier to identify them earlier.

**II.**    **RCCs and MCCs Have Suffered No Prejudice**

RCCs' vitriolic accusations of discovery "misconduct" have no basis in law or fact. Rather, Frontier properly complied with all of its discovery obligations and, indeed, went above and beyond by creating and producing the Spreadsheet at substantial effort and by providing RCCs with additional information about the Spreadsheet in Mr. Garcia's errata. It bears observation, nevertheless, that RCCs' overwrought claims of prejudice are both without basis and disingenuous.

First, the claim that RCCs required the Spreadsheet to conduct full examinations of Frontier's witnesses is belied by their own expert, who examined Frontier's document production and readily determined which accounts were terminated. RCCs could—and did— examine Mr. Garcia at length about Frontier's decisions to terminate or not to terminate specific subscribers.

Second, though the Errata Letter raises a series of questions about the Spreadsheet that RCCs claim required answers, RCCs never sought the answers (including at the Garcia deposition) and instead have sought only to preclude the Spreadsheet. From the first time RCCs raised with Frontier any concern about the Spreadsheet, they did not ask a single question about its contents, but instead requested only that Frontier agree not to use it. *See* Ex. 4. During the

---

accounts that Frontier terminated under its repeat infringement program but I'm not positive, but I do recognize many of these names because I personally would have sent most of the letters.")); Ex. 3 at 426:24 – 427:21, 428:22 – 429:12.



Chief Judge Martin Glenn
July 26, 2024
Page 8

meet-and-confer that followed, when Frontier offered to make Mr. Garcia available for further deposition (either by Zoom or in person), RCCs rejected that proposal outright, preferring instead to gamble on preclusion, and they submitted the Errata Letter that same day. Frontier would have been happy to answer RCCs' questions had they asked; indeed, the answers are provided in the accompanying Murphy Declaration. Ex. 1 ¶¶ 14-17.

Despite the lack of any wrong, Frontier freely offered RCCs a "remedy"—the opportunity to continue Mr. Garcia's deposition—but RCCs chose for tactical reasons to submit the Errata Letter instead. The Court should not reward their gamble. *Da Silva*, 2023 WL 8096925, at *4 ("Even when there is deficient Rule 30(b)(6) testimony, 'courts are reluctant to award sanctions . . . when counsel fail to make a good faith effort to resolve the deficiencies or when the application for sanctions appears tactically motivated.'" (ellipsis in original) (quoting *First Hill Partners, LLC v. BlueCrest Cap. Mgmt., Ltd.*, No. 13-CV-07570, 2015 WL 13885012, at *1 (S.D.N.Y. July 5, 2015)); *Elavon*, 2022 WL 1166157 (denying tactically motivated motion); *Rahman v. Smith & Wollensky Rest. Grp., Inc.*, No. 06-CV-06198, 2009 WL 72441, at *4 (S.D.N.Y. Jan. 7, 2009) (finding sanctions inappropriate where defendants offered an additional witness); *see also Tchatat v. O'Hara*, 249 F. Supp. 3d 701, 707 (S.D.N.Y. 2017) ("[I]t is well accepted that a court should always impose the least harsh sanction that can provide an adequate remedy. The choices include—from least harsh to most harsh—further discovery, cost-shifting, fines, special jury instructions, preclusion, and the entry of default judgment or dismissal." (quoting *Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 185 (S.D.N.Y. 2014))), *aff'd sub nom. Tchatat v. City of N.Y.*, 795 F. App'x 34 (2d Cir. 2019); *In re SageCrest II, LLC*, 444 B.R. 20 (D. Conn. Jan. 14, 2011) (vacating bankruptcy court's preclusion order for failure to consider the efficacy of lesser sanctions). The fact of the matter is, no remedy is necessary or appropriate any longer, as RCCs now have all the information about RCC Exhibit 124 they claimed to lack. *See* Ex. 1 ¶¶ 14-17.

## CONCLUSION

For the foregoing reasons, Frontier respectfully requests that the Court deny the relief requested by RCCs and MCCs in its entirety so that the case may proceed to a full and fair determination on its merits.

Respectfully submitted,

*/s/ Stanley A. Twardy, Jr.*

Stanley A. Twardy, Jr.

cc:     All Counsel Record

119557148.5