

Matthew Oppenheim
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.450.3958
matt@oandzlaw.com

*VIA CM/ECF AND EMAIL*　　　　　　　　　　　　　　　　　　　　　　　　　July 31, 2024

The Honorable Martin Glenn
U.S. Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

**Re:**　　*In re Frontier Communications Corp.*, **Case No. 20-22476 (S.D.N.Y. Bankr.)**

Dear Chief Judge Glenn:

We represent the Record Company Claimants ("RCCs") in the above-captioned case and write in response to Frontier's July 26 letter (ECF No. 2402, "Opposition" or "Opp.").

Frontier's admissions in its Opposition compel precluding the Spreadsheet and Frontier's attempt to substantively rewrite Paul Garcia's deposition testimony via errata. First, Frontier admits it produced the Spreadsheet less than 24 hours before Mr. Garcia's deposition and less than 48 hours before the close of fact discovery. Opp. 3. Second, Frontier admits Mr. Garcia had never seen the Spreadsheet before his deposition and could not answer questions about it. *Id*. at 3 (Mr. Garcia "was uncomfortable answering questions about a Spreadsheet he had never seen before"). Third, Frontier admits that, to try to cure Mr. Garcia's failure to prepare to testify about the Spreadsheet, Frontier made wholesale changes and additions to Mr. Garcia's deposition testimony through errata. *Id.* at 7 (Frontier "provid[ed] RCCs with additional information about the Spreadsheet in Mr. Garcia's errata").

Frontier's conduct concerning the Spreadsheet has detrimentally prejudiced the RCCs by preventing the RCCs from investigating and verifying which and how many of Frontier's repeatedly infringing subscribers Frontier in fact terminated. Frontier's last minute production of the document, complete failure to prepare Mr. Garcia to testify about it, and substitution by errata of his non-answers a month later and after the close of discovery—with the selectively disclosed results of a "[f]ollow-up investigation"—precluded the RCCs' opportunity to understand and verify the contents of the Spreadsheet, question it, examine Frontier's witnesses on it, and make use of it through expert reports and beyond. As opposed to the prejudice the RCCs will suffer due to Frontier's conduct, Frontier will suffer none by preclusion of the Spreadsheet. In Frontier's own words, "proof of subscriber terminations will be made *independent of the evidence*" the RCCs seek to exclude. Opp. 1 (emphasis added).

Unable to escape these undisputed points, Frontier instead offers a litany of excuses that distort and misrepresent the facts and conflict with Frontier's own actions and statements:

- Frontier claims the RCCs never requested the Spreadsheet but admits elsewhere they did.

- Frontier claims it timely produced the Spreadsheet but the record strongly suggests Frontier delayed producing it as long possible.
- Frontier claims Mr. Garcia was not its designated witness on the Spreadsheet but he was designated on the topics concerning subscriber terminations, and, if he was not, his errata would have been neither necessary nor appropriate.
- Frontier asserts Mr. Garcia's errata fully complied with Rule 30(e) but failed to comply with the rule's requirement that the party or witness request the right to serve errata before the deposition was completed.
- Frontier claims the RCCs never sought answers regarding the Spreadsheet but the transcript betrays a dozen questions seeking information concerning the Spreadsheet—the very questions Mr. Garcia could not answer. ECF No. 2403 ("RCCs' Ltr.") Ex. C.
- Frontier claims that the RCCs' expert was able to determine the subscribers Frontier terminated using other documents Frontier produced, and that the Spreadsheet corroborates this analysis, but the Spreadsheet conflicts with the information on which the RCCs' expert relied.

Contrary to Frontier's suggestion, the RCCs look forward to trying this case on the merits. Frontier is correct that its repeat infringer policy and the manner in which it was implemented is unprecedented. The RCCs are unaware of any other service provider that would:

(i) Not inform subscribers that they were the subject of copyright infringement notices *until the fifteenth time* the subscriber was caught infringing;
(ii) Then take no action with the subscriber other than send a "warning" email to that subscriber until he or she was the subject of at least *100* notices;
(iii) Thereafter, place the subscriber in a click-through walled garden, which wasn't functional for a year and a half, and after which they could continue to infringe; and
(iv) Finally, only sometime after all of that and in particular circumstances *consider* the subscriber for termination, though in many instances subscribers with *thousands* of notices were never terminated or even considered for termination. Ex. 1, Garcia Vol. II Tr. 456:14–457:20 (testifying that a subscriber with more than 1,400 infringement notices was not considered for termination but rather put on a "Watchlist").

Under no interpretation of the DMCA is Frontier's conduct the reasonable implementation of a repeat infringer policy under 17 U.S.C. § 512(i), even if Frontier eventually terminated a few hundred such subscribers over a nearly nine-year period.

Far from seeking to try this case on the merits, Frontier has repeatedly stymied the RCCs' attempts to develop the facts that would allow the Court to fully assess those merits. The Court should not countenance Frontier's efforts to hide the facts concerning its purported subscriber terminations, nor Frontier's attempt to cure its misconduct weeks after discovery has closed and on the verge of trial. The Spreadsheet and Mr. Garcia's errata should be precluded.

2

## I. The facts undercut Frontier's attempts to excuse its discovery misconduct.

### a. Frontier withheld critical information the RCCs sought early in discovery.

The RCCs' requests for production and the history of the Parties' discovery disputes bely Frontier's assertion that the Spreadsheet is not "responsive to any of RCCs' discovery requests." Opp. 5.  Indeed, Frontier's Opposition admits Frontier agreed to provide the information "*at RCCs' request* and to avoid a discovery dispute."  Opp. 3 (emphasis added).  The RCCs sought records regarding Frontier's terminations in their first requests for production, served in November 2023, and Frontier never disputed—until now—that the Spreadsheet falls within the RCCs' discovery requests.  For good reason: it clearly falls under several of them.  While Frontier disputes it, RFP No. 9 expressly requests "internal communications concerning the actual or potential termination of internet services to any Subscriber."  RFP No. 5 seeks, "[d]ocuments sufficient to show . . . the number of . . . terminations . . . taken in response to [infringement] notices."  The Spreadsheet purports to contain exactly this information.

Frontier, however, failed to produce any records evidencing actual termination by the April 25 substantial completion of fact discovery deadline.  Consequently, on April 29, before the April 30 discovery status hearing, the RCCs submitted a letter to the Court explaining that "Frontier has not clearly identified the subscribers it claims to have terminated for repeat infringement."  ECF No. 2346 at 2.  The RCCs further pointed out that, "[w]hile Frontier has produced letters it sent to subscribers informing those subscribers that Frontier planned to terminate them for repeat infringement, *those letters do not establish that Frontier followed through and actually terminated those subscribers*.  And, in fact, Frontier's productions show that at least some of those subscribers were not terminated. . . ." *Id.* (emphasis added).  The RCCs therefore requested that, "[i]f Frontier does not have documents clearly identifying terminated repeat infringers, the RCCs should be permitted to serve an interrogatory seeking this information with an expedited response date." *Id*.

The next day, before the hearing, the Parties conferred on this issue and Frontier quickly agreed to provide this information, mooting (for the time) the RCCs' request for the Court's intervention.[1]  The day after that, the RCCs' counsel emailed Frontier "confirming [the Parties'] conversation prior to the hearing," including where Frontier agreed to provide "proof of subscriber terminations."  RCCs' Ltr. Ex. A at 3.  Frontier responded that it was "collecting this information" and would produce it "as soon as possible." *Id*.

Had Frontier, at any point, refused to produce the information because it was not covered by the RCCs' discovery requests, the RCCs would have quickly raised such dispute with the Court—as they did in April.  Only *now*, in a last-ditch effort to justify its misconduct, does Frontier argue out of one side of its mouth that the information it provided was not covered by a discovery request, even though Frontier admits out of the other side of its mouth that Frontier produced the Spreadsheet "at RCCs' request."

The timing of Frontier's production of the Spreadsheet and its attempt to defend its conduct raise grave questions about Frontier's diligence and good faith in the discovery process.  It is now

---

[1] *See* April 30, 2024 Hr'g Tr. 23:5–8 (Frontier's counsel stating that the parties "work[ed] [the issues] all out within about 15 minutes.").

3

clear that Frontier made *zero* effort to collect and produce this critical data *before* the RCCs raised it to the Court on April 29. In fact, Frontier asserts that, as late as Sean Murphy's deposition on May 28—several months after the RCCs initially requested the information and a month after Frontier explicitly agreed to produce it—Frontier still did not know whether the information existed or if it was even possible to put such proof together. Opp. 7 & Ex. 1 ¶ 10. This timeline strongly suggests the large majority of Frontier's "90+ hours" of work, Opp. Ex. 1 ¶ 13, required to create the Spreadsheet occurred after May 28, and that Frontier did not attempt to produce the Spreadsheet "as soon as possible" as it had promised on May 3. It is hard to square Frontier's claim that it timely and diligently produced the Spreadsheet with the May 28 deposition testimony of Mr. Murphy—testimony given *while he was directing the spreadsheet's creation*, and only two weeks before the Spreadsheet's production—that he did not know if records existed that would allow him to determine which subscribers were terminated. RCCs' Ltr. 2; Opp. 7.

Furthermore, it is now clear that Frontier had withheld that its DPI system contained relevant and responsive information.[2] Mr. Murphy's declaration states that the "Memos" extracted from the DPI system include "notations made by Frontier personnel on a subscriber's account" that Mr. Murphy directed be made—*i.e.*, *internal* communications—and "notes by Frontier's customer service personnel as a result of interactions with subscribers." Murphy Decl. ¶ 15. Such notes include, for example, a record of a Frontier customer service representative telling a repeat infringer Frontier claims it terminated that, "I don't see any red flag on the account that would indicate that your account will be disconnected so you have nothing to worry about." RCCs' Ltr. Ex. B at 5. Despite months of conferrals and discussions about Frontier's systems, including what information was kept within those systems, Frontier not once disclosed that it had a DPI system that kept information and notes about terminations and copyright infringement, including records of conversations with subscribers about infringement notices of which they were the subject.[3]

### b. Frontier designated Mr. Garcia as its 30(b)(6) witness on the information contained in the Spreadsheet but he could not testify about it.

There can be no question that Mr. Garcia was Frontier's 30(b)(6) witness on the Spreadsheet, which Topic 26 covered. RCCs' Ltr. 2 n.1. Frontier's argument otherwise is a transparent attempt to avoid blame for its own failures. Frontier does not argue that someone *else* was designated to testify about the Spreadsheet, nor could it. To the extent Frontier asserts that the RCCs' topics did not explicitly reference the Spreadsheet, Frontier ignores that the RCCs did not even have the Spreadsheet, or know that it was forthcoming, until less than a day before Mr.

---

[2] The information contained in Frontier's DPI system itself falls within the RCCs' discovery requests. *See e.g.*, RCCs' RFP No. 9 ("All communications concerning alleged or repeat copyright infringement by Subscribers . . . including internal communications concerning the actual or potential termination of internet services to any Subscriber."); RCCs' RFP No. 7 ("All communications and summaries or records of communications with Subscribers concerning Frontier's copyright infringement-related policies and agreements, alleged copyright infringement, or any Infringement Notice."); RCCs' RFP No. 8 ("All records or call logs. . . or documents discussing calls or reflecting the content of any calls between a Frontier employee and any Subscriber identified in Infringement Notices. . . . related to alleged copyright infringement . . . .").

[3] The Spreadsheet also calls into question the accuracy of Frontier's other discovery responses. In response to an interrogatory asking Frontier to "[i]dentify all persons . . . with responsibility for communicating with Subscribers who were the subject of Infringement Notices," Frontier identified only four individuals. The Spreadsheet indicates other Frontier employees, whom Frontier has never identified, were also communicating with Frontier subscribers regarding infringement notices.

4

Garcia's deposition (the last fact-witness deposition). Of course, the RCCs' topics could not reference a document the RCCs did not know existed at the time the topics were served.[4] Further, Frontier's errata rewriting Mr. Garcia's testimony about the Spreadsheet implicitly acknowledges that Mr. Garcia was Frontier's designated witness regarding the Spreadsheet—there would be no need to revise Mr. Garcia's testimony in his *personal* capacity about the Spreadsheet, which Frontier acknowledges by asserting that Mr. Murphy, deposed only in his personal capacity, had "no reason . . . to correct this testimony through errata." Opp. 7.

It is also undeniable that Mr. Garcia could not provide any testimony about the Spreadsheet. Frontier admits that he was "uncomfortable answering questions about a Spreadsheet he had never seen before." Opp. 3. Mr. Garcia revealed nothing more about the Spreadsheet the second day of his deposition, where he remained just as clueless about it. Frontier's assertion that Mr. Garcia "even testified concerning the subscriber terminations in the context of the Spreadsheet" is belied by Mr. Garcia's own words that he "*believe[s]*" the spreadsheet could be "the list of *most of the accounts*" but "*I'm not positive*." Opp. 6 n.5 (emphasis added). The ultimate proof of Mr. Garcia's ignorance of the Spreadsheet was his need to conduct a "[f]ollow-up investigation" *after* his deposition and provide new testimony about the Spreadsheet in his errata that he was not capable of providing at his deposition.

Frontier attempts to blame the RCCs by asserting that it "would have been happy to answer RCCs' questions had they asked." Opp. 8. Of course, the RCCs *did* ask the relevant questions during Mr. Garcia's deposition—the proper forum for such questions—but Mr. Garcia could not answer them. RCCs' Ltr. 1–2. Frontier's late production of the Spreadsheet and deposition chicanery appears designed to avoid exposing any witness to thorough cross-examination on this critical data. The Court should not reward this improper gamesmanship.[5]

Frontier asserts that Mr. Garcia's errata fully complies with Rule 30(e). However, neither Mr. Garcia nor his counsel made a request on the record to read a copy of and sign his transcript. As Frontier observes, Rule 30(e) permits a witness to serve errata only after a "request by the deponent or a party *before the deposition is completed* . . . ." Fed. R. Civ. P. 30(e)(1) (emphasis added). Where no such request is made on the record at the deposition, the right to serve errata is waived. *Marquez-Ortiz v. United States*, No. 20-CV-5793, 2023 WL 3568806, at *2 (S.D.N.Y. May 18, 2023) ("Rule 30(e) applies only when the deponent makes a request to review the deposition transcript 'before the deposition is completed'"); *Express Freight Systems Inc. v. YMB Enterprises Inc.*, 2022 WL 2467176, at *4 (E.D.N.Y. Mar. 29, 2022) ("[a]ny [deposition transcript] review request must be made before the deposition is completed").

---

[4] Where Frontier *timely* produced data that the RCCs wanted to explore, the RCCs' 30(b)(6) topics specifically referenced that data. *See, e.g.*, RCCs' 30(b)(6) topic numbers 43 "Frontier's average revenues and profits. . .per Subscriber, including the average revenues and profits reflected in FRONTIER_00001988" and 45 "Revenues and profits that Frontier received . . .including the subscriber revenues and profits reflected in FRONTIER_00094690."

[5] The RCCs do not seek sanctions merely on the basis that Mr. Garcia was unprepared to testify about the Spreadsheet, as Frontier suggests (Opp. 6 n.5, citing to *Da Silva v. N.Y.C. Transit Auth.*, No. 17-CV-04550, 2023 WL 8096925, at *4 (E.D.N.Y. Nov. 20, 2023), but because he could not testify about a topic for which he was clearly designated as Frontier's 30(b)(6) witness, had to later conduct a "[f]ollow-up" investigation to learn about the Spreadsheet for which he knew he should have been prepared to testify, and then served an errata which attempted to provide foundation for the Spreadsheet, *after the close of fact discovery*, thereby preventing the RCCs from investigating the Spreadsheet and questioning Frontier's witnesses about it.

5

None of the cases Frontier cites on the proper use of errata concerned a party's attempt to fix the testimony of its Rule 30(b)(6) witness on an issue of central importance to its defense by conducting a post-deposition "investigation" of a document the witness knew nothing about in order to try to establish a foundation for the admission of that document at trial. Rather, Frontier's use of errata is more akin to cases where courts have excluded supplemental testimony added by errata after examining the improper purpose and effect of the testimony a witness adds following post-deposition investigation or action. *Cf One Source Env't, LLC v. M + W Zander, Inc.*, No. 2:12-CV-145, 2015 WL 13505360, at *2 (D. Vt. Dec. 8, 2015) ("Rule[30(e)] does not permit a deponent to supplement her deposition transcript with information related to a subsequent investigation that does not actually *change* one of her responses made during the deposition"); *Grottoes Pallet Co., Inc. v. Graham Packaging Plastic Prod., Inc.*, No. 5:15-CV-00017, 2016 WL 93869, at *6 (W.D. Va. Jan. 7, 2016) (refusing to consider testimony added through errata to oppose summary judgment where "the only explanation for these changes is again 'further recollection' or 'further investigation.'"). As Frontier admits, it "provid[ed] RCCs with *additional* information about the Spreadsheet in Mr. Garcia's errata" based on Mr. Garcia's investigation of the spreadsheet "after his deposition." Opp. at 7 (emphasis added), 3.

## II. Frontier's discovery misconduct has detrimentally prejudiced the RCCs by forestalling interrogation regarding the conflicts between the existing record and the Spreadsheet.

The evidence contradicts Frontier's assertion that it has produced a "voluminous" record enabling the RCCs to identify "which subscriber accounts were terminated, and when," which the Spreadsheet "corroborate[s]." Opp. 2–3 & Ex. 1 ¶ 13. Frontier points to its termination letters as evidence of terminations, Opp. 2–3, but it is well aware that it did not terminate every subscriber to whom it sent a termination letter. Opp. 2. In some cases, Frontier rescinded the termination. *Id*. In others, the termination failed and the subscriber was either able to continue using, or was able to reconnect to, Frontier's internet service. Opp. Ex. 1 ¶ 17. Indeed, this is precisely why, in April, the RCCs sought, and Frontier agreed to produce, termination records. *See infra* at 3.

Thus, while the RCCs' expert, Kristofer Buchan, analyzed the termination letters, he could not "readily determine[] which accounts were terminated." Opp. 7. Instead, Mr. Buchan's analysis concluded that many subscribers who were the subject of termination letters were *not* terminated but continued to receive infringement notices after the termination date specified in the letter, corroborating that termination letters did not necessarily indicate terminations. Opp. Ex. 2 at FN 97 and ¶¶ 73–75. Mr. Buchan further found that some subscribers even received multiple termination letters, suggesting they were not in fact terminated after the first letter. *Id*.

Nor does the Spreadsheet resolve the mystery of whom Frontier terminated and when. Far from "corroborat[ing]" other evidence, the Spreadsheet conflicts with that evidence. Most glaringly, even though Frontier claims sending a subscriber a termination letter is a prerequisite to terminating that subscriber, Opp. 2, the Spreadsheet identifies at least four subscribers for whom Frontier produced *no* termination letter. Further, the termination letters Frontier produced do not align with the Spreadsheet. Frontier produced termination letters for nearly 60 subscribers whose names do not appear on the Spreadsheet. *See, e.g.*, Ex. 2, FRONTIER_00000432 & FRONTIER_00000004. And the number of subscribers to whom Mr. Buchan concluded Frontier

6

sent termination letters differs from the number of subscribers listed in the Spreadsheet. Opp. Ex. 2 ¶ 74 (identifying "445 unique subscribers"); RCCs' Ltr. Ex. B (identifying 444 rows of subscriber names, where sometimes a name appears multiple times). Further, while the "Memo" field for some subscribers in the Spreadsheet indicates a "DMCA User Termination per legal", for 160 subscribers in the Spreadsheet, the Memo field is blank, leaving unclear whether the subscriber was terminated due to repeated copyright infringement or for some other unrelated reason.

Frontier implicitly acknowledges this fundamental uncertainty. Even now, after producing the Spreadsheet, Mr. Garcia's errata, and submitting multiple declarations, Frontier's Opposition conspicuously refuses to commit to an actual number of subscribers it terminated, only referencing terminations of "hundreds of accounts," Opp. 1, and "over 400 subscribers" (*Id*. Ex. 1 ¶ 4).

Even where subscribers on the Spreadsheet match those in the termination letters Frontier produced, the data still raises alarming questions regarding *when* Frontier terminated those subscribers. For example, Frontier produced a termination letter for one subscriber indicting his service would be terminated on July 8, 2022. Ex. 3, FRONTIER_00038387. However, the Spreadsheet shows Frontier did not disconnect that subscriber's service until January 23, 2024, roughly 18 months later. RCCs' Ltr. Ex. B at 6. Even worse, Frontier produced a termination letter stating that it intended to terminate another subscriber's service effective November 18, 2016. Ex. 4, FRONTIER_00037122. But the Spreadsheet shows that Frontier did not disconnect that subscriber's service until April 26, 2024—nearly *eight years later*. RCCs' Ltr. Ex. B at 8. Frontier's failure to terminate subscribers on the dates set forth in the letters also led to *more* infringement. For instance, Frontier produced a termination letter stating that a subscriber's services would be terminated on October 6, 2023 (Ex. 5, FRONTIER_00000195), but, according to the Spreadsheet, Frontier did not terminate that subscriber's service for another six months, until March 28, 2024 (RCCs' Ltr. Ex. B at 9), and during those six months the subscriber was the subject of *71 additional* copyright infringement notices.

Frontier's misconduct has deprived the RCCs of the opportunity to question Frontier's witnesses regarding all of these incongruities and to use the Spreadsheet to substantively interrogate Frontier's implementation of its repeat infringer policy. Whether Frontier can satisfactorily explain all of these inconsistencies its records and documents reveal is still unclear, but what is clear is that Frontier has prevented the RCCs from obtaining those answers in discovery. Frontier is not entitled to ambush the RCCs at trial with new explanations that the RCCs had no opportunity to test in discovery.

### III. It is too late for Frontier to attempt to cure the prejudice its misconduct has caused by offering to re-open fact discovery.

Precluding the Spreadsheet and Mr. Garcia's errata is the only fair remedy. Frontier's offer to re-open Mr. Garcia's deposition is a day late and a dollar short. Trial starts in only ten weeks, fact discovery closed more than six weeks ago, and the parties have already served expert reports. The time for Frontier to cure its misconduct with additional discovery has long since passed.[6]

---

[6] Nothing prevented Frontier from serving Mr. Garcia's errata before July 13 or providing the information contained in Mr. Murphy's declaration well before July 26. While Rule 30(e) *allows* a witness 30 days to serve errata, it does

       Nor would just re-opening Mr. Garcia's deposition cure the prejudice from Frontier's misconduct. At the very least, the RCCs would also need to re-depose Mr. Murphy and supplement their expert reports. Further, as indicated above, this additional discovery would not be limited to asking a few foundational questions; instead, the Spreadsheet opens up whole new avenues for significant substantive analysis and interrogation of Frontier's termination processes. All of this work would interfere with the parties' preparations for trial.

Respectfully submitted,

*/s/ Matthew J. Oppenheim*
Matthew J. Oppenheim

---

not *require* the witness to wait 30 days. In circumstances like these where time is short, Frontier's needless delay undermines its claim of good faith and makes remediating its misconduct more difficult.