# CULPEPPER IP, LLLC

ATTORNEY AT LAW

75-170 HUALALAI ROAD, SUITE B204
KAILUA-KONA, HAWAII 96740

TEL: (808) 464-4047
FAX: (202) 204-5181

WWW.CULPEPPERIP.COM
―――――――
PATENTS, TRADEMARKS & COPYRIGHTS

KERRY S. CULPEPPER *

* ADMITTED TO PRACTICE IN VIRGINIA, HAWAI'I
  AND BEFORE THE USPTO

Aug. 15, 2024

Via E-mail: mg.chambers@nysb.uscourts.gov

Via ECF

Chief Judge Martin Glenn

US Bankruptcy Court, Southern District of New York

One Bowling Green

New York, NY 10004-1408

Case Name: *In re: FRONTIER COMMUNICATIONS CORPORATION, et al.*, Case No. 20-22476-mg

Re: Request for Conference on Discovery Dispute

Dear Judge Glenn,

    I represent Movie Company Claimants ("MCCs") in this contested proceeding against Debtor Frontier concerning allegations of secondary liability for copyright infringements and 17 U.S.C. §1202 violations. I am writing to request a discovery conference or leave to file a motion for appropriate remedies under Rule 37(e) for Frontier's intentional failure to preserve and produce important electronic data: IP address assignment records for IP addresses MCCs identified multiple times in writing to Frontier between March 2020 and Jan. 2021; copyright infringement e-mails sent to customers prior to Sept. of 2019; and system error logs from Frontier's DMCA system to deprive MCCs from obtaining this evidence. As explained below, Frontier's counsels have repeatedly shifted explanations for why it has failed to preserve and produce some of this electronic data.

**A.** ***Frontier was obligated to preserve relevant electronic records at least since 3/18/2020.***

    Frontier was obligated to preserve data pertaining to its DMCA defense and the IP address assignment electronic records at least from 3/18/2020 when Frontier received MCCs' demand letter (*see* Doc.#1894-4) to which Frontier's in-house counsel Paul Garcia responded on 3/31/2020. *See* Doc. #2302-2. At the latest, Frontier was obligated to preserve the electronic data from 6/8/2020 when MCCs (the Hannibal affiliates) filed the first proof of claim [*see* Doc. #1984-1 (claim #1372)][1]. *See Shamis v. Ambassador Factors Corp.*, 34 F.Supp.2d 879, 889 (S.D.N.Y. 1999); *see also Fujitsu Ltd. v. Federal Exp.*

---

[1] It appears from Frontier's privilege log that no type of legal hold in response to MCCs' proofs of claims was placed until 1/24/2021. *See* Frontier's Fifth Supplemental and Cumulative Privilege Log, PRIV00000618.

*Corp.*, 247 F.3d. 423, 436 (2d Cir. 2001) (obligation to preserve evidence known to be relevant to future litigation). MCCs explicitly informed Frontier of their intention to request subscriber identification information on 12/28/2020. *See* Ex. "A" (FRONTIER_00036567). Further, on 1/18/2021 the MCCs sent Frontier an excel sheet listing the roughly 200,000 notices and relevant IP addresses. *See* Doc. #2302-3. Thus, Frontier knew exactly what it needed to preserve. As explained below, it was Frontier's policy to retain such records for a period of 2 years in 2020. Thus, had Frontier preserved its records as required, MCCs would have been able to obtain IP address records going back to at least March of 2018. Accordingly, Frontier's failure to preserve the IP address assignment records was intentionally done to deprive MCCs from obtaining the information they told Frontier they needed.

**B.** ***Frontier failed to preserve IP address assignments, subscriber identifications and error logs.***

On 11/22/2023, MCCs served Requests for Production ("RFPs") 1-4 requesting (i) identification information of Frontier subscribers assigned IP addresses at infringement dates between 5/2016 to 12/2020 (just as MCCs stated they would on 12/28/2020 as shown in Ex. "A"); and (ii) the timeframes for which the IP addresses were assigned to the subscribers and all other IP addresses assignments for each subscriber ("IP address assignments"). *See* Doc. #2302-4. Although a total of 470 unique IP addresses were included in RFPs 1-4, Frontier only produced 93 subscriber identifications for 93 IP addresses and IP address assignment records from 8/31/2022 through 3/22/2024 for about 76 different Frontier accounts (identified by email addresses)[2]. Frontier did not produce the IP address assignment records for over 300 of the 470 IP addresses or any IP address assignment records prior to 8/31/2022. And despite Frontier's counsels first arguing that the data was no longer available due to it being for "former customers and for whom Frontier had no email or physical address information" (Doc. #2302-6, p.3) and later contradictorily arguing that the data "never existed" (Doc. #2302-7, p.2) for the accounts, Frontier finally admitted in response to Request for Admission ("RFA") #6 "that as of April 1, 2024, Frontier did not maintain all IP address assignment records older than 18 months." Ex. "B". Even worse, Frontier's 30(b)(6) representative Mr. Levan admitted during his 6/6/2024 deposition that (i) Frontier still was currently deleting IP address records older than 18 months; and (ii) Frontier had previously retained the IP address assignment records for up to two years through 2021. *See* Ex. C: 6/6/2024 Levan Tr., 224:16-18, 227:7 - 228:18.

Also, on 11/22/2023, MCCs served RFP #32 requesting *inter alia* documents sufficient to show Frontier's actual enforcement of its policy regarding copyright infringement from 1/1/2016[3] to the present. However, Frontier purged all system log records of errors that disrupted its DMCA notice processing system prior to 2/6/2021. *See id.*, 163:7-164:8. That is, Frontier did not stop purging system logs until about 3/21/2021, despite being on notice of MCCs' claims since 3/18/2020 at earliest or 6/8/2020 at latest when proofs of claims were filed.

---

[2] These productions were on 3/8/2024, 3/28/2024 and 4/11/2024.

[3] The start date became 10/18/2016 as a result of Your Honor's ruling in the Cable Act Order.

**C.** *MCCs have been prejudiced by Frontier's failure to preserve and produce IP address assignment records, identification information and system logs.*

The heart of this case is what actions Frontier took (or did not take) in response to notices from copyright holders concerning infringement at IP addresses. Without the IP address assignments MCCs cannot use *Frontier's documents* to prove that ongoing infringement at a certain IP address was for the same subscriber. For example, MCCs cannot show *by Frontier's documents*, for example, that all 491 notices sent to Frontier on behalf of MCCs concerning ongoing infringement at IP address 32.211.168.134 (one of the IP addresses listed in MCCs' Mar. 2020 demand letter) were all concerning Internet service of the same subscriber [4]. MCCs cannot use *Frontier's documents* to challenge Frontier's counsel's unverifiable assertion that from the 470 IP addresses of the RFP, there were only 112 unique accounts (*see* Doc. #2302-6, p3). MCCs are hindered from obtaining further evidence from Frontier's subscribers admitting to the direct infringements and rebutting Frontier's DMCA defense. Despite the limited time frame for discovery and Frontier's objections to RFPs 1-4, MCCs obtained declarations from numerous subscribers admitting to directly infringing MCCs' Works and rebutting Frontier's asserted repeat infringer policy. *See* RFAs 27-32 [5]. If Frontier had preserved the subscriber identification information and assignment records from the 2 years prior to MCCs' March of 2020 demand letter in line with Frontier's practices as admitted by Mr. Levan, MCCs would have received the IP address assignment records and subscriber names from March of 2018 and obtained further evidence from these subscribers to rebut Frontier's purported safe harbor defense and establish direct infringement and 1202 violations just like MCCs did from other subscribers (*see* RFAs 27-32). *See Cat3, Ltd. Liab. Co. v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 497 (S.D.N.Y. 2016) (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 533 (D. Md. 2010) ("Plaintiff's case against Defendants is weaker when it cannot present the overwhelming quantity of evidence it otherwise would have to support its case.")

Further, Frontier should not be able to assert that gaping holes in its DMCA system such as its failures to place subscribers in the walled garden, ingest incoming notices or match IP addresses with subscribers are attributed to innocent system errors while at the same time deleting the system error records. This issue is particularly prejudicial to MCCs because Frontier disputes that the number of notices MCCs' agents sent to Frontier is the same as the number Frontier received from MCCs [6]. For example, Frontier has

---

[4] Likewise for IP addresses 47.146.148.100 (573 Notices); 50.47.111.3 (385 Notices); and 50.35.177.133 (362 Notices). *See* Doc.#1894-4. Documents produced by Frontier show that some of these IP addresses had also been identified as problematic by a different rightsholder. *See* FRONTIER_00034255.

[5] One example redacted declaration from a Frontier subscriber B Y was filed at ECF No. 2301-6. B Y admits to direct infringements of multiple MCC Works and other facts that call into serious question Frontier's purported repeat infringer policy and its implementation.

[6] Over 200,000 notices were sent to Frontier on behalf of MCCs and their affiliates from 2016 to 2020. *See* Doc. #1894-5, ¶3.

denied in response to RFA# 29 that it received more than 75 notices for IP address 47.197.47.162. At the same time, Frontier has served expert reports asserting that the majority of Frontier's subscribers ceased piracy activities after receiving 10 notices.

Finally, despite Frontier having a written policy to maintain indefinitely copyright infringement e-mails sent to customers [*see* FRONTIER_00019288, FRONTIER_00019291 (Copyright infringement e-mails sent to customers indicated data retention period indicated as "indefinite")] Frontier failed to turn over basically any such emails prior to 9/2019.

**D.     *Remedies***

Because Frontier intentionally continued to delete the IP address assignment records despite MCCs' explicitly informing Frontier that they intended to request this information, the Court can invoke a 37(e)(2) remedy and presume that the deleted information was favorable to MCCs. That is, the Court can presume that for each unique IP address for which multiple notices were sent to Frontier prior to 8/31/2022, that the same customer was assigned the unique IP address. Further, for the IP addresses for which Frontier failed to preserve the customer identification information, the Court can presume that the customers (these unique IP addresses) committed the direct infringements of MCCs' Works and section 1202 violations. Note this remedy is available even under Rule 37(e)(1) as a measure no greater than necessary to cure the prejudice if the Court concludes the deletion was not done with intent to deprive because Frontier will still be able to put upon its safe harbor defense and defense of lack of secondary liability. However, Frontier should not be permitted to argue that it sent emails to customers or that it did not receive notices MCCs sent prior to 9/2019 since it deleted the emails in violation of its own policy that called for indefinite storage.

**E.     *Conclusion***

It is undisputed that Frontier continued to purge IP address assignment records throughout this litigation and continued to delete system error logs after receiving MCCs' 3/18/2020 demand letter, responding to the demand letter on 3/31/2020 and MCCs filing proofs of claims on 6/8/2020. MCCs met and conferred with Frontier concerning this issue by video on 8/13/2024 and exchanged emails on 8/6 and 8/8/2024 but were unable to come to any agreement. MCCs request that the court grant them leave to file a Rule 37(e) motion or at least grant them a discovery conference to discuss this important issue.

I thank the Court for its attention to this matter.

Sincerely,

/ksc/

Kerry S. Culpepper

kculpepper@culpepperip.com

Attachments: Exhibits "A" (FRONTIER_00036567); "B" (Frontier's response to Requests for Admissions); and "C" (Excerpts from 6/6/2024 Levan Transcript).