Kerry S. Culpepper (admitted *pro hac vice*)
**CULPEPPER IP, LLLC**
75-170 Hualalai Rd., STE B204
Kailua-Kona, HI 96740
Telephone: (808) 464-4047
Facsimile: (202) 204-5181
Email: kculpepper@culpepperip.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FRONTIER COMMUNICATIONS CORPORATION, *et al.*[1] | Case No. 20-22476 (MG) |
| | (Jointly Administered) |

## MOVIE COMPANY CLAIMANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SANCTIONS

---

[1] Due to the large number of debtor entities in these chapter 11 cases, for which joint administration has been granted, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Reorganized Debtors' claims and noticing agent at https://cases.primeclerk.com/ftr. The location of the Reorganized Debtors' service address for purposes of these chapter 11 cases is: 50 Main Street, Suite 1000, White Plains, New York 10606.

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................ 2

TABLE OF AUTHORITIES ......................................................................................... 4

I. INTRODUCTION ...................................................................................................... 6

II. RELEVANT FACTUAL BACKGROUND ............................................................ 7

III. LEGAL STANDARD ............................................................................................ 10

IV. ARGUMENT ......................................................................................................... 11

        A.     Frontier had a duty to preserve relevant evidence at least from March 10, 2020. ................................................................................................ 11

             i. Frontier had a duty to preserve relevant evidence at least from March 10, 2020. ......................................................................................... 11

             ii. Frontier had a duty to preserve relevant evidence at least from June 8, 2020. ........................................................................................... 15

             iii. Frontier had a duty to preserve relevant evidence at least from Dec. 28, 2020. .......................................................................................... 16

             iv. Frontier had a duty to preserve relevant evidence at least from Jan. 18, 2021. ............................................................................................ 17

             v. Frontier recognized that it had a duty to preserve relevant evidence at least from Nov. 12, 2019. ...................................................................... 20

             vi. Frontier had a duty to preserve relevant evidence at least from Sept. 19, 2016.. ............................................................................................. 20

        B.     MCCs were prejudiced by Frontier's deletion of IP address assignment records, Notices and DMCA system logs ................................................ 21

        C.     MCCs were prejudiced by Frontier's failure to preserve Hartman's hard drive and emails ...................................................................................... 24

        D.     Frontier's intentional and deceptive conduct supports 37(e)(2) sanctions .................................................................................................... 25

      E.      MCCs request relief under Rule 37(b)(2), 37(e)(1) and (2) ..................... 28

V. CONCLUSION ................................................................................................... 30

CERTIFICATE OF SERVICE ............................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 430 (S.D.N.Y. 2009) ................ 12

*Cat3, Ltd. Liab. Co. v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 499 (S.D.N.Y. 2016) ........... 25

*Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012) .......................................... 10

*Dorchester Financial Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 185 (S.D.N.Y. 2014)
.................................................................................................................................................. 11

*Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 176 (S.D.N.Y. 2022) ................... 12, 25

*Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) ............................................ 10

*Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018) .............................. 10

*Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) .................................................... 15

*Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 431-32 (W.D.N.Y. 2017) ........................... 25

*Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 581-82 (S.D.N.Y. 2017) ............. 25

*Rai v. WB Imico Lexington Fee, LLC*, 802 F.3d 353, 360 (2d Cir. 2015) ................................... 19

*Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 407 (S.D.N.Y. 2015) ....................... 16

*Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1184 (2d Cir. 1992) ......................................... 25

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) ................................... 10

**Statutes**

17 U.S.C. § 501 ............................................................................................................................. 12

17 U.S.C. § 507 ............................................................................................................................. 21

17 U.S.C. § 512 ............................................................................................................................. 29

17 U.S.C. § 1202 ....................................................................................................................... 7, 29

47 U.S.C. §551(c)(2)(C) ............................................................................................................... 25

**Rules**

Fed. R. Civ. P. 37 ..................................................................................................... 7, 10, 11, 25, 28

## I.      INTRODUCTION

After a year of deception, Frontier finally admits that it deleted important Internet Protocol

("IP") address assignment records from its RADIUS database through the close of discovery.

These records were essential for proving *by evidence from Frontier* that the same subscriber was

assigned the IP address for the duration of ongoing infringements of MCCs' Works and thus was

a repeat infringer.  These records were also essential for identifying the Frontier subscribers so that

MCCs could prove *by evidence from Frontier's subscribers* that: (i) users of the subscribers'

Internet service actually downloaded and shared copies of MCCs' movies with altered file titles

from their Frontier Internet service; (ii) the users knew the file titles were altered to include names

of notorious piracy websites to promote piracy; and (iii) that the ability to freely download and

share pirated copies of content including MCCs' Works was a draw for these subscribers to

become or remain subscribers of Frontier.  The subscriber identifications were also essential to

rebut Frontier's affirmative defense that it has properly implemented a repeat infringer policy.  But

not only did Frontier continue to delete the IP address assignment records after the Cable Act Order,

Frontier ***shortened*** its retention period of the records from 24 months to 18 months in violation of

the Cable Act Order.  Frontier has continued to give conflicting explanations for this failure that

ranging from weird (Frontier never knew who its customers were) to absurd (Frontier's outside

counsel never gave Frontier the spreadsheets MCCs' counsel produced).  Further, until February

of 2021, Frontier kept deleting system logs that expose significant flaws in Frontier's DMCA

system such as that for years it often sent customer notifications to non-existent email addresses.

Frontier has admitted that the system logs are important and that copies should have been preserved.

But just this past week it has come to light that Frontier also started deleting transcripts of phone

calls from its customers older than 90 days in July of 2023 so that no transcripts older than June

15, 2024 when Frontier finally produced the transcripts on Oct. of 2024.  Frontier continued this

deletion policy throughout discovery despite MCCs serving a document request for written notes

of verbal communications with customers subject of notices in Nov. of 2023.

The timing of Frontier's implementation of new deletion policies after Court orders and

notifications from MCCs' counsel strongly suggests bad faith in and of itself. Frontier then

confirmed its ill intentions by spending nearly a year actively concealing the fact that key data was

deleted and making bogus arguments that it did not know how to comply with a Cable Act Order

while disparaging claims as trolls.  From purposeful delays in discovery, through attempts to avoid

the Court's intervention, to misleadingly implying that none of the missing data ever existed to

begin with, Frontier demonstrated that its destruction of IP address assignment records, system

logs and Notice data from its DMCA system was deliberately calculated to prevent MCCs from

proving that it knowingly let its subscribers engage in massive infringement. Accordingly, MCCs

request that the Court impose sanctions on Frontier to cure the prejudice it has caused MCCs, by

*inter alia* precluding Frontier from using the absence of the deleted data to challenge MCCs' expert

reports or argue against MCCs assertion that Frontier's subscribers directly infringed their Works

with file titles altered in violation of 17 U.S.C. §1202. MCCs also request an irrebuttable

presumption pursuant to Rule 37(e)(2)(A) that the destroyed evidence was unfavorable to Frontier

and their attorneys' fees and costs in connection with the motion.

## II.    RELEVANT FACTUAL BACKGROUND

Since at least Oct. 27, 2012, Frontier has received notices alleging infringement of

copyrights at IP addresses associated with Frontier subscribers ("Notices").  *See* Joint Stipulation

at ¶1.

MCCs started sending notices to Frontier in 2016. *See* Joint Stipulation at ¶26. Particularly, the MCCs' agents began sending Notices to Frontier as early as March 12, 2016. Between 2016 and December 31, 2023, MCCs' agents sent 242,822 DMCA Notices to Frontier. *See* Decl. of Culpepper at ¶2. Frontier's outside counsel acknowledged receiving a list of Notices sent to Frontier that "cover a 44 month period from April 2016 through December 2020." Ex. "M-11" at p.4.

Between June 8 and September 28, 2020, MCCs filed multiple proofs of claims asserting pre-petition claims on the basis, *inter alia*, that Frontier was secondarily liable for copyright infringement. *See* Joint Stipulation at ¶43. MCCs filed claim numbers 1378, 1372, 1394 and 1434 on June 8, 2020. *See* Decl. of Culpepper at ¶44.

On Mar. 10, 2020, MCCs' counsel sent a cease-and-desist letter to Frontier's designated DMCA email address and by certified mail to its legal department threatening litigation for secondary liability for copyright infringement ("3-10-2020 demand letter"). *See* Ex. "B". Frontier acknowledges receiving a physical copy of the 3-10-2020 demand letter on Mar. 16, 2020. *See* Joint Stipulation at ¶20. Frontier also received a copy via email on Mar. 10, 2020. *See* Ex. "M-3" [Levan Depo. Tr. 416:7 – 416:18].

Frontier's RADIUS database contains IP address assignment records that typically allow Frontier to determine the cable modem or gateway assigned a particular Frontier IP address over a recent particular time which are not in the Frontier DMCA database. *See* Joint Stipulation at ¶4. Frontier's DMCA script uses the RADIUS database to identify the subscriber assigned the IP address at the time of alleged infringement in the Notice. *See* Joint Stipulation at ¶5.

Until Jan. of 2024, Frontier purged IP address assignment records older than 24 months or more from the RADIUS database. *See* Ex. "M-3" [6/6/2024 Levan Depo. Tr. 226:20-227:13]. In

Jan. of 2024, Frontier begin purging IP address assignment records older than 18 months. *See* Ex. "M-12" (Frontier's Response to MCCs' Am. Second Interrog. at No. 24).

Frontier continued purging IP address assignment records from its RADIUS database through the close of document discovery. *See* Ex. "M-3" [11/12/2024 Levan Depo. Tr. 433:13-20]. Sometime after the June 2024 deposition of Phillippe Levan, Frontier began archiving historical IP address assignment records. *See* Ex. "M-3" [11/12/2024 Levan Depo. Tr. 434:8-15]. Frontier states it intended to archive the IP address assignment records in March of 2021 but forgot. *See* Ex. "M-3" [Levan Depo. Tr. 426:3-10] ("…unfortunately, with time, we -- we forgot about it. And so we did not archive more of the RADIUS data after -- after about three months…"); Ex. "M-14".

Prior to March 2, 2020, the retention period for the Reports table of Frontier's DMCA Database was 6 months. Between March 2, 2020, and January 15, 2021, the retention period was 12 months. On January 15, 2021, the retention period was extended indefinitely. The Reports table stores Reports of Notices successfully processed by Frontier from Sept. 2, 2019 on. *See* Joint Stipulation at ¶¶6-7.

Frontier's earliest Notifications table data is dated October 27, 2012. *See* Joint Stipulation at ¶12. However, until March 11, 2021, Frontier only sent Notifications to subscribers upon receipt of the 16th Notice linked to an IP address assigned to the subscriber's account within a 90-day period. *See* Joint Stipulation at ¶13.

Until March 23, 2021, Frontier purged system logs of errors wrote by its main Notice processing script, dmca-xml.py script that were older than 45 days. Frontier retains and has produced system logs from February 6, 2021 on. *See* Joint Stipulation at ¶¶16-17.

Frontier's dmca-xml.py script creates daily backtrace files for debugging purposes when the script encounters particular errors that cause the script to terminate. Frontier retains and has produced backtrace files from May 13, 2022. *See* Joint Stipulation at ¶18.

### III.    LEGAL STANDARD

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co*., 167 F.3d 776, 779 (2d Cir. 1999).

Spoliation of electronically stored information ("ESI") is governed by Rule 37(e) of the Federal Rules of Civil Procedure, which was amended in 2015 to read as follows:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> (A) presume that the lost information was unfavorable to the party;
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> (C) dismiss the action or enter a default judgment.
> Fed. R. Civ. P. 37(e).

"The party seeking discovery sanctions on the basis of spoliation must show" the elements of such a claim "by a preponderance of the evidence." *Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018) (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012)).

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)).

Rule 37 does not specify which party bears the burden on the issue of prejudice. Rather, it gives the court discretion to determine prejudice based on the particular facts before it. Upon a finding of prejudice, the Court is tasked with determining the "least harsh sanction that can provide an adequate remedy." *Dorchester Financial Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 185 (S.D.N.Y. 2014); see also 2015 Advisory Notes to Rule 37(e).

## III.    ARGUMENT

### A.    Frontier had a duty to preserve relevant evidence of its DMCA system.

A question set forth by the Court was: "On what date(s) was Frontier required to place a litigation hold on electronic and/or paper copies of files and records relating to alleged copyright infringement by Frontier ISP subscribers?"  Doc. #2424.  Frontier instituted a legal hold on Jan. 25, 2021.  *See* Ex. "M-2" (Frontier's Resp. to MCCs' Third Req. for Admis. at No. 147).  But as explained below, Frontier was required to place litigation hold as early as Oct. 2016 but it was put on notice multiple times by MCCs and third-parties between Oct. 2016 and Jan. 2021 that key evidence from its DMCA database was relevant to future litigation.  However, even Frontier admits that did not even comply with the Jan. 25, 2021 legal hold because it needed to and intended to archive copies of tables from its RADIUS database in March 29, 2021. *See* Ex. "M-14" ("Due to a legal hold related to pending litigation, we need to preserve a copy of old accounting tables until further notice.")  Frontier's states: "we forgot about it".   Accordingly, there is no question that Frontier was required to preserve relevant evidence from its RADIUS database as of Mar. 29, 2021 and failed to do so.

### i.    Frontier had a duty to preserve relevant evidence at least from March 10, 2020.

On Mar. 10, 2020, MCCs sent Frontier a cease-and-desist letter via email to Frontier's designated DMCA email address and certified mail to its legal department ("3-10-2020 demand

letter"). *See* Joint Stipulations at ¶20; Ex. "B"; Ex. "M-3" [Levan Depo. Tr. 416:7 – 416:18].

MCCs argued in their Oct. 25, 2024 memorandum that applicable caselaw such as *Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 176 (S.D.N.Y. 2022) establishes that Frontier was obligated to preserve relevant evidence in response to the 3-10-2020 demand letter because it made specific factual assertions and demands concerning MCCs' belief that Frontier is liable for its subscribers' copyright infringements in violation of 17 U.S.C. §501. *See* Doc. #2454 at pp. 5-9. "Where copyright infringement is alleged, and a cease and desist letter issues, such a letter triggers the duty to preserve evidence, even prior to the filing of litigation." *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 430 (S.D.N.Y. 2009).

The 3-10-2020 demand letter referred to specific IP addresses 47.146.148.100; 32.211.168.134; 50.47.111.3; 50.45.234.126; 32.208.214.132; 32.209.75.93; 32.210.96.25; 32.210.1 14.34; 32.210.215.115; 32.211.168.134 in the heading. *See* Ex. "B" at p.2; Ex. M-2 (Frontier's Resp. to MCCs' Third Req. for Admis. at No. 125).

The 3-10-2020 demand letter points out that a particularly high number of Notices ranging from 362 to 573 were sent for IP addresses 47.146.148.100 (573 Notices); 32.211.168.134 (491 Notices); 50.47.111.3 (385 Notices); and 50.35.177.133 (362 Notices). *See* Ex. "B" at p.5. The 3-10-2020 demand letter also included example Notices that referred to specific infringements at specific IP addresses at specific times after March 2018: (a) 50.35.177.133 at Aug. 5, 2018 07:54:15 (*See id.* at p.12); (b) 47.146.148.100 at Nov. 7, 2018 02:18 (*See id.* at p.16); and (c) 32.211.168.134 at May 6, 2019 00:19 (*See id.* at p.20). Because as of March 10, 2020, Frontier preserved IP address assignment records in its RADIUS database for 24 months, *see* Ex. "M-3" [6/6/2024 Levan Depo. Tr. 226:20-227:13], Frontier could have pulled: the customer that was assigned the customers that were assigned the IP addresses in (a) - (c) and; all the customers that

12

were assigned all the IP addresses identified in the 3-10-2020 demand letter for at least the previous two years. At the least, Frontier should have preserved assignment records for these IP addresses mentioned in the 3-10-2020 demand letter. Further, as argued in MCCs' Oct. 25, 2024 memorandum of law, Frontier's Mar. 31, 2020 response to the 3-10-2020 demand letter also obligated Frontier to preserve all records in connection with its DMCA database because Frontier's response letter asserted the DMCA safe harbor affirmative defense and stated that Frontier would seek their reasonable attorneys' fees. *See* Doc. #2454 at p.9.

Notably, roughly a month before the 3-10-2020 demand letter (one month earlier), Frontier received a similar demand letter from BMG Rights Management, LLC ("BMG"). *See* Ex. "K". Frontier hastily terminated a customer BMG indicated as an egregious infringer. *See* Ex. "M-4" ("…Paul and I have been navigating a complaint from BMG Music and Rightscorp, a copyright activist, about a single customer …. allegedly violating music copyrights with illegal downloading. We have received over 120 copyright complaints about the customer (that we can see in our system), but Rightscorp alleges there have been thousands of complaints."); *see also* Ex. "M" (Paul Garcia letter to Rightscorp stating Frontier had terminated the subscriber assigned an IP address mentioned by Rightscorp in a telephone conversation). When the customer asked Frontier to reconsider, Frontier told the customer on Feb. 21, 2020: "Please understand copyright owners have become increasingly aggressive and have sued internet service providers for literally millions of dollars if appropriate action is not taken for DMCA violations." Ex. "M-7". Accordingly, Frontier knew that litigation was imminent.

Later, on May 26, 2020, Frontier's in-house counsel Paul Garcia sent an email as follows:

> Thanks. I mentioned some additional accounts on our call this morning that fell through cracks because of the programming situation that Phillippe described. Are we able to identify these customers, or do we need to know the time frame of the violations to do so?

13

> 47.149.221.167: 290 notices
> 32.210.96.25: 105 notices
> 184.18.46.136: 71 notices
> 32.211.168.134: 59 notices
> 32.210.215.115: 47 notices

Ex. "M-5" at p.5.

Three of the five IP addresses (32.211.168.134, 32.210.96.25, and 32.210.215.115) identified by Mr. Garcia were also referred to in MCCs' 3-10-2020 demand letter. *See* Ex. "B". That same day, Mr. Levan pulled account information for the five IP addresses. *See* Ex. "M-5" at pp. 3-4. On May 27, 2020, Frontier employee Josh Elmore stated: "Three of them aren't in the report from the beginning of this month…I cannot recall what exactly the programming situation was or if Rightscorp specifically wanted them disconnected." Id. at p2. Frontier later decided to "terminate the one ongoing infringer, and keep an eye on the others…". Ex. "M-6" at pp. 2. Accordingly, Frontier possessed detailed information for IP addresses 32.211.168.134, 32.210.96.25 and 32.211.168.134 at least as of May 27, 2020. But unlike Frontier's response to the Rightscorp/BMG letters, Frontier ignored MCCs' reply to Mr. Garcia's response. *See* Joint Stipulation at ¶42.

MCCs served Frontier a request for identification for the customers assigned IP addresses was 32.211.168.134; 32.210.96.25 and 32.210.215.115. *See* Ex. "R" at 26. Frontier did not produce identification information for IP address 32.211.168.134. *See* Decl. of Culpepper at ¶83. Further, Frontier failed to produce IP address assignment records for any part of MCCs' claim period of 2016-2021. *See id.* Accordingly, Frontier deleted these IP address assignment records despite knowing that both MCCs and Rightscorp had made a specific demand concerning these IP addresses and possessed this information as of May 27, 2020.

Despite the MCCs' and demand letter and Mr. Garcia's response letter, Frontier continued to delete IP address assignment records from its RADIUS database through the close of discovery. *See* Ex. "M-3" [6/6/24 Levan Depo. Tr. 228:10-19].  Frontier admits to the importance of these records. *See* Ex. "M-3" [Levan Depo. Tr. 451:6 – 452:6].  Frontier also admits that at the time of the 3-10-2020 demand letter, its practice was to preserve IP address assignment records for 24 months or more.  *See* Ex. "M-3 [6/6/24 Levan Depo. Tr. 226:20-227:13].  Accordingly, Frontier could have archived a copy of IP address assignment records of the IP addresses for up to 24 months earlier (3-10-2018) at that time.  *See* Ex. "M-3 [Levan Depo. Tr. 434:17 – 436:3]. Further, there would have been no burden to Frontier to have archived a copy of 24 months of assignment records as of March 10, 2020 because it would not have cost Frontier an additional cent to do so. *See* Ex. "M-3 [Levan Depo. Tr. 436:4 – 437:1].  Frontier has admitted that the "proper action" would have been to do so.  *See* Ex. "M-3 [Levan Depo. Tr. 448:3 – 449:15].

### ii.    Frontier had a duty to preserve relevant evidence at least from June 8, 2020.

The duty to preserve evidence arises "most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (citations omitted).  Between June 8 and September 28, 2020, MCCs filed multiple pre-petition claims on the basis, *inter alia*, that Frontier was secondarily liable for copyright infringement. *See* Joint Stipulation at ¶43.  Between May 28 and June 1, 2021, MCCs filed post-petition administrative claims in the Frontier bankruptcy on the basis, *inter alia*, that Frontier was secondarily liable for copyright infringement.  *See id.* at ¶44.  A prepetition claim filed by MCCs in 2020 stated that "MEU sent at least 573 notices to [Frontier] regarding infringements at IP address 47.146.148.100

between November of 2016 and January of 2020. *See* Ex. "M-2" (Frontier's Resp. to MCCs' Third

Req. for Admis. at No. 158). However, Frontier did nothing to preserve records of the IP addresses

mentioned in MCCs' proof of claims from June 8, 2020 through the close of discovery. *See* Ex.

"M-3" [Levan Depo. Tr. 232:3 – 236:1] ("Q. Fair to say Frontier did nothing to preserve any

information after seeing this proof of claim in the summer of 2020? MR. KLIMMEK: Object to

the form. You can answer. A. That's correct."). Notably, the day MCCs' filed their first proof of

claim on June 8, 2024, *see* Joint Stipulation at ¶43, Frontier's in-house counsel Paul Garcia stated:

> We are also being more aggressive about policing the DMCA violations
> because copyright owners and their troll agents are suing companies like Frontier
> for LOTS of damages if we don't take action. Cox, for example, just had to pay 1
> billion (with a b) in damages in a lawsuit in Virginia. We really are between a rock
> and a hard place.

Ex. "M-8".

Accordingly, Frontier knew that it had been sued on June 8, 2020, yet Mr. Garcia

waited until Jan. 25, 2021 to place a legal hold in response to MCCs' claims. *See* Ex. "M-

2" (Frontier's Resp. to MCCs' Third Req. for Admis. at No. 147).

### iii.    Frontier had a duty to preserve relevant evidence at least from Dec. 28, 2020.

"[A] litigant has the duty to preserve what it knows, or reasonably should know, is relevant

in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably

likely to be requested during discovery and/or is the subject of a pending discovery

request." *Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 407 (S.D.N.Y. 2015) (internal

quotation marks and citation omitted).

On Dec. 14, 2020, Frontier's outside counsel Joshua Robinson emailed MCCs' counsel

stating that Frontier and MCCs would need to decide upon a discovery schedule for an evidentiary

hearing to adjudicate Frontier's liability. *See* Ex. "M-2" (Frontier's Resp. to MCCs' Third Req.

for Admis. at No. 167). On Dec. 28, 2020, MCCs' counsel and Frontier's outside counsels conducted a phone conversation to dismiss the proof of claims. *See* Ex. "P"; Decl. of Culpepper at ¶68; Ex. "M-2" (Frontier's Resp. to MCCs' Third Req. for Admis. at No. 168)). During the phone conversation, MCCs' counsel explicitly told Frontier's counsels that Frontier's proposed compressed discovery schedule was unfeasible because MCCs would be requesting identification information of subscribers. *See* Decl. of Culpepper at ¶54. That same day, MCCs' counsel sent Frontier an email summarized the topic discussed that specifically referred to subscriber names for IP address and asked about Frontier's retention period. *See* Decl. of Culpepper at ¶55; Ex. "M-2" (Frontier's Resp. to MCCs' Third Req. for Admis. at No. 168)); Ex. "P". Accordingly, Frontier clearly knew on Dec. 28, 2020 that MCCs would be requesting the identification data during discovery. Frontier argues in its Aug. 23, 2024 letter that "…Frontier could not have been expected to indefinitely suspend its normal retention policy for the entirety of its RADIUS database containing IP assignment data on millions of subscribers that have nothing to do with MCCs' claims…". Doc. #2420 at p.4. However, Frontier could have at least archived a copy of its IP assignment data to preserve data as it existed rather than suspending retention, something Frontier recognizes that it should have done. *See* Ex. "M-3" [Levan Depo. Tr. 426:3-10] ("…unfortunately, with time, we -- we forgot about it. And so we did not archive more of the RADIUS data after -- after about three months…"). Accordingly, Frontier had an obligation to at least archive a copy of the IP address assignment records and system logs from its DMCA system on Dec. 14, 2020.

### iv.    Frontier had a duty to preserve relevant evidence at least from Jan. 18, 2021.

On Jan. 8, 2021, Mr. Robinson emailed MCCs' counsel a proposed outline of topics for discovery. *See* Ex. "M-2" (Frontier's Resp. to MCCs' Third Req. for Admis. at No. 170). On Jan. 14, 2021, Frontier's outside counsels and MCCs' counsels held a telephone conference to

discuss a discovery schedule. *See* Ex. "M-9". On Jan. 18, 2021, MCCs' counsel sent to Frontier's outside counsels: (i) a letter detailing information requested by Frontier during the telephone conference including ownership, copyright certificates, and an excel sheet listing more than 200,000 notices and corresponding IP addresses and dates sent to Frontier from April of 2016 through December of 2020. *See* Ex. "M-10", "M-11". Because of the size of the attachments, MCCs' counsel sent the documents to Frontier's outside counsel using their firm transfer tool. *See* Ex. "M-12" (email from Kirkland with upload instructions and screenshot of the files prior to being uploaded). Then, on Jan. 20, 2021 MCCs' counsel sent Frontier's outside counsel a link for downloading the notices. *See* Decl. of Culpepper at ¶61; Ex. "M-13". Accordingly, Frontier did not have to even archive all the assignment records from its RADIUS database. Frontier only had to instruct Mr. Levan to archive a copy of its IP assignments for the IP addresses in the spreadsheet MCCs' counsel produced on Jan. 18, 2021. Frontier's employee Mr. Levan admits that he would have done so if he had received the spreadsheet. *See* Ex. "M-3" [Levan Depo. Tr. 451:19 – 452:6] ("…In – hindsight, if we had been asked to do that, yets, that's what should have been done, but it was not…"). Accordingly, Frontier had an obligation to at least archive from its RADIUS database a copy of the IP address assignment records from the spreadsheet and system logs from its DMCA system at that time.

Frontier continues its pattern of deception by now arguing that it never received the notices and spreadsheets from MCCs' counsel in January of 2021. *See* Ex. "M-2" (Frontier's Resp. to MCCs' Third Req. for Admis. at Nos. 172-178). This is absurd. Documents *produced by Frontier* show that its counsel Joshua Robinson acknowledged receipt on Feb. 10, 2021 of the data including the spreadsheet and the copies of the notices sent by MCCs' counsel on Jan. 18, 2021. *See* Ex. "M-11" at p.5 ("We have received the data and the company's IP counsel is evaluating."). Indeed,

on April 2, 2020 Mr. Robinson asked detailed questions about the Notice data he could not do unless he had received it. *See id.* at p.4 (Asking why 148 notices entered in the spreadsheet do not include a date and noting that the notices cover the period from April 2016 through December 2020). MCCs also attach as an exhibit a screenshot of files including the spreadsheet that was uploaded to Frontier's outside counsel's firm upload tool. *See* Ex. "M-12" at p4. Frontier cannot argue that its outside counsel receiving the data does not mean Frontier received it because an attorney Frontier retained for the litigation is its agent. *See Rai v. WB Imico Lexington Fee, LLC*, 802 F.3d 353, 360 (2d Cir. 2015). Moreover, the top the top of the email thread *produced by Frontier* shows that Mr. Robinson had sent a copy of all the communications to Frontier's in-house counsel Paul Garcia. *See* Ex. "M-11" at p.2.

Notably, on June 28, 2021 MCCs' filed a motion that argued MCCs intention to request an Oder per 47 U.S.C. § 551(c)(2)(C) (the "Cable Act") Order for a percent of the more than 89,000 subscribers that pirated their motion pictures to prove the direct infringements was a basis for withdrawing the reference. *See* Doc. #1927-1 at p.10. On July 12, 2021, Frontier argued in opposition to MCCs' motion to withdraw the reference that "The Bankruptcy Court is more than capable of managing discovery, even discovery implicating 47 USC § 551(c)(2)(C), based on well-settled precedent." Case 1:21-cv-05708-AT Document 11 at p23. Thus, Frontier had to have known in June 28, 2021 that the IP address records from RADIUS database needed to be preserved. Notably, Frontier had no problem producing this information when it is a third-party to a copyright lawsuit. *See* Ex. "M-20".

### v. Frontier recognized that it had a duty to preserve relevant evidence at least from Nov. 12, 2019.

On Nov. 12, 2019, Frontier's in-house counsel John Greifzu placed a legal hold on Josh Elmore and Phillippe Levan for DMCA copyright matters. *See* Ex. "A" at p.3. Accordingly, Frontier recognized that it was on duty to preserve data related to its DMCA database. Yet Frontier continued to delete Reports older than 6 months and IP address assignment records older than 24 months. *See* Joint Stipulation at ¶6. Further, Frontier failed to preserve emails for Greg Hartman (the predecessor to Phillippe Levan) who resigned 3 days earlier. *See* Joint Stipulation at ¶¶30-33; *see* Ex. "M-2" (Frontier's Resp. to MCCs' Third Req. for Admis. at Nos. 94-98, 100-101 and 103); Decl. of Garcia at ¶3(c). Frontier asserts that his laptop it preserved has mysteriously disappeared. *See id*. ("Frontier has a record of the preservation of Mr. Hartman's hard drive and no record of its destruction but has been unable to locate the hard drive."). Notably, Frontier did not disclose that Mr. Hartman was a person with relevant evidence in its initial disclosures of Dec. 21, 2023. *See* Decl. of Culpepper at ¶21. Accordingly, MCCs could not appreciate that Mr. Hartman was a key custodian whose emails should have been searched at the time the Parties negotiated custodians and search terms.

### vi.    Frontier had a duty to preserve relevant evidence at least from Sept. 19, 2016.

On Sept. 19, 2016, Frontier received a demand letter from RightsCorp, Inc. asserting "we see the same ongoing pattern of infringement on your network that we saw on the Cox network that led to the $25 million judgment for our client BMG." *See* Ex. "M-2" (Frontier's Resp. to MCCs' Third Req. for Admis. at No. 104); Ex. "C". The demand letter requested that Frontier adopt "redirect pages as a sanction" for subscribers' infringements among other measures. *See id.* at pp. 3-4. On Oct. 13, 2016, Frontier sent a response letter to Rightscorp's demand letter stating

*inter alia* that "Frontier has been consistent and diligent in forwarding copyright infringement allegations to its accused customers and terminating customers when appropriate, at a substantial business cost to the Company." *See* Ex. "D".   However, at the time of the response letter, documents produced by Frontier show that it had only sent notices of termination to ten customers at most, at least one of which Frontier revoked. *See* Dec. of Culpepper at ¶16.   After the 2016 Rightscorp letter, Frontier implemented a legal hold on emails of its in-house counsel Cecilia Stiber.   *See* Decl. of Garcia at ¶3(e).   Accordingly, Frontier recognized the seriousness of the 2016 Rightscorp letter.   However, Frontier continued to delete Reports Notice data from its DMCA system older than 6 months.   *See* Joint Stipulation at ¶6, Ex. "M-2" (Frontier's Resp. to MCCs' Third Req. for Admis. at Nos. 172-178).   Frontier had an obligation to preserve the Reports table for at least 3 years in view of the Rightscorp letter and the general 3 year time period for filing a civil action for copyright infringement for 17 U.S.C. §507(b).

## B.    MCCs were prejudiced by Frontier's deletion of IP address assignment records, Notices and DMCA system logs.

MCCs' agents sent over 140,000 Notices to Frontier from Oct. 14, 2016 though to Sept. 1, 2019.   *See* Decl. of Culpepper at ¶2.   However, because Frontier purged all Report records of incoming notices prior to Sept. 2, 2019, MCCs cannot prove by Frontier's evidence whether Frontier properly tracked incoming Notices as it asserts.   Nor can MCCs do this by Notification records because prior to Mar. 11, 2021, Frontier only sent a Notification to its subscriber if it received more than 15 Notices for that subscriber within a 90 day period.   *See* Joint Stipulation at ¶13.

Frontier provided MCCs with identifications for only 93 of the 959 instances of infringement at IP addresses requested (less than ten percent) and without any assignment records

for the time period relevant to MCCs' claims.  *See* Ex. "M-2" (Frontier's Resp. to MCCs' Third Req. for Admis. at No. 191); Decl. of Garcia at ¶3(m).  The Frontier subscriber D. B. with email address diane1612@frontier.com that was assigned IP address 32.212.80.6 at 12/7/2020 16:34 is illustrative of the prejudice MCCs' have suffered from Frontier's failure to preserve the IP address assignment records.  D.B. admitted to pirating numerous copies of MCCs' Works from her Frontier Internet service using a BitTorrent software app.  *See* Ex. "M-15" (Decl. of D.B. at ¶¶8-12).

Frontier failed to provide any IP address assignment records for time periods applicable to MCCs' claim period.  MCCs' agents sent hundreds of notices to Frontier concerning infringements of their Works at IP address 32.212.80.6 from 10/29/2016.  After receiving this subscriber's identification, MCCs' counsel contacted the subscriber who admitted to pirating numerous copies of MCCs' Works from her Frontier Internet service using a BitTorrent software app.  *See* Ex. "M-15" (Decl. of D.B. at ¶¶8-12).  However, MCCs' cannot prove *by documents provided by Frontier* that this subscriber was assigned IP address 32.212.80.6 for the duration of these infringements because the IP address assignment records produced by Frontier for this IP address start at Sept. 6, 2022.  Moreover, if MCCs had received identification information for at least 500 of the 959 instances in a reasonably time, MCCs would have likely received numerous similar declarations from subscribers admitting to piracy.  *See, e.g.,* Docs. ##2301-6 (subscriber admitting to piracy).

Numerous individuals have boasted in the social media website Reddit about using Frontier's Internet service for piracy. *See* Ex. M-"19" at p19 ("Been using Frontier DSL for years. Despite the shitty internet, they don't give a shit what I download.").  MCCs have been prevented from locating the Frontier subscribers that made similar boastful conduct by Frontier's failure to preserve identification records.

Besides the IP address assignment records, Frontier continued to delete its DMCA system log records until March of 2021 despite receiving MCCs' 3-10-2020 demand letter and MCCs' proof of claims in June of 2020. *See* "M-3" [Levan Depo. Tr. 163:7-164:19]. The limited system log records that were produced show significant flaws in Frontier's DMCA system such as the fact for years it often sent customer notifications to non-existent email addresses. Frontier admits that it should have preserved these log records too. *See* "M-3" [Levan Depo. Tr. 432:1-11]. The Frontier subscriber D. B. is also illustrative of the prejudice MCCs' have suffered from Frontier's failure to preserve the system log records. Frontier asserts that it sends a customer a Notification after a certain threshold of Notices are received (ranging from 15 to 10). *See* Joint Stipulations at ¶13-14. However, D. B. asserts that Frontier did not send a Notification to her until around 2022 or 2023. *See* Ex. "M-15" (Decl. of D.B. at ¶13). The limited system error logs Frontier produced show that Frontier failed multiple times to send Notifications to D. B. *See* Ex. "M-16" (Recipient address rejected: Account is inactive or has been disabled or discontinued')}). However, D. B. was still a customer at the time Frontier's system was failing to deliver the Notifications to D. B. When Frontier later started using D. B.'s preferred email address ("d███████0@gmail.com") in April of 2023, Frontier successfully delivered the Notifications to D. B.'s email address. *See* Ex. "M-17". However, because Frontier purged all system error logs older than Feb. 6, 2021, *see* Joint Stipulations at ¶17, MCCs cannot prove *by documents provided by Frontier* that Frontier failed to send notifications to this subscriber from 2016 through 2023. Frontier's failure to successfully send notices to subscriber is a huge flaw in its DMCA system. Notably, Frontier has conceded that it was aware as early as 2016 or 2017 that its subscribers were not receiving emails sent to the customers frontier.com email address. *See* 6/6/2024 Levan Depo. Tr. 52:5-22.

Just recently it has come to light that in July of 2023 Frontier started deleting transcripts of certain audio calls from its customers older than 90 days so that no transcripts older than June 15, 2024 exists. *See* Ex. "M-23" at p.6. Frontier continued this deletion policy throughout discovery despite MCCs serving a request for written notes of verbal communications with customers subject of notices in Nov. of 2023. *See* Ex. "R" at 15 (#53). The limited transcripts that Frontier produced after the Court reopened discovery prove demonstrate that at least one customer who Frontier claimed it terminated for repeat infringement is again a current customer. *See* Ex. "M-18" (Ross Depo Tr. 159:18 – 163:16). Thus, MCCs have been prejudiced by Frontier's deletion of call transcripts that would have proven that Frontier let other customers it knew were repeat infringers re-sign up as customers.

**C.    MCCs were prejudiced by Frontier's failure to preserve Hartman's hard drive and emails.**

Frontier initially failed to produce documents prior to 2017 despite the Court explicitly stating that the discovery period would begin on Oct. 13, 2024. *See* Doc. #2361. Frontier finally produced pre-2017 documents on May 23, 2024 (after the original document production cut-off and three weeks before original deposition cut-off). The pre-2017 documents show that Mr. Hartman had generated reports of repeat infringers, *see* Joint Stip at ¶32, and that Mr. Hartman had a Left-To-Do item to "Identify FTR employee in report, hand off info to legal for action." *See* Decl. of Garcia at ¶3(q). Mr. Hartman testified that he notified Frontier's legal department of the particular Frontier employee. *See* Ex. "M-24" at pp. 5-7. However, Frontier has not produced any records in connection with this Frontier employee and has been "unable to locate" his hard drive. *See* Decl. of Garcia at ¶¶3(c) and (q). Frontier's failure to preserve Mr. Hartman's emails and hard drive have prevented MCCs from identifying the Frontier employee and the IP address used

to ascertain if this employee infringed MCCs' Works. Frontier does not have a safe harbor from

its own employees' infringements. Thus, sanctions are also appropriate under Rule 37(e)(1) for

Frontier's failure to preserve Mr. Hartman's hard drive and his emails.

**D.    Frontier's intentional and deceptive conduct supports 37(e)(2) sanctions.**

MCCs do not seek terminating sanctions. Accordingly, the standard of proof is

preponderance of the evidence. *See Cat3, Ltd. Liab. Co. v. Black Lineage, Inc.*, 164 F. Supp. 3d

488, 499 (S.D.N.Y. 2016). However, even if the higher clear and convincing standard is applied,

MCCs can still prove Frontier's intent to deprive the movant of the information for use in the

litigation by circumstantial evidence. *See Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1184

(2d Cir. 1992) (circumstantial evidence may be accorded equal weight with direct evidence);

*Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 431-32 (W.D.N.Y. 2017) (finding intent based

on defendants' actions in the litigation that allowed evidence to be overwritten and destroyed);

*Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 581-82 (S.D.N.Y. 2017) (considering

plaintiff's conduct throughout the litigation and during discovery disputes). Further, even in

*Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 175 (S.D.N.Y. 2022) where the Court

applied the clear and convincing standard, the Court stated that "Intent can be inferred when a

party has significantly failed in its obligation to preserve and collect documents."

The facts in this case fit to a tee the guidance of *Ottoson*, *Europe* and *Moody.* Frontier's

excuses that it just forgot to preserve the IP address assignment records or cannot locate Mr.

Hartman's laptop are not acceptable in view of the multiple instances between March 2020 and

January of 2021 where MCCs (and Rightscorp) alerted Frontier to problems with specific IP

addresses. If Frontier's deletion of the data was truly an innocent mistake based upon

misapprehending its importance, Frontier should have admitted that it had deleted it in the parties'

Rule 26 conference where they discussed in ESI plan or in the first case management hearing before the Court.  Instead, Frontier first tried to convince the Court based upon inopposite caselaw that it should deny MCCs' request for a Cable Act Order.  *See* Doc. #2233 at p.7 (Court describes Frontier's cited cases as inopposite and not instructive).   During the hearing where the Court told the Parties that it intended to grant MCCs' Cable Act Order request, Frontier could have told the Court that there was an issue because it no longer had most of the data.  Instead, Frontier made frivolous objections to MCCs' requests for customer identifications and waited until nearly the end of January to begin notifying its customers.  *See* Ex. "M-2" (Frontier's Resp. to MCCs' Third Req. for Admis. at No. 185).  Consequently, MCCs were forced to request a discovery conference to have the Court overrule Frontier's objections.  *See* Doc. #2253 at p.2.  Astoundingly, rather than preserving the IP address assignment records at this date, Frontier not only kept deleting the records in violation of the Cable Act order, but ***shortened*** its retention period from 24 months to 18 months.  *See* Ex. "M-3" (Levan Depo. Tr. 226:9-19).   Accordingly, Frontier has acted affirmatively.

When Frontier finally responded with identifications for only 93 of the 959 instances of infringement at IP addresses requested (less than ten percent) and without any assignment records for the time period relevant to MCCs' claims, Frontier's counsel first gave the excuse that the missing instances were all for 20 former customers whose data Frontier no longer had.  *See* Ex. "M-2") (Frontier's Resp. to MCCs' Third Req. for Admis. at No. 191).  When MCCs' counsel asked why Frontier did not preserve the data for the 20 former customers, Frontier shifted to the new excuse that it never had identification data for the 20 former customers from the beginning. *See* Ex. "M-2" (Frontier's Resp. to MCCs' Third Req. for Admis. at No. 194).  When MCCs raised this issue of Frontier failure to preserve the data by letter on Mar. 21, 2024, *see* Doc. #2302,

Frontier stated it was "surprised" by MCCs' letter because it had provided all the information but for 20 subscribers for whose information was never in its database – all the while knowing that Frontier had deleted the data for 90 percent of the instances. *See* Doc. #2306 at p.2. Frontier's excuse about 20 subscribers that were former customers was a clever misdirection to trick MCCs into believing that the missing instances were all for the 20 former customers. Frontier now finally admits that it was unable to identify the subscribers for the remaining 90 percent because it did not preserve the records. *See* Decl. of Garcia at ¶3(m). The timing of Frontier's deletions, deceptive excuses and dilatory conduct along with its repeated description of claimants as "trolls" evidences its intent to deprive MCCs of relevant evidence. *See* Ex. "M-4" ("…Her IP address is also on the radar of one of the copyright trolls that has brought successful DMCA litigation…"); Ex. "M-8" ("We are also being more aggressive about policing the DMCA violations because copyright owners and their troll agents are suing companies like Frontier….").

As a result of Frontier's nearly year of deception, MCCs had to serve interrogatories and conduct depositions on this subject to prove something that was pretty obvious. In response to MCCs' letter request on this issue, *see* Doc. #2413, Frontier shifted to a new falsity – that MCCs could somehow figure out who the customers were themselves from Frontier's Notification records – to attempt to persuade the Court that MCCs should not be permitted to file a motion for sanctions relief. *See* Doc. #2420 at p5. Frontier now admits that it would be impossible for MCCs to reconstruct this information from the Notifications records. *See* Ex. "M-2" (Frontier's Resp. to MCCs' Third Req. for Admis. at No. 194). But Frontier continues the pattern of deception by arguing that Frontier never received the notices and spreadsheets from MCCs' counsel in January of 2021 despite its outside counsel acknowledging receipt. *See* Ex. "M-2" (Frontier's Resp. to MCCs' Third Req. for Admis. at Nos. 172-178).

**E.      MCCs request relief under Rule 37(b)(2), 37(e)(1) and (2).**

As discussed above, sanctions are applicable under Rule 37(e)(1) because MCCs' have suffered prejudice from Frontier's failure to preserve call transcripts, tables and Reports from its RADIUS database, and system log records.  Sanctions are also applicable under Rule 37(e)(2) because the timing of Frontier's deletions (shortening the retention period from 24 to 18 months after discover) and Frontier's deceptive conduct supports the conclusion that its conduct was intentional.  Further, sanctions are also appropriate under Rule 37(b)(2)(A) because Frontier effectively evaded the Court's Cable Act order [Doc. #2233] of Dec. 1, 2023 by continuing to delete the IP address assignment records from its RADIUS database that would identify customers.

To cure the prejudice suffered by MCCs for Frontier's failure to comply with the Cable Act order and intentional deletion of IP address assignment records from its RADIUS database, Reports older than Sept. 2, 2019 from its DMCA database, system logs and call transcripts, MCCs request the following relief under Rules 37(b)(2) and (e)(2):

The Court should deem that Frontier had knowledge of its subscribers' infringements of MCCs' Works prior to September 2, 2019 due to its failure to maintain Reports data;

The Court should deem that Frontier received all the Notices that MCC's agents sent to Frontier from October 14, 2016;

Frontier's experts should be precluded from testifying that their opinions would not have changed had they received pre-Sept. 2, 2019 Reports data from Frontier's DMCA system;

The Court should deem that the same subscriber is responsible for all the infringements for which MCCs have evidence of infringements at an IP address;

The Court should deem that Frontier's subscribers directly infringed MCCs' Works;

The Court should deem that Frontier's subscribers violated the integrity of copyright management information in their Works under 17 U.S.C. 1202(a) and (b);

The Court should deem that Frontier did not have a policy for terminating repeat infringers per 17 U.S.C. 512(i) through Sept. 2, 2019 for its failure to preserve Reports data;

The Court should deem that Frontier's subscribers were drawn to become or remain customers of Frontier due to its policies of allowing its customers to use it Internet service to engage in infringement of copyrighted materials including MCCs;

The Court should deem that Frontier failed to successfully forward Notices to all its subscribers prior to prior to Feb. 6, 2021 due to its failure to preserve error logs;

The factfinder can consider evidence of Frontier's failure to preserve IP address assignment records from RADIUS database and sys error logs in ascertaining liability;

The factfinder can deem that Frontier had a duty to preserve pre-9/2/2019 Notice data and failed to do so;

The factfinder can deem that Frontier had a duty to preserve IP address assignment records from its RADIUS database and failed to do so;

The factfinder can deem that Frontier had a duty to preserve system log records and failed to do so;

The factfinder can deem that Frontier had a duty to preserve audio call transcripts and failed to do so;

Frontier should be ordered to pay MCCs' reasonable attorney fees and costs in connection with the motion and discovery on the spoliation;

Frontier should be precluded from arguing that detection of infringement at a Frontier IP address by MCCs' agents is not evidence of actual distribution or downloading of the Works;

MCCs should be permitted to introduce as evidence declarations from Frontier's subscribers over any objection such as hearsay or authentication;

MCCs should be permitted to introduce as evidence social media comments such as shown in Ex. "M-19" (the Reddit comments) over any objection such as hearsay or authentication;

Frontier is merely precluded from relying on the absence of the data it destroyed to refute liability;

Frontier should not be permitted to introduce any evidence of its purported DMCA repeat infringer policy prior to Sept. 2, 2019;

Frontier should not be permitted to introduce evidence or argue that it did not have knowledge of its subscribers' infringements of MCCs' Works prior to Sept. 2, 2019;

Frontier should not be permitted to introduce evidence or argue that the same subscribers were not assigned the same IP address where MCCs' Works were repeatedly infringed;

Frontier should not be permitted to introduce evidence that it forwarded Notices to subscribers prior to Feb. 6, 2021; and

The factfinder should be allowed to consider Frontier's loss of the evidence, and the circumstances of its loss, in evaluating witness credibility and otherwise making its determinations.

## **V. CONCLUSION**

For the foregoing reasons, the Court should grant MCCs' request for sanctions for Frontier's intentional spoliation of key evidence.


DATED: Kailua-Kona, HI, Nov. 19, 2024.

/s/ Kerry S. Culpepper
Kerry S. Culpepper
CULPEPPER IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawaii 96740
Telephone:    (808) 464-4047
Facsimile:    (202) 204-5181
E-Mail:    kculpepper@culpepperip.com

## CERTIFICATE OF SERVICE

I hereby certify that on <u>Nov. 19, 2024</u>, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all ECF recipients in the above-captioned matter.

Pursuant to the Case Management Order #1 [Doc. #2229] applying Part VII rules including Fed. R. Bankr. P.7005 to this contested matter – Movie Company Claimants have complied with their service obligations by serving counsel for all Parties in this contested matter pursuant to Fed. R. Civ. Pro 5(b)(2)(E) for service by the above ECF submission.

Dated: Kailua-Kona, HI Nov. 19, 2024

*/s/ Kerry S. Culpepper*

Kerry S. Culpepper (admitted *pro hac vice*)
**CULPEPPER IP, LLLC**
75-170 Hualalai Rd., STE B204
Kailua-Kona, HI 96740
Telephone: (808) 464-4047
Facsimile: (202) 204-5181
Emails: kculpepper@culpepperip.com
