

Matthew Oppenheim
4530 Wisconsin Ave, NW, Suite 5
Washington, DC 20016
Tel. 202.450.3958
matt@oandzlaw.com

*VIA CM/ECF AND EMAIL*  December 4, 2024

The Honorable Martin Glenn
U.S. Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

**Re:** *In re Frontier Communications Corp.*, **Case No. 20-22476 (S.D.N.Y. Bankr.)**

Dear Chief Judge Glenn:

On behalf of the Record Company Claimants (the "RCCs") in the above-captioned action, we write to request a pre-motion conference to address Frontier's continued and repeated refusal to provide basic, foundational discovery concerning subscribers Frontier purportedly terminated for copyright infringement. As the Court may recall, at the very end of fact discovery in June, Frontier produced an Excel spreadsheet purporting to show the internet service disconnection dates for roughly 440 Frontier subscribers (the "Spreadsheet"). Ex. A. But Frontier provided no witness to testify about the document and no information about its creation: Frontier's 30(b)(6) witness, Paul Garcia, claimed to have never seen the Spreadsheet and refused to answer questions about it. In what can only be deemed discovery gamesmanship, Frontier improperly tried to lay a foundation for the Spreadsheet by attempting to later rewrite Mr. Garcia's testimony through an errata sheet.

The Court struck Mr. Garcia's testimony by errata and reopened fact discovery to give Frontier another opportunity to address the issues the Spreadsheet raised. Reopened fact discovery has now closed, and Frontier ignored the Court's direction to correct its failure from the original discovery period. Instead, Frontier doubled down on the same tactics. Like Mr. Garcia, Frontier's new 30(b)(6) witness designated to provide testimony regarding the Spreadsheet could not answer basic, critical questions about how the document was created. That testimony did reveal, however, that one of Frontier's key witnesses, Sean Murphy, made serious, affirmative misrepresentations concerning the creation of the Spreadsheet.

The contents of the Spreadsheet go to the very heart of the case: whether Frontier can prove it terminated subscribers for repeated copyright infringement, which subscribers Frontier purportedly terminated, when Frontier purportedly terminated them, and what those subscribers' infringement histories were. Frontier intends to offer the Spreadsheet or its contents at trial to establish the subscribers it purportedly terminated for copyright infringement in support of its DMCA safe harbor affirmative defense under 17 U.S.C. § 512(a). At the same time, Frontier has repeatedly stymied the RCCs' efforts to obtain basic information about the Spreadsheet, what information the Spreadsheet represents, and how Frontier created it. At this point, Frontier should not be permitted to offer the Spreadsheet at trial or testimony relating to the purported termination of the subscribers in the Spreadsheet unless Frontier has independent documentation from another source that it timely produced and that corroborates such termination.

While admissibility of evidence generally can be resolved at the motion *in limine* stage, prudence dictates that the Court should resolve the Spreadsheet's admissibility now. Whether the Spreadsheet is admissible will fundamentally affect the parties' trial strategy and trial preparation. The RCCs recognize that the Court's "bias always is to hear matters on the merits," Ex. B 69:6–7 (Aug. 14, 2024 Hr'g Tr.), but Frontier's conduct has left the RCCs with no choice but to seek preclusion because, despite the Court reopening discovery to give Frontier the opportunity to explain it, the Spreadsheet remains a complete enigma in terms of how it was compiled and whether it is reliable.

I. **Frontier has repeatedly refused to provide essential testimony regarding the Spreadsheet.**

Throughout discovery, the RCCs sought records showing the precise number and identities of subscribers that Frontier claims to have terminated pursuant to its repeat infringer policy, as well as the timing of those alleged terminations. Two days before the initial close of fact discovery, on June 11, 2024, Frontier produced the Spreadsheet, listing roughly 440 names. Ex. A. When producing the Spreadsheet, Frontier gave no indication of what the Spreadsheet purported to be.

At his deposition, Mr. Garcia refused to testify about the Spreadsheet, claiming he had never seen it before. Ex. C 51:10–16, 53:7–10 (Garcia Vol. I Tr.). A month later, well after the close of the original discovery period, Frontier attempted to rewrite Mr. Garcia's testimony via his deposition errata sheet in an effort to provide a purported foundation for the Spreadsheet. The RCCs moved to strike Mr. Garcia's untimely errata and to preclude Frontier's use of the Spreadsheet.[1] ECF No. 2403.

At a hearing on August 14, 2024 (the "August Hearing"), the Court struck Mr. Garcia's errata sheet and ruled that Mr. Garcia could not be the witness through whom the Spreadsheet might be introduced because he lacked personal knowledge about it. Ex. B 50:10–52:20, 70:19–24 (Aug. 14, 2024 Hr'g Tr.). Having many questions itself over the creation of the Spreadsheet, the Court held that if the Spreadsheet was going to be introduced at trial, which was "not yet determined," Frontier would have to provide "competent evidence" and a witness with "personal knowledge" about the Spreadsheet. *Id*. at 51:23–52:5. Ultimately, the Court reopened fact discovery so that Frontier could produce, among other things, the documents and witness through which the Spreadsheet might be introduced at trial, and so that the RCCs could examine that evidence. *Id*. at 69:7–71:18.

After two months of document discovery on the materials purportedly used to create the Spreadsheet, the RCCs noticed a 30(b)(6) deposition of Frontier, including with respect to the Spreadsheet. Frontier designated Jesse Ross, Frontier's Vice President, Information Technology, as its 30(b)(6) witness with regard to the topic of the Spreadsheet, including the all-important question of "how it was determined which [s]ubscribers would be included in this [S]preadsheet." Ex. D at 6 (Topic 6); Ex. E 10:20–11:1 (Ross Tr.).

---

[1] The RCCs' prior submissions explain in depth the history of the dispute between the RCCs and Frontier regarding the Spreadsheet. ECF Nos. 2403, 2404. The RCCs do not repeat this history here, but incorporate it by reference.

At Mr. Ross's deposition on November 12, 2024, Mr. Ross testified that, while he had "direct oversight" over the extraction of data for use in the Spreadsheet, he could not answer the crucial questions of how Frontier decided whom to include on the Spreadsheet:

> Q. Did you personally have any role in the creation of [the Spreadsheet]?
> A. Yes, I had *direct oversight* of this document and provided some guidance of – of the best tactics to obtain data from DPI *given the criteria that we received from Sean Murphy* that my team worked on.
> . . .
> Q. [] [Y]ou said that the first part of the request was to identify data from the DPI billing system – system[] for customers identified in what you called the DMCA file; is that correct?
> A. That's correct. *We received – received an Excel spreadsheet from Sean Murphy called DMCA*, and it had customer name for some of the records, various – various fields in it, and we worked to match all of that data up against Frontier systems to find the customer account data from DPI.
> Q. And do you know how the customer list, the [spreadsheet] was generated?
> A. No, I do not. The – *the DMCA spreadsheet we received from Sean Murphy, I don't know how it was created*.
> . . .
> Q. Do you know whether this document purports to be a list of all of the subscribers Frontier terminated for repeated copyright infringement?
> A. *I don't know that*. I know that this is data that I was able to match to customer accounts in our IT systems that match data from an Excel spreadsheet called DMCA from Sean Murphy as part of this case.

Ex. E 87:13–18, 88:8–22, 89:8–14 (Ross Tr.) (emphasis added).  The RCCs did not re-depose Sean Murphy at Frontier's request because of medical issues Mr. Murphy was facing and because Frontier assured the RCCs that Frontier's 30(b)(6) witness, Mr. Ross, would be able to answer all questions about the Spreadsheet.  But Mr. Ross had no clue where Mr. Murphy's list came from or how it was generated.  Indeed, Mr. Ross could not even attest to whether the Spreadsheet purported to be a list of terminated repeat infringers.

**II.      The Spreadsheet should be precluded because Frontier failed to comply with the Court's order requiring Frontier to put forward a witness to testify to the Spreadsheet's foundation.**

Frontier should be precluded from offering the Spreadsheet or any non-corroborated testimony relating to specific terminations as evidence at trial because Frontier flouted the Court's order that Frontier must produce a witness to explain how the Spreadsheet was assembled and lay a foundation for its contents.  At the August Hearing, the Court ordered Frontier to produce a witness who could testify about the Spreadsheet, making clear that "if you're able to provide evidence at trial not yet determined, you will provide competent evidence," that "witnesses who testify at trial are going to have to have personal knowledge on the subjects they testify about" and that "somebody is going to be the sponsor" of the Spreadsheet.  Ex. B 51:23–25, 52:3–5, 70:25 (Aug. 14, 2024 Hr'g Tr.).  Frontier once again failed to provide such a witness and failed to obey the Court's order.

3

Where, as here, "a party . . . fails to obey an order to provide or permit discovery," Rule 37 empowers the Court to "prohibit[] the disobedient party . . . from introducing designated matters in evidence." Fed. R. Civ. P. 37(b)(2)(A)(ii). A preclusion order under this rule must be "just" and "'must relate to the particular claim to which the discovery order was addressed.'" *Vaccaro v. Waterfront Homes Marina*, No. 10 CIV. 4288 NRB, 2011 WL 5980997, at *3 (S.D.N.Y. Nov. 30, 2011) (quoting *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir. 1991)). Such an order may consider "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012) (internal quotation marks omitted). However, "because the district court has wide discretion in imposing sanctions under Rule 37, these factors are not exclusive . . . ." *Id.* (internal quotation marks omitted).

Frontier's failure to obey the Court's directive—and, for the second time, produce a Rule 30(b)(6) witness who could lay a foundation for the contents of the Spreadsheet—requires precluding the Spreadsheet. The Court made clear Frontier must provide "competent evidence." Frontier ignored that command. Preclusion is therefore "the just and logical consequence" of Frontier's non-compliance. *Adrian Shipholding Inc. v. Lawndale Group S.A.*, No. 08–cv–11124, 2012 WL 104939, at *6–*8 (S.D.N.Y. Jan. 13, 2012) (precluding defendant from contesting issue on which it failed to comply with order to adequately prepare Rule 30(b)(6) corporate designee); *Vaccaro*, 2011 WL 5980997, at *3 (precluding party's use of documents party failed to produce in response to court order).

Frontier also has not provided any other reliable evidence of whom Frontier terminated for repeat infringement. Without a sufficient foundation, evidence is not relevant under Federal Rule of Evidence 401. *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 207 (2d Cir. 1984) (stating that "the proffered evidence must be relevant to the issues on trial within the meaning of Fed. R. Evid. 401" and affirming exclusion of evidence for lack of foundation). There is no record evidence tying the data in the Spreadsheet to any aspect of Frontier's DMCA/repeat infringer program or Frontier's responses to infringement notices. There is no record evidence showing what the subscribers in the Spreadsheet represent, how Frontier chose the subscribers for inclusion in the Spreadsheet, or which subscribers Frontier omitted. On these crucial points, Mr. Ross—Frontier's 30(b)(6) witness on "how it was determined which [s]ubscribers would be included in this [S]preadsheet"—could provide no answers. Mr. Ross's testimony that the Spreadsheet reflects connection and disconnection dates from Frontier's DPI system for the subscribers listed, without any explanation of the basis for and circumstances of the alleged disconnections, is not enough.

Consequently, the Spreadsheet is just a list of disconnection dates for a group of Frontier subscribers who wound up on a list for reasons that Frontier refuses to—and apparently cannot—explain. Frontier certainly has not established that the list contains all of the subscribers Frontier purportedly terminated for repeat copyright infringement, yet that is precisely what Frontier intends to use the Spreadsheet to demonstrate. Indeed, that is the entire value of the Spreadsheet to Frontier. But without testimony connecting the subscribers in the Spreadsheet to repeat infringer terminations—testimony entirely absent from the record—there is no basis to admit the Spreadsheet.

4

Frontier's refusal to explain the Spreadsheet's provenance leaves many critical questions unanswered. As discussed at the August Hearing, for approximately 280 accounts in the Spreadsheet, the Memo field indicates a termination for DMCA, but for the other 160 accounts, this notation is missing. Ex. B 33:6–11 (Aug. 14, 2024 Hr'g Tr.). Moreover, some accounts in the Spreadsheet continued to be the subject of infringement notices *after* their supposed termination dates. Ex. E 97:24-98:19; 99:14-100:12; 101:5–103:12 (Ross Tr.). Some of the names on the list even appear multiple times. Ex. A at Rows 16–18; 345–346; 361–362. And Frontier is even listed as one of its own customers. *Id*. at Row 133. Frontier's non-compliance has prejudiced the RCCs by precluding their ability to verify that the Spreadsheet represents what Frontier asserts it does—the list of subscribers Frontier terminated for copyright infringement.

### III.    Frontier's bad-faith discovery conduct justifies precluding the Spreadsheet.

If Frontier's repeated refusal to produce a witness alone does not merit preclusion, Mr. Ross's testimony further justifies preclusion by casting significant doubt on Frontier's good faith regarding its creation of the Spreadsheet. Mr. Ross testified that his team completed the first draft of the Spreadsheet on May 22, 2024. Ex. E 87:9–12 (Ross Tr.). Six days *later*, on May 28, Mr. Murphy, who acknowledged that he directed the creation of the Spreadsheet, Ex. F ¶ 10 (Decl. of Sean Murphy, ECF No. 2402-1), testified at his deposition that he was not yet aware whether Frontier even had sufficient records to create a list of terminated subscribers. Ex. G 83:13–16 (Murphy Tr.) ("Q. If you wanted to go back and check who Frontier terminated for copyright infringement and when, are there records that would allow you to do that? A. I don't know."). Mr. Murphy later stated in a declaration opposing the RCCs' motion to preclude the Spreadsheet that, "[a]t the time of my deposition, I was unsure if [creating the Spreadsheet] would even be possible." Ex. F ¶ 10 (Decl. of Sean Murphy, ECF No. 2402-1).

Mr. Murphy's testimony appears to be palpably untrue because Frontier had already completed the first draft of the Spreadsheet six days before he was deposed. It is impossible to square Mr. Ross's testimony that his team had already completed a draft of the Spreadsheet by May 22 with Mr. Murphy's testimony that he didn't yet know on May 28 whether creating the Spreadsheet was even possible. The Court was correct in being "very skeptical about the good faith of Frontier and its professionals in pulling this information together." Ex. B 30:10–12 (Aug. 14, 2024 Hr'g Tr.).

* * *

Frontier has had multiple opportunities to lay a proper foundation for the Spreadsheet. Frontier has deliberately chosen not to do so, repeatedly refusing to prepare its witnesses to provide the necessary testimony and instead providing misleading and contradictory testimony about the Spreadsheet's creation. Frontier's refusal has prevented the RCCs from understanding the Spreadsheet's provenance and from challenging its accuracy and meaning. The only appropriate remedy for Frontier's multiple discovery failures regarding the Spreadsheet is precluding Frontier's use of the Spreadsheet at trial, and disallowing any testimony arising from the Spreadsheet. For the reasons stated above, the RCCs respectfully request that Frontier be precluded from offering as evidence at trial the Spreadsheet or any testimony relating to the termination of the subscribers in the Spreadsheet without independent documentation from another source that Frontier timely produced and that corroborates the purported termination.

Respectfully submitted,

*/s/ Matthew J. Oppenheim*
Matthew J. Oppenheim

cc:     All Counsel of Record