# DAY PITNEY LLP

BOSTON   CONNECTICUT   FLORIDA   NEW JERSEY   NEW YORK   PROVIDENCE   WASHINGTON, DC

**STANLEY A. TWARDY, JR.**
Attorney at Law

One Stamford Plaza, 7th Floor
263 Tresser Boulevard
Stamford, CT 06901
T: (203) 977-7368 F: (866) 458-1037
satwardy@daypitney.com

December 10, 2024

**VIA E-FILING**
Chief Judge Martin Glenn
U.S. Bankruptcy Court, S.D.N.Y.
One Bowling Green
New York, NY 10004-1408

Re:    In re: Frontier Communications Corp., No. 20-22476-mg

Dear Chief Judge Glenn:

We write on behalf of Frontier Communications Corporation ("Frontier") in response to the December 4, 2024, letter from the Record Company Claimants ("RCCs") requesting a pre-motion conference (ECF No. 2470, "Letter") and joined today by Movie Company Claimants (ECF No. 2471). The Court has scheduled a hearing for December 11, 2024.

RCCs seek leave to move that Frontier be precluded entirely from using at trial or offering "any testimony arising from" an Excel spreadsheet created *at RCCs' request*, showing the internet service disconnection dates for certain subscribers as reflected in Frontier's DPI database. (Letter at 5.) Their primary argument is that Frontier's 30(b)(6) representative on one of six subparts of one of 17 deposition topics (Jesse Ross) was unable to answer questions concerning how subscribers were chosen for inclusion in the spreadsheet. The remedy RCCs seek for this asserted shortcoming is inappropriate for at least two reasons.

First, rather than confer with us concerning the issue, RCCs waited more than three weeks after Mr. Ross' deposition to raise the issue for the first time directly with the Court in their Letter. Had RCCs conferred with us, Frontier would have provided Mr. Ross or another designee for a short supplemental deposition. There is no true mystery here: the spreadsheet comprises data for subscribers who received a DMCA termination letter from Frontier and whose internet service Frontier subsequently terminated. RCCs are disingenuous to say they do not know what the spreadsheet is because RCCs know that Frontier created the spreadsheet at RCCs' insistence that Frontier compile proof regarding terminations of subscribers. But for RCCs' demand, Frontier would not have created the spreadsheet and would have proven terminations (as it may still) through other documents and testimony. Moreover, though struck by the Court as evidence, Frontier disclosed the scope of the spreadsheet to RCCs in the July 12, 2024, sworn errata prepared by Paul Garcia. (ECF No. 2403-4 at 3 ("I have confirmed that Exhibit RCC 124 is a list of accounts to which Termination Letters were sent under Frontier's



Chief Judge Martin Glenn
December 10, 2024
Page 2

'repeat copyright infringement' policy showing the date their internet service and/or all services with Frontier ended.").) Rule 30(b)(6) does not require a witness with personal knowledge, and so RCCs are elevating form over substance. In short, it appears RCCs are engaged in a game of "gotcha" and are going to great lengths to avoid confronting a fact they have never before had to face: Frontier terminated hundreds of subscribers pursuant to its repeat infringer policy.

Second, even if an additional deposition were deemed "too little, too late," the alternative remedy RCCs seek is too much and too soon. Mr. Ross testified in detail and at length concerning the spreadsheet, answering all RCCs' questions to the best of his and Frontier's ability concerning when it was created, by whom, where the data (other than the starting subscriber list) was extracted or derived, what Frontier did to verify the accuracy of the data in the spreadsheet, and, to the extent understood, whether any of the listed subscribers reestablished service with Frontier or continued to maintain internet service beyond the termination date indicated in the spreadsheet. (*See* Letter Ex. D.) Therefore, to the extent RCCs are entitled to any remedy beyond a further deposition (at Frontier's cost) with respect to a single subtopic, it is inappropriate to preclude Frontier from presenting *any* evidence regarding or "arising from" the spreadsheet, which would be highly disproportionate.

RCCs' Letter incorrectly presumes that the spreadsheet and the information it contains can be admissible only if Frontier lays a foundation for the scope of the spreadsheet by answering questions directed to the spreadsheet itself. Not so. Rather, as Mr. Ross testified, the spreadsheet sets forth the dates of termination in Frontier's DPI database for each of the subscribers listed. Frontier will demonstrate the relevance of that data by introducing other evidence, such as the termination letters directed to each of those subscribers. Fed. R. Evid. 104(b). *See, e.g.*, *United States v. Coplan*, 703 F.3d 46, 81 (2d Cir. 2012) ("When faced with a question of conditional relevance, the district court should examine all the evidence in the case and decide whether the jury could reasonably find the conditional fact by a preponderance of the evidence.") (quotation marks and alteration marks omitted). It is premature to preclude all use of the spreadsheet without considering the evidence Frontier may proffer to "tie it up."

In that vein, RCCs' claim that Frontier "has not provided any other reliable evidence of whom Frontier terminated for repeat infringement" is incorrect. (Letter at 4.) Frontier has produced substantial evidence in discovery regarding the operation of its DMCA program and the selection of certain subscribers for termination. Among other things, Frontier produced the quarterly spreadsheets from which the DMCA team identified subscribers for termination, the certified letters Frontier sent subscribers in advance of termination, emails among the DMCA team regarding specific terminations, emails with subscribers following their receipt of termination letters, emails sent to the group in Frontier responsible for implementing terminations, emails confirming that the terminations were effectuated, and even evidence of phone calls in which subscribers complained their internet service had been disconnected. *E.g.*, ECF No. 2402-1, Decl. of Sean Murphy ¶ 5 (describing process for termination and citing example emails). All this evidence undergirds the spreadsheet, which is a summary document

**DAY PITNEY** LLP

Chief Judge Martin Glenn
December 10, 2024
Page 3

Frontier spent substantial time and effort creating at RCCs' insistence to avoid burdening the Court with a discovery dispute. *See* ECF No. 2402 at 4-6 (describing how the spreadsheet was originally assembled and produced).

      RCCs complain that Frontier's testimony "leaves many critical questions unanswered." (Letter at 5.) But these questions were answered to the best of Frontier's ability. *See, e.g.*, ECF No. 2402-1 ¶ 7 (Sean Murphy attesting: "At some point – I don't recall precisely when – I began to request the Frontier Residential Offline team to start adding notes in the DPI platform indicating the reason for the DCMA Terminations was 'legal,' and that those termination decisions should not be deactivated or canceled and the terminated internet customers should not be allowed to sign up again."). This is why approximately 280 accounts include such a notation. RCCs did not ask Mr. Ross about these notations during his deposition. As for the rest, Mr. Ross testified in detail and at length concerning (a) certain subscribers whose accounts continued to be the subject of infringement allegations after the termination dates in Frontier's records, (b) a few subscribers who appear in the spreadsheet multiple times, and (c) a "Frontier Communications" account. Whatever questions RCCs asked with respect to these subscribers were answered to the best of Frontier's ability, and RCCs' remaining concerns go to the weight of the evidence in the spreadsheet, not its admissibility.

      RCCs' secondary argument that Frontier should be precluded from using the spreadsheet for "bad-faith discovery conduct" is entirely baseless. On July 26, 2024, Mr. Murphy provided a declaration stating he was unsure at the time of his deposition on May 28, 2024, whether it would be possible to extract information from DPI sufficient to prepare the spreadsheet. RCCs infer from Mr. Ross' testimony regarding the existence of a first draft of the spreadsheet on May 22, 2024, that Mr. Murphy's declaration was "palpably untrue." (Letter at 5.) This inference is unsupported. First, there is no evidence that Mr. Murphy—who is based in Florida and was not a 30(b)(6) witness—was familiar at the time of his deposition with this initial draft prepared by his colleagues in Washington less than a week before. Second, more fundamentally, at the time of Mr. Murphy's deposition, the extant version of the spreadsheet was exactly as Mr. Ross described, only a draft. At the time of Mr. Murphy's deposition, it was not yet clear whether Frontier would be able to provide the information RCCs demanded. Significant further effort was required after Mr. Murphy's deposition for Frontier to be comfortable with the data ultimately reported in the spreadsheet.

      We look forward to the opportunity to discuss these matters further with the Court on Wednesday.

Respectfully submitted,

*Stanley A. Twardy, Jr.*

Stanley A. Twardy, Jr.

cc:    All Counsel of Record