**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FRONTIER COMMUNICATIONS CORP., *et al.*, | Case No. 20-22476 (MG) |
| Debtor. | (Jointly Administered) |

**ORDER CONCERNING ECF DOC. ## 2483, 2487**

Once again, the parties in this case are at loggerheads over fact discovery long after its close. This time, the dispute concerns a spreadsheet (the "Spreadsheet") which Frontier represented to the Court contains the definitive set of customer terminations for DMCA violations which it intends to introduce at trial. (ECF Doc. # 2474 (transcript of December 11 hearing) at 26:13–30:17.) Frontier has subsequently described this list to the plaintiffs as "compris[ing] a list of subscribers who received termination letters <u>and</u> for whom Frontier identified a subsequent disconnect or data disconnect date in DPI" (one of Frontier's databases). (ECF Doc. # 2483 at 5 (emphasis in original).) This is different from a list of customers who were terminated *because of* DMCA violations. Frontier itself recognizes this distinction, writing to the plaintiffs, "As RCCs [the Record Company Claimants] have noted, there are many cases in which DPI includes a note expressly indicating that there was a DMCA termination. In many other cases, however, there is no such note, and so it will be necessary for the factfinder to draw inferences from other available information" (presumably to determine the cause of the terminations), "including, for example, the proximity in time of the announced termination date and the termination. In the case of [redacted] and [redacted], we have determined these accounts were <u>not</u> terminated for DMCA violations." (*Id.* (emphasis in original).) Frontier did not explain how it so determined. Frontier's email to the plaintiffs touches on the key problems

posed by the Spreadsheet: what use will Frontier make of it, and how can the plaintiffs determine what it actually reflects?

At the December 11 hearing, it came to light that Frontier had been refusing to provide documentation "underlying" the Spreadsheet and concerning the "creati[on] of this list," instead asserting work product privilege over the documents. (ECF Doc. # 2474 at 32:18–34:13.) The Court ordered submission of these documents for *in camera* review. (*Id.*) Frontier produced to the Court 157 documents dating from May 1, 2024 (the day when Frontier began to work on creating the Spreadsheet) to June 11, 2024 (the day when Frontier produced the Spreadsheet to the plaintiffs).

The RCCs take issue with this temporal limitation and argue that Frontier should be required to produce documents postdating June 11, "including through the present," since such documents "contain essential information about the Spreadsheet and Frontier's subscriber terminations" which is "crucial . . . to understand Frontier's defense." (ECF Doc. # 2483 at 1.) They claim that Frontier's shifting descriptions of the Spreadsheet indicate that Frontier itself is unsure of what the Spreadsheet represents, and that Frontier is still determining whether the subscribers listed there were terminated because of DMCA violations. In other words, the work on the Spreadsheet did not stop on June 11, when Frontier handed it over to the plaintiffs. Frontier admits this point. (ECF Doc. # 2487 at 2 ("[T]he RCCs are correct that 'Frontier's attempts to answer the question the RCCs have been asking . . . did not end on June 11.'").) For this reason, the RCCs argue, they need access to more recent documents which will shed light on the content of the Spreadsheet. Furthermore, they argue that Frontier is improperly asserting work-product privilege over facts—the "underlying facts concerning the Spreadsheet and Frontier's subscriber terminations." (*Id.* at 2–3.)

2

Frontier protests the supposed unfairness of this request, on the grounds that the RCCs had only requested documents concerning "the creation of" the Spreadsheet at the December 11 hearing. (ECF Doc. # 2487 at 1.) Frontier characterizes the RCCs' December 11 request as being animated by "a dispute about the timing of Frontier's production of the Spreadsheet," and claims that now, the RCCs are creating a "new issue concern[ing] the data itself." (*Id.* at 1–2.)

Not so. It should have been clear to all on December 11 that a critical issue concerning the Spreadsheet is what, precisely, it represents. The Court emphasized that, while Frontier will have every right "to put up its defense . . . the claimants are entitled to their discovery to understand what that defense is," in order to avoid a trial by "surprise," and hence the Court (and the parties) need to "pin down" the "universe" of terminated customers "that we're talking about"—i.e., to understand what the Spreadsheet contains and reflects. (ECF Doc. # 2474 at 38:22–39:5.) No "new issue" has arisen since December 11.

Frontier complains that the RCCs' request for post-June 11 documents will impose an unreasonable burden of collection on the company. While it may be unusual to require ongoing document production, Frontier created this situation for itself by choosing to make a summary document in response to the plaintiffs' request for production, and by subsequently failing to establish clearly, both for the plaintiffs and the Court, what that document represents. The Court finds that the burden, both on the plaintiffs and on the Court, of conducting a trial by surprise is significantly higher than the burden of producing the documents which shed light on the contents of the Spreadsheet—a burden Frontier is subject to anyway, to some extent, under Fed. R. Evid. 1006 (*see infra*). Moreover, the contemplated production will not last indefinitely: Frontier represented to the RCCs and the Court that its "further investigation" (presumably into the contents of the Spreadsheet) will end "no later than January 6, 2025." (ECF Doc. # 2487.) If

3

Pg 4 of 5

this is true and Frontier can determine definitively what the Spreadsheet reflects by January 6, Frontier should not need to produce documents postdating January 6 in order to provide the needed clarity to the plaintiffs and the Court.

Frontier frames the RCCs' request as one targeting its privileged communications with its outside counsel. Again, not so. As Frontier concedes, the RCCs seek documents which would allow it to determine the meaning of the Spreadsheet, including "various iterations of the Spreadsheet and related facts." (ECF Doc. # 2483 at 3.) As both parties know, facts underlying a given piece of work product are not protected by the work-product or attorney-client privileges, even if acquired in anticipation of litigation.[1] *See Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 471 (S.D.N.Y. 1993) ("[T]he [work product] rule does not protect from disclosure the underlying facts known to the party or his counsel, even if acquired in anticipation of litigation."); *In re Six Grand Jury Witnesses*, 979 F.2d 939, 945 (2d Cir. 1992) ("factual information is not protected by the attorney-client privilege just because the information was developed in anticipation of litigation."). Moreover, as established at the December 11 hearing, the Spreadsheet is a summary of voluminous material under Fed. R. Evid. 1006, and as such, the plaintiffs are entitled to the original records (or duplicates thereof) underlying the Spreadsheet. The RCCs are seeking, at least in part, non-privileged documents, and they are entitled to such documents.

The Court finds—in light of Fed. R. Evid. 1006, Frontier's inconsistent explanations of the contents of the Spreadsheet, the RCCs' numerous document requests on this subject, and the need to avoid trial by surprise—that Frontier must produce to the plaintiffs all documents relating to each of the entries in the Spreadsheet, dating from May 1, 2024 through January 6,

---

[1] Facts themselves—in this case, for example, a termination letter sent to a Frontier customer—are, after all, not work product.

2025 (or later if the issues with the spreadsheet are not resolved by January 6, 2025). If Frontier wishes to assert privilege over any such document, it can, as before, submit those documents to the Court for *in camera* review, along with an updated privilege log reflecting the type of privilege asserted over each document. The Court will shortly issue an order concerning the first batch of 157 Spreadsheet-related documents submitted for its review; Frontier should look to that order to guide it in making subsequent assertions of privilege or work product. That order will also address the question of producing drafts of the Spreadsheet.

As the Court has now expressed on multiple occasions, Frontier's response to discovery has bordered on (or passed the line making it) sanctionable, with potential sanctions including the possibility of precluding Frontier from offering the spreadsheet or the documents that allegedly underlie the spreadsheet in evidence at trial. Enough is enough!

**IT IS SO ORDERED.**

Dated: December 27, 2024
New York, New York

                                              **/s/ Martin Glenn**
                                            MARTIN GLENN
                                  Chief United States Bankruptcy Judge