**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FRONTIER COMMUNICATIONS | ) | Case No. 20-22476 (MG) |
| CORPORATION, *et al.*, | ) | |
| | ) | |
| Reorganized Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER GRANTING IN PART THE RCCS' MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF KEITH EPSTEIN

Pending before the Court is the RCC's motion *in limine* ("Motion") seeking to exclude the testimony of one of Frontier's experts, Keith Epstein ("Epstein"), on the grounds that (1) he opines on the law, (2) he uses unreliable methodology, and (3) he provides his non-expert opinion on the plain language of Frontier's Acceptable Use Policies ("AUP") and terms of service. (Motion at 1–3.) Frontier has submitted a response ("Response"), and the RCCs have submitted a reply ("Reply"). For the following reasons, the RCCs' MIL is **GRANTED IN PART**.

## I.    BACKGROUND

### A.  Epstein's Report

A key question in this litigation is whether Frontier has complied with 17 U.S.C. § 512(i), which triggers protection for ISPs from copyright infringement lawsuits *if* the ISP "has adopted and reasonably implemented, and informed subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i)(1)(A). The statue does not define "reasonably implemented," "in appropriate circumstances," or "repeat infringers."

Epstein is a retired attorney who spent his entire career at AT&T. (Ex. 2 to the Motion ("Epstein Report") at 3.) As counsel to AT&T, his responsibilities included "advising and counseling various AT&T Internet Services affiliates, including with respect to the implementation of policies and procedures related to the provisions of the Digital Millennium Copyright Act of 1998, Public Law 105-304 (DMCA)." (*Id.*) He also assisted in the drafting of the DMCA. (*Id.*) He described his opinions in his report as "regarding Frontier's response to notices of alleged copyright infringement (ISP Notices) from various copyright owners (Rightsholders)." (*Id.* at 4.) In his report, he states was "asked to provide [his] professional opinion on matters concerning the handling of ISP Notices sent by Rightsholders, as well as on the business considerations and practical implications of setting up and operating a system for handling ISP Notices." (*Id.* at 5.) In his deposition, he testified that he was "asked to provide, based on [his] industry experience of 20-plus years, an opinion as to what would be an appropriate reasonable methodology to use to process notices generated by rights holders by an Internet service provider." (Ex. 1 to Motion ("Epstein Deposition") at 84:20–85:10.)

Under the section titled "Purpose of the Report," Epstein states that "it is [his] opinion that between May 2019 through December 2023, Frontier reasonably implemented a policy that provides for termination of repeat infringers in appropriate circumstances." (Epstein Report at 5.) This language nearly tracks 17 U.S.C. § 512(i)(1)(A). He also opines that "Frontier's policy, as well as its implementation of that policy, is consistent with industry norms for repeat infringer policies." (*Id.*) A few pages later, he sets out the statutory requirements ISPs must meet under section 512(i) of the DMCA to qualify for the safe harbor under section 512(a). (*Id.* at 6 (citing 17 U.S.C. § 512(i)(1) to explain what an ISP "must" do to "qualify for the Safe Harbor").) Epstein then provides a brief history of ISPs' responses to allegations of misuse of their services

for the purpose of copyright infringement, focusing on a protocol created in 2010 meant to address ISPs' approach to online copyright infringement that took into account both the concerns of rightsholders and of ISPs.  (*Id.* at 6–10.)  Epstein states that "[a]ll ISPs of which [he is] aware implemented some sort of graduated response program similar in concept" to that protocol around 2010, including Frontier.  (*Id.* at 9.)  He then goes into what he calls "[p]ractical [c]onsiderations" when implementing a repeat infringement policy, and explains what he asserts was the "opinion of most ISPs at the time" (he does not specify which time): "(1) the statute [the DMCA] should not be interpreted to require the ISP to terminate all repeat infringers in 'all circumstances'; (2) the statute should not be interpreted to specify a precise number of allegations of infringement above which a termination was warranted; and (3) ISPs should have discretion as to when and under what circumstances to terminate subscribers for repeat infringement based on a qualitative analysis of all the facts and circumstances surrounding a subscribers' account."  (*Id.* at 11–12.)  Later, Epstein discusses Frontier's repeat infringer policy (*see id.* at 15), and, after quoting from it extensively, states that it is his opinion "that Frontier reasonably and concisely articulated its 'repeat infringer policy'" in a manner available for the public to read (*id.* at 17).  He then opines on Frontier's implementation of its repeat infringer policy.  (*Id.* at 17–22.)

## B.  RCCs' Argument

The following statements from Epstein's report are some of the ones with which the RCCs take issue:

- "Between May 2019 through December 2023, Frontier reasonably implemented a policy that provides for termination of repeat infringers in appropriate circumstances," Epstein Rpt. at 5, 17–22, including that Frontier's various "notice thresholds" for triggering subscriber-facing action were "reasonable," *see id*. 18–20, 22.

3

- What other ISPs do to implement their own "repeat infringer policies" to comply with the DMCA can be compared to Frontier. *See, e.g.*, Epstein Rpt. at 11–15.
- The phrases "reasonably implement" and "in appropriate circumstances" in § 512(i) should be interpreted based on the "opinion" of other ISPs at the time of the statute's passage and his own personal reading. *See, e.g.*, Epstein Rpt. at 11–12, 19.
- Frontier "clearly articulated" its policies to subscribers. *See, e.g.*, Epstein Rpt. at 15–17.
- "It is my opinion that Frontier's [Graduated Response] Program is a rational response to ISP Notices[.]" Epstein Rpt. at 17.
- "It is consistent with industry norms and *reasonable* for Frontier to have periodically refined its [Graduated Response] Program and made these types of changes [to its program]." Epstein Rpt. at 18 (emphasis added).
- "In my opinion, *it was reasonable* for Frontier to perform a periodic qualitative assessment of these subscribers' accounts . . . ." Epstein Rpt. at 19 (emphasis added).
- "The grace period [in Frontier's Graduated Response Program] *is humane and reasonable . . . .*" Epstein Rpt. at 19 (emphasis added).
- "Frontier's Program has all the features *necessary to responsibly implement* the Company's policy for the termination of subscribers *in appropriate circumstances* and, based on my review of materials, Frontier followed through on the implementation of its Program." Epstein Rpt. at 20 (emphasis added).
- "I have also reviewed the expert report submitted by Courtney Fletcher of Guidepost, which *further supports the implementation and reasonableness* of Frontier's [Graduated Response] Program." Epstein Rpt. at 21 (emphasis added).
- "In sum, it is my opinion that Frontier has a policy providing for the termination of repeat infringers *in appropriate circumstances*, communicates that policy to its subscribers, *reasonably implemented* that policy through its graduated response program, and terminated subscribers *in appropriate circumstances* based on allegations of copyright infringement." Epstein Rpt. at 22 (emphasis added).
- "It is my opinion that this data supports the *reasonableness* of Frontier's [notice] thresholds, including initial thresholds of 10 or 15 notices before Frontier sent a notification to a subscriber." Epstein Rpt. at 21–22 (emphasis added).

(Motion at 4–5, 8–9.)

The RCCs argue that Epstein's report embodies ultimate legal conclusions and therefore exceeds the permissible scope of expert testimony under Federal Rule of Evidence 702. (*Id.* at 7.) They point to instances of Epstein opining on whether Frontier has "reasonably

4

implemented" a repeat infringer policy (examples listed above), and accuse him of

impermissibly tracking the language of the DMCA in his report. (*Id.* at 8.) The RCCs argue that

every time Epstein speaks to the "reasonableness" of either Frontier's repeat infringer policy as

implemented or the system's individual components, he usurps the role of this Court as

factfinder by opining on the ultimate conclusion of whether Frontier "adopted and reasonably

implemented" a repeat infringer policy under § 512(i), and so such conclusions must be

excluded. (*Id.* at 9–10.) The RCCs make the same argument about Epstein's "attempts to opine

on the meaning of the DMCA," including what it means to "reasonably implement" a repeat

infringer policy and what it means to terminate a subscriber in "appropriate circumstances." (*Id.*

at 18–19.)

 The RCCs also object on the grounds that Epstein's testimony about Frontier's

implementation of its repeat infringer policy should be excluded "because it is nothing more than

thinly disguised attorney argument" in that it argues that Frontier's response system satisfies §

512(i) of the DMCA, and therefore again exceeds the permissible bounds of FRE 702. (*Id.* at

11.) The RCCs argue that Epstein's report merely regurgitates otherwise admissible evidence

and therefore must be excluded because it "supplants the role of counsel in making argument at

trial" and the role of the Court in finding facts. (*Id.*) They claim that Epstein's testimony does

not rely on his own analysis or experience and will do nothing to help the Court understand facts

that are "outside common understanding." (*Id.* at 12.)

 The RCCs argue that Epstein's testimony on whether Frontier satisfies § 512(i) should be

excluded because it lacks any basis in fact regarding whether Frontier terminated subscribers "in

appropriate circumstances," because Epstein admitted that he did not conduct any "analysis of

individual subscribers and whether the decision to terminate them or not terminate them was

appropriate[.]"  (Epstein Dep. Tr. at 344:18–345:1.)  The RCCs point out that it is "impossible to

say whether an ISP has terminated subscribers 'in appropriate circumstances' without even

*looking* at those circumstances."  (Motion at 13.)

The RCCs then call Epstein's testimony that Frontier's "multi-step 'graduated response'

program . . . has all the features necessary to responsibly implement the Company's policy for

the termination of subscribers in appropriate circumstances" and that "Frontier followed through

on the implementation of its Program" "pure *ipse dixit* unconnected to any specific facts of the

case."  (Epstein Report at 17, 20–21; Motion at 14.)  Apart from pointing generally to his own

"knowledge" and "experience," Epstein does not explain or describe the bases for those opinions

or the analytical method he used to reach them, according to the RCCs.  (Motion at 15.)

Similarly, the RCCs argue that Epstein's testimony about how other ISPs implement

repeat infringement policies is "equally disconnected from any actual facts because Mr. Epstein

admits he does not actually know how other ISPs implement repeat infringer policies."  (*Id.* at

16.)  The same argument applies to Epstein's opinion that Frontier's notice thresholds are

reasonable because they comport with "industry norms"—the RCCs argue that these assertions

"lack[] any basis in actual facts," and point out that Epstein admitted in his deposition that he had

no knowledge about the notice thresholds other ISPs employ.  (*Id.* at 17–18.)

They also argue that allowing Epstein to opine on the behaviors of other ISPs is

inappropriate because the question whether Frontier complied with section 512(i) of the DMCA

does not depend on what other ISPs do to comply, and "permitting Epstein to opine on other

ISPs' behavior would run afoul of the Court's blocking discovery into other ISPs' actual

practices."  (*Id.* at 16 n.10.)

Finally, the RCCs argue that Epstein's testimony concerning whether Frontier clearly articulates its repeat infringer policy to subscribers (and thus complies with section 512(i) of the DMCA) should also be precluded, as "this opinion does nothing more than characterize and interpret plainly written, public-facing documents that the Court needs no help in reading and understanding." (*Id.* at 20.) Epstein does not use any scientific, technical, or other specialized knowledge to provide this opinion. (*Id.* at 21.) Epstein also assumes "without any basis" that is contained in Frontier's AUP constitutes a "policy" under applicable law. (*Id.* at 20.)

The RCCs request that the Court preclude Epstein from testifying as to:

- Whether "Frontier reasonably implemented a policy that provides for termination of repeat infringers in appropriate circumstances," Epstein Rpt. at 5, 17–22, including whether Frontier's various "notice thresholds" for triggering subscriber-facing action were "reasonable," *see id*. 18–20, 22.
- What other ISPs do to implement their own "repeat infringer policies" to comply with the DMCA.
- The meaning and interpretation of statutory phrases contained in § 512(i), including "reasonably implement" and "in appropriate circumstances."
- Whether Frontier "clearly articulated" its "repeat infringer policy" to its subscribers.

(*Id.* at 21.)

## C. Frontier's Opposition

Frontier advances five arguments in its opposition. First, it claims that expert testimony bearing on an ultimate issue in the case is permitted under FRE 704, and that regardless, in a bench trial, there is a minimal risk that the expert's opinion on an ultimate question of fact will supplant that of the Court. (Opposition at 7–8.) Frontier also argues that Epstein does not, at any rate, provide improper legal conclusions or usurp this Court's role as a factfinder, because he merely utilizes his industry knowledge to conduct a comparative analysis of Frontier's approach versus that of other ISPs. (*Id.*)

Second, Epstein's opinion does not supplant the role of Frontier's counsel to demonstrate at trial how Frontier adopted and implemented a repeat infringer policy. Frontier argues that Epstein's report merely lays out a factual narrative regarding the implementation of the repeat infringer policy because "such a narrative is necessary to give context to Mr. Epstein's opinion." (*Id.* at 9, *see also id.* at 10–11.)

Third, Frontier argues that Epstein was not required to perform a per-subscriber analysis in order to opine on the reasonableness of Frontier's repeat infringer policy, and his view of it is based on his holistic view of Frontier's program and his industry experience and knowledge. (*Id.* at 12.) Experts have some latitude with respect to the data on which they rely. Per Frontier, this challenge posed by the RCCs goes more toward the weight to be accorded to Epstein's report than to its admissibility. (*Id.* at 11–12.)

Fourth, Frontier denies that any part of Epstein's report is *ipse dixit*, pointing to various citations within the report. Frontier points out that his opinions regarding Frontier's responses to notices of alleged infringement are based on his "knowledge of the WIPO Treaties and the provisions concerning online service providers from the time they were being negotiated; Congressional efforts at drafting the DMCA to implement the [online service provider] provisions of the WIPO Treaties; experience interacting with [copyright owners and their agents] in the years following the passage of the DMCA; experience in the development of policies to respond to [] [n]otices; and familiarity with systems, customs, training, methods and practices with the Internet Access industry pertaining to how ISPs handle and respond to notices of alleged copyright infringement." (Opposition at 3–4 (citing Epstein Report at 4–5).) Frontier also points to Epstein's citation at page 20 of his report of broad categories of materials in evidence which

Epstein states he reviewed (Opposition at 12–13), and his citation to publicly-available information posted online by four major ISPs (*id.* at 13).

Fifth, because Epstein has relevant knowledge and experience regarding the implementation of repeat infringer policies, his opinions regarding whether Frontier "clearly articulated" its policy are reliable and will assist the Court, according to Frontier. (*Id.* at 14.)

### D.  RCCs' Reply

The RCCs double down on their argument that Epstein's report is filled with impermissible legal conclusions. (Reply at 3–5.) They point to a ruling on similar motions *in limine* in one of the *Cox Communications* cases which precluded experts from opining on the effectiveness and reasonableness of Cox's repeat infringer programs, on the grounds that such testimony would usurp the jury's factfinding role. *See Sony Music Ent. V. Cox Commc'ns, Inc.*, No. 1:18-CV-950, 2019 WL 9088257, at *1 (E.D. Va. Nov. 19, 2019).

The RCCs also emphasize their point that Epstein's testimony is argument which Frontier's counsel should make, pointing out that he did not perform an actual analysis or study of Frontier's repeat infringer policy in operation: "He did not consider a single subscriber's circumstances . . . .  He did not evaluate whether terminations occurred, whether Frontier resubscribed terminated subscribers, the quantum of infringement notices that Frontier was sent, or how Frontier actually handled them . . . .  He simply summarizes the written policy and then gives that policy his blessing" without using special expertise. (Reply at 5–6.)

The RCCs contest that Epstein adequately identified documents on which he based his analysis of Frontier's repeat infringer policy, and therefore cannot be said to have implemented a reliable methodology. (*Id.* at 6.) The RCCs also argue that Epstein's failure to consider any of Frontier's specific termination decisions (a point which Frontier concedes) renders his report

irrelevant because he cannot reliably opine that Frontier terminated repeat infringers in appropriate circumstances without having reviewed those circumstances.  (*Id.* at 7; *see also* Ex. 1 to Motion at 344:18–345:1 (Epstein admitting that he did not analyze terminations of individual subscribers).)  This argument also applies to Epstein's opinions on other ISPs' repeat infringer policies, as he admitted that, apart from AT&T, he does not know how other ISPs implement their repeat infringer policies, nor any specifics of their notice thresholds or the circumstances under which they terminate subscribers.  (Reply at 8; *see also* Epstein Dep. Tr. at 320:10–321:8 (Epstein stating that he does not know details of Optimum's repeat infringer policy), 322:3–323:15 (the same for Spectrum), 323:16–325:17 (the same for Comcast), 326:16–327:8 (Epstein testifying that he has no knowledge about the repeat infringer thresholds that other ISPs besides Frontier employ).)

## II.    LEGAL STANDARD

Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds.  *See Baxter Diagnostics, Inc. v. Novatek Medical, Inc.,* No. 94 Civ. 5520, 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998).  A court considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context.  *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996).  "Further, the court's ruling regarding a motion *in limine* is 'subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the . . . proffer.'"  *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 140 (S.D.N.Y. 2003) (internal citation omitted).

The admissibility of expert testimony is governed by FRE 702, made applicable to bankruptcy cases by Federal Rule of Bankruptcy Procedure 9017:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FRE 702. Applying these factors to proffered expert testimony, a judge assumes a "gatekeeping" role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

A trial court must decide whether a qualified expert's testimony rests on a reliable foundation, or is instead based on "subjective belief or unsupported speculation." *Id.* at 590. Expert testimony which is speculative or conjectural should be excluded. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). A court may exclude expert evidence where it concludes "that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Although an expert may opine on the ultimate issue of fact, he "may not give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *see* Fed. R. Evid. 704 advisory committee's note; *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988) ("[B]ecause [the expert's] opinions were calculated to invade the province of the court to determine the applicable law and to instruct the jury as to that law, . . . they could not have been helpful to the jury in carrying out its legitimate functions." (internal quotation marks and citations omitted)); *State v. Deutsche Telekom AG*, 419 F. Supp. 3d 783, 790 (S.D.N.Y. 2019) ("[W]here expert reports read like legal briefs and threaten to usurp judges' duty to determine the relevant law, courts may reasonably exclude such evidence at

11

trial."). By attempting to opine on questions of law, the expert is not considered helpful to the

trier of fact because "an expert is . . . barred from giving 'testimony on issues of

law.'" *Navigators Ins. Co. v. Goyard*, 608 F. Supp. 3d 44, 48 (S.D.N.Y.

2022) (quoting *Bilzerian*, 926 F.2d at 1294). The Second Circuit has "consistently held . . . that

expert testimony that 'usurp[s] either the role of the trial judge in instructing the jury as to the

applicable law or the role of the jury in applying that law to the facts before it . . . by definition

does not 'aid the jury in making a decision'; rather, it 'undertakes to tell the jury what result to

reach,' and thus 'attempts to substitute the expert's judgment for the jury's." *Nimely v. City of

New York*, 414 F.3d 381, 397 (2d Cir. 2005) (internal citations omitted). "The rule

prohibiting experts from providing their legal opinions or conclusions is 'so well-established that

it is often deemed a basic premise or assumption of the evidence law—a kind of axiomatic

principle.'" *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y.

2001) (quoting Thomas Baker, *The Impropriety of Expert Witness Testimony on the Law*, 40 U.

KAN. L. REV. 325, 352 (1992)). Along the same lines, an expert's testimony may not "track the

language of the statute or the law that the defendants are accused of violating." *Highland Cap.

Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 179 (S.D.N.Y. 2008); *see also Scop*, 846 F.2d at

140 (barring expert testimony which "drew directly upon the language of the statute and

accompanying regulations" at issue in the case, finding that these opinions were "legal

conclusions"); *AUSA Life Ins. Co. v. Dwyer,* 899 F. Supp. 1200, 1202 n.2

(S.D.N.Y.1995) (stating that the Second Circuit is "especially concerned with testimony that

tracks the language of particular statutes or legal standards"); *Joint Stock Co. Channel One

Russia Worldwide v. Infomir LLC*, No. 16CV1318GBDBCM, 2021 WL 4810266, at *18 n.31

(S.D.N.Y. Sept. 30, 2021) ("In the Second Circuit, an expert impermissibly presents testimony in

the form of legal opinions when those opinions track the exact language of the statutes and

regulations which the defendant had allegedly violated or use judicially defined terms." (cleaned

up)).

Relatedly, an expert may not "supplant the role of counsel in making argument at trial,

and the role of the jury [in] interpreting the evidence." *Primavera Familienstifung v. Askin*, 130

F. Supp. 2d 450, 529 (S.D.N.Y. 2001), *abrogated on other grounds by Casey v. Merck & Co.,*

*Inc.*, 653 F.3d 95 (2d Cir. 2011); *see also LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242 (SAS),

2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (rejecting plaintiff's expert report because the

report "does no more than counsel for [plaintiff] will do in argument, i.e., propound a particular

interpretation of [defendant's] conduct" (internal citation omitted)).  "It is also inappropriate for

experts to act as mere . . . vehicles for factual narrative." *Island Intell. Prop. LLC v. Deutsche*

*Bank AG*, No. 09 CIV. 2675 KBF, 2012 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2012) (internal

citation omitted).

The "fundamental" requirement that expert testimony must "assist the trier of fact"

obligates the Court to "determine whether the testimony 'usurp[s] either the role of the trial

judge in instructing the jury as to the applicable law or the role of the jury in applying that law to

the facts before it.'" *Allen v. City of New York*, 466 F. Supp. 2d 545, 548 (S.D.N.Y. 2006)

(quoting *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)). "Examples of 'expert'

testimony that courts have excluded on this basis include factual narratives and interpretations of

conduct or views as to the motivation of parties." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp.

2d 531, 541 (S.D.N.Y. 2004); *see, e.g., Taylor v. Evans*, No. 94 CIV. 8425 (CSH), 1997 WL

154010, at *1–2 (S.D.N.Y. Apr. 1, 1997) (affirming preclusion of expert report "replete with . . .

speculations on defendants' state of mind" and addressing "factual issues which could be

13

understood without the aid of expert testimony"). The upshot of Rule 702's helpfulness

requirement is that the proffered expert testimony must actually help the factfinder "understand

facts that are outside common understanding." *LinkCo*, 2002 WL 1585551 at *1. "An expert

thus may not merely recite a factual narrative that does not draw technical or scientific

conclusions." *In re Lyondell Chem. Co.*, 558 B.R. 661, 667 (Bankr. S.D.N.Y. 2016)

## III.    DISCUSSION

### A.  Legal Opinions In Epstein's Report

Epstein's report repeatedly, and impermissibly, opines on ultimate issues of law in this

matter. Epstein's testimony regarding the instructions Frontier gave to him—to produce an

"opinion as to what would be an **appropriate reasonable** methodology to use to process notices

generated by rights holders by an Internet service provider" (Epstein Dep. Tr. 84:20–85:10,

emphasis added)—is telling, as this instruction closely tracks the language of DMCA section

512(i), which applies the section 512(a) safe harbor to those service providers which have

"adopted and **reasonably** implemented, and informs subscribers and account holders of

the service provider's system or network of, a policy that provides for the termination in

**appropriate** circumstances of subscribers and account holders of the service provider's system

or network who are repeat infringers." (Emphases added.) "Appropriate" and "reasonable" are

key terms left undefined by the DMCA and thus open to *judicial* interpretation. Right off the

bat, then, Epstein's instructions, as he understood them, bear a remarkable similarity to the

language of the statute which will control the outcome of this case. Despite Epstein's

protestations to the contrary in his report,[1] the language in his "Conclusions" section strongly

suggests that he was impermissibly instructed to opine on a legal question, perhaps *the* ultimate

---

[1]      *See, e.g.*, Epstein Report at 5 n.5 ("Nor have I been asked to provide—and I do not offer—any legal
opinions on any topic.").

legal question, in this case: "[I]t is my opinion that Frontier has a policy providing for the termination of repeat infringers in appropriate circumstances, communicates that policy to its subscribers, reasonably implemented that policy through its graduated response program, and terminated subscribers in appropriate circumstances based on allegations of copyright infringement." (Epstein Report at 22.) This paragraph tracks the structure and language of section 512(i) of the DMCA and *is* a legal opinion.

Numerous other portions of Epstein's report track the language of section 512(i) incredibly closely. For example:

- "Based on my review it is my opinion that between May 2019 through December 2023, Frontier reasonably implemented a policy that provides for termination of repeat infringers in appropriate circumstances." (*Id.* at 5.)
- "Based on my experience, it is a generally accepted and *reasonable* business practice to attempt to educate customers to discourage file sharing of copyrighted works before taking action that will prevent them from having access to the Internet for many legitimate purposes." (*Id.* at 12 (emphasis added).)
- "It is consistent with industry norms and *reasonable* for Frontier to have periodically reined its [repeat infringer] Program and made these types of changes." (*Id.* at 18 (emphasis added.)
- "In my opinion, it is reasonable for Frontier to include this language." (*Id.* at 18 n.35.)
- "It is my opinion that this data supports the reasonableness of Frontier's thresholds . . ." (*Id.* at 22.)

This is not to mention those portions of his report where Epstein appears to dance around the language of section 512(i) but says, in essence, that Frontier reasonably implemented an appropriate repeat infringer policy:

- "It is my opinion that Frontier's [repeat infringer] Program is a rational response to ISP Notices that balances the interest of" the various parties at stake. (*Id.* at 17.)
- "The Program is pragmatic, manageable, balanced, and humane to subscribers." (*Id.* at 18.) (This line appears to be an attempt to define "reasonableness.")
- "Frontier's [repeat infringer] Program has all the features necessary to responsibly implement the Company's policy for the termination of subscribers in appropriate circumstances and, based on my review of materials, Frontier followed through on the implementation of its Program." (*Id.* at 20.)

The above are clear examples (but not an exhaustive list) of impermissible expert testimony on a question of law. *See supra*; *see also* Motion at 8–9, 19–20 for a longer list of excerpts of impermissible testimony.

Frontier's argument, which is essentially that it does not matter if Epstein opines on legal issues because this is a bench trial, is unavailing. As the cases Frontier cites recognize, while it is true that an expert can sometimes opine on "matters that may help to inform how a legal standard or test will be applied," that does not alter the hard-and-fast rule in this Circuit that "expert testimony . . . that enters the zone of legal opinion and even the ultimate issue to be decided by the court, should not be considered." *In re Golden*, No. 16-40809-ESS, 2022 WL 362913, at *13 (Bankr. E.D.N.Y. Feb. 4, 2022).[2] The other case Frontier cites to support its argument that Epstein should be permitted to opine on statutory interpretation or legal terms of art is distinguishable: *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 467 (S.D.N.Y. 2016) involved a jury trial (not a bench trial) which turned on a company's compliance with FDA regulations. That court permitted expert testimony on the question of compliance with intricate FDA regulations in order to assist the jury in understanding "this complex regulatory process." *Id.* By contrast, there is no jury here which may need assistance in understanding the DMCA, and this Court is perfectly capable of ruling on the meaning of the DMCA without expert assistance. *See Sony Music Ent. v. Cox Commc'ns, Inc.*, No. 1:18-CV-950, 2019 WL 9088257, at *1 (E.D. Va. Nov. 19, 2019) (in similar DMCA litigation, court excluded expert testimony opining on the "effectiveness" of ISP's repeat infringer program and testimony).

---

[2]    "Rule 704 was not intended to allow experts to offer opinions embodying legal conclusions." *Bausch & Lomb, Inc. v. Alcon Labs., Inc.*, 79 F. Supp. 2d 252, 255 (W.D.N.Y. 2000) (quoting *Scop*, 846 F.2d at 139). Where an expert, "[r]ather than being asked to develop an expert opinion that might happen to embrace certain ultimate issues, [is] asked to reach legal conclusions regarding those ultimate issues," the expert's assignment is "flawed from the outset." *Primavera Familienstifung*, 130 F. Supp. 2d at 528.

Epstein will not be permitted to opine whether Frontier met its obligations under DMCA

section 512(i), and the Court will disregard those portions of his expert report which include

testimony on that matter.

Because Epstein is not allowed to testify regarding whether Frontier satisfies section

512(i) of the DMCA (because this is a legal issue), the RCCs' objection to such testimony on

grounds of evidentiary insufficiency is moot.  (*See* Motion at 13–14.)

### B.  Epstein's Testimony on Frontier's Implementation of its Repeat Infringer Program is Excluded

In *LinkCo*, the court excluded in its entirety an expert report that offered an extended

factual narrative, because it did "not address technical questions that may be difficult for a juror

to comprehend.  Instead, it contain[ed] arguments and conclusory statements about questions of

fact masquerading behind a veneer of technical language."  *LinkCo*, 2002 WL 1585551, at *1–2.

The report, which was "based on an independent examination of documents, . . . deposition

transcripts and exhibits," was inadmissible for the additional reason that firsthand "testimony by

fact witnesses familiar with those documents would be far more appropriate."  *Id.* at

*2 (quoting *Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*, No. 95 CIV. 3901, 1999 WL

946354, at *3 (S.D.N.Y. Oct. 19, 1999)).  *See also In re Fosamax Prod. Liab. Litig.*, 645 F.

Supp. 2d 164, 192 (S.D.N.Y. 2009) (excluding in part expert's report because experts may not

"regurgitate the evidence") (internal quotation marks omitted); *Highland Cap. Mgmt., L.P. v.

Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005) (holding that, "[t]o the extent that [the

expert] is simply rehashing otherwise admissible evidence about which he has no personal

knowledge, such evidence—taken on its own—is inadmissible"); *In re Rezulin*, 309 F. Supp. 2d

at 551 (excluding in part expert testimony because the testimony was "merely a 'narrative of the

case which a juror is equally capable of understanding'") (internal citation omitted); *Primavera*

*Familienstifung*, 130 F. Supp. 2d at 530 (concluding that expert who offers factual conclusions dependent on his own interpretation of deposition testimony "does no more than counsel for the [plaintiff] will do in argument, *i.e.,* propound a particular interpretation of [the defendant's] conduct").

The RCCs argue that Section XII of Epstein's report, titled "Frontier's Implementation of its Repeat Infringer Policy" (Epstein Report at 17), is nothing but rehashing of facts and should be precluded because it does nothing to help the Court "understand facts that are outside common understanding." (Motion at 12.) Frontier claims that this factual narrative is "necessary to give context to Mr. Epstein's opinion"—his ultimate opinion which, as discussed *supra*, is impermissible because it is a legal analysis. (Response at 9.)

The Court sides with RCCs. This case is on all fours with *Lyondell*, in which this Court excluded an expert report on the grounds that the factual narrative constituted nothing more than "selection, organization, and characterization of excerpts from the discovery record" and hence "no more than counsel . . . will do in argument." *Lyondell*, 558 B.R. at 668 (internal citation omitted). As with the expert report in *Lyondell*, Section XII of Epstein's report is based on the record (*see* Epstein Report at 17 ("Based on my review of documents produced in this case and relevant deposition testimony . . . "), 18–19 (citing the discovery record)) and is littered with Epstein's own interpretations. This type of narrative is inadmissible because "it invades the province of the factfinder by merely 'regurgitat[ing] the evidence.'" *Lyondell*, 558 B.R. at 668 (internal citation omitted). This section does not derive from Epstein's expertise and is in no way helpful to the Court, unlike the expert report in *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 46 (S.D.N.Y. 2016) (cited in Frontier's opposition at page 10). In that case, the expert drew conclusions from a factual narrative about a company's "historical success and

18

growth and the costs and pressures associated with its business practices," and thus helped the trier of fact in understanding the company's "business model" and "common business practices related to cost savings"; in other words, the expert relied on his own expertise to opine on a non-legal issue which required technical knowledge to analyze. *Id.* Epstein does no such thing here: instead, he rehashes portions of the discovery record and adds a few lines of his own legal opinion.

The portions of Epstein's expert report on Frontier's implementation of its repeat infringer policy will be disregarded and Epstein is precluded from opining on such matters at trial.

The above determination moots the RCCs' objection to Epstein's testimony about the implementation of Frontier's repeat infringer program on *ipse dixit* grounds. (*See* Motion at 14–15.)

This same argument applies to Section XI of Epstein's report, in which he states that Frontier's repeat infringer policy is "clearly articulated in Frontier's residential Acceptable Use Policy." (Report at 15.) Once again, Epstein here merely quotes from the evidentiary record and states that he thinks that Frontier "reasonably and concisely articulated its 'repeat infringer policy' in the AUPs." (*Id.* at 15–17.) The Court does not need expert assistance in reading the evidentiary record and drawing a (legal) conclusion as to whether the ISP has "inform[ed] subscribers and account holders of [its] system or network of" a repeat infringer policy, as required by section 512(i) of the DMCA. Section XI of Epstein's report is hereby struck.

### *C.* Epstein's Testimony Regarding Other ISPs' Practices is *Ipse Dixit*

"Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."

19

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137 (1997). "If experts are permitted to testify on an

issue of fact, they must provide some explanation for their conclusions, rather than referring

generally to their experience. Without good explanations, courts cannot assess the reliability of

any conclusion drawn by an expert, even if he possesses relevant experience." *LinkCo*, 2002 WL

1585551, at *4. In other words, there must be some clear methodology and sourcing laid out in

the expert report, and "[w]here an expert otherwise reliably utilizes scientific methods to reach a

conclusion, lack of textual support may go to the weight, not the admissibility of the expert's

testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)

(cleaned up).

Epstein largely does not explain whence he derives his testimony on what other ISPs do,

besides pointing to his experience. While he does cite to publicly-available information posted

by AT&T, Optimum, Spectrum, and Comcast to conclude that "most ISPs have adopted

graduated response programs that impose progressive steps prior to termination,"[3] some of his

other conclusions about the "ISP industry" writ large are wholly unsupported[4]:

- "At the time of the passage of the DMCA, the ISP industry believed that Rightsholders
  would use the Courts to decide that a subscriber was a repeat infringer within the meaning
  of the DMCA. The ISPs did not expect that they would act as judge, jury, and executioner
  . . . . At a minimum, the ISPs expected that a Rightsholder would seek a declaratory ruling
  of repeat infringement . . . . [T]he ISPs were concerned about any automatic termination
  of Subscriber accounts . . . . ISPs, public interest groups and policy makers believed that

---

[3]    Without information about the ISP market, it is impossible for the Court to know whether these four ISPs comprise "most" of the market.

[4]    Epstein cites to his "knowledge of the WIPO Treaties and the provisions concerning online service providers from the time they were being negotiated; Congressional efforts at drafting the DMCA . . .; experience interacting with Rightsholders in the years following the passage of the DMCA; experience in the development of policies to respond to ISP Notices; and familiarity with systems, customs, training, methods and practices within the Internet Access industry pertaining to how ISPs handle and respond to notices of alleged copyright infringement" as the sources of information he draws on throughout his Report. (Report at 4-5.) Only the first two categories are definitive (knowledge of WIPO treaties and Congressional efforts to draft the DMCA); the rest are broad citations to his "experience." While his experience may indeed be extensive, experience alone is not enough to support expert testimony, and the passages highlighted in this order have nothing to do with the drafting of the WIPO treaties or the DMCA (meaning he relied only on his experience to reach those conclusions). *See supra*.

education was a much more valuable tool in correcting customer behavior." (Epstein Report at 11.)

- "It is generally accepted that the ISP cannot verify the Rightsholder's representation of actual, let alone repeat infringement as true and correct since it is impractical for the ISP to independently assess whether an actual infringement has occurred." (*Id.* at 12.)
- "[It] is a generally accepted and reasonable business practice to attempt to educate customers to discourage file sharing of copyrighted works before taking action . . ." (*Id.*)
- "Often, it was difficult to match the notice to the subscriber for a variety of reasons . . . . Some ISPs may not have had sufficient resources" to effectively respond to infringement notices. (*Id.* at 13.)
- "In my experience, most ISPs consider multiple notices for the same subscriber to be a single incident . . ." (*Id.* at 15.)
- "The graduated response programs that ISPs employed differed based on, among other things, available resources and experience. ISPs would also periodically modify their graduated response programs to address issues as they arise." (*Id.*)

He also makes other contentions without relying on any sources apart from his "experience," which caselaw clearly holds is insufficient. For example, Epstein testifies that in his "experience many subscribers are unaware that their Internet service is allegedly being used for file sharing." (*Id.* at 12.)

Caselaw makes clear that merely citing to personal experience is insufficient to support conclusions made in an expert's brief. Indeed, this goes to how expert testimony is distinct from lay testimony: lay testimony is based on the witness's own perception and experience, FRE 701, while expert testimony entails the application of specialized knowledge and reliable principles and methods to the facts of the case, FRE 702. Frontier has provided no caselaw to support its argument that these portions of the report are *not ipse dixit*, and instead merely pointed to the fact that Epstein cited information made available online about four ISPs' repeat infringer policies. (Opposition at 13.) As discussed above, that does not address many of Epstein's statements made without any support.

The RCCs' request to strike unsupported portions of Epstein's report is granted.

21

**D.  What Remains**

Not much remains of Epstein's report.  However, Sections IV through VII are sourced,

reflect Epstein's specialized knowledge as gained from his knowledge of the drafting of WIPO

treaties and the DMCA (*see* Report at 4), and provide potentially helpful context to this Court.

Those sections, and related testimony at trial, may remain.

**IT IS SO ORDERED.**

Dated:      April 3, 2025
            New York, New York

                                    _____/s/   Martin Glenn_____
                                        MARTIN GLENN
                              Chief United States Bankruptcy Judge