**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| FRONTIER COMMUNICATIONS CORPORATION, *et al.*, | ) Case No. 20-22476 (MG) |
| Reorganized Debtors. | ) (Jointly Administered) |

### ORDER GRANTING THE RCCS' MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF CHRISTOPHER SPRIGMAN

Pending before the Court is the RCCs' motion *in limine* ("Motion")[1] seeking to exclude the testimony of one of Frontier's experts, Christopher Sprigman ("Sprigman"), on the grounds that (1) he opines on the law, (2) he lacks expertise regarding relevant ISP behavior, (3) his methodology is unreliable, and (4) his testimony is not helpful. Frontier has submitted a response ("Response"), and the RCCs have submitted a reply ("Reply").

For the following reasons, the RCCs' MIL is **GRANTED**.

### I. BACKGROUND

**A. Sprigman's Report**

Sprigman has been a law professor sine 2005, first at the University of Virginia School of Law and then at NYU. (Sprigman Rpt. at 3.) He has written extensively on antitrust, privacy, and copyright law issues (among others) (Sprigman Dep. Tr. 105:2–11), but has not written a single piece about the behavior of online service providers and how they implement the repeat infringer policy under DMCA Section 512(i) (*id.* at 111:19–112:2).

---

[1] Attached as Exhibit 1 to the Motion are excerpts from Sprigman's deposition testimony ("Sprigman Dep. Tr."). His expert report is attached as Exhibit 2 ("Sprigman Report"), and a transcript of a discovery conference which took place on April 16, 2024 is attached as Exhibit 3.

He was asked by Frontier to undertake the following three tasks, as he frames them: (1) "[d]escribe the strategies that online service providers ('OSPs') have adopted to reasonably implement the four 'safe harbors,' set out in Section 512 of the Copyright Act, 17 U.S.C. § 512, that together limit both the contributory and vicarious copyright infringement liability of OSPs like Frontier for online infringement by their customers"; (2) "[d]escribe the real-world measures that OSPs have adopted to respond to repeat allegations of infringement"; and (3) "[p]rovide my expert opinion regarding the real-world factors that OSPs take into consideration, specifically in the context of infringement allegations against an OSP customer relating to 'transitory digital network communications' covered under the safe harbor set out in 17 U.S.C. § 512(a), in order to properly balance the interests of both copyright owners and private individuals seeking to maintain their access to the internet." (Sprigman Rpt. at 4–5.) In his deposition, he described his assignment as follows: "I was retained to opine on the diversity of approaches that ISPs take to *reasonable* implementation of repeat infringer policies that provide, as Congress says, inappropriate circumstances for the termination of repeat infringers." (Sprigman Dep. Tr. 155:9–18 (emphasis added).) To write his report, he relied on a few filings in this case, a number of publicly-available articles written by others, a copyright treatise, some FAQ pages posted online by other ISPs, a random sample of 100 notices alleging copyright infringement which Frontier received, and his own experience. (Exs. B, C to the Sprigman Rpt., Sprigman Rpt. at 8 (describing his "[m]ethodology" as based on his "more than quarter-century of experience"), Sprigman Dep. Tr. 154:10–155:8.) He did not speak with anyone at Frontier. (Sprigman Dep. Tr. 168:8–11.) He never worked for an ISP, nor has he ever consulted for one or advised one on the implementation of safe harbors. (*Id.* 169:2–15.)

2

To summarize his conclusions, he states: "with respect especially to the § 512(a) conduit OSP safe harbor and infringement allegations involving transitory network communications, OSPs should design and reasonably implement repeat infringer policies that include a graduated response, take all the relevant interests into account, and provide for termination of repeat infringers not automatically, but in appropriate circumstances—which requires a cautious balancing of interests." (*Id.* at 8.)  He starts off, then, by essentially telling the Court what counts as a reasonable repeat infringer policy—it is one which "include[s] a graduated response, take[s] all the relevant interests into account," and only terminates subscribers when "appropriate," "not automatically."

Sprigman then spends multiple pages summarizing the DMCA safe harbors, restating the law, applying it to the facts of this case, and explaining what service providers must do to fall under one of the § 512 safe harbors.  (*Id.* at 9–14; *see id.* at 10 (applying the statutory definition of "service provider" to Frontier and determining that "Frontier is a 'service provider' under the definition that applies to the § 512(a) safe harbors.")  He then launches into a discussion of online service providers' "real-world behavior" and how it "is consistent with an understanding of § 512(i)(1)(A) that does not ignore repeat infringement allegations, but also does not premise termination solely on those allegations"—*i.e.*, how their behavior is "reasonable" under the statute, in his view.  (*Id.* at 15.)  Notably, the only sources Sprigman cites, beyond his own observations of "OSPs [sic] real-world behavior" (*see, e.g.*, *id.* at 20), are publicly-available FAQs posted by a handful of ISPs which set out what each ISP claims is its repeat infringer policy.  (*Id.* at 16–20.)  (It is not clear where he could have made such observations about service providers' "real-world behavior," as he does not have experience working for any ISP.)  He does not describe how the ISPs *in reality* implement these policies—he merely states that "[t]hese

policies reflect what I have observed in the marketplace: different OSPs have deployed various processes by which OSPs determine whether and when it is appropriate to terminate a subscriber." (*Id.* at 19.) Sprigman then opines, again, on what the DMCA requires, claiming that § 512(i)(1)(A) (which requires ISPs to have policies providing for the termination of customers "who are repeat infringers") means that "termination need not—and, in fact, should not— be based solely on *allegations* of repeat infringement, because allegations, standing alone, are not proof . . . . § 512(i)(1)(A)'s language can be read to require termination only for customers who have been *adjudicated repeat infringers*." (*Id.* at 20 (emphasis in original).) He claims, without citing any sources, that, "[j]udging by OSPs real-world behavior, this is also the understanding on which OSPs have based their business practices." (*Id.*) He continues in a similar vein, alternating between making conclusory statements about ISPs' "real-world" practices and legal interpretation. (*See id.* at 21–23 (discussing how, for example, "OSPs' real-world behavior is . . . consistent with Section 512's legislative history" as that concerns the reasonable implementation of a repeat infringer policy; opining that "OSPs' real-world behavior is consistent with what § 512(m) and the legislative history of § 512 provides" and with "the legislative history of § 512(i)(1)(A).")

Next, Sprigman moves on to an attack on the unreliability of DMCA notices, especially those generated by machine. (*Id.* at 23.) He states that he "reviewed a random sample of 100 of the notices that Frontier has received alleging copyright infringement related to transitory network communications," and determined that they "appear to have been generated by machine, and without any evidence (or claim) of human review." (*Id.*) Notably, he does not opine on the validity of those 100 notices. He instead cites a number of studies, written by others, which purportedly show that machine-generated DMCA notices are frequently faulty. (*Id.* at 23–26.)

4

Sprigman then switches back to legal analysis and *ipse dixit* statements, opining on the difficulty of implementing a reasonable repeat infringement policy "in the context of 'transitory digital network communications.'" (*Id.* at 27.) He analyzes the DMCA, setting out his view of what it does and does not require service providers to do when faced with a notice of infringement (*id.*), and why it is (in his view) more difficult for transitory network communications providers to respond to allegations of infringement (*id.* at 28–29).

Finally, Sprigman devotes multiple pages to discussing the importance of Internet access for households, citing works written by others as well as caselaw from across the country. (*Id.* at 29–32.)

### B.  RCCs' Argument

The RCCs seek to exclude "any and all" of Sprigman's testimony. (Motion at 1.) The arguments in this round of briefing are similar to those concerning Keith Epstein's, so the summary will be shorter.

The RCCs point out that Sprigman opines on "his interpretation of a variety of provisions in the DMCA," reviewed above, as well as his "'understanding' of the text and terms of the statute and its legislative history." (*Id.* at 2, 8–10.) They argue that Sprigman is "wholly unqualified to opine as an expert on the irrelevant subject[] of ISP behavior" because he "never worked for, consulted for, advised, nor represented an ISP as a client," has never "written or spoken about ISPs' implementation of repeat infringer policies," did not speak to anyone at any ISP about how they implement repeat infringer policies when preparing this report, and "admitted that he has never seen any internal documents from any ISP demonstrating or discussing how an ISP implements such policies." (*Id.* at 2–3, 10–13.) Third, they argue that the part of Sprigman's testimony which is not legal opinion is a "series of second-hand observations

5

about non-specific ISP behavior that he contends reflect his own understanding about what § 512(i) requires," none of which constitutes an expert opinion, and all of which is dependent upon unreliable methodology (the methodology being pure say-so). (*Id.* at 3, 13–16.) Finally, the RCCs argue that Sprigman's testimony and opinions are not helpful because he does not apply his opinions to the facts of this case; the RCCs argue that his testimony, which focuses on other ISPs' behavior, is irrelevant to this case. (*Id.* at 17–19.)

### C. Frontier's Opposition

Frontier counters by describing Sprigman's report as a "description of the statutory scheme of the" DMCA, as opposed to legal opinion. (Opposition at 1.) It argues that Sprigman's report does not offer any "opinions as to the ultimate issues in this case, including as to the adequacy of the RCCs' notices or Frontier's repeat infringer policy," and merely provides "relevant statutory context" to his "opinions about the business practices of OSPs." (*Id.* at 7.) Frontier describes Sprigman's DMCA discussion as merely "recitations of the statute." (*Id.*) It also argues that Sprigman properly opines on "the current state of the market, *i.e.*, how OSPs have implemented policies pursuant to the DMCA," which is not a legal conclusion. (*Id.* at 8.) The fact that Sprigman did not speak with anyone from Frontier is because, per Frontier, of the bar on Sprigman opining on legal issues as applied to this case. (*Id.* at 9.)

Frontier argues that Sprigman's testimony is helpful to this Court "because it provides important context regarding the application of the DMCA's safe harbors." (*Id.* at 9.) According to Frontier, his testimony situates section 512(i) of the DMCA within a broader "statutory scheme" (*id.* at 10), and his explanation of what other ISPs do to comply with the DMCA is analogous to explaining how two works are similar in the copyright context (*id.* at 11).

6

Frontier also insists that Sprigman, as one of the nation's top copyright scholars, is eminently qualified to opine in this matter, and points to Sprigman's history teaching about the DMCA and online service providers as qualifying experience. (*Id.* at 2, 11–13.)

Finally, Frontier argues that Sprigman's methodology is reliable, and that even if there is a valid attack on his methodology, recent changes to Rule 702 "make clear [that] questions of the application of an expert's methodology 'are questions of weight and not admissibility.'" (*Id.* at 14-16.)

### D. RCCs' Reply

The RCCs reiterate their original arguments in their Reply, which will not be rehashed here.

## II.    LEGAL STANDARD

The admissibility of expert testimony is governed by FRE 702, made applicable to bankruptcy cases by Federal Rule of Bankruptcy Procedure 9017:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FRE 702. Applying these factors to proffered expert testimony, a judge assumes a "gatekeeping" role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

A trial court must decide whether a qualified expert's testimony rests on a reliable foundation, or is instead based on "subjective belief or unsupported speculation." *Id.* at 590.

Expert testimony which is speculative or conjectural should be excluded. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). A court may exclude expert evidence where it concludes "that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* at 137. "If experts are permitted to testify on an issue of fact, they must provide some explanation for their conclusions, rather than referring generally to their experience. Without good explanations, courts cannot assess the reliability of any conclusion drawn by an expert, even if he possesses relevant experience." *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 CIV. 7242 (SAS), 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002). In other words, there must be some clear methodology and sourcing laid out in the expert report, and "[w]here an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may go to the weight, not the admissibility of the expert's testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (cleaned up).

Although an expert may opine on the ultimate issue of fact, he "may not give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *see* Fed. R. Evid. 704 advisory committee's note; *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988) ("[B]ecause [the expert's] opinions were calculated to invade the province of the court to determine the applicable law and to instruct the jury as to that law, . . . they could not have been helpful to the jury in carrying out its legitimate functions." (internal quotation marks and citations omitted)); *State v. Deutsche Telekom AG*, 419 F. Supp. 3d 783, 790 (S.D.N.Y. 2019) ("[W]here expert reports read like legal briefs and threaten to usurp

judges' duty to determine the relevant law, courts may reasonably exclude such evidence at trial."). By attempting to opine on questions of law, the expert is not considered helpful to the trier of fact because "an expert is . . . barred from giving 'testimony on issues of law.'" *Navigators Ins. Co. v. Goyard*, 608 F. Supp. 3d 44, 48 (S.D.N.Y. 2022) (quoting *Bilzerian*, 926 F.2d at 1294). The Second Circuit has "consistently held . . . that expert testimony that 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it . . . by definition does not 'aid the jury in making a decision'; rather, it 'undertakes to tell the jury what result to reach,' and thus 'attempts to substitute the expert's judgment for the jury's." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (internal citations omitted). "The rule prohibiting experts from providing their legal opinions or conclusions is 'so well-established that it is often deemed a basic premise or assumption of the evidence law—a kind of axiomatic principle.'" *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (quoting Thomas Baker, *The Impropriety of Expert Witness Testimony on the Law*, 40 U. KAN. L. REV. 325, 352 (1992)). Along the same lines, an expert's testimony may not "track the language of the statute or the law that the defendants are accused of violating." *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 179 (S.D.N.Y. 2008); *see also Scop*, 846 F.2d at 140 (barring expert testimony which "drew directly upon the language of the statute and accompanying regulations" at issue in the case, finding that these opinions were "legal conclusions"); *AUSA Life Ins. Co. v. Dwyer,* 899 F. Supp. 1200, 1202 n.2 (S.D.N.Y.1995) (stating that the Second Circuit is "especially concerned with testimony that tracks the language of particular statutes or legal standards"); *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16CV1318GBDBCM, 2021 WL 4810266, at *18 n.31

9

(S.D.N.Y. Sept. 30, 2021) ("In the Second Circuit, an expert impermissibly presents testimony in the form of legal opinions when those opinions track the exact language of the statutes and regulations which the defendant had allegedly violated or use judicially defined terms." (cleaned up)).

Relatedly, an expert may not "supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence." *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001), *abrogated on other grounds by Casey v. Merck & Co., Inc.*, 653 F.3d 95 (2d Cir. 2011); *see also* LinkCo, 2002 WL 1585551, at *2 (rejecting plaintiff's expert report because the report "does no more than counsel for [plaintiff] will do in argument, i.e., propound a particular interpretation of [defendant's] conduct" (internal citation omitted)).

The "fundamental" requirement that expert testimony must "assist the trier of fact" obligates the Court to "determine whether the testimony 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *Allen v. City of New York*, 466 F. Supp. 2d 545, 548 (S.D.N.Y. 2006) (quoting *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)). "Examples of 'expert' testimony that courts have excluded on this basis include factual narratives and interpretations of conduct or views as to the motivation of parties." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004); *see, e.g., Taylor v. Evans*, No. 94 CIV. 8425 (CSH), 1997 WL 154010, at *1–2 (S.D.N.Y. Apr. 1, 1997) (affirming preclusion of expert report "replete with . . . speculations on defendants' state of mind" and addressing "factual issues which could be understood without the aid of expert testimony"). The upshot of Rule 702's helpfulness requirement is that the proffered expert testimony must actually help the factfinder "understand facts that are outside common understanding." *LinkCo*, 2002 WL 1585551 at *1. "An expert

10

thus may not merely recite a factual narrative that does not draw technical or scientific conclusions." *In re Lyondell Chem. Co.*, 558 B.R. 661, 667 (Bankr. S.D.N.Y. 2016).

### III.    DISCUSSION

As this motion is similar to the (successful) motion to exclude Keith Epstein's report and testimony and that logic largely controls the outcome here, the Court need not walk through every objection and argument. (The RCCs' motion *in limine* to exclude Epstein's report and testimony was granted in part, *see* ECF Doc. # 2521.)  The Court has thoroughly reviewed Sprigman's report and briefly summarized it above.  As the summary indicates, every section of Sprigman's report either constitutes legal opinion and analysis; his belief about what most online service providers do in order to comply with the DMCA, which is ungrounded in anything beyond his own largely unrelated "experience"; and his summary of public documents, written by others, which is unhelpful to the Court and largely unrelated to the issues in this case.  None of this is permissible in an expert report. *See supra*; *see also* ECF Doc. # 2521.  Therefore, the RCCs' Motion is **GRANTED** in full.

## IV.    CONCLUSION

For the foregoing reasons, Sprigman's report is excluded in its entirety and he is barred from testifying at trial.  The RCCs' motion is **GRANTED** in full.

**IT IS SO ORDERED.**

Dated:    April 9, 2025
    New York, New York

                    /s/   Martin Glenn
                    MARTIN GLENN
                    Chief United States Bankruptcy Judge