**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- X

In re:                                                                  :          Chapter 11

FRONTIER COMMUNICATIONS                      :          Case No. 20-22476 (MG)
CORPORATION, *et al*.                                      :
                                                                            :          (Jointly Administered)
                Debtors.                                             :
                                                                            :
                                                                            :
                                                                            :
                                                                            :
                                                                            :
                                                                            :
-------------------------------------------------------- X

<u>**PARTIES' JOINT PRETRIAL ORDER**</u>

    The Record Company Claimants[1] (the "RCCs"), the Movie Company Claimants[2] (the

"MCCs), and Reorganized Debtors[3] ("Frontier," and collectively, with the RCCs and MCCs, the

---

[1] The Record Company Claimants are Claimants UMG Recordings, Inc., Capitol Records, LLC (collectively the "Universal Claimants"); ABKCO Music & Records, Inc. (the "ABKCO Claimants"); Sony Music Entertainment, Arista Music, Arista Records LLC, LaFace Records LLC, Sony Music Entertainment US Latin LLC, Volcano Entertainment III, L.L.C., and Zomba Recording LLC (collectively, the "Sony Claimants"); and Atlantic Recording Corporation, Atlantic Records Group LLC, Bad Boy Records LLC, Big Beat Records Inc., Elektra Entertainment Group Inc., Fueled by Ramen LLC, Lava Records LLC, Maverick Recording Company, Nonesuch Records Inc., Rhino Entertainment Company, Rhino Entertainment LLC, Roadrunner Records, Inc., Warner Music Inc., Warner Music International Services Limited, Warner Music Nashville LLC, and Warner Records Inc. (collectively, the "Warner Claimants").

[2] The Movie Company Claimants are Voltage Holdings, LLC; Union Patriot Capital Management, LLC; Venice PI, LLC; Bedeviled, LLC; MON, LLC; Colossal Movie Productions, LLC; WWE Studios Finance Corp; TBV Productions, LLC; Definition Delaware LLC; I Am Wrath Productions, Inc.; Hannibal Classics Inc.; Justice Everywhere Productions LLC; Badhouse Studios, LLC; Rise Up, LLC; Status Update LLC; Morgan Creek Productions, Inc.; Shock and Awe, LLC; Fun Mom Dinner, LLC; Dead Trigger Movie, LLC; YAR Productions, Inc.; Gunfighter Productions, LLC; Ace in the Hole Productions, LP; SF Film, LLC; The Rest of Us, Inc.; Killing Link Distribution, LLC; Dallas Buyers Club, LLC; Rambo V Productions, Inc.; Millennium Funding, Inc.; Millennium IP, Inc.; LHF Productions, Inc.; UN4 Productions, Inc.; Millennium Media, Inc.; Bodyguard Productions, Inc.; Hunter Killer Productions, Inc.; Fallen Productions, Inc.; HB Productions, Inc.; Black Butterfly Film, LLC; AMBI Distribution Corp.; Dubious Productions, Inc.; Rupture CAL, Inc.; Outpost Productions, Inc.; Nikola Productions, Inc.; Eve Nevada, LLC; After II Movie, LLC; and Wonder One, LLC.

[3] Due to the large number of debtor entities in these Chapter 11 cases, for which joint administration has been granted, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/ftr. The location of the Debtors' service address for purposes of these Chapter 11 cases is: 50 Main Street, Suite 1000, White Plains, New York 10606.

"Parties"), having conferred among themselves and with the Court pursuant to Fed. R. Civ. P. 16, the following statements, directions and agreements are adopted as the Pretrial Order herein.

## I.    NATURE OF THE CASE

The RCCs and MCCs have asserted pre-petition claims and administrative claims against Frontier alleging secondary copyright infringement. Claimants all allege Frontier is contributorily liable for copyright infringement because it provided high-speed Internet service to known repeat copyright infringers using Frontier's network.[4] Certain MCCs additionally allege that Frontier is secondarily liable (contributorily or vicariously) for violations of the integrity in copyright management information ("CMI") in digital copies of their movie under 17 U.S.C. § 1202. Finally, certain MCCs allege that Frontier is liable for direct infringement of certain movies at Frontier company accounts or, in the alternative, secondarily (contributorily or vicariously) liable for said direct infringements.

Frontier denies all liability. Frontier further asserts that it is a conduit provider under the Digital Millennium Copyright Act and entitled to the safe harbor against monetary liability pursuant to Section 512(i). 17 U.S.C. § 512(a), (i).

## II.    BASIS FOR JURISDICTION, WHETHER THE CASE IS CORE OR NON-CORE, AND WHETHER THE BANKRUPTCY JUDGE MAY ENTER FINAL ORDERS OR JUDGMENT

This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(B), and this Court has jurisdiction to enter a final order and judgment in this proceeding.

---

[4] To narrow the issues in dispute between the RCCs and Frontier, the RCCs have dropped their vicarious infringement claims and will proceed on their contributory infringement claims.  MCCs are not asserting that Frontier is secondarily liable under vicarious infringement for copyright infringement at subscriber accounts.  MCCs assert that Frontier is secondarily liable under vicarious infringement for copyright infringement at Frontier company accounts (if not liable directly).  MCCs also assert that Frontier is secondarily liable for CMI violations under vicarious infringement and contributorily.

III.    **STIPULATIONS**

a.  **Facts to which all Parties stipulated in ECF 2460**

1.      Since at least October 27, 2012, copyright owners and their representatives have been sending notices to Frontier alleging infringement of their copyrights at IP addresses associated with Frontier subscribers' accounts (each a "Notice").

2.      The Universal Claimants began sending Notices to Frontier on May 3, 2019. Other RCCs began sending Notices to Frontier in 2020.

3.      Frontier uses the open-source software MariaDB to maintain a relational database documenting certain information in connection with certain actions Frontier took in response to Frontier's receipt of Notices (the "Frontier DMCA Database"). The Frontier DMCA Database tracks certain events in three tables: Reports, Notifications, and WG_Intercept. The Reports table contains records of Notices that Frontier has received, parsed, and processed. The Notifications table contains records of e-mail notifications ("Notifications") Frontier attempted to send to subscribers whose IP addresses were the subject of a Notice.  The WG_Intercept table contains records of Walled Garden intercepts Frontier sought to implement with respect to users of an IP address assigned to an account that was the subject of a certain number of notices.  The Reports, Notifications, and WG_Intercept records were created by a computer script contemporaneously with (1) the processing of a Notice, (2) an attempt to email a Notification, or (3) initiation, acknowledgment, or removal of a Walled Garden intercept, respectively.

4.      Frontier has records that, for most but not all subscribers, show which subscriber was assigned a particular cable modem or gateway, identified by MAC address.  Frontier's Remote Authentication Dial-In User Service ("RADIUS") database contains records that typically allow Frontier to determine the cable modem or gateway assigned a particular Frontier IP address over

3

a recent particular time.  In this manner, Frontier can typically identify which subscriber account is or was associated with a particular IP address at a particular recent date and time.  However, it is not always possible for Frontier to do so because the RADIUS database does not and never did include such a record for all subscribers.

5.      The Reports table of Frontier's DMCA Database contains a record of the Notices that Frontier processed successfully.  Records in the Reports table (each a "Report") identify the subscriber account associated with a particular processed Notice, to the extent Frontier's DMCA script identified the subscriber from the RADIUS database. Because the Reports table does not contain records for every Notice Frontier received, the data in the Reports table cannot be used to definitively identify the subscriber account, if any, associated with every Notice.

6.      Prior to March 2, 2020, the retention period for the Reports table was 6 months. Between March 2, 2020, and January 15, 2021, the retention period was 12 months.  On January 15, 2021, the retention period was extended indefinitely.

7.      The Reports table stores Reports of Notices successfully processed by Frontier from Sept. 2, 2019 on.

8.      Each Report includes identifying information for the subscriber whose account was associated with the IP address in the corresponding Notice at the date/time specified in the Notice. The identifying information can include the subscriber's user name, e-mail address, or MAC address.

9.      Individual Reports reflect the IP address assignment at the date/time specified in the corresponding Notice, but not at other times.

10.     If the IP address in a Notice is not assigned to a subscriber at the time alleged in the Notice, or if the IP address assignment in Frontier's systems has not been refreshed within a

4

specified time period, Frontier's DMCA script does not create a Report, but the Notice is still delivered to Frontier's DMCA mailbox.

11.     Frontier has produced data from its DMCA Database in FRONTIER_00166746. In that production, the earliest Reports table data is dated September 2, 2019, the earliest Notifications table data is dated October 27, 2012, and the earliest WG_Intercept table data is dated August 11, 2017.

12.     Reports data in Frontier's DMCA Database older than September 2, 2019, was purged on or before March 2, 2020 by the automated operation of Frontier's computer system. Syslogs (defined in ¶ 16) older than February 6, 2021, were purged on or before March 23, 2021, by the automated operation of Frontier's computer system. The programs that purged Reports data and syslogs were created by Frontier and modified from time to time (see, for example, ¶¶ 6, 16).

13.     Before March 11, 2021, Frontier sent Notifications to subscribers upon receipt of the 16th Notice linked to an IP address assigned to the subscriber's account within a 90-day period. On March 11, 2021, Frontier changed the Notification threshold to the 11th Notice within a 90-day period.

14.     For most but not all Frontier subscribers, Frontier's RADIUS database contains histories of dynamic IP addresses assigned to those subscribers.

15.     Frontier's main Notice processing script, dmca-xml.py, writes information about its processing of Notices over the course of each day into a text file known as a system log ("syslog"). The script creates a syslog entry when the script processes a particular Notice and encounters a particular threshold or encounters a particular error; the script then writes to the log a message indicating that it has encountered the threshold or error while processing a particular Notice. Among other things, the script writes error messages in the syslog ("syslog error") in a

variety of circumstances, including but not limited to (i) when it cannot parse the XML contained in a Notice; or (ii) if the owner field for the IP address identified in the Notice cannot be populated.

16.     On or about March 23, 2021, Frontier extended its syslog retention period from 45 days to indefinite. Frontier retains and has produced syslogs from February 6, 2021 on.

17.     Frontier's dmca-xml.py script creates daily backtrace files for debugging purposes when the script encounters particular errors that cause the script to terminate. Frontier retains and has produced backtrace files from May 13, 2022 on.

18.     Frontier began preserving the emails of Philippe Levan and Josh Elmore automatically on November 12, 2019 pursuant to the request of its in-house counsel John Greifzu as reflected in Exhibit A to ECF No. 2460.

19.     On or about March 16, 2020, Frontier received by certified mail from MCCs' counsel Kerry Culpepper a physical copy of the letter attached as Exhibit B to No. ECF 2460.

20.     The Universal Claimants filed a Proof of Claim reflecting prepetition claims against Frontier in these Chapter 11 cases on January 22, 2021 (the "Universal Prepetition Claim"). The Universal Claimants filed an Amended Proof of Claim reflecting prepetition claims against Frontier in these Chapter 11 cases on August 17, 2022.

21.     The Universal Claimants and the ABKCO Claimants filed a Proof of Claim reflecting administrative claims against Frontier in these Chapter 11 cases on June 1, 2021. The Universal Claimants and ABKCO Claimants filed an Amended Proof of Claim reflecting administrative claims against Frontier in these Chapter 11 cases on August 16, 2022.

22.     The Sony Claimants filed a Proof of Claim reflecting administrative claims against Frontier in these Chapter 11 cases on June 1, 2021. The Sony Claimants filed an Amended Proof of Claim reflecting administrative claims against Frontier in these Chapter 11 cases on

6

August 16, 2022.

23.    The Warner Claimants filed a Proof of Claim reflecting administrative claims against Frontier on June 1, 2021. The Warner Claimants filed an Amended Proof of Claim reflecting administrative claims against Frontier in these Chapter 11 cases on August 16, 2022.

24.    On May 17, 2021, Frontier filed an omnibus objection (ECF No. 1818) directed to the Universal Prepetition Claim and to one other claim filed in the case.

### b. Facts to which the MCCs and Frontier stipulated in ECF 2460[5]

1.    Certain of the MCCs began sending Notices to Frontier in 2016.

2.    Frontier's static IP address databases (IP admin and IP tracker) contain active records for current static IP address assignments to Frontier subscribers.

3.    Frontier's DMCA Database includes a Walled Garden table that records data in connection with the operation of Frontier's Walled Garden, including the number of Walled Garden intercepts and the number of Walled Garden acknowledgments per subscriber.

4.    From February of 2015 to July 31, 2022, John Greifzu worked at Frontier as an in-house counsel.

5.    From March 2012 through November 8, 2019, Greg Hartman was an Engineer, IT Systems for Frontier.

6.    In 2017, Mr. Hartman took on responsibilities related to the implementation of Frontier's repeat infringer policy.

7.    During 2017, 2018, and 2019, Mr. Hartman periodically ran a script that listed subscriber accounts and the number of Notices linked to each account during the past 90 days, sorted in descending order, from highest to lowest number of Notices.

---

[5] The RCCs take no position regarding these stipulations.

8.      Before he resigned from Frontier in November 2019, Mr. Hartman showed Joshua Elmore how he carried out certain of Frontier's practices with respect to implementation of its repeat infringer policy.

9.      On September 19, 2016, Frontier received from RightsCorp, Inc. the letter attached as Exhibit C to ECF No. 2460. On October 13, 2016, Frontier sent to RightsCorp the response letter attached as Exhibit D to ECF No. 2460.

10.     On October 18, 2016, Frontier sent letters to certain subscribers notifying them that their internet service would be terminated, copies of which are attached as Exhibits E-H to ECF No. 2460.

11.     On December 13, 2019, Frontier received from third-party MG Premium Limited the letter attached as Exhibit I to ECF No. 2460.

12.     On January 9, 2020, Frontier's in-house counsel sent MG Premium Limited the letter attached as Exhibit J to ECF No. 2460.

13.     On or about February 3, 2020, Frontier received from BMG Rights Management, LLC the letter attached as Exhibit K to ECF No. 2460.

14.     On March 4, 2020, Frontier's in-house counsel sent BMG Rights Management, LLC the letter attached as Exhibit L to ECF No. 2460.

15.     On March 12, 2020, Frontier sent to RightsCorp, Inc. the letter attached as Exhibit M to ECF No. 2460.

16.     On March 31, 2020, Mr. Garcia responded to Mr. Culpepper's letter with the letter attached as Exhibit N to ECF No. 2460.

17.     On April 6, 2020, Mr. Culpepper sent Mr. Garcia the letter attached as Exhibit O to ECF No. 2460. Frontier did not respond to the letter.

18.     Between June 8 and September 28, 2020, MCCs filed multiple proofs of claim in the Frontier bankruptcy asserting pre-petition claims on the basis, inter alia, that Frontier was secondarily liable for copyright infringement.

19.     Between May 28 and June 1, 2021, MCCs filed post-petition administrative claims in the Frontier bankruptcy on the basis, inter alia, that Frontier was secondarily liable for copyright infringement.

20.     On December 28, 2020, after speaking with Frontier's outside counsel Joshua Robinson by telephone, Mr. Culpepper sent Mr. Robinson the e-mail correspondence attached as Exhibit P to ECF No. 2460.

21.     On January 8, 2021, Frontier's outside counsel Mr. Robinson emailed MCCs' counsel Mr. Culpepper the proposed outline of topics for discovery attached as Exhibit Q to ECF No. 2460.

22.     In May 2021, Frontier voluntarily produced to the MCCs data from Frontier's DMCA database for the period from September 2, 2019 through May 11, 2021.

23.     On November 22, 2023, MCCs served their First Request for Production of Documents, which are attached as Exhibit R to ECF No. 2460.

24.     On January 25, 2024, the Court issued an Order under the Cable Act authorizing and directing Frontier to disclose the identities of certain customers pursuant to a procedure established by the Court. ("Cable Act Order") ECF No. 2264.

25.     On March 26, 2024, Frontier produced IP address assignment records for 64 subscribers for the period from August 2022 to March 2024.

26.     On April 11, 2024, Frontier identified 12 additional subscribers and produced IP address assignment records for 11 subscribers for the period from September 2022.

27.     On June 10, 2024, Frontier served Responses to MCCs' First Set of Requests for Admissions, which are attached as Exhibit S to ECF No. 2460.

28.     On August 1, 2024, Frontier served Supplemental Answers to MCCs' First Set of Interrogatories, which are attached as Exhibit T to ECF No. 2460.

### c.   Additional Factual Stipulations

1.     The websites thepiratebay.org; 1337x.to; YTS.mx; and torrentgalaxy.to are hosted on servers outside of the United States.

2.     Frontier will not claim at trial to have terminated under its repeat infringer policy any subscriber account not listed on RCC 124 (RX 518).

3.     Under Frontier's Residential Acceptable Use Policy and Frontier's Commercial Acceptable Use Policy, repeated copyright infringements are grounds for termination of service.

4.     On January 15, 2021, Frontier reduced the threshold for placing users in the DMCA walled garden from 100 to 50 notices during a 90-day lookback period.

5.     On March 11, 2021, Frontier further reduced the threshold for placing users in the DMCA walled garden from 50 notices to 30 notices during a 90-day lookback period.

6.     Frontier provides subscribers with, among other things, conduit internet service under 17 U.S.C. § 512(a).

### d.   Procedural Stipulations

1.     **Opening Statements**.  The Parties disagree regarding the length of opening statements:

- Claimants' proposal: If permitted by the Court, the RCCs and Frontier will have up to 60 minutes for each of their openings, and the MCCs will be limited to 30 minutes.

- Frontier's proposal: If permitted by the Court, opening statements shall be limited to 25 minutes each for MCCs and RCCs and 30 minutes for Frontier

10

2.      **Post-trial submissions**.  The parties will submit proposed findings of fact and conclusions of law 45 days after receipt of the final trial transcript.  The parties agree to split the costs of transcripts equally between Claimants and Respondent.  Oral argument shall be at the Court's discretion.

3.      **Fact witnesses**.  Fact witnesses shall only appear once, unless unexpectedly needed for rebuttal.  All witnesses employed by a party or under a party's control that are listed on another party's witness list to be called live shall, if the latter so requests, be made available by the former at the time the latter intends to call them, provided that reasonable notice is given and the witness is not, in good faith, unavailable; and otherwise at such time as the parties and the witness may agree or as ordered by the Court.  If the RCCs/MCCs call a Frontier witness in their case-in-chief, that witness's entire testimony shall occur at that time; the witness will be excused and not subsequently recalled in Frontier's case-in-chief; provided, however, Frontier can request leave to recall a Frontier witness to address unanticipated rebuttal issues arising as a result of Claimants' sequencing of witnesses.  The parties shall cooperate on making witnesses available.  Each party shall make a good-faith effort to notify all other parties of witnesses it intends to call on a particular day 48 hours before such party intends to call those witnesses.

4.      **Preference for live testimony**.  A party may not introduce deposition designations for any witness that has been made available for live testimony.  A party need not serve deposition designations for any witness that an opposing party has indicated will be made available for live testimony (this includes witnesses for which a party has indicated it will be submitting written direct testimony).  If a party that has indicated a witness will be made available for live testimony subsequently provides notice that such witness will not be made available for live testimony, any opposing party shall have the right to serve deposition designations for that

witness within a reasonable time of receiving such notice.

5.    **Expert witnesses**.  Subject to the Court's decisions on admissibility, a party may present the testimony of any expert witness entirely live.  To the extent any party chooses to present the testimony of an expert other than live (except as to background, qualifications, and experience), the party must do so by witness declaration within the deadline for other witness statements, unless as part of *voir dire*.  Expert witnesses need not hear testimony in person to respond to or rebut evidence presented during the trial; they can review transcripts and exhibits for that purpose.

6.    **Demonstratives**.  Any party wishing to use demonstratives shall provide such demonstratives to opposing counsel by 8 pm the day before the party intends to use them.  The parties shall confer regarding any objections to the demonstratives in advance of their use.

7.    **Witness Rule**.  In accordance with Fed. R. Evid. 615, except as provided in Fed. R. Evid. 615(a)(1)-(4), no fact witness shall be present in the courtroom for any other witness's testimony, nor shall any fact witness review the transcript of any trial testimony, nor shall anyone disclose any trial testimony to any fact witness.  However, this prohibition shall not apply to a witness that has already testified and been excused, nor to any expert witness.

8.    **Technology**.  Each party is entitled to have a technological assistant present at counsel's table to facilitate the digital display of exhibits and deposition testimony.

9.    **Witness Availability**.  In order to address witness availability issues: (i) Jonathan Yunger, Richard Rionda, and Chris Taylor (MCC witnesses) shall testify during the first week of trial; (ii) Stephen Bunting (one of MCCs' experts) shall complete his testimony by May 21; (iii) Dr. Lehr (one of the RCCs' experts on harm) and any experts rebutting his testimony shall not testify until the week of May 26; (iv) Jesse Ross (a Frontier witness) shall testify after

12

May 11; (v) Scott Mispagel (a Frontier witness) need not testify on May 20-21; (vi) Christopher Sprigman (one of Frontier's experts) need not testify during May 19-21; and (vii) Keith Epstein (one of Frontier's experts) need not testify during May 21-25. Frontier has indicated that Laurie Alm is unavailable between May 13 and May 27 for both personal and business reasons. To the extent that Claimants are unable to call her during the period she is available, they object to her absence.

10.     **Cross-use**. Testimony and evidence admitted in connection with the MCCs' claims may be considered in connection with the RCCs' claims, and vice versa. Any party has a right to examine or cross-examine a witness from any other party, subject to the Court resolving any disputes on a case-by-case basis. To the extent Frontier thinks the RCCs' mode of questioning an MCC witness (or vice-versa) is improper, it can object.

11.     **Scheduling coordination**. In order to facilitate witness scheduling coordination, after the April 16, 2025 Pre-Trial Conference, each party shall serve a non-binding, good-faith estimate of approximately how long it expects each of its cross-examinations to last. The RCCs and MCCs shall serve a non-binding, good faith sequence of the witnesses they intend to call in their cases-in-chief by April 21, 2025. Frontier shall serve a non-binding, good-faith sequence of the witnesses it intends to call in its case-in-chief by April 25, 2025.

12.     **Right to cure**. Subject to the Court's discretion, each party shall have the right to attempt to cure any issues with respect to the admissibility of evidence in a witness statement or of a proposed trial exhibit by live examination in open court.

## IV.    PARTIES' CONTENTIONS

MCCs Millennium Funding, Inc., Voltage Holdings, LLC, Black Butterfly Film, LLC, Rambo V Productions, Inc., Fallen Productions, Inc., Morgan Creek Productions, Inc. seek to amend their pre-petition claims to hold Frontier liable under direct infringement, or in the alternative, secondarily liable under contributory or vicarious infringement for its contractors and/or employees' infringements of the works *Rambo V: Last Blood*, *Angel Has Fallen*, *Leatherface*, *Mechanic: Resurrection*; *Criminal*; *Black Butterfly*; *All Eyez on Me*; *The Hitman's Bodyguard*; *I Feel Pretty*; and *Hunter Killer* on Frontier company accounts. Frontier opposes this request, which is out of time and without sufficient evidential basis.

The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties.

### A.    The RCCs' Contentions

1.    The RCCs seek to hold Frontier liable under the theory of contributory copyright infringement of 7,758 of their copyrighted sound recordings because Frontier provided high-speed internet service to known repeat infringers who used the service to infringe the RCCs' sound recordings.

2.    The RCCs, through their agent, sent Frontier 8,264 infringement notices between May 2, 2019 and March 10, 2020 (the Pre-Petition Claims) and the RCCs, through their agent, sent Frontier 23,460 infringement notices between April 14, 2020 – April 30, 2021 (the Administrative Claims), which made Frontier aware that specific Frontier subscribers were repeatedly infringing the RCCs' copyrighted works by downloading, uploading, or making those works available for downloading using peer-to-peer software over Frontier's network.  Frontier

14

received over 600,000 more infringement notices from third parties during this same period, many concerning the same subscribers at issue in the RCCs' infringement notices.

3.     Frontier did little to nothing to address the infringement notices it received.  It effectively had no repeat infringer policy, and its internal processes for responding to notices were developed to do as little as possible to stop the infringement on Frontier's network.

4.     The effect of Frontier's system was that Frontier continued to provide high speed internet service to the vast majority of repeat infringers who continued to infringe with impunity.

5.     Frontier's conduct was willful because it knew the infringement was occurring, but continued to facilitate the infringement by providing its high-speed network to the infringers.

6.     Under the law, Frontier is liable for willful contributory copyright infringement and for damages and remedies provided under Sections 504 and 505 of the Copyright Act.

### B.  The MCCs' Contentions

1.     The MCCs seek to hold Frontier liable under contributory copyright infringement for its users' infringements of their copyrighted Works because Frontier provided high-speed Internet service to known repeat infringers who used the service to infringe the motion picture and screenplay copyrights in MCCs' movies.

2.     The MCCs' agents sent over 200,000 infringement notices to Frontier between March 12, 2016 and Sept. 22, 2020 (the Pre-Petition claims) and 12,139 infringement notices between April 14, 2020 – April 30, 2021 (the Administrative Claims) which made Frontier aware that specific Frontier subscribers were repeatedly infringing the MCCs' copyrighted works by downloading, uploading, or making those works available for downloading using peer-to-peer software over Frontier's network.  Frontier received hundreds of thousands of more infringement

notices from third parties during this same period, many concerning the same subscriber

accounts that were the subject of MCCs' infringement notices.

3.      MCCs' counsel sent Frontier a demand letter by email and certified mail on

March 10, 2020 detailing concerns about widespread piracy of the MCCs' movies at Frontier

accounts ("3-10-2020 demand letter").  The 3-10-2020 demand letter included examples of IP

addresses that had been the subject of hundreds of infringement notices from MCCs.  The 3-10-

2020 demand letter also made Frontier aware that specific Frontier subscriber accounts were

repeatedly infringing the MCCs' copyrighted works.

4.      At least three IP addresses referenced in the 3-10-2020 demand letter were

implicated by the third-party Rightscorp as egregious infringing accounts in a demand letter

earlier in 2020.

5.      MCCs filed pre-petition claims between 6/8/2020-9/22/2020 that also described

certain egregious IP addresses.

6.      Frontier refused to terminate any of the accounts assigned the IP addresses

described in the 3-10-2020 demand letter or MCCs' pre-petition claims including the three that

were also implicated by Rightscorp.  Frontier did little to nothing to address the infringement

notices it received.  It effectively had no repeat infringer policy, and its internal processes for

responding to notices were developed to do as little as possible to stop the infringement on

Frontier's network.

7.      The effect of Frontier's system was to allow repeat infringers to continue to

infringe with impunity.

8.      Frontier's conduct was willful because it knew the infringement was occurring

but continued to facilitate the infringement by providing its high-speed network to the infringers.

16

9.      Under the law, Frontier is liable for willful contributory copyright infringement and for damages and remedies provided under Sections 504 and 505 of the Copyright Act.

10.     The MCCs Black Butterfly Film, LLC, AMBI Distribution Corp., Dubious Productions, Inc., Rupture CAL, Inc., Future World One, LLC, Groove Tails Productions, LLC, Nikola Productions, Inc., Eve Nevada, LLC, After II Movie, LLC, Wonder One, LLC, Millennium Funding, Inc., and MON, LLC  seek to hold Frontier secondarily liable for users of its Internet service sharing pirated copies of movies with false digital file CMI altered to refer to notorious piracy websites such as, for example, OMIKRON, STUTTERSHIT, YTS, RARBG and TorrentGalaxy in violation of 17 U.S.C. §1202.

11.     The infringement notices sent by MCCs' agents included the file title indicating the false altered CMI.

12.     Frontier provided high-speed Internet service to subscriber accounts known for repeatedly sharing pirated copies with false altered CMI.

13.     The MCCs seek to hold Frontier vicariously liable for its users' repeat CMI violations because Frontier has the right to supervise and control the CMI violations and infringing activity of users of its service and a direct financial interest in the CMI violations.

14.     Frontier's conduct was willful because it knew that its users were sharing pirated copies of MCCs' movies with false and altered file titles that referred to piracy websites but continued to facilitate the infringement and violations by providing its high-speed network to the infringers.

15.     Under the law, Frontier is secondarily liable for its users' violations of MCCs' right of integrity in the CMI of their works in violation of 17 U.S.C. §1202 and for damages and remedies provided under 17 U.S.C. §1203.

16.  Subject to Court ruling on MCCs' request to amend, MCCs Millennium Funding, Inc., Voltage Holdings, LLC, Black Butterfly Film, LLC, Rambo V Productions, Inc., Fallen Productions, Inc., Morgan Creek Productions, Inc. seek to amend their pre-petition claims to hold Frontier liable under direct infringement, or in the alternative, secondarily liable under contributory or vicarious infringement for its contractors and/or employees' infringements of the Works *Rambo V: Last Blood*, *Angel Has Fallen*, *Leatherface*, *Mechanic: Resurrection*; *Criminal*; *Black Butterfly*; *All Eyez on Me*; *The Hitman's Bodyguard*; *I Feel Pretty*; and *Hunter Killer* on Frontier company accounts.

**C. Frontier's Contentions**

1.  Frontier denies all claims asserted by RCCs and MCCs.

2.  As a threshold matter, the Claimants must prove direct infringement occurred before they can proceed with a claim against Frontier for secondary liability. To do so, the Claimants must prove ownership of valid copyrights and direct infringement by a person for whose conduct Frontier is responsible.

3.  The Claimants lack evidence sufficient to establish direct infringement. In some cases, they are unable even to prove copyright ownership. In all cases, they are unable to prove direct infringement by a person for whom Frontier is responsible.

4.  Contrary to the assertions of the Claimants, the notices sent by the Claimants' agents do not prove an underlying act of direct infringement for which Frontier may be held responsible. In fact, these notices are hearsay and inadmissible for their truth. Notices sent by third parties are likewise inadmissible hearsay.

5.  Further, and also contrary to the Claimants' assertions, notices did not provide Frontier with knowledge that an infringement had occurred or would occur. Claimants did not

provide Frontier with their "evidence packages" until discovery. In any event, the "evidence

packages" collected by their agents do not prove copyright infringement by Frontier's

subscribers or even by anyone using Frontier's network.

6.      Frontier did not have knowledge that specific infringements had occurred or

foreknowledge that infringements would occur.

7.      Frontier's internet service is capable of and primarily serves non-infringing uses.

Mere provision of internet service does not materially contribute to any infringing activity.

8.      Frontier has not influenced or encouraged anyone to share copyrighted materials

unlawfully, actively participated in anyone's decision to share such materials unlawfully, or

acted in concert with any infringer.

9.      Frontier did not have any direct financial interest in any alleged infringing

activity.

10.     Frontier did not have the right or ability to supervise any infringing activity.

11.     Frontier did not act willfully with regard to any of the alleged conduct underlying

the Claimants' claims for secondary copyright infringement. To the contrary, Frontier went to

substantial effort to reduce infringement by those using its network.

12.     Frontier's efforts to avoid infringement on its network were successful.

Approximately 98% of its subscriber accounts were never the subject of an allegation of

copyright infringement. Most of the remainder were the subject of only a small number of

allegations. Most of the subscriber accounts that were subject to more than a low threshold

number of notices stopped being subject to such notices after receiving one or a few notifications

from Frontier. In appropriate circumstances, Frontier terminated subscriber accounts.

13.    MCCs lack sufficient evidence to support their false copyright management information claims. Among other things, there is no evidence that any of the persons accused of the primary CMI violations acted with the requisite scienter, and there is also no evidence Frontier knew that they had so acted.

14.    Frontier did not have knowledge of any CMI violations, promote a product designed to facilitate such violations, have the right or practical ability to control CMI violations, or have a direct financial interest in such violations.

15.    Frontier qualifies for the safe harbor set out in the DMCA and is protected from monetary liability for secondary copyright infringement.

16.    Frontier is a conduit internet service provider – it provides the pipes that others use to access the internet.

17.    Frontier's Acceptable Use Policies ("AUPs") state that subscribers cannot use Frontier's network to engage in copyright infringement. Its AUPs include a repeat infringer policy that has been in place since at least 2015, which provides: "Repeated copyright infringements are grounds for termination."

18.    Frontier's AUPs are available on Frontier's website for review by every subscriber, and Frontier's Terms of Service incorporate the applicable AUP and need to be acknowledged by subscribers before they can utilize Frontier's internet service.

19.    Frontier has reasonably implemented its repeat infringer policy. Frontier employs a graduated approach that includes processing email notices alleging copyright infringement at Frontier IP addresses at specific dates and times, identifying associated subscriber accounts where possible, notifying subscribers whose accounts have been subject to a low threshold number of such notices of any further allegations, responding to subscriber inquiries, evaluating

accounts subject to the most notices for possible termination, and terminating subscriber accounts in appropriate circumstances.

20.    Frontier has not failed to accommodate or interfered with any standard technical measures.

21.    To the extent MCCs are permitted to pursue direct copyright infringement claims, which are not asserted in their proofs of claim, they are unable to identify any person who committed such infringement and unable to show that any such person is one for whom Frontier is responsible.

22.    RCCs registered and initially released most of their sound recordings as compilations—albums—and all sound recordings on each album constitute a single "work."

23.    There is no evidence anyone uploaded, downloaded, or shared any of MCCs' screenplays using Frontier's network, nor that anyone performed any of the screenplays or played any of the movies using Frontier's network.

24.    Frontier's provision of internet service to its subscribers was not a proximate cause of any harms allegedly caused to RCCs or MCCs by the users of other ISPs' networks.

25.    Non-monetary remedies are inappropriate, and some of the remedies MCCs seek are impossible.

## V.    ISSUES TO BE TRIED

**Issues to be tried for the RCCs:**

1. Whether Frontier is liable for contributory copyright infringement, and whether that infringement was willful;

2. Whether Frontier is eligible for the DMCA safe harbor defense under 17 U.S.C. §§ 512(a) and 512(i)[6]; and

3. If Frontier is liable, the amount of damages that should be awarded to the RCCs.

**Issues to be tried for the MCCs:**

1. Whether Frontier is directly liable for copyright infringement of certain MCC works at its company accounts, or in the alternative, secondarily liable for said copyright infringements, and whether that infringement was willful.

2. If Frontier is liable for copyright infringement at company accounts (directly or secondarily), the amount of damages that should be awarded to the MCCs.

3. Whether Frontier is secondarily liable for violations in the integrity of certain MCC works under 17 U.S.C. §1202.

4. If Frontier is liable for violations in the integrity of certain MCC works, the amount statutory damages that should be awarded to the MCCs.

5. Whether Frontier is liable for contributory copyright infringement at subscriber accounts, and whether that infringement was willful.

6. Whether Frontier is eligible for the DMCA safe harbor defense under 17 U.S.C. §§ 512(a) and 512(i).

7. If Frontier is liable for contributory copyright infringement, the amount of damages that should be awarded to the MCCs.

8. Whether Frontier should be enjoined to block access by DNS blocking of notorious piracy websites hosted in foreign countries that distribute links to pirating MCCs' works.

9. Whether MCCs were prejudiced by Frontier's spoliation of evidence.

---

[6] The RCCs are mindful that the District Court withdrew the reference as to the Safe Harbor Defense on the Pre-Petition claims. The RCCs are prepared to allow the Bankruptcy Court to rule on the Safe Harbor Defense in the first instance. *See* ECF No. 2240.

10. Whether Frontier's spoliation of evidence was done with intent to deprive claimants of evidence.

The RCCs and the MCCs reserve the right to seek appropriate, tailored injunctive relief based on the outcome of this proceeding.

## FRONTIER'S OBJECTIONS

In addition to its denial of all claims and its assertion of its affirmative defense under the DMCA safe harbor, 17 U.S.C. § 512, Frontier objects to MCCs' belated requests to amend their claims, including to add claims for direct infringement or to add claims of infringement of additional works. Frontier further objects to any claims extending beyond the applicable statute of limitations. Frontier also objects to Claimants' requests for injunctive relief.

## VI.   THE RCCS' EXHIBITS

The RCCs' exhibit list with Frontier's objections to specific documents is attached hereto as **Exhibit A**. In addition, Frontier objects to any compilation exhibits that are not reasonably defined and based on a discrete organizing principle. Further, where RCCs have included within any compilation exhibit any document that is subject to objection, Frontier objects to the admission of the entire exhibit.

## VII.   THE MCCS' EXHIBITS

The MCCs' exhibit list with Frontier's objections to specific documents is attached hereto as **Exhibit B.** In addition, Frontier objects to any compilation exhibits that are not reasonably defined and based on a discrete organizing principle. Further, where MCCs have included within any compilation exhibit any document that is subject to objection, Frontier objects to the admission of the entire exhibit.

## VIII.   FRONTIER'S EXHIBITS

23

Frontier's exhibit list with Claimants' combined objections is attached hereto as **Exhibit C.**

## IX.    STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS

Generally, the parties have set forth their objections with respect to exhibits listed on Exhibits A-C, but given the volume of exhibits and evidence, reserve the right to raise unforeseen objections at trial.

## X.    CLAIMANTS' WITNESS LISTS

**The RCCs:**

**The RCCs intend to call, live, either in their case in chief or for cross-examination, the following witnesses:**

1. Alasdair McMullan
2. Tracie Parry
3. Jason Gallien
4. Jeff Walker
5. Wade Leak
6. Lou Dickler
7. William Pittenger
8. Jeremy Landis
9. Jason Allen
10. Kristofer Buchan
11. Barbara Frederiksen-Cross
12. William Lehr
13. Paul Garcia
14. Josh Elmore
15. Jesse Ross
16. Albert Mauri
17. Kevin Vosburgh
18. Todd Wells
19. Phil Hazzard
20. Philippe Levan
21. Laurie Alm
22. Scott Mispagel

The RCCs are submitting witness statements for 1-9 contemporaneously by email, and to the Court in binders, with Frontier's objections.

**The RCCs intend to call the following additional witnesses by deposition designation:**

1. Sandra Abrego
2. Derk Steggewentz[7]
3. John Greifzu
4. Kyle Morrison
5. Vincent Messina
6. Greg Hartman
7. Sean Murphy
8. Todd Simpson
9. Eric Vilim

The RCCs are submitting each of transcripts 1-8 contemporaneously by email, and to the Court in binders, with designations, counter-designations and objections, and objections to counter-designations. The transcript deposition of Mr. Vilim was only just received and will be submitted as soon as possible. The RCCs reserve the right to examine any witnesses called by the MCCs or Frontier.

**The MCCs:**

**Trial Witnesses MCCs Expect To Present Through Live Testimony:**

1. Jonathan Yunger
2. Sarah Dunn
3. Richard Rionda
4. Paul Hertzberg
5. Chris Taylor
6. Stephen M. Bunting
7. Michael J. Chapman
8. Thomas Nowak
9. Nike Ho*
10. Yanhua Guan*

*MCCs will call to testify only if Frontier's objections to their written testimony is sustained*

If Frontier's objections to the written testimony of Yanhua Guan and Nike Ho are sustained, MCCs request leave for them to testify remotely since their testimony is limited to

---

[7] The RCCs only intend to call Mr. Steggewentz by deposition designation if the Court does not grant the RCCs Motion *in Limine* To Exclude Events After the Bankruptcy Case Period (submitted by e-mail on March 28, 2025 ).

25

authenticating certain documents.[8] Mr. Hertzberg will be presented through his witness statement and Frontier waives the right to cross-examine him.

MCCs are submitting each of these witness statements contemporaneously by email with Frontier's objections.

### Trial Witnesses MCCs Expect to Present Through Deposition:

1. Brandon Yassim
2. Alvin Mathew
3. Luca Matrundola
4. Daniel Arheidt
5. David Fannon
6. Todd Simpson

MCCs are submitting each of these transcripts contemporaneously by email with designations, counter-designations and objections, and objections to counter-designations.

### Trial Witnesses From Frontier MCCs Expect To Present Through Deposition (unless called live by Frontier or the RCCs):

1. Greg Hartman
2. John Greifzu
3. Kyle Morrison
4. Vincent Messina
5. Phillip Hazzard
6. Todd Wells
7. Scott Mispagel
8. Sandra Abrego
9. Lauri Alm
10. Derk Steggewentz[9]

### Trial Witnesses from Frontier MCCs expect to Present at Trial Live:

1. Paul Garcia
2. Jesse Ross
3. Josh Elmore
4. Sean Murphy
5. Philippe Levan

---

[8] Frontier disagrees with this characterization of their intended testimony, which is laden with characterizations of files as "legitimate" and "pirated," and objects to any witness testifying remotely.
[9] The MCCs also only intend to call Mr. Steggewentz by deposition designation if the Court does not grant the RCCs' Motion *in Limine* To Exclude Events After the Bankruptcy Case Period.

26

6. Albert Mauri
7. Kevin Vosburgh

## XI.    FRONTIER'S WITNESS LIST

**Trial Witnesses Frontier Expects to Present Through Written Direct Testimony**

1. Laurie Alm
2. Josh Elmore
3. Paul R. Garcia
4. Phillip K. Hazzard, Jr.
5. Philippe Levan
6. Albert Mauri
7. Scott Mispagel
8. Jesse Ross
9. Kevin Vosburgh
10. Leslie T. Wells

Frontier submitted each of these witness statements on April 1, 2025, by email with

Claimants' objections. Frontier has also submitted hardcopies of these materials by overnight

mail.

**Trial Witnesses Frontier Expects to Present at Trial Through Deposition (to the extent not called live by MCCs or the RCCs)**

1. Mark Collins
2. Derk Steggewentz

Frontier submitted the transcript of Mr. Collins' deposition on April 1, 2025, by email

with designations, counter-designations and objections, and objections to counter-designations.

Frontier has also submitted hardcopies of this transcript by overnight mail. Mr. Steggewentz's

transcript is being submitted by RCCs.

**Trial Witnesses Frontier Expects to Present at Trial Live**

1. Keith Epstein
2. Courtney Fletcher
3. Jason Frankovitz
4. Andreas Groehn
5. Chase Perry
6. Christopher Sprigman
7. Alasdair McMullan

27

8.   Tracie Parry
9.   Jason Gallien
10.  Jeff Walker
11.  Wade Leak
12.  Lou Dickler
13.  William Pittenger
14.  Jeremy Landis
15.  Jason Allen
16.  Jonathan Yunger
17.  Sarah Dunn
18.  Richard Rionda
19.  Chris Taylor
20.  Thomas Nowak
21.  Nike Ho (only if called live)
22.  Yanhua Guan (only if called live)
23.  Luke Morris
24.  Stephal Aban
25.  Dana Phan
26.  Alvin Mathew (if his declaration is offered)
27.  Bao Huynh (if his declaration is offered)
28.  Diane Burdick (if her declaration is offered)
29.  Terence Decker (if his declaration is offered)
30.  Venkat Yeruandi (if his declaration is offered)
31.  Daniel Arheidt (if his declarations are offered)
32.  Matt Wheeler (if his declaration is offered)

## XII.    RELIEF SOUGHT

**The RCCs**: The RCCs seek:

a)  statutory damages in an unliquidated amount based upon Frontier's willful

acts of infringement of their copyrighted sound recordings and unauthorized

acts pursuant to the Copyright Act, 17 U.S.C. §§ 101 *et seq*. and costs and

disbursements of this action,

b)  reasonable attorneys' fees, pursuant to 17 U.S.C. § 505,

c)  pre-judgment and post-judgment interest, to the fullest extent available, and

d)  such other further relief as a court deems just and proper.

**The MCCs:** The MCCs seek statutory damages pursuant to 17 U.S.C. §504(c) in an unliquidated amount based upon Frontier's willful acts of contributing to its users' infringements of the screenplay and motion picture copyrights in their movies and unauthorized acts pursuant to the Copyright Act, 17 U.S.C. §§ 101 *et seq*.

The MCCs also seek statutory damages pursuant to 17 U.S.C. §1203(c)(1)(B) in an unliquidated amount based upon Frontier's willful acts of contributing to its users' (i) providing copyright management information that was false in violation of §1202(a)(1); (ii) distributing copyright management information that was false in violation of §1202(a)(2); (iii) distributing copyright management information that the users knew had been altered without the authority of MCCs or the law in violation of §1202(b)(2); and/or (iv) distributing copies of MCCs' works knowing that copyright management information has been removed or altered without authority of the MCCs or the law.

MCCs also seek their costs and disbursements of this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. §§ 505 and 1203(b)(5), pre-judgment and post-judgment interest, to the fullest extent available,

MCCs further request the Court grant an injunction ordering Frontier to terminate accounts of customers that have repeatedly infringed MCCs' Works and block access on the domain name service ("DNS") level of foreign piracy websites thepiratebay.org, 1337x.to, YTS.MX and torrentgalaxy.to and any of their proxy websites pursuant to 17 U.S.C. §§502(a) and 512(j)(1)(B).

MCCs request such other further relief as a court deems just and proper.

**Frontier**: Frontier seeks:

Disallowance of all proofs of claim submitted by RCCs and MCCs.

Declaration that Frontier is entitled to a safe harbor under the Digital Millennium

Copyright Act, 17 U.S.C. § 512, for any acts of infringement committed by users of Frontier's

network through April 30, 2021. The Claimants object to this relief as Frontier has never

previously indicated any request for declaratory relief.

An award of Frontier's fees and costs, including attorneys' fees, under 17 U.S.C. § 505.

Such other and further relief as the Court deems just and proper.


Dated:  April 2, 2025

/s/ Matthew J. Oppenheim
Counsel for the Record Company Claimants

/s/ Kerry S. Culpepper
Counsel for the Movie Company Claimants

/s/ Stanley A. Twardy, Jr.
Counsel for Frontier Communications Corp.


Dated:  April 21, 2025
**IT IS SO ORDERED:**

**/s/Martin Glenn**
**Martin Glenn**
**UNITED STATES BANKRUPTCY JUDGE**